LATHAM & WATKINS LLP
   Peter M. Gilhuly (Bar No. 151516)
   *peter.gilhuly@lw.com*
   Daniel Scott Schecter (Bar No. 171472)
   *daniel.schecter@lw.com*
   Amy C. Quartarolo (Bar No. 222144)
   amy.quartarolo@lw.com
   Nima H. Mohebbi (Bar No. 275453)
   *nima.mohebbi@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Telephone:  +1.213.485.1234
Facsimile:  +1.213.891.8763

Attorneys for Plaintiffs Dikla Gavrieli
a/k/a Dikla Gavrieli Unatin and Dean K. Unatin

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>KFIR GAVRIELI,<br><br>     Debtor.<br><br>DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, individually and derivatively on behalf of GAVRIELI BRANDS, LLC d/b/a TIEKS BY GAVRIELI, a California limited liability company, and DEAN K. UNATIN, an individual,<br><br>     Plaintiffs,<br><br>  v.<br><br>KFIR GAVRIELI, an individual,<br><br>     Debtor,<br><br>  - and -<br><br>GAVRIELI BRANDS, LLC d/b/a TIEKS BY GAVRIELI, a California limited liability company,<br><br>     Nominal Defendant. | Case No. 2:21-bk-10826-BB<br>Chapter 11<br>Adversary No._____<br><br>**COMPLAINT FOR:**<br><br>1) **NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523;**<br>2) **NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523;**<br>3) **CONTRACTUAL INDEMNITY; AND**<br>4) **UNJUST ENRICHMENT**<br><br>**VERIFIED DERIVATIVE CLAIMS FOR:**<br><br>5) **EXPULSION OF DEBTOR AS MEMBER OF GAVRIELI BRANDS, LLC;**<br>6) **APPOINTMENT OF RECEIVER;**<br>7) **BREACH OF FIDUCIARY DUTY;**<br>8) **CORPORATE WASTE;**<br>9) **CONVERSION;**<br>10) **UNJUST ENRICHMENT;**<br>11) **VIOLATION OF CALIFORNIA PENAL CODE § 496;**<br>12) **ACCOUNTING; AND**<br>13) **NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523** |

Plaintiffs Dikla Gavrieli a/k/a Dikla Gavrieli Unatin ("Dikla") and Dean Unatin ("Dean," and together with Dikla, the "Unatins" or "Plaintiffs") hereby complain and allege against Debtor Kfir Gavrieli ("Debtor" or "Kfir") as follows:

1.      Plaintiffs consent to the entry of a final order by the Court in connection with this adversary proceeding to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## NATURE OF THE ACTION

2.      "Reprehensible."  That was the express finding of the Los Angeles Superior Court regarding Debtor's behavior toward his sister, Plaintiff Dikla Gavrieli Unatin.  It came after a six-week jury trial and over a year of post-trial motion practice, affirming the jury's sweeping findings of malice, fraud, and oppression on every tort claim submitted by the Unatins.

3.      Debtor's conduct was shocking.  He declared "nuclear war" on Dikla (in writing).  He set out on a plan (in writing) to cripple her financially.  He threatened to "destroy her life," and then did everything he could to do so.  He browbeat her with vile epithets (in writing).  He did this all in an attempt to steal her interest in the successful company co-owned and operated by Dikla, founded upon Dikla's idea, and because of her resistance to his tax scheming.  On an overwhelming record of Debtor's misconduct, the Superior Court held that "Kfir's actions were reprehensible:  he put his own greed and financial interests above the interests of the other co-owner, Dikla."[1]

4.      This is a heartbreaking case that demonstrates what happens when ego, greed, and undeserved entitlement overwhelms a person.  It is not a normal bankruptcy proceeding.  Rather, it is a continuation of Debtor's solemn threat to Dikla when she refused to submit to his takeover and tax scheme, in his last ever text message to her:  "I'll come at you. . . All day, every day, til the day I die."[2]  Debtor's bankruptcy petition is simply another step in this absolutely vile

---

[1] *See* Ex. C at  21.  Ex C is the Superior Court's December 16, 2020 Order on the Debtor's Motions for JNOV and New Trial in the matter of *Gavrieli v. Gavrieli*, Los Angeles Superior Court Case No. BC686856 (the "State Court Litigation").

[2] *See* Ex. D (Trial Ex. 1969).

2

campaign of terror he began inflicting in 2017, to steal the company he and both the Unatins built together for nearly a decade (Gavrieli Brands, LLC, the "Company"), and virtually every dollar it ever made.  Debtor's plan is transparent:  He is trying to force Dikla to capitulate, hoping she will sell her interest in the Company to him for a fraction of its worth.  He has gone so far as to put the Company into freefall since unlawfully seizing control over three years ago.

5.     Debtor used his initial filings in this bankruptcy case to try and cast himself as a good-natured businessman in need of bankruptcy protection.  Neither is true.  He is seeking to ram through a plan of reorganization that is completely unnecessary for him financially and is transparently structured to maximize prejudice to the Unatins, against whom he openly proclaimed and waged "war" for the last several years.

6.     The overwhelming evidence demonstrates that Debtor did not file this case because he is in financial distress or otherwise needs this Court's assistance to reorganize.  He routinely touts his education, self-proclaimed business acumen, and abilities to generate wealth. Debtor's filings claim a current $21 million positive net worth (even using a vastly understated value of the Company), and demonstrate that he has access to over $45 million in liquid assets and credit.  He plainly has no bona fide need for the Court's assistance to reorganize his affairs. Despite this liquidity and net worth, Debtor seeks to weaponize the Bankruptcy Code, by singling out the Unatins' claims for the worst treatment possible, while paying out to various insider and friendly creditors the very funds he stole from the Unatins.

7.     Against this backdrop, Plaintiffs, in their individual capacity, bring this adversary proceeding so that this Court can adjudicate multiple claims against Debtor that are essential to the administration of this bankruptcy case:

a.     Plaintiffs seek an Order that their claims against Debtor arising from the Final Judgment in the State Court Litigation are nondischargeable pursuant to 11 U.S.C. Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6).[3]  Debtor's heinous actions already have

---

[3] The term "Final Judgment" as used herein refers to that certain Judgment entered on January 22, 2021 by the Court in the State Court Litigation, attached hereto as Ex. A.  The Court's Statement of Decision, entered on October 9, 2020, is attached hereto as Ex. B.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1    been adjudged by the judge and jury in the State Court Litigation to have been

2    "reprehensible" and the product of malice, fraud, and oppression.  On that basis and the

3    overwhelming record of Debtor's conduct, Plaintiffs' claims are nondischargeable.

4           b.       Debtor is also in breach of an agreement entered into during the State

5    Court Litigation, regarding his refusal to distribute proper tax payments for the Unatins

6    for the 2017, 2018, and 2019 tax years, after unlawfully seizing total control of the

7    Company's funds and bank accounts.  As a pass-through entity for tax purposes, the

8    Company's income is attributed directly to its owners, even where no income is actually

9    distributed to them.  As a result, the Company has always paid the resulting taxes as

10    necessary.  Since Debtor stole control of the Company and its funds, the Unatins have

11    been completely dependent on him to release those tax payments.  Because of Debtor's

12    false claims trumped up for litigation that he owned 60% of the Company,[4] he refused

13    repeated demands for tax payments on a 50/50 basis (or even a 60/50 basis in his favor to

14    ensure there was no underpayment for either side).  Debtor instead created a massive

15    overpayment for himself, and equally large underpayment for the Unatins.  On April 11,

16    2018, to avoid immediate court intervention, Debtor agreed to personally indemnify

17    Dikla for any underpayment and penalties associated with the tax payments, and to return

18    any overpayment created to the Company.  However, with his false claim to majority

19    ownership thoroughly rejected, he has failed to honor this agreement.

20           c.       Debtor retains substantial sums that are the fruits of his unlawful conduct

21    which were not part of the Final Judgment in the State Court Litigation, and which have

22    resulted in Debtor's unjust retention of funds at Dikla's expense following the Superior

23    Court's acceptance of Debtor's argument that Dikla elected monetary damages in lieu of

24    title to the joint investments, which are managed by Debtor's close friends and whose

25

26    [4] Debtor's attempt to justify his misconduct at trial was based on his unsupported claim to 60% ownership of the Company and sole control based on, *inter alia*, his "inherent" value as a person, which he claimed

27    rendered him free to take the astonishing steps he took in 2017 to destroy his sister.  Unsurprisingly, the jury (and the Superior Court) rejected each of these absurd claims, and the Superior Court issued a

28    declaratory judgment and other equitable relief (including a permanent injunction) that confirmed that Dikla and Kfir own the Company 50/50 and have joint and equal management authority over it.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1    true value was concealed for years. These sums include the following (the "Unjustly

2    Retained Investment Funds"): (i) 50% of the actual value of investments and other assets

3    which Debtor vigorously fought to exclude from trial in the State Court Litigation (based

4    largely on the absence of substantial financial information he and others working to aid

5    him had concealed)[5], but which his own Schedules make clear far exceed the damages

6    awarded, less the amounts awarded in the Final Judgment in connection with these

7    investments; and (ii) 50% of the proceeds of investments Debtor made with Company

8    profits, which were to be owned jointly by Debtor and Dikla, and were nevertheless

9    retained by Debtor (including Dikla's share of millions of dollars in cryptocurrency

10    holdings made with investment returns, above and beyond the damages reflected in the

11    Final Judgment, some of which Debtor now vaguely claims were lost to "hacking"). The

12    Final Judgment did not include the full amount of the Unjustly Retained Investment

13    Funds, resulting in unjust enrichment to Debtor of millions of dollars. Moreover, Debtor

14    used the Unjustly Retained Investment Funds before filing this case to give favorable

15    treatment to his creditors, who consist largely of friends and family; this deserves

16    considerable scrutiny by this Court.[6]

17        8.    In addition, Dikla brings the following claims against Debtor individually and

18    derivatively on behalf of the Company as follows:

19            a.    Although the Unatins and Debtor built and managed the Company jointly

20    from its inception until he abruptly disappeared from December 2016 to September 12,

21

22    [5] Debtor lied to the Court, claiming that he did not know the fair market value of the investments. Yet, in his bankruptcy filings, he has estimated their value to the penny.

23    [6] During the pendency of the State Court Litigation, Debtor's friend, Daniel Murillo, who manages
24    several real estate entities which received millions of dollars of Debtor and Dikla's funds, and aided
      Debtor's misconduct, entered into a standstill agreement with Dikla to provide Dikla copies of all investor
25    communications provided to Debtor in exchange for delaying any necessary legal action against him
      while he was in compliance. In addition, Debtor agreed to maintain funds distributed from Mr. Murillo's
26    entities in a designated account (-0112) at First Republic Bank. In November 2020—several weeks after
      judgment was first entered in the State Court Litigation—Debtor abrogated this standstill agreement and
27    withdrew Dikla's already limited visibility on the -0112 account. His Schedules make clear that in the
      weeks that followed, and prior to filing this bankruptcy case, Debtor drained nearly all the contents of the
28    -0112 account (approximately $4 million), and used those funds for unknown purposes which will be the
      subject of discovery in this adversary proceeding.

5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1   2017, Debtor has been in sole, total, and complete control of the Company since

2   unlawfully ousting the Unatins in late-2017—outright refusing every reasonable demand

3   Dikla has made to reassert joint control.

4       b.      During Debtor's sole control of the Company, he has presided over a 75%

5   decline in the Company's profits.

6       c.      Moreover, based on Debtor's filings in this case and trial testimony from

7   his own financial expert (Bruce Strombom) in the State Court Litigation, Debtor is

8   claiming that he presided over a drop of at least 90% in the Company's value since

9   Debtor launched his "nuclear war" in late-2017.  At trial, Debtor's financial expert valued

10  the Company at $388 million as of year-end 2017.  Yet Debtor's Schedules claim a

11  current $20 million valuation for his 50% share.  If Debtor's Schedules are truthful, he

12  has admitted the Company has a total current value of $40 million or less, and thus he has

13  admitted to destroying 90% of the Company's value during his watch.  He did this

14  incredible damage to the Company to further his personal scheme to force Dikla out and

15  buy her interest for pennies on the dollar.  (Dkt. 17 at 9.)

16      d.      Apart from the fiscal harm Debtor has caused to the Company, Debtor

17  engaged in transparently sexist and harmful conduct in forcefully removing his sister, the

18  co-owner and co-founder and visionary of a company which purports to stand for

19  women's empowerment.  Triggered by his obsessive and unfounded demand to be called

20  "the boss,"[7] Debtor has caused substantial harm to the Company's brand.

21      e.      The foregoing and other facts demonstrate that Debtor has deliberately put

22  the Company in a nosedive, hoping to deflate its value and reduce the price at which he

23  seeks to buy Dikla's share in a resolution of the conflict he manufactured for that very

24  purpose.  By ousting the Unatins from the Company, willfully suppressing the

25  Company's performance to advance his personal interest at the Company's expense, and

26

27  [7] See Ex. E (Trial Ex. 152) ("I'm Dikla's boss. Tell her!"); Ex. D (Trial Ex. 1969) ("You've forced me to
    come back to the office earlier than I should you dirty whore.  Challenge my authority today and see what
28  happens"; "Be in the office on Monday if you accept I'm boss on all things.  No exceptions.")

6

1    failing to take basic steps to foster its success or growth (including several strategies

2    which were identified specifically by the Unatins during the State Court Litigation),

3    Debtor is liable to the Company for breaching his fiduciary duties, waste of corporate

4    assets, unjust enrichment, and more.  Given the drop in Company profits and value

5    according to Debtor, these damages may exceed $300 million.[8]

6         f.    In addition to this monetary relief, on these derivative claims, Dikla, on

7    behalf of the Company, seeks expulsion of Debtor as a member of the Company and

8    appointment of a receiver under California law.  The undisputed facts, now credited by a

9    12-person California jury and three Superior Court judges, establish that Debtor's

10    conduct was "reprehensible."  It is the conduct of a malevolent actor hell-bent on doing

11    everything he can to destroy the Company for the sole purpose of achieving the lowest

12    possible settlement value for the State Court Litigation.  The jury's verdict that Debtor

13    breached his fiduciary duties in his capacity as a member of the Company creates a more

14    than adequate basis to eject Debtor from the Company and remove him from any

15    significant capacity at the business, and specifically the "sole" control he gained as a

16    direct result of his unlawful conduct.  His extensive record of financial misconduct and

17    other unlawful acts, including the ongoing exclusion of Dikla from the Company, are

18    grounds for such relief as well.  He must be excised from the membership of the

19    Company to prevent him from causing further irreversible damage to the business and

20    brand.

21         g.    Moreover Dikla, on behalf of the Company, seeks an Order that the

22    derivative claims set forth in this Complaint are nondischargeable pursuant to 11 U.S.C.

23    Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6).

24

25

26

27    [8] Even in the face of these declines, Debtor refused Dikla's various proposals after trial, including "that
the Company engage a financial advisor to be selected and overseen by mutual agreement of Mrs. Unatin

28    and Mr. Gavrieli . . . to review the Company's options and situation (and Mrs. Unatin's and Mr.
Gavrieli's options as owners)."  *See* Ex. F (December 3, 2019 email from D. Schecter to M. Camp).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

**JURISDICTION, VENUE, AND THE PARTIES**

9.      On February 1, 2021, Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code.  This adversary proceeding is brought in connection with *In re: Kfir Gavrieli*, No. 2:21-bk-10826-BB (Bankr. C.D. Cal.) now pending in this Court (the "Bankruptcy Case").  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 523.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. § 1409.

10.      Plaintiffs Dikla Gavrieli Unatin and Dean Unatin are individuals residing in this District.

11.      Debtor is an individual residing in this District.

12.      Nominal Defendant Gavrieli Brands, LLC is a California limited liability company with its principal place of business in this District.

**GENERAL ALLEGATIONS**

**A.      Debtor's "Nuclear War" Against the Unatins.**

13.      As discussed above, Debtor's bankruptcy filing is the latest phase of a "war" he declared (in writing) and has waged on his sister and brother-in-law for several years.[9]

14.      Debtor's scheme to unlawfully steal control of the Company, along with virtually all the profits it ever produced (and accompanying rage), was fueled by the Unatins' resistance and refusal to perpetuate Debtor's improper tax scheme.  That led to Debtor launching a plot whereby he disappeared for months to scheme a way to steal the business and oust the Unatins, and then violently confronted them on the eve of the Company's tax deadline in September 2017.  He did so with stunning threats accompanied by violence, and then unilaterally filed a tax return which dramatically understated the Company's income.  Debtor then locked the Unatins out of

---

[9] *See e.g.* Exs. G and H.  Ex. G (Trial Ex. 150) consists of a series of text messages between Debtor and Dikla sent between June 12 and 14, 2017.  Ex. H (Trial Ex. 1834) consists of a series of text messages between Debtor and his mother and his one complicit sister, sent between September 12 and 19, 2017. These texts contain examples of Debtor's rage-fueled epithets about Dikla to one of their sisters, and his exhortations to and threats of physical violence, in the hours after the incidents of September 12, 2017, when he returned to the Company from a long absence.

the Company, cut off their access to funds, and stashed millions in Company and personal funds he had stolen from the Unatins in secret accounts.

15. Beyond his egregious financial and business misconduct, Debtor waged his war through horrible psychological abuse, including repeated written (and oral) epithets—calling Dikla a "dirty whore," "f***ing slut," and "bitch," among other heinous slurs.[10] Debtor's outbursts—documented in numerous text messages, emails, and a voicemail which revealed the depth of his fury at trial—exploded into physical violence on September 12, 2017. That day, when he sought to oust Dikla and Dean from the Company, Debtor became so enraged that he inflicted deep bruises on Dikla's body as well as a fractured rib.[11]

16. Ultimately, financial pain and continued threats became the prime weapon of choice for Debtor against his sister and brother-in-law. He ejected them from the Company they had built together for nearly a decade—created from Dikla's product idea and using Dean's life savings to seed—swiftly withdrawing the entire contents of the Company's bank account in a cashier's check ($5.26 million). This came after the bank refused Debtor's fraudulent efforts to remove Dikla and Dean as signatories from the account, an account the Unatins themselves had opened in 2009, and rejected his lies about the Unatins' role at the business.[12] He walked that cashier's check to a bank near his home that the Company had never used (First Republic Bank), opened a secret account that the Unatins did not know of—let alone could access or control—and then diverted all the Company's revenue to that secret account. Debtor diverted over $25 million between October and December of 2017 before the Unatins gained a small modicum of visibility by initiating litigation and obtaining injunctive relief. While concealing his acts, Debtor spent Company funds freely and lavishly, with millions of dollars used for expenses and

---

[10] *See* Exs. D, E, and G (Trial Exs. 1969, 152, and 150). Exs. D, E, and G consist of a series of text messages between Debtor and Dikla and Debtor's other sister Yamit from June and September of 2017.

[11] *See* Exs. N, O, and P to Dkt. 48 (Schecter Declaration in Support of Objection to Applications to Shorten Time for Hearing on First-Day Motions). These exhibits document physical harm Debtor inflicted on Dikla on September 12, 2017, including medical records, photographic evidence, and Dikla's gripping trial testimony of the incidents of that day.

[12] As the Company's banker at Bank of America testified at trial, Debtor lied to the bank, claiming that Dikla and Dean had simply "quit" the Company.

1  payments for himself and those who conspired with him.

2      17.   Debtor also stole millions of dollars through "investments" he purported to make

3  on behalf of the parties, using Company profits they each owned, and millions more in

4  distributions and gains from the parties' admittedly joint investments that Debtor received and

5  intentionally hid from the Unatins.  For years, Debtor told Dikla and Dean that he needed to put

6  the investments "temporarily" in his name (for various reasons), but ultimately refused to return

7  them or even provide information about them.  While repeatedly telling Dikla he would never

8  steal from her, the investments generated millions of dollars in returns, which Debtor deposited

9  into a secret bank account in his name alone and concealed entirely from the Unatins.  Debtor's

10  secret account of stolen funds remained hidden until discovery in the State Court Litigation

11  revealed not only its existence, but that Debtor had opened it in 2015 shortly after the parties'

12  first joint investment, demonstrating the length and extent of Debtor's scheming.  Debtor also

13  brazenly used substantial investment returns (50% of which were owned and should have

14  immediately been received by Dikla and Dean) to secretly purchase cryptocurrency and other

15  assets for himself, and further conceal those assets from the Unatins.  These investments and

16  other assets stolen from the Unatins now make up the bulk of the liquid and secured assets which

17  he now proposes be distributed to his friends and family through the bankruptcy.

18      18.   Debtor also controls over $13 million dollars of funds held in offshore bank

19  accounts in Hong Kong.  He claims a 50% ownership in those accounts, conceding that the other

20  50% belongs to Dikla as ordered by the Superior Court in imposing a constructive trust over

21  those funds in the State Court Litigation.[13]  Although those funds are earmarked for tax

22  payments, Debtor has consistently refused to repatriate or distribute them despite Dikla's express

23  and repeated demands.  All of this, and much more, is part of Debtor's shameless plan to cripple

24  the Unatins financially, continue to profit from his egregious misconduct, punish Dikla for

25  resisting him, and force her to give in to his perverse desire to do as he pleases with the

26

27  [13] *See* Ex. I (June 5, 2020 Minute Order Regarding Equitable Issues issued in State Court Litigation, holding:  "It is undisputed that one half of the funds [in Hong Kong Bank Accounts] belong to Dikla.");

28  Dkt. 17, Part 4, Question 35 at 13 (acknowledging Debtor's "50% ownership of approximately $13.2 million in cash held in various accounts in Hong Kong subject to order by the State Court.").

Company, its profits, and taxes.

19. Debtor left little doubt about his motives. He documented much of it in notes to himself, as well as epithets and ominous threats made to Dikla and her family for resisting his tax scheme. Of course, Dikla never responded in kind. These are just a few examples of Debtor's own words:[14]

| | |
|---|---|
| "HOW TO WHORE OUT YOUR FAMILY IN 20 EASY STEPS:  The story of Dikla Unatin's life.  Write it in your free time now.  You will pay dearly for all this.  Say goodbye to your supposed 40%.  It is no more." | "If you make a single wire without my permission I will never forgive you in my life and it will be all out nuclear war.  I promise you on my life.  Have no doubt about that.  I dare you to cross me." |
| "Every time you and your bitch ass husband come at me, I'll come at you 5 times harder.  Any pain or inconvenience you try to inflict on me, the business, mom, or the rest of the family, you and your family will feel multiples of that back. I promise you that.  All day, every day, til the day I die.  You will live to regret every misstep." | "[Y]ou've forced me to come back to the office earlier than I should you dirty whore.  Challenge my authority today and see what happens." |
| "She wants to challenge that she's in for a world of pain." | "I am done dealing with your bullshit. I will regulate as needed on you and Dean. There will be major changes. Don't f**k with me." |
| "She'll be in much worse shape if I punch dean in the face I promise you that." | "If you want to play like this I can promise you your life will be miserable." |

20. This only scratches the surface of the depths Debtor went to try to use family members to berate and threaten Dikla into submitting to his unlawful whims.[15]

---

[14] This consists of statements by Debtor in text messages he sent to Dikla, or his other sister Yamit Betesh ("Yamit").  See Exs. D, E, G, J, K.  They are only a small sample of the overwhelming documentary record of Debtor's abusive, tortious conduct, which spanned the last decade.

Indeed, to aid in his scheme to usurp power over the Company that Dikla refused to turn over to him, Debtor enlisted two family members to turn on Dikla—his mother Mira Gavrieli ("Mira") and his other sister, Yamit.  They were thoroughly impeached and discredited as trial witnesses due to, inter alia, their: financial dependence on Debtor (who had them on payroll at the Company); complicity in his planning for "war" with the Unatins and Yamit's participation in Debtor's ongoing tax scheme over the Unatins' objections (see Ex. L (Trial Ex. 237) (telling Yamit to "wait[] to get a better sense for the war we have on our hands")); shocking indifference when Debtor hurled vile epithets about Dikla in writing; and fully documented threats and coordinated scheme to threaten to cut off family ties to coerce Dikla into submission to Debtor.

[15] Debtor's text messages to Yamit on the morning of September 13, 2017 (just hours after the physical altercation at the Company offices when Debtor returned for the first time in ten months) offer a vivid example.  Referring to Dikla's and Debtor's youngest brother Elram, Debtor commanded Yamit:  "Send

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

**B.**    **The Superior Court Finds That Dikla Sought To End Debtor's Tax Scheme.**

21.    In his filings, Debtor references significant tax issues and his participation in the

IRS Offshore Voluntary Disclosure Program (OVDP) to rectify past underpayments of certain

tax liabilities.[16]  He fails to mention (1) that it was the Unatins who forced him to rectify his tax

scheme by refusing to go along with his improper practices (which led to his violent rage,

exclusion of the Unatins from the Company, and the ongoing dispute between the parties); and

(2) it was the Unatins who forced Debtor to enter the OVDP, yet spared him from criminal

prosecution by giving him advance notice of their intention to do so to rectify the Company's tax

dealings and report his scheme to the government.

22.    These matters were presented extensively at trial, with Debtor's nonsensical

distortion of events thoroughly rejected and rebuked by both the judge and jury.  Judge Patrick

Madden, who presided over the trial, expressly found, in imposing a constructive trust on Debtor

for Dikla's benefit, that:  "It was Dikla who stopped the underreporting of income, not Kfir."[17]

23.    Indeed, even apart from the complete verdict in Dikla's favor on these issues, the

factual record makes clear that Debtor lied about his tax practices.  It was on these very tax

issues that Debtor's periodic fits of rage were most prone to manifest.  For example, at one point

in late 2016, Debtor was unable to control himself and became too heated about the tax issues to

discuss them at the Company's offices because employees would hear his yelling and bullying.

He thus demanded that Dikla meet him at a nearby park.  At the park, Debtor's screaming was so

loud and offensive that it attracted bystanders who summoned the police to the area out of

concern for Dikla's safety.  This incident is documented in a contemporaneous Culver City

Police Department report.[18]

**C.**    **Debtor Disappears From The Company To Plot His Scheme While The
Unatins Lead It To Its Greatest Success In His Absence.**

---

elram to [Dean's] house . . . Dikla won't call police on him . . . Tell [Elram] to hold [Dean] down if he
needs to and not let him out of the house. . . . WHATEVER IT TAKES."  Ex. E (Trial Ex. 152).

[16] *See* Declaration of Kfir Gavrieli in support of First Day Motions (Dkt. 36, ¶ 28).

[17] *See* Ex. B at 24 (Statement of Decision in State Court Litigation).

[18] *See* Ex. M (Trial Ex. 1915) (Culver City Police Department Incident Report, dated November 9, 2016).

12

24.     With the Unatins resisting and asking too many questions about his tax and financial dealings that Debtor could not answer, Debtor disappeared from the Company without explanation or warning in December 2016 during the Company's busiest time of year (expressing further threats against the Unatins on his way out the door).  The record in the State Court Litigation revealed that Debtor left for a specific purpose:  to secretly plot and carry out his elaborate scheme to steal control, cut out Dikla and Dean from the Company they built, continue his tax scheme, and otherwise steal millions of dollars.  As the Company became successful, Debtor had become obsessed with seizing control of it in a way Dikla and Dean had never (and would never) accept.

25.     Despite Debtor's attempt to portray himself as key to the Company's success, the Company did not miss a beat when Dikla and Dean ran it without him for the bulk of 2017.  Not knowing where Debtor had gone, what he was doing, or whether he would return, Dikla and Dean ran the Company without him and led it to its most successful period *ever*.  As the Superior Court held, with Debtor gone, Dikla and Dean began to rectify Debtor's tax scheme and took steps to ensure that taxes were properly and timely paid.[19]  Consistent with the parties' practice, Dikla and Dean distributed Company profits to make tax payments for Debtor and themselves, even during Debtor's absence.  This included making substantial tax payments in early 2017, based on drastically higher estimates of net income than Debtor had ever used previously, and making quarterly estimated tax payments for the first time in the Company's history.

26.     The Unatins' exercise of proper, basic, and customary corporate governance— paying taxes when they were due and in a proper amount—further enraged Debtor.  He then went to a local bank branch in April and June 2017 and unilaterally made wires out of the Company's bank account totaling millions of dollars, purportedly to make investments with his college friends (some of whom he now claims are among his largest creditors).  In doing so, he plainly was seeking to drain the account of cash to keep Dikla and Dean from making tax payments and hoard and conceal the Company's profits for his sole benefit.

---

[19] *See* Ex. B at 24 (Statement of Decision in State Court Litigation).

13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

27.     Debtor also escalated his threats as Dikla and Dean were rectifying the Company's tax practices.  This ultimately devolved into a proclamation of "nuclear war" on June 14, 2017—the day before a quarterly tax payment deadline.  Debtor threatened:  "If you make a single wire without my permission, I will never forgive you in my life and it will be <u>all out nuclear war</u>.  I promise you on my life.  Have no doubt about that.  I dare you to cross me."[20]

28.     Even after the June 2017 tax deadline passed—without payment because Debtor had drained the Company's bank account by wiring more money to one of his friends (without the Unatins' consent and after Dikla *expressly* told him in a contemporaneous email that no investments were to be made)[21]—he continued to harass and threaten Dikla about tax payments, culminating in a terrorizing voicemail left on June 30, 2017 in which he violently screamed:

> I WANT TO BE CLEAR, IN CASE THE TEXT WASN'T CLEAR ENOUGH.  NOT A SINGLE F***ING WIRE GOES OUT WITHOUT MY F**KING PERMISSION.  AND EVERY ONE THAT DOES, YOU AND YOUR BITCH ASS HUSBAND WILL PAY A STEEP MOTHERF***ING PRICE, I PROMISE YOU.  NOT A SINGLE F**KING WIRE!  TRY ME![22]

29.     Simultaneously, during his mysterious absence, which he now claims was for "medical" reasons (despite his extensive and luxurious international and domestic travels for various social events during the same time period documented via social media), Debtor continued to plot ways to steal the Company.  Discovery in the State Court Litigation revealed that Debtor had secret, extensive discussions with the Company's tax counsel, whom he paid using Company funds, on ways to divest the Unatins of their interest in the Company.  At one point, in July 2017, Debtor even ominously asked the attorney the implications if anything happened to Dikla (including if she were to "*die*"), and also expressly indicated that he did not wish to be in a partnership with Dean.[23]  Debtor also sought advice on "succession planning" for

[20] *See* Ex. G (Trial Ex. 150) (text messages between Debtor and Dikla sent June 12-14, 2017).

[21] *See* Ex. N (Trial Ex. 151).

[22] *See* Ex. O (Trial Ex. 148) (transcription of voicemail left by Debtor on Dikla's phone on June 30, 2017).  The audio recording of the actual voicemail provides a breathtaking window into the depth of Debtor's rage over these tax issues, just a few weeks before he returned to the Company, ejected the Unatins, and absconded with millions of dollars.

[23] *See* Ex. P (Trial Ex. 65) (email from Michael Karlin, tax counsel to the Company, to Debtor regarding "Estate planning; relationships with your sister and brother-in-law"; dated July 13, 2017).

14

1  the Company, *i.e.*, looking for any legal maneuvering that might remove or divest the Unatins

2  from the business entirely.  Documents revealed that his plans involved an elaborate web of

3  foreign and domestic trusts that would ultimately grant him full control over the Company and

4  its assets.  However, those plans eventually stalled when these same attorneys properly

5  confronted Debtor about having had no contact with Dikla (despite repeated requests to meet

6  her), and made clear that they would need to communicate directly with Dikla about whether she

7  was in agreement with Debtor's dubious plans to benefit himself.

8       **D.**     **Debtor Returns To The Company On September 12, 2017 And Unleashes His Reign Of Terror To Stop The Unatins From Rectifying His Tax Scheme.**

9

10       30.     On September 12, 2017, three days before the Company's extended deadline to

11  file tax returns, Debtor made a surprise return to the office for the first time in nearly a year.  He

12  did so only after learning that the Unatins planned to report to the IRS the ***actual*** taxes owed by

13  the Company and far more than Debtor wanted reported.  Debtor confronted Dikla and became

14  abusive, physically violent, and threatening.  Consistent with his vile texts and emails, he made

15  multiple verbal threats to Dikla, repeatedly asserting in sum and substance that he could "do

16  whatever he wanted," including to "burn th[e] place down," and that if she challenged him on his

17  tax plan, she and her family would "pay the price."[24]

18       31.     Over the following days, Debtor carried out his threats.  He employed complicit

19  family members to threaten and intimidate Dikla, and continued his campaign of abuse in an

20  effort to prevent the Unatins from returning to the business.  On September 15, 2017, Debtor

21  filed the Company's tax returns with no preparation, discussion, input from, or notice to the

22  Unatins.  Without any justification or backup, Debtor reported net income for the Company

23  millions of dollars ***lower*** than what the Unatins told him needed to be paid, and below even the

24  estimates the Unatins had used to make extension payments earlier in the year in his absence but

25  for which he was fully aware.[25]

26  _____

27  [24] *See* Ex. P to Dkt. 48 (Dikla trial testimony).

28  [25] Earlier in the year, the Unatins made estimated payments for tax year 2016 at approximately 10 times the income Debtor had used for the prior year just a few months earlier.  By September 12, 2017, they had

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BK NO.: 2:21-bk-10826-BB
COMPLAINT

32.    Debtor then swiftly implemented a series of illegal measures to freeze the Unatins out of the Company, strip Dikla of her right of information and control, ruin her financially, steal the Company, and keep all of its profits for himself.  That included the investments and other assets he had placed in his name, as well as millions of dollars in distributions from investments that he hid in his secret bank and cryptocurrency accounts.[26]

33.    Debtor also unilaterally declared that he owned 60% of the Company, despite only ever having owned 50%, and on September 17, 2017, Debtor texted Dikla:  "HOW TO WHORE OUT YOUR FAMILY IN 20 EASY STEPS:  The story of Dikla Unatin's life.  Write it in your free time now.  You will pay dearly for all this.  Say goodbye to your supposed 40%.  It is no more."[27]  Within minutes he changed the critical passwords and administrative access the parties had shared for eight years to the Company's bank account and the Company's critical website and e-commerce sales platform.  Debtor next cut off Dikla's access to all Company accounts, which provided data to verify sales, revenue, shipments, inventory, spending, purchasing, customer acquisition, and other vital operations, as well as any visibility on the Company's production, sourcing, freight, and related manufacturing operations.  When Bank of America refused Debtor's demand to remove Dikla from the Company's only bank account, he absconded with the full account balance of $5.26 million via cashier's check, opened a secret account at a new bank, gave Dikla no privileges on the new account or notice of its existence, and diverted all Company revenue to that account—over $25 million before Dikla obtained a TRO to prevent further diversion, waste, and theft.

34.    The depravity, malice, violence, and cruelty of Debtor's conduct would be

---

generated calculations of higher income, including reporting those higher figures to Debtor when he reappeared at the Company.  However, Debtor refused and unilaterally filed returns for the Company with artificially low income.  When all was said and done, and the Company hired a forensic accountant to reconstruct accurate financial statements and tax returns for the Company, the income calculated for 2016 was almost exactly what the Unatins had reported to Debtor and intended to pay, as memorialized in several documents, before Debtor seized control on September 12, 2017 and excluded them.

[26] Debtor asserts that Dikla has elected monetary remedies in lieu of title to the joint investments.  That election actually was a determination by Judge Madden over Dikla's objection.  Dikla has reserved her right under California law to elect remedies when Debtor's final challenges to the Judgment are resolved.

[27] See Ex. D (Trial Ex. 1969) (capitalization in original).  Ex. D consists of a series of text messages between Debtor and Dikla sent between September 3 and 23, 2017.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

1  shocking on its own.  But perhaps most telling is that Debtor left nothing to the imagination

2  when it came to his intentions in waging a completely unprovoked "nuclear war" which he

3  promised to "battle to the death" with Dikla and Dean.[28]  If his declarations of "war" were not

4  bizarre enough, Debtor religiously documented it in writing via texts and emails to convince

5  everyone how much he meant it.[29]

6      E.    **The Unatins Initiate The State Court Litigation And Win A Complete And**
       **Total Victory On All Claims And Issues**.
7

8      35.    On this record, and despite Debtor's furious efforts to revise history and spin his

9  litigation outcome as something other than a total loss in his initial filings with this Court, it is

10  unsurprising that a 12-member Los Angeles Superior Court jury issued a sweeping verdict

11  against Debtor on November 12, 2019.[30]  Despite Debtor's shameless "defense" of rank victim-

12  shaming, the jury was unmoved, finding that he breached his fiduciary duties to Dikla with

13  respect to both the Company and more than $15 million of Company profits invested,[31]

14  purportedly for himself and Dikla, but which he kept entirely in his own name.  The jury also

15  found him liable for fraud and conversion with respect to the investments, and found that he

16  breached his contractual obligations regarding those investments.

17  ─────────────────────

18  [28] Although any sense of human decency towards business partners, family members, and even strangers
    would render Debtor's conduct abhorrent and reprehensible (as the jury found on every tort claim), it
19  bears noting that the record is totally devoid of any reciprocal conduct by either Dikla or Dean towards
    Debtor.  No threats of violence.  No invectives or epithets.  Debtor's horrible conduct was provoked by
20  nothing other than his absolute desire to control the Company and destroy his sister and brother-in-law for
    their refusal to go along with his tax scheme.  *See* Ex. H.  Ex. H consists of a series of text messages
21  between Debtor, Mira Gavrieli, and Yamit, sent between September 12 and 19, 2017.

22  [29] *See* Ex. G (Trial Ex. 150).  Ex. G consists of a series of text messages between Debtor and Dikla sent
    between June 12 and 14, 2017.

23  [30] Only this Debtor could attempt to spin a complete and total loss like the one he suffered at the hands of
    the jury, affirmed by the Superior Court in post-trial motions, as a victory and a "fiasco" for his
24  opponents.  *See* Dkt. 51.

25  [31] In short, starting in September 2015, the parties agreed to use millions in their share of Company profits
    to make joint outside investments, unrelated to the Company's day-to-day operations.  Debtor concealed
26  information and the existence of distributions from the investments, which he diverted to a secret bank
    account in his name alone.  Beginning in 2016, Dikla confronted Debtor about why her name was not on
27  the investments and why she was not receiving full information.  He continued to lie.  To this day, ***over
    five years later***, Dikla never received access to or full information regarding the investments, and the jury
28  awarded significant damages related to these funds.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

36.    The jury similarly found that Debtor had defrauded Dean, in urging him to invest much of his life savings and to give up his successful young career to devote himself fully to building the Company as partners.

37.    On every tort claim asserted against him, the jury found that Debtor had acted with malice, fraud, and oppression and awarded millions of dollars in punitive damages to Dikla and Dean, in addition to pain and suffering damages to Dikla.

38.    Finally, the jury completely rejected Debtor's contrived cross-claim that there was an unsigned agreement with Dikla to gift him ownership of the Company at 60/40 if the Company surpassed a $200 million valuation, instead confirming that Debtor and Dikla have always owned and controlled the Company jointly and equally.[32]  The jury also rejected Debtor's specious cross-claims asserted to bring Dean into the litigation.

39.    Despite the jury's verdict, Debtor remained completely unmoved by the repudiation of his conduct.  He staunchly refused to restore even the most basic access for Dikla to the Company or its accounts after the verdict (he literally even changed the locks), and spent the ensuing year fighting the verdict tooth and nail before the Superior Court.  This included craven efforts to relitigate long decided issues—much as he does before this Court—after insisting to the Superior Court that the jury's verdict was dispositive on those issues, and resisting the imposition of injunctive relief to restore Dikla's clear legal rights.  And it now is apparent, from his bankruptcy filings, that despite requesting and obtaining a lengthy discretionary stay from the Superior Court of enforcement of the money judgment, he has been crafting this bankruptcy strategy at a cost exceeding $2 million, all in furtherance of his continuing "nuclear war" against his sister and her family.[33]  Indeed, while he was stripping her of her livelihood and her Company, Debtor repeatedly threatened that Dikla's life would be

---

[32] Debtor claimed that Dikla agreed he would have sole and total control over the Company when it was formed, even though:  (a) the product was her idea; (b) the funds to launch and sustain the Company (and all three of them) came from Dean; (c) Debtor was living in Dikla's and Dean's apartment rent-free and they were supporting him financially; and (d) Debtor was a recent business school graduate without a job and with no relevant prior experience.  Debtor's claim was so far-fetched and obviously contrived that during cross examination at trial, his answers on this topic elicited audible laughter from the jury box.

[33] *See* Ex. G (Trial Ex. 150) (text messages between Debtor and Dikla between June 12-14, 2017).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BK NO.: 2:21-bk-10826-BB
COMPLAINT

1    "destroy[ed]," that he would "discredit her," and that she "would never see a penny from [the

2    C]ompany again."

3    F.    **Following Trial, Judge Madden Grants Sweeping Equitable Relief—**
     **Including A Constructive Trust And Broad Permanent Injunction—And**

4    **Denies Debtor's New Trial And JNOV Motions.**

5    40.    Debtor's disgraceful efforts also were met with a stinging rebuke from the trial

6    judge, Hon. Patrick Madden.  Debtor fared no better with Judge Madden than he did with the

7    jury or with two preceding Superior Court judges who ruled against him:  Hon. Amy Hogue,

8    who granted a TRO and Preliminary Injunction early in the case, and Hon. Dalila Lyons, who

9    granted summary adjudication against Debtor on every claim requested against Dean, and denied

10   Debtor's motion for summary judgment on Dean's cross-claims.

11   41.    On October 9, 2020, Judge Madden issued a Statement of Decision, completely

12   rejecting Debtor's aggressively and thoroughly litigated legal and factual positions.  On

13   December 16, 2020, Judge Madden issued an Order Regarding Debtor's Motions for JNOV and

14   New Trial.  In rejecting Debtor's motions, Judge Madden specifically rejected Debtor's

15   desperate attempt to discredit Dikla, holding that "[b]ased on the totality of the evidence from the

16   trial, the court finds that Dikla was a credible witness" and that Debtor wrongfully "pushed Dikla

17   out the door of the business and she completely lost her ability to any access to the finances of

18   the Company."[34]  Judge Madden further held that "Kfir's actions were reprehensible:  he put his

19   own greed and financial interests above the interests of the other co-owner, Dikla."[35]

20   42.    Following post-trial motions where Judge Madden explicitly held that Dikla and

21   Dean had proved their entitlement to punitive damages, Dikla and Dean now hold a final

22   judgment against Debtor which includes:  (a) $16.9 million of monetary relief; (b) a constructive

23   trust over 50% of overseas bank accounts with approximately $13.2 million on deposit (Debtor's

24   share of these funds is referenced in his Schedules at Dkt. 17); and (c) a permanent injunction

25   and declaratory judgment.

26   _____

     [34] *See* Ex. C (Order on Debtor's Motions for JNOV and New Trial).

27   [35] Judge Madden also rejected other litigation tactics by Debtor, for example finding that he was judicially
     estopped from changing his position on the dispositive nature of the jury's verdict on declaratory relief

28   after trial, to claim that the jury's verdict was merely advisory.  Ex. I at 4-6.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

G.    **Debtor Has Deliberately Put The Company Into A Tailspin Since September 2017, In A Transparent Attempt To Suppress The Price To Buy Out Dikla That He So Desires While Refusing To Sell His Own Interest.**

43.    Since seizing control of the Company in September 2017, Debtor has acted on his threats to "burn th[e] place down." Even after the jury's verdict and the Superior Court's Judgment, Debtor has completely excluded Dikla and Dean from management of the Company, while reporting massive declines in performance under his management. Since excluding the Unatins, he has presided over a 75% decline in the Company's profits. Moreover, Debtor's own financial expert (Bruce Strombom) testified at trial in 2019 that the Company reached a valuation of $388 million at the end of 2017.[36] Debtor now claims that in the three years since—while he has been in sole and total control—the Company's value has dropped such that his 50% interest is worth $20 million. (Dkt. 17 at 9.)

44.    Thus, Debtor claims a 90% drop in the Company's value under his management since launching his war and excluding the Unatins. These facts strongly suggest that Debtor has deliberately put the Company in a nosedive, as he had threatened to do (in writing). His motive is abundantly clear, and revealed by his own threats to "destroy the Company." He has schemed for years to steal sole ownership of the Company. Having failed to do so by various other despicable means, he has manufactured extreme deadlock, forced years of costly litigation, refused to distribute profits, and ultimately acted to depress the Company's value to try and reduce the price at which he can buy out Dikla to settle the State Court Litigation. Removing any doubt about his ongoing scheme, Debtor steadfastly refused to bring in outside professionals to help address the Company's freefall or to explore a sale of some or all of the Company, belying his claims about the Company's low value. It is all consistent with his ruthless behavior to date, and is a topic that requires inquiry by this Court when assessing Debtor's bad faith.

45.    To this end, and in contravention of the Company's historically innovative operations (which led to its renowned status), during the pendency of the State Court Litigation, Debtor deliberately caused the Company to decline. Various critical operational components such as its e-commerce storefront, branding, creative, customer service, marketing, advertising,

---

[36] *See* Ex. Q (Trial Ex. 419) (Company valuation prepared by Debtor's trial expert Bruce Strombom).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BK NO.: 2:21-bk-10826-BB
COMPLAINT

and others areas severely languish.  As he ran out of shoe styles hand-picked by Dikla, he launched regrettable choices instead.  He refused to implement any meaningful marketing or advertising campaigns, and recycled stale campaigns from years prior.

46.    Debtor has also refused to implement longstanding growth strategies of the Company including the expansion into international markets, the introduction of new shoe styles, and much more, even after several were specifically identified in discovery in the State Court Litigation as a source of his failings.  He has stopped any meaningful innovation of the Company or its products, which has drastically harmed the Company's brand and sales.  He has deprived this pioneering women's brand of its visionary female founder.  He has failed to hire professional management to properly or efficiently run the Company, or to implement any reliable accounting system for the Company, even despite the significant tax and financial issues at the core of this dispute (and which only will be rectified because the Unatins pressed the issue).

47.    Separately, and in addition to the millions of dollars in investments Debtor stole (as described above), Debtor also took millions of dollars of additional Company funds without consent or authorization, spending freely on himself while locking the Unatins out from all funds.  These acts include, but are not limited to, the following:

a.    On October 20 and 23, 2017, Debtor made two unauthorized wire transfers out of a secret First Republic Bank account containing Company funds to an undisclosed personal account in his name in a total amount of $250,000.  Debtor took this money directly from the Company without consent or authorization.

b.    In late-2017, Debtor paid millions of dollars to credit cards in his name, as well as other personal expenses and payments, all from Company funds without consent or authorization.

c.    On November 16, 2017, Debtor secretly made $1,014,116 in unauthorized and unilateral personal tax distributions for himself using Company funds, while continuing to block Dikla from the Company's accounts.

d.    Debtor paid various personal expenses for himself and others (*e.g.*, home mortgage, housekeepers, gardeners, car insurance, and home utilities), and sent

21

hundreds of thousands of dollars of Company funds to complicit family members, to reward them for supporting his misconduct and carrying out his scheme. Debtor even used family members' status on payroll to funnel additional Company money to himself in violation of the TRO. On December 18, 2017, for instance, Debtor directed Mira to wire $50,000 to one of his new secret accounts at First Republic Bank and reimbursed her through the Company's payroll, even though Mira did not work at the Company. Even today, Debtor refuses to remove family members from payroll, despite the Company's accountant identifying the issue and the ongoing improper classification.

e.  In violation of the Preliminary Injunction, Debtor stole additional Company funds to pay for personal expenses including, but not limited to, litigation expenses in the State Court Litigation, food and dining, entertainment, travel, transportation, an Equinox gym membership, unauthorized public relations services to benefit himself, and more.

f.  In addition, and in an effort to evade the Preliminary Injunction, Debtor shifted personal purchases to credit cards in a personal assistant's name and attempted to categorize those purchases as "business" expenses to shield his theft of Company funds. Similarly, Debtor has made and authorized substantial Company spending by himself and others, and failed to properly substantiate that spending or involve the Unatins in its classification.

g.  Debtor has used Company funds to give substantial "bonuses" to certain Company employees and individuals who testified falsely on his behalf during the State Court Litigation to reward their support for him, despite the Company's unprecedented poor financial performance over the same period.

h.  Debtor has also stolen substantial benefits that previously belonged to the Company. For example, since excluding the Unatins, Debtor has shifted millions of dollars in Company spending to credit cards in his name. In doing so, he denied the Company the substantial financial discounts it has always received on

22

such spending, and generated a windfall and unlisted asset for himself in the form of substantial cash back, points, or other rewards held by Debtor alone.

48.     Despite Debtor's attempt to explain the Company's precipitous decline under his watch due to a sudden onset of competition (oddly concurrent with him seizing sole control of the Company)[37] or the COVID-19 pandemic, competition has always existed, and the decline was engineered by Debtor and was manifest over two years before the onset of the pandemic.

**H.     Debtor Refuses To Pay Sufficient Taxes For Dikla, Choosing To Indemnify Her And Create A Windfall For Himself And Shortfall For Her.**

49.     As the Debtor's Schedules indicate, while the State Court Litigation was pending, the Unatins initiated action with the IRS to remedy Debtor's improper tax dealings.  Despite all Debtor had already done, they still notified him before initiating that process, to spare Debtor the likely criminal prosecution that would result from them filing first and without him.

50.     In addition, beginning in February 2018, Plaintiffs' counsel made concerted efforts to coordinate with Debtor's counsel well in advance of the April 2018 tax deadlines for the parties.  In what became a pattern, Debtor's counsel did not respond in full until April 11, 2018, just days before the deadline.

51.     Then, in order to gain leverage over Dikla and advance his litigation position, and enabled by his improper sole control over all Company funds he had unlawfully seized, Debtor refused to make any tax payments unless allocated 60% to him and 40% to Dikla.

52.     To justify that improper allocation, Debtor promised on April 11, 2018 "to pay any interest and penalties Mrs. Unatin might owe with respect to any resulting underpayment of her estimated tax liability, and to return to the company any resulting overpayment of his estimated liability" from any determination "that she owns 50% rather than 40% of the Company."  This agreement is hereinafter referred to as the "Tax Indemnity Agreement."

53.     Because Dikla had no other choice—given Debtor's complete and unlawful exclusion of her from all Company funds, coupled with the imminent tax payment deadlines and

---

[37] It bears note that, during the period Debtor has claimed to preside over an unprecedented decline in Company performance, other competitors in the same e-commerce shoe category as the Company experienced unprecedented growth.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BK NO.: 2:21-bk-10826-BB
COMPLAINT

1  to avoid potentially devastating consequences for failure to comply with tax requirements while

2  her application to the OVDP was pending—she agreed to the Tax Indemnity Agreement and did

3  not refuse to allow Debtor's tax payments.

4       54.    Debtor continued this practice of unilateral and improper 60/40 tax distributions

5  in his favor for all payments made for the 2017, 2018, and 2019 tax years.  This was done in

6  each instance over Dikla's express, written objection to Debtor's allocation and in express

7  reliance upon the Tax Indemnity Agreement.

8       55.    As referenced above, on November 12, 2019, the jury in the State Court Litigation

9  returned a verdict in favor of Dikla and against Debtor, confirming Dikla and Debtor each own,

10  and have always owned, 50% of the Company.  It expressly rejected Debtor's claim to majority

11  ownership.  Judge Madden heard repeated attempts by Debtor to reverse that finding, but found

12  against him each time, and entered judgment confirming the same.  The Final Judgment in the

13  State Court Litigation (entered on January 22, 2021) explicitly confirmed Dikla's 50%

14  ownership interest in and joint control of the Company.

15       56.    Despite this judicial determination, Debtor refuses to correct the multimillion

16  dollar windfall he engineered for himself, or to correct the shortfall suffered by Dikla, consistent

17  with their 50% ownership interests in the Company.

18             **DEMAND FUTILITY ALLEGATIONS FOR DERIVATIVE CLAIMS**

19       57.    Dikla re-alleges the allegations of paragraphs 1 through 56 against Debtor as if

20  fully set forth herein.

21       58.    Dikla brings this action both individually and derivatively on behalf of the

22  Company to redress injuries suffered as a result of Debtor's wrongful conduct, breaches of his

23  fiduciary duties, gross mismanagement, unauthorized acts, waste of corporate assets, conversion,

24  unjust enrichment, and more, as described herein and as will be proven at trial.

25       59.    Dikla is a member of the Company and was a member at the time of the conduct

26  complained of herein.  Dikla will adequately and fairly represent the interests of the Company in

27  enforcing and prosecuting its rights.

28       60.    The Company has two named members and managers, Dikla and Debtor.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BK NO.: 2:21-bk-10826-BB
COMPLAINT

1    Following Debtor's wrongful conduct in locking Dikla out of the Company through violence,

2    intimidation, and otherwise, Debtor has remained in sole control over the business.  As

3    explained, he has steadfastly refused to provide critical information about the Company's

4    performance to Dikla or to honor the Final Judgment.  There are no other current managers or

5    named members in control of the business on whom a demand could be made.

6        61.    Dikla has informed Debtor of the issues identified above, and made specific

7    proposals in an attempt to address them.  For example, given the declines in Company

8    performance on Debtor's watch as of the end of 2019 (which have only accelerated in the last

9    year), on December 3, 2019, Dikla's counsel made an explicit proposal in writing to Debtor's

10    counsel:

> As we discussed this evening, given the deadlock between Mrs. Unatin and Mr. Gavrieli which you have commented on, and in light of the Company's performance over the past two years (as confirmed by Mr. Gavrieli's testimony during Phase II of the trial), Mrs. Unatin believes it is in the best interests of all involved for the Company to engage a financial advisor to review the Company's options and situation (and Mrs. Unatin's and Mr. Gavrieli's options as owners), including a potential sale of some or all of the Company to a strategic or financial buyer.

> Specifically, Mrs. Unatin proposes that the Company engage a financial advisor to be selected and overseen by mutual agreement of Mrs. Unatin and Mr. Gavrieli for this purpose.   Please advise if Mr. Gavrieli agrees to this proposal.

Debtor rejected this proposal.

22        62.    Accordingly, no demand is necessary and, in any event, demand would be futile

given that Debtor is plainly not independent and disinterested as the foregoing allegations are

against him personally and include allegations that he has intentionally impaired the Company's

performance and value to advance his own personal interest in buying out Dikla at a discount.  In

addition, Debtor has shown no willingness to address the Company's performance, even

rejecting the reasonable suggestion to bring in an outside financial advisor to review the

Company's options.  All of this renders any demand futile.

        63.    This is not a collusive action to confer jurisdiction on this Court that it would not

otherwise have.

25

BK NO.: 2:21-bk-10826-BB
COMPLAINT

### FIRST CLAIM FOR RELIEF
**(Nondischargeability Of Judgment Under 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6))**
**(By Dikla Unatin Against Debtor)**

64.    Dikla realleges the allegations of paragraphs 1 through 63 against Debtor as though fully set forth herein.

65.    The Final Judgment establishes Debtor's breaches of his fiduciary duties to Dikla with respect to the Company and the joint investments, and that Debtor acted with malice, fraud, and oppression in breaching his fiduciary duties.  The Final Judgment awards Dikla punitive damages with respect to the joint investments.

66.    The Final Judgment also establishes that Debtor and Dikla were and are, and have been at all relevant times, members, managers, and co-owners of the Company, a California LLC.

67.    Accordingly, Debtor owed unqualified fiduciary duties of good faith, care, and loyalty to Dikla pursuant to *inter alia,* California Corporations Code Sections 16404 and 17704.09.  The Final Judgment additionally establishes that:

    a.    Debtor breached his fiduciary duties to Dikla with respect to the Company by, without limitation, intentionally developing and implementing a calculated scheme to steal the Company from Dikla and starve her of cash, and diverting and wrongfully using and concealing Company funds and assets without Dikla's consent.

    b.    Debtor's breaches of his fiduciary duties to Dikla resulted in compensatory and punitive damages of $14,834,730.69 to Dikla.[38]

68.    These damages constitute a liability on the part of Debtor that are not dischargeable under 11 U.S.C §§ 523(a)(2), 523(a)(4), and 523(a)(6).

69.    In addition, the Final Judgment established that, as outlined in *inter alia*, Paragraphs 17, 26, 28, 32, and 35, in September 2015, the parties entered into a joint investment agreement, whereby they assented and agreed to use a portion of Company profits to form a partnership to make outside investments, which were unrelated to the Company's day-to-day operations.  The

---

[38] $14,834,730.69 is the sum of the total judgments awarded on Dikla's claims for breach of fiduciary duty regarding the Company ($2,438,952.10) and the joint investments ($12,395,778.59), as reflected in the Final Judgment.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

1  Final Judgment additionally establishes that:  (a) Debtor and Dikla were and are, and have been at

2  all relevant times, members of a partnership under the investment agreement to share certain joint

3  investments and the proceeds thereof, Debtor owed unqualified fiduciary duties of good faith, care,

4  and loyalty to Dikla pursuant to, *inter alia*, California Corporations Code Section 16404, as well

5  as the common law; (b) Debtor fraudulently induced Dikla to agree to use her portion of Company

6  profits for investments she believed would be jointly evaluated and owned; (c) Debtor willfully

7  and intentionally converted Dikla's interest in the joint investments with the intention to starve

8  Dikla of cash; (d) as a proximate result of Debtor's wrongful conversion of Dikla's interests and

9  property, Dikla suffered injury; (e) Debtor committed these acts knowingly, fraudulently, and with

10  the intent to deceive Dikla; and (f) as a direct and proximate result of Debtor's misrepresentations,

11  false promises, and concealment, Dikla sustained significant damages.

12      70.    The Final Judgment established that Debtor's willful and malicious conduct

13  outlined above resulted in compensatory and punitive damages of $13,479,586.45 to Dikla.[39]

14  These damages are not dischargeable under 11 U.S.C §§ 523(a)(2), 523(a)(4), and 523(a)(6).

15      71.    The Final Judgment established that Debtor's fraud resulted in compensatory and

16  punitive damages of $12,395,778.59 to Dikla.  These damages constitute a liability on the part of

17  Debtor that is not dischargeable under 11 U.S.C §§ 523(a)(2), 523(a)(4), and 523(a)(6).

18  

**SECOND CLAIM FOR RELIEF**
**(Nondischargeability Of Judgment Under 11 U.S.C. §§ 523(a)(2) and 523(a)(6))**
**(By Dean Unatin Against Debtor)**

19

20      72.    Dean realleges the allegations of paragraphs 1 through 71 against Debtor as

21  though fully set forth herein.

22      73.    The Final Judgment established that Debtor fraudulently induced Dean to

23  contribute his life savings to seed and build the Company, provide financially for Debtor, and

24  ultimately to leave his stable and lucrative career to devote himself to building the Company, as

25  partners, without a salary, through repeated misrepresentations, false promises, and concealment.

26  The Final Judgment additionally establishes that:  (a) Debtor falsely promised Dean they were

27

28  _____

[39] $13,479,586.45 is the total judgment awarded on Dikla's claim for conversion of the joint investments,
as reflected in the Final Judgment.

27

1    partners and co-owners of the Company, while concealing his true belief that Dean was an at-

2    will unpaid employee who could be "fired" at any time; (b) Debtor committed these acts

3    knowingly, fraudulently, and with the intent to deceive Dean; and (c) as a direct and proximate

4    result of Debtor's misrepresentations, false promises, and concealment, Dean sustained

5    significant damages, including the unrecouped investment of his savings and the loss of nearly a

6    decade of his career without pay.

7          74.    The Final Judgment established that Debtor's willful and malicious conduct

8    against Dean resulted in compensatory and punitive damages of $987,713.10.  These damages

9    constitute a liability on the part of Debtor that is not dischargeable under 11 U.S.C §§ 523(a)(2)

10   and 523(a)(6).

11                        **THIRD CLAIM FOR RELIEF**
                **(Contractual Indemnification – Tax Indemnity Agreement)**
12                       **(By Dikla Unatin Against Debtor)**

13         75.    Dikla realleges the allegations of paragraphs 1 through 74 against Debtor as

14   though fully set forth herein.

15         76.    In April 2018, Debtor entered into the Tax Indemnity Agreement with Dikla.  The

16   premise of the Tax Indemnity Agreement was that, were the jury and the Court to find in a final

17   judgment that Dikla owned 50% of the Company, rather than 40%, Debtor would personally

18   indemnify her for the consequences of dictating her underpayment while in control of the

19   Company's finances.

20         77.    Dikla performed all of her obligations under the Tax Indemnity Agreement and,

21   while reasserting her objections to Debtor's unilateral misconduct in paying taxes

22   disproportionately and reserving her rights, agreed to allow distributions from the Company to

23   cover the parties' tax obligations for tax years 2017, 2018, and 2019.

24         78.    For each tax payment associated with tax years 2017, 2018, and 2019, Debtor

25   made tax payments on behalf of himself and Dikla using distributions of Company funds based

26   on a 60%/40% profit, loss and capital allocation in his favor.

27         79.    The Final Judgment, including unstayed declaratory relief, establishes Dikla's

28   50% ownership share in the Company, as well as that Debtor lacks sole control over the business

28

1    and its finances.

2       80.    Despite the Final Judgment, Debtor has materially breached the Tax Indemnity

3    Agreement.  He has failed and refused to pay Dikla, or agree to have the Company distribute to

4    Dikla an amount necessary to correct his misconduct.  Debtor has also failed to pay Dikla the

5    interest and penalties associated with his misconduct.  Further, Debtor has failed to return

6    millions of dollars in excess tax payments he distributed to himself from the Company.

7       81.    Moreover, Debtor indicates on his Schedules that he expects a tax refund of at

8    least $6.5 million.  Under the Tax Indemnity Agreement, Debtor promised to return these sums

9    to the Company.  The Court should order that any tax refund received by Debtor be paid to the

10   Company, as specific performance of the Tax Indemnity Agreement.

11      82.    In addition, Dikla is entitled to the payment of all penalties and interest (both at

12   the federal and state tax rates), including penalties and interest resulting from Debtor's failure to

13   repatriate funds in the Hong Kong accounts.

14      83.    Dikla is entitled to compensatory damages to address these injuries pursuant to

15   the Tax Indemnity Agreement, and specific performance of that agreement.

16                          **FOURTH CLAIM FOR RELIEF**
                        **(Unjust Enrichment Re: Joint Investments)**
17                        **(By Dikla Unatin Against Debtor)**

18      84.    Dikla realleges the allegations of paragraphs 1 through 83 against Debtor as

19   though fully set forth herein.

20      85.    As the Court found in the Final Judgment,[40] Debtor entered into an agreement

21   with Dikla whereby the parties agreed that they would invest Company profits 50/50 in various

22   outside investments, and this agreement created a general partnership between Dikla and Debtor.

23      86.    Even after the issuance of the Final Judgment, it is evident from Debtor's

24   Schedules that Debtor wrongfully retains substantial sums that are the fruits of his unlawful

25   conduct which were not awarded to Dikla in the Final Judgment.  These funds have been

26   unjustly retained by Debtor at Dikla's expense following the Superior Court's acceptance of

27

28   [40] *See* Ex. A at 17-18.

                                29

1   Debtor's argument that Dikla elected monetary damages, in lieu of title to the joint investments.

2   These Unjustly Retained Investment Funds include:  (i) 50% of the actual value of investments

3   which Debtor vigorously fought to exclude from trial in the State Court Litigation (about which

4   he concealed substantial financial information), but which his own Schedules make clear far

5   exceed the damages awarded to Dikla, less the amounts awarded in the Final Judgment in

6   connection with these investments; and (ii) 50% of the proceeds, gains, and returns from the

7   investments Debtor made with joint funds including Company profits, which were to be owned

8   jointly by Debtor and Dikla, and were nevertheless retained by Debtor (including Dikla's share

9   of millions of dollars in cryptocurrency holdings made with investment returns, above and

10   beyond the damages reflected in the Final Judgment).

11         87.    The Final Judgment does not include the full amount of the Unjustly Retained

12   Investment Funds, resulting in unjust enrichment to Debtor of millions of dollars; due to

13   Debtor's financial machinations and lack of transparency regarding these investments.

14   Discovery is necessary to determine the full amount.  Moreover, Debtor's use of the Unjustly

15   Retained Investment Funds in advance of this bankruptcy case to give favorable treatment to his

16   creditors, who consist largely of friends and family, deserves scrutiny by this Court.

17         88.    Of note, Debtor repeatedly misled the court in the State Court Litigation—

18   including under oath on the witness stand—in stating that he had no evidence of the fair market

19   value of the investments, seeking to undercut Dikla's ability to claw back fairly her 50% of the

20   stolen money.  He also misled the Superior Court in asserting that he had produced all evidence

21   of his investment-related activities to Dikla.  As his bankruptcy filings make clear, all of that is

22   absolutely untrue.  He has notably estimated the fair market value of the investments to the

23   penny, while he hid the vast majority of this information from his partner Dikla.

24         89.    Put another way, throughout the parties' State Court Litigation all the way

25   through the first disclosures Debtor made in this case, he concealed the full extent of his theft of

26   the Unjustly Retained Investment Funds.  It is now clear that he concealed details as to the

27   provenance of millions of dollars in joint funds, related proceeds, and fraudulent maneuvers he

28   made to take everything for himself.  All measures of equity compel this Court not to allow

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

Debtor to get away with literally stealing millions of dollars in investments and profiting from what amounts to a personal Ponzi scheme where Debtor lied to his partner to induce her consent to invest tens of millions of dollars, only to mislead her about the performance of the investments, and then steal the gains for himself.

90.    Debtor has been unjustly enriched by retaining the Unjustly Retained Investment Funds.  These funds are above and beyond the damages Dikla obtained at trial.  They are proper because, as the jury found, Dikla is a 50% owner of the investment proceeds.  Thus, while the Superior Court held that Dikla elected damages as a remedy for certain "identified" investments, she is still entitled in equity to recover all proceeds from the fruits of Debtor's illegal conduct with respect to the Unjustly Retained Investment Funds, *i.e.*, the fair market value of the funds, accounts, and new investments Debtor hid from Dikla and otherwise made in the weeks and months leading to these proceedings.[41]

91.    In addition, to the extent Debtor does not perform under the Tax Indemnity Agreement, as well as other issues, he has been unjustly enriched due to the substantial overpayment of taxes on his behalf by the Company and any refunds he has or will be entitled to receive as a result.

92.    Finally, Debtor continues to exercise control and dominion over $13 million in funds in bank accounts in Hong Kong, which he acknowledges is owned 50/50 by Debtor and Dikla.  *See* Dkt. 17, Part 4, Question 35 at 13 (acknowledging Debtor's "50% ownership of approximately $13.2 million in cash held in various accounts in Hong Kong subject to order by the State Court").  Debtor's refusal and failure to return those funds and pay over Dikla's 50% ownership share not only is the subject of a constructive trust imposed in the State Court Litigation, but also results in unjust enrichment to Debtor which requires disgorgement to Dikla of her 50% share.

93.    As a result of this unjust enrichment, Debtor should be required to disgorge and

---

[41] By way of example, the parties jointly invested in Halogen Ventures LP, and Debtor concedes it is jointly owned, yet he has failed to correct its title, and unlawfully concealed, deposited, and retained 100% of its distributions.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

make restitution to Dikla of all monies and gains which he obtained and/or retained at the expense of Dikla.  This includes the items discussed above, as well as assets or funds that Debtor now claims are lost (*e.g.*, the cryptocurrency he claims was lost to "hacking").

**FIFTH CLAIM FOR RELIEF**
**(Expulsion Of Debtor As Member Of Gavrieli Brands, LLC)**
**(Derivative Claim)**
**(By Dikla Unatin Against Debtor)**

94.     Dikla realleges the allegations of paragraphs 1 through 93 against Debtor as though fully set forth herein.

95.     Under California Corporations Code § 17706.02(e), a limited liability company can request a judicial order expelling a member where the member has:  (1) engaged, or is engaging, in wrongful conduct that has adversely and materially affected, or will adversely and materially affect, the limited liability company's activities; (2) willfully or persistently committed, or is willingly and persistently committing, a material breach of the member's fiduciary duties; or (3) engaged, or is engaging, in conduct relating to the limited liability company's activities that makes it not reasonably practicable to carry on the activities with the person as a member.

96.     Debtor has engaged and continues to engage in wrongful conduct, including without limitation, unlawfully excluding the other member and manager of the Company, depriving it of its visionary co-founder, engaging in extensive financial and other misconduct, and deliberately, and in bad faith, suppressing Company sales and value in order to advance his litigation position in the State Court Litigation.  In doing so, Debtor is significantly harming the Company by locking out Dikla and Dean through violence, intimidation, and otherwise, refusing to provide Dikla the information necessary to run the business, and stealing and concealing Company funds for his own personal use.  Debtor did this to advance his personal interest at the Company's expense.

97.     Debtor's conduct makes it not reasonably practicable to carry on the activities with him as a member.  Debtor has emotionally, physically, and financially abused and threatened his co-member, co-manager, and co-founder of the Company, has deliberately

32

suppressed the value of the Company, and has significantly harmed the Company by excluding

the Unatins from the business, although it still retains far more value than Debtor will

acknowledge.

98.     Debtor's wrongful conduct is adversely and materially affecting the Company's

activities.  Notably, since Debtor has seized sole control over the Company's operations three

and a half years ago, Debtor has presided over a 75% decline in the Company's profits, and a

nearly 90% decline in valuation—if his own trial expert in the State Court Litigation and his

filings before this Court are to be believed.

99.     As alleged herein and further below, Debtor has willfully and persistently

committed material breaches of his fiduciary duties as a member and manager of the Company

under California Corporations Code § 17704.09.

100.    Pursuant to California Corporations Code § 17706.02(e), Debtor should be

expelled as a member of the Company by judicial order.

**SIXTH CLAIM FOR RELIEF**
**(Appointment Of Receiver)**
**(Derivative Claim)**
**(By Dikla Unatin Against Debtor)**

101.    Dikla realleges the allegations of paragraphs 1 through 100 against Debtor as

though fully set forth herein.

102.    The Final Judgment establishes that Dikla and Debtor are co-equal owners of the

Company.

103.    Debtor's wrongful conduct is adversely and materially affecting the Company's

activities.  Notably, since Debtor seized sole control over the Company's operations three and a

half years ago, Debtor has presided over a 75% decline in the Company's profits, and a nearly

90% decline in valuation—if his own trial expert in the State Court Litigation and his filings

before this Court are to be believed.

104.    As a result of Debtor's misconduct as detailed herein including, but not limited to,

his fraud, mismanagement, misappropriation of funds, and depression of the Company's value,

as well as his continuing efforts to create deadlock with Dikla on material issues impacting the

33

1  Company, and based on the massive decline in profits and Company value, Dikla requests,

2  derivatively and on behalf of the Company, the appointment of a provisional director and/or

3  receiver to manage the Company's business and affairs pending the resolution of this dispute

4  pursuant to California Code of Civil Procedure § 564.

5
### SEVENTH CLAIM FOR RELIEF
**(Breach Of Fiduciary Duty)**
6  **(Derivative Claim)**
**(By Dikla Unatin Against Debtor)**
7

8      105.    Dikla realleges the allegations of paragraphs 1 through 104 against Debtor as

9  though fully set forth herein.

10      106.    By virtue of Debtor's position as a manager and member of the Company, a

11  California LLC, he owed unqualified fiduciary duties of good faith, care, and loyalty to the

12  Company pursuant to, *inter alia*, California Corporations Code § 17704.09, as well as the

13  common law.

14      107.    Since September 2017, Debtor has seized and refused to relinquish sole control of

15  the Company, and has precluded Dikla from exercising the rights and responsibilities of a

16  manager of the Company, even fifteen months after the jury's verdict and several months after

17  the Court's Final Judgment establishing Dikla's rights to joint control.  By excluding Dikla,

18  Debtor effectively made himself the sole manager of the Company since September 2017, and he

19  owed the Company the fiduciary duties associated with his (wrongfully seized) sole control of

20  the Company.

21      108.    Debtor wholly disregarded these duties under California law.  As set forth herein,

22  Debtor breached his fiduciary duties by, without limitation, unlawfully excluding the other

23  member and manager of the Company, depriving it of its visionary co-founder, engaging in

24  extensive financial and other misconduct, and deliberately and in bad faith suppressing Company

25  sales and value in order to advance his litigation position in the State Court Litigation.  In doing

26  so, Debtor is significantly harming the Company by locking out Dikla and Dean through

27  violence, intimidation, and otherwise, refusing to provide Dikla the information necessary to run

28  the business, and stealing and concealing Company funds for his own personal use.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

109.    Debtor's wrongful conduct is adversely and materially affecting the Company's activities.  Notably, since Debtor has seized sole control over the Company's operations three and half years ago, Debtor has presided over a 75% decline in the Company's profits, and a nearly 90% decline in valuation—if his own trial expert in the State Court Litigation and his filings before this Court are to be believed.

110.    Debtor undertook this conduct to advance his personal interest at the Company's expense, in hopes of buying out Dikla at a bargain price by attempting to lower the Company's valuation.

111.    As a proximate result of these and other breaches of fiduciary duties by Debtor, the Company (and, by extension, Dikla's 50% interest in the Company) has suffered damages in an amount to be determined at trial, but which exceed the jurisdictional requirements of this Court.  Given the valuations provided by Debtor for 2017 during trial in the State Court Litigation, and the current Company valuation implied in his Schedules, these damages are expected to exceed $300 million given Debtor's claim of a massive decline since he seized control of the Company.

112.    The wrongful conduct particularized herein was not due to any honest error in judgment or an attempt to act in the best interests of the Company, but rather to Debtor's willful misconduct, bad faith, and at a minimum, his reckless and grossly negligent disregard of his fiduciary duties to the Company and to Dikla, without the reasonable and ordinary care he owed them.

113.    Debtor has acted with oppression, fraud, and malice in these foregoing actions, willfully breaching his fiduciary duties to the Company.  The Company is thus entitled to exemplary and punitive damages.  Cal. Civ. Code § 3294.

114.    Dikla requests, derivatively and on behalf of the Company, pursuant to this Court's equitable powers, the expulsion or dissociation of Debtor as a member of the Company, an order barring Debtor from ever serving again as a manager or officer of the Company, and/or the appointment of a provisional director and/or receiver to manage the Company's business and affairs pending the resolution of this dispute, as well as all other equitable remedies and rights

35

1    under Cal. Corp. Code § 17701.01 *et seq.*

## EIGHTH CLAIM FOR RELIEF
### (Corporate Waste)
### (Derivative Claim)
### (By Dikla Unatin Against Debtor)

115.    Dikla realleges the allegations of paragraphs 1 through 114 against Debtor as though fully set forth herein.

116.    Debtor's bad faith breaches of his fiduciary duties of care, loyalty, and good faith and fair dealing resulted in a waste of Company assets.  As set forth herein, Debtor breached his fiduciary duties by, without limitation, unlawfully excluding the other member and manager of the Company, depriving it of its visionary co-founder, engaging in extensive financial and other misconduct, and deliberately and in bad faith suppressing Company sales and value in order to advance his litigation position in the State Court Litigation.  In doing so, Debtor is significantly harming the Company by locking out Dikla and Dean through violence, intimidation, and otherwise, refusing to provide Dikla the information necessary to run the business, and stealing and concealing Company funds for his own personal use.

117.    As a result of Debtor's misconduct as set forth above, since Debtor has seized sole control over the Company's operations three and half years ago, Debtor has presided over a 75% decline in the Company's profits, and a nearly 90% decline in valuation—if his own trial expert in the State Court Litigation and his filings before this Court are to be believed.

118.    As a proximate result of Debtor's misconduct, the Company (and, by extension, Dikla's 50% interest in the Company) has suffered damages in an amount to be determined at trial, but which exceed the jurisdictional requirements of this Court.  Given the valuations provided by Debtor for 2017 during trial in the State Court litigation, and the current Company valuation implied in his Schedules, these damages are expected to exceed $300 million given Debtor's claim of a massive decline since he seized control of the Company.

119.    Debtor has acted with oppression, fraud, and malice in these foregoing actions, and deliberately and in bad faith in wasting corporate assets.  The Company is thus entitled to exemplary and punitive damages.  Cal. Civ. Code § 3294.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
LOS ANGELES

120.    Dikla requests, derivatively and on behalf of the Company, pursuant to this Court's equitable powers, the expulsion or dissociation of Debtor as a member of the Company, an order barring Debtor from ever serving again as a manager or officer of the Company, and/or the appointment of a provisional director and/or receiver to manage the Company's business and affairs pending the resolution of this dispute, as well as all other equitable remedies and rights under Cal. Corp. Code § 17701.01 *et seq.*

**NINTH CLAIM FOR RELIEF**
**(Conversion)**
**(Derivative Claim)**
**(By Dikla Unatin Against Debtor)**

121.    Dikla realleges the allegations of paragraphs 1 through 120 against Debtor as though fully set forth herein.

122.    At all relevant times herein mentioned, the Company maintained dominion and control (and had the right of control) over its funds.

123.    Debtor has converted millions of dollars of the Company's funds by stealing them directly from the Company without consent or authorization.

124.    These acts of conversion are described in detail above and include, but are not limited to:  compensating himself and others aiding his misconduct, including for legal advice and personal expenses for himself and family members; making unauthorized wire transfers from a secret account holding Company funds to an undisclosed personal account; paying millions of dollars to credit cards in his name with Company funds; and making personal tax payments for himself with Company funds.

125.    Debtor's wrongful conversion of the Company's funds and assets was an intentional interference with the Company's dominion and control over such property.

126.    As a proximate result of Debtor's wrongful conversion of the Company's interests and property, the Company (and, by extension, Dikla's 50% interest in the Company) has suffered damages in an amount to be proven at trial, but which exceed the jurisdictional requirements of this Court.

127.    Between the time of Debtor's conversion of the Company's interests and property

37

for his own use and the filing of this claim, Dikla, derivatively on behalf of the Company, has expended substantial time and money in pursuit of the wrongfully converted property (including in attorneys' fees and related costs spent filing this suit and making the multiple demands described herein on Debtor) and has suffered further damages in an amount to be proven at trial.

128.    The aforementioned conversion of the Company's funds by Debtor was willful, wanton, malicious, and oppressive, was undertaken with the intent to defraud, and justifies exemplary and punitive damages in an amount to be proven at trial.  Cal. Civ. Code § 3294.

<u>**TENTH CLAIM FOR RELIEF**</u>
**(Unjust Enrichment)**
**(Derivative Claim)**
**(By Dikla Unatin Against Debtor)**

129.    Dikla realleges the allegations of paragraphs 1 through 128 against Debtor as though fully set forth herein.

130.    Debtor received an unlawful benefit at the Company's expense by stealing and concealing the Company's funds and assets as described above.  He had no right to exercise sole control over the Company's funds.

131.    As a proximate result of Debtor's wrongful theft of the Company's funds, he has been unjustly enriched at the Company's expense.

132.    Since excluding the Unatins from the Company and any control over its funds, Debtor has used Company funds to make millions of dollars in personal tax payments on his behalf for various tax years.  Debtor made these tax payments in excess of his true or expected tax liability for those years, so that he could receive millions of dollars through tax refunds then or in the future.  By doing so, Debtor effectively laundered massive unauthorized Company profits distributions to himself through the tax agencies, while simultaneously denying any corresponding distribution to Dikla commensurate with their profit interests in the Company. This receipt and unjust retention of benefits at the Company's expense is a textbook example of unjust enrichment.

133.    As a result of this unjust enrichment, Debtor should be required to disgorge and make restitution of all monies and gains which he obtained at the expense of the Company, in an

38

1 amount to be proven at trial.

2 **ELEVENTH CLAIM FOR RELIEF**
3 **(Violation Of Cal. Penal Code § 496)**
**(Derivative Claim)**
4 **(By Dikla Unatin Against Debtor)**

5 134.    Dikla re-alleges the allegations of paragraphs 1 through 133 against Debtor as

6 though fully set forth herein.

7 135.    Debtor stole, concealed, and withheld millions of dollars of the Company's funds

8 and assets.  As described above, Debtor's theft includes, but is not limited to:  compensating

9 himself and others aiding his misconduct, including for legal advice and personal expenses for

10 himself and family members; making unauthorized wire transfers from a secret account holding

11 Company funds to an undisclosed personal account; paying millions of dollars to credit cards in

12 his name with Company funds; and making personal tax payments for himself with Company

13 funds.

14 136.    At all times mentioned herein, Debtor knew that using the Company's funds and

15 assets in this manner was unauthorized and constituted theft of the Company's property.

16 137.    As a proximate result of Debtor's receipt of stolen property as set forth above, the

17 Company suffered damages in an amount to be proven at trial, but which exceed the

18 jurisdictional requirements of this Court.  The Company is thus entitled to three times the amount

19 of actual damages, plus costs and attorneys' fees as provided under California Penal Code

20 Section 496(c).

21 **TWELFTH CLAIM FOR RELIEF**
**(Accounting)**
22 **(Derivative Claim)**
**(By Dikla Unatin Against Debtor)**

23 138.    Dikla re-alleges the allegations of paragraphs 1 through 137 against Debtor as

24 though fully set forth herein.

25 139.    As alleged above, at all relevant times, Debtor, as a member and manager of the

26 Company, owed fiduciary duties to the Company.

27 140.    In addition to his breaches of fiduciary duty and acts of waste, Debtor converted

28 millions of dollars of the Company's funds by stealing them directly from the Company without

39

consent or authorization.  Debtor also received an unlawful benefit at the Company's expense by

stealing and concealing the Company's funds and assets as described above.

141.    An accounting is necessary to determine the full extent of monies owed to the

Company by Debtor and to determine whether any funds or assets have been dissipated or

devalued due to Debtor's conduct.

**THIRTEENTH CLAIM FOR RELIEF**
**(Nondischargeability Of Tort Claims Asserted In This Adversary Proceeding**
**Under 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6))**
**(Derivative Claim)**
**(By Dikla Unatin Against Debtor)**

142.    Dikla realleges the allegations of paragraphs 1 through 141 against Debtor as

though fully set forth herein.

143.    By virtue of Debtor's position as a manager and member of the Company, a

California LLC, he owed unqualified fiduciary duties of good faith, care, and loyalty to the

Company pursuant to, *inter alia*, California Corporations Code § 17704.09, as well as the

common law.  As alleged more fully in *inter alia* Paragraphs 43-48, and 94-141 (which are

incorporated herein by reference), Debtor wholly disregarded these duties by, without limitation,

intentionally and in bad faith suppressing Company sales and value to advance his litigation

position in the State Court Litigation (advancing his personal interest at the Company's expense,

in hopes of buying out Dikla at a bargain price by attempting to lower the Company's valuation),

significantly harming the Company by excluding Dikla and Dean from the business, *i.e.*, the

indispensable leaders of the most essential departments of the Company, refusing to provide

Dikla the information necessary to run the business, and stealing and concealing Company funds

for his own personal use.

144.    Debtor's wrongful conduct has adversely and materially affected the Company's

activities, and is continuing.  Notably, since Debtor has seized sole control over the Company's

operations three and half years ago, Debtor has presided over a 75% decline in the Company's

profits, and a nearly 90% decline in valuation—if his own trial expert in the State Court

Litigation and his filings before this Court are to be believed.

145.    Debtor's bad faith breaches of his fiduciary duties of care, loyalty, and good faith

40

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

and fair dealing, corporate waste, conversion, and violation of California Penal Code Section

496(c) all were committed with oppression, fraud, and malice, causing "willful and malicious

injury" to the Company. Accordingly, these claims give rise to liabilities on the part of Debtor

that are nondischargeable under 11 U.S.C §§ 523(a)(2), 523(a)(4), and 523(a)(6).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

## **ON THE INDIVIDUAL CLAIMS**

1.      Determine that Dikla's Final Judgment against Debtor in the State Court

Litigation in the amount of $14,834,730.69 is nondischargeable pursuant to 11 U.S.C. §§

523(a)(2), 523(a)(4), and 523(a)(6); and enter judgment against Debtor in the amount of

$14,834,730.69, plus applicable interest in accordance with 28 U.S.C. § 1961;

2.      Determine that Dikla's Final Judgment against Debtor in the State Court

Litigation in the amount of $13,479,586.45 is nondischargeable pursuant to 11 U.S.C. §§

523(a)(2), 523(a)(4), and 523(a)(6), and enter judgment against Debtor in the amount of

$13,479,586.45, plus applicable interest in accordance with 28 U.S.C. § 1961;

3.      Determine that Dikla's Final Judgment against Debtor in the State Court

Litigation in the amount of $12,395,778.59 is nondischargeable pursuant to 11 U.S.C. §§

523(a)(2), 523(a)(4), and 523(a)(6), and enter judgment against Debtor in the amount of

$12,395,778.59, plus applicable interest in accordance with 28 U.S.C. § 1961;

4.      Determine that Dean's Final Judgment against Debtor in the State Court

Litigation in the amount of $987,713.10 is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)

and 523(a)(6), and enter judgment against Debtor in the amount of $987,713.10, plus applicable

interest in accordance with 28 U.S.C. § 1961;

5.      Determine that all tort claims asserted in this Adversary Proceeding are

nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6);

6.      For an award of compensatory damages in favor of Dikla and against Debtor in an

amount to be determined at trial, including, without limitation compensatory damages for all

penalties and interest incurred by Dikla pursuant to the Tax Indemnity Agreement);

41

7.      For an order of specific performance of the Tax Indemnity Agreement, including an order that any tax refund received by Debtor be paid to the Company pursuant to the Tax Indemnity Agreement;

8.      For an order that Debtor make restitution to Dikla for any unjust enrichment, in an amount to be determined at trial;

9.      For costs of suit; and

10.     For such other and further relief as this case may require and the Court deems just and proper.

## ON THE INDIVIDUAL AND DERIVATIVE CLAIMS

11.     For an order expelling Debtor as a member, manager and/or officer of the Company and barring Debtor from ever serving again as a manager or officer of the Company pursuant to California Corporations Code § 17706.02(e);

12.     For the appointment of a provisional director and/or receiver to manage the Company's business and affairs pursuant to California Code of Civil Procedure § 564;

13.     For an award of compensatory damages against Debtor, in an amount to be determined at trial, including interest;

14.     For an award of punitive damages against Debtor;

15.     For an order that Debtor make restitution for any unjust enrichment, in an amount to be determined at trial;

16.     For an award of actual damages, treble damages, costs and attorneys' fees as provided under California Penal Code Section 496(c);

17.     For an accounting to determine the full extent of Debtor's unlawful acts toward the Company and the sums owed to the Company by Debtor;

18.     Determine that all tort claims asserted in this Adversary Proceeding are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6);

19.     For costs of suit; and

20.     For such other and further relief as the Court deems just and proper.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BK NO.: 2:21-bk-10826-BB
COMPLAINT

1    Dated:  February 19, 2021                    LATHAM & WATKINS LLP
2                                                    Peter M. Gilhuly
                                                      Daniel Scott Schecter
3                                                    Amy C. Quartarolo
                                                      Nima H. Mohebbi
4

5                                              By  /s/ Amy C. Quartarolo
                                                      Amy C. Quartarolo
6                                              Attorneys for Plaintiffs Dikla Gavrieli Unatin
                                                a/k/a Dikla Unatin and Dean Unatin
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

## **VERIFICATION**

I, Dikla Gavrieli a/k/a Dikla Gavrieli Unatin, hereby declare as follows:

I am a plaintiff in this adversary proceeding. I have read the derivative claims and allegations. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the derivative claims and allegations set forth in Paragraphs 8-12, 33, 43-48, 57-63, and 94-145, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _2-19-21_____

_Dikla Unatin_____
Dikla Gavrieli a/k/a Dikla Gavrieli Unatin

# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FILED**
Superior Court of California
County of Los Angeles

01/22/2021

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ K. Kelly _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, an individual, | Case No. BC 686856 |
| Plaintiff, | Assigned to:  Hon. Patrick T. Madden Dept. S28 |
| v. | **JUDGMENT** Œ] ^} å^å |
| KFIR GAVRIELI, an individual; and DOES 1-10, inclusive, | Action Filed:  December 13, 2017 Trial Date:     September 23, 2019 |
| Defendants. | |
| AND RELATED CROSS-ACTIONS. | |

**JUDGMENT**

1    The above-entitled matter came on regularly for trial beginning September 23, 2019, in

2    Department S28 of the above-entitled court, Honorable Patrick T. Madden, presiding.  Plaintiff

3    Dikla Gavrieli a/k/a Dikla Gavrieli Unatin (referred to herein as Dikla Gavrieli Unatin) and

4    Cross-Defendant Dean Unatin were represented at trial by Daniel Scott Schecter and Nima

5    Mohebbi of Latham & Watkins LLP.  Defendant Kfir Gavrieli was represented at trial by

6    Marshall Camp and Allison L. Libeu of Hueston Hennigan LLP.

7    A jury of 12 persons was regularly impaneled and sworn/acknowledged and agreed to try

8    the case.  Witnesses were sworn and testified from October 8, 2019 to October 31, 2019.  After

9    hearing evidence, arguments of counsel, and being instructed by the Court, the matter was

10    submitted to the jury with instruction to return a verdict.  The jury deliberated and thereafter

11    returned to court with its verdict on November 12, 2019 in words and figures as follows:

12    **<u>Verdict Form 1: Dikla Gavrieli Unatin's Claims Against Kfir Gavrieli</u>**

13    **Dikla Gavrieli Unatin's Breach of Fiduciary Duty Claim Against Kfir Gavrieli Regarding
Gavrieli Brands, LLC**

14
15    1.    On Dikla Gavrieli Unatin's claim for Breach of Fiduciary Duty against Kfir

Gavrieli regarding Gavrieli Brands, LLC:

16    ___X___  We find in favor of Dikla Gavrieli Unatin and against Kfir Gavrieli.

17    _____  We find in favor of Kfir Gavrieli and against Dikla Gavrieli Unatin.

18    *If you find in favor of Dikla Gavrieli Unatin, proceed to Question No. 2.*

19    *If you find in favor of Kfir Gavrieli, proceed to Question No. 5 and do not answer Question No.
2, Question No. 3, or Question No. 4.*

20
21    2.    We award Dikla Gavrieli Unatin the following economic damages, if any, on her

22    claim for Breach of Fiduciary Duty against Kfir Gavrieli regarding Gavrieli Brands, LLC:

23    $ 1,425,000.00

24    3.    We award Dikla Gavrieli Unatin the following pain and suffering damages, if any,

25    on her claim for Breach of Fiduciary Duty against Kfir Gavrieli regarding Gavrieli Brands, LLC:

26    $ 5,000,000.00

27    *Proceed to Question No. 4.*

28    4.    If you found in favor of Dikla Gavrieli Unatin on Question No. 1, do you find that

2

**JUDGMENT**

1    Dikla Gavrieli Unatin proved by clear and convincing evidence that Kfir Gavrieli engaged in

2    malice, oppression, or fraud with respect to Dikla Gavrieli Unatin's claim for Breach of

3    Fiduciary Duty regarding Gavrieli Brands, LLC?

4            __X__  Yes

5            _____  No

6    *Proceed to Question No. 5.*

7    **Dikla Gavrieli Unatin's Claims Against Kfir Gavrieli Regarding Outside Investments**

8            5.      On Dikla Gavrieli Unatin's claim for Breach of Fiduciary Duty against Kfir

9    Gavrieli regarding outside investments made from Company profits:

10           __X__  We find in favor of Dikla Gavrieli Unatin and against Kfir Gavrieli.

11           _____  We find in favor of Kfir Gavrieli and against Dikla Gavrieli Unatin.

12   *If you find in favor of Dikla Gavrieli Unatin, proceed to Question No. 6.*

13   *If you find in favor of Kfir Gavrieli, proceed to Question No. 9 and do not answer Question No.
6, Question No. 7, or Question No. 8.*

14

15           6.      *Indicate below the amount of economic damages you award, if any, in connection*

16   *with Dikla Gavrieli Unatin's claim for Breach of Fiduciary Duty against Kfir Gavrieli regarding*

17   *the outside investments made from Company profits.*

18           *If you award economic damages, you must indicate which of three categories such*

19   *damages fall into:*

20           *(Category 1)   Amounts invested from Company funds;*

21           *(Category 2)   Distributions from outside investments that were reinvested into new*

22           *investments; and*

23           *(Category 3)   Distributions that were not reinvested and remain in the First Republic*

24           *Bank -0112 account.*

25           *If you choose to award damages in Category 1 or Category 2, you must also decide*

26   *whether to award prejudgment interest with respect to damages in these categories.*

27           *If you find that Dikla Gavrieli Unatin did not suffer economic damages, indicate "0" in*

28   *each blank below.*

3

**JUDGMENT**

1    We award Dikla Gavrieli Unatin the following economic damages, if any, on her claim

2  for Breach of Fiduciary Duty against Kfir Gavrieli regarding the outside investments made from

3  Company profits:

4    Category 1:              $7,520,609.00

5    Prejudgment Interest for Category 1:   $1,609,952.00

6    Category 2:              $1,418,597.00

7    Prejudgment Interest for Category 2:   $203,733.00

8    Category 3:              $1,542,465.00

9  *Proceed to Question No. 7.*

10    7.    We award Dikla Gavrieli Unatin the following pain and suffering damages, if any,

11  on her claim for Breach of Fiduciary Duty against Kfir Gavrieli regarding the outside

12  investments made from Company profits:

13    $ 0

14  *Proceed to Question No. 8.*

15    8.    If you found in favor of Dikla Gavrieli Unatin on Question No. 5, do you find that

16  Dikla Gavrieli Unatin proved by clear and convincing evidence that Kfir Gavrieli engaged in

17  malice, oppression, or fraud with respect to Dikla Gavrieli Unatin's claim for Breach of

18  Fiduciary Duty regarding outside investments made from Company profits?

19    X   Yes

20    _____ No

21  *Proceed to Question No. 9.*

22    9.    On Dikla Gavrieli Unatin's claim for Fraud against Kfir Gavrieli regarding

23  outside investments made from Company profits:

24    X   We find in favor of Dikla Gavrieli Unatin and against Kfir Gavrieli.

25    _____ We find in favor of Kfir Gavrieli and against Dikla Gavrieli Unatin.

26  *If you find in favor of Dikla Gavrieli Unatin, proceed to Question No. 10.*

27  *If you find in favor of Kfir Gavrieli, proceed to Question No. 13 and do not answer Question No.
10, Question No. 11, or Question No. 12.*

28

**JUDGMENT**

10.     *Indicate below the amount of economic damages you award, if any, in connection with Dikla Gavrieli Unatin's claim for Fraud against Kfir Gavrieli regarding the outside investments made from Company profits.*

*If you award economic damages, you must indicate which of three categories such damages fall into:*

*(Category 1)    Amounts invested from Company funds;*

*(Category 2)    Distributions from outside investments that were reinvested into new investments; and*

*(Category 3)    Distributions that were not reinvested and remain in the First Republic Bank -0112 account.*

*If you choose to award damages in Category 1 or Category 2, you must also decide whether to award prejudgment interest with respect to damages in these categories.*

*If you find that Dikla Gavrieli Unatin did not suffer economic damages, indicate "0" in each blank below.*

We award Dikla Gavrieli Unatin the following economic damages, if any, on her claim for Fraud against Kfir Gavrieli regarding the outside investments made from Company profits:

Category 1:                                    $7,520,609.00

Prejudgment Interest for Category 1:    $1,609,952.00

Category 2:                                    $1,418,597.00

Prejudgment Interest for Category 2:    $203,733.00

Category 3:                                    $1,542,465.00

*Proceed to Question No. 11.*

11.     We award Dikla Gavrieli Unatin the following pain and suffering damages, if any, on her claim for Fraud against Kfir Gavrieli regarding the outside investments made from Company profits:

$ 0

*Proceed to Question No. 12.*

12.     If you found in favor of Dikla Gavrieli Unatin on Question No. 9, do you find that

5

**JUDGMENT**

1  Dikla Gavrieli Unatin proved by clear and convincing evidence that Kfir Gavrieli engaged in

2  malice, oppression, or fraud with respect to Dikla Gavrieli Unatin's claim for Fraud regarding

3  outside investments made from Company profits?

4        __X__ Yes

5        _____ No

6  *Proceed to Question No. 13.*

7        13.    On Dikla Gavrieli Unatin's claim for Conversion against Kfir Gavrieli regarding

8  outside investments made from Company profits:

9        __X__ We find in favor of Dikla Gavrieli Unatin and against Kfir Gavrieli.

10        _____ We find in favor of Kfir Gavrieli and against Dikla Gavrieli Unatin.

11  *If you find in favor of Dikla Gavrieli Unatin, proceed to Question No. 14.*

12  *If you find in favor of Kfir Gavrieli, proceed to Question No. 17 and do not answer Question No.*
   *14, Question No. 15, or Question No. 16.*

13

14        14.    *Indicate below the amount of economic damages you award, if any, in connection*

15  *with Dikla Gavrieli Unatin's claim for Conversion against Kfir Gavrieli regarding the outside*

16  *investments made from Company profits.*

17        *If you award economic damages, you must indicate which of three categories such*

18  *damages fall into:*

19        *(Category 1)    Amounts invested from Company funds;*

20        *(Category 2)    Distributions from outside investments that were reinvested into new*

21        *investments; and*

22        *(Category 3)    Distributions that were not reinvested and remain in the First Republic*

23        *Bank -0112 account.*

24        *If you choose to award damages in Category 1 or Category 2, you must also decide*

25  *whether to award prejudgment interest with respect to damages in these categories.*

26        *If you find that Dikla Gavrieli Unatin did not suffer economic damages, indicate "0" in*

27  *each blank below.*

28        We award Dikla Gavrieli Unatin the following economic damages, if any, on her claim

6

**JUDGMENT**

1    for Conversion against Kfir Gavrieli regarding the outside investments made from Company

2    profits:

3         Category 1:                      $7,520,609.00

4         Prejudgment Interest for Category 1:  $1,609,952.00

5         Category 2:                      $1,418,597.00

6         Prejudgment Interest for Category 2:  $203,733.00

7         Category 3:                      $1,542,465.00

8    *Proceed to Question No. 15.*

9         15.     We award Dikla Gavrieli Unatin the following pain and suffering damages, if any,

10    on her claim for Conversion against Kfir Gavrieli regarding the outside investments made from

11    Company profits:

12         $1,000,000.00

13    *Proceed to Question No. 16.*

14         16.     If you found in favor of Dikla Gavrieli Unatin on Question No. 13, do you find

15    that Dikla Gavrieli Unatin proved by clear and convincing evidence that Kfir Gavrieli engaged in

16    malice, oppression, or fraud with respect to Dikla Gavrieli Unatin's claim for Conversion

17    regarding outside investments made from Company profits?

18         X   Yes

19               No

20    *Proceed to Question No. 17.*

21         17.     On Dikla Gavrieli Unatin's claim for Breach of Oral Contract against Kfir

22    Gavrieli regarding outside investments made from Company profits:

23         X   We find in favor of Dikla Gavrieli Unatin and against Kfir Gavrieli.

24               We find in favor of Kfir Gavrieli and against Dikla Gavrieli Unatin.

25    *If you find in favor of Dikla Gavrieli Unatin, proceed to Question No. 18.*

26    *If you find in favor of Kfir Gavrieli, proceed to Question No. 19 and do not answer Question*

27    *No. 18.*

28         18.    *Indicate below the amount of economic damages you award, if any, in connection*

7

**JUDGMENT**

1 *with Dikla Gavrieli Unatin's claim for Breach of Oral Contract against Kfir Gavrieli regarding*

2 *the outside investments made from Company profits.*

3   *If you award economic damages, you must indicate which of three categories such*

4 *damages fall into:*

5   *(Category 1) Amounts invested from Company funds;*

6   *(Category 2) Distributions from outside investments that were reinvested into new*

7   *investments; and*

8   *(Category 3) Distributions that were not reinvested and remain in the First Republic*

9   *Bank -0112 account.*

10   *If you choose to award damages in Category 1 or Category 2, you must also decide*

11 *whether to award prejudgment interest with respect to damages in these categories.*

12   *If you find that Dikla Gavrieli Unatin did not suffer economic damages, indicate "0" in*

13 *each blank below.*

14   We award Dikla Gavrieli Unatin the following economic damages, if any, on her claim

15 for Breach of Oral Contract against Kfir Gavrieli regarding the outside investments made from

16 Company profits:

17   Category 1:    $7,520,609.00

18   Prejudgment Interest for Category 1: $1,609,952.00

19   Category 2:    $1,418,597.00

20   Prejudgment Interest for Category 2: $203,733.00

21   Category 3:    $1,542,465.00

22 *Proceed to Question No. 19.*

23   19. On Dikla Gavrieli Unatin's claim for Breach of the Covenant of Good Faith and

24 Fair Dealing against Kfir Gavrieli regarding outside investments made from Company profits:

25   __X__ We find in favor of Dikla Gavrieli Unatin and against Kfir Gavrieli.

26   _____ We find in favor of Kfir Gavrieli and against Dikla Gavrieli Unatin.

27 *If you find in favor of Dikla Gavrieli Unatin, proceed to Question No. 20.*

28 *If you find in favor of Kfir Gavrieli, sign and complete this verdict form.*

8

**JUDGMENT**

1      20.    *Indicate below the amount of economic damages you award, if any, in connection*

2  *with Dikla Gavrieli Unatin's claim for Breach of the Covenant of Good Faith and Fair Dealing*

3  *against Kfir Gavrieli regarding the outside investments made from Company profits.*

4      *If you award economic damages, you must indicate which of three categories such*

5  *damages fall into:*

6      *(Category 1)   Amounts invested from Company funds;*

7      *(Category 2)   Distributions from outside investments that were reinvested into new*

8      *investments; and*

9      *(Category 3)   Distributions that were not reinvested and remain in the First Republic*

10      *Bank -0112 account.*

11      *If you choose to award damages in Category 1 or Category 2, you must also decide*

12  *whether to award prejudgment interest with respect to damages in these categories.*

13      *If you find that Dikla Gavrieli Unatin did not suffer economic damages, indicate "0" in*

14  *each blank below.*

15      We award Dikla Gavrieli Unatin the following economic damages, if any, on her claim

16  for Breach of the Covenant of Good Faith and Fair Dealing against Kfir Gavrieli regarding the

17  outside investments made from Company profits:

18      Category 1:             $7,520,609.00

19      Prejudgment Interest for Category 1:  $1,609,952.00

20      Category 2:             $1,418,597.00

21      Prejudgment Interest for Category 2:  $203,733.00

22      Category 3:             $1,542,465.00

23

24

25

26

27

28

9

**JUDGMENT**

## <u>Verdict Form 2: Kfir Gavrieli's Claims Against Dikla Gavrieli Unatin</u>

**Kfir Gavrieli's Declaratory Judgment Claim Against Dikla Gavrieli Unatin**

1.    Did Kfir Gavrieli and Dikla Gavrieli Unatin enter into a contract to shift ownership of Gavrieli Brands, LLC from 50/50 to 60% for Kfir Gavrieli and 40% for Dikla Gavrieli Unatin if Gavrieli Brands, LLC reached a value of $200 million?

_____  Yes

\_\_X\_\_  No

*If you answered "Yes" to Question No. 1, proceed to Question No. 2.  If you answered "No" to Question No. 1, proceed to Question No. 3 and do not answer Question No. 2.*

2.    Did Gavrieli Brands, LLC reach a value of $200 million?

_____  Yes

_____  No

*Proceed to Question No. 3.*

3.    As to authority over the Company, we find:

_____    When the Company was formed, Kfir Gavrieli and Dikla Gavrieli Unatin agreed that Kfir Gavrieli would serve as the Chief Executive Officer with final decision-making authority over the Company.

\_\_X\_\_    When the Company was formed, Kfir Gavrieli and Dikla Gavrieli Unatin agreed that they would have joint and equal authority over the Company.

*Proceed to Question No. 4.*

4.    Did Kfir Gavrieli and Dikla Gavrieli Unatin enter into a contract providing that the outside investments made from Company profits would be owned in proportion to their respective ownership interests in Gavrieli Brands, LLC?

\_\_X\_\_  Yes

_____  No

*If you answered "Yes" to Question No. 4, proceed to Question No. 5. If you answered "No" to Question No. 4, proceed to Question No. 6 and do not answer Question No. 5.*

5.    Under the contract relating to the outside investments, do Kfir Gavrieli and Dikla

10

**JUDGMENT**

1  Gavrieli Unatin's respective ownership interests in all outside investments change with their

2  respective ownership interests in Gavrieli Brands, LLC?

3  _____ Yes

4  __X__ No

5  *Proceed to Question No. 6.*

6  6.    Did Kfir Gavrieli and Dikla Gavrieli Unatin enter into a contract providing that

7  the investments would be transferred into trusts?

8  _____ Yes

9  __X__ No

10

11  **Verdict Form 3: Kfir Gavrieli's Claims Against Dean Unatin**

12  **Kfir Gavrieli's Claims Against Dean Unatin**

13  1.    On Kfir Gavrieli's claim against Dean Unatin for Breach of Fiduciary Duty:

14  _____ We find in favor of Kfir Gavrieli and against Dean Unatin.

15  __X__ We find in favor of Dean Unatin and against Kfir Gavrieli.

16  *If you find in favor of Kfir Gavrieli, proceed to Question No. 2.*

17  *If you find in favor of Dean Unatin, proceed to Question No. 4 and do not answer Question No. 2*
18  *or Question No. 3.*

19  2.    We award Kfir Gavrieli the following damages, if any, on his claim for Breach of

20  Fiduciary Duty against Dean Unatin:

21  $ _____.

22  *Proceed to Question No. 3.*

23  3.    If you found in favor of Kfir Gavrieli on Question No. 1, do you find that Kfir

24  Gavrieli proved by clear and convincing evidence that Dean Unatin engaged in malice,

25  oppression, or fraud with respect to Kfir Gavrieli's Breach of Fiduciary Duty claim?

26  _____ Yes

27  _____ No

28  *Proceed to Question No. 4.*

11

JUDGMENT

4.     On Kfir Gavrieli's claim against Dean Unatin for Professional Negligence:

_____  We find in favor of Kfir Gavrieli and against Dean Unatin.

__X__  We find in favor of Dean Unatin and against Kfir Gavrieli.

*If you find in favor of Kfir Gavrieli, proceed to Question No. 5.*

*If you find in favor of Dean Unatin, sign and complete this verdict form.*

5.     We award Kfir Gavrieli the following damages, if any, on his claim for Professional Negligence against Dean Unatin:

$ _____

### **Verdict Form 4: Dean Unatin's Claim Against Kfir Gavrieli**

**Dean Unatin's Claim Against Kfir Gavrieli**

1.     On Dean Unatin's claim against Kfir Gavrieli for Fraud:

__X__  We find in favor of Dean Unatin and against Kfir Gavrieli.

_____  We find in favor of Kfir Gavrieli and against Dean Unatin.

*If you find in favor of Dean Unatin, proceed to Question No. 2.*

*If you find in favor of Kfir Gavrieli, sign and complete this verdict form and do not answer Question No. 2 and Question No. 3.*

2.     We award Dean Unatin the following damages, if any, on his claim for Fraud against Kfir Gavrieli:

$ 450,000.00

*Proceed to Question No. 3.*

3.     If you found in favor of Dean Unatin on Question No. 1, do you find that Dean Unatin proved by clear and convincing evidence that Kfir Gavrieli engaged in malice, oppression, or fraud with respect to Dean Unatin's claim for Fraud?

__X__  Yes

_____  No

As noted above, after a jury of 12 persons was regularly impaneled and sworn/acknowledged and agreed to try the case, witnesses were sworn and testified from October

12

**JUDGMENT**

1    8, 2019 to October 31, 2019.  After hearing evidence, arguments of counsel, and being instructed

2    by the Court, the matter was submitted to the jury with instruction to return a verdict.  The jury

3    deliberated and thereafter returned to court with the verdict above on November 12, 2019,

4    finding that Dikla Gavrieli Unatin and Dean Unatin were entitled to punitive damages.

5    Witnesses were again sworn and testified on November 12, 2019 regarding Dikla Gavrieli

6    Unatin's and Dean Unatin's entitlement to punitive damages.  After hearing evidence, arguments

7    of counsel, and being instructed by the Court, the matter was submitted to the jury with

8    instruction to return a verdict.  The jury deliberated and thereafter returned to court on November

9    12, 2019 with its punitive damages verdict in words and figures as follows:

10

11   **Punitive Damages Verdict Form 1: Dikla Gavrieli Unatin's Claim for Breach of Fiduciary**

12   **Duty Against Kfir Gavrieli Regarding Gavrieli Brands, LLC**

13       1.      What amount of punitive damages, if any, do you award Dikla Gavrieli Unatin on

14   her claim for Breach of Fiduciary Duty against Kfir Gavrieli regarding Gavrieli Brands, LLC?

15       $  0

16

17   **Punitive Damages Verdict Form 2: Dikla Gavrieli Unatin's Claim for Breach of Fiduciary**

18   **Duty Against Kfir Gavrieli Regarding Outside Investments Made From Company Profits**

19       1.      What amount of punitive damages, if any, do you award Dikla Gavrieli Unatin on

20   her claim for Breach of Fiduciary Duty against Kfir Gavrieli regarding outside investments made

21   from Company profits?

22       $  15,000,000

23

24   **Punitive Damages Verdict Form 3: Dikla Gavrieli Unatin's Claim for Fraud Against Kfir**

25   **Gavrieli Regarding Outside Investments Made From Company Profits**

26       1.      What amount of punitive damages, if any, do you award Dikla Gavrieli Unatin on

27   her claim for Fraud against Kfir Gavrieli regarding outside investments made from Company

28   profits?

13

**JUDGMENT**

1    $ 15,000,000

2

3    **Punitive Damages Verdict Form 4: Dikla Gavrieli Unatin's Claim for Conversion Against**

4    **Kfir Gavrieli Regarding Outside Investments Made From Company Profits**

5    1.    What amount of punitive damages, if any, do you award Dikla Gavrieli Unatin on

6    her claim for Conversion against Kfir Gavrieli regarding outside investments made from

7    Company profits?

8    $ 15,000,000

9

10    **Punitive Damages Verdict Form 5: Dean Unatin's Claim for Fraud Against Kfir Gavrieli**

11    1.    What amount of punitive damages, if any, do you award Dean Unatin on his claim

12    for Fraud against Kfir Gavrieli?

13    $ 1,500,000

14

15    It appearing by reason of said verdicts that Dikla Gavrieli Unatin and Dean Unatin are

16    entitled to judgment against Kfir Gavrieli.  This Judgment has been amended in accordance with

17    the Court's December 16, 2020 Order Re Motions for JNOV and New Trial, and Dikla Gavrieli

18    Unatin's and Dean Unatin's consent to the remittiturs outlined therein and set forth in the Notice

19    of Acceptance of Remittiturs, which was filed on December 23, 2020.

20    **BASED UPON THE FOREGOING, IT IS ORDERED, ADJUDGED AND**

21    **DECREED** that Judgment is entered as follows:

22    1.    **On Dikla Gavrieli Unatin's First Cause of Action for Breach of Fiduciary**

23    **Duty Regarding Gavrieli Brands, LLC**

24    On her First Cause of Action for Breach of Fiduciary Duty Regarding Gavrieli Brands,

25    LLC, Dikla Gavrieli Unatin shall have and recover from Kfir Gavrieli **damages in the amount**

26    **of $2,425,000**, with post-verdict, prejudgment interest in the sum of $ _____, **for a total**

27

28

14

**JUDGMENT**

1  **judgment of $** _____ **on this claim,**[1] with post-judgment interest thereon at the rate of

2  ten percent (10%) per annum from the date of the judgment until paid pursuant to Code Civ.

3  Proc. § 685.010(a).

4        **2.**     **On Dikla Gavrieli Unatin's Second, Third, Fourth, Fifth, and Sixth Causes of Action Regarding the Outside Investments (the "Investment Claims")**

5

6          a.     **On Dikla Gavrieli Unatin's Second Cause of Action for Breach of Fiduciary Duty Regarding the Outside Investments**

7       On her Second Cause of Action for Breach of Fiduciary Duty Regarding the Outside

8  Investments, Dikla Gavrieli Unatin shall have and recover from Kfir Gavrieli $9,130,561 in

9  compensatory damages and $2,500,000 in punitive damages for total damages in the amount of

10  $11,630,561, with additional post-verdict, prejudgment interest on the compensatory damage

11  award in the sum of $ _____, **for a total judgment of $** _____ **on this claim,**[2] plus

12  post-judgment interest at the rate of ten percent (10%) per annum from the date of the judgment

13  until paid pursuant to Code Civ. Proc. § 685.010(a); § 3287(a).

14          b.     **On Dikla Gavrieli Unatin's Third Cause of Action for Breach of Oral Contract Regarding the Outside Investments**

15

16       On her Third Cause of Action for Breach of Oral Contract Regarding the Outside

17  Investments, Dikla Gavrieli Unatin shall have and recover from Kfir Gavrieli $9,130,561 in

18  compensatory damages with additional post-verdict, prejudgment interest in the sum of

19  $ _____, **for a total judgment of $** _____ **on this claim**, plus post-judgment interest

20  at the rate of ten percent (10%) per annum from the date of the judgment until paid pursuant to

21

---

22  [1] This sum reflects the application of a daily rate of prejudgment interest (seven percent (7%) per annum) to the compensatory damages on this claim, for each day between the date that Dikla Gavrieli Unatin filed a Notice of Acceptance of Remittitus (December 23, 2020) through the date of entry of judgment. That daily rate is $465.07 (reflecting annual interest divided by 365 days). The Court has multiplied this daily rate by the number of days from the filing of the Notice of Acceptance of Remittitus (December 23, 2020) through entry of judgment.

25  [2] The post-verdict, pre-judgment amount entered by the Court in Sections 2(a) through 2(e) covering each of the Investment Claims reflects the application of a daily rate of prejudgment interest (seven percent (7%) per annum) to the compensatory damages on these claims, for each day between the date of the verdict (November 12, 2019) through the date of entry of judgment. That daily rate for Sections 2(a) through 2(d) is $1,751.07, and for Section 2(e) that daily rate is $1,942.85 (reflecting annual interest divided by 365 days). The Court has multiplied this daily rate by the number of days from the verdict (November 12, 2019) through entry of judgment.

**JUDGMENT**

1  Code Civ. Proc. § 685.010(a); § 3287(a).

2          c.      **On Dikla Gavrieli Unatin's Fourth Cause of Action for Breach of the**
            **Covenant of Good Faith and Fair Dealing Regarding the Outside**
3          **Investments**

4          On her Fourth Cause of Action for Breach of the Covenant of Good Faith and Fair

5  Dealing Regarding the Outside Investments, Dikla Gavrieli Unatin shall have and recover from

6  Kfir Gavrieli $9,130,561 in compensatory damages with additional post-verdict, prejudgment

7  interest the sum of $‪‪‪‪‪‪‪‪‪‪‪‪‪‪, **for a total judgment of $‪‪‪‪‪‪‪‪‪‪‪‪‪ on this claim**, plus

8  post-judgment interest at the rate of ten percent (10%) per annum from the date of the judgment

9  until paid pursuant to Code Civ. Proc. § 685.010(a); § 3287(a).

10         d.      **On Dikla Gavrieli Unatin's Fifth Cause of Action for Fraud**
            **Regarding the Outside Investments**
11

12         On her Fifth Cause of Action for Fraud Regarding the Outside Investments, Dikla

13  Gavrieli Unatin shall have and recover from Kfir Gavrieli $9,130,561 in compensatory damages

14  and $2,500,000 in punitive damages for total damages in the amount of $11,630,561 with

15  additional post-verdict, prejudgment interest on the compensatory damage award in the sum of

16  $‪‪‪‪‪‪‪‪‪‪‪‪‪, **for a total judgment of $‪‪‪‪‪‪‪‪‪‪‪‪‪ on this claim,** plus post-judgment

17  interest at the rate of ten percent (10%) per annum from the date of the judgment until paid

18  pursuant to Code Civ. Proc. § 685.010(a); § 3287(a).

19         e.      **On Dikla Gavrieli Unatin's Sixth Cause of Action for Conversion**
            **Regarding the Outside Investments**
20

21         On her Sixth Cause of Action for Conversion Regarding the Outside Investments, Dikla

22  Gavrieli Unatin shall have and recover from Kfir Gavrieli $9,130,561 in compensatory damages,

23  $1,000,000 in pain and suffering damages, and $2,500,000 in punitive damages for total damages

24  in the amount of $12,630,561 with additional post-verdict, prejudgment interest on the

25  compensatory damage award in the sum of $‪‪‪‪‪‪‪‪‪‪‪‪, **for a total judgment of**

26  $‪‪‪‪‪‪‪‪‪‪‪‪ **on this claim,** plus post-judgment interest at the rate of ten percent (10%) per

27  annum from the date of the judgment until paid pursuant to Code Civ. Proc. § 685.010(a); §

28

16

**JUDGMENT**

3287(a).[3]

**3.      On Dikla Gavrieli Unatin's Seventh Cause of Action Against Kfir Gavrieli for Constructive Trust**

On her Seventh Cause of Action for Constructive Trust, Judgment is entered in favor of Dikla Gavrieli Unatin against Kfir Gavrieli.

Accordingly, **IT IS ORDERED, ADJUDGED AND DECREED** that a Constructive Trust is hereby imposed over a 50% share of all funds transferred to and/or located at HSBC – Hong Kong accounts ending -9838, -5938, -7838; Hang Seng Bank Limited account ending -6883; DBS Bank (Hong Kong) Limited account ending -6098; and Euro Pacific Bank Limited account ending -4711 (collectively, the "Bank Accounts") and Kfir Gavrieli is held to be an involuntary, constructive trustee thereof.

**4.      On Dikla Gavrieli Unatin's Eighth Cause of Action for Accounting**

On her Eighth Cause of Action for Accounting, Judgment is entered in favor of Kfir Gavrieli against Dikla Gavrieli Unatin.

Accordingly, **IT IS ORDERED, ADJUDGED AND DECREED** that Dikla Gavrieli Unatin shall have and recover nothing by way of her Eighth Cause of Action for Accounting.

**5.      On Dikla Gavrieli Unatin's Ninth Cause of Action for Declaratory Relief**

On her Ninth Cause of Action for Declaratory Relief, Judgment is entered in favor of Dikla Gavrieli Unatin against Kfir Gavrieli.

Accordingly, based on the jury's verdicts on Questions 1, 5, 9, 13 and 17 on Verdict Form 1 and Questions 1, 3, 4, 5, and 6 on Verdict Form 2, **IT IS ORDERED, ADJUDGED AND DECREED** as follows:

a.      Dikla Gavrieli Unatin owns 50% of Gavrieli Brands, LLC; Kfir Gavrieli owns 50% of Gavrieli Brands, LLC.

b.      Dikla Gavrieli Unatin and Kfir Gavrieli did **not** enter into a contract to shift ownership of Gavrieli Brands, LLC from 50/50 to 60% for Kfir

---

[3] To avoid double recovery, Dikla Gavrieli Unatin is entitled to a total maximum monetary recovery on the Investment Claims under Sections 2(a) through 2(e) which shall not exceed the total judgment amount entered by the Court on Claim 2(e) (Conversion) above.

17

**JUDGMENT**

1    Gavrieli and 40% for Dikla Gavrieli Unatin if Gavrieli Brands, LLC

2    reached a value of $200 million (as Kfir Gavrieli had contended).

3    c.    When Gavrieli Brands, LLC was formed, Dikla Gavrieli Unatin and Kfir

4    Gavrieli agreed that they would have joint and equal authority over

5    Gavrieli Brands, LLC.  Dikla Gavrieli Unatin and Kfir Gavrieli continue

6    to have joint and equal management and control authority over Gavrieli

7    Brands, LLC.

8    d.    Dikla Gavrieli Unatin and Kfir Gavrieli entered into a contract providing

9    that the outside investments made from Gavrieli Brands, LLC profits

10    would be owned in proportion to their respective ownership interests in

11    Gavrieli Brands, LLC, and would be controlled and shared by them on a

12    50/50 basis.  Under this contract, Dikla Gavrieli Unatin and Kfir Gavrieli

13    did not agree that their respective ownership interests in the outside

14    investments made from Gavrieli Brands, LLC profits would change with

15    their respective ownership interests in Gavrieli Brands, LLC that were

16    50/50 from inception (as Kfir Gavrieli had contended).  Dikla Gavrieli

17    Unatin and Kfir Gavrieli also did not enter into a contract providing that

18    the investments would be transferred into trusts (as Kfir Gavrieli had

19    contended).[4]

20    **6.    On Dikla Gavrieli Unatin's Request for a Permanent Injunction:**

21    On Dikla Gavrieli Unatin's request for a Permanent Injunction, the Court finds that,

22    based on the jury's verdict on Question 1 on Verdict Form 1 and Questions 1 and 3 on Verdict

23    Form 2, the testimony and evidence submitted at trial, and the submissions of the parties in post-

24    verdict filings, absent exercising its discretion to grant the injunctive relief, Kfir Gavrieli will

25    

_____

26    [4] For the avoidance of doubt, the Court finds that by electing damages, Mrs. Unatin disclaims
any present interest in the outside investments (a term that does not include any investment in

27    Halogen Ventures for which Mrs. Unatin did not seek damages).  However, the declaratory
judgment confirms the jury's finding that at the time the outside investments were made, she and

28    Mr. Gavrieli each had a 50% interest in those investments.

18

**JUDGMENT**

1   never permit Dikla Gavrieli Unatin to assume her role as a co-owner and co-manager of the

2   Company.  Accordingly, the Court hereby:

3            a.       Enjoins and prohibits Kfir Gavrieli from excluding Dikla Gavrieli Unatin

4   as a member and manager of Gavrieli Brands, LLC with the full and uninhibited right of

5   joint control;

6            b.       Enjoins and prohibits Kfir Gavrieli from blocking Dikla Gavrieli Unatin's

7   full access to all Gavrieli Brands, LLC-related banking, e-commerce, credit card

8   processing, charitable-based, or other accounts, wherever held (including, without

9   limitation, Gavrieli Brands, LLC's accounts with First Republic Bank (such as the

10  account ending in -1076), Magento, Braintree, American Express, Instagram, Pinterest,

11  and Facebook);

12           c.       Enjoins and prohibits Kfir Gavrieli from denying Dikla Gavrieli Unatin

13  complete access to all books, records, documents, and other information concerning

14  Gavrieli Brands, LLC;

15           d.       Orders Kfir Gavrieli to add Dikla Gavrieli Unatin as a signatory with the

16  equal rights and privileges that Kfir Gavrieli has for any and all Gavrieli Brands, LLC

17  accounts and information, including, without limitation, the First Republic Bank account

18  ending in -1076, Magento, Braintree, American Express, and social media accounts

19  including Instagram, Pinterest and Facebook, and to immediately update her of any

20  changes to any such logins, for all Gavrieli Brands, LLC accounts;

21           e.       Enjoins and prohibits Kfir Gavrieli from precluding Dikla Gavrieli Unatin

22  from obtaining rights and privileges for any and all Gavrieli Brands, LLC accounts and

23  information as set forth in Section 6(d) directly from any third party who provides access

24  and privileges to such accounts (*e.g.*, contacting First Republic Bank directly to obtain

25  full rights and privileges to Gavrieli Brands, LLC's account ending in-1076);

26           f.       Enjoins and prohibits Kfir Gavrieli from blocking Dikla Gavrieli Unatin's

27  full and equal access to all Gavrieli Brands, LLC-related funds, including funds that have

28  been diverted to date, including without limitation:

19

**JUDGMENT**

1        (1)     Any and all funds that have been transferred from Gavrieli Brands,

2                  LLC's Bank of America account to Gavrieli Brands, LLC's First

3                  Republic Bank account ending in -1076 to date, including without

4                  limitation, $5,261,016.70 that was transferred into that account in

5                  or about October 2017;

6        (2)     Any and all funds from Braintree and/or American Express which

7                  have been diverted to Gavrieli Brands, LLC's First Republic Bank

8                  account ending in -1076 to date, including without limitation,

9                  $20,495,333.50 that was transferred into that account between

10                 September 12, 2017 and December 31, 2017; and

11       g.     Enjoins and prohibits Kfir Gavrieli from interfering with Mrs. Unatin's

12  right to access information about funds sent to and/or located in accounts at the following

13  banks:  HSBC – Hong Kong, Hang Seng Bank Limited, DBS Bank (Hong Kong)

14  Limited, and Euro Pacific Bank Limited (including, without limitation, HSBC – Hong

15  Kong accounts ending -9838, -5938, -7838; Hang Seng Bank Limited account ending -

16  6883; DBS Bank (Hong Kong) Limited account ending -6098; and Euro Pacific Bank

17  Limited account ending -4711), *i.e.*, the Bank Accounts; and

18       h.     Enjoins and prohibits Kfir Gavrieli from using Gavrieli Brands, LLC's

19  funds, assets, and/or property for any purpose other than the ongoing operation of the

20  business, *i.e.*, business expenses, without Dikla Gavrieli Unatin's express consent.

21  **7.    On  Kfir Gavrieli's Second, Third, Fourth, Fifth and Sixth Cross-Claims**
     **Against Dean Unatin for Fraud, Constructive Fraud, Negligent**
22       **Misrepresentation, Professional Negligence and Breach of Fiduciary Duty**

23  On Kfir Gavrieli's Second, Third, Fourth, Fifth and Sixth Cross-Claims Against Dean

24  Unatin for Fraud, Constructive Fraud, Negligent Misrepresentation, Professional Negligence and

25  Breach of Fiduciary Duty, **IT IS ORDERED, ADJUDGED AND DECREED** as follows**:**

26       a.     Judgment is hereby entered in favor of Dean Unatin against Kfir Gavrieli

27  on all of Kfir Gavrieli's Cross-Claims.

28       b.     Kfir Gavrieli shall have and recover **nothing** by reason of his Amended

20

**JUDGMENT**

1  Cross-Claims against Dean Unatin for Fraud, Constructive Fraud, Negligent

2  Misrepresentation, Professional Negligence and Breach of Fiduciary Duty.[5]

3

4  **8.    On Dean Unatin's Cross-Claim Against Kfir Gavrieli for Fraud**

5  On Dean Unatin's Cross-Claim against Kfir Gavrieli for Fraud, **IT IS ORDERED,**

6  **ADJUDGED AND DECREED** as follows:

7      a.    Judgment is hereby entered in favor of Dean Unatin against Kfir Gavrieli

8  on his Cross-Claim for Fraud.

9      b.    Dean Unatin shall have and recover from Kfir Gavrieli compensatory

10  damages in the amount of $450,000 and punitive damages in the amount of $500,000,

11  with post-verdict, prejudgment interest on the compensatory damage award in the sum of

12  $_____, **for a total judgment of $**_____ **on this cross-claim,**[6] with

13  interest thereon at the rate of ten percent (10%) per annum from the date of the judgment

14  until paid pursuant to Code Civ. Proc. § 685.010(a).

15

16      **IT IS FURTHER ADJUDGED, ORDERED, AND DECREED** that Dikla Gavrieli

17  Unatin and Dean Unatin are the prevailing parties in this action, and shall have and recover costs

18  of suit against Kfir Gavrieli in the amount of $_____.

19

20  Dated: _____, 2021

21  HONORABLE PATRICK T. MADDEN
    Judge of the Superior Court
    Patrick T. Madden, Judge

22

23  ───────────────────

[5] On July 23, 2019, the Honorable Dalila Corral Lyons granted Dean Unatin's Motion for
24  Summary Adjudication on the Second Cause of Action (Fraud), Third Cause of Action
    (Constructive Fraud), and Fourth Cause of Action (Negligent Misrepresentation) in Kfir
25  Gavrieli's First Amended Cross-Complaint.

[6] The post-verdict, pre-judgment amount entered by the Court reflects the application of a daily
26  rate of prejudgment interest (seven percent (7%) per annum) to the compensatory damages on
    this claim, for each day between the date of the verdict (November 12, 2019) through the date of
27  entry of judgment.  That daily rate is $86.30 (reflecting annual interest divided by 365 days).
    The Court has multiplied this daily rate by the number of days from the verdict through entry of
28  judgment.

21

**JUDGMENT**

# EXHIBIT B

1

2

**FILED**
Superior Court of California
County of Los Angeles

3

**10/09/2020**

4

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ K. Kelly _____ Deputy

5

6

7

8

9

10

11

12    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13    **FOR THE COUNTY OF LOS ANGELES**

14

| | |
|---|---|
| DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, an individual, | Case No. BC 686856 |
| Plaintiff, | Assigned to:  Hon. Patrick T. Madden Dept. S28 |
| v. | **STATEMENT OF DECISION** |
| KFIR GAVRIELI, an individual; and DOES 1-10, inclusive, | |
| Defendants. | Action Filed:  December 13, 2017 Trial Date:       September 23, 2019 |
| AND RELATED CROSS-ACTIONS. | |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**STATEMENT OF DECISION**

1  **[~~PROPOSED~~] STATEMENT OF DECISION**

2          The above-entitled matter came on regularly for trial beginning September 23, 2019, in

3  Department S28 of the above-entitled court, Honorable Patrick T. Madden, presiding.  Mrs.

4  Unatin was represented at trial by Daniel Scott Schecter and Nima Mohebbi of Latham &

5  Watkins LLP.  Defendant Kfir Gavrieli was represented at trial by Marshall Camp and Allison L.

6  Libeu of Hueston Hennigan LLP.  After a jury of 12 persons was regularly impaneled and sworn,

7  witnesses were sworn and testified from October 8, 2019 to October 31, 2019.

8          After hearing evidence, arguments of counsel, and instructions by the Court, the matter

9  was submitted to the jury with instruction to return a verdict.  Following the jury's verdict, Mr.

10  Gavrieli requested adjudication of his cross-claim for declaratory relief, and Mrs. Unatin

11  requested that the Court issue equitable relief in the form of a declaratory judgment, a permanent

12  injunction, a constructive trust and an accounting, a receiver, and prejudgment interest.

13          As to Mr. Gavrieli's cross-claim for declaratory relief and Mrs. Unatin's request for

14  equitable relief, Mr. Gavrieli has requested and the Court renders this Statement of Decision

15  ("Statement") pursuant to California Rule of Court 3.1590.[1]  The purpose of this Statement is to

16  set forth the factual and legal bases for the Court's adjudication of the remaining equitable issues

17  between the parties.  The Court need not and does not discuss all issues and evidentiary facts, but

18  only discloses its determinations as to the ultimate facts and material issues in this case.  *See*

19  *Central Valley General Hospital v. Smith*, 162 Cal. App. 4th 501, 513 (2008) ("[A] statement of

20  decision is adequate if it fairly discloses the determinations as to the ultimate facts and material

21  issues in the case."); *In re Marriage of Balcof*, 141 Cal. App. 4th 1509, 1530-31 (2006) ("The

22  trial court need not discuss each question listed in a party's request; all that is required is an

23  explanation of the factual and legal basis of the court's decision regarding the principal

24  controverted issues"); *Hellman v. La Cumbre Golf & Country Club*, 6 Cal. App. 4th 1224, 1230-

25

26  _____
[1] The jury also rendered verdicts on Cross-Claims asserted by Mr. Gavrieli against Mr. Unatin
for breach of fiduciary duty and professional negligence, and Cross-Claims by Mr. Unatin
27  against Mr. Gavrieli for fraud.  Because Mr. Gavrieli and Mr. Unatin agree that the claims
between them were purely legal in nature, this Statement of Decision does not address those
28  claims and they will be covered only in the Judgment entered by the Court.

2

STATEMENT OF DECISION

1   31 (1992) (same); *Wegner et al.*, Cal. Practice Guide: Civil Trials and Evidence (The Rutter

2   Group 2019) ¶ 16:172 ("A statement of decision . . . . should provide a *narrative explanation* of

3   the judge's *reasoning*—the 'factual and legal basis' for the decision.  But the judge cannot be

4   required 'to make minute findings as to individual items of evidence.'") (emphasis original).

5   Accordingly, this Statement focuses on the material issues, with some references to the evidence,

6   reasonable inferences from evidence, and applicable law upon which the Court relied in

7   rendering its decisions.

8   **I.    GENERAL BACKGROUND AND PROCEDURAL HISTORY**

9        In April 2009, the parties formed Gavrieli Brands, LLC (the "Company"), with Mrs.

10  Unatin and Mr. Gavrieli as the two members.  The parties agreed that Mrs. Unatin and Mr.

11  Gavrieli would own the Company on a 50/50 basis.  In September 2015, the parties also decided

12  to contribute a portion of Company profits to make outside investments unrelated to the

13  Company's day-to-day operations.  Beginning on September 12, 2017, after Mr. Gavrieli

14  returned to the Company after a nine-month absence, he took several actions that resulted in Mrs.

15  Unatin losing access to the Company's funds, accounts, and platforms.  Mr. Gavrieli also

16  withdrew the full balance of $5,261,016.70 from the Company's long-time operating account at

17  Bank of America (to which Mrs. Unatin had full and equal access with Mr. Gavrieli), and

18  deposited that full sum into a new account at First Republic Bank to which Mrs. Unatin did not

19  have any access.  Mr. Gavrieli also diverted the Company's monthly credit card revenues—

20  which ran in the millions of dollars each month and totaled over $20 million between September

21  12 and December 31, 2017—so that they would be deposited into the same account at First

22  Republic Bank, rather than have them deposited into the Company's Bank of America account.

23       On December 13, 2017, Mrs. Unatin filed this lawsuit against Mr. Gavrieli for, among

24  other claims, breach of fiduciary duty, conversion, and breach of contract.  In her Second

25  Amended Complaint, Mrs. Unatin claimed that Mr. Gavrieli prevented her from exercising her

26  right of joint and equal control when he removed her access to the Company's funds, accounts,

27  and platforms.  As to the parties' investments, Mrs. Unatin claimed that they agreed the

28  investments would be jointly identified, evaluated, and owned in proportion to their ownership

3

**STATEMENT OF DECISION**

1   interests in the Company.  She claimed that Mr. Gavrieli misappropriated those investments and

2   used her money without her consent or authorization.

3        The Court issued a Temporary Restraining Order against Mr. Gavrieli on December 15,

4   2017, which the Court converted into a Preliminary Injunction on January 5, 2018.  That

5   Preliminary Injunction "[p]rohibit[ed] [Mr. Gavrieli] and anyone acting on his behalf from using

6   Company funds, assets, and/or property for any purpose other than the ongoing operation of the

7   business, *i.e*., ordinary business expenses."

8        On May 29, 2018, Mr. Gavrieli filed a Cross-Complaint seeking, among other claims,

9   declaratory relief against Mrs. Unatin.  Of relevance here, Mr. Gavrieli claimed that he owned

10   60% of the Company and Mrs. Unatin owned 40% based on an agreement in February 2014.

11   Mr. Gavrieli also claimed that since the Company's inception, he and Mrs. Unatin agreed that he

12   would serve as the Chief Executive Officer with final decision-making authority over the

13   Company.  With respect to the events on and after September 2017, Mr. Gavrieli claimed that

14   Mrs. Unatin quit the Company and that he had the right to take the actions he took in removing

15   her access to Company funds, accounts, and platforms.  As to the parties' outside investments,

16   Mr. Gavrieli claimed that the parties agreed that he would have sole authority over them and

17   would later transfer the funds into trusts for the parties.

18        Trial in this case commenced on September 23, 2019.  After a jury of 12 persons was

19   regularly impaneled and sworn, 19 witnesses were sworn and testified from October 8, 2019 to

20   October 31, 2019, and 377 exhibits were admitted into evidence.  After hearing evidence,

21   arguments of counsel, and instructions by the Court, all of the claims in the matter were

22   submitted to the jury.  As between Mrs. Unatin and Mr. Gavrieli, two verdict forms were

23   submitted to the jury.  Verdict Form 1 encompassed Mrs. Unatin's claims against Mr. Gavrieli

24   and Verdict Form 2 encompassed Mr. Gavrieli's cross-claim for declaratory relief against Mrs.

25   Unatin.  Between them, Verdict Forms 1 and 2 spanned 10 pages.  Phase One of the trial was

26   submitted to the jury on November 4, 2019 with instruction to return a verdict.  The jury

27   deliberated and returned a verdict on Phase One of the trial on November 12, 2019.  After

28   hearing evidence, arguments of counsel, and instructions by the Court on Phase Two (amount of

4

STATEMENT OF DECISION

1  punitive damages, if any), the matter of the amount of punitive damages, if any, was submitted to

2  the jury on November 12, 2019.  The jury deliberated and returned a verdict on Phase Two of the

3  trial on November 12, 2019.

4       On Verdict Form 1, the jury found in favor of Mrs. Unatin and against Mr. Gavrieli on all

5  of her claims:  breach of fiduciary duty regarding the Company, breach of fiduciary duty

6  regarding the outside investments, fraud, conversion, breach of contract, and breach of the

7  covenant of good faith and fair dealing.  The jury also found that Mr. Gavrieli engaged in malice,

8  oppression, and/or fraud with respect to each of Mrs. Unatin's tort claims.

9       On Verdict Form 2, the jury found the following:

10      1.    *Did Kfir Gavrieli and Dikla Gavrieli Unatin enter into a contract to shift*

11  *ownership of Gavrieli Brands, LLC from 50/50 to 60% for Kfir Gavrieli and 40% for Dikla*

12  *Gavrieli Unatin if Gavrieli Brands, LLC reached a value of $200 million?*

13      _____  *Yes*

14      *X*  *No*

15  *If you answered "Yes" to Question No. 1, proceed to Question No. 2.  If you answered "No" to*
*Question No. 1, proceed to Question No. 3 and do not answer Question No. 2.*

16      2.    *Did Gavrieli Brands, LLC reach a value of $200 million?*

17      _____  *Yes*

18      _____  *No*

19  *Proceed to Question No. 3.*

20      3.    *As to authority over the Company, we find:*

21      _____  *When the Company was formed, Kfir Gavrieli and Dikla Gavrieli Unatin*

22  *agreed that Kfir Gavrieli would serve as the Chief Executive Officer with final decision-making*

23  *authority over the Company.*

24      *X*  *When the Company was formed, Kfir Gavrieli and Dikla Gavrieli Unatin*

25  *agreed that they would have joint and equal authority over the Company.*

26  *Proceed to Question No. 4.*

27      4.    *Did Kfir Gavrieli and Dikla Gavrieli Unatin enter into a contract providing that*

28

5

STATEMENT OF DECISION

*the outside investments made from Company profits would be owned in proportion to their*

*respective ownership interests in Gavrieli Brands, LLC?*

     ___X___ *Yes*

     _____ *No*

*If you answered "Yes" to Question No. 4, proceed to Question No. 5. If you answered "No" to Question No. 4, proceed to Question No. 6 and do not answer Question No. 5.*

     5.    *Under the contract relating to the outside investments, do Kfir Gavrieli and Dikla*

*Gavrieli Unatin's respective ownership interests in all outside investments change with their*

*respective ownership interests in Gavrieli Brands, LLC?*

     _____ *Yes*

     ___X___ *No*

*Proceed to Question No. 6.*

     6.    *Did Kfir Gavrieli and Dikla Gavrieli Unatin enter into a contract providing that*

*the investments would be transferred into trusts?*

     _____ *Yes*

     ___X___ *No*

Following the jury's verdict, Mrs. Unatin requested equitable relief in the form of a declaratory judgment, a permanent injunction, a constructive trust and an accounting, a receiver, and prejudgment interest.  Mr. Gavrieli also requested adjudication of his cross-claim for declaratory relief.

The parties submitted no less than 16 briefs on these issues between November 22, 2019 and May 21, 2020.  The Court also held oral argument on February 6, 2020.  In light of the COVID-19 global pandemic, in lieu of additional oral argument, the Court also permitted the parties to submit additional briefing, which was submitted on May 19, 2020 and May 21, 2020. The Court issued a tentative ruling on June 5, 2020.

6

**STATEMENT OF DECISION**

## II. POST-VERDICT EQUITABLE ISSUES

The sole issues remaining for the Court to adjudicate and on which to enter a final judgment are those relating to the equitable claims in this lawsuit. The following summarizes both the Court's findings of relevant facts and conclusions of law related to each remaining question. The analysis, in other words, supports the accompanying Judgment.

### A. Issue No. 1: Verdict Form 2 is Binding.

#### 1. Parties' Contentions as to Issue No. 1:

First, Mr. Gavrieli contends that the jury's findings on Verdict Form 2 were only advisory because they relate solely to his cross-claim for declaratory relief, and equitable claims must be resolved by a court rather than a jury. In other words, he asks the Court to treat the jury's findings as advisory rather than binding and to adjudicate his declaratory relief claim anew. He also contends that the contracts he sought to establish to the jury were only raised in Verdict Form 2 and the jury did not make these findings in the context of any legal claim. Accordingly, Mr. Gavrieli requests that the Court independently evaluate the evidence presented at trial and issue a declaration that he owns 60% of the Company and Mrs. Unatin owns 40% of the Company, and that he has final decision-making authority, contrary to the jury's verdict.

Mrs. Unatin, on the other hand, contends that Verdict Form 2 is binding given that the parties agreed and stipulated that the jury's answers to the questions in that verdict form would govern. In addition, she claims that the jury's findings implicate common issues of fact on both Verdict Forms 1 and 2. She contends that in a mixed trial of legal and equitable issues where legal issues are first tried to a jury, the Court is bound to adopt the jury's factual determinations on common issues of fact in adjudicating subsequent equitable relief. Mrs. Unatin also highlights several examples illustrating how Verdict Forms 1 and 2 were intertwined throughout trial. Therefore, she contends, the jury necessarily made findings of fact common to both Verdict Forms 1 and 2.[2]

Mrs. Unatin also contends that the doctrine of judicial estoppel bars Mr. Gavrieli from

---

[2] Mrs. Unatin also argues that the factual questions presented to the jury in Verdict Form 2 are legal in nature, rather than equitable, given that they were premised on the existence of various oral contracts and were effectively a substitute for an action at law for breach of contract.

7

STATEMENT OF DECISION

1   now arguing that the jury's findings on Verdict Form 2 were advisory.  She notes that Mr.

2   Gavrieli never argued that the questions submitted to the jury on Verdict Form 2 would be

3   advisory in the entire 5,000+ page trial and pre-trial record or in any prior filings in the case.

4   Rather, she claims that Mr. Gavrieli repeatedly argued to the Court that the issues underlying his

5   cross-claim for declaratory relief were required by law to be submitted to the jury for binding

6   resolution.  As one example, she notes that during argument over the wording of the questions in

7   Verdict Form 2, Mr. Gavrieli successfully argued that not allowing him to put the exact wording

8   of his declaratory relief cross-claim to the jury would be reversible error.  Thus, her position is

9   that Mr. Gavrieli is barred from now taking the inconsistent position that the jury's findings on

10  Verdict Form 2 were only advisory.

11          Mr. Gavrieli disputes Mrs. Unatin's claim for judicial estoppel and argues that the

12  advisory nature of a jury verdict rendered on an equitable claim is not waivable.  Accordingly, he

13  claims that even when a party requests that an equitable issue be submitted to the jury, the jury's

14  decision remains advisory.  In addition, Mr. Gavrieli contends that the elements necessary for

15  judicial estoppel are not satisfied because he never asserted any position inconsistent with his

16  current position that the jury's findings on Verdict Form 2 were advisory, and the jury was not

17  instructed on statutory and common law rules of contract formation and interpretation that

18  govern Mr. Gavrieli's cross-claim for declaratory relief.[3]

19          **2.      Statement of Decision as to Issue No. 1:**

20          Upon reviewing the evidence and the arguments of counsel, the Court finds that Mr.

21  Gavrieli is barred by the doctrine of judicial estoppel from now arguing that the jury's findings

22  on Verdict Form 2 were only advisory.

23          Judicial estoppel applies when "(1) the same party has taken two positions; (2) the

24  positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was

25  successful in asserting the first position (*i.e.*, the tribunal adopted the position or accepted it as

26  true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a

---

27  [3] Both parties also argue that the other is equitably estopped from taking their current positions
due to the evidence presented at trial, each party's conduct, and the parties' course of dealing.

28  The Court addresses these arguments in Issue Nos. 2 and 3 below.

8

STATEMENT OF DECISION

1  result of ignorance, fraud, or mistake."  *Jackson v. City of Los Angeles*, 60 Cal. App. 4th 171,

2  183 (1997).  Even where the elements of judicial estoppel are met, the Court possesses discretion

3  in determining whether to apply the doctrine of judicial estoppel in any particular case.  *People v.*

4  *Castillo*, 49 Cal. 4th 145, 156 (2010).

5     The facts the Court finds relevant as to Issue No. 1 are as follows:

6     Prior to the post-trial briefing in this case, Mr. Gavrieli's unequivocal position to the

7  Court, through express representations and pre-trial filings,[4] was that the issues related to his

8  cross-claim for declaratory relief would be submitted to the jury and would be binding on the

9  Court and the parties.  *See, e.g.*:

10  • "We're asking *the jury* to declare agreement, agreement, agreement."  (Trial Tr. at

11     3511:6-8 (emphasis added).)

12  • "The parties [] *agree* that the jury will receive certain questions [regarding

13     declaratory relief]."  (Trial Tr. at 4520:2-5 (emphasis added).)

14  • "*[I]f the jury agrees with us* [on the declaratory relief questions] . . . Your Honor

15     then *enters dec relief on that very point.*"  (Trial Tr. at 4669:25-28 (emphases

16     added).)

17  • "We are entitled *to ask this jury* did they reach that agreement."  (Trial Tr. at 4798:5-

18     6 (emphasis added).)

19  • "So let's start with Form Number 2.  This is our case.  This is our declaratory relief

20     claim.  *It's where we're asking you [i.e., the jury] to decide the agreements* that you

21     keep hearing me talk about."  (Trial Tr. at 4982:9-12 (emphasis added).)

22     In light of Mr. Gavrieli's numerous representations, the Court ultimately agreed that "the

23  declaratory relief [claim] . . . will be taken up by the jury."  (Trial Tr. at 4525:1-5.)

24     During the charging conference on November 2, 2019, the Court directly asked counsel

25  for Mr. Gavrieli how the declaratory relief claim would be handled following the jury's verdict.

26  _____

27  [4] Mr. Gavrieli made his position clear to the Court even before trial began in his pre-trial filings.
   For example, on August 5, 2019, Mr. Gavrieli filed a proposed special verdict form and argued
   that "*jury determination* of factual issues underlying a declaratory relief cause of action is

28  proper" and "that the proposed verdict form is *necessary* in this case to resolve the factual issues
   in dispute."  (*See* 8-5-2019 Def's Proposed Verdict Form (emphases added).)

9

1   Counsel was unequivocal that, by agreement of the parties, the issues related to his cross-claim

2   for declaratory relief would be submitted to the jury for **binding** resolution—not merely an

3   advisory verdict.

4
        **THE COURT:** So let me take a step back.  The declaratory relief claims in
5       Verdict Form 2 are questions that go to the jury asking them to answer certain
        questions; and declaratory relief, as we all know, is an equitable claim, it is
6       typically not a jury question, *but by agreement, there's questions that the jury is
        going to be asked.*  What is—what is going to happen with these answers?
7       Whatever the questions are, what—what do we do with their answers?

8       **MS. LIBEU:**  Well, *it's agreement by the parties and the law on equitable relief.*
        It's equitable in that Your Honor enters the judgment; but the law is pretty clear
9       when it's a dec relief action that involves disputed issues of fact, *those disputed
        issues go to the jury*, hence why the parties have agreed they go to the jury . . .
10      Your Honor would enter judgment on those facts as to what we claim dec relief . .
        . *If the jury agrees with us and finds that . . . fact, we have proven, Your Honor
11      then enters dec relief on that very point.*

12  (Trial Tr. at 4668:24-4669:28 (emphases added); *see also* 8-28-19 Hrg. Tr. at 50:14-27.)

13      Indeed, during argument over the substance of Verdict Form 2, Mr. Gavrieli also

14  implored this Court that not allowing him to put the exact wording of his cross-claim for

15  declaratory relief to the jury would be "reversible error."  (Trial Tr. at 4794:4-4795:25.)  If Mr.

16  Gavrieli merely sought an advisory verdict from the jury as he now contends, then such strict

17  adherence to the wording of his claim would have been unnecessary and surely not "reversible

18  error," given that the Court would independently evaluate the evidence afterward.

19      Mr. Gavrieli was successful in asserting this position and the Court ultimately agreed and

20  permitted him to submit the exact wording of his cross-claim for declaratory relief to the jury for

21  binding resolution.  This position is undoubtedly inconsistent with the position Mr. Gavrieli

22  takes now, which is to claim that the jury's findings on Verdict Form 2 were merely advisory.

23      There is no indication that Mr. Gavrieli's first position was taken as a result of ignorance,

24  fraud, or mistake—rather, the Court finds that Mr. Gavrieli's consistent representations

25  demonstrated a clear intent to advocate for a position he now contradicts.  Mr. Gavrieli's current

26  position would result in severe prejudice to Mrs. Unatin, who had no reason to argue that these

27  matters were jury triable prior to the jury's verdict (because defense counsel repeatedly agreed

28  and argued that they were jury triable and not merely advisory) and, more importantly, would

10

1   allow Mr. Gavrieli to benefit from an unfair trial strategy.

2        Accordingly, the Court makes the following determinations:

3        In light of the facts above, the Court finds that the elements of judicial estoppel have been

4   satisfied and there is good cause to exercise its discretion to apply judicial estoppel here.

5        Judicial estoppel is necessary to "maintain the integrity of the judicial system." *Aguilar*

6   *v. Lerner*, 32 Cal. 4th 974, 986 (2004).  "It [would be] wrong to allow [Mr. Gavrieli] to abuse the

7   judicial process by first advocating one position [on declaratory relief], and later . . . assert[ing]

8   the opposite." *Jackson*, 60 Cal. App. 4th at 181.

9        Mr. Gavrieli has taken a position inconsistent with the position he took during the

10  entirety of the trial.  It was only *after* the jury's verdict against him that Mr. Gavrieli argued for

11  the first time that the jury's findings on Verdict Form 2 were only advisory.  He never requested

12  that the Court bifurcate any equitable issues from the legal issues in the case, and instead

13  successfully argued to the Court to submit these issues to the jury for binding resolution.  Put

14  simply, Mr. Gavrieli's position pre-verdict was that the jury's verdict would be final and binding,

15  not advisory.

16       Permitting Mr. Gavrieli to take the opposite position now would reward him for an unfair

17  trial strategy wherein, prior to the jury's verdict, he also gained the additional benefit of being

18  able to argue to the jury that it should decide the issues on Verdict Form 2 favorably to him and,

19  if it did so, then as to Verdict Form 1, the jury should also award Mrs. Unatin no damages.  (*See,*

20  *e.g.*, Trial Tr. at 5010:16-21; at 5013:11-21; *see also* 2019-9-6 Hrg. Tr. at 58:8-59:8.)

21       As to Mr. Gavrieli's argument that the advisory nature of a jury's verdict on equitable

22  issues is not waivable, he has offered insufficient support for this proposition.  The cases cited by

23  Mr. Gavrieli, including *Holland v. Kelly*, 177 Cal. 43 (1917), did not involve or discuss the

24  doctrine of judicial estoppel and any references to whether the advisory nature of a jury's verdict

25  is waivable were dicta.  As to Mr. Gavrieli's argument that the jury was not instructed as to the

26  elements of contract formation and interpretation, the record belies that claim and confirms

27  that—largely at his request—the jury was provided with all of the standard instructions on

28  formation and interpretation of contracts, including instructions modeled after CACI 300, 302,

STATEMENT OF DECISION

1  303, 304, 305, 307, 309, 314, 315, 317, 318, 320, 325, 332, and 350. (*See* 11-7-2019 Joint

2  Submission of Jury Instructions.)  As to the assertion that the jury was never asked to decide

3  whether equitable estoppel applies to the 60/40 agreement, that is true.  However, the claim of

4  equitable estoppel is not a jury question; it is an issue for the court to resolve.

5      In light of the Court's decision that the doctrine of judicial estoppel applies against Mr.

6  Gavrieli, the Court finds that the jury's findings on Verdict Form 2 are binding and final.  The

7  Court need not address the other arguments raised by the parties.

8      **B.      Issue No. 2: Mrs. Unatin's Claim of Equitable Estoppel is Moot.**

9          **1.      Parties' Contentions as to Issue No. 2:**

10      Mrs. Unatin contends that Mr. Gavrieli is also equitably estopped from denying that the

11 jury's findings on Verdict Form 2 are binding in light of his conduct and the parties' course of

12 dealing following each of the alleged agreements Mr. Gavrieli sought to establish.

13          **2.      Statement of Decision as to Issue No. 2:**

14      Given that the Court has determined that the doctrine of judicial estoppel bars Mr.

15 Gavrieli from arguing that the jury's findings on Verdict Form 2 were only advisory, and has

16 decided that the jury's findings on Verdict Form 2 are instead binding and final, Mrs. Unatin's

17 claim for equitable estoppel is moot and the Court need not determine whether equitable estoppel

18 also applies against Mr. Gavrieli.

19      **C.      Issue No. 3:  Mr. Gavrieli Cannot Rely on Equitable Estoppel.**

20          **1.      Parties' Contentions as to Issue No. 3:**

21      Mr. Gavrieli separately contends that Mrs. Unatin is equitably estopped from denying the

22 existence of the alleged agreements he sought to establish to the jury due to her conduct and the

23 parties' course of dealing.  He also claims that (1) the question of whether equitable estoppel

24 applies was not submitted to the jury and must be decided by the Court; (2) he sufficiently

25 disclosed his equitable estoppel defense in pleadings and discovery; and (3) California law

26 provides that equitable estoppel may be used in support of affirmative claims.

27      Mrs. Unatin counters that Mr. Gavrieli cannot establish the elements required for

28 equitable estoppel.  She also argues that (1) the Court is barred from using the equitable estoppel

12

1    doctrine to contravene the jury's factual findings; (2) Mr. Gavrieli never disclosed this defense in

2    his pleadings or discovery; (3) California law bars Mr. Gavrieli's attempt to use equitable

3    estoppel offensively to confer substantive rights and agreements; and (4) Mr. Gavrieli's attempt

4    to establish agreements rejected by the jury is precluded by his inequitable conduct in taking

5    inconsistent positions regarding the binding nature of the jury's verdict.

6         **2.**     <u>**Statement of Decision as to Issue No. 3:**</u>

7         The Court has already determined that Mr. Gavrieli is barred by the doctrine of judicial

8    estoppel from arguing that the jury's findings on Verdict Form 2 were only advisory.  The Court

9    has made this determination in order "to protect the integrity of the judicial process." *Jackson*,

10   60 Cal. App. 4th at 183.  Accordingly, consistent with the Court's decision, Mr. Gavrieli is not

11   entitled to rely on equitable estoppel as an alternative theory to bar Mrs. Unatin from arguing

12   that she and Mr. Gavrieli own the Company 50/50 and have equal and joint authority over the

13   Company, as the jury expressly found in Verdict Form 2.

14        Whether equitable estoppel is to be applied in any particular case is left to the sound

15   discretion of the trial court.  *Hopkins v Kedzierski*, 225 Cal. App. 4th 736, 756 (2014); *Castillo*,

16   49 Cal. 4th at 156.  Here, the Court declines to credit Mr. Gavrieli's request for equitable

17   estoppel.  Whatever the merit of Mr. Gavrieli's request for equitable estoppel, the Court finds

18   that under the circumstances of this case and in exercising its discretion, the doctrine of judicial

19   estoppel, which focuses on the integrity of the judicial process, trumps Mr. Gavrieli's request for

20   equitable estoppel.

21        **D.**     <u>**Issue No. 4:  Mrs. Unatin is Entitled to a Declaratory Judgment.**</u>

22        **1.**     <u>**Parties' Contentions as to Issue No. 4:**</u>

23        Mrs. Unatin requests a declaratory judgment based on her Ninth Cause of Action,

24   Questions 1 through 5 on Verdict Form 1, and on Mr. Gavrieli's competing cross-claim for

25   declaratory relief, Questions 1 through 6 on Verdict Form 2.

26        Specifically, she requests a declaration that:

27   • She owns 50% of the Company and Mr. Gavrieli owns 50% of the Company;

28   • She and Mr. Gavrieli never entered into a contract to shift ownership of the Company

13

**STATEMENT OF DECISION**

1    from 50/50 to 60% for Mr. Gavrieli and 40% for her if the Company reached a value

2    of $200 million (as Mr. Gavrieli had contended);

3    • When the Company was formed, she and Mr. Gavrieli agreed that they would have

4      joint and equal authority over the Company, and they continue to have joint and equal

5      authority over the Company; and

6    • She and Mr. Gavrieli entered into a contract providing that the outside investments

7      would be owned in proportion to their respective ownership interests in the Company,

8      and would be controlled and shared by them on a 50/50 basis; that under the contract,

9      she and Mr. Gavrieli did not agree that their respective ownership interests in the

10     outside investments would change with their respective ownership interests in the

11     Company (as Mr. Gavrieli had contended); and that she and Mr. Gavrieli did not enter

12     into a contract providing that the outside investments would be transferred into trusts

13     (as Mr. Gavrieli had contended).

14    Mr. Gavrieli argues that Mrs. Unatin is not entitled to the declaration she seeks because,

15 once again, the jury's findings on Verdict Form 2 were advisory and the Court must

16 independently determine each of those findings.  He also again contends that equitable estoppel

17 should be applied against Mrs. Unatin.

18    As to the portion of Mrs. Unatin's proposed declaration that the parties agreed they

19 would have joint and equal control over the outside investments, Mr. Gavrieli argues that the

20 jury made no findings related to control over the investments.  Finally, Mr. Gavrieli contends

21 that Mrs. Unatin has elected monetary damages on her investment claims and thus cannot obtain

22 a declaration that she continues to own 50% of the investments, which would result in double

23 recovery.

24    Mrs. Unatin counters that the jury necessarily found that she and Mr. Gavrieli agreed they

25 would have joint and equal control over the outside investments by finding in her favor on her

26 claims for breach of fiduciary duty regarding the investments, fraud, conversion, breach of

27 contract, and breach of the covenant of good faith and fair dealing.  She also cites to Instruction

28 300, which outlined the parties' competing contentions—that Mrs. Unatin claimed they agreed

14

1   they would jointly identify, discuss, and evaluate the outside investments while Mr. Gavrieli

2   claimed they agreed he would be solely responsible for identifying, making, and managing the

3   outside investments—as well as the jury's findings on Verdict Forms 1 and 2 wholly in her

4   favor.

5       Mrs. Unatin also argues that she is not seeking a declaration affirming her current

6   ownership interest in the outside investments and is merely asking the Court to declare that she

7   did not enter into the agreement Mr. Gavrieli attempted to prove at trial.  In other words, she

8   contends, the requested declaration merely reiterates the jury's findings.

9           **2.    <u>Statement of Decision as to Issue No. 4</u>:**

10      The Court finds that Mrs. Unatin is entitled to the declaratory judgment she requests, as

11  outlined in the accompanying Judgment, as follows:

12  • Dikla Gavrieli Unatin owns 50% of Gavrieli Brands, LLC; Kfir Gavrieli owns 50% of

13      Gavrieli Brands, LLC.

14  • Dikla Gavrieli Unatin and Kfir Gavrieli did **<u>not</u>** enter into a contract to shift

15      ownership of Gavrieli Brands, LLC from 50/50 to 60% for Kfir Gavrieli and 40% for

16      Dikla Gavrieli Unatin if Gavrieli Brands, LLC reached a value of $200 million (as

17      Kfir Gavrieli had contended).

18  • When Gavrieli Brands, LLC was formed, Dikla Gavrieli Unatin and Kfir Gavrieli

19      agreed that they would have joint and equal authority over Gavrieli Brands, LLC.

20      Dikla Gavrieli Unatin and Kfir Gavrieli continue to have joint and equal management

21      and control authority over Gavrieli Brands, LLC.

22  • Dikla Gavrieli Unatin and Kfir Gavrieli entered into a contract providing that the

23      outside investments made from Gavrieli Brands, LLC profits would be owned in

24      proportion to their respective ownership interests in Gavrieli Brands, LLC, and would

25      be controlled and shared by them on a 50/50 basis.  Under this contract, Dikla

26      Gavrieli Unatin and Kfir Gavrieli did not agree that their respective ownership

27      interests in the outside investments made from Gavrieli Brands, LLC profits would

28      change with their respective ownership interests in Gavrieli Brands, LLC that were

15

**STATEMENT OF DECISION**

1       50/50 from inception (as Kfir Gavrieli had contended).  Dikla Gavrieli Unatin and

2       Kfir Gavrieli also did not enter into a contract providing that the investments would

3       be transferred into trusts (as Kfir Gavrieli had contended).

4       The Court has already addressed Mr. Gavrieli's arguments as to the binding nature of the

5  jury's findings on Verdict Form 2 and whether equitable estoppel applies against Mrs. Unatin.

6  Accordingly, the Court expressly finds that each of the terms of the declaratory judgment listed

7  above are taken directly from the jury's verdict, and on that basis alone, the declaratory judgment

8  can and should enter.

9       Other than the arguments regarding the binding nature of the jury's verdict and judicial

10  and equitable estoppel discussed above, the only real dispute raised by Mr. Gavrieli as to the

11  declaratory judgment is his argument that the jury did not find that he and Mrs. Unatin agreed

12  they would have joint and equal control over the outside investments.  The Court finds that the

13  jury's findings on Verdict Forms 1 and 2 show otherwise.

14       The following facts are particularly relevant:

15       Throughout the trial, the parties argued their competing claims regarding the terms of

16  their agreement regarding control over the outside investments.  Mr. Gavrieli testified that his

17  "position [wa]s the same as with the Company where [he is] a majority owner . . . [he] make[s]

18  the decisions, the final decisions at the Company.  [He] thought the same thing applied to the

19  investments."  (Trial Tr. at 3400:12-22; at 3398:3-14 (Q: "[you could keep investing] whether

20  she [Mrs. Unatin] liked it or not, sir; isn't that true?  A: I think that's why we're here.").)

21       Following the completion of testimony and evidence, the jury was instructed consistently.

22  For instance, Instruction 300 provided:

23
     Dikla and Kfir each contend they entered into a contract to make outside
     investments from profits derived from Gavrieli Brands, LLC. Dikla contends that,
24     as part of that agreement, Dikla and Kfir agreed that they would jointly identify,
     discuss and evaluate certain outside investments.
25

26
     Dikla claims that Kfir breached this contract by making investments without her
     consent, failing to provide information on the outside investments, and failing to
     provide Dikla her share of profits and distributions received from the outside
27     investments.

28     . . .

STATEMENT OF DECISION

Kfir contends that he and Dikla agreed that Kfir would be responsible for identifying, making, and managing the outside investments.

The jury found that Mr. Gavrieli breached that contract governing the outside investments (in addition to finding him liable for breach of fiduciary duty, conversion, and fraud) and awarded monetary damages to Mrs. Unatin. (*See* Verdict Form 1, Questions 5-20.) Moreover, in Verdict Form 2, Question 6, the jury rejected Mr. Gavrieli's argument that he and Mrs. Unatin agreed he would have sole control over the investments and would later transfer them to trusts:

*Did Kfir Gavrieli and Dikla Gavrieli Unatin enter into a contract providing that the investments would be transferred into trusts?*

_____ *Yes*

___X___ *No*

Accordingly, the Court makes the following determinations:

Taken together, it is implicit in the jury's findings on Verdict Forms 1 and 2 that the jury found that Mrs. Unatin and Mr. Gavrieli agreed they would have joint and equal control over the outside investments, and a finding that the parties did not agree to joint control would conflict with the jury's verdict.  The jury rejected Mr. Gavrieli's theory that he was entitled to control Mrs. Unatin's money as he pleased and instead credited Mrs. Unatin's theory that they had agreed to have joint control over the investments.  Mrs. Unatin is thus entitled to a declaration as to this fact.  Accordingly, Mrs. Unatin is entitled to a declaration consistent with the jury's findings that, under their agreement, she and Mr. Gavrieli each owned 50% of the outside investments, agreed to jointly control them, and never agreed to have those investments transferred into trusts at a later date.

As noted above, Mrs. Unatin also is entitled to the remainder of her requested declaratory judgment as each fact flows directly from the jury's verdict, which is binding and final.

As to Mr. Gavrieli's claim that Mrs. Unatin is seeking a declaration that she presently has a 50% interest in the outside investments, the Court finds that by electing damages, Mrs. Unatin

1  disclaims any present interest in the outside investments.[5]  However, the declaratory judgment

2  confirms the jury's finding that at the time the outside investments were made, she and Mr.

3  Gavrieli each had a 50% interest in those investments.[6]

4  **E.      Issue No. 5:  Mrs. Unatin is Entitled to a Permanent Injunction.**

5  **1.      Parties' Contentions as to Issue No. 5:**

6  Mrs. Unatin next requests a permanent injunction to restore her access to Company

7  accounts and funds, prohibit Mr. Gavrieli's wrongful use of Company funds, and prohibit false

8  statements by Mr. Gavrieli regarding the ownership of the Company, in light of her successful

9  claims, including for breach of fiduciary duty and the declaratory judgment establishing her joint

10  control of the Company.

11  Mr. Gavrieli disputes Mrs. Unatin's entitlement to a permanent injunction.  He claims the

12  jury never made findings that he committed any wrongdoing with respect to Company funds,

13  accounts, or books and records.  Moreover, he claims that an injunction is not necessary because

14  Mrs. Unatin does not wish to return to the Company.  He also argues that various terms in the

15  requested injunction are vague and ambiguous.

16  Mrs. Unatin counters that her breach of fiduciary duty claim regarding the Company was

17  based on Mr. Gavrieli's actions in locking her out and removing her access to the Company's

18  funds, accounts, and platforms, and the jury found he breached his fiduciary duties and did so

19  with malice, oppression, and/or fraud.  She asserts that she prevailed, yet Mr. Gavrieli continues

20  to prevent her from regaining access to the Company's financial and online accounts, and from

21  resuming her role as a joint and equal owner and manager of the Company.  She also contends

22  that the requested injunction is narrowly tailored to effectuate the jury's findings, to restore the

23  parties to the status quo prior to Mr. Gavrieli's actions, and that the terms of the injunction are

24  neither vague nor difficult to understand.

---

25  [5] For the avoidance of doubt, the term "outside investments" does not include any investment in
26  Halogen Ventures for which Mrs. Unatin did not seek damages.

27  [6] Mrs. Unatin has stated that she reserves the right to modify her election of remedies until the
judgment is satisfied, should the need to do so arise in the future.  At this time, the Court need
28  not and does not decide whether and under what circumstances Mrs. Unatin may be permitted to
change her election.

**2.**      <u>Statement of Decision as to Issue No. 5</u>:

The Court finds that Mrs. Unatin is entitled to a permanent injunction, as outlined in the accompanying Judgment, which:

- Enjoins and prohibits Kfir Gavrieli from excluding Dikla Gavrieli Unatin as a member and manager of Gavrieli Brands, LLC with the full and uninhibited right of joint control;

- Enjoins and prohibits Kfir Gavrieli from blocking Dikla Gavrieli Unatin's full access to all Gavrieli Brands, LLC-related banking, e-commerce, credit card processing, charitable-based, or other accounts, wherever held (including, without limitation, Gavrieli Brands, LLC's accounts with First Republic Bank (such as the account ending in -1076), Magento, Braintree, American Express, Instagram, Pinterest, and Facebook);

- Enjoins and prohibits Kfir Gavrieli from denying Dikla Gavrieli Unatin complete access to all books, records, documents, and other information concerning Gavrieli Brands, LLC;

- Orders Kfir Gavrieli to add Dikla Gavrieli Unatin as a signatory with the equal rights and privileges that Kfir Gavrieli has for any and all Gavrieli Brands, LLC accounts and information, including, without limitation, the First Republic Bank account ending in -1076, Magento, Braintree, American Express, and social media accounts including Instagram, Pinterest and Facebook, and to immediately update her of any changes to any such logins, for all Gavrieli Brands, LLC accounts;

- Enjoins and prohibits Kfir Gavrieli from precluding Dikla Gavrieli Unatin from obtaining rights and privileges for any and all Gavrieli Brands, LLC accounts and information as set forth above directly from any third party who provides access and privileges to such accounts (*e.g.*, contacting First Republic Bank directly to obtain full rights and privileges to Gavrieli Brands, LLC's account ending in-1076);

- Enjoins and prohibits Kfir Gavrieli from blocking Dikla Gavrieli Unatin's full and equal access to all Gavrieli Brands, LLC-related funds, including funds that have

19

1    been diverted to date, including without limitation:

2        o  Any and all funds that have been transferred from Gavrieli Brands, LLC's Bank

3          of America account to Gavrieli Brands, LLC's First Republic Bank account

4          ending in -1076 to date, including without limitation, $5,261,016.70 that was

5          transferred into that account in or about October 2017;

6        o  Any and all funds from Braintree and/or American Express which have been

7          diverted to Gavrieli Brands, LLC's First Republic Bank account ending in -1076

8          to date, including without limitation, $20,495,333.50 that was transferred into that

9          account between September 12, 2017 and December 31, 2017; and

10    • Enjoins and prohibits Kfir Gavrieli from interfering with Mrs. Unatin's right to access

11    information about funds sent to and/or located in accounts at the following banks:

12    HSBC – Hong Kong, Hang Seng Bank Limited, DBS Bank (Hong Kong) Limited, and

13    Euro Pacific Bank Limited (including, without limitation, HSBC – Hong Kong

14    accounts ending -9838, -5938, -7838; Hang Seng Bank Limited account ending -6883;

15    DBS Bank (Hong Kong) Limited account ending -6098; and Euro Pacific Bank

16    Limited account ending -4711); and

17    • Enjoins and prohibits Kfir Gavrieli from using Gavrieli Brands, LLC's funds, assets,

18    and/or property for any purpose other than the ongoing operation of the business, *i.e.*,

19    business expenses, without Dikla Gavrieli Unatin's express consent.

20    To obtain a permanent injunction, Mrs. Unatin must establish:  "(1) the elements of a

21  cause of action involving the wrongful act sought to be enjoined, and (2) the grounds for

22  equitable relief, such as, inadequacy of the remedy at law."  *City of South Pasadena v.*

23  *Department of Transportation*, 29 Cal. App. 4th 1280, 1293 (1994).

24    The following facts are particularly relevant:

25    The Court finds that Mrs. Unatin's claim for breach of fiduciary duty regarding the

26  Company was largely focused on Mr. Gavrieli's conduct, including in locking her out of the

27  Company and depriving her of access and control to the Company's accounts, funds, and

28

1   platforms.[7]  The jury found that she proved that claim (Verdict Form 1, Questions 1-4), and Mr.

2   Gavrieli's conduct was established through the trial record, including, for example at:  Trial Tr.

3   at 712:2-713:3; at 715:2-6; at 1338:9-27; at 2210:16-2211:2; at 2750:2-2752:18; at 4842:3-18;

4   Trial Exhibits 10, 248, 257, 1442, 1656, 1969, 4033.

5           In addition, the Court finds that since the jury rendered its verdict on November 12, 2019,

6   the parties have presented additional evidence and argument effectively agreeing that Mrs.

7   Unatin continues to lack the ability to participate in the management and control of the

8   Company, now over six months later.  (*See, e.g.*, 1-30-2020 Declaration of Dikla Gavrieli Unatin

9   ¶¶ 3-4; 4-20-2020 Pl's Statement Re: Equitable Relief at 12, Exs. K, L; 5-5-2020 Def's Response

10  to Pl's Statement Re: Equitable Relief at 20-21.)

11          Accordingly, the Court makes the following determinations:

12          Based on the trial record and the jury's verdict, there is no basis for Mr. Gavrieli to

13  continue to preclude Mrs. Unatin from exercising her established rights of joint control and

14  access to the Company.  The Court finds that an injunction is also necessary and appropriate.

15  Indeed, absent the Court exercising its discretion and granting Mrs. Unatin the injunctive relief

16  she requests, it is clear that Mr. Gavrieli will never permit Mrs. Unatin to assume her role as a

17  co-owner and co-manager of the Company.

18          As to Mr. Gavrieli's argument that the terms of the requested injunction are vague and

19  ambiguous, the Court disagrees.  "It is unnecessary in a judgment to set forth in minute detail all

20  the acts which defendants have performed or threaten to perform which interfere with plaintiffs'

21  rights."  *Hucke v. Kader*, 109 Cal. App. 2d 224, 229 (1952).  All that is required is that the

22  injunction provide "reasonable notice of what conduct is prohibited."  *People v. JTX Tax, Inc.*,

23  212 Cal. App. 4th 1219, 1259 (2013).  Here, the terms of the proposed injunction are readily

24  understandable; indeed, Mr. Gavrieli is in the best position to understand the terms given that

25  they rectify the actions he undertook in 2017 to remove Mrs. Unatin's access to and control over

26  the Company.

27  

28  ───────────────
    [7] Mrs. Unatin also detailed this conduct at length in her Second Amended Complaint.  (*See*
    Second Amended Complaint ¶¶ 70, 72-76, 80, 81, 89, 90, 92, 93.)

21

STATEMENT OF DECISION

1    Last, as a 50% owner of the Hong Kong funds, Mrs. Unatin has the right to access

2  information about these funds.

3    F.    **Issue No. 6:  Mrs. Unatin is Entitled to a Constructive Trust as to the Hong
          Kong Funds, but She is not Entitled to a Constructive Trust as to Company**

4          **Funds or the Outside Investments or to an Accounting.**

5        1.    **Parties' Contentions as to Issue No. 6:**

6    Mrs. Unatin requests a constructive trust and an accounting over:  (1) Company funds;

7  (2) the outside investments; and (3) funds the parties sent offshore to various accounts in Hong

8  Kong.

9    •    As to Company funds and the investments, Mrs. Unatin argues that a constructive

10        trust is necessary to ensure that Mr. Gavrieli will not dissipate the funds prior to

11        satisfying the judgment, and an accounting is warranted to provide Mrs. Unatin with

12        the same information Mr. Gavrieli has enjoyed for years.

13    •    As to the outside investments, Mrs. Unatin also argues that she is not required to elect

14        between the damages awarded by the jury and equitable relief because these remedies

15        are not inconsistent.  In addition, Mrs. Unatin states she only seeks these equitable

16        remedies until the judgment is satisfied and contends she should be entitled to change

17        her remedies after judgment.

18    •    As to the parties' funds sent to and/or located in Hong Kong, Mrs. Unatin claims that

19        a constructive trust and an accounting are appropriate as there was significant

20        evidence presented at trial proving that Mr. Gavrieli opened the bank accounts in

21        Hong Kong, used the parties' joint funds, and continues to control those funds while

22        excluding Mrs. Unatin from doing the same.

23    Mr. Gavrieli argues that Mrs. Unatin is not entitled to a constructive trust or an

24  accounting as to any of the foregoing categories of funds.

25    •    As to Company funds, Mr. Gavrieli argues that Mrs. Unatin is not entitled to a

26        constructive trust or an accounting because they belong to the Company and she does

27        not own those funds personally.

28    •    As to the investments, Mr. Gavrieli argues that granting Mrs. Unatin a constructive

22

STATEMENT OF DECISION

1    trust and an accounting would impermissibly provide her with double recovery and

2    she must elect between the damages awarded by the jury or title to the investments

3    and equitable relief.  Mr. Gavrieli contends that because Mrs. Unatin has already

4    elected monetary damages, she can no longer seek any equitable relief as to the

5    investments.

6    • As to the parties' funds located in Hong Kong, Mr. Gavrieli argues that the funds are

7      held by a foreign third party, not him, and these funds were not part of the pleadings

8      or Mrs. Unatin's breach of fiduciary duty claim.

9          **2.      <u>Statement of Decision as to Issue No. 6</u>:**

10       The Court finds that Mrs. Unatin is entitled to a constructive trust over a 50% share of the

11   funds sent to and/or located in Hong Kong, but not a constructive trust over Company funds in

12   general or the outside investments. The Court also finds that Mrs. Unatin is not entitled to an

13   accounting.

14       As to Company funds and the outside investments, the Court makes the following factual

15   findings and determinations:

16       The Court finds that Mrs. Unatin has already agreed to accept monetary damages.

17   Accordingly, a constructive trust and an accounting would be improper as it would result in

18   double recovery.  *Fowler v. Fowler*, 227 Cal. App. 2d 741, 745 (1964).

19       As to the parties' funds sent to and/or located in Hong Kong, the Court makes the

20   following factual findings and determinations:

21       The Court finds that the jury awarded no damages with respect to these funds and there is

22   no risk of double recovery to Mrs. Unatin if equitable relief is granted.  The Court also finds that

23   the pleadings, discovery and the trial all set forth Mrs. Unatin' claim for breach of fiduciary duty

24   with respect to the Hong Kong funds.  The second amended complaint at ¶ 90 includes the

25   allegation that relates to this claim.  Discovery propounded by Mrs. Unatin shows her efforts to

26   obtain information as to the Hong Kong accounts.

27       The court also finds that the trial was replete with evidence that related to Mrs. Unatin's

28   efforts to use the Hong Kong funds to pay the taxes owed to the government and Mr. Gavrieli

23

STATEMENT OF DECISION

1   not permitting this to occur.  When Mr. Gavrieli barred Mrs. Unatin from obtaining her 50%

2   share of the Hong Kong funds, he committed a breach of fiduciary duty.  That said, even if there

3   was not a breach of fiduciary duty, *Martin v. Kehl*, 145 Cal. App. 3d 228, 237 (1983) held that

4   the trial court could impose a constructive trust to prevent unjust enrichment without a finding of

5   a fiduciary relationship.

6        The Court finds that the doctrine of unclean hands does not bar the imposition of a

7   constructive trust for the benefit of Mrs. Unatin as to her 50% share of the Hong Kong funds.  As

8   held in *O'Flaherty v. Belgium*, 115 Cal. App. 1044, 1060 (2004), "[T]he doctrine of unclean

9   hands 'must not be applied where to do so would create an injustice. [citation omitted].'"  The

10   Court finds that it was Mrs. Unatin who stopped the underreporting of income, not Mr. Gavrieli.

11   If a constructive trust is not imposed as to her share of the $13 million in the Hong Kong bank

12   accounts, Mr. Gavrieli would receive a windfall that would permit him to keep not only his share

13   of the Hong Kong funds, but to double his share by keeping Mrs. Unatin's share as well.  Such a

14   result would be unjust.

15        The Court finds that it is undisputed that Mrs. Unatin has an interest in the parties' funds

16   sent to and/or located in Hong Kong proportional to her ownership share of the Company (which

17   pursuant to the declaratory relief entered herein is 50%), yet she continues to have no access to

18   or control over them.  Accordingly, a constructive trust is appropriate over a 50% share of the

19   Hong Kong funds.

20        An accounting is not warranted with respect to the Hong Kong funds. It is undisputed that

21   the parties are aware of the amount of money that was sent to the Hong Kong banks. Thus, an

22   accounting would not change what is already known. It is also undisputed that the parties have

23   jointly engaged Gary Howard, C.P.A., a forensic accountant to perform the task of accounting

24   for all the funds in the Hong Kong banks. It would be a needless and costly duplication for the

25   court to also order an accounting.

26     **G.**    **Issue No. 7:  Mrs. Unatin is Not Entitled to a Receiver.**

27         **1.**    **Parties' Contentions as to Issue No. 7:**

28       Mrs. Unatin next requests the appointment of a limited purpose receiver pursuant to Code

1  of Civil Procedure Section 564(b) to carry the judgment into effect and to assist the parties in

2  managing the Company—specifically, to break deadlock (by casting a tie-breaking vote), which

3  Mrs. Unatin contends has already occurred between the parties and is likely to continue when she

4  returns to manage the Company alongside Mr. Gavrieli.

5        Mr. Gavrieli argues that the Court lacks jurisdiction to appoint a receiver because the

6  Company is not a party to this proceeding as required by *McRae v. Superior Court*, 221 Cal.

7  App. 2d 166, 172-73 (1963).  In addition, Mr. Gavrieli argues that the appointment of a receiver

8  is an extreme remedy that is not warranted here, and that the appointment of a receiver to

9  permanently manage the Company is particularly unjustified.

10        Mrs. Unatin, by contrast, argues that a receiver is necessary.  She argues that there is no

11  authority requiring an LLC to be a party for the Court to appoint a receiver and that *McRae v.*

12  *Superior Court* predates the California LLC Act and only applies to corporations, not LLCs.  She

13  also contends that a receiver would only need to be appointed until the parties agree upon a tie-

14  breaking mechanism to manage the Company moving forward.  Moreover, Mrs. Unatin argues

15  that a receiver would ensure that documents necessary to resolve the parties' tax issues with the

16  IRS are collected and the process is not impeded.

17        **2.**     **Statement of Decision as to Issue No. 7:**

18        The Court finds that the appointment of a receiver is not appropriate at this juncture.  The

19  Court makes the following factual findings and determinations:

20        The Court finds that in order to consider whether to appoint a receiver, the Company

21  must be a party to this action, which it is not.  *McRae v. Superior Court*, 221 Cal. App. 2d 166,

22  172-73 (1963).  Nonetheless, even if the Company were a party to this action, the Court finds

23  that there is no present showing that a receiver should be appointed at this juncture.

24        **H.**     **Issue No. 8:  Mrs. Unatin is Entitled to Prejudgment Interest.**

25        **1.**     **Parties' Contentions as to Issue No. 8:**

26        Mrs. Unatin requests prejudgment interest on the damages awarded by the jury on her

27  investment claims from the date of the verdict through entry of judgment.  She contends that her

28  damages on her investment claims were "liquidated" and thus prejudgment interest is mandatory

25

**STATEMENT OF DECISION**

1   pursuant to Civil Code Section 3287.  Alternatively, Mrs. Unatin argues that even if her

2   investment claims were initially unliquidated, her damages became liquidated at the time the jury

3   rendered its verdict, and prejudgment interest is still appropriate.

4         Mr. Gavrieli disagrees and argues that Mrs. Unatin's investment claims were

5   unliquidated and she is thus not entitled to prejudgment interest from the date of the verdict

6   through entry of judgment.  In addition, he argues that the jury already awarded Mrs. Unatin

7   prejudgment interest under Civil Code Section 3288 and that she is not entitled to any post-

8   verdict, prejudgment interest.

9                **2.**      **Statement of Decision as to Issue No. 8:**

10        The Court finds that Mrs. Unatin is entitled to prejudgment interest from the date of the

11   verdict through entry of judgment on her compensatory damages.  The Court makes the

12   following factual findings and determinations:

13        The Court finds that regardless of whether Mrs. Unatin's investment claims were initially

14   liquidated or unliquidated, they clearly became liquidated as of the date the jury returned its

15   verdict.  *See, e.g.*, *Bullock v. Philip Morris USA, Inc*., 198 Cal. App. 4th 543, 574 (2011); *In re*

16   *Marriage of Dalgleish & Slevaggio*, 17 Cal. App. 5th 1172, 1181, n. 6 (2017).  Accordingly,

17   Mrs. Unatin is entitled to prejudgment interest at 7% between the date of the verdict and the date

18   the Court enters judgment in this matter.

19   **III.   JUDGMENT**

20        Consistent with the Court's determinations above, judgment shall be entered as specified

21   in the accompanying Judgment.

22

23   Dated:   U&¢ à^¦Å¦ , 2020

24                                              HONORABLE PATRICK T. MADDEN
                                                Judge of the Superior Court

25

26

27

28

26

# EXHIBIT C

1

2

3

4

5

6

7

**FILED**
Superior Court of California
County of Los Angeles

DEC 1 6 2020

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
K. lin Kelly

8              **SUPERIOR COURT OF CALIFORNIA**

9              **FOR THE COUNTY OF LOS ANGELES**

10

11  **Dikla Gavrieli,**                    )    **Case No. BC686856**
                                           )
12                        **Plaintiff,**   )
                                           )    **Order Re Motions for JNOV**
13           **v.**                        )        **and New Trial**
                                           )            **and**
14  **Kfir Gavrieli,**                     )    **Statement of Reasons for**
                                           )      **Conditionally Granting**
15                       **Defendant.**    )        **New Trial Motions**
                                           )
16  _____   )

17          This Order contains the court's rulings on: (1) Motion of Defendant, Kfir Gavrieli (Kfir), for

18  Judgment Notwithstanding the Verdict or, in the Alternative, Motion of Kfir for New Trial as to the

19  Claims of Plaintiff, Dikla Gavrieli (Dikla); (2) Motion of Kfir for Judgment Notwithstanding the

20  Verdict or, in the Alternative Motion for New Trial as to Claims of Cross-Complainant, Dean

21  Unatin (Dean); (3) Motion of Kfir for New Trial as to Claims of Dikla; and (4) Motion of Kfir for

22  New Trial as to Claims of Dean. (Collectively these four motions will be referred to as Motions.)

23  This Order also sets forth the Statement of Reasons for conditionally granting the Motions for

24  New Trial. As in previous orders, the court will use the first name of the parties. This is not out

25  of disrespect, but for clarity. The parties are related: Kfir and Dikla are brother and sister and

26  Dean is the spouse of Dikla.

27          Dikla and Dean filed Evidentiary Objections to the declaration of Steven Tensmeyer and

28  objections to certain exhibits attached to the declaration of Allison Libeu. Additionally, Kfir filed

1

objections to portions of the declarations of Brian McManus and objections to certain exhibits attached to the declaration of Nima Mohebbi and an objection to a portion of the declaration of Daniel Schecter. Both sides responded to the objections. The rulings on these objections are set forth in a separate filing that is filed concurrently with this Order.

## Procedural Background

The Notices of Intent to file the four Motions were filed on October 23, 2020. On October 27, 2020, the parties stipulated to the briefing schedule for the Motions, as well as the hearing date for the Motions, and on that same date, the court entered an order confirming those dates. On October 30, 2020, Kfir filed the Motions. Thereafter, Dikla and Dean timely filed their Oppositions to the Motions and Kfir timely filed his replies to the oppositions. On November 17, 2020, the court granted Dikla's ex parte application and permitted Dikla to file up to a total of an additional fifteen pages in their oppositions to the Motions and permitted Kfir to file up to a total of an additional fifteen pages in his replies to the oppositions. The hearing on the Motions were held on December 10 and 11, 2020. The court has considered the moving, opposition and reply papers. The court has also considered the oral arguments of counsel. The court now rules on the Motions.

## Motions for Judgment Notwithstanding the Verdict or, in the Alternative, Motions for New Trial

### Standard for Motion for Judgment Notwithstanding the Verdict

A motion for judgment notwithstanding the verdict (jnov) should be granted "whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made." Section 629, Code of Civil Procedure. A motion for jnov should be granted "[i]f it appears from the evidence, viewed in the light most favorable to the party securing the

2

1    verdit, that there is no substantial evidence to support the verdict." <u>Hauter v. Zogarts</u> (1975) 14

2    Cal.3d 104, 110. Kfir posits that if the motion for jnov is granted based on insufficiency of the

3    evidence, then Dikla is not entitled to a new trial and judgment for Kfir should be entered. <u>Frank</u>

4    <u>v. County of Los Angeles</u> (2007) 149 Cal.App.4th 805, 833. In deciding a motion for jnov, a trial

5    judge is not permitted to re-weigh the evidence; and the motion for jnov should be denied if the

6    evidence is conflicting or if there are several reasonable inferences that may be drawn from the

7    evidence. <u>Hauter v. Zogarts</u>, 14 Cal.3d 104 at 110.

## **Motion for JNOV Directed to Dikla**

*Claim: The Award of Economic Damages for Breach of Fiduciary Duty Related to the*

*Corporation Should Be Vacated*

14    Kfir argues that Dikla's claim that she owes back taxes, penalties and interest because of

15    Kfir's conduct is not a valid claim. This is because Dikla filed false tax returns and she now seeks

16    to recover from Kfir the taxes, penalties and interest she incurred or will incur because of these

17    filings. Kfir argues that because she filed false tax returns, Dikla is precluded from seeking

18    damages from Kfir.  Taxes, penalties and interest belong to the IRS, not to Dikla.  <u>Olenicoff v.</u>

19    <u>UBS AG</u> 2012 WL 1192911 (C.D. Cal. 2012). Additionally, Kfir argues that Dikla's tax damages

20    are speculative because she has not incurred any tax penalties or interest based on Kfir's

21    wrongful conduct.

22    As to the testimony of Dikla's expert, Carlyn Irwin, Ms. Irwin relied on impermissible

23    hearsay and speculation, since she testified that she never saw Dikla's tax returns. Kfir also

24    asserts that Ms. Irwin speculated as to the amount of the penalties and interest that would be

25    imposed on Dikla by the IRS.

26    Kfir also asserts that Dikla presented no evidence that the allocation of profits 60/40 on

27    the corporation's tax returns was because Kfir breached a fiduciary duty to Dikla. The evidence

28    was that the allocation of 60/40 was based on negotiations between counsel for the parties.

3

1    *Analysis and Discussion*

2

3       Kfir is correct that back taxes belong to the government. However, that is not Dikla's claim.

4   Her damages are premised on Kfir's improperly taking distributions that should have been used

5   to pay taxes, thereby depriving Dikla of the ability to pay her taxes. This conduct, the jury found,

6   was a breach of fiduciary duty to Dikla. Kfir's actions caused Dikla damages because she was

7   unable to pay her taxes. For this reason, the cases cited by Kfir are distinguishable. In addition

8   to the unpaid back taxes, she owes interest and penalties on the unpaid taxes. This is the

9   gravamen of Dikla's breach of fiduciary claim that pertains to back taxes.

10      Ms. Irwin's testimony was based on the financial documents of the corporation, which Kfir

11  also relied on for the valuation of the company. Ms. Irwin's testimony was not based on

12  impermissible hearsay.

13      As to the 60/40 allocation of profits used on the corporation's tax returns, this issue was

14  fully addressed at trial: both sides presented the jury with evidence as to this issue and in closing

15  argument, each side addressed the merits of their side of the issue to the jury. The fact that there

16  was a negotiation between counsel and an indemnity provision were also in evidence. It was a

17  question of fact for the jury to determine if the conduct of Kfir amounted to a breach of fiduciary

18  duty. The court finds that there is substantial evidence to support the verdict as to this issue.

19

20      *Claim: There Is a Lack of Evidence to Support a Claim for Punitive Damages*

21

22      Dikla was awarded $15M in punitive damages. Kfir argues that to award punitive

23  damages, there must be evidence of net worth. <u>Farmers & Merchants Trust Co v. Vanetik</u> (2019)

24  33 Cal.App.5th 638, 647-48.   However, at trial, Dikla failed to introduce any evidence of Kfir's

25  net worth. While Dikla introduced evidence of some of Kfir's assets, there was no evidence of

26  his liabilities, which is necessary in order to determine net worth.   <u>Kelly v. Haag</u> (2006) 145

27  Cal.App.4th 919, 915. The only evidence as to his liabilities is his testimony that he borrowed

28  over $15M to fund this litigation, he owes $5M on a loan and he owes over $20M in back taxes.

4

*Analysis and Discussion*

Evidence of Kfir's financial condition is a prerequisite to permitting a jury to access punitive damages. Evidence of Kfir's net worth is one method to satisfy this requirement, but it is not the only means to do so. The Supreme Court in <u>Adams v. Murakami</u> (1991) 54 Cal.3d 105, 116, n.7 stated that the ability to pay a punitive damage award is necessary and the burden to provide the jury this information is on plaintiff. Evidence of Kfir's ability to pay punitive damages was presented to the jury: Kfir has a 50% interest in a highly profitable company that was appraised at a value in excess of $200M. In addition, Kfir has $10M in outside investments that are in his name which he owns free of Dikla. This evidence was presented to the jury to show Kfir's ability to pay a punitive damage award. The court cannot ignore the substantial evidence of Kfir's ability to pay a punitive damages award. For these reasons, the motion for jnov as to the punitive damages award to Dikla is denied.

*Claim: Dikla Lacks Standing to Assert Claims for Conversion, Fraud and Breach of Fiduciary Duty Related to the Outside Investments*

Citing <u>Paclink Communications International v. Superior Court</u> (2001) 90 Cal.App.4th 958, 964, Kfir argues that the outside investments are owned by the company, not the individual members who own the company.

*Analysis and Discussion*

The evidence at trial was that the outside investments were owned by Dikla and Kfir, these investments were all in Kfir's name and were all under his sole control. The money used for the outside investments were the profits from the company, and the profits are owned by Dikla and Kfir, not by Gavrieli Brands. The <u>Paclink</u> case is distinguishable: it concerned the fraudulent transfer of assets from the corporation without any off-setting compensation paid to

5

1  the corporation. On that basis, the claim in Paclink was a derivative claim.  On the other hand,

2  in this case, it was profits from the corporation which were owned by the parties that were used

3  to fund the outside investments that are owned by Kfir and Dikla. There was no testimony that

4  the profits invested in the outside investments were owned by the corporation. Gavrieli Brands

5  has no interest in these investments. Kfir's standing argument is misplaced.

6

7      *Claim: The Economic Loss Rule Bars Tort Claims Involving the Outside Investments*

8

9      The economic loss rule provides that "A person may not ordinarily recover in tort for the

10  breach of duties that merely restate contractual obligations." Aas v. Superior Court (2000) 24

11  Cal.4th 627, 643. Kfir argues that the tort cause of action that relates to the outside investments

12  is a restatement of Dikla's breach of contract claim.

13

14                          *Analysis and Discussion*

15

16      Kfir's statement of the economic loss rule is an accurate statement of the law. However,

17  the economic loss rule does not apply in instances where the contract was fraudulently induced,

18  which is the gist of Dikla's breach of fiduciary claim at trial. Robinson Helicopter Co., Inc. v. Dana

19  Corp. (2004) 34 Cal.4th 979, 989-90. For this reason, the economic loss rule does not apply. At

20  trial, Dikla presented evidence that Kfir fraudulently induced her to enter in the contract with him

21  to invest their profits in the outside investments. This claim permitted Dikla to pursue her claim

22  for fraud against Kfir. For this reason, the Aas case, as well as the other cases relied on by Kfir

23  for this argument, are distinguishable. It was a question of fact for the jury to determine whether

24  the money placed in the outside investments was wrongfully taken by Kfir with the intent to

25  deprive Dikla of her share of these investments or, as Kfir asserted, these are illiquid investments

26  that by their nature are not freely available to the parties and he had no intent to deprive her of

27  her share of these investments. This issue of fact was presented to the jury to decide and the

28

6

1  jury found fraud by Kfir.  The court finds that substantial evidence supports this aspect of the
2  jury's verdict.

4  *Claim: Dikla's Fraud Claim Is Barred as a Matter of Law*

6  Kfir argues that Dikla's fraud theory is that Kfir induced Dikla to invest profits in the outside
7  investments by falsely stating that he did not intend to steal the investments when in fact, he
8  harbored the secret intend to do so. Based on <u>Bank of America Corp. v. Superior Court</u> (2011)
9  198 Cal.App.4th 862, 872, Kfir argues that he could not commit fraud based on an alleged failure
10  to disclose an intent to commit an intentional tort. In addition, at trial, Dikla introduced no
11  evidence that establishes that at the time the investments were made, he harbored an intention
12  to steal them. The only evidence of Kfir's intent when the investments were made was Kfir's
13  testimony that he would split the investments with Dikla and later split them into trusts.

15  *Analysis and Discussion*

17  The <u>Bank of America</u> case, cited by Kfir, is distinguishable. It is a fraudulent nondisclosure
18  case that turned on lack of duty to disclose. However, in this case, Dikla asserted a claim
19  premised on deceit: that Kfir knowingly made false misrepresentations of fact to her intending
20  that she would rely on the misrepresentation, she reasonably relied on the misrepresentations,
21  and she was damaged. <u>Lazar v. Superior Court</u> (1996) 12 Cal.4th 631, 638. At trial, Dikla's
22  presented a viable claim for fraud: that Kfir induced Dikla to invest in the outside investments
23  that were to be jointly owned, when in fact, Kfir harbored a secret intent to steal her share of the
24  investments. This claim is not barred as a matter of law.

25  / / / / /
26  / / / / /
27  / / / / /
28  / / / / /

7

1  *Claim: Dikla's Claim Is Barred Because She Did Not Prove a Separate Investment Partnership*

3      Kfir argues that as to the outside investments, Dikla alleged a separate partnership was
4  created to invest profits into ventures outside of the corporation. However, at trial, Dikla failed to
5  prove that there was a separate partnership for the outside investments. For this reason, Kfir
6  contends Dikla's breach of fiduciary claim fails.

8  *Analysis and Discussion*

10      As Dikla points out, there was substantial evidence that the parties agreed to jointly invest
11  their profits in outside investments. This is sufficient evidence of a partnership.    Section
12  16202(a), Corporations Code. A formal written partnership agreement is not required; it is
13  sufficient that the parties agreed to "carry on as coowners a business for profit. . . ." Section
14  16202(a), Corporations Code.

16  ### ***Ruling and Order Re Motion for JNOV as to Dikla***

18      The Motion for JNOV as to Dikla, is denied. There was substantial evidence at trial to
19  support her claims against Kfir and to support an award of punitive damages. Kfir's arguments
20  to support the Motion for JNOV as to Dikla lack merit.

22  ### **Motion for JNOV Directed to Dean**

24  *Claim: Dean Failed to Prove His Claim for Fraud*

26      The elements of a claim for fraud are: (1) a misrepresentation; (2) knowledge of the falsity;
27  (3) intent to induce reliance on the misrepresentation; (4) justifiable reliance; and (5) damages.
28  Cansino v. Bank of America (2014) 224 Cal.App.4th 1462, 1469. At trial, Dean testified that Kfir

8

misrepresented to him that he would be financially secure: that they would own, run, manage and build the company together as partners. Kfir argues that none of these statements constitute a false promise. No material fact was concealed from Dean: he was an at will employee under California law. No false promise was made by Kfir to Dean. There was no reasonable reliance, because the statements made by Kfir are non-actionable statements of future events. The statements made by Kfir were made seven years before Dean was terminated. There is no evidence that when the statements were made Kfir knew they were false. Additionally, Dean suffered no damages. Instead, his net worth increased substantially (based on Dean's community property interest in Dikla's ownership interest in Gavrieli Brands). Further, since Gavrieli Brands was paying for his lavish lifestyle, rather than sustaining damages, Dean was actually enriched.

*Analysis and Discussion*

There was evidence at trial, primarily the testimony of Dean and Dikla, that supports Dean's claim that Kfir fraudulently induced Dean to invest his savings and earnings in the start-up company and later to leave his job as an attorney at a law firm. No one testified that there was ever a discussion that Kfir could fire Dean. To the contrary: Dikla testified that there was a discussion with Kfir, Dikla and Dean that no one could fire anyone, since all three were partners, equals and owners of the company. Dean testified that Kfir told him that because they were business partners, Dean should invest his money in the company and leave the law firm and work at the company. These statements are not vague predictions or opinions of future events. Taken together and in the context of the parties investing significant time and capital in a start-up, they show that Kfir made promises to Dean, and Dean relied on Kfir's promises that he would be an equal partner/owner who would not be excluded from the enterprise. As for the seven-year delay between the time of the promises and the firing of Dean, Kfir's fraudulent intent is established by his own testimony, viz. he never believed that Dean was an equal partner or owner and Dean could be excluded at any time.

9

As to Dean's damages claim, there was uncontradicted evidence that the cash contributions Dean made to the company kept the company afloat in its early stages and these contributions total $107,500. In addition, Dean quit his employment at a law firm based on the representations made to him by Kfir. Dean's salary was about $200K per year. While working at Gavrieli Brands for seven years, he received no salary. As to the claim that Dean's net worth increased substantially because of his wife's interest in the company – that argument was made to the jury. In addition, he would have received that benefit without quitting his job at the law firm. There is substantial evidence to support the jury's findings that Kfir committed fraud and Dean was damaged by Kfir's false representations.

*Claim: The Fraud Claim Is Untimely*

The statute of limitations for fraud is three years from discovery of the facts constituting the fraud or three years from the date that would lead a reasonable person to suspect the fraud. Section 338(d), Civil Code; Miller v. Bechtel (1983) 33 Cal.3d 868, 875. Dean filed his cross-complaint alleging fraud on June 29, 2018.  Kfir argues that Dean did not carry his burden to establish that he timely filed his cross-complaint. Kfir argues that Dean should reasonably have discovered the alleged fraud long before June 29, 2015. For example, in 2011, Dean told the company's accountant that there were only two members of the LLC, Dikla and Kfir. In 2009, Statements of Information were filed with the Secretary of State stating that only Dikla and Kfir were owners of the company. Additionally, in September 2011, Kfir sent an email stating that Kfir is the CEO 100% of the time and there is no co-CEO position at the company. These facts, Kfir argues, establish that Dean's cross-complaint is time barred.

*Analysis and Discussion*

The jury was presented with this affirmative defense and found that the cross-complaint was filed timely. Since this issue is now presented in the context of a motion for jnov, the court

10

must accept the evidence that supports the verdict and disregard conflicting evidence and indulge in every legitimate inference that may be drawn in support of the judgment. <u>Jones v. Matson & Hall</u> (2007) 155 Cal.App.4th 1596, 1607. Against the evidence presented by Kfir on this issue, Dean testified that the first time he realized that the Kfir lied to him and committed fraud was the day he was fired in September 2017. The jury accepted Dean's testimony as to what he knew and when he knew it. Dean's testimony constitutes substantial evidence that supports the jury's verdict. Dean's testimony is not unreasonable in light of the facts and circumstances of this case.

*Claim: There Is a Lack of Evidence to Support a Claim for Punitive Damages*

Kfir argues that Dean failed to present any evidence, let alone clear and convincing evidence, that Kfir acted with malice, oppression or fraud – or committed reprehensible conduct which would justify the imposition of punitive damages.   <u>Jet Source Charter, Inc. v. Doherty</u> (2007) 148 Cal.App.4th 1, 8. There was no physical harm to Dean, there was no reckless disregard of the health or safety of others, Dean was not financially vulnerable and there is no risk of the conduct being repeated. Additionally, Dean failed to produce any evidence of Kfir's net worth or ability to pay $1.5M in punitive damages awarded to Dean. Since Dean failed to present the evidence of Kfir's net worth, the award of punitive damages should be reversed and there should not be a retrial on punitive damages, since Dean had the opportunity to present evidence of net worth or ability to pay at the trial and failed to do so.

*Analysis and Discussion*

As previously noted, in a motion for jnov, the court must view the evidence presented at trial in a manner most favorable to the judgment. Dean's evidence was that he contributed his life savings to the new venture and he left the law firm where he was employed, because he relied on fraudulent misrepresentations of fact by Kfir, viz. that Dean would be an equal and

11

could not be terminated from his employment at the company. Dean testified that Kfir made these false promises to him over a period of years. This conduct constitutes a willful and conscious disregard of the rights of Dean.  In addition, it constitutes fraud. Kfir's conduct is sufficient to support a claim for punitive damages against Kfir.

As to Kfir's argument that Dean failed to present evidence of Kfir's net worth which requires the court to grant the motion for jnov as to the punitive damages, this issue is discussed in the Motion for JNOV brought against Dikla. The same reasoning applies. There was substantial evidence presented to the jury as to Kfir's ability to pay a punitive damages award. For this reason, the motion for jnov as to the punitive damages award is denied.

### Ruling and Order as to Motion for JNOV as to Dean

The Motion for JNOV as to Dean is denied. In Hale v. Farmers Insurance Exchange (1974) 42 Cal.App.3d 681, 690, the court stated that when ruling on a motion for jnov, the trial court is required to accept the evidence tending to support the verdict as true. The Hale court also stated

> Whether the trial judge . . . concur[s] with the jury's evaluation of the testimony is not controlling. The controlling factor [in analyzing this motion is whether] there was evidence from which the jury could have inferred [the facts necessary to support the verdict].

Hale, id at 692.

There was substantial evidence at trial to support the jury's verdict as to Dean's claim for fraud against Kfir and the punitive damages that were awarded to Dean.

/ / / / /

/ / / / /

/ / / / /

12

## Motions for New Trial

### Standard for Motions for New Trial

Section 657, Code of Civil Procedure sets forth the grounds for a new trial. They include accident or surprise; newly discovered evidence; excessive damages; insufficiency of the evidence to justify the verdict; and error in law. Section 657 also states, inter alia:

> A new trial shall not be granted upon the ground of insufficiency of the
> evidence . . . nor upon the ground of excessive or inadequate damages,
> unless after weighing the evidence the court is convinced from the
> entire record, including reasonable inferences therefrom, that the court
> or jury clearly should have reached a different verdict or decision.

Case law provides additional guidance: "[The court in ruling on a motion for new trial] has to do more than disagree with the jury's verdict. [It] has to be of the opinion that the verdict is clearly against the weight of the evidence." Causey v. Cornelius (1958) 164 Cal.App.2d 269, 284. As to errors of law, the error must be prejudicial, and it must be "reasonably probable" the moving party would have received a more favorable verdict. Pope v. Babick (2014) 229 Cal.App.4th 1238, 1251. "If it clearly appears the error could not have affected the result of the trial, the court is bound to deny the motion." Bristow v. Ferguson (1981) 121 Cal.App.3d 823, 826.

/ / / / /
/ / / / /
/ / / / /
/ / / / /
/ / / / /
/ / / / /

## Motion for New Trial Directed to Dikla

*Claim: There Is New Evidence and There Was Unfair Surprise at Trial*

Kfir argues that newly discovered evidence establishes that post-verdict Dikla has taken the position that the 60/40 tax allocation for the 2019 tax year is correct and it should not be restated based on a 50/50 allocation. At trial, however, Dikla's position was that ownership and the taxes for the outside investments should be on a 50/50 basis. This new fact was not discovered until after the verdict was rendered. If the correct allocation is 60/40, as Dikla now maintains, then Dikla's claim against Kfir based on his use of a 60/40 allocation during the 2017 through 2019 tax years has no merit. In addition, Kfir argues that this claim for breach of fiduciary duty was not disclosed during discovery and, because it was not disclosed, Kfir was unfairly surprised at trial. Kfir could not propound discovery as to this claim and Kfir was unable to retain an expert witness to rebut this claim.

*Analysis and Discussion*

Addressing the second claim first, to establish unfair surprise at trial, Kfir must first show that in discovery the new information at trial was requested and, in her discovery responses, Dikla either withheld the requested information or she provided false or misleading information in her verified responses. The court notes that in the motion for new trial, Kfir presented no pre-trial discovery and no discovery responses to establish this claim – that at trial, he was ambushed with legal theories and evidence that was not disclosed in discovery. However, in Kfir's reply to the opposition to the motion, Kfir attached as Exhibit 7 to the December 3, 2020 declaration of Marshall Camp, Dikla's responses to form interrogatories (served on March 15, 2018). In her response to Interrogatory 6.2 (23:14-20), Dikla's response stated

14

1                       Finally, Defendant has also misrepresented Plaintiff's ownership

2    and management rights in the Company and in over $15 million in funds

3    invested from Company profits since 2015, which were to be invested

4    on the parties' behalf, i.e., the Joint Investment Funds. Defendant has

5    also concealed, stolen, and refused to account for such funds. Namely,

6    Plaintiff has recently discovered that substantial returns and/or

7    distributions (in the magnitude of several hundreds of thousands of

8    dollars, or millions) have been made on the investments which, on

9    information and belief, Defendant has also stolen and concealed from

10   Plaintiff.

11        This response is straight forward and establishes that in March 2018, Dikla advised Kfir

12   that she had a claim against Kfir based on the outside investments. If Kfir wanted to obtain

13   additional facts as to this claim, then he should have propounded contention interrogatories,

14   which would have required Dikla to lay out the specific facts then known that would support this

15   claim. There is no showing that Kfir undertook this discovery. By failing to establish that he

16   conducted this discovery, Kfir cannot now complain that he was misled or sandbagged.

17   Furthermore, in a reply, the court is not permitted to consider any new factual information, such

18   as the information contained in the declaration of Mr. Camp that was filed in reply to the

19   opposition to the Motion for New Trial. Any new factual information in the declaration should

20   have been part of the motion, not set forth in the reply to the opposition. Since the information is

21   set forth in the reply, Dikla has no opportunity to rebut any of the factual matters in the

22   declaration. For this reason, the court would not consider that information had the discovery

23   response supported Kfir's motion, which it does not. Durham v. City of Los Angeles ((1997) 91

24   Cal.App.3d 567, 571, n. 2. Additionally, Dikla's damages expert, Ms. Irwin, was deposed before

25   trial and there was a §402, Evidence Code, hearing on Ms. Irwin's opinions before she was

26   permitted to testify. Her opinions and the basis for those opinions were disclosed before Ms.

27   Irwin testified.

28

1   Based on the declaration of Michel Stein, Kfir argues there is new evidence that was only

2   recently discovered that shows that post-judgment Dikla now affirms the 60/40 allocation. On

3   the other hand, Brian McManus, the tax attorney for Dikla, submitted a declaration that states

4   the only reason for Dikla affirming the 60/40 allocation post-verdict was because pre-verdict (in

5   April 2019), at Kfir's insistence, the corporation made tax distribution payments to Kfir and Dikla

6   based on the 60/40 allocation. (During the trial, there was evidence of the corporation distributing

7   profits for the parties to pay their taxes based on a 60/40 allocation and as well, the parties

8   receiving distributions of profit during the litigation based on the 60/40 allocation. This allocation

9   was solely the idea of Kfir: Dikla wanted a 50/50 allocation. Because of the tax ramifications of

10  the off-shore accounts, the underpayment of taxes because of the off-shore accounts and

11  because of the improper 60/40 allocation, the parties submitted to a voluntary program with the

12  IRS to "true up" their respective tax obligations.) The declaration of Mr. McManus states that

13  following the verdict, Dikla disputed the 60/40 allocation and through Mr. McManus, her tax

14  counsel, he requested to Kfir that the final tax payments for 2019 should be on a 50/50 split. Kfir

15  refused. Because the corporation 2019 tax return was based on a 60/40 allocation, the two

16  taxpayers, viz. Kfir and Dikla, needed to file their 2019 personal tax returns in conformity with

17  the corporation's return. Mr. McManus also states that it is anticipated that an amended 2019

18  tax return will be filed that correctly shows the 50/50 allocation. Based on the declaration of Mr.

19  McManus, there is a clear showing that establishes that Dikla has not agreed that the 60/40

20  allocation is correct.

21

22  *Claim: There Is Insufficient Evidence to Support the Economic Damages Award Relating to the*

23  *Outside Investments*

24

25   In Dikla's claims related to the outside investments, she was awarded three buckets of

26  damages:

27   Bucket 1: $7,520,609 in money sent to the outside investment entities, plus $1,609,952

28  in pre-judgment interest;

16

Bucket 2: $1,418,597 in investment returns from the outside investments that were reinvested, plus pre-judgment interest of $203,733; and

Bucket 3: $1,542,465 in returns from the outside investments that were not reinvested that now sit in bank accounts.

Kfir argues that only the Bucket 1 is allowable, since Dikla presented evidence of only her out of pocket damages claim (Bucket 1), and she did not present evidence as to any benefit of the bargain damages (Buckets 2 and 3). Buckets 2 and 3 are distributions from the investments. "Out-of-pocket measure of damages is directed to restoring the Dikla to the financial position enjoyed by him prior to the . . . transaction." Alliance Mortgage Co. v. Rothwell (1995) 10 Cal.4th 1226. Kfir argues that much of the money contained in Buckets 2 and 3 were profits. Additionally, Dikla's expert, Carlyn Irwin, acknowledged that she placed a $650K loan in Bucket 1 and later counted the $650K in Bucket 3 when it was repaid.

Kfir also argues that as set forth in the motion for jnov, Dikla's fraud claim is not viable, viz. the claim that Kfir made false statements to her to induce her to agree to make the outside investments while he secretly harbored an intent to steal these funds. Kfir argues that Dikla's testimony was that only the investments made after March 2017 were made without her consent. That means that she did not rely on any statement by Kfir with respect to investments that were made after March 2017. Dikla's maximum damages for this claim should be a maximum of $7,850,804.50 and all damages in excess should be remitted.


*Analysis and Discussion*


Dikla's theory against Kfir is breach of fiduciary duty. In a breach of fiduciary action, a plaintiff is permitted to pursue either a claim for return of capital (out of pocket damages) or return of her share of the profits from those investments (benefit of the bargain damages). There is no authority for the recovery of both. In Fragale v. Faulkner (2003) 110 Cal.App.4th 229, 235-39, cited by Dikla, the Court of Appeal held that in a fraud action brought against a fiduciary, the

17

1    plaintiff is permitted to seek his out of pocket damages or benefit of the bargain damages. Id. at
2    235-39.

3        There is no logic or fairness to permit an injured party in a breach of fiduciary action to
4    pursue both her out of pocket damages and her benefit of the bargain damages. For example,
5    if two parties, D and K, form a partnership and each invests $1M and the investments do well
6    and reach a FMV of $5M, but later the manager, K, absconds with the investments, in her lawsuit
7    D is entitled to seek either the return of her $1M investment, plus interest, or her 50% share of
8    the profits ($2.5M). It would be illogical and unfair to permit D to recover both her initial $1M
9    investment, plus her share of the profits, $2.5M (for a total of $3.5M). Thus, if Dikla is awarded
10   Buckets 2 and 3 she would be overcompensated for her loss. Kfir is correct in arguing that only
11   Bucket 1 and the interest on those damages is recoverable, since Dikla did not present evidence
12   at trial that establishes the fair market value of the investments. For these reasons, a new trial
13   is granted as to the economic damages from outside investments unless by January 15, 2021,
14   Dikla consents to a remit all of the damages in Buckets 2 and 3 (that total $3,164,795). If Dikla
15   does not consent to a reduction of the economic damages from the outside investments that
16   total $3,164,795 (all of the damages from Bucket 2 and 3), then the Motion for New Trial based
17   on excessive economic damages is granted.

18        Contrary to Kfir's argument, Dikla is permitted to seek recovery of investments made
19   before, as well as after March 2017. When she agreed to make the joint investments with Kfir,
20   she did not consent to the theft of the investments that were made before March 2014.

21

22   *Claim: There Is Insufficient Evidence to Support the Award of Non-Economic Damages and*
23                       *the Award of Punitive Damages to Dikla*

24

25        Kfir argues that the emotional distress award of $5M for her breach of fiduciary claim and
26   $1M for her conversion claim are clearly excessive. As to the breach of fiduciary claim, Dikla
27   never claimed any emotional distress related to the investment funds. As for the breach of
28   fiduciary claim, Dikla's testimony to support her claim for emotional distress was that for the last

1  two years, her life has been difficult, and she was humiliated when she had to purchase company

2  gift cards because she could not get them for free. Any mental distress suffered to get her rights

3  restored is stress associated with being a litigant and such a claim is not compensable.

4  MacCharles v. Bilson (1986) 186 Cal.App.3d 954, 958.

5       Kfir also argues that most of Dikla's testimony was vague and conclusory and does not

6  support an award of emotional distress damages, let along an award of $6M.

7       In addition, Kfir argues that Dikla made improper arguments: her counsel argued that

8  these are first world problems and a large award of emotional distress damages is proper

9  because Gavrieli Brands is a very successful company.

10      As to the $15M punitive damage award based on Dikla's claim for breach of fiduciary duty

11 as to the outside investments, Kfir argues that there was no evidence showing Kfir's ability to

12 pay a punitive damages award. He also contends there was no clear and convincing evidence

13 of fraud, oppression, malice or reprehensibility. His conduct caused no physical harm to Dikla.

14 Should the court deny the jnov motion as to punitive damages, then the court should substantially

15 remit the punitive damage award. Additionally, if the court reduces the compensatory damages

16 then this would require reversal of the punitive damages award because the punitive damages

17 award must bear a reasonable relationship to the actual damages. Auerbach v. Great Western

18 Bank (1999) 74 Cal.App.4th 1172, 1190.

19

20                                  *Analysis and Discussion*

21

22      Plaintiff argues that this is not a run of the mill fiduciary duty case. On the other hand,

23 defendant argues this is simply a commercial dispute between business partners.   While it is a

24 commercial dispute, it is also more. A brother and a sister struggled and worked together to form

25 a successful enterprise that became successful beyond their wildest imagination. Dikla had a

26 dream: to design a high-end woman's flat designer slipper shoe that would also be durable. Dikla

27 worked in the U.S. to move the project forward – working on designing a shoe for a niche market

28 that at the time was untapped, while Kfir worked in China to set up production of the shoe.

1 | Neither task was easy. They also had no experience in retail, let alone the shoe business and

2 | almost no capital to fund the enterprise. So Dikla's husband, Dean, continued to work as a

3 | lawyer, draw his salary and use his earnings to fund the up-start operation. Eventually, the

4 | company became very successful and highly profitable. From the jury's verdict, it is apparent

5 | that they found that Kfir usurped his co-ownership position and forced Dean and Dikla out of the

6 | company. There were no written agreements – everyone was family. It is not unreasonable that

7 | Dikla became very emotionally upset -- she believed she and her husband were forced out of

8 | the company she co-founded. Additionally, there were millions of dollars of profits that were

9 | owned by Dikla and Kfir in offshore bank accounts, all in Kfir's name or under his control. It is

10 | not unreasonable that under these circumstances the jury reasonably believed that Dikla

11 | reasonably suffered a great deal of emotional distress: Kfir pushed Dikla out the door of the

12 | business and she completely lost her ability to any access to the finances of the company.

13 | After weighing all the evidence and based on the entire record, including reasonable

14 | inferences from the evidence, the court finds there is insufficient evidence to justify a verdict of

15 | $5M for non-economic damages for the breach of fiduciary claim as to Gavrieli Brands. Clearly,

16 | Dikla became very upset and suffered humiliation and anger for the manner Kfir forced her out

17 | of the company and barred her from financial information about Gavrieli Brands. That said, there

18 | was no physical injury component to her claim for emotional distress injurie, she did not seek

19 | treatment for these injuries and there is no future emotional distress component. Based on the

20 | evidence from the trial, a reasonable amount to compensate Dikla for her emotional distress

21 | relating to the breach of fiduciary duty claim is $1M.

22 | As for the emotional distress associated with the conversion claim as to the outside

23 | investments, the jury's award of $1M is reasonable. It is more than reasonable to assume that

24 | Dikla was extremely upset when she determined that Kfir had converted to himself ownership of

25 | her share of these assets.

26 | Therefore, as to the non-economic damages associated with the breach of fiduciary claim,

27 | the court conditionally grants a new trial unless Dikla consents to a reduction of the non-

28 | economic damages award from $5M to $1M.  If Dikla consents to the reduction of the non-

1  economic damages on the breach of fiduciary claim to $1M by January 15, 2021, then the Motion

2  for New Trial based on excessive non-economic damages is denied. If Dikla does not consent

3  to the reduction on the non-economic damages associated with the breach of fiduciary claim to

4  $1M by January 15, 2021, then a new trial is granted as to the Dikla's claim for non-economic

5  damages.

6      Dikla was awarded $15M in punitive damages as to her claims against Kfir for fraud,

7  breach of fiduciary duty and conversion that relate to the outside investments. As to the punitive

8  damages awards, based on the entire record, including reasonable inferences from the

9  evidence, the court finds there is insufficient evidence to justify a verdict of $15M in punitive

10  damages. The court finds that in light of the record as a whole, the punitive damages award was

11  based in part by passion or prejudice. In Boeken v. Philip Morris, Inc. (2005) 127 Cal.App.4th

12  1640, 1689, the court listed three factors to determine whether an award is excessive: (1) the

13  reprehensibility of the defendant; (2) the amount of compensatory damages awarded; and (3)

14  the wealth of the defendant. The court finds that Kfir's actions were reprehensible: he put his

15  own greed and financial interests above the interests of the other co-owner, Dikla. However,

16  Dikla was not physically injured by his conduct and it is very unlikely that he will repeat his

17  misconduct. As to the compensatory damages from the misconduct, they total $7.5M., a sizable

18  sum. As to the wealth of Kfir, he has a 50% interest in a highly profitable company that was

19  appraised at a value in excess of $200M. In addition, Kfir has $10M in outside investments that

20  are in his name which he owns free of Dikla.  Based on these factors, the court finds that a

21  reasonable amount of punitive damages related to Dikla's claims as to the outside investments

22  is $2.5M.

23      Therefore, the court conditionally grants a new trial unless Dikla consents to a reduction

24  of the punitive damages from $15M to $2.5M. If Dikla consents to the reduction of the punitive

25  damages award as to the outside investments by January 15, 2021, then the Motion for New

26  Trial based on excessive punitive damages is denied. If Dikla does not consent to the reduction

27  of the punitive damages as to the outside investments from $15M to $2.5M by January 15, 2021,

28  then a new trial is granted as to Dikla's claim for punitive damages.

21

1   *Claim: Dikla's Interpretation of the 60/40 Agreement is Against the Overwhelming Weight of*

2   *the Evidence*

3

4   Kfir argues that the evidence overwhelmingly supports Kfir's claim: that when the

5   company reached a value of $200M, Dikla had agreed that the ownership of the company would

6   shift from 50/50 to Kfir owning 60% of the company and Dikla owning 40%. Kfir asks the court

7   to review the communications that relate to the agreement. After reviewing all the evidence, Kfir

8   argues that the court will conclude that Dikla was not credible.  Citing <u>Barrese v. Murray</u> (2011)

9   198 Cal.App.4th 494, 504, Kfir argues the court should consider credibility independently of the

10  jury's conclusions. In addition, because Dikla failed to correct Kfir's understanding of the

11  agreement, Kfir argues the agreement should be interpreted consistent with Kfir's

12  understanding. <u>Merced City Sheriff's Employees' Ass'n v. County of Merced</u> (1987) 188

13  Cal.App.3d 662, 670.

14

15   *Analysis and Discussion*

16

17  This issue was addressed by the jury in the special interrogatories on Verdict Form 2.

18  Each factual claim was found adversely to Kfir's present position. In this aspect of the motion for

19  new trial, Kfir asks the court to re-examine and re-weigh the evidence. He argues the

20  "overwhelming" weight of the evidence supports his claim. Dikla testified she agreed to shift the

21  equity from 50/50 to 60/40 only if the company is sold. Kfir has three degrees from Stanford

22  University, including an M.B.A. Following the purported 60/40 agreement, he took no action to

23  reduce the purported oral agreement to writing. Instead, after he testified there was an

24  agreement, two cash distributions were taken by the parties and both were on a 50/50 basis.

25  These independent facts are strong evidence that there was no agreement to shift to 60/40 when

26  the company reached a $200M value. Additionally, Kfir never took any steps to have the

27  company valued, so that the purported equity shift would take place. Based on the totality of the

28  evidence from the trial, the court finds that Dikla was a credible witness. Based on Dikla's

22

credibility and the totality of the evidence at trial, the court finds that Dikla never agreed to shift the equity of the company 60/40 when the company reached a value of $200M.  The Merced City Sheriff's case is distinguishable: the facts disclose that the parties (the County and the Association representing the Sheriffs) had signed an agreement; later, it was learned there was an ambiguous provision in the signed agreement. The Court of Appeal affirmed the contract and held that the ambiguous provision should be interpreted as a reasonable person would -- on the "outward manifestations of consent." Id. at 672. In this case, there is no ambiguous provision: Dikla testified she did not consent to the proposal from Kfir. As noted, her testimony is credible. There was no contract.

### *Claim: Prejudicial Evidence and Arguments Prevented a Fair Trial*

In this aspect of the motion for new trial and, as well, in the motion for new trial that is directed to the verdict on Dean's cross-complaint, there are multiple claims of misconduct by plaintiff: in the opening statement, during the presentation of the evidence and in closing arguments. In that regard, in these motions, there are citations to the trial transcript with the numerous claims of misconduct. Kfir argues that the unduly  prejudicial evidence and attorney misconduct resulted in prejudice to Kfir, which prevented a fair trial. Kfir acknowledges that in many instances no objection was made as to the claimed misconduct; Kfir argues that he was excused from objecting. Love v. Wolf (1964) 226 Cal.App.2d 378, 392.

### *Analysis and Discussion*

The court has carefully reviewed the motions for new trial and the replies by Kfir to the oppositions of Dikla and Dean and the evidentiary support and opposition to this aspect of the motion for new trial.  Kfir argues that he was deprived of a fair trial because of extensive misconduct by opposing counsel and for this reason, a new trial should be granted.

It is axiomatic that except in exceptional circumstances, an objection to inadmissible evidence is required to preserve the objection.  Section 353(a), Evidence Code, states

> A verdict . . . shall not be set aside, nor shall the judgment . . . be
> reversed by reason of the erroneous admission of evidence unless:
> (a) There appears of record and objection to or a motion to exclude or
>     to strike the evidence that was timely made and so stated as to make
>     clear the specific ground of the objection . . . .

In the motion for new trial as to Dikla, Kfir cited to 38 specific instances of misconduct by Dikla's side that are part of the trial transcript. As to these thirty-eight instances, the transcript discloses the following:

-14 objections to evidence were made on behalf of Kfir in front of the jury: 7 objections were sustained and 7 were overruled;

-4 objections and/or discussions took place outside the presence of the jury;

-1 citation was outside the presence of the jury; the court ruled on limiting the use of evidence outside the presence of the jury;

-1 citation was taking the verdict; and

-18 cites contained no objection by counsel.

(Some of the citations were used in the brief on more than one occasion.)

In the motion for new trial as to Dean, Kfir cited to 81 instances of misconduct. (Some were also cited in the arguments as to Dikla; and some were cited more than once.) The trial transcript discloses the following:

-11 objections to evidence were made in the presence of the jury: 7 were sustained and 4 were overruled;

-68 cites contained no objection by counsel; and

-2 cites there was an objection, but no ruling on the objection.

24

1    Love v. Wolf gives Kfir no sanctuary for his failure to object. In the Love case, plaintiff's

2    counsel repeatedly vilified opposing counsel in front of the jury and repeatedly asked improper

3    questions. The Court of Appeal also noted that the trial judge failed to exercise control of the trial

4    by repeatedly failing to rule on objections or to control the misconduct. Against these exceptional

5    circumstances, the Court of Appeal excused counsel's failure to object. That is not this case. If

6    Kfir believed that improper questions were asked a witness or an improper argument was made,

7    then it is counsel's duty to object, so that the trial judge can promptly address the issue in front

8    of the jury. This permits prompt remediation of objectionable question or argument while it is

9    fresh in juror's minds.

10

11    ### *Ruling and Order as to Motion for New Trial as to Dikla*

12

13    The Motion for New Trial as to Dikla as to the economic damages from the outside

14    investments is conditionally granted unless Dikla consents to remit the award of $1,418,597 (as

15    to Bucket 2), plus prejudgment interest of $203,733 and, in addition, to remit the award of

16    $1,542,465 (as to Bucket 3), for a total of $3,164,795 as to economic damages from the outside

17    investments. If Dikla consents to the reduction of the economic damages from the outside

18    investments from Buckets 2 and 3, which total $3,164,795, then the Motion for New Trial based

19    on excessive economic damages from the outside investments is denied. If Dikla does not

20    consent to the reduction of $3,164,795, based on excessive economic damages from the outside

21    investments, then the Motion for New Trial is granted.

22    In addition, the court conditionally grants a new trial unless Dikla consents to a reduction

23    of the non-economic damages award from $5M to $1M on the breach of fiduciary claim If Dikla

24    consents to the reduction of the non-economic damages to $1M for the breach of fiduciary claim

25    by January 15, 2021, then the Motion for New Trial based on excessive non-economic damages

26    is denied. If Dikla does not consent to the reduction on the non-economic damages for the

27    breach of fiduciary claim to $1M by January 15, 2021, then a new trial is granted as to the Dikla's

28    claim for non-economic damages.

1    Additionally, the court conditionally grants a new trial unless Dikla consents to a reduction

2    of the punitive damage award from $15M to $2.5M by January 15, 2021. If Dikla consents to the

3    reduction of the punitive damages award from $15M to $2.5M by January 15, 2021, then the

4    Motion for New Trial based on excessive punitive damages is denied. If Dikla does not consent

5    to the reduction of the punitive damages from $15M to $2.5M by January 15, 2021, then a new

6    trial is granted as to Dikla's claim for punitive damages.

7    As to the other grounds asserted by Kfir in his Motion for New Trial, the Motion for New

8    Trial as to Dikla is denied.

9

10    **Motion for New Trial Directed to Dean**

11

12    *Claim: Dean Failed to Introduce Sufficient Evidence to Justify the Verdict*

13

14    Kfir argues that the evidence presented by Dean was insufficient to justify a finding of

15    liability for fraud. Kfir argues that it is not plausible that Dean believed that he was an equal

16    owner and manager of the company.

17    In addition, Kfir argues the evidence was insufficient to justify an award of compensatory

18    damages. Dean's claimed damages are speculative and not supported by the evidence. Dean's

19    evidence as to damages was (a) $107,000 that he allegedly contributed to the Company and

20    (b) the salary that he allegedly gave up when he joined the company. Dean testified that his

21    salary was about $200K per year with raises each year of about 10%. However, this testimony

22    was contradicted by later testimony and by his tax return. Additionally, in closing argument

23    Dean's counsel had no evidentiary support for the arguments he made as to Dean's economic

24    damages.

25    Kfir argues that there was no evidence, let alone clear and convincing evidence, that Kfir

26    acted with fraud, oppression of malice as to Dean and despite that, the jury awarded Dean $1.5M

27    in punitive damages. This is more than triple the compensatory damages awarded to Dean.

28    Additionally, the only fraudulent statement used to justify the punitive damage award was made

26

1  seven years before Dean was terminated, when Dean began to work at the company. At a

2  minimum, Kfir asks the court to remit the punitive damage award to a nominal amount.

4                              *Analysis and Discussion*

6          There is substantial credible evidence from the testimony of Dean and Dikla that supports

7  Dean's claim that Kfir fraudulently induced Dean to invest his savings and earnings in the newly

8  formed venture and later to leave his job as an attorney at a law firm. Dikla testified credibly that

9  there was a 3-way discussion with Kfir, Dikla and Dean that no one could fire anyone, since that

10  all three were partners, equals and owners of the company. At trial, no one testified that there

11  was ever a discussion that Kfir could fire Dean. Dean testified that Kfir told him that because

12  they were business partners, Dean should invest his money in the company and leave the law

13  firm and work at the company. These statements and the context of the statements constitute

14  reasonable and credible evidence that Kfir made promises to Dean, and Dean relied on Kfir's

15  promises that he would be an equal partner/owner who would not be excluded from the

16  enterprise. There is substantial credible evidence that supports the jury's finding of liability as to

17  Dean's claim of fraud against Kfir and the damages of $450,000. There is no basis for the court

18  to find that the jury should have reached a different verdict.

19          As to the punitive damages award, based on the entire record, including reasonable

20  inferences from the evidence, the court finds there is insufficient evidence to justify a verdict of

21  $1.5M in punitive damages.  In closing argument, Dikla's counsel asked the jury to award

22  punitive damages against Kfir and for Dean between $450K and $900K. Instead, the jury

23  awarded him $1.5M, over triple the compensatory damages. Kfir's conduct resulted in no

24  physical injury to Dean. And Kfir's conduct is unlikely to take place again. Additionally, with

25  remittitur, the ratio of actual damages to punitive damages is slightly more that 1:1, rather than

26  the 3:1 ratio from the jury's verdict. The 1:1 ratio is a more reasonable punishment for the

27  misconduct committed by Kfir as to Dean.

28

Therefore, the court conditionally grants a new trial unless Dean consents to a reduction of the punitive damages from $1.5M to $500K by January 15, 2021. If Dean  consents to the reduction of the punitive damages award from $1.5M to $500K by January 15, 2021, then the Motion for New Trial based on excessive punitive damages is denied. If Dean does not consent to the reduction of the punitive damages from $1.5M to $500K by January 15, 2021, then a new trial is granted as to Dean's claim for punitive damages.

*Claim: Prejudicial Evidence and Arguments Prevented a Fair Trial*

Kfir contends that the opening statement by Dean's attorney is replete with appeals to prejudice, e.g. Kfir is a bully and he should be judged by the unkind things he has said about people, including Dean. Additionally, Kfir asks that consideration be given to the prejudicial evidence and arguments that are set forth in Kfir's motion for new trial as to Dikla.

Additionally, Kfir argues that Dean's evidence focused improperly on propensity evidence, viz. that character evidence and instances of specific conduct were used to prove Kfir's conduct on a specific occasion. For example, on the first day of trial Dikla testified that her father was abusive and cracked her head open with a dish of food; Dikla was told by her mother to lie about the incident. Kfir argues that this evidence was used to improperly suggest that Kfir acts similarly to his father. There were additional instances of misconduct by Dean's attorney: another example relates to an incident in 2010 when Kfir became angry: he yelled at Dikla, pinned her to a wall and punched a hole in the wall. Numerous other examples are set forth in the motion and in the declaration of Mr. Tensmeyer. In addition, inadmissible character evidence was used to attack Kfir's credibility.

Kfir also argues that Dean used propensity arguments to argue to the jury that they should find for Dean because of the jury's dislike for Kfir. As one example, Dikla testified that Kfir hit her with a box on September 12, 2017. This alleged incident has no relevance to any issue in the case. In addition, in questions to defense witnesses, specifically Yamit Betesh and her mother, Mira Gavrieli, they were asked about foul language used by Kfir. There was no reason for these

28

1  questions except to inflame the jury. Based on the prejudicial evidence submitted by Dikla, Kfir

2  argues that there was significant prejudice to Kfir, and for this reason, a new trial should be

3  granted to Kfir as to Dean's claims.

4

5                                    *Analysis and Discussion*

6

7       This claim of prejudice and misconduct that Kfir contends was committed by opposing

8  counsel is discussed in detail in the court's Analysis and Discussion in this Order in the Motion

9  for New Trial as to Dikla. They apply equally here.

10

11               ***Ruling and Order as to Motion for New Trial as to Dean***

12

13       The court conditionally grants a new trial unless Dean consents to a reduction of the

14  punitive damages from $1.5M to $500K by January 15, 2021. If Dean consents to the reduction

15  of the punitive damages award from $1.5M to $500K by January 15, 2021, then the Motion for

16  New Trial based on excessive punitive damages is denied. If Dean does not consent to the

17  reduction of the punitive damages from $1.5M to $500K by January 15, 2021, then a new trial is

18  granted as to Dean's claim for punitive damages. In all other respects, the Motion for New Trial

19  as to Dean is denied.

20  DATED: DECEMBER 16, 2020

21

22

23  PATRICK T. MADDEN
    Judge of the Superior Court

24

25

26

27

28

# EXHIBIT D

Excerpt from UNATIN00786566 Chats Between Kfir and Dikla 9/13-23/2017

| Participants | From | Body | Timestamp: Time |
|---|---|---|---|
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | All out war if dean comes tomorrow. Bring it! | 9/13/2017 12:28:02 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | You've forced me to come back to the office earlier than I should you dirty whore. Challenge my authority today and see what happens. | 9/13/2017 7:44:06 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | Be in the office on Monday if you accept I'm boss on all things. No exceptions. Not now not ever. You'll have to earn my trust and that won't be easy. If you don't accept and don't show up on Monday we can talk about your exit. Period. | 9/16/2017 4:12:54 PM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | I want all dean's logins for business related sites by tonight. Yamit texted him. Don't fuck with me | 9/17/2017 4:31:22 PM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | HOW TO WHORE OUT YOUR FAMILY IN 20 EASY STEPS: The story of Dikla Unatin's life. Write it in your free time now. You will pay dearly for all this. Say goodbye to your supposed 40%. It is no more. | 9/17/2017 10:33:36 PM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | You've lost all sense of right and wrong. You've tried to whore me out and your whole family for your husband. What a fool to think I'd allow that. Over my dead body. I mean that from the bottom of my heart. | 9/18/2017 10:43:17 PM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | Every time you and your bitch ass husband come at me, I'll come at you 5 times harder. Any pain or inconvenience you try to inflict on me, the business, mom, or the rest of the family, you and your family will feel multiples of that back. I promise you that. All day, every day, til the day I die. You will live to regret every misstep. | 9/23/2017 7:52:29 PM(UTC-7) |



DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856

Plaintiff's Trial Exhibit No.

# PTX 1969

Date Entered _____

By _____, Deputy Clerk

# EXHIBIT E

**EXHIBIT**

*152*

Excerpts from KG00180806 Chats between Yamit and Kfir 9/12/2017

| | Participants | From | Body | Timestamp: Time | PST Conversion |
|---|---|---|---|---|---|
| **Msg 1** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Dikla just told mom she's going to office! | 9/13/2017 04:00(UTC+0) | 9/12/2017 8:00 PM |
| **Msg 2** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Get out of there. Don't let them brainwash you | 9/13/2017 05:43(UTC+0) | 9/12/2017 9:43 PM |
| **Msg 3** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Come back | 9/13/2017 05:43(UTC+0) | 9/12/2017 9:43 PM |
| **Msg 4** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Get out of there | 9/13/2017 05:43(UTC+0) | 9/12/2017 9:43 PM |
| **Msg 5** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Hope you got the f out of there. They were dominating you and you were saying dumb stuff | 9/13/2017 05:56(UTC+0) | 9/12/2017 9:56 PM |
| **Msg 6** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | "You're a boss. Kfir's a boss. Who cares?" Really? | 9/13/2017 05:58(UTC+0) | 9/12/2017 9:58 PM |
| **Msg 7** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Find me 2 big security guards for tmrw am | 9/13/2017 05:58(UTC+0) | 9/12/2017 9:58 PM |
| **Msg 8** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | 8am | 9/13/2017 05:58(UTC+0) | 9/12/2017 9:58 PM |
| **Msg 9** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | ??? | 9/13/2017 06:05(UTC+0) | 9/12/2017 10:05 PM |
| **Msg 10** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | They will send u a text | 9/13/2017 06:05(UTC+0) | 9/12/2017 10:05 PM |
| **Msg 11** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Where r u? | 9/13/2017 06:06(UTC+0) | 9/12/2017 10:06 PM |
| **Msg 12** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Driving | 9/13/2017 06:06(UTC+0) | 9/12/2017 10:06 PM |
| **Msg 13** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | No tell her for dean not to come tmrw | 9/13/2017 06:25(UTC+0) | 9/12/2017 10:25 PM |
| **Msg 14** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Top priority. I fired him. | 9/13/2017 06:25(UTC+0) | 9/12/2017 10:25 PM |

DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856

Trial Exhibit No.

**TX 152**

Date Entered _____

By _____, Deputy Clerk

TX 152-0001

| | | | | | |
|---|---|---|---|---|---|
| Msg 15 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | I have the right to fire dean | 9/13/2017 06:25(UTC+0) | 9/12/2017 10:25 PM |
| Msg 16 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | But I hung up | 9/13/2017 06:25(UTC+0) | 9/12/2017 10:25 PM |
| Msg 17 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | "Kfir has the right to fire dean" | 9/13/2017 06:26(UTC+0) | 9/12/2017 10:26 PM |
| Msg 18 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | No one will ever agree with her that I don't have the right to do that | 9/13/2017 06:26(UTC+0) | 9/12/2017 10:26 PM |
| Msg 19 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Of course I have that right | 9/13/2017 06:26(UTC+0) | 9/12/2017 10:26 PM |
| Msg 20 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Dean is not my partner | 9/13/2017 06:26(UTC+0) | 9/12/2017 10:26 PM |
| Msg 21 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Kfir makes ALL final decisions | 9/13/2017 06:26(UTC+0) | 9/12/2017 10:26 PM |
| Msg 22 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | I'm Dikla's boss | 9/13/2017 06:26(UTC+0) | 9/12/2017 10:26 PM |
| Msg 23 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Tell her! | 9/13/2017 06:27(UTC+0) | 9/12/2017 10:27 PM |
| Msg 24 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | This is too much for mom. I will do this alone | 9/13/2017 07:18(UTC+0) | 9/12/2017 11:18 PM |
| Msg 25 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | She is shaking and crying too much | 9/13/2017 07:18(UTC+0) | 9/12/2017 11:18 PM |
| Msg 26 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Good night | 9/13/2017 07:19(UTC+0) | 9/12/2017 11:19 PM |
| Msg 27 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | No mom needs to be involved | 9/13/2017 07:20(UTC+0) | 9/12/2017 11:20 PM |
| Msg 28 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | It should be both of you | 9/13/2017 07:20(UTC+0) | 9/12/2017 11:20 PM |
| Msg 29 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | She needs to take this on head on and be involved rather than sit back and stress out without doing anything about it | 9/13/2017 07:21(UTC+0) | 9/12/2017 11:21 PM |

TX 152-0002

| | | | | | |
|---|---|---|---|---|---|
| Msg 30 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Kfir mom is in bad shape | 9/13/2017 07:22(UTC+0) | 9/12/2017 11:22 PM |
| Msg 31 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Maybe that fucking slut won't sue you and mom if you use physical force | 9/13/2017 07:22(UTC+0) | 9/12/2017 11:22 PM |
| Msg 32 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Don't txt her anymore tonight | 9/13/2017 07:23(UTC+0) | 9/12/2017 11:23 PM |
| Msg 33 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | She'll be in much worse shape if I punch dean in the face I promise you that | 9/13/2017 07:23(UTC+0) | 9/12/2017 11:23 PM |
| Msg 34 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Ok great | 9/13/2017 07:23(UTC+0) | 9/12/2017 11:23 PM |
| Msg 35 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | That's the fucking reality and you guys need to deal with it and step the fuck up in these moments | 9/13/2017 07:24(UTC+0) | 9/12/2017 11:24 PM |
| Msg 36 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Stop getting dominated by them and put up a fucking fight of our lives | 9/13/2017 07:24(UTC+0) | 9/12/2017 11:24 PM |
| Msg 37 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Dean is running our fucking family | 9/13/2017 07:24(UTC+0) | 9/12/2017 11:24 PM |
| Msg 38 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | What other evidence do you need | 9/13/2017 07:24(UTC+0) | 9/12/2017 11:24 PM |
| Msg 39 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | This is the first of many battles | 9/13/2017 07:25(UTC+0) | 9/12/2017 11:25 PM |
| Msg 40 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | I know. I get it. | 9/13/2017 07:25(UTC+0) | 9/12/2017 11:25 PM |
| Msg 41 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Mom is an emotional mess | 9/13/2017 07:25(UTC+0) | 9/12/2017 11:25 PM |
| Msg 42 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Send elram to his house | 9/13/2017 07:25(UTC+0) | 9/12/2017 11:25 PM |
| Msg 43 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Dikla won't call police on him | 9/13/2017 07:25(UTC+0) | 9/12/2017 11:25 PM |
| Msg 44 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | We will succeed. Just be patient | 9/13/2017 07:25(UTC+0) | 9/12/2017 11:25 PM |

TX 152-0003

| | | | | | |
|---|---|---|---|---|---|
| **Msg 45** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Tell him to hold him down if he needs to and not let him out of the house | 9/13/2017 07:25(UTC+0) | 9/12/2017 11:25 PM |
| **Msg 46** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | WHATEVER IT TAKES | 9/13/2017 07:26(UTC+0) | 9/12/2017 11:26 PM |
| **Msg 47** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Got it | 9/13/2017 07:26(UTC+0) | 9/12/2017 11:26 PM |
| **Msg 48** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | don't lose | 9/13/2017 07:26(UTC+0) | 9/12/2017 11:26 PM |

TX 152-0004

Excerpts from KG00180806 Chats between Yamit and Kfir 9/13/2017

| | Participants | From | Body | Timestamp: Time | PST Conversion |
|---|---|---|---|---|---|
| Msg 49 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Elram available | 9/13/2017 14:49(UTC+0) | 9/13/2017 6:49 AM |
| Msg 50 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Yes | 9/13/2017 14:50(UTC+0) | 9/13/2017 6:50 AM |
| Msg 51 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Tell her that already she's forcing me now to go back to office earlier than I should and I'll never forgive her for that in my life | 9/13/2017 14:50(UTC+0) | 9/13/2017 6:50 AM |
| Msg 52 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | All because she's a dirty whore | 9/13/2017 14:50(UTC+0) | 9/13/2017 6:50 AM |
| Msg 53 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +18184028659 yamit gavrieli | She called mom pissed about your text | 9/13/2017 14:53(UTC+0) | 9/13/2017 6:53 AM |
| Msg 54 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | New reality bitch | 9/13/2017 14:54(UTC+0) | 9/13/2017 6:54 AM |
| Msg 55 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | And she is a dirty whore | 9/13/2017 14:54(UTC+0) | 9/13/2017 6:54 AM |
| Msg 56 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Dean is her pimp | 9/13/2017 14:54(UTC+0) | 9/13/2017 6:54 AM |
| Msg 57 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Getting to her house now. Will update u. | 9/13/2017 15:36(UTC+0) | 9/13/2017 7:36 AM |
| Msg 58 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Seems a little late to be getting to her house | 9/13/2017 15:38(UTC+0) | 9/13/2017 7:38 AM |
| Msg 59 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | I'm the boss of this company. Period | 9/13/2017 15:39(UTC+0) | 9/13/2017 7:39 AM |
| Msg 60 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Doesn't look like they are coming to work this morning | 9/13/2017 15:39(UTC+0) | 9/13/2017 7:39 AM |
| Msg 61 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | She wants to challenge that she's in for a world of pain | 9/13/2017 15:39(UTC+0) | 9/13/2017 7:39 AM |

TX 152-0005

| | | | | | |
|---|---|---|---|---|---|
| **Msg 62** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | I don't like idea of you and mom talking to both of them together. They dominate you | 9/13/2017 15:39(UTC+0) | 9/13/2017 7:39 AM |
| **Msg 63** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Best thing you can do is show unity behind me | 9/13/2017 15:39(UTC+0) | 9/13/2017 7:39 AM |
| **Msg 64** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | We will | 9/13/2017 15:40(UTC+0) | 9/13/2017 7:40 AM |
| **Msg 65** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Don't be peacemakers. Be hard. Kfir is the boss. He can obviously fire dean. | 9/13/2017 15:40(UTC+0) | 9/13/2017 7:40 AM |
| **Msg 66** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | I know. We will. Will update u | 9/13/2017 15:41(UTC+0) | 9/13/2017 7:41 AM |
| **Msg 67** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | She's the one trying to upend the order of things and say I'm not the boss. She's lost her fucking mind | 9/13/2017 15:41(UTC+0) | 9/13/2017 7:41 AM |
| **Msg 68** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Show dikla she's picking dean over her brother in the company her brother founded. Big mistake | 9/13/2017 15:47(UTC+0) | 9/13/2017 7:47 AM |
| **Msg 69** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | And more broadly make it clear she's picking dean over the family | 9/13/2017 15:47(UTC+0) | 9/13/2017 7:47 AM |
| **Msg 70** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Ok | 9/13/2017 15:52(UTC+0) | 9/13/2017 7:52 AM |
| **Msg 71** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Will need everyone again to make sure he doesn't come tomorrow | 9/13/2017 15:56(UTC+0) | 9/13/2017 7:56 AM |
| **Msg 72** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | I have Dr appointments tmrw | 9/13/2017 15:57(UTC+0) | 9/13/2017 7:57 AM |
| **Msg 73** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | I am really hoping we get through this today and don't do this again tomorrow. We need to find a time today for u and her to talk. | 9/13/2017 15:59(UTC+0) | 9/13/2017 7:59 AM |
| **Msg 74** | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | He's not coming tmrw | 9/13/2017 16:02(UTC+0) | 9/13/2017 8:02 AM |

TX 152-0006

| | | | | | |
|---|---|---|---|---|---|
| **Msg 75** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Her going on strike won't change that | 9/13/2017 16:02(UTC+0) | 9/13/2017 8:02 AM |
| **Msg 76** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | She's welcome to never come back if that's what she wants | 9/13/2017 16:02(UTC+0) | 9/13/2017 8:02 AM |
| **Msg 77** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | If him leaving means she wants to leave too then fuck her | 9/13/2017 16:02(UTC+0) | 9/13/2017 8:02 AM |
| **Msg 78** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Shows how brainwashed that dirty whore is | 9/13/2017 16:03(UTC+0) | 9/13/2017 8:03 AM |
| **Msg 79** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Let dean know he's destroying the family | 9/13/2017 16:16(UTC+0) | 9/13/2017 8:16 AM |
| **Msg 80** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | That fucking prick | 9/13/2017 16:16(UTC+0) | 9/13/2017 8:16 AM |
| **Msg 81** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | And put mom's condition on them 100% | 9/13/2017 16:16(UTC+0) | 9/13/2017 8:16 AM |
| **Msg 82** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Want to meet and talk w her? | 9/13/2017 17:36(UTC+0) | 9/13/2017 9:36 AM |

TX 152-0007

# EXHIBIT F

| | |
|---|---|
| **From:** | Schecter, Daniel (CC) |
| **Sent:** | Tuesday, December 3, 2019 9:22 PM |
| **To:** | Marshall Camp (mcamp@hueston.com) |
| **Cc:** | Mohebbi, Nima (LA) |
| **Subject:** | Financial Advisor for the Company |

Marshall:

As we discussed this evening, given the deadlock between Mrs. Unatin and Mr. Gavrieli which you have commented on, and in light of the Company's performance over the past two years (as confirmed by Mr. Gavrieli's testimony during Phase II of the trial), Mrs. Unatin believes it is in the best interests of all involved for the Company to engage a financial advisor to review the Company's options and situation (and Mrs. Unatin's and Mr. Gavrieli's options as owners), including a potential sale of some or all of the Company to a strategic or financial buyer.

Specifically, Mrs. Unatin proposes that the Company engage a financial advisor to be selected and overseen by mutual agreement of Mrs. Unatin and Mr. Gavrieli for this purpose.  Please advise if Mr. Gavrieli agrees to this proposal.

To be clear, this is not a settlement proposal or a settlement communication; it is separate from any settlement discussion we have had previously.  This is a basic proposal to start down a path to provide Mrs. Unatin and Mr. Gavrieli with information from an informed expert on options for the Company moving forward, particularly given Mr. Gavrieli's testimony about the Company's current financial situation and prospects (see e.g., Trial Transcript at 5448-50).

dss

_____

**Daniel Scott Schecter**
**LATHAM & WATKINS LLP**
10250 Constellation Boulevard, Suite 1100
Los Angeles, California 90067
(o): 424.653.5577
(m): 213.280.9474
**email**: daniel.schecter@lw.com

_____

# EXHIBIT G



Excerpt from UNATIN00786566 Chats between Kfir and Dikla 6/12-14/17

| Participants | From | Body | Timestamp: Time |
|---|---|---|---|
| diklaunatin@gmail.com Dikla (owner) <br> +13109948180 Kfir <br> +13108016424 Dikla (owner) | +13109948180 Kfir | No payments are to go out from the account without my permission. None. To anyone | 6/12/2017 3:16:15 PM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) <br> +13109948180 Kfir <br> +13108016424 Dikla (owner) | +13109948180 Kfir | Not even a fucking credit card | 6/12/2017 3:52:31 PM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) <br> +13109948180 Kfir <br> +13108016424 Dikla (owner) | +13109948180 Kfir | Not a single payment | 6/13/2017 6:50:24 PM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) <br> +13109948180 Kfir <br> +13108016424 Dikla (owner) | +13109948180 Kfir | You and your husband will pay for any violations | 6/13/2017 6:51:21 PM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) <br> +13109948180 Kfir <br> +13108016424 Dikla (owner) | +13109948180 Kfir | And the cost will be severe | 6/13/2017 6:51:46 PM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) <br> +13109948180 Kfir <br> +13108016424 Dikla (owner) | +13109948180 Kfir | If you make a single wire without my permission I will never forgive you in my life and it will be all out nuclear war. I promise you on my life. Have no doubt about that. I dare you to cross me | 6/14/2017 11:40:46 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) <br> +13109948180 Kfir <br> +13108016424 Dikla (owner) | +13109948180 Kfir | You've done enough damage already that you'll have to speak for | 6/14/2017 11:41:24 AM(UTC-7) |

DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856

Trial Exhibit No.

TX 150

Date Entered _____
By _____, Deputy Clerk

TX 150-0001

# EXHIBIT H

Excerpts from KG00180806 Chats bewteen Kfir, Mira, and Yamit 9/12-19/17

| | Participants | From | Body | Timestamp: Time | PST Conversion |
|---|---|---|---|---|---|
| Msg 1 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Don't reveal to dikla that I'll clear out his desk tonight if/when you talk to her | 9/13/2017 01:52(UTC+0) | 9/12/2017 6:52 PM (UTC-7) |
| Msg 2 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | Ok | 9/13/2017 01:52(UTC+0) | 9/12/2017 6:52 PM (UTC-7) |
| Msg 3 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028874 Mom | Ok | 9/13/2017 01:53(UTC+0) | 9/12/2017 6:53 PM (UTC-7) |
| Msg 4 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | More chances than they ever deserved after today | 9/13/2017 02:25(UTC+0) | 9/12/2017 7:25 PM (UTC-7) |
| Msg 5 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | Saw him on his phone a few minutes ago | 9/13/2017 02:26(UTC+0) | 9/12/2017 7:26 PM (UTC-7) |
| Msg 6 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | Ps you said he had my car. He doesn't. He has the 100D. One of the best most expensive cars in the world. Mine is the 85D | 9/13/2017 02:27(UTC+0) | 9/12/2017 7:27 PM (UTC-7) |
| Msg 7 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | Hopefully he gives the right answer | 9/13/2017 02:27(UTC+0) | 9/12/2017 7:27 PM (UTC-7) |
| Msg 8 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | Arik told me it was same car as urs. I never saw it. He's a lucky bastard. | 9/13/2017 02:27(UTC+0) | 9/12/2017 7:27 PM (UTC-7) |
| Msg 9 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Lucky ungrateful motherfuckers | 9/13/2017 02:30(UTC+0) | 9/12/2017 7:30 PM (UTC-7) |

DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856

Plaintiff's Trial Exhibit No.

PTX 1834

Date Entered _____
By _____, Deputy Clerk

PTX 1834-0001

| | | | | | |
|---|---|---|---|---|---|
| Msg 10 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | I built 90% of that company dikla built 10% max | 9/13/2017 02:31(UTC+0) | 9/12/2017 7:31 PM (UTC-7) |
| Msg 11 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | Anything? | 9/13/2017 03:14(UTC+0) | 9/12/2017 8:14 PM (UTC-7) |
| Msg 12 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Nothing. I'm gonna go to the office now | 9/13/2017 03:14(UTC+0) | 9/12/2017 8:14 PM (UTC-7) |
| Msg 13 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | We need plan to avoid him coming to office tmrw | 9/13/2017 03:14(UTC+0) | 9/12/2017 8:14 PM (UTC-7) |
| Msg 14 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | If he does will get nasty | 9/13/2017 03:14(UTC+0) | 9/12/2017 8:14 PM (UTC-7) |
| Msg 15 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | It's gonna get nasty before it gets pretty. This is all out war. Don't lose. | 9/13/2017 07:12(UTC+0) | 9/13/2017 12:12 AM (UTC-7) |
| Msg 16 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Never back down | 9/13/2017 07:12(UTC+0) | 9/13/2017 12:12 AM (UTC-7) |
| Msg 17 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Please. This is the most important job you've ever done for me | 9/13/2017 07:12(UTC+0) | 9/13/2017 12:12 AM (UTC-7) |
| Msg 18 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Please make me believe in you guys. Whatever it takes | 9/13/2017 07:12(UTC+0) | 9/13/2017 12:12 AM (UTC-7) |

PTX 1834-0002

| | | | | | |
|---|---|---|---|---|---|
| Msg 19 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | I know | 9/13/2017 07:12(UTC+0) | 9/13/2017 12:12 AM (UTC-7) |
| Msg 20 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | The stronger we are now the less we'll have to fight in the future. If we lose this battle we're fucked. A lot of it is in your hands now | 9/13/2017 07:13(UTC+0) | 9/13/2017 12:13 AM (UTC-7) |
| Msg 21 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Stop him by any means necessary | 9/13/2017 07:14(UTC+0) | 9/13/2017 12:14 AM (UTC-7) |
| Msg 22 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | Talked to her again. Decided to talk again in the morning. | 9/13/2017 07:15(UTC+0) | 9/13/2017 12:15 AM (UTC-7) |
| Msg 23 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | I'll update you | 9/13/2017 07:15(UTC+0) | 9/13/2017 12:15 AM (UTC-7) |
| Msg 24 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | No backing down. Concrete wall. "Kfir has 100% right to fire dean." You and mom need to reinforce that a million times | 9/13/2017 07:15(UTC+0) | 9/13/2017 12:15 AM (UTC-7) |
| Msg 25 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Get elram chiming in in support too if he's on board and has the right messaging | 9/13/2017 07:16(UTC+0) | 9/13/2017 12:16 AM (UTC-7) |
| Msg 26 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | MUST WIN BATTLE TO THE DEATH | 9/13/2017 07:16(UTC+0) | 9/13/2017 12:16 AM (UTC-7) |
| Msg 27 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Main point for Dikla: if she's going on strike now it's dumb and childish. Kfir had every right and every justification to fire Dean. | 9/14/2017 05:57(UTC+0) | 9/13/2017 10:57 PM (UTC-7) |

**141**

PTX 1834-0003

| | | | | |
|---|---|---|---|---|
| **Msg 28** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | And Dikla's not welcome back at tieks until she acknowledges I'm the boss no matter what on all issues | 9/14/2017 09:09(UTC+0) | 9/14/2017 2:09 AM (UTC-7) |
| **Msg 29** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | Dean leaving Tieks should obviously be independent of her. If she leaves bc of him think about how toxic and damaging that makes Dean. Truly makes him an enemy of the family | 9/14/2017 17:33(UTC+0) | 9/14/2017 10:33 AM (UTC-7) |
| **Msg 30** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | Emphasize the Dean being enemy of the family part | 9/14/2017 17:34(UTC+0) | 9/14/2017 10:34 AM (UTC-7) |
| **Msg 31** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | Don't be afraid. We're at war | 9/14/2017 17:34(UTC+0) | 9/14/2017 10:34 AM (UTC-7) |
| **Msg 32** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | Dikla quitting bc I fired dean is absurd | 9/14/2017 17:40(UTC+0) | 9/14/2017 10:40 AM (UTC-7) |
| **Msg 33** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | But I'm more than happy to discuss her resignation | 9/14/2017 17:40(UTC+0) | 9/14/2017 10:40 AM (UTC-7) |
| **Msg 34** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | FYI | 9/16/2017 23:13(UTC+0) | 9/16/2017 4:13 PM (UTC-7) |
| **Msg 35** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +18184028659 yamit gavrieli | Ok | 9/16/2017 23:16(UTC+0) | 9/16/2017 4:16 PM (UTC-7) |
| **Msg 36** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | If she's not there on Monday she's out at tieks. And out at tieks means no 40% | 9/16/2017 23:18(UTC+0) | 9/16/2017 4:18 PM (UTC-7) |
| **Msg 37** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | 40% entails honoring the rules of the company forever | 9/16/2017 23:18(UTC+0) | 9/16/2017 4:13 PM (UTC-7) |

PTX 1834-0004

| | | | | |
|---|---|---|---|---|
| **Msg 38** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | Rule #1 and rule #2 | 9/16/2017 23:18(UTC+0) | 9/16/2017 4:18 PM (UTC-7) |
| **Msg 39** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | Every transgression of Dikla's during this period that she whores out her family is being recorded and highlighted in the book of her life. It will never be forgotten. Every time she lies, gives lawyer like bs answers, etc it is being highlighted. These are the times when we measure a person and she's showing us her worth and dedication to the family in crystal clear terms. | 9/18/2017 05:27(UTC+0) | 9/17/2017 10:27 PM (UTC-7) |
| **Msg 40** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | My latest text to her. Mom's not picking up my call | 9/18/2017 05:35(UTC+0) | 9/17/2017 10:35 PM (UTC-7) |
| **Msg 41** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | This means a major escalation of the war. I hope you guys did everything in your power to prevent it. Can't imagine why or how it makes sense to send mom to do the bidding on her own | 9/18/2017 05:46(UTC+0) | 9/17/2017 10:46 PM (UTC-7) |
| **Msg 42** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | ALL SITES AND LOGINS | 9/18/2017 19:04(UTC+0) | 9/18/2017 12:04 PM (UTC-7) |
| **Msg 43** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | Not for her to do the payroll | 9/18/2017 19:06(UTC+0) | 9/18/2017 12:06 PM (UTC-7) |
| **Msg 44** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | I told her I want all sites and logins period | 9/18/2017 19:06(UTC+0) | 9/18/2017 12:06 PM (UTC-7) |
| **Msg 45** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | And we need to discuss her exit | 9/18/2017 19:10(UTC+0) | 9/18/2017 12:10 PM (UTC-7) |
| **Msg 46** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | But she won't get 40% | 9/18/2017 19:10(UTC+0) | 9/18/2017 12:10 PM (UTC-7) |
| **Msg 47** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | That's the right and fair thing | 9/18/2017 19:10(UTC+0) | 9/18/2017 12:10 PM (UTC-7) |
| **Msg 48** | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | That's what was agreed to | 9/18/2017 19:10(UTC+0) | 9/18/2017 12:10 PM (UTC-7) |

PTX 1834-0005

| | | | | |
|---|---|---|---|---|
| Msg 49 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | Stick to the agreement or leave the company | 9/18/2017 19:12(UTC+0) | 9/18/2017 12:12 PM (UTC-7) |
| Msg 50 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | She tried changing the rules | 9/18/2017 19:12(UTC+0) | 9/18/2017 12:12 PM (UTC-7) |
| Msg 51 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | She doesn't get 40% | 9/18/2017 19:13(UTC+0) | 9/18/2017 12:13 PM (UTC-7) |
| Msg 52 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | Ps I'm figuring out paychecks. Apparently all the employees expecting them today so I'm doing it now | 9/18/2017 20:22(UTC+0) | 9/18/2017 1:22 PM (UTC-7) |
| Msg 53 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +18184028659 yamit gavrieli | Ok | 9/18/2017 20:25(UTC+0) | 9/18/2017 1:25 PM (UTC-7) |
| Msg 54 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | When she says to you guys "do you think kfir is acting in the best interest of the business? Is firing dean in the best interest of the business?" 100% it is. He rebelled against my authority. Did she think I could ever work with him again? Hell no. That was the right and responsible thing to do. And the fact that she didn't expect me to do that is incredible | 9/18/2017 23:01(UTC+0) | 9/18/2017 4:01 PM (UTC-7) |
| Msg 55 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | When she says "do you think I could ever sit next to kfir after what he's done" and tried to play victim, tell her "no dikla. Don't you dare try to turn things around. Do you think kfir would sit next to you after what you've done?" Turn everything around. Don't let her get away with anything. Tell her she and her husband are committing treason against the leader of the family business and family and we will not accept it.<br><br>Don't leave dean out of this. He's sitting pretty on the sidelines and standing behind her protected. Attack him too. | 9/18/2017 06:02(UTC+0) | 9/18/2017 11:02 PM (UTC-7) |
| Msg 56 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | And most importantly just use common sense when you argue with her. We are right. She is wrong. Don't fall for her lies. | 9/19/2017 06:29(UTC+0) | 9/18/2017 11:29 PM (UTC-7) |
| Msg 57 | +13109948180 Kfir Gavrieli (owner)<br>+18184028659 yamit gavrieli<br>+18184028874 Mom | +13109948180 Kfir Gavrieli | They are conniving | 9/19/2017 06:29(UTC+0) | 9/18/2017 11:29 PM (UTC-7) |

PTX 1834-0006

| | | | | | |
|---|---|---|---|---|---|
| Msg 58 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028874 Mom | I can't believe the earthquake center was close to Westwood | 9/19/2017 06:31(UTC+0) | 9/18/2017 11:31 PM (UTC-7) |
| Msg 59 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | I am going to look at it all from this new perspective of don't give her an inch. No matter what. | 9/19/2017 13:57(UTC+0) | 9/19/2017 6:57 AM (UTC-7) |
| Msg 60 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | Ok. I'll keep texting her throughout the day | 9/19/2017 16:14(UTC+0) | 9/19/2017 9:14 AM (UTC-7) |
| Msg 61 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | Ok | 9/19/2017 16:35(UTC+0) | 9/19/2017 9:35 AM (UTC-7) |
| Msg 62 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Right now she's holding a lot of things hostage. Web stuff. And yesterday she tried to hold payroll hostage. | 9/19/2017 17:31(UTC+0) | 9/19/2017 10:31 AM (UTC-7) |
| Msg 63 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | By not being cooperative | 9/19/2017 17:32(UTC+0) | 9/19/2017 10:32 AM (UTC-7) |
| Msg 64 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | I will get through this and she will regret it for the rest of her life | 9/19/2017 17:32(UTC+0) | 9/19/2017 10:32 AM (UTC-7) |
| Msg 65 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | I'll write that now | 9/19/2017 17:32(UTC+0) | 9/19/2017 10:32 AM (UTC-7) |
| Msg 66 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | I just found a lot of stuff so I am figuring it out on my own fyi. But she isn't being cooperative and trying to terrorize me and the business | 9/19/2017 17:34(UTC+0) | 9/19/2017 10:34 AM (UTC-7) |
| Msg 67 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +18184028659 yamit gavrieli | Ok | 9/19/2017 17:34(UTC+0) | 9/19/2017 10:34 AM (UTC-7) |
| Msg 68 | +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli +18184028874 Mom | +13109948180 Kfir Gavrieli | Everything she makes me figure out the hard way is irreversible | 9/19/2017 17:48(UTC+0) | 9/19/2017 10:48 AM (UTC-7) |

PTX 1834-0007

# EXHIBIT I

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
South District, Governor George Deukmejian Courthouse, Department S28

**BC686856**                                                          June 5, 2020
**DIKLA GAVRIELI VS KFIR GAVRIELI**                                    2:45 PM

Judge: Honorable Patrick T. Madden          CSR: None
Judicial Assistant: K. Kelly                ERM: None
Courtroom Assistant: None                   Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Court Order

Minute Order

In chambers – Remotely prepared (not in the courthouse)

A. Background and Orders

Because of the COVID-19 virus, the civil courts in Los Angeles County are no longer operating normally. At the present, with few exceptions, there are no court hearings in civil matters and the exceptions do not apply to this case. In addition, Dept. 28 has been dark since the time of court closures in Los Angeles. For that reason, this Minute Order was prepared remotely, i. e. not in the courthouse.

This Minute Order is to be considered the Tentative Decision, but it is not the Statement of Decision. All the Tentative Rulings (TRs) and discussions as to the TRs herein are not final and are subject to change when the court issues the Statement of Decision.

Because of the very limited resources that are available to the court, the court is adopting the following procedures with respect to the issues that are addressed in this Tentative Decision and that will be set forth by counsel in the Proposed Statement of Decision (PSD).

The parties in this case are brother and sister. They share the same last name. As in past Minute Orders, the court is using the first name of the parties, Dikla for Dikla Gavrieli and Kfir for Kfir Gavrieli. Use of their first names is for clarity, not out of disrespect.

1. Pursuant to Rule 3.1590(c)(3), California Rules of Court, on or before June 29, 2020, counsel for Dikla shall draft a PSD that sets forth in a non-argumentative fashion: a concise but complete

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
South District, Governor George Deukmejian Courthouse, Department S28

BC686856                                                                June 5, 2020
**DIKLA GAVRIELI VS KFIR GAVRIELI**                                        2:45 PM

Judge: Honorable Patrick T. Madden          CSR: None
Judicial Assistant: K. Kelly                ERM: None
Courtroom Assistant: None                   Deputy Sheriff: None

factual and procedural summary of the case; an identification of each of the issues addressed herein; a statement of the claims and contentions of each party with respect to each of those issues including relevant case authority and each side's version of the facts and law that supports each party's position as to an issue; finally, based on the court's TRs as set forth herein, the PSD shall set forth the TRs herein as rulings of the court as to each issue. As to each ruling in the PSD, the PSD shall set forth the legal and factual analysis that supports the ruling.

2. The rulings that will be set forth in the PSD to be drafted by plaintiff may or may not be adopted by the court when the court issues the Statement of Decision.

3. Counsel for Dikla and Kfir shall have twenty (20) calendar days to file an opposition to the PSD. Upon the filing of the oppositions or, if not filed, then as of the date the oppositions are due to be filed, the matter will then be deemed submitted for decision.

4. The PSD and any opposition to the PSD shall be e-filed and served on opposing counsel electronically. In addition, counsel are relieved of their obligation to provide Dept. 28 with courtesy copies of their filings.

5. If any party believes that they are not given sufficient time to fully brief their position and if a party contends that additional time is required to prepare a brief, then counsel are permitted to send an email to the court (with a copy to opposing counsel) with the request.

6. Counsel are reminded that counsel shall provide the court with a copy of all their briefs and other filings using the court's personal email address: pmadden@lacourt.org. The filing shall be a Microsoft Word document. It shall not be in a PDF format.

7. No further testimony is to be presented in the case.

B. Pursuant to Rule 3.1590(a), California Rules of Court, the Court's Tentative Decision.

1. Is the jury's verdict advisory or is it dispositive as to the claims of Kfir in his cross-complaint?

The jury's verdict as to Verdict Form 1 is not advisory; it is final, and no argument was presented by either party to the contrary. As to Verdict Form 2, there are issues that need to be addressed in order to resolve whether the jury's verdict is advisory, as Kfir contends, or binding, as Dikla contends. Kfir argues that all the questions addressed by the jury in Verdict Form 2 are advisory, because they relate solely to his equitable claims and equitable claims are resolved by the court, rather than by a jury. Kfir also argues that Dikla is equitably estopped to deny that the

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
South District, Governor George Deukmejian Courthouse, Department S28

BC686856                                                                    June 5, 2020
**DIKLA GAVRIELI VS KFIR GAVRIELI**                                          2:45 PM

Judge: Honorable Patrick T. Madden          CSR: None
Judicial Assistant: K. Kelly                ERM: None
Courtroom Assistant: None                   Deputy Sheriff: None

issues addressed by the jury on Verdict Form 2 are advisory. On the other hand, Dikla has two primary arguments that the jury's verdict is dispositive. Her first assertion is that judicial estoppel bars Kfir from making this claim. Her second argument is that Kfir is equitably estopped to deny that the issues in Verdict Form 2 are binding.

For reasons that will become apparent, the court will first address Dikla's judicial estoppel claim. Dikla argues that Kfir has taken two inconsistent positions as to whether the jury's verdict is advisory or dispositive. She argues that Kfir's position that the jury's verdict is advisory is inconsistent with the position he took during the trial, viz. that the jury would decide the factual questions that are set forth on Verdict Form 2 and those findings would then be set forth on the judgment. In support of her position, Dikla relies on Jackson v. City of Los Angeles (1997) 60 Cal.App.4th 171. In Jackson, the court held:

In accordance with the purpose of judicial estoppel, we conclude that the doctrine should apply when: (1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.

Jackson, 60 Cal.App.4th at 183

Dikla argues that throughout the case until immediately after the jury reached its verdict, Kfir's position was that as to Verdict Form 2, the jury's verdict would be binding on the parties, the jury's verdict would resolve the matters on Verdict Form 2 and following the jury's verdict, the court would enter judgment based on that verdict. However, after the jury reached its verdict, Kfir's argued for the first time that the jury's verdict is advisory, and the court should now resolve these claims independently of the jury's verdict. As to the third element, Dikla argues that, as requested by Kfir, the parties and the court agreed that all the issues from Kfir's cross-complaint were to go to the jury and the jury's verdict would be dispositive. As to the fourth element, Dikla argues that Kfir's present position, that the verdict is advisory, is inconsistent with his position at trial, which was that the verdict would be binding as to the claims in Kfir's declaratory relief cause of action. In respect to fifth element, there is no claim by Kfir of ignorance, fraud or mistake. It was an informed and considered decision.

In his opposition, Kfir argues that he is not judicially estopped because the advisory nature of the jury's verdict on equitable issues is not waivable. Holland v. Kelly (1917) 177 Cal. 43, 44-45. Secondly, he argues that he never took a position during the trial that is inconsistent with his

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
South District, Governor George Deukmejian Courthouse, Department S28

**BC686856**                                                              June 5, 2020
**DIKLA GAVRIELI VS KFIR GAVRIELI**                                        2:45 PM

Judge: Honorable Patrick T. Madden            CSR: None
Judicial Assistant: K. Kelly                  ERM: None
Courtroom Assistant: None                     Deputy Sheriff: None

present position. Additionally, he argues that the jury was never instructed on the rules of contract formation, which govern his claims for declaratory relief. His final argument is that the jury was never asked to decide whether Dikla is bound by the 60/40 agreement because of equitable estoppel.

TR: As is set forth above in Dikla's arguments supporting her claim of judicial estoppel, all the elements of judicial estoppel are present in this case. That said, application of the judicial estoppel doctrine in a particular case is discretionary and judicial estoppel is not necessarily enforced just because all the elements are met. People v. Castillo (2010) 49 Cal.4th 145, 156. The issue then is, should the court in its discretion find judicial estoppel applies to this case?

It was not until after the jury's verdict that Kfir argued for the first time that the jury's verdict was merely advisory. Before the verdict, the parties and the court relied on Kfir's representation that the jury's verdict would be binding, not advisory. If the court finds that judicial estoppel applies to this case, it would protect Dikla from an unfair trial strategy by Kfir. Additionally, if judicial estoppel is applied to this case, it would have the laudatory effect to "maintain the integrity of the judicial system." Aguilar v. Lerner, 32 Cal.4th at 986.

After reviewing the arguments of the parties in this case and the relevant case law that applies to judicial estoppel, the court finds that in its discretion, judicial estoppel should be applied to this case. Thus, as to the declaratory relief cross-complaint of Kfir, the findings of the jury are binding and not advisory. Kfir is judicially estopped to now claim that Verdict 2 was advisory. While the 1917 case of Holland v. Kelly (1917) 177 Cal. 43 does state that the advisory nature of a jury's verdict on equitable issues is not waivable, that statement is dicta; in addition, the case did not involve or discuss the doctrine of judicial estoppel. Insofar as Kfir argues that he did not adopt inconsistent positions, the record belies that claim. Before the case was submitted to the jury, Kfir argued to the court that it would be reversible error for the court not to include Kfir's version of Verdict Form 2 to the jury. If Kfir intended Verdict Form 2 to be advisory rather than binding, there would be no reversible error if the verdict form contained a question that was an incorrect statement of Kfir's position. In addition, at no time did Kfir ever request the court bifurcate any equitable issues from the legal issues in the case. The logical reason this was not done is that until Kfir failed to prevail as to the matters on Verdict Form 2, the parties and the court understood the resolution by the jury as to the matters on Verdict Form 2 would be binding. There was an additional reason for Kfir's pre-verdict position that the jury's verdict would be the final word as to the issues raised on Verdict Form 2. It permitted Kfir to argue to the jury that the jury should decide the issues on Verdict Form 2 favorably to Kfir and if they did so, then as to Verdict Form 1, the jury should award Dikla no damages.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
South District, Governor George Deukmejian Courthouse, Department S28

**BC686856**                                                        June 5, 2020
**DIKLA GAVRIELI VS KFIR GAVRIELI**                                 2:45 PM

Judge: Honorable Patrick T. Madden          CSR: None
Judicial Assistant: K. Kelly                ERM: None
Courtroom Assistant: None                   Deputy Sheriff: None

The clear import of Kfir's position pre-verdict was the jury's verdict would be final, not
advisory. It was only after the jury's verdict that Kfir argued for the first time that Verdict Form
2 was advisory. As for the claim the jury was not instructed as to the elements of contract
formation, again the record reveals the jury was provided with all the standard instructions on
formation of contracts. As to the assertion that the jury was never asked to decide whether
equitable estoppel applies to the 60/40 agreement, that is true. However, the claim of equitable
estoppel is not a jury question; it is for an issue for the court to resolve. Because the TR is to
grant, the court will not independently address and decide any of the issues on Verdict Form 2,
but is accepting as final the jury's decisions that are set forth on Verdict Form 2.

2. Does equitable estoppel apply to this case?

Both sides argue that equitable estoppel applies to bar the other side's post-verdict claims. Both
sides rely on the case of Hoopes v. Dolan (2008) 168 Cal.App.4th 146 in support of their
position.

A. Dikla's Claim of Equitable Estoppel

Dikla argument is that if judicial estoppel does not apply and if Verdict Form 2 is advisory, then
based on equitable estoppel, Kfir is estopped from denying that: (a) the parties agreed to a 50/50
split of the profits except on sale of Gavrieli Brands (which will give Kfir 60% of the profits); (b)
the parties are co-managers of the company; and (c) the parties agreed the outside investments
would be owned in the same proportion as their ownership in the court has company.

TR: Because the court has found that judicial estoppel applies to prevent Kfir from now arguing
that the jury's verdict as to Kfir's declaratory relief claims is advisory, Dikla's argument is moot.
The court need not consider whether Dikla's claim of equitable estoppel applies.

B. Kfir's Claim of Equitable Estoppel

Kfir asserts that Dikla is equitably estoped to deny that Kfir: (a) owns 60% of the company and
Dikla owns 40% once the company has a value of $200M; and (b) Kfir is the sole CEO of the
company.

TR: Denied. Kfir cannot rely on doctrine of equitable estoppel to now argue that Dikla is barred
from arguing that jury's verdict as to Kfir's declaratory cross-complaint is dispositive. To do so,
would negate the court's ruling as to judicial estoppel. For this reason, the court declines to
consider Kfir's equitable estoppel claim. As noted by the court in Jackson, "judicial estoppel

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
South District, Governor George Deukmejian Courthouse, Department S28

**BC686856**                                                                June 5, 2020
**DIKLA GAVRIELI VS KFIR GAVRIELI**                                           2:45 PM

Judge: Honorable Patrick T. Madden          CSR: None
Judicial Assistant: K. Kelly                ERM: None
Courtroom Assistant: None                   Deputy Sheriff: None

focuses on 'the relationship between the litigant and the judicial system,' and is designed 'to protect the integrity of the judicial process.'" Jackson v. City of Los Angeles, 60 Cal.App.4th at 183. To protect the integrity of the judicial system, this court in its discretion will not consider Kfir's argument that Dikla is equitably estopped from asserting her claim that that Verdict Form 2 is binding. Whether equitable estoppel is to be applied in a particular case is left to the sound discretion of the trial court. Hopkins v Kedzierski (2014) 225 Cal.App.4th 736, 756; People v. Castillo, 49 Cal.4th at 156. In the court's discretion, the court finds that in the circumstances of this case, judicial estoppel, which focuses on the integrity of the courts, trumps Kfir's claim for equitable estoppel.

3. Dikla's Equitable Claims.

Post-verdict, Dikla seeks the following equitable relief: (a) declaratory relief; (b) a constructive trust and an accounting; (c) a permanent injunction; and (d) the appointment of a receiver. Each of these claims will be addressed separately.

A. Declaratory Relief Claim

Dikla's claim for declaratory relief is premised on her Ninth Cause of Action in her complaint, on questions 1 through 5 on Verdict From 1 and on questions 1 through 6 on Verdict Form 2. The declaratory relief she seeks is:

1. Dikla owns 50% of Gavrieli Brands and Kfir owns 50% of Gavrieli Brands.
2. Dikla and Kfir never agreed to shift ownership of Gavrieli Brands 60% to Kfir if the company reached a value of $200M.
3. When Gavrieli Brands was formed through the present, Dikla and Kfir have joint and equal management and control authority over Gavrieli Brands.
4. Dikla and Kfir entered into an agreement that they would jointly own and control investments that were made with Gavrieli Brand's profits in proportion to their ownership of Gavrieli Brands, which is on a 50/50 basis, and these investments would not be held in a family trust.

In his opposition, Kfir objects to Dikla's declaratory relief claims, arguing that the jury's verdict as to Verdict Form 2 is advisory and this requires the court to independently determine each of the declaratory relief claims asserted by Dikla. In addition, Kfir argues that even if the jury's verdict is not advisory, before the court addresses the merits of Dikla's declaratory relief claims, the court must first address Kfir's equitable estoppel claim, which Kfir asserts, bars Dikla's claim for declaratory relief. Kfir also argues that if the court determines that Dikla is entitled to declaratory relief, the declaratory relief must be limited to the findings of the jury as set forth on

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
South District, Governor George Deukmejian Courthouse, Department S28

**BC686856**                                                            June 5, 2020
**DIKLA GAVRIELI VS KFIR GAVRIELI**                                     2:45 PM

Judge: Honorable Patrick T. Madden          CSR: None
Judicial Assistant: K. Kelly                ERM: None
Courtroom Assistant: None                   Deputy Sheriff: None

---

Verdict Form 2. Finally, Dikla's claim that she owns 50% of the joint investments would permit Dikla to have double recovery, because the jury awarded Dikla damages for her share of the joint investments.

TR: The court has already addressed the first two of Kfir's arguments. As to Kfir's third argument, that the declaratory relief must be limited to the jury's findings, that is a correct statement. However, it is implicit that the jury did find that Dikla and Kfir agreed that they would have joint control over the outside investments. As to the Kfir's claim that Dikla is seeking a declaration that she presently has a 50% interest in the outside investments, Dikla disclaims any present interest in these investments. However, Dikla she does seek a declaration that at the time the investments were made, she and Kfir each had a 50% interest in those investments. That was a finding of the jury. Additionally, the jury also found that they did not agree to have the outside investments transferred into a family trust.

B. Constructive Trust and an Accounting

As pointed out by Dikla, "the purpose of a constructive trust 'is to prevent unjust enrichment and to prevent a person from taking advantage of his or her own wrongdoing.' Martin v. Kehl, 145 Cal.App.3d 228, 237 (1983)." Plaintiff's Statement Re Equitable Relief and Election of Remedies (Plaintiff's Statement Re Equitable Issues) at 14:4-6. As to the specifics, Dikla seeks a constructive trust over all Gavrieli Brands corporate funds and over all joint investment funds. Dikla maintains that Kfir presently has sole access and control to these funds. As to the Gavrieli Brand accounts and the joint investment accounts, Dikla argues that a constructive trust should be imposed on these funds to ensure that Kfir will not dissipate these funds before Kfir satisfies the judgment. As for the requested accounting, Dikla argues that she has the right to have this information since Kfir is the only person with access to the information.

Dikla also argues that there are funds in Hong Kong bank accounts, over $13M, that are jointly hers and Kfir's. Dikla argues that the funds in those bank accounts should be subject to a constructive trust. As to the funds in the Hong Kong bank accounts, at trial she did not seek, and the jury did not award her damages as to those funds.

In his opposition, Kfir cites Ram's Gate Winery, LLC v. Roche (2015) 235 Cal.App.4th 1071, 1077, 1087 (2015) and argues that Dikla is seeking double recovery and a duplication of remedies as to the corporate funds and as to the joint investment funds. In that regard, Kfir argues that Dikla must elect her remedies: either accept the money damages that were awarded to her by the jury or pursue the equitable remedies of constructive trust and an accounting. Dikla appears to elect to receive the damages that were awarded to her, but argues that until the

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
South District, Governor George Deukmejian Courthouse, Department S28

**BC686856**                                                          June 5, 2020
**DIKLA GAVRIELI VS KFIR GAVRIELI**                                    2:45 PM

Judge: Honorable Patrick T. Madden          CSR: None
Judicial Assistant: K. Kelly                ERM: None
Courtroom Assistant: None                   Deputy Sheriff: None

---

damage award is paid, there should be a constructive trust on the funds. As to the Hong Kong bank accounts, Kfir argues that these funds are not held by him, but by a third party, who is not a party to this litigation and, in addition, the Hong Kong bank accounts were not part of the pleadings or the evidence at trial. Dikla disputes these arguments and maintains that the evidence at trial was that Kfir opened the Hong Kong bank accounts with joint funds and Kfir controls the funds in the Hong Kong bank accounts.

TR: Deny as to Dikla's claim for a constructive trust or an accounting as to the Gavrieli Brands accounts and the joint investment accounts. Dikla is required to elect between damages and equitable relief. If Dikla were permitted to seek these both damages and equitable remedies as to the same funds, it would result in double recovery. Fowler v. Fowler (1964) 227 Cal.App.2d 741, 745. Dikla has agreed to accept damages.
There is a different result as to the funds that were placed in the Hong Kong bank accounts. The jury did not issue a damages award as to Dikla's interest in these funds. It is undisputed that one-half of the funds belong to Dikla. At present, she has no access or control over these funds. As to these funds in the Hong Kong bank accounts, the TR is to Grant a constructive trust.

C. Permanent Injunction

At the inception of this litigation, Dikla obtained a temporary injunction. Now Dikla seeks a permanent injunction that would:
1. Enjoin Kfir from excluding Dikla as a member and a manager of Gavrieli Brands and give Dikla the right of joint control of the company.
2. Prohibit Kfir from blocking Dikla's access to the various accounts of Gavrieli Brands.
3. Prohibit Kfir from stating the Dikla does not have full access to the company's books and records.
4. Require Kfir to put Dikla on all the accounts of Gavrieli Brands.

To obtain a permanent injunction, Dikla must establish: (1) the elements of a cause of action involving the wrongful act sought to be enjoined, and (2) the grounds for equitable relief, such as inadequacy of the remedy at law." City of South Pasadena v. Department of Transportation (1994) 29 Cal.App.4th 1280, 1293. The underlying cause of action is Dikla's claim against Kfir for breach of fiduciary duty. Her claim, disputed by Kfir, was the Kfir locked her out of the company and deprived Dikla of the ability to access the various business-related accounts of Gavrieli Brands. Kfir disputes that Dikla is entitled to any injunctive relief. He argues that various terms in the proposed injunction are vague, such as "ordinary business expenses."

TR: Grant. The court finds that the injunction requested by Dikla is appropriate in this case and

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
South District, Governor George Deukmejian Courthouse, Department S28

**BC686856**                                          June 5, 2020
**DIKLA GAVRIELI VS KFIR GAVRIELI**                    2:45 PM

Judge: Honorable Patrick T. Madden          CSR: None
Judicial Assistant: K. Kelly                ERM: None
Courtroom Assistant: None                   Deputy Sheriff: None

the objected to terms are not vague; they are readily understandable. The jury found that Kfir breached his fiduciary duties to Dikla by locking her out of the company. Absent the court exercising its discretion and granting Dikla the injunctive relief she requests that is set forth in in Plaintiff's Statement Re Equitable Issues at 13:1-23, it is clear that Kfir will never permit Dikla to assume her role as a co-owner and co-manager of Gavrieli Brands. The jury rendered its verdict in this case on November 8, 2019. Based on the representations of both sides in their recently filed briefs, Dikla remains on the outside and is unable to participate in the management and control of the company in which she is a 50% co-owner. Additionally, at the present, Dikla has limited access to only some of the financial records and information of Gavrieli Brands.

D. Appointment of a Receiver

Dikla seeks an order appointing a receiver to help manage the company's affairs and to break deadlocks that she contends will arise when she returns to co-manage the company. As authority for this remedy, Dikla relies on §564(b)(1), Code of Civil Procedure. She argues that this provision gives the court broad authority to appoint a receiver when there is a deadlock, because a deadlock between managers would materially injure the corporation. Dikla also argues that the receiver would ensure that the necessary documents are obtained to resolve the off-shore tax issues with the IRS. On the other hand, Kfir argues that the court lacks jurisdiction to appoint a receiver. He asserts that Dikla has cited no case authority to permit the appointment of a receiver to manage the company indefinitely. In addition., Kfir cites McRae v. Superior Court (1963) 221 Cal.App.2d 166, 172-73 for the proposition that for the court to appoint a receiver the company must be a party to the litigation, which it is not.

TR: Deny. For the court to consider appointing a receiver, Gavrieli Brands must be a party to this litigation, which it is not. But, even if Gavrieli Brands were a party, there is no present showing that a receiver should be appointed.

4. Dikla's Request for Prejudgment Interest

Dikla argues that her claim for investment damages was liquidated and because of this, §3287, Civil Code mandates that she receive prejudgment interest. Alternatively, Dikla cites Bullock v. Philip Morris USA, Inc. (2011) 198 Cal.App.4th 543, 574 (2011) for the proposition that if Kfir's position is correct and her investment damages were unliquidated at the time the jury rendered its verdict, then her damages became liquidated and as of the date of the verdict, she is entitled to interest on the jury's verdict. Kfir argues that Dikla's claim was not liquidated and, for that reason, she should not be awarded prejudgment interest.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

### Civil Division

South District, Governor George Deukmejian Courthouse, Department S28

**BC686856**                                                                      June 5, 2020
**DIKLA GAVRIELI VS KFIR GAVRIELI**                                                   2:45 PM

Judge: Honorable Patrick T. Madden          CSR: None
Judicial Assistant: K. Kelly                ERM: None
Courtroom Assistant: None                   Deputy Sheriff: None

---

TR: Based on Bullock, Dikla is entitled to interest on the judgment as of the date the jury
returned its verdict, November 8, 2019. That is when her damages became liquidated.

So that I know that you have received this email, at least one trial counsel from each party is to
send a confirming email to the court acknowledging receipt of this email.

A copy of this Minute Order is served by email on June 5, 2020. This Minute Order will not be
served by any other means, including U. S. mail.

Dated: June 5, 2020

# EXHIBIT J

Excerpts from UNATIN00786566 Chats between Kfir and Dikla 12.23.16

| Participants | From | Body | Timestamp: Time |
|---|---|---|---|
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13108016424 Dikla | Oh please. If you want to be involved then be involved. And stop creating conflict | 12/23/2016 7:50:07 AM(UTC-8) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | You want to disobey me, undermine my authority, violate my trust and start war? Fine. I will never back down. Don't make a single post or final decision without my approval. Try me. | 12/23/2016 1:52:03 PM(UTC-8) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13108016424 Dikla | I don't agree with or want any of those things. When you disappear without saying anything don't act surprised when decisions get made. If you want to be more involved in posts that's great. If you really want to tell them not to make already planned posts then you can do that. If you need time away that's fine too. If you're just looking to play games or to try and embarrass anyone don't expect my help. | 12/23/2016 9:43:45 PM(UTC-8) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13108016424 Dikla | And of course everything is on Paige and the fb doc if you want to see or talk about it. No reason to be so nasty and disrespectful. | 12/23/2016 9:45:23 PM(UTC-8) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | I repeat. Don't make a single post or final decision without my approval while I'm gone. If there's something coming up you'll keep me in the loop throughout the process with ample time for me to give guidance and approvals. Period. You've lost my trust and privileges I'd afford you on making decisions. You will manage things according to my rules and execute my decisions as I say. When I'm gone but say that I want updates and you don't give them to me there are consequences. When I make decisions you don't follow through on there will be consequences. When you lie and backstab and undermine my authority and then deny all those things there will be consequences. When you go to war against Yamit joining tieks there will be consequences. I am done dealing with your bullshit. I will regulate as needed on you and Dean. There will be major changes. Don't fuck with me. | 12/23/2016 11:47:12 PM(UTC-8) |

DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856

Plaintiff's Trial Exhibit No.

PTX 1233

Date Entered _____
By _____, Deputy Clerk

PTX 1233-0001

# EXHIBIT K

Excerpt from UNATIN00786566 Chats between Dikla and Kfir 6/6/17 & 6/7/17

| Participants | From | Body | Timestamp: Time |
|---|---|---|---|
| diklaunatin@gmail.com Dikla (owner)<br>+13109948180 Kfir<br>+13108016424 Dikla (owner) | +13109948180 Kfir | I'm coming back in a few weeks. I want an update from you tomorrow. Meet me for lunch at cafe vida at noon. | 6/6/2017 5:14:07 PM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner)<br>+13109948180 Kfir<br>+13108016424 Dikla (owner) | +13108016424 Dikla | I'm not meeting you in person. If you have something to say you can tell me. | 6/7/2017 9:43:12 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner)<br>+13109948180 Kfir<br>+13108016424 Dikla (owner) | +13109948180 Kfir | Meet me at lunch and update me on what's been going on at the business. I'm not asking you | 6/7/2017 9:55:13 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner)<br>+13109948180 Kfir<br>+13108016424 Dikla (owner) | +13109948180 Kfir | If you're declaring an act of war right now I will act accordingly | 6/7/2017 9:55:41 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner)<br>+13109948180 Kfir<br>+13108016424 Dikla (owner) | +13108016424 Dikla | If you want to do the right things then we can have a call. If you just want to threaten and bully me I'm not interested. | 6/7/2017 10:07:53 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner)<br>+13109948180 Kfir<br>+13108016424 Dikla (owner) | +13109948180 Kfir | I want an update on my fucking business. So meet me in person. If you don't I will do what I need to do. | 6/7/2017 10:08:39 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner)<br>+13109948180 Kfir<br>+13108016424 Dikla (owner) | +13109948180 Kfir | And if you want to play like this I can promise you your life will be miserable. | 6/7/2017 10:09:14 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner)<br>+13109948180 Kfir<br>+13108016424 Dikla (owner) | +13109948180 Kfir | I will protect myself and this family at all costs and do whatever I have to do | 6/7/2017 10:10:01 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner)<br>+13109948180 Kfir<br>+13108016424 Dikla (owner) | +13108016424 Dikla | If all you want is an update we can do that by phone. Not available to meet you in person today. | 6/7/2017 10:48:31 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner)<br>+13109948180 Kfir<br>+13108016424 Dikla (owner) | +13109948180 Kfir | Meet me in person. Cancel whatever the fuck you have or recommend another time today. | 6/7/2017 10:49:21 AM(UTC-7) |

DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856

Plaintiff's Trial Exhibit No.

PTX 1040

Date Entered _____
By _____, Deputy Clerk

PTX 1040-0001

| | | | |
|---|---|---|---|
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | Let me know your plans asap | 6/7/2017 11:19:13 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13108016424 Dikla | I can't meet until 5 today | 6/7/2017 11:58:13 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | I'll see you there | 6/7/2017 11:58:57 AM(UTC-7) |
| diklaunatin@gmail.com Dikla (owner) +13109948180 Kfir +13108016424 Dikla (owner) | +13109948180 Kfir | Send me details of each raise. When, how much, notes and where it's stored behind my back | 6/7/2017 6:23:43 PM(UTC-7) |

PTX 1040-0002

# EXHIBIT L

Excerpt from KG00180806 Chats between Kfir and Yamit 8/23/2017

| Participants | From | Body | Timestamp: Time | PST Conversion |
|---|---|---|---|---|
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | It's not cool that you tell me I'm burdening you when all I'm doing is asking for advice on an issue that's important to me and my family. Whenever you have anything important or not important that you need I give you my full undivided attention, no matter what else I have going on in my life. And to say that I don't know how to sacrifice is also very unwarranted and unfair. All I do is sacrifice for others. I send you a few emails and texts about the issue and you don't even open and respond to them. That sucks. | 8/24/2017 00:53(UTC+0) | 8/23/2017 5:53 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | I've been completely off email and text the past couple days because of the Michael smith issue | 8/24/2017 00:54(UTC+0) | 8/23/2017 5:54 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | And it is true that you're forcing this issue right now when it's not an ideal time | 8/24/2017 00:55(UTC+0) | 8/23/2017 5:55 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | In every sense. Especially since so much of it rides on tieks situation which you're most in the loop on | 8/24/2017 00:55(UTC+0) | 8/23/2017 5:55 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | You'd be the first one in the family to own a house. Is that really the necessary move right now?? | 8/24/2017 00:56(UTC+0) | 8/23/2017 5:56 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | When is it an ideal time? Now is a much better time than it was 3 or 6 months ago. | 8/24/2017 00:56(UTC+0) | 8/23/2017 5:56 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | With all the current uncertainty and all these balls in the air? | 8/24/2017 00:56(UTC+0) | 8/23/2017 5:56 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | We talked about that and you said that it's fine. My waiting for Dikla to buy a house when she is living very comfortably makes no sense | 8/24/2017 00:57(UTC+0) | 8/23/2017 5:57 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | With me possibly needing a brain surgery? | 8/24/2017 00:57(UTC+0) | 8/23/2017 5:57 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | It's not a fancy house. It's in the freaking valley. | 8/24/2017 00:57(UTC+0) | 8/23/2017 5:57 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Its waiting to get a better sense for the war we have on our hands. You want to maintain maximum flexibility and a house in The Valley is the opposite of that. | 8/24/2017 00:58(UTC+0) | 8/23/2017 5:57 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Your nerve issue just came up and it's a long road to figuring all that out | 8/24/2017 00:58(UTC+0) | 8/23/2017 5:58 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | I'd be wherever I need to be whenever I'm needed. Like I always am. Even if it means sacrificing what's important to me. | 8/24/2017 00:59(UTC+0) | 8/23/2017 5:59 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | You didn't even look at where it is. And honestly when I drive home from your house to mine it's a 40 min drive at least. | 8/24/2017 01:00(UTC+0) | 8/23/2017 6:00 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | The sacrifice point is that we all would've been better off if you were at tieks much earlier and that wasn't a sacrifice you were prepared to make. That's just a fact | 8/24/2017 01:01(UTC+0) | 8/23/2017 6:01 (UTC-7) |



DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856

Trial Exhibit No.

## TX 237

Date Entered _____

By _____, Deputy Clerk

**163**

TX 237-0001

| | | | | |
|---|---|---|---|---|
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | I wish you would stop rubbing that in my face. It was a mistake. Can't take it back now. All I can do is show my unconditional commitment, which I have and will continue to do. | 8/24/2017 01:03(UTC+0) | 8/23/2017 6:03 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | I don't rub in your face. I point it out when you say something different or fail to acknowledge it. If you understand it and didn't deny it when I speak to you then I'd have no reason to mention it. | 8/24/2017 01:04(UTC+0) | 8/23/2017 6:04 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | My mentioning that I had a newborn and was finishing a dissertation is a reality of what I was dealing with then. | 8/24/2017 01:05(UTC+0) | 8/23/2017 6:05 (UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Then we could talk about right after your dissertation and since | 8/24/2017 01:06(UTC+0) | 8/23/2017 6:06(UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +18184028659 yamit gavrieli | Ok kfir | 8/24/2017 01:08(UTC+0) | 8/23/2017 6:08(UTC-7) |
| +13109948180 Kfir Gavrieli (owner) +18184028659 yamit gavrieli | +13109948180 Kfir Gavrieli | Again I only say these things when you're saying things that are off base | 8/24/2017 01:10(UTC+0) | 8/23/2017 6:10 (UTC-7) |

TX 237-0002

# EXHIBIT M



# Incident Report



**Print Date/Time:** 08/12/2019 11:09
**Login ID:** rt1174

Culver City Police Department
**ORI Number:** CA0191800

**Incident:** 2016-00043974

| | | | |
|---|---|---|---|
| **Incident Date/Time:** | 11/9/2016 1:25:00 PM | **Incident Type:** | 273.5 CORPORAL INJ/SPOUSE |
| **Location:** | BUCKINGHAM PKY / CANTERBURY DR Culver City CA 90230 | **Venue:** | Culver City |
| **Phone Number:** | | **Source:** | TELEPHONE |
| **Report Required:** | No | **Priority:** | 2 |
| **Prior Hazards:** | No | **Status:** | I/P |
| **LE Case Number:** | | **Nature of Call:** | |

## Unit/Personnel

| Unit | Personnel |
|---|---|
| 1A52 | 1146-Park |
| | 1035-Shimabukuro |
| 1L51 | 773-Hernandez |
| 1L53 | 1135-Hernandez |

## Person(s)

| No. | Role | Name | Address | Phone | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| | CONFIDENTIAL INFORMANT | | <UNKNOWN> | | | | |
| | REPORTING PARTY | 911 | | | | | |

## Vehicle(s)

| Role | Type | Year | Make | Model | Color | License | State |
|---|---|---|---|---|---|---|---|

## Disposition(s)

| Disposition | Count |
|---|---|
| 2 | 2 |

## Property

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|---|---|---|---|---|---|---|---|

DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856

Plaintiff's Trial Exhibit No.

# PTX 1915

Date Entered _____
By _____, Deputy Clerk

Page: 1 of 2

UNATIN00892664
PTX 1915-0001



# Incident Report



**Print Date/Time:**   08/12/2019 11:09
**Login ID:**          rt1174

Culver City Police Department
**ORI Number:**   CA0191800

## CAD Narrative

11/09/2016 13:26:25  **Donna Piacentini  Narrative: MW AND FW ON THE BENCHES IN THE CENTER OF THE PARK**
11/09/2016 13:26:49  **Donna Piacentini  Narrative: MALE SUBJ IS SCREAMING AT THE FEMALE**
11/09/2016 13:27:21  **Diego Hernandez  Narrative: Dispatch received by unit 1L51**
11/09/2016 13:27:47  **Juan Hernandez  Narrative: Dispatch received by unit 1L53**
11/09/2016 13:34:01  **Jeffrey Park  Narrative: Dispatch received by unit 1A52**
11/09/2016 13:34:57  **Bret Nelson  Narrative: 53 ON TWO**

CONFIDENTIAL

UNATIN00892665
PTX 1915-0002

Print Date/Time: 8/12/2019 11:00:54 AM

| Date/Time | User | Action | Description | MachineID |
|-----------|------|--------|-------------|-----------|
| 11/09/2016 13:52:46 | Bret Nelson | Call Cleared | | CC220904 |
| 11/09/2016 13:52:46 | Bret Nelson | Unit Status Action | Unit 1L53 cleared from call | CC220904 |
| 11/09/2016 13:52:45 | Bret Nelson | Call Updated | Dispositions Changed | CC220904 |
| 11/09/2016 13:35:57 | Bret Nelson | Unit Status Action | Unit 1A52 cleared from call | CC220904 |
| 11/09/2016 13:35:54 | Bret Nelson | Unit Status Action | Unit 1L53 C4 | CC220904 |
| 11/09/2016 13:34:57 | Bret Nelson | Narrative Added | 53 ON TWO | CC220904 |
| 11/09/2016 13:34:05 | Bret Nelson | Unit Status Action | Unit 1L51 cleared from call | CC220904 |
| 11/09/2016 13:34:01 | Jeffrey Park | Narrative Added | Dispatch received by unit 1A52 | 1A52 |
| 11/09/2016 13:33:59 | Bret Nelson | Unit Status Action | Unit 1A52 ENR | CC220904 |
| 11/09/2016 13:33:31 | Bret Nelson | Unit Status Action | Unit 1L53 ONS | CC220904 |
| 11/09/2016 13:27:47 | Juan Hernandez | Narrative Added | Dispatch received by unit 1L53 | 1L53 |
| 11/09/2016 13:27:45 | Bret Nelson | Unit Status Action | Unit 1L53 ENR | CC220904 |
| 11/09/2016 13:27:21 | Diego Hernandez | Narrative Added | Dispatch received by unit 1L51 | 1L51 |
| 11/09/2016 13:27:20 | Bret Nelson | Unit Status Action | Unit 1L51 ENR | CC220904 |
| 11/09/2016 13:27:20 | Bret Nelson | Incident Created | Added Incident Number, ORI: CA0191800, Number: 2016-00043974 | CC220904 |
| 11/09/2016 13:26:51 | | Call Timer Expired | Call Timer Expired | |
| 11/09/2016 13:26:49 | Donna Piacentini | Narrative Added | MALE SUBJ IS SCREAMING AT THE FEMALE | CC220903 |
| 11/09/2016 13:26:42 | Donna Piacentini | Person Updated | Name: 911,,,, Contact Phone: | CC220903 |
| 11/09/2016 13:26:37 | Donna Piacentini | Person Added | Name: 911,,, | CC220903 |
| 11/09/2016 13:26:25 | Donna Piacentini | Narrative Added | MW AND FW ON THE BENCHES IN THE CENTER OF THE PARK | CC220903 |
| 11/09/2016 13:25:51 | Donna Piacentini | Call Type | NewCallType: 415 DM, Status: IN PROGRESS, Priority: 2 | CC220903 |
| 11/09/2016 13:25:48 | Donna Piacentini | Reset Alarm Level | Fire Alarm Level Reset | CC220903 |
| 11/09/2016 13:25:48 | Donna Piacentini | Location | Location: BUCKINGHAM PKY / CANTERBURY DR, Venue: Culver City | CC220903 |
| 11/09/2016 13:25:44 | Donna Piacentini | Person Added | Name: | CC220903 |
| 11/09/2016 13:25:44 | Donna Piacentini | Call Created | New call created. Call Type: *New*, Location: , Phone Number: , Name: | CC220903 |

Total Rows: 25

CONFIDENTIAL

UNATIN00892666
PTX 1915-0003

# EXHIBIT N

| | |
|---|---|
| **From:** | Dikla Gavrieli [dikla@tieks.com] |
| **Sent:** | 6/13/2017 11:57:02 PM |
| **To:** | Kfir Gavrieli [kfir.gavrieli@gmail.com] |
| **Subject:** | payments |

It's unbelievable to me that you took over a million dollars out of the business again. I told you I don't want any more joint investing with you. For the second time you did that without telling me or knowing what the business needs are. $3 million is due for taxes on June 15 and now there's not enough money to make those payments, just like when you did this in April. I can't believe you're playing these games, especially with the taxes.

--
Dikla Gavrieli Unatin

TIEKS BY GAVRIELI
Facebook | Twitter | Instagram | Pinterest





Confidential

KG00121345

**170**

TX 151-0001

# EXHIBIT O



EXHIBIT

148

DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856

Trial Exhibit No.

TX 148

Date Entered _____
By _____, Deputy Clerk

UNATIN_00005467

TX 148-0001



1

2

3

4

5

6

7

8

9       AUDIO TRANSCRIPTION

10       KFIR GAVRIELI VOICEMAIL

11       JUNE 30, 2017

12

13

14

15

16

17

18

19

20

21

22

23   Transcribed by:
     Diana Sasseen
24   CSR No. 13456

25   Job No. 10043677

UNATIN_00005468

TX 148-0002

```
1              KFIR GAVRIELI:  I want to be clear, in   case
2   the text wasn't clear enough.  Not a single fucking   wire
3   goes out without my fucking permission.  And every   one
4   that does, you and your bitch ass husband will pay a
5    mother fucking price, I promise you.  Not a single
6    fucking wire.  Try me.
7              (End of recording.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

UNATIN_00005469

TX 148-0003

1                    REPORTER'S CERTIFICATE

2          I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, do hereby certify:

4          That the foregoing electronically-recorded

5    proceedings were transcribed by me to the best of my

6    ability.

7          I further certify I am neither financially

8    interested in the action nor a relative or employee of

9    any attorney or party to this action.

10          IN WITNESS WHEREOF, I have this date

11    subscribed my name.

12

13    Dated: May 24, 2018

14

15

16                    _____
                      Diana Sasseen
17                    CSR NO. 13456

18          .

19

20

21

22

23

24

25

UNATIN_00005470

TX 148-0004

# EXHIBIT P

**From:** Michael J.A. Karlin
**Sent:** Thursday, July 13, 2017 10:07 AM
**To:** Kfir Gavrieli
**Subject:** Estate planning; relationships with your sister and brother-in-law

Kfir:

To restate the issue, you are concerned about the fact that your brother-in-law, as matters stand, almost certainly has a community property interest in your sister's share of Gavrieli Brands LLC. That does not mean he is a member of the LLC but he likely is entitled, in the absence of any documentation to the contrary, to various rights in relation to your sister's interest. Moreover, there are various events that could take place. For example:

- If your sister were to die, he would most likely acquire your sister's interest in the LLC, although that would depend on your sister's estate planning arrangements or, in the absence of any such arrangements, on the California law of intestacy.
- If your sister were to become incapacitated, he would likely be the person to administer her assets, including her interest in the LLC.
- If your sister and brother-in-law were to divorce, he might receive some or all of the interest in the LLC in a divorce settlement.

In none of these cases could you, as matters currently stand, force him to sell to you or sideline him.

Resolving this issue can proceed down two tracks.

First, and most obviously, the LLC should have an operating agreement. You have told me that Gavrieli Brands does not have an operating agreement. I wonder if that can be true, because normally banks require to see the operating agreement as part of the procedures for opening an account. But if there is no agreement or if any agreement that does exist has not been reviewed with the above issues in mind, you can solve many of the problems with a properly drafted agreement.

At the most basic level, the operating agreement can acknowledge your brother-in-law's community property interest but make clear that only your sister is a member of the LLC and only she has any management rights. Very often, even a basic operating agreement will say something like this. However, the agreement can go a lot further to protect you. For example:

- It can make the LLC manager-managed and appoint you as the sole manager or you and your sister as the managers, with no provision for your brother-in-law to become a manager even if anything happens to your sister.
- You can include buy-sell or buy-out provisions and other remedies that can be triggered if any of the above events (death, incapacity, divorce) occur. Those provisions can be supplemented with methods of financing a buyout. These can include provisions for payment by installments or assuring liquidity through life insurance money.
- It can include drag along provisions allowing you to force your sister and, as needed, your brother-in-law to sell if you decide to sell your interest and it can also include a right of first refusal in case one of you wanted to sell out.
- It can also provide protections for your sister in the case anything happens to you.

One advantage of going down this track – adopting a sophisticated operating agreement – is that it largely does not need you to be involved in your sister's and brother-in-law's marital and estate planning arrangements. Also, you could have the company's counsel prepare the agreement and while it might well be desirable for the parties to be separately represented, it would not be legally necessary.

The second track does involve those marital and estate planning arrangements. I understand that you do not want your brother-in-law to have an interest in Gavrieli Brands to have no ability to interfere in its management and operation, and this could be accomplished with a post-nuptial agreement. But post-nups, even more than pre-nups are tricky and both parties have to be separately represented and there has to be full disclosure of assets to each partner in the marriage. And all this is somewhat delicate because these are, first and foremost, matters that concern your sister and your brother-in-law. It's quite awkward for you to get involved with their estate plan and even more so for you to get involved in a post-nup.

You asked – who would be the best person to help you. I spoke to Jane and both of us agree that quite a lot of this is outside our main areas of practice. For example, I am perfectly capable of drafting an operating agreement with some of the provisions described above. But I am not "the best", nor is Jane. Similarly, while Jane and Jeannette both deal with marital agreements, it's a relatively small part of their practices. You originally hired our firm for its international tax practice – and at that we are more than capable, I believe. And Jane and Jenny are top notch estate planners. But what you need here is not in our sweet spot.

For this reason, I'd like to recommend that we bring in another firm. The firm I would recommend is Jeffer Mangels Butler & Mitchell, and specifically Burton (Burt) Mitchell. They are a terrific firm and Burt is a tough and thoroughly knowledgeable practitioner. They have the resources on the corporate and marital front. We have a long-standing record of working with them cooperatively.

Let me know how you would like to proceed. I can readily make the introduction to Burt.

Kind regards,

Michael

Michael J. A. Karlin
Karlin & Peebles, LLP
5900 Wilshire Boulevard, Suite 500
Los Angeles, CA 90036



**CONFIDENTIAL**



DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856

Trial Exhibit No.

**TX 065**

Date Entered _____
By _____, Deputy Clerk

KARLIN001543

EXHIBIT
Karlin
65
5-29-18

TX 065-0001

323-852-0033 Los Angeles office
310-388-5537 fax
310-990-0898 U.S. cell
mjkarlin@karlinpeebles.com
http://www.karlinpeebles.com

The information contained in this message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or e-mail, and delete the message from your system. Thank you.

*Michael and Fiona Karlin are sponsors of Invertigo Dance Theatre. Invertigo is a leading Los Angeles contemporary dance company that creates exciting, whimsical and fresh dance theatre that connects with audiences, and provides dance classes for people living with Parkinson's disease and dance education for underserved students through its InvertEd program.  www.invertigodance.org*

CONFIDENTIAL

KARLIN001544

TX 065-0002

# EXHIBIT Q

*Privileged and Confidential*
*Attorney Work Product*

# Exhibit 1
# Fair Market Value of a 100% Ownership Interest in Gavrieli Brands, LLC
## on a Non-Marketable, Controlling Ownership Interest Basis
### *as of December 31, 2015, 2016, and 2017*

($ in millions)

| Method | Indicated Value as of Dec. 31, 2015 | Indicated Value as of Dec. 31, 2016 | Indicated Value as of Dec. 31, 2017 | Assigned Weight |
|---|---|---|---|---|
| **Market Approach** | **$147.0** *Ex. 2A, 2B* | **$433.8** *Ex. 2A, 2C* | **$410.9** *Ex. 2A, 2D* | 50% |
| **Income Approach** | **$130.4** *Ex. 3C* | **$397.1** *Ex. 3C* | **$366.2** *Ex. 3C* | 50% |
| **Weight-Adjusted Indicated Fair Market Value** | **$138.7** | **$415.4** | **$388.6** | |

**Notes:**
[1] The company had no interest bearing debt as of the valuation dates.
[2] Valuations include excess cash as of December 31, 2015 ($0), 2016 ($0), and 2017 ($10.265 million). See Exhibit 3C.





DIKLA GAVRIELI v. KFIR GAVRIELI
Case No. BC686856
Trial Exhibit No.
TX 419
Date Entered _____
By _____, Deputy Clerk

EXHIBIT
419
Strombom

ANALYSIS GROUP, INC.

TX 419-0001

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2A**

**Market Approach Summary**

**Indicated Values of Gavrieli Brands, LLC**

*as of December 31, 2015, 2016, and 2017*

($ in millions)

| Support Exhibit | Valuation Date | [A] Comparison Group TEV/EBITDA Multiple[1] | [B] Gavrieli Adjusted EBITDA[2] | [C]= [A]*[B] Gavrieli TEV per EBITDA Multiple | [D]= [C]*20% Control Premium of 20.0% | [E]= [C]*-15% Illiquidity Discount of 15.0% | [F] Gavrieli Excess Cash[3] | [G]= [C]+[D]+[E]+[F] Indicated Value Including Excess Cash |
|---|---|---|---|---|---|---|---|---|
| Ex. 2B | Dec. 31, 2015 | 17.0x | $8.2 | $140.0 | $28.0 | ($21.0) | $0.0 | $147.0 |
| Ex. 2C | Dec. 31, 2016 | 15.5x | $26.6 | $413.1 | $82.6 | ($62.0) | $0.0 | $433.8 |
| Ex. 2D | Dec. 31, 2017 | 14.2x | $26.9 | $381.6 | $76.3 | ($57.2) | $10.3 | $410.9 |

**Notes:**

[1] Comparison Group Total Enterprise Value ("TEV")/EBITDA Multiple is the 75th percentile of the guideline public company multiples for 2015, the 75th percentile of multiples for 2016, and the median multiple for 2017.

[2] Gavrieli Adjusted Earnings Before Interest, Tax, Depreciation and Amortization ("EBITDA") values for 2015, 2016, and 2017 are from "Gavrieli Brand LLC, Financial Reports, Tax Return, and Workpapers," adjusted for reasonable compensation. See Exhibit 3C.

[3] Gavrieli Excess Cash values are assumed to be zero for 2015, zero for 2016, and $10.265 million for 2017. See Exhibit 3C.

ANALYSIS GROUP, INC.

TX 419-0002

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2B**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2015**
*S&P Capital IQ Industry: Women's and Girls' Footwear*

($ in millions)

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2015 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 1 | C.Banner Intl. Holdings Limited (SEHK: 1028) | C.Banner International Holdings Limited, an investment holding company, manufactures, sells, and retails women's formal and casual footwear primarily in the People's Republic of China, the United Kingdom, the United States, and internationally. The company operates through three segments: Retail and Wholesale of Shoes, Contract Manufacturing of Shoes, and Retail of Toys. It also acts as the OEM or ODM manufacturer for shoes companies in export markets, as well as retailer of toys. The company offers its products under the self-developed brands, including C.banner, EBLAN, sundance, MIO, Badgley Mischka, and natursun, as well as under the licensed brands, such as ASH, JC Collezione, and United Nude, and Steve Madden. C.banner International Holdings Limited distributes its self-developed and licensed brands products primarily through department stores and independent retail stores. The company was formerly known as Hongguo International Holdings Limited and changed its name to C.banner International Holdings Limited in February 2012. C.banner International Holdings Limited was founded in 1995 and is based in Hong Kong, Hong Kong. | $893.4 | $469.1 | $49.0 | 18.2 x | 10.4% |
| 2 | Crocs, Inc. (NasdaqGS: CROX) | Crocs, Inc., together with its subsidiaries, designs, develops, manufactures, markets, and distributes casual lifestyle footwear and accessories for men, women, and children worldwide. It offers various footwear products, including clogs, sandals, flips and slides, shoes, and boots under the Crocs brand name. The company sells its products in approximately 90 countries through domestic wholesalers, as well as international wholesalers and distributors; and stores and e-commerce sites. As of December 31, 2017, it had 161 retail stores; 71 kiosks and store-in-stores; 215 outlet stores; and 13 company-operated e-commerce sites. The company was founded in 1999 and is headquartered in Niwot, Colorado. | $768.4 | $1,090.6 | ($10.9) | N.M | -1.0% |
| 3 | Deckers Outdoor Corporation (NYSE: DECK) | Deckers Outdoor Corporation, together with its subsidiaries, designs, markets, and distributes footwear, apparel, and accessories for casual lifestyle use and high performance activities. It offers premium footwear, apparel, and accessories under the UGG brand name; sandals, shoes, and boots under the Teva brand name; and footwear under the Sanuk brand name. The company also provides running footwear and apparel under the Hoka brand name; and fashion casual footwear using sheepskin and other plush materials under the Koolaburra brand. It sells its products through department stores, domestic independent action sports and outdoor specialty footwear retailers, and larger national retail chains, as well as online retailers such as Amazon and Zappos.com. The company also sells its products directly to consumers through its retail stores and e-commerce Websites, as well as distributes its products through distributors and retailers in the United States, Europe, the Asia-Pacific, Canada, Australia, Latin America, and internationally. As of March 31, 2018, it had 165 retail stores, including 98 concept stores and 67 outlet stores worldwide. The company was founded in 1973 and is headquartered in Goleta, California. | $1,776.0 | $1,817.1 | $263.8 | 6.7 x | 14.5% |
| 4 | Geox S.p.A. (BIT: GEO) | Geox S.p.A. creates, produces, promotes, and distributes footwear and apparel for retailers and end consumers in Italy, Europe, North America, and internationally. It operates through two segments, Footwear and Apparel. The company offers shoes and jackets, as well as accessories for men, women, and children under the Geox brand through multi-brand selling points, mono-brand shops, and Geox Shops. As of December 31, 2017, it operated 1,095 Geox Shops, including 656 franchised stores and 439 directly operated stores. The company was founded in 1995 and is headquartered in Montebelluna, Italy. Geox S.p.A. is a subsidiary of LIR S.r.l. | $1,145.7 | $949.6 | $67.2 | 17.0 x | 7.1% |

Page 1 of 4

ANALYSIS GROUP, INC.

TX 419-0003

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2B**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2015**

*S&P Capital IQ Industry: Women's and Girls' Footwear*

($ in millions)

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2015 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 5 | NIKE, Inc. (NYSE: NKE) | NIKE, Inc., together with its subsidiaries, designs, develops, markets, and sells athletic footwear, apparel, equipment, and accessories worldwide. It offers NIKE branded products in nine categories: running, NIKE basketball, the Jordan brand, football, men's training, women's training, action sports, sportswear, and golf. The company also markets products designed for kids, as well as for other athletic and recreational uses, such as cricket, lacrosse, tennis, volleyball, wrestling, walking, and outdoor activities. In addition, it sells sports apparel; and markets apparel with licensed college and professional team and league logos. Further, the company sells a line of performance equipment, including bags, socks, sport balls, eyewear, timepieces, digital devices, bats, gloves, protective equipment, and other equipment under the NIKE brand for sports activities; various plastic products to other manufacturers; athletic and casual footwear, apparel, and accessories under the Jumpman trademark; action sports and youth lifestyle apparel and accessories under the Hurley trademark; and casual sneakers, apparel, and accessories under the Converse, Chuck Taylor, All Star, One Star, Star Chevron, and Jack Purcell trademarks. Additionally, it licenses agreements that permit unaffiliated parties to manufacture and sell apparel, digital devices, and applications and other equipment for sports activities under NIKE-owned trademarks. The company sells its products to footwear stores, sporting goods stores, athletic specialty stores, department stores, skate, tennis and golf shops, and other retail accounts through NIKE-owned retail stores and Internet Websites, mobile applications, independent distributors, and licensees. The company was formerly known as Blue Ribbon Sports, Inc. and changed its name to NIKE, Inc. in 1971. NIKE, Inc. was founded in 1964 and is headquartered in Beaverton, Oregon. | $102,579.2 | $30,601.0 | $4,824.0 | 21.3 x | 15.8% |
| 6 | Skechers U.S.A., Inc. (NYSE: SKX) | Skechers U.S.A., Inc. designs, develops, markets, and distributes footwear for men, women, and children; and performance footwear for men and women under the Skechers GO brand worldwide. It operates through three segments: Domestic Wholesale Sales, International Wholesale Sales, and Retail Sales. The company offers casual boots, shoes, and sandals for men; shoes, oxfords and slip-ons, lug outsole and fashion boots, and casual sandals for women; dress casuals, seasonal sandals and boots, classic and wide fit, and relaxed fit casuals for men and women, and casual athletic line for men and women under the Skechers USA brand. It also provides lightweight sport athletic lifestyle products, classic athletic-inspired styles, and sport sandals and boots under the Skechers Sport brand name; casual and sport styles sneakers, and sandals under the Skechers Active and Skechers Sport Active brand; and sneakers under Skecher Street brand for millennials, Gen Y's, and young women. In addition, the company offers classic espadrille, and vulcanized and sport footwear under the BOBS from Skechers name; casual, dress, and active styles, as well as boots and accessories for men under the Mark Nason name; technical footwear under the Skechers Performance brand for men and women, as well as under the YOU by Skechers name for women; and boots, shoes, high-tops, sneakers, and sandals for infants, toddlers, boys, and girls under the Skechers Kids name. Further, it provides men's and women's casuals, such as field boots, hikers, and athletic shoes under the Skechers Work name. The company sells its products through department and specialty stores, athletic and independent retailers, boutiques, and Internet retailers, as well as through its e-commerce Websites and own retail stores. As of March 1, 2018, it owned and operated 2,570 company-owned and third-party-owned retail stores. Skechers U.S.A., Inc. was founded in 1992 and is headquartered in Manhattan Beach, California. | $4,352.0 | $3,159.1 | $404.5 | 10.8 x | 12.8% |

ANALYSIS GROUP, INC.

TX 419-0004

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2B**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2015**

*S&P Capital IQ Industry: Women's and Girls' Footwear*

($ in millions)

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2015 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 7 | Stella International Holdings Limited (SEHK: 1836) | Stella International Holdings Limited develops, manufactures, and retails footwear products and leather goods for men and women. The company operates through Men's Footwear, Women's Footwear, and Footwear Retailing and Wholesaling segments. It is also involved in the sale and distribution of footwear; holding of intellectual property rights; and provision of secretary and accounting services. The company operates its stores under the Stella Luna, What For, and JKJY by Stella names. It operates in the United States, the People's Republic of China, the United Kingdom, the Netherlands, Italy, Canada, Japan, Germany, Belgium, Spain, and internationally. The company was founded in 1982 and is based in Kowloon, Hong Kong. | $1,972.0 | $1,769.9 | $154.0 | 12.8 x | 8.7% |
| 8 | Steven Madden, Ltd. (NasdaqGS: SHOO) | Steven Madden, Ltd. designs, sources, markets, and sells fashion-forward name brand and private label footwear for women, men, and children worldwide. Its Wholesale Footwear segment provides footwear under the Steve Madden Women's, Madden Girl, Steve Madden Men's, Madden, Madden NYC, Dolce Vita, DV by Dolce Vita, Mad Love, Steven by Steve Madden, Report, Superga, Betsey Johnson, Betseyville, Steve Madden Kids, FREEBIRD by Steven, Stevies, B Brian Atwood, Blondo, Kate Spade, and Avec Les Filles brands, as well as private label footwear. The company's Wholesale Accessories segment offers Big Buddha, Madden NYC, Betsey Johnson, Steve Madden, Steven by Steve Madden, Madden Girl, Cejon, B Brian Atwood, Luv Betsey, DKNY, and Donna Karan accessories brands; private label fashion handbags and accessories to department stores, mass merchants, value priced retailers, online retailers, and specialty stores; and cold weather accessories, fashion scarves, wraps, and other trend accessories primarily under Cejon, Steve Madden, Betsey Johnson, and Big Buddha brand names, as well as private labels to department stores and specialty stores. Its Retail segment operates Steve Madden, Steven, Superga, and International retail stores, as well as Steve Madden, Superga, Betsey Johnson, and Dolce Vita e-commerce Websites. As of December 31, 2017, the company owned and operated 206 retail stores. Its First Cost segment operates as a buying agent for footwear products under private labels for mass-market merchandisers, shoe chains, and other mid-tier retailers. The company's Licensing segment licenses its Steve Madden, Steven by Steve Madden, and Madden Girl trademarks. Steven Madden, Ltd. was founded in 1990 and is based in Long Island City, New York. | $1,830.0 | $1,405.2 | $194.1 | 9.4 x | 13.8% |
| 9 | TOD'S S.p.A. (BIT: TOD) | TOD'S S.p.A., together with its subsidiaries, creates, produces, and distributes shoes, leather goods and accessories, and apparel in Italy, Europe, the Americas, and China. It provides shoes and luxury leather goods under the TOD'S brand; shoe collections for women, men, and children under the Hogan brand; casual wear under the FAY brand; and shoes, handbags, small leather goods, jewelry, and sunglasses under the Roger Vivier brand names. The company distributes its products through directly operated stores (DOS), franchised retail outlets, and independent multi-brand stores. As of December 31, 2016, its distribution network comprised 272 DOS and 107 franchised stores. The company is based in Sant'Elpidio a Mare, Italy. TOD'S S.p.A. is a subsidiary of Diego Della Valle & C. S.A.P.A. | $2,372.0 | $1,138.6 | $217.2 | 10.9 x | 19.1% |

ANALYSIS GROUP, INC.

TX 419-0005

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2B**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2015**
*S&P Capital IQ Industry: Women's and Girls' Footwear*

($ in millions)

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2015 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 10 | Wolverine World Wide, Inc. (NYSE: WWW) | Wolverine World Wide, Inc. designs, manufactures, sources, markets, licenses, and distributes footwear, apparel, and accessories. The company operates through four segments: Wolverine Outdoor & Lifestyle Group, Wolverine Boston Group, Wolverine Heritage Group, and Wolverine Multi-Brand Group. It offers casual footwear and apparel; performance outdoor and athletic footwear and apparel; children's footwear; industrial work boots and apparel; and uniform shoes and boots. The company sources and markets a range of footwear styles, such as shoes, boots, and sandals under the Bates, Cat, Chaco, Harley-Davidson, Hush Puppies, HyTest, Keds, Merrell, Saucony, Sebago, Soft Style, Sperry, Stride Rite, and Wolverine brand names. It also markets apparel and accessories under the Merrell and Wolverine brands, as well as licenses its brands for use on non-footwear products, including the Hush Puppies apparel, eyewear, watches, socks, handbags, and plush toys; the Wolverine brand eyewear and gloves; and the Keds, Saucony, Sperry brand apparel. In addition, the company markets pigskin leather under the Wolverine Warrior Leather, Weather Tight, and All Season Weather Leathers trademarks for use in the footwear industry. Wolverine World Wide, Inc. sells its products in the United States, Canada, the United Kingdom, and certain countries in continental Europe and Asia Pacific to department stores, national chains, catalog and specialty retailers, independent retailers, uniform outlets, and mass merchant and government customers through retail stores, as well as through third-party licensees and distributors. As of December 30, 2017, the company operated 81 retail stores, as well as 29 consumer-direct Websites. Wolverine World Wide, Inc. was founded in 1883 and is based in Rockford, Michigan. | $2,351.8 | $2,691.6 | $287.4 | 8.2 x | 10.7% |

| | |
|---|---|
| Min | 6.7 x |
| Median | 10.9 x |
| Mean | 12.8 x |
| 75th % | 17.0 x |
| Max | 21.3 x |

| | | |
|---|---|---|
| [2] | Gavrieli Adjusted LTM EBITDA | $8.2 |
| | 75th Percentile Multiple for Comparison Group | 17.0 x |
| | Total Enterprise Value using the 75th Percentile | $140.0 |
| [3] | Control Premium of 20.0% | $28.0 |
| [4] | Illiquidity Discount of 15.0% | ($21.0) |
| [5] | Gavrieli Excess Cash | $0.0 |
| | **Indicated Value of Gavrieli** | **$147.0** |

**Notes:**
[1] Guideline Public Companies are companies that (1) appear in Capital IQ with the S&P Industry Classification of "Women's and Girls' Footwear (Primary)," and (2) produce women's casual shoes for sale in the US.
[2] Gavrieli Adjusted Earnings Before Interest, Tax, Depreciation and Amortization ("EBITDA") values for 2015, 2016, and 2017 are from "Gavrieli Brand LLC, Financial Reports, Tax Return, and Workpapers," adjusted for reasonable compensation. See Exhibit 3C.
[3] Control Premium is estimated as 20%.
[4] Illiquidity Discount is estimated as 15%.
[5] Gavrieli Excess Cash values are assumed to be zero for 2015, zero for 2016, and $10.265 million for 2017. See Exhibit 3C.
**Source:**
Capital IQ.

TX 419-0006

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2C**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2016**
*S&P Capital IQ Industry: Women's and Girls' Footwear*

($ in millions)

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2016 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 1 | C.Banner Intl. Holdings Limited (SEHK: 1028) | C.banner International Holdings Limited, an investment holding company, manufactures, sells, and retails women's formal and casual footwear primarily in the People's Republic of China, the United Kingdom, the United States, and internationally. The company operates through three segments: Retail and Wholesale of Shoes, Contract Manufacturing of Shoes, and Retail of Toys. It also acts as the OEM or ODM manufacturer for shoes companies in export markets, as well as retailer of toys. The company offers its products under the self-developed brands, including C.banner, EBLAN, sundance, MIO, Badgley Mischka, and natursun, as well as under the licensed brands, such as ASH, JC Collezione, and United Nude, and Steve Madden. C.banner International Holdings Limited distributes its self-developed and licensed brands products primarily through department stores and independent retail stores. The company was formerly known as Hongguo International Holdings Limited and changed its name to C.banner International Holdings Limited in February 2012. C.banner International Holdings Limited was founded in 1995 and is based in Hong Kong, Hong Kong. | $671.0 | $461.8 | $38.0 | 17.7 x | 8.2% |
| 2 | Crocs, Inc. (NasdaqGS: CROX) | Crocs, Inc., together with its subsidiaries, designs, develops, manufactures, markets, and distributes casual lifestyle footwear and accessories for men, women, and children worldwide. It offers various footwear products, including clogs, sandals, flips and slides, shoes, and boots under the Crocs brand name. The company sells its products in approximately 90 countries through domestic wholesalers, as well as international wholesalers and distributors; and stores and e-commerce sites. As of December 31, 2017, it had 161 retail stores; 71 kiosks and store-in-stores; 215 outlet stores; and 13 company-operated e-commerce sites. The company was founded in 1999 and is headquartered in Niwot, Colorado. | $536.0 | $1,036.3 | $31.5 | 17.0 x | 3.0% |
| 3 | Deckers Outdoor Corporation (NYSE: DECK) | Deckers Outdoor Corporation, together with its subsidiaries, designs, markets, and distributes footwear, apparel, and accessories for casual lifestyle use and high performance activities. It offers premium footwear, apparel, and accessories under the UGG brand name; sandals, shoes, and boots under the Teva brand name; and footwear under the Sanuk brand name. The company also provides running footwear and apparel under the Hoka brand name; and fashion casual footwear using sheepskin and other plush materials under the Koolaburra brand. It sells its products through department stores, domestic independent action sports and outdoor specialty footwear retailers, and larger national retail chains, as well as online retailers such as Amazon and Zappos.com. The company also sells its products directly to consumers through its retail stores and e-commerce Websites, as well as distributes its products through distributors and retailers in the United States, Europe, the Asia-Pacific, Canada, Australia, Latin America, and internationally. As of March 31, 2018, it had 165 retail stores, including 98 concept stores and 67 outlet stores worldwide. The company was founded in 1973 and is headquartered in Goleta, California. | $1,977.5 | $1,875.2 | $242.2 | 8.2 x | 12.9% |
| 4 | Geox S.p.A. (BIT: GEO) | Geox S.p.A. creates, produces, promotes, and distributes footwear and apparel for retailers and end consumers in Italy, Europe, North America, and internationally. It operates through two segments, Footwear and Apparel. The company offers shoes and jackets, as well as accessories for men, women, and children under the Geox brand through multi-brand selling points, mono-brand shops, and Geox Shops. As of December 31, 2017, it operated 1,095 Geox Shops, including 656 franchised stores and 439 directly operated stores. The company was founded in 1995 and is headquartered in Montebelluna, Italy. Geox S.p.A. is a subsidiary of LIR S.r.l. | $639.5 | $950.9 | $55.8 | 11.5 x | 5.9% |

Page 1 of 4

ANALYSIS GROUP, INC.

TX 419-0007

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2C**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2016**
*S&P Capital IQ Industry: Women's and Girls' Footwear*

($ in millions)

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2016 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 5 | NIKE, Inc. (NYSE: NKE) | NIKE, Inc., together with its subsidiaries, designs, develops, markets, and sells athletic footwear, apparel, equipment, and accessories worldwide. It offers NIKE brand products in nine categories: running, NIKE basketball, the Jordan brand, football, men's training, women's training, action sports, sportswear, and golf. The company also markets products designed for kids, as well as for other athletic and recreational uses, such as cricket, lacrosse, tennis, volleyball, wrestling, walking, and outdoor activities. In addition, it sells sports apparel; and markets apparel with licensed college and professional team and league logos. Further, the company sells a line of performance equipment, including bags, socks, sport balls, eyewear, timepieces, digital devices, bats, gloves, protective equipment, and other equipment under the NIKE brand for sports activities; various plastic products to other manufacturers; athletic and casual footwear, apparel, and accessories under the Jumpman trademark; action sports and youth lifestyle apparel and accessories under the Hurley trademark; and casual sneakers, apparel, and accessories under the Converse, Chuck Taylor, All Star, One Star, Star Chevron, and Jack Purcell trademarks. Additionally, it licenses agreements that permit unaffiliated parties to manufacture and sell apparel, digital devices, and applications and other equipment for sports activities under NIKE-owned trademarks. The company sells its products to footwear stores, sporting goods stores, athletic specialty stores, department stores, skate, tennis and golf shops, and other retail accounts through NIKE-owned retail stores and Internet Websites, mobile applications, independent distributors, and licensees. The company was formerly known as Blue Ribbon Sports, Inc. and changed its name to NIKE, Inc. in 1971. NIKE, Inc. was founded in 1964 and is headquartered in Beaverton, Oregon. | $82,247.9 | $32,376.0 | $5,164.0 | 15.9 x | 16.0% |
| 6 | Skechers U.S.A., Inc. (NYSE: SKX) | Skechers U.S.A., Inc. designs, develops, markets, and distributes footwear for men, women, and children; and performance footwear for men and women under the Skechers GO brand worldwide. It operates through three segments: Domestic Wholesale Sales, International Wholesale Sales, and Retail Sales. The company offers casual boots, shoes, and sandals for men; shoes, oxfords and slip-ons, lug outsole and fashion boots, and casual sandals for women; dress casuals, seasonal sandals and boots, classic and wide fit, and relaxed fit casuals for men and women; and casual athletic line for men and women under the Skechers USA brand. It also provides lightweight sport athletic lifestyle products, classic athletic-inspired styles, and sport sandals and boots under the Skechers Sport brand name; casual and sport styles sneakers, and sandals under the Skechers Active and Skechers Sport Active brand; and sneakers under Skecher Street brand for millennials, Gen Y's, and young women. In addition, the company offers classic espadrille, and vulcanized and sport footwear under the BOBS from Skechers name; casual, dress, and active styles, as well as boots and accessories for men under the Mark Nason name; technical footwear under the Skechers Performance brand for men and women, as well as under the YOU by Skechers name for women; and boots, shoes, high-tops, sneakers, and sandals for infants, toddlers, boys, and girls under the Skechers Kids name. Further, it provides men's and women's casuals, such as field boots, hikers, and athletic shoes under the Skechers Work name. The company sells its products through department and specialty stores, athletic and independent retailers, boutiques, and Internet retailers, as well as through its e-commerce Websites and own retail stores. As of March 1, 2018, it owned and operated 2,570 company-owned and third-party-owned retail stores. Skechers U.S.A., Inc. was founded in 1992 and is headquartered in Manhattan Beach, California. | $3,368.3 | $3,577.2 | $449.7 | 7.5 x | 12.6% |
| 7 | Stella International Holdings Limited (SEHK: 1836) | Stella International Holdings Limited develops, manufactures, and retails footwear products and leather goods for men and women. The company operates through Men's Footwear, Women's Footwear, and Footwear Retailing and Wholesaling segments. It is also involved in the sale and distribution of footwear; holding of intellectual property rights; and provision of secretary and accounting services. The company operates its stores under the Stella Luna, What For, and JKJY by Stella names. It operates in the United States, the People's Republic of China, the United Kingdom, the Netherlands, Italy, Canada, Japan, Germany, Belgium, Spain, and internationally. The company was founded in 1982 and is based in Kowloon, Hong Kong. | $1,308.9 | $1,550.9 | $91.5 | 14.3 x | 5.9% |

ANALYSIS GROUP, INC.

TX 419-0008

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2C**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2016**
*S&P Capital IQ Industry: Women's and Girls' Footwear*

($ in millions)

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2016 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 8 | Steven Madden, Ltd. (NasdaqGS: SHOO) | Steven Madden, Ltd. designs, sources, markets, and sells fashion-forward name brand and private label footwear for women, men, and children worldwide. Its Wholesale Footwear segment provides footwear under the Steve Madden Women's, Madden Girl, Steve Madden Men's, Madden, Madden NYC, Dolce Vita, DV by Dolce Vita, Mad Love, Steven by Steve Madden, Report, Superga, Betsey Johnson, Betseyville, Steve Madden Kids, FREEBIRD by Steven, Stevies, B Brian Atwood, Blondo, Kate Spade, and Avec Les Filles brands, as well as private label footwear. The company's Wholesale Accessories segment offers Big Buddha, Madden NYC, Betsey Johnson, Steve Madden, Steven by Steve Madden, Madden Girl, Cejon, B Brian Atwood, Luv Betsey, DKNY, and Donna Karan accessories brands; private label fashion handbags and accessories to department stores, mass merchants, value priced retailers, online retailers, and specialty stores; and cold weather accessories, fashion scarves, wraps, and other trend accessories primarily under Cejon, Steve Madden, Betsey Johnson, and Big Buddha brand names, as well as private labels to department stores and specialty stores. Its Retail segment operates Steve Madden, Steven, Superga, and International retail stores, as well as Steve Madden, Superga, Betsey Johnson, and Dolce Vita e-commerce Websites. As of December 31, 2017, the company owned and operated 206 retail stores. Its First Cost segment operates as a buying agent for footwear products under private labels for mass-market merchandisers, shoe chains, and other mid-tier retailers. The company's Licensing segment licenses its Steve Madden, Steven by Steve Madden, and Madden Girl trademarks. Steven Madden, Ltd. was founded in 1990 and is based in Long Island City, New York. | $2,074.6 | $1,399.6 | $188.6 | 11.0 x | 13.5% |
| 9 | TOD'S S.p.A. (BIT: TOD) | TOD'S S.p.A., together with its subsidiaries, creates, produces, and distributes shoes, leather goods and accessories, and apparel in Italy, Europe, the Americas, and China. It provides shoes and luxury leather goods under the TOD'S brand; shoe collections for women, men, and children under the Hogan brand name; casual wear under the FAY brand; and shoes, handbags, small leather goods, jewelry, and sunglasses under the Roger Vivier brand names. The company distributes its products through directly operated stores (DOS), franchised retail outlets, and independent multi-brand stores. As of December 31, 2016, its distribution network comprised 272 DOS and 107 franchised stores. The company is based in Sant'Elpidio a Mare, Italy. TOD'S S.p.A. is a subsidiary of Diego Della Valle & C. S.A.P.A. | $2,281.6 | $1,071.5 | $217.1 | 10.5 x | 20.3% |

ANALYSIS GROUP, INC.

TX 419-0009

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2C**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2016**
*S&P Capital IQ Industry: Women's and Girls' Footwear*

($ in millions)

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2016 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 10 | Wolverine World Wide, Inc. (NYSE: WWW) | Wolverine World Wide, Inc. designs, manufactures, sources, markets, licenses, and distributes footwear, apparel, and accessories. The company operates through four segments: Wolverine Outdoor & Lifestyle Group, Wolverine Boston Group, Wolverine Heritage Group, and Wolverine Multi-Brand Group. It offers casual footwear and apparel; performance outdoor and athletic footwear and apparel; children's footwear; industrial work boots and apparel; and uniform shoes and boots. The company sources and markets a range of footwear styles, such as shoes, boots, and sandals under the Bates, Cat, Chaco, Harley-Davidson, Hush Puppies, HyTest, Keds, Merrell, Saucony, Sebago, Soft Style, Sperry, Stride Rite, and Wolverine brand names. It also markets apparel and accessories under the Merrell and Wolverine brands, as well as licenses its brands for use on non-footwear products, including the Hush Puppies apparel, eyewear, watches, socks, handbags, and plush toys; the Wolverine brand eyewear and gloves; and the Keds, Saucony, Sperry brand apparel. In addition, the company markets pigskin leather under the Wolverine Warrior Leather, Weather Tight, and All Season Weather Leathers trademarks for use in the footwear industry. Wolverine World Wide, Inc. sells its products in the United States, Canada, the United Kingdom, and certain countries in continental Europe and Asia Pacific to department stores, national chains, catalog and specialty retailers, independent retailers, uniform outlets, and mass merchant and government customers through retail stores, as well as through third-party licensees and distributors. As of December 30, 2017, the company operated 81 retail stores, as well as 29 consumer-direct Websites. Wolverine World Wide, Inc. was founded in 1883 and is based in Rockford, Michigan. | $2,695.6 | $2,494.6 | $253.7 | 10.6 x | 10.2% |

| | | |
|---|---|---|
| Min | 7.5 x |
| Median | 11.2 x |
| Mean | 12.4 x |
| 75th % | 15.5 x |
| Max | 17.7 x |

| | | |
|---|---|---|
| [2] | Gavrieli Adjusted LTM EBITDA | $26.6 |
| | 75th Percentile Multiple for Comparison Group | 15.5 x |
| | Total Enterprise Value using the 75th Percentile | $413.1 |
| [3] | Control Premium of 20.0% | $82.6 |
| [4] | Illiquidity Discount of 15.0% | ($62.0) |
| [5] | Gavrieli Excess Cash | $0.0 |
| | **Indicated Value of Gavrieli** | **$433.8** |

Notes:
[1] Guideline Public Companies are companies that (1) appear in Capital IQ with the S&P Industry Classification of "Women's and Girls' Footwear (Primary)," and (2) produce women's casual shoes for sale in the US.
[2] Gavrieli Adjusted Earnings Before Interest, Tax, Depreciation and Amortization ("EBITDA") values for 2015, 2016, and 2017 are from "Gavrieli Brand LLC, Financial Reports, Tax Return, and Workpapers," adjusted for reasonable compensation. See Exhibit 3C.
[3] Control Premium is estimated as 20%.
[4] Illiquidity Discount is estimated as 15%.
[5] Gavrieli Excess Cash values are assumed to be zero for 2015, zero for 2016, and $10.265 million for 2017. See Exhibit 3C.
Source:
Capital IQ.

TX 419-0010

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2D**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2017**
*S&P Capital IQ Industry: Women's and Girls' Footwear*

*($ in millions)*

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2017 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 1 | C.Banner Intl. Holdings Limited (SEHK: 1028) | C.banner International Holdings Limited, an investment holding company, manufactures, sells, and retails women's formal and casual footwear primarily in the People's Republic of China, the United Kingdom, the United States, and internationally. The company operates through three segments: Retail and Wholesale of Shoes, Contract Manufacturing of Shoes, and Retail of Toys. It also acts as the OEM or ODM manufacturer for shoes companies in export markets, as well as retailer of toys. The company offers its products under the self-developed brands, including C.banner, EBLAN, sundance, MIO, Badgley Mischka, and natursun, as well as under the licensed brands, such as ASH, JC Collezione, and United Nude, and Steve Madden. C.banner International Holdings Limited distributes its self-developed and licensed brands products primarily through department stores and independent retail stores. The company was formerly known as Hongguo International Holdings Limited and changed its name to C.banner International Holdings Limited in February 2012. C.banner International Holdings Limited was founded in 1995 and is based in Hong Kong, Hong Kong. | $733.1 | $470.8 | $21.8 | 33.6 x | 4.6% |
| 2 | Crocs, Inc. (NasdaqGS: CROX) | Crocs, Inc., together with its subsidiaries, designs, develops, manufactures, markets, and distributes casual lifestyle footwear and accessories for men, women, and children worldwide. It offers various footwear products, including clogs, sandals, flips and slides, shoes, and boots under the Crocs brand name. The company sells its products in approximately 90 countries through domestic wholesalers, as well as international wholesalers and distributors; and stores and e-commerce sites. As of December 31, 2017, it had 161 retail stores; 71 kiosks and store-in-stores; 215 outlet stores; and 13 company-operated e-commerce sites. The company was founded in 1999 and is headquartered in Niwot, Colorado. | $885.0 | $1,023.5 | $72.0 | 12.3 x | 7.0% |
| 3 | Deckers Outdoor Corporation (NYSE: DECK) | Deckers Outdoor Corporation, together with its subsidiaries, designs, markets, and distributes footwear, apparel, and accessories for casual lifestyle use and high performance activities. It offers premium footwear, apparel, and accessories under the UGG brand name; sandals, shoes, and boots under the Teva brand name; and footwear under the Sanuk brand name. The company also provides running footwear and apparel under the Hoka brand name; and fashion casual footwear using sheepskin and other plush materials under the Koolaburra brand. It sells its products through department stores, domestic independent action sports and outdoor specialty footwear retailers, and larger national retail chains, as well as online retailers such as Amazon and Zappos.com. The company also sells its products directly to consumers through its retail stores and e-commerce Websites, as well as distributes its products through distributors and retailers in the United States, Europe, the Asia-Pacific, Canada, Australia, Latin America, and internationally. As of March 31, 2018, it had 165 retail stores, including 98 concept stores and 67 outlet stores worldwide. The company was founded in 1973 and is headquartered in Goleta, California. | $2,499.6 | $1,790.1 | $206.9 | 12.1 x | 11.6% |
| 4 | Geox S.p.A. (BIT: GEO) | Geox S.p.A. creates, produces, promotes, and distributes footwear and apparel for retailers and end consumers in Italy, Europe, North America, and internationally. It operates through two segments, Footwear and Apparel. The company offers shoes and jackets, as well as accessories for men, women, and children under the Geox brand through multi-brand selling points, mono-brand shops, and Geox Shops. As of December 31, 2017, it operated 1,095 Geox Shops, including 656 franchised stores and 439 directly operated stores. The company was founded in 1995 and is headquartered in Montebelluna, Italy. Geox S.p.A. is a subsidiary of LIR S.r.l. | $940.3 | $1,062.1 | $85.9 | 10.9 x | 8.1% |

ANALYSIS GROUP, INC.

TX 419-0011

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2D**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2017**
*S&P Capital IQ Industry: Women's and Girls' Footwear*

($ in millions)

| Guideline No. | Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2017 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 5 | NIKE, Inc. (NYSE: NKE) | NIKE, Inc., together with its subsidiaries, designs, develops, markets, and sells athletic footwear, apparel, equipment, and accessories worldwide. It offers NIKE brand products in nine categories: running, NIKE basketball, the Jordan brand, football, men's training, women's training, action sports, sportswear, and golf. The company also markets products designed for kids, as well as for other athletic and recreational uses, such as cricket, lacrosse, tennis, volleyball, wrestling, walking, and outdoor activities. In addition, it sells sports apparel; and markets apparel with licensed college and professional team and league logos. Further, the company sells a line of performance equipment, including bags, socks, sport balls, eyewear, timepieces, digital devices, bats, gloves, protective equipment, and other equipment under the NIKE brand for sports activities; various plastic products to other manufacturers; athletic and casual footwear, apparel, and accessories under the Jumpman trademark; action sports and youth lifestyle apparel and accessories under the Hurley trademark; and casual sneakers, apparel, and accessories under the Converse, Chuck Taylor, All Star, One Star, Star Chevron, and Jack Purcell trademarks. Additionally, it licenses agreements that permit unaffiliated parties to manufacture and sell apparel, digital devices, and applications and other equipment for sports activities under NIKE-owned trademarks. The company sells its products to footwear stores, sporting goods stores, athletic specialty stores, department stores, skate, tennis and golf shops, and other retail accounts through NIKE-owned retail stores and Internet Websites, mobile applications, independent distributors, and licensees. The company was formerly known as Blue Ribbon Sports, Inc. and changed its name to NIKE, Inc. in 1971. NIKE, Inc. was founded in 1964 and is headquartered in Beaverton, Oregon. | $100,373.5 | $34,350.0 | $5,465.0 | 18.4 x | 15.9% |
| 6 | Skechers U.S.A., Inc. (NYSE: SKX) | Skechers U.S.A., Inc. designs, develops, markets, and distributes footwear for men, women, and children; and performance footwear for men and women under the Skechers GO brand worldwide. It operates through three segments: Domestic Wholesale Sales, International Wholesale Sales, and Retail Sales. The company offers casual boots, shoes, and sandals for men; shoes, oxfords and slip-ons, lug outsole and fashion boots, and casual sandals for women; dress casuals, seasonal sandals and boots, classic and wide fit, and relaxed fit casuals for men and women; and casual athletic line for men and women under the Skechers USA brand. It also provides lightweight sport athletic lifestyle products, classic athletic-inspired styles, and sport sandals and boots under the Skechers Sport brand name; casual and sport styles sneakers, and sandals under the Skechers Active and Skechers Sport Active brand; and sneakers under the Skecher Street brand for millennials, Gen Y's, and young women. In addition, the company offers classic espadrille, and vulcanized and sport footwear under the BOBS from Skechers name; casual, dress, and active styles, as well as boots and accessories for men under the Mark Nason name; technical footwear under the Skechers Performance brand for men and women, as well as under the YOU by Skechers name for women; and boots, shoes, high-tops, sneakers, and sandals for infants, toddlers, boys, and girls under the Skechers Kids name. Further, it provides men's and women's casuals, such as field boots, hikers, and athletic shoes under the Skechers Work name. The company sells its products through department and specialty stores, athletic and independent retailers, boutiques, and Internet retailers, as well as through its e-commerce Websites and own retail stores. As of March 1, 2018, it owned and operated 2,570 company-owned and third-party-owned retail stores. Skechers U.S.A., Inc. was founded in 1992 and is headquartered in Manhattan Beach, California. | $5,394.3 | $4,180.8 | $479.4 | 11.3 x | 11.5% |
| 7 | Stella International Holdings Limited (SEHK: 1836) | Stella International Holdings Limited develops, manufactures, and retails footwear products and leather goods for men and women. The company operates through Men's Footwear, Women's Footwear, and Footwear Retailing and Wholesaling segments. It is also involved in the sale and distribution of footwear; holding of intellectual property rights; and provision of secretary and accounting services. The company operates its stores under the Stella Luna, What For, and JKJY by Stella names. It operates in the United States, the People's Republic of China, the United Kingdom, the Netherlands, Italy, Canada, Japan, Germany, Belgium, Spain, and internationally. The company was founded in 1982 and is based in Kowloon, Hong Kong. | $1,213.0 | $1,577.3 | $80.4 | 15.1 x | 5.1% |

Page 2 of 4

ANALYSIS GROUP, INC.

TX 419-0012

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2D**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2017**
*S&P Capital IQ Industry: Women's and Girls' Footwear*

*($ in millions)*

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2017 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 8 | Steven Madden, Ltd. (NasdaqGS: SHOO) | Steven Madden, Ltd. designs, sources, markets, and sells fashion-forward name brand and private label footwear for women, men, and children worldwide. Its Wholesale Footwear segment provides footwear under the Steve Madden Women's, Madden Girl, Steve Madden Men's, Madden NYC, Dolce Vita, DV by Dolce Vita, Mad Love, Steven by Steve Madden, Report, Superga, Betsey Johnson, Betseyville, Steve Madden Kids, FREEBIRD by Steven, Stevies, B Brian Atwood, Blondo, Kate Spade, and Avec Les Filles brands, as well as private label footwear. The company's Wholesale Accessories segment offers Big Buddha, Madden NYC, Betsey Johnson, Steve Madden, Steven by Steve Madden, Madden Girl, Cejon, B Brian Atwood, Luv Betsey, DKNY, and Donna Karan accessories brands; private label fashion handbags and accessories to department stores, mass merchants, value priced retailers, online retailers, and specialty stores; and cold weather accessories, fashion scarves, wraps, and other trend accessories primarily under Cejon, Steve Madden, Betsey Johnson, and Big Buddha brand names, as well as private labels to department stores and specialty stores. Its Retail segment operates Steve Madden, Steven, Superga, and International retail stores, as well as Steve Madden, Superga, Betsey Johnson, and Dolce Vita e-commerce Websites. As of December 31, 2017, the company owned and operated 206 retail stores. Its First Cost segment operates as a buying agent for footwear products under private labels for mass-market merchandisers, shoe chains, and other mid-tier retailers. The company's Licensing segment licenses its Steve Madden, Steven by Steve Madden, and Madden Girl trademarks. Steven Madden, Ltd. was founded in 1990 and is based in Long Island City, New York. | $2,623.0 | $1,546.1 | $168.9 | 15.5 x | 10.9% |
| 9 | TOD'S S.p.A. (BIT: TOD) | TOD'S S.p.A., together with its subsidiaries, creates, produces, and distributes shoes, leather goods and accessories, and apparel in Italy, Europe, the Americas, and China. It provides shoes and luxury leather goods under the TOD'S brand; shoe collections for women, men, and children under the Hogan brand name; casual wear under the FAY brand; and shoes, handbags, small leather goods, jewelry, and sunglasses under the Roger Vivier brand names. The company distributes its products through directly operated stores (DOS), franchised retail outlets, and independent multi-brand stores. As of December 31, 2016, its distribution network comprised 272 DOS and 107 franchised stores. The company is based in Sant'Elpidio a Mare, Italy. TOD'S S.p.A. is a subsidiary of Diego Della Valle & C. S.A.P.A. | $2,469.5 | $1,180.0 | $186.4 | 13.2 x | 15.8% |

Page 3 of 4

ANALYSIS GROUP, INC.

TX 419-0013

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 2D**
**Market Approach using Guideline Public Companies**
**Indicated Value of Gavrieli Brands, LLC as of December 31, 2017**
*S&P Capital IQ Industry: Women's and Girls' Footwear*

($ in millions)

| No. | Guideline Company[1] | Business Description | Total Enterprise Value ("TEV") as of Dec. 31, 2017 | Total Revenue [LTM] | EBITDA [LTM] | TEV/ EBITDA [LTM] | EBITDA Margin% [LTM] |
|---|---|---|---|---|---|---|---|
| 10 | Wolverine World Wide, Inc. (NYSE: WWW) | Wolverine World Wide, Inc. designs, manufactures, sources, markets, licenses, and distributes footwear, apparel, and accessories. The company operates through four segments: Wolverine Outdoor & Lifestyle Group, Wolverine Boston Group, Wolverine Heritage Group, and Wolverine Multi-Brand Group. It offers casual footwear and apparel; performance outdoor and athletic footwear and apparel; children's footwear; industrial work boots and apparel; and uniform shoes and boots. The company sources and markets a range of footwear styles, such as shoes, boots, and sandals under the Bates, Cat, Chaco, Harley-Davidson, Hush Puppies, HyTest, Keds, Merrell, Saucony, Sebago, Soft Style, Sperry, Stride Rite, and Wolverine brand names. It also markets apparel and accessories under the Merrell and Wolverine brands, as well as licenses its brands for use on non-footwear products, including the Hush Puppies apparel, eyewear, watches, socks, handbags, and plush toys; the Wolverine brand eyewear and gloves; and the Keds, Saucony, Sperry brand apparel. In addition, the company markets pigskin leather under the Wolverine Warrior Leather, Weather Tight, and All Season Weather Leathers trademarks for use in the footwear industry. Wolverine World Wide, Inc. sells its products in the United States, Canada, the United Kingdom, and certain countries in continental Europe and Asia Pacific to department stores, national chains, catalog and specialty retailers, independent retailers, uniform outlets, and mass merchant and government customers through retail stores, as well as through third-party licensees and distributors. As of December 30, 2017, the company operated 81 retail stores, as well as 29 consumer-direct Websites. Wolverine World Wide, Inc. was founded in 1883 and is based in Rockford, Michigan. | $3,512.7 | $2,350.0 | $211.6 | 16.6 x | 9.0% |

| | |
|---|---|
| Min | 10.9 x |
| Median | 14.2 x |
| Mean | 15.9 x |
| 75th % | 16.3 x |
| Max | 33.6 x |

| | |
|---|---|
| [2] Gavrieli Adjusted LTM EBITDA | $26.9 |
| Median Multiple for Comparison Group | 14.2 x |
| Total Enterprise Value using the Median Multiple | $381.6 |
| [3] Control Premium of 20.0% | $76.3 |
| [4] Illiquidity Discount of 15.0% | ($57.2) |
| [5] Gavrieli Excess Cash | $10.3 |
| **Indicated Value of Gavrieli** | **$410.9** |

**Notes:**
[1] Guideline Public Companies are companies that (1) appear in Capital IQ with the S&P Industry Classification of "Women's and Girls' Footwear (Primary)," and (2) produce women's casual shoes for sale in the US.
[2] Gavrieli Adjusted Earnings Before Interest, Tax, Depreciation and Amortization ("EBITDA") values for 2015, 2016, and 2017 are from "Gavrieli Brand LLC, Financial Reports, Tax Return, and Workpapers," adjusted for reasonable compensation. See Exhibit 3C.
[3] Control Premium is estimated as 20%.
[4] Illiquidity Discount is estimated as 15%.
[5] Gavrieli Excess Cash values are assumed to be zero for 2015, zero for 2016, and $10.265 million for 2017. See Exhibit 3C.
**Source:**
Capital IQ.

ANALYSIS GROUP, INC.

TX 419-0014

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 3A**
## Gavrieli Brands, LLC Income Statement
*2012-2017*

| ($ in thousands) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| **Net Sales:** | **4,655** | **12,452** | **11,633** | **19,287** | **49,218** | **50,089** |
| *Annual Growth* | | *167 %* | *(7%)* | *66 %* | *155 %* | *2 %* |
| Cost of Goods Sold: | 1,208 | 3,460 | 3,818 | 5,396 | 12,237 | 12,228 |
| *% of Net Sales* | *26 %* | *28 %* | *33 %* | *28 %* | *25 %* | *24 %* |
| **Gross Profit:** | **3,447** | **8,992** | **7,815** | **13,892** | **36,981** | **37,861** |
| *% of Net Sales* | *74 %* | *72 %* | *67 %* | *72 %* | *75 %* | *76 %* |
| **Expenses:** | | | | | | |
| Advertising and Marketing Expense | 1,358 | 1,195 | 541 | 1,682 | 5,455 | 5,594 |
| Salaries and Wages Expense | 159 | 477 | 621 | 663 | 851 | 1,354 |
| Legal Fees | 230 | 260 | 724 | 446 | 791 | 738 |
| Office Rent Expense | 0 | 0 | 154 | 566 | 534 | 548 |
| Outside Services | 148 | 262 | 257 | 311 | 630 | 163 |
| Website Development Expense | 13 | 152 | 180 | 176 | 179 | 179 |
| Total Insurance Expense | 16 | 50 | 95 | 120 | 147 | 211 |
| Employee Meals and Events | 7 | 30 | 96 | 96 | 134 | 139 |
| Other Expenses | 209 | 344 | 325 | 394 | 422 | 757 |
| **Total Expenses:** | **2,139** | **2,770** | **2,993** | **4,453** | **9,144** | **9,682** |
| *% of Net Sales* | *46 %* | *22 %* | *26 %* | *23 %* | *19 %* | *19 %* |
| **Depreciation & Amortization:** | **0** | **0** | **3** | **24** | **28** | **9** |
| *% of Net Sales* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* |
| **Operating Income (EBIT):** | **1,307** | **6,222** | **4,823** | **9,439** | **27,838** | **28,178** |
| *% of Net Sales* | *28 %* | *50 %* | *41 %* | *49 %* | *57 %* | *56 %* |
| **EBITDA:** | **1,307** | **6,222** | **4,826** | **9,463** | **27,866** | **28,187** |
| *Annual Growth* | | *376 %* | *(22%)* | *96 %* | *194 %* | *1 %* |
| *% of Net Sales* | *28 %* | *50 %* | *41 %* | *49 %* | *57 %* | *56 %* |
| Other Income: | 109 | 31 | 2 | 0 | 7 | 0 |
| *% of Net Sales* | *2 %* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* |
| **Pre-Tax Income:** | **1,198** | **6,191** | **4,820** | **9,439** | **27,830** | **28,178** |
| *% of Net Sales* | *26 %* | *50 %* | *41 %* | *49 %* | *57 %* | *56 %* |
| Provision for Income Taxes: | 5 | 8 | 28 | 14 | 0 | 19 |
| *% of Net Sales* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* |
| **Net Income:** | **1,193** | **6,183** | **4,792** | **9,425** | **27,830** | **28,159** |
| *% of Net Sales* | *26 %* | *50 %* | *41 %* | *49 %* | *57 %* | *56 %* |

**Sources:** 2012-2017 "Gavrieli Brand LLC, Financial Reports, Tax Return, and Workpapers."

ANALYSIS GROUP, INC.

TX 419-0015

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 3B**
**Gavrieli Brands, LLC Balance Sheet**
*2012-2017*

*($ in thousands)*

| Assets: | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| **Current Assets:** | | | | | | |
| Cash and Cash Equivalents:[1] | $96 | $139 | $249 | $802 | $3,540 | $13,868 |
| *% of Total Assets* | *11 %* | *2 %* | *3 %* | *7 %* | *23 %* | *55 %* |
| *% of Net Sales* | *2 %* | *1 %* | *2 %* | *4 %* | *7 %* | *28 %* |
| Accounts Receivable:[2] | 0 | 0 | 37 | 25 | 101 | 80 |
| *% of Total Assets* | *0 %* | *0 %* | *0 %* | *0 %* | *1 %* | *0 %* |
| Inventory: | 422 | 2,584 | 7,210 | 7,882 | 10,308 | 9,451 |
| *% of Total Assets* | *48 %* | *46 %* | *88 %* | *66 %* | *66 %* | *37 %* |
| Prepaid Expenses & Other: | 356 | 2,944 | 706 | 3,014 | 1,542 | 1,805 |
| *% of Total Assets* | *41 %* | *52 %* | *9 %* | *25 %* | *10 %* | *7 %* |
| **Total Current Assets:** | **874** | **5,666** | **8,202** | **11,724** | **15,491** | **25,205** |
| *% of Total Assets* | *100 %* | *100 %* | *100 %* | *98 %* | *99 %* | *100 %* |
| **Long-Term Assets:** | | | | | | |
| Leasehold Improvements: | 0 | 0 | 0 | 189 | 227 | 84 |
| *% of Total Assets* | *0 %* | *0 %* | *0 %* | *2 %* | *1 %* | *0 %* |
| Camera Equipment: | 0 | 0 | 0 | 0 | 4 | 3 |
| *% of Total Assets* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* |
| Computer Equipment: | 0 | 0 | 0 | 0 | 0 | 2 |
| *% of Total Assets* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* |
| Furniture and Equipment: | 0 | 0 | 17 | 24 | 24 | 0 |
| *% of Total Assets* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* | *0 %* |
| Accumulated Depreciation: | 0 | 0 | (3) | (27) | (55) | (86) |
| **Total Long-Term Assets:** | **0** | **0** | **14** | **186** | **200** | **3** |
| *% of Total Assets* | *0 %* | *0 %* | *0 %* | *2 %* | *1 %* | *0 %* |
| **Total Assets:** | **874** | **5,666** | **8,215** | **11,910** | **15,691** | **25,208** |
| **Liabilities & Shareholders' Equity** | | | | | | |
| **Current Liabilities:** | | | | | | |
| Accounts Payable:[3] | 24 | 20 | 57 | 90 | 191 | 348 |
| *% of Total Assets* | *3 %* | *0 %* | *1 %* | *1 %* | *1 %* | *1 %* |
| **Total Liabilities:** | **24** | **20** | **57** | **90** | **191** | **348** |
| *% of Total Assets* | *3 %* | *0 %* | *1 %* | *1 %* | *1 %* | *1 %* |
| **Equity:** | | | | | | |
| Prior Period Adjustment: | 0 | 0 | 0 | 0 | 0 | 11,022 |
| Draws/Distributions: | | | | | | |
| Draws Dean/Dikla: | (88) | (106) | (356) | (598) | (2,164) | (7,300) |
| Draws Kfir: | (235) | (201) | (164) | (476) | (1,969) | (5,783) |
| Draws Elram: | (83) | (76) | (19) | (5) | (5) | (1,230) |
| Draws Mira: | (40) | (187) | (246) | (403) | (274) | (322) |
| Draws Yamit: | 0 | 0 | (0) | (141) | (31) | (125) |
| Kiva Distributions: | (53) | (188) | (900) | (300) | (300) | 0 |
| Hong Kong Distributions: | 0 | (596) | (496) | (2,932) | (9,195) | 0 |
| Other Distributions:[4] | (156) | (96) | (104) | (929) | (10,227) | (4,499) |
| Total Distributions: | (655) | (1,449) | (2,286) | (5,784) | (24,166) | (19,260) |
| Retained Earnings: | 92 | 850 | 5,646 | 8,179 | 11,821 | 4,938 |
| Net Income: | 1,412 | 6,246 | 4,797 | 9,425 | 27,845 | 28,159 |
| **Total Equity:** | **850** | **5,646** | **8,158** | **11,820** | **15,500** | **24,860** |
| *% of Total Assets* | *97 %* | *100 %* | *99 %* | *99 %* | *99 %* | *99 %* |
| **Total Liabilities & Equity:** | **874** | **5,666** | **8,215** | **11,910** | **15,691** | **25,208** |

**Notes:**
[1] Cash and Cash Equivalents includes checking, savings, PayPal, and Transfer Exchange accounts.
[2] Accounts Receivable includes merchant receipts in transit from AMEX 3341, Braintree 73dw, and Bank of America x3618.
[3] Accounts Payable includes credit cards, merchant fees, and sales tax payable.
[4] Other distributions include investments and unidentified distributions.
**Sources:** 2012-2017 "Gavrieli Brand LLC, Financial Reports, Tax Return, and Workpapers."

ANALYSIS GROUP, INC.

TX 419-0016

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 3C**
**Two-Stage Income Approach Model**
*Indicated Value of Gavrieli Brands, LLC as of December 31*

| ($ in thousands) | 2015 | 2016 | 2017 | |
|---|---|---|---|---|
| **Net Sales:** | $19,287 | $49,218 | $50,089 | [A] |
| *Annual Growth* | *66 %* | *155 %* | *2 %* | |
| **Operating Income (EBIT):** | 9,439 | 27,838 | 28,178 | [B] |
| *% of Net Sales* | *49 %* | *57 %* | *56 %* | |
| Adjustment for Reasonable Compensation:[1] | (1,250) | (1,250) | (1,250) | [C] |
| **EBIT Adjusted for Reasonable Compensation:** | 8,189 | 26,588 | 26,928 | [D]=[B]+[C] |
| *% of Net Sales* | *42 %* | *54 %* | *54 %* | |
| **Depreciation:** | 24 | 28 | 9 | [E] |
| *% of Net Sales* | *0 %* | *0 %* | *0 %* | |
| **EBITDA Adjusted for Reasonable Compensation:** | 8,213 | 26,616 | 26,937 | [F]=[D]+[E] |
| *% of Net Sales* | *43 %* | *54 %* | *54 %* | |
| **Imputed Taxes:** | 2,866 | 9,306 | 5,386 | [G]=Tax Rate*[D] |
| *Tax Rate [2]* | *35 %* | *35 %* | *20 %* | |
| **Adjusted Net Income:** | 5,323 | 17,282 | 21,543 | [H]=[D]-[G] |
| Current Assets (excluding excess cash):[3] | 11,724 | 15,491 | 14,940 | [I] |
| Current Liabilities: | (90) | (191) | (348) | [J] |
| **Working Capital:** | 11,634 | 15,300 | 14,591 | [K]=[I]+[J] |
| Prior Year Working Capital: | 8,144 | 15,300 | | |
| **Change in Working Capital:** | 3,490 | 3,666 | (709) | [L]=[K]$_{(t)}$-[K]$_{(t-1)}$ |
| **PP&E:** | 24 | 28 | 6 | [M] |
| **Prior Year PP&E:** | 17 | | | |
| **Capital Expenditures:** | 31 | 32 | (14) | [N]=[M]$_{(t)}$-[M]$_{(t-1)}$+[E] |
| **Free Cash Flow:** | 1,826 | 13,612 | 22,274 | [O]=[D]-[G]+[E]-[L] -[N] |
| **Stage 1: Projection Period** | | | | |
| Free Cash Flow:[4] | 20,986 | 67,424 | 68,874 | [P] |
| **Present Value:[5]** | 17,904 | 57,798 | 59,694 | [Q] |
| **Stage 2: Terminal Value[6]** | | | | |
| **Present Value:[5]** | 106,284 | 320,395 | 279,277 | [R] |
| **Indicated Value:** | 124,188 | 378,193 | 338,972 | [S]=[Q]+[R] |
| Excess Cash: | 0 | 0 | 10,265 | [T] |
| **Indicated Value: Income Approach** | 124,188 | 378,193 | 349,237 | [U]=[S]+[T] |
| **Control Premium of 20.0%[7]** | 24,838 | 75,639 | 67,794 | [V]=[S]*20% |
| **Illiquidity Discount of 15.0%[8]** | (18,628) | (56,729) | (50,846) | [W]=[S]*15% |
| **Indicated Value of Gavrieli** | 130,398 | 397,102 | 366,186 | [X]=[U]+[V]+[W] |

| | Stage 1 2016-2018 | Stage 2 2019+ | Stage 1 2017-2019 | Stage 2 2020+ | Stage 1 2018-2020 | Stage 2 2021+ |
|---|---|---|---|---|---|---|
| Discount Rate: | 10% | 10% | 10% | 10% | 10% | 10% |
| Growth Rate: | 35% | 3% | 25% | 3% | 5% | 3% |
| Number of Years: | 3 | | 3 | | 3 | |

ANALYSIS GROUP, INC.

**196**

TX 419-0017

*Privileged and Confidential*
*Attorney Work Product*

**Notes:**

[1] Adjustment for reasonable compensation includes salaries for executives totaling $1 million, plus 25% in benefits. See, Bureau of Labor Statistics, "Occupational Employment and Wages, May 2016." See also, Bureau of Labor Statistics, "May 2016 National Industry-Specific Occupational Employment and Wage Estimates, NAICS 454100 - Electronic Shopping and Mail-Order Houses."

[2] Tax rate is assumed to be 35% for 2015 and 2016 and 20% for 2017.

[3] Operating cash for 2015 and 2016 is assumed to be equal to total cash. Operating cash for 2017 is calculated as total cash as a percentage of sales for 2016 (7.2%) multiplied by 2017 net sales; any remaining cash is assumed to be excess cash.

[4] I estimate projected free cash flow for Stage 1 as follows:

    A) Free cash flow before changes in working capital for year zero (e.g., 2015 for the valuation as of December 31, 2015) is increased by the indicated Stage 1 growth rates for each of the three years in Stage 1.

    B) Annual changes in working capital during Stage 1 are assumed to equal 31.8% (the average ratio of working capital to sales in 2012 and 2013) of the projected changes in annual sales. Annual sales are assumed to increase from their levels in year zero at the indicated Stage 1 rate.

    C) Projected free cash flow equals projected free cash flow before changes in working capital (from step A) minus projected changes in working capital.

[5] Present value of free cash flows is calculated using the mid-year discounting convention.

[6] Terminal value is calculated as: [projected free cash flow in Stage 1 year three*(1+g)]/(r-g), where g is the indicated growth rate for Stage 2 and r is the discount rate.

[7] Control Premium is estimated as 20%.

[8] Illiquidity discount is estimated as 15%.

**Sources:** Exhibits 3A, 3B, 3D, and 3E.

ANALYSIS GROUP, INC.

TX 419-0018

*Privileged and Confidential*
*Attorney Work Product*

**Exhibit 3D**
## Gavrieli Brands, LLC WACC Assuming Median Industry Capital Structure
*(Industry Beta from Duff & Phelps)*

|  | 2015 | 2016 | 2017 |  |
|---|---|---|---|---|
| **Cost of Debt** | | | | |
| Risk Free Rate[1] | 2.67% | 2.79% | 2.58% | [A] |
| Default Spread[2] | 0.70% | 1.00% | 0.80% | [B] |
| Pre-Tax Cost of Debt | 3.37% | 3.79% | 3.38% | [C]=[A]+[B] |
| Tax Rate[3] | 35.00% | 35.00% | 20.00% | [D] |
| After-Tax Cost of Debt | 2.19% | 2.46% | 2.70% | [E]=[C]*(1-[D]) |
| **Cost of Equity** | | | | |
| Risk Free Rate[1] | 2.67% | 2.79% | 2.58% | [F] |
| Beta[4] | 0.76 | 0.62 | 0.92 | [G] |
| Equity Risk Premium[5] | 5.00% | 5.50% | 5.00% | [H] |
| Size Premium[6] | 4.07% | 4.14% | 3.94% | [I] |
| Cost of Equity | 10.54% | 10.34% | 11.12% | [J]=[F]+[G]*[H]+[I] |
| **Weighted Average Cost of Capital** | | | | |
| Assumed D/V[7] | 2.11% | 3.87% | 4.31% | [K] |
| Assumed E/V[8] | 97.89% | 96.13% | 95.69% | [L] |
| Weighted Average Cost of Capital | 10.36% | 10.03% | 10.75% | [M]=[E]*[K]+[J]*[L] |
| **Rounded Discount Rate** | **10.00%** | **10.00%** | **11.00%** | |

**Notes & Sources:**
[1] The 20-year Treasury yield with constant maturity as of each valuation date. See, Federal Reserve Economic Data, 20-Year Treasury Constant Maturity Rate (DGS20), https://fred.stlouisfed.org/series/DGS20.
[2] The default spread as of each valuation date is based on an Aa2/AA credit rating, available at people.stern.nyu.edu/adamodar/pc/datasets.
[3] Tax rate is assumed to be 35% for 2015 and 2016 and 20% for 2017.
[4] Beta is the full information beta for SIC code (566 Shoe Stores). See, Duff & Phelps Cost of Capital Navigator.
[5] Duff & Phelps recommended equity risk premium as of each valuation date from the Duff & Phelps Cost of Capital Navigator.
[6] The average of the size premia in excess of the risk free rate and equity risk premium for the 9th and 10th deciles as of each valuation date. See, Duff & Phelps Cost of Capital Navigator.
[7] Gavrieli's assumed debt as a percentage of equity plus debt is equal to the median debt as a percentage of equity plus debt of the guideline public companies as of each valuation date. For this calculation I use each company's market value of equity and book value of debt as reported by Capital IQ (market value of debt is not available on Capital IQ).
[8] Gavrieli's assumed equity as a percentage of equity plus debt is equal to the median equity as a percentage of equity plus debt of the guideline public companies as of each valuation date. For this calculation I use each company's market value of equity and book value of debt as reported by Capital IQ (market value of debt is not available on Capital IQ).

ANALYSIS GROUP, INC.

TX 419-0019

*Privileged and Confidential*
*Attorney Work Product*

## Exhibit 3E
### Gavrieli Brands, LLC WACC Assuming Median Industry Capital Structure
*(Cost of Equity using Build-up Method from Duff & Phelps)*

| | 2015 | 2016 | 2017 | |
|---|---|---|---|---|
| **Cost of Debt** | | | | |
| Risk Free Rate[1] | 2.67% | 2.79% | 2.58% | [A] |
| Default Spread[2] | 0.70% | 1.00% | 0.80% | [B] |
| Pre-Tax Cost of Debt | 3.37% | 3.79% | 3.38% | [C]=[A]+[B] |
| Tax Rate[3] | 35.00% | 35.00% | 20.00% | [D] |
| After-Tax Cost of Debt | 2.19% | 2.46% | 2.70% | [E]=[C]*(1-[D]) |
| | | | | |
| **Cost of Equity** | | | | |
| Risk-Free Rate[1] | 2.67% | 2.79% | 2.58% | [F] |
| Equity Risk Premium[4] | 5.00% | 5.50% | 5.00% | [G] |
| Industry Premium[5] | (1.45%) | (2.27%) | (0.48%) | [H] |
| Size Premium[6] | 4.07% | 4.14% | 3.94% | [I] |
| Cost of Equity | 10.29% | 10.16% | 11.04% | [J]=[F]+[G]+[H]+[I] |
| | | | | |
| **Weighted Average Cost of Capital** | | | | |
| Assumed D/V[7] | 2.11% | 3.87% | 4.31% | [K] |
| Assumed E/V[8] | 97.89% | 96.13% | 95.69% | [L] |
| Weighted Average Cost of Capital | 10.12% | 9.86% | 10.68% | [M]=[E]*[K]+[J]*[L] |
| | | | | |
| **Rounded Discount Rate** | **10.00%** | **10.00%** | **11.00%** | |

**Notes & Sources:**

[1] The 20-year Treasury yield with constant maturity as of each valuation date. See, Federal Reserve Economic Data, 20-Year Treasury Constant Maturity Rate (DGS20), https://fred.stlouisfed.org/series/DGS20.

[2] The default spread as of each valuation date is based on an Aa2/AA credit rating, available at people.stern.nyu.edu/adamodar/pc/datasets.

[3] Tax rate is assumed to be 35% for 2015 and 2016 and 20% for 2017.

[4] Duff & Phelps recommended equity risk premium as of each valuation date from the Duff & Phelps Cost of Capital Navigator.

[5] The industry risk premium is the Long-term Supply-Side Equity Risk Premia for SIC code (5661 Shoe Stores). See, Duff & Phelps Cost of Capital Navigator.

[6] The average of the size premia in excess of the risk free rate and equity risk premium for the 9th and 10th deciles as of each valuation date. See, Duff & Phelps Cost of Capital Navigator.

[7] Gavrieli's assumed debt as a percentage of equity plus debt is equal to the median debt as a percentage of equity plus debt of the guideline public companies as of each valuation date. For this calculation I use each company's market value of equity and book value of debt as reported by Capital IQ (market value of debt is not available on Capital IQ).

[8] Gavrieli's assumed equity as a percentage of equity plus debt is equal to the median equity as a percentage of equity plus debt of the guideline public companies as of each valuation date. For this calculation I use each company's market value of equity and book value of debt as reported by Capital IQ (market value of debt is not available on Capital IQ).

ANALYSIS GROUP, INC.

TX 419-0020

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10250 Constellation Blvd., Suite 1100, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*):
COMPLAINT FOR: 1. NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523; 2. NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523; 3. CONTRACTUAL INDEMNITY; AND 4. UNJUST ENRICHMENT; VERIFIED DERIVATIVE CLAIMS FOR: 5. EXPULSION OF DEBTOR AS MEMBER OF GAVRIELI BRANDS, LLC; 6. APPOINTMENT OF RECEIVER; 7. BREACH OF FIDUCIARY DUTY; 8. CORPORATE WASTE; 9. CONVERSION; 10. UNJUST ENRICHMENT; 11. VIOLATION OF CALIFORNIA PENAL CODE § 496; 12. ACCOUNTING; AND 13. NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ___February 19, 2021___, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

William H Brownstein (Brownsteinlaw.bill@gmail.com)
William N Lobel (wlobel@tocounsel.com)
Kerri A Lyman (klyman@steptoe.com)
Jeffrey M. Reisner (jreisner@steptoe.com)

Eryk R Escobar (eryk.r.escobar@usdoj.gov)
Kenneth G Lau (kenneth.g.lau@usdoj.gov)

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _February 19, 2021_, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**By Overnight Mail**
Honorable Sheri Bluebond
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1534 / Courtroom 1539
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| February 19, 2021 | Aimee Mandel | *(signature)* |
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.