CHRISTOPHER E. PRINCE (SBN 183553)
  cprince@lesnickprince.com
LISA R. PATEL (SBN 341574)
  lpatel@lesnickprince.com
LESNICK PRINCE PAPPAS & ALVERSON LLP
315 W. Ninth Street, Suite 705
Los Angeles, CA  90015
Telephone:  (213) 493-6496
Facsimile:   (213) 493-6596

Attorney for Plaintiff Dikla Gavrieli, individually
and derivatively on behalf of Gavrieli Brands,
LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>KFIR GAVRIELI,<br><br>       Debtor. | Case No.  2:21-bk-10826-BB<br><br>Chapter 11 |
| DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, individually and derivatively on behalf of GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>       Plaintiff,<br><br>  v.<br><br>KFIR GAVIELI, an individual,<br><br>       Defendant.<br><br>-and-<br><br>GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>       Nominal Defendant. | Adv. No.  2:21-ap-01034-BB<br><br>**NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND COMPLAINT TO ADD ALLEGATIONS REGARDING WAYFAIR LIABILITY AND MODIFICATION OF SCHEDULING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF DIKLA GAVRIELI UNATIN AND DANIEL SCHECTER IN SUPPORT THEREOF**<br><br>Hearing Information:<br>Date: May 12, 2026<br>Time: 2:00 p.m.<br>Place: Courtroom 1539<br>    255 E. Temple Street<br>    Los Angeles, CA 90012<br>    Or Remotely Via ZoomGov |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, at the above-referenced date, time and location, or as soon thereafter as the matter may be heard, Plaintiff Dikla Gavrieli a/k/a Dikla Gavrieli Unatin, individually and derivatively on behalf of Gavrieli Brands, LLC ("Plaintiff"), will and hereby does move the Court (the "Motion") for an order granting Plaintiff leave to file a Fourth Amended Complaint (the "FAC") (a relined copy of which is attached to this Motion) and a modification of the Court's Scheduling Order in this case to permit limited additional discovery and motion practice.

This Motion is made pursuant to Federal Rule of Civil Procedure 15(a)(2), made applicable by Federal Rule of Bankruptcy Procedure 7015, on the grounds that Plaintiff has acted diligently in seeking leave to amend and that leave will not prejudice Defendant Kfir Gavrieli. No trial date has been set, and the case remains at a stage where any additional discovery related to the proposed amendments can be conducted without disrupting the schedule or imposing undue burden. Moreover, the proposed amendments are based on information obtained in this action, rather than on previously available facts, further supporting Plaintiff's diligence.

PLEASE TAKE FURTHER NOTICE that this Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, Declarations of Dikla Gavrieli Unatin and Daniel Schecter, all other papers, documents, or exhibits that may be filed in support of this Motion, and the argument of counsel made at the hearing.

PLEASE TAKE FURTHER NOTICE that Local Bankruptcy Rule 9013-1(f) requires that any response must be filed with the Court and served on the parties no less than 14 days before the hearing on the Motion. The failure to timely respond to this Motion may be deemed to be consent to the relief requested in this Motion.

DATED: April 20, 2026                    LESNICK PRINCE PAPPAS & ALVERSON LLP


                                   By: /s/ Christopher E. Prince
                                       Christopher E. Prince
                                       Counsel for Plaintiff Dikla Gavrieli a/k/a Dikla
                                       Gavrieli Unatin, individually and derivatively on
                                       behalf of Gavrieli Brands, LLC

3

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Kfir Gavrieli has knowingly and intentionally caused Gavrieli Brands LLC (the "Company") to evade sales tax obligations throughout the United States. This problem was completely avoidable.  With a few mouse clicks on a computer, Kfir could have enabled the collection of sales tax from customers who purchase shoes through the Company's website. Instead, Kfir has exposed the Company (and himself) to a massive multimillion dollar tax liability, a *per se* breach of fiduciary duty.

Kfri's breach of fiduciary duty is particularly concerning because the Plan is now in default and Kfir's ownership interest in the Company is headed for liquidation.  In other words, Kfir remains in control of the Company even though he no longer has genuine economic interest in it.

As this Court is aware, this bankruptcy case arose out of Defendant Kfir Gavrieli's self-proclaimed "nuclear war" against Plaintiff Dikla Gavrieli Unatin and her husband, Dean Unatin. Kfir's war goals were and are simple: (1) to steal control of the Company and its profits from the Unatins; and (2) to, in his own words, "destroy" the Unatins and "leave them with nothing."   In light of his explicit threats, and concerned about Kfir's stewardship of the Company, Dikla filed an adversary complaint against Kfir.

A central premise underlying Dikla's complaint was simple. Dikla alleged that Kfir was sabotaging the Company's financial performance to gain leverage in settlement negotiations and, failing that, to deprive Dikla of financial resources:

> Debtor's plan is transparent: He is trying to force Dikla to capitulate, hoping she will sell her interest in the Company to him for a fraction of its worth. He has gone so far as to put the Company into freefall since unlawfully seizing control over three years ago.

[Complaint, Adv. Dkt. No. 1, ¶ 4.]

Throughout challenges to her pleadings, her allegations of mismanagement and breach of fiduciary duty remained largely the same:

> In particular, Defendant is acting willfully and intentionally to

depress the Company's value to try to increase Plaintiff's financial distress, with the ultimate goal of obtaining Plaintiff's ownership interest in the Company for pennies on the dollar.

….

Plaintiff is informed and believes, and alleges thereon, that Defendant's complete inaction in the face of the Company's decline and implosion was to serve his own personal interests in trying to force Plaintiff to sell her ownership interest at a minimal value. In doing so, he breached his fiduciary duties to the Company by putting his personal interest in buying out his coowner above the Company's.

[Third Amended Complaint, Adv. Dkt. No. 128, ¶ 32, 35.]

Long after Dikla filed her operative complaint (the Third Amended Complaint), Dikla discovered additional information regarding Kfir's mismanagement and breach of fiduciary duty. Specifically, Kfir's counsel (Mr. Reisner) told Dikla's counsel (Mr. Schecter) that Kfir was choosing to ignore the Company's legal obligation to collect, report, and remit sales tax for sales to customers outside of California. Kfir's counsel gave an estimate that this created a liability for unpaid sales tax in "the range of $5-10 [million]."

The sales tax liability is known as a *Wayfair* liability, named after the Supreme Court decision in *South Dakota v. Wayfair, Inc.*, 585 U.S. 162 (2018).  In *Wayfair*, the Court overturned prior precedent that precluded states from taxing companies with no physical presences in the state.  Since *Wayfair*, states have been permitted to collect sales taxes from companies with no physical presence in the state if they have a sufficient economic nexus to the state.

The multimillion-dollar *Wayfair* liability is particularly significant because (1) it was easily avoidable through the simple process of enabling collection of sales tax on the Company's website; and (2)  Kfir has overseen a precipitous decline in the Company's overall financial position making the *Wayfair* liability potentially catastrophic.

In 2017, when Kfir locked the Unatins out of the Company, the Company generated tens of millions in sales and profits. After Kfir took control of the Company, the Company's performance declined every year.  By 2023 Kfir reported the Company's first-ever net loss (totaling $1.65 million). The Company's 2024 financials revealed that losses

had nearly tripled to $4.6 million on just $11 million in sales – a massive and devastating swing from when the Unatins operated the Company.

Kfir's destruction of the Company is also reflected in its bank balance. At the end of 2020 (a month before Kfir filed his Chapter 11 petition), the Company had approximately $20 million in cash on hand. Now, the cash is believed to have dropped to just $5 million. In other words, Kfir has knowingly and intentionally created a *Wayfair* liability that exceeds all of the Company's cash.

Dikla discovered the *Wayfair* liability that Kfir created long after her operative complaint was filed, but the allegations she seeks to add in her proposed amended complaint fall squarely within the general allegations of the currently operative complaint: Specifically, Kfir has breached his fiduciary duty as part of his larger goal of depriving Dikla of financial resources and forcing her to sell her interest in the Company at a deep discount. To the extent an amended complaint is necessary, Dikla asks for leave of court to amend her complaint to include specific allegations relating to collection of sales taxes.  Dikla also requests a limited modification of the scheduling order to permit discovery and motion practice regarding these issues.

## II.    THE "*WAYFAIR*" ISSUE

Since he unlawfully ousted the Unatins from the Company in late 2017, Kfir has controlled the Company exclusively. [Declaration of Dikla Gavrieli Unatin, ¶ 2.] As described below and in the attached Declarations, Kfir has caused the Company to violate state sales tax laws throughout the country by failing to collect, report, and remit required sales tax. [*See, e.g.*, Declaration of Daniel Schecter, ¶ 2; Dikla Declaration, ¶¶ 3-8.]

In October 2025, the Unatins received the Company's financials for 2024 for the first time. [Dikla Declaration, ¶ 3.]  No information or analysis regarding *Wayfair* was provided.  However, it appears from those financials that no steps have been taken to stop

or rectify Kfir's ongoing sales tax misconduct. [Dikla Declaration, ¶ 4.]

### A. The Company Is Required To File Returns And Pay Sales Tax In All States That Collect Sales Tax.

Prior to 2018, longstanding Supreme Court precedent precluded states from collecting sales tax from sellers with no physical presence in their state. *See National Bellas Hess v. Department of Revenue*, 386 U.S. 753 (1967). With the explosive growth of internet sales, the public, lower courts, and individual justices on the Supreme Court began to question the fairness of this rule.

Eventually, the Supreme Court took the issue up again, resulting in considerable national media attention.[1] On June 21, 2018, the Court reversed its prior rulings. *South Dakota v. Wayfair, Inc.*, 585 U.S. 162 (2018). The *Wayfair* decision established an "economic nexus" test, thereby allowing states to impose sales tax obligations on out-of-state businesses based solely on their sales volume or transaction count, even without a physical presence.

Post-*Wayfair*, every state that imposes sales tax requires remote sellers to collect and remit sales tax once their sales exceed a specific economic threshold. *See* Sales Tax Institute, *Economic Nexus State by State Chart*, https://www.salestaxinstitute.com/resources/economic-nexus-state-guide (last visited Dec. 16, 2025).

### B. Kfir Is Knowingly Violating State Sales Tax Law Throughout The Country.

The Unatins learned of the Company's *Wayfair* issues from Kifr's counsel. In an email to Daniel Schecter dated March 19, 2024, Jeffrey Reisner described the Company's

---

[1] *See, e.g.,* David J. Herzig, *States Pay the Price When You Buy Online*, N.Y. TIMES, Jan. 1, 2018; Brent Kendall & Richard Rubin, *Supreme Court to Consider Internet Sales Tax Collection*, WALL ST. J., Jan. 12, 2018; Jess Bravin, *Trump Administration Joins States in Push to Expand Online Sales-Tax Collections*, WALL ST. J., Mar. 6, 2018; Adam Liptak, *Supreme Court Divided on Sales Taxes for Online Purchases*, N.Y. TIMES, Apr. 17, 2018; Jess Bravin, *Supreme Court Weighs Internet Sales-Tax Case,* WALL ST. J., Apr. 17, 2018.

*Wayfair* liability as follows:

> The Wayfair issue is very straightforward, and $7.5m was meant to be a conservative estimate. Kfir isn't forcing his estimates on you, and you and your clients are entitled to come up with your own (I'd be surprised if you haven't already). Wayfair isn't unique to Tieks, is something many companies have had to catch up on, and there's a lot of public information about it. A phone call to Gary[2] would tell you how to come up with an estimate, which only takes minutes. However, figuring out an exact liability is an expensive, multi-month undertaking that involves hundreds of jurisdictions with unique rules, thresholds, rates, etc, which is not something the Company has done. But for estimation purposes, if you take non-CA sales, which your clients know how to estimate, for the past three years (~$55m) and apply a blended state plus city sales tax rate of 8% (Gary's suggestion), you get to approximately $4.5m. Roughly 20% of states look back 4 or 5 years instead of 3, so $5m is an appropriate estimate. By postponing voluntary disclosures to states, Kfir has lowered the liability, since sales have dropped so steeply at the Company. Of course, if states start reaching out to the Company, which they haven't, and insist on going back further than 3-5 years and charging interest and penalties, then the number can get significantly higher, hence the range of $5-10m. In the meantime, the liability is decreasing.

Schecter Declaration, ¶ 2.

The Company's 2024 financials, received by the Unatins from the Company's accountant in late 2025 and the most recent information provided to the Unatins, suggest that no steps have been taken to stop or correct the issue. [Dikla Declaration, ¶¶ 3-4.] For example, the Company's sales tax workpapers indicate that no sales tax payments were made outside of California in 2024, and the Company's balance sheet does not reflect sales tax liabilities to any other states. [Dikla Declaration, ¶ 4.]

In addition, review of the Company's website indicates that the Company collects no sales tax for sales outside of California, with one recent exception. [Dikla Declaration, ¶ 5.] It appears that the Company is currently collecting sales tax for sales in Wisconsin. [*Id*.] Unfortunately, this is not a sign that Kfir has seen the light and is voluntarily

---

[2] "Gary" is a reference to Gary Howard, a forensic accountant.

8

complying with state law. Rather, it appears that the State of Wisconsin forced his hand.

A review of the limited bank activity available indicates an unusual transaction dated July 18, 2025 in the amount of $1,483.42 to "WI DEPT REVENUE." [Dikla Declaration, ¶ 6.] The "WI DEPT REVENUE" almost certainly refers to the State of Wisconsin Department of Revenue, which collects sales tax for Wisconsin. *Id*. Further review revealed a "Misc. debit" for $233,670.83 for May 5, 2025 with the description "COAL-05APR25-508" and another for $3,289.87 on July 14, 2025 with the description "COAL-13Jun25-464." [Dikla Declaration, ¶ 7.]  COAL likely stands for "Court Ordered Action Levy" which suggests a taxing authority, likely Wisconsin, levied the Company's bank account. [*Id*.]

The apparent Wisconsin enforcement actions are evidence that the Company's sales tax liabilities need to be addressed promptly. Wisconsin has a sales tax of five percent. If the levy represented only unpaid taxes for 2024, the amount would reflect sales tax on nearly $5 million in sales in Wisconsin. However, the Company's total sales in 2024 were $11 million, and Wisconsin represents less than two percent of the United States' population.  Therefore, the levy amount suggests that Wisconsin collected taxes for multiple tax years and may have collected substantial interest and penalties.

**C.    In Addition to the *Wayfair* Issue, Kfir Is Causing The Company To Report False Sales Figures To California Taxing Authorities.**

Review of the Company's past sales tax data also reveals another troubling indication of fraud by Kfir.  Although the Company collects sales taxes in California, it appears Kfir has long caused the Company to report false sales numbers to California taxing authorities and is potentially underpaying California sales taxes. For example, since seizing sole control of the Company, the Company's sales tax filings show 15 quarters where Kfir reported the Company's California sales incredibly at exactly ten percent of total sales, even when rounded out to an astounding thousandth of a percent. [Dikla Declaration, ¶ 8.] Statistically, this is so improbable that it can be considered impossible.

The ten percent figure Kfir reported for years is not only arbitrary and, therefore, inaccurate, but it may also substantially underreport the Company's California

sales and tax. [*Id.*]  When the Unatins operated the Company, the Company never observed or reported less than 12% of its sales from California, and often significantly higher.  And the Company did not experience consecutive quarters with the exact same California sales percentage, let alone an inconceivable 15 consecutive quarters as reported by Kfir. [Dikla Declaration, ¶ 8.]  If the Company's true California sales percentage did in fact remain above 10% as suggested by prior years, and Kfir underreported California sales at 10%, then Kfir has caused the Company to collect more in sales taxes than it remits to the taxing authorities – the cardinal sin of sales tax evasion.

### D.    The Tax Issues Compound The Company's Precarious Financial Position.

When the Unatins operated the Company, it was highly successful. In 2017, the Company generated tens of millions in sales and profits. [Dikla Declaration, ¶ 9.] Under Kfir's unlawful sole control, the Company's financial performance has declined dramatically. Sales and profits have dropped in each successive year. [Dikla Declaration, ¶ 10.] In 2023, Kfir reported the Company's first-ever loss, which totaled $1.65 million. [*Id.*]  Since then, the numbers have become far worse. The recently received 2024 financials reveal a massive $4.6 million loss on just $11 million in sales. [*Id.*]

The Company's decline under Kfir is also reflected in its bank balance.  At the end of 2020 (a month before Kfir filed his Chapter 11 petition), the Company had approximately $20 million in cash on hand. [Dikla Declaration, ¶ 11.] Now, its cash is believed to be just $5 million, and there are concerns that the *Wayfair* liability Kfir has knowingly generated may well exceed its available cash. [*Id.*]

## III.    PROCEDURAL BACKGROUND

The Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on February 1, 2021 (the "Petition Date"). The Debtor scheduled approximately $64 million in assets and $43 million in liabilities.  [Debtor's Summary of Assets and Liabilities, Docket No. 16].  Of the $43 million in liabilities, approximately $31 million related to either tax claims (which have since been fully satisfied), or the judgment

awarded to the Plaintiff in the Los Angeles County Superior Court (the "State Court"). [Schedule D: Creditors who have Claims Secured by Property, Docket No. 19].

The Unatins obtained a judgment in State Court for monetary and punitive damages of approximately $17 million.  The state court also issued extensive non-monetary relief, including a constructive trust in favor of the Plaintiff's interest in funds Debtor maintained in Hong Kong, as well as injunctive relief that enjoins the Debtor from interfering with the Plaintiff's rights as a member and manager of Gavrieli Brands with "the full and uninhibited right of joint control" (the "Permanent Injunction").  The judgment is currently the subject of an appeal to the California Second Appellate District [Case No. B308136] (the "State Court Appeal").

On May 31, 2022, the Court entered an order confirming the Chapter 11 Trustee's Second Amended Plan of Reorganization [Docket Nos. 829, 834] (the "Plan").  The Plan was effective on June 17, 2022.  In connection with the Plan, a "Post-Effective Date Trust" was created (the "Trust"), and Michael Issa was selected to serve as the Post-Effective Date Trustee (hereafter the "Trustee").  Under the Plan, the Debtor does not receive a discharge unless all Plan payments are made (i.e., all claims are paid in full).  *See* Plan, §§ 6.8, 10.3.

**IV.    The Adversary Proceeding**

On February 19, 2021, shortly after the Debtor initiated his bankruptcy case, Plaintiff filed this adversary proceeding against the Debtor. Plaintiff's Third Amended Verified Complaint (hereafter, the "Complaint") alleges the Debtor engaged in misconduct on or after July 22, 2019, through the present, which has harmed Gavrieli Brands, LLC and the Plaintiff.

In the Complaint, Plaintiff, derivatively on behalf of Gavrieli Brands, brings three claims against the Debtor: (1) breach of fiduciary Duty; (2) conversion; (3) corporate waste; and (4) violations of the California Penal Code § 496.

## V.    ARGUMENT

Absent a specific right to amend not applicable here, to amend its complaint, a party must obtain leave of the court or consent of the adverse party. Fed. R. Civ. P. 15(a). "In general, a court should liberally allow a party to amend its pleading." *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (citing Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires")) (*Owens v. Kaiser Found. Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir.2001) ("A district court shall grant leave to amend freely when justice so requires," and "this policy is to be applied with extreme liberality")).

"Courts may decline to grant leave to amend only if there is strong evidence of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc.'" *Sonoma Cnty. Ass'n of Retired Emps.*, 708 F. 3d at 1117 (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

Here, none of the factors warranting denial is present. The PEDT has known about the Wayfair issue for more than a year and has known Dikla intended to include it in this proceeding.  Indeed, Dikla discovered the *Wayfair* issue from Kfir's counsel long after her operative complaint was filed, and information regarding the *Wayfair* issue is entirely within the hands of the PEDT's agent, Kfir.  Dikla has been trying to obtain that information through document requests served on the PEDT and through subpoenas served on the Company and Kfir regarding the *Wayfair* issue in December 2024.

Granting leave will not prejudice the PEDT. No trial date has been set, the pretrial conference has not been conducted, Dikla's deposition is not concluded, and Dean's deposition has not commenced. In light of Rule 15(a)'s liberal standard, and the absence of any countervailing factors, leave to amend is appropriate.

12

### E.  PERSONAL AND PROFESSIONAL CIRCUMSTANCES OF HER COUNSEL CONSTITUTE GOOD CAUSE TO PERMIT AMENDMENT AND A LIMITED REOPENIING OF DISCOVERY.

Lesnick Prince Pappas & Alverson, LLP ("LPPA") first appeared for Dikla at a chapter 11 status conference on March 11, 2025.  [Prince Declaration, ¶2.]  Counsel had just recently been retained at that time and was serving as co-counsel with Dikla's prior counsel (Latham & Watkins).  [*Id*.]  On March 3, 2025, just over a week before the March 11, 2025 status conference, Joseph Sanberg was arrested and his co-conspirator Alhusseini's indictment and plea agreement were unsealed, throwing the bankruptcy case into unforeseen territory.

At the March 11, 2025 status conference, the Court ordered the parties to mediation.  As they had done multiple times before, the parties stipulated to continue the deadlines in the adversaries.  [*Id*.]

In July 2025, LPPA filed a formal notice of appearance in this adversary and in the main chapter 11 case.  [*Id*. at ¶3.]  Shortly thereafter, in August 2025, one of LPPA's non-attorney employees (its only paralegal) went to the emergency room after experiencing unusual back pain.  [*Id*.]  After an initial diagnosis of a spinal fracture, additional tests were conducted, and this person was diagnosed with an underlying illness that is life-threatening.  [*Id*.]  This person has been on disability since that diagnosis and is not expected to return to work.  [*Id*.]  This person worked for LPPA for more than a decade and is an irreplaceable team member.  [*Id*.]

Latham & Watkins formally withdrew as counsel on September 18, 2025.  [*Id*. at ¶4.]  Approximately 10 days prior, on or about September 9, a close family member of the Unatins' lead counsel at LPPA (Mr. Prince) was diagnosed with a serious illness.  [*Id*.]  To treat this illness, this family member had multiple rounds of invasive testing, two surgeries, radiation and other treatments that continue to the present.  [*Id*.]

In December 2025, Kaitlyn Husar, the associate at LPPA who was assigned to this matter, gave notice that she would be leaving the firm to accept a position as a law clerk for Judge Victoria Kaufman.  [*Id*. at ¶5.]  Her last day was in January 2026.  [*Id*.]

Given the size and complexity of LPPA's engagement to represent the Unatins and the personal and professional circumstances described above, allowing the amendment and a limited modification of the scheduling order is appropriate.

**VI.     CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order: (1) granting Plaintiff leave to file the proposed FAC, attached to this Motion as Exhibit A, and (2) for such further relief as the Court deems just and proper.

DATED: April 20, 2026                    LESNICK PRINCE PAPPAS & ALVERSON LLP


By: /s/        Christopher E. Prince
Christopher E. Prince
Counsel for Plaintiff Dikla Gavrieli a/k/a Dikla Gavrieli Unatin, individually and derivatively on behalf of Gavrieli Brands, LLC

## DECLARATION OF DIKLA GAVRIELI UNATIN

1.       I, Dikla Gavrieli Unatin, declare that I am over the age of 18 and, unless indicated otherwise, I have personal knowledge of the facts set forth in this declaration. If called upon to testify, I could and would testify competently to these facts under oath.

2.       Since late 2017, Kfir has controlled Gavrieli Brands (the "Company") exclusively.

3.       In 2024, I was informed through counsel that Kfir was causing the Company to fail to report, collect or remit sales tax outside of California.  This was described to me as the "*Wayfair* issue" or, alternatively, the Company's "*Wayfair* liability."

4.       In October 2025, I received the Company's financials for 2024 for the first time. No information or analysis regarding *Wayfair* liability was provided.  However, it appears from those financials that no steps have been taken to stop or rectify Kfir's ongoing sales tax misconduct.  For example, the Company's sales tax workpapers do not indicate sales tax payments made outside of California in 2024, and the Company's balance sheet does not appear to reflect sales tax liabilities to any other states.

5.       In addition, I reviewed the Company's website and it indicates that the Company collects no sales tax for sales outside of California, with one seemingly recent exception.  It appears that the Company is currently collecting sales tax for sales in Wisconsin.

6.       A review of the limited bank activity available indicates an unusual transaction dated July 18, 2025 in the amount of $1,483.42 to "WI DEPT REVENUE." The "WI DEPT REVENUE" almost certainly refers to the State of Wisconsin Department of Revenue, which collects sales tax for Wisconsin.  Further review revealed a "Misc. debit" for $233,670.83 for May 5, 2025 with the description "COAL-05APR25-508" and another for $3,289.87 on July 14, 2025 with the description "COAL-13Jun25-464." COAL likely stands for "Court Ordered Action Levy."  Excerpts of the relevant bank records are attached to the concurrently filed

compendium of exhibits as Exhibit B.

7.    This suggests a taxing authority, such as Wisconsin, may have levied the Company's bank account. I understand Wisconsin has a sales tax of approximately five to six percent. If the levy represented only unpaid taxes for 2024, the amount would reflect sales tax on well over $4 million in sales in Wisconsin. However, the Company's total sales in 2024 were $11 million, and Wisconsin represents less than two percent of the United States' population.  Therefore, the levy amount suggests that Wisconsin collected taxes for multiple tax years and may have collected substantial interest and penalties.

8.    Review of the Company's past sales tax data also reveals another troubling indication of fraud by Kfir.  Although the Company collects sales taxes in California, it appears Kfir has long caused the Company to report false sales numbers to California taxing authorities and is potentially underpaying California sales taxes. For example, since seizing sole control of the Company, the Company's sales tax filings appear to show 15 quarters where Kfir reported the Company's California sales at exactly ten percent of the Company's total sales, even when rounded out to a thousandth of a percent.

9.    The ten percent figure Kfir reported for years appears not only arbitrary and, therefore, inaccurate, but may also substantially underreport the Company's California sales and tax. I believe when my husband and I operated the Company, the Company consistently reported at least 12% of its sales from California, and often significantly higher.  I do not believe the Company ever experienced consecutive quarters with the exact same California sales percentage, let alone 15 consecutive quarters as reported by Kfir. If the Company's true California sales percentage did in fact remain above 10% as suggested by prior years, and Kfir underreported California sales at 10%, then Kfir has caused the Company to collect more in sales taxes than it remits to the taxing authorities.

10.    Prior to Kfir stealing sole control of the Company, it was highly successful. In 2017, the Company generated tens of millions in sales and profits.  Under Kfir's unlawful sole control, the Company's financial performance has declined dramatically. Sales and

profits have dropped in each successive year. In 2023, I understand Kfir reported the Company's first-ever loss, which he reported at $1.65 million. Since then, I understand the numbers have become far worse. The 2024 financials provided to me indicate a massive $4.6 million loss on just $11 million in sales.

11.    The Company's decline under Kfir is also reflected in its bank balance. In December 2020 (a month before Kfir filed his Chapter 11 petition), the Company had approximately $20 million in cash on hand. Now, its cash balance is believed to be just $5 million.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on April 20, 2026 in Los Angeles County, California.

Dikla Gavrieli Unatin

17

I, Daniel Schecter, declare as follows:

1.      I am an attorney licensed to practice in the State of California. I am currently of counsel with Latham & Watkins LLP. I previously represented Dikla Gavrieli Unatin and Dean Unatin (the Unatins) in the above-captioned Chapter 11 case, related adversary proceedings, as well as related litigation in Los Angeles Superior Court. I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would competently testify to such facts under oath.

2.      In January 2024, I learned from Kfir Gavrieli's counsel that, under Kfir's management, Gavrieli Brands, LLC (the "Company") was not collecting or remitting state sales taxes and that, as a result, the Company had substantial unpaid sales tax liabilities. He referred to this as the "Wayfair" issue, in reference to a Supreme Court case, *South Dakota v. Wayfair, Inc.*, 585 U.S. 162 (2018).

3.      In an email to me on March 19, 2024, Kfir's counsel, Jeffrey M. Reisner, stated the following (I am not attaching the entire email because it contains specifics about the parties' respective settlement proposals):

> The Wayfair issue is very straightforward, and $7.5m was
> meant to be a conservative estimate. Kfir isn't forcing his
> estimates on you, and you and your clients are entitled to come
> up with your own (I'd be surprised if you haven't already).
> Wayfair isn't unique to Tieks, is something many companies
> have had to catch up on, and there's a lot of public information
> about it. A phone call to Gary[1] would tell you how to come up
> with an estimate, which only takes minutes. However, figuring
> out an exact liability is an expensive, multi-month undertaking
> that involves hundreds of jurisdictions with unique rules,
> thresholds, rates, etc, which is not something the Company has

---

[1] "Gary" is a reference to Gary Howard, a forensic accountant.

2

done. But for estimation purposes, if you take non-CA sales, which your clients know how to estimate, for the past three years (~$55m) and apply a blended state plus city sales tax rate of 8% (Gary's suggestion), you get to approximately $4.5m. Roughly 20% of states look back 4 or 5 years instead of 3, so $5m is an appropriate estimate. By postponing voluntary disclosures to states, Kfir has lowered the liability, since sales have dropped so steeply at the Company. Of course, if states start reaching out to the Company, which they haven't, and insist on going back further than 3-5 years and charging interest and penalties, then the number can get significantly higher, hence the range of $5-10m. In the meantime, the liability is decreasing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 30, 2026 at Manhattan Beach, California.

Daniel S. Schecter

3

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Lesnick Prince Pappas & Alverson LLP, 315 W. 9th Street, Suite 705, Los Angeles, CA 90015

A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND COMPLAINT TO ADD ALLEGATIONS REGARDING WAYFAIR LIABILITY AND MODIFICATION OF SCHEDULING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF DIKLA GAVRIELI UNATIN AND DANIEL SCHECTER IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)April 20, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Gregory K Jones**    gjones@stradlinglaw.com, smjohnson@sycr.com;smjohnson@stradlinglaw.com
- **Robert Allan Kors (TR)**    robertkorstrustee@gmail.com
- **Allison L Libeu**    alibeu@hueston.com, sjones@hueston.com
- **William N Lobel**    wlobel@tocounsel.com, mmason@tocounsel.com
- **Kerri A Lyman**    klyman@steptoe.com, #-FirmPSDocketing@Steptoe.com;nmorneault@Steptoe.com;mhernandez@steptoe.com;aodonnell@steptoe.com
- **Christopher E Prince**    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com;porpe@lesnickprince.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Richard Lee Wynne**    richard.wynne@hoganlovells.com, tracy.southwell@hoganlovells.com;cindy.mitchell@hoganlovells.com;rick-wynne-7245@ecf.pacerpro.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| Christopher E. Prince | | /s/ Christopher E. Prince |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**