CHRISTOPHER E. PRINCE (SBN 183553)
  cprince@lesnickprince.com
LISA R. PATEL (SBN 341574)
  lpatel@lesnickprince.com
LESNICK PRINCE PAPPAS & ALVERSON LLP
315 W. Ninth Street, Suite 705
Los Angeles, CA  90015
Telephone:  (213) 493-6496
Facsimile:   (213) 493-6596

Attorney for Plaintiff Dikla Gavrieli, individually
and derivatively on behalf of Gavrieli Brands,
LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>KFIR GAVRIELI,<br><br>                    Debtor. | Case No.  2:21-bk-10826-BB<br><br>Chapter 11<br><br>Adv. No.  2:21-ap-01034-BB |
| DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, individually and derivatively on behalf of GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>                    Plaintiff,<br><br>          v.<br><br>KFIR GAVIELI, an individual,<br><br>                    Defendant.<br><br>-and-<br><br>GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>                    Nominal Defendant. | **NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND COMPLAINT RE ASPIRATION PARTNERS AND MODIFICATION OF SCHEDULING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF DIKLA GAVRIELI UNATIN AND CHRISTOPHER E. PRINCE IN SUPPORT THEREOF**<br><br>Hearing Information:<br>Date:   May 12, 2026<br>Time:   2 p.m.<br>Place:  Courtroom 1539<br>           255 E. Temple Street<br>           Los Angeles, CA 90012<br>           Or Remotely Via ZoomGov |

1

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, at the above-referenced date, time and location, or as soon thereafter as the matter may be heard, Plaintiff Dikla Gavrieli a/k/a Dikla Gavrieli Unatin, individually and derivatively on behalf of Gavrieli Brands, LLC ("Plaintiff"), will and hereby does move the Court (the "Motion") for an order granting Plaintiff leave to file a Fourth Amended Complaint (the "FAC"), a copy of which is attached as Exhibit A and a modification of the Court's Scheduling Order in this case to permit limited additional discovery and motion practice.

This Motion is made pursuant to Federal Rule of Civil Procedure 15(a)(2), made applicable by Federal Rule of Bankruptcy Procedure 7015, on the grounds that Plaintiff has acted diligently in seeking leave to amend and that leave will not prejudice Defendant Kfir Gavrieli. No trial date has been set, and the case remains at a stage where any additional discovery related to the proposed amendments can be conducted without disrupting the schedule or imposing undue burden. Moreover, the proposed amendments are based on information obtained in this action, rather than on previously available facts, further supporting Plaintiff's diligence.

PLEASE TAKE FURTHER NOTICE that this Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, Declarations of Dikla Gavrieli Unatin and Daniel Schecter, all other papers, documents, or exhibits that may be filed in support of this Motion, and the argument of counsel made at the hearing.

PLEASE TAKE FURTHER NOTICE that Local Bankruptcy Rule 9013-1(f) requires that any response must be filed with the Court and served on the parties no less than 14 days before the hearing on the Motion. The failure to timely respond to this Motion may be deemed to be consent to the relief requested in this Motion.

DATED: April 20, 2026            LESNICK PRINCE PAPPAS & ALVERSON LLP


By: /s/ Christopher E. Prince
    Christopher E. Prince
    Counsel for Plaintiff Dikla Gavrieli a/k/a Dikla
    Gavrieli Unatin, individually and derivatively on
    behalf of Gavrieli Brands, LLC

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.   **INTRODUCTION**

Since the very earliest days of Kfir's bankruptcy case, a simple question has hovered over the proceedings:  why did Joseph Sanberg give Kfir the Plan Backstop?

The Plan Backstop was supposed to be a $36 million unsecured and fully subordinated line of credit that might never be repaid.  And, so far as the Unatins and this Court were told, Sanberg was giving Kfir the Plan Backstop while receiving nothing from Kfir in return.  Supposedly, Sanberg was offering over $30 million out of the goodness of his heart because of his close friendship with Kfir. It now appears that Sanberg's motive had far more to do with the massive financial fraud orchestrated at Sanberg's company, Aspiration Partners ("Aspiration").

In Sanberg's plea agreement, Sanberg admits that he caused Aspiration (described as "Company A") to report phony revenue for a new business line it had established.  Aspiration's new business line ("enterprise sustainability services") was selling tree planting services to individuals and companies purportedly interested in reducing their environmental impact.  Aspiration established the new business line in January 2021 – the month before Kfir filed his chapter 11 petition.

The fraud worked as follows:  Sanberg and certain "friends and associates" solicited letters of intent ("LOIs") from various companies and individuals ("LOI Customers") that purported to obligate the LOI Customers to pay huge sums of money for purported tree planting services.  Sanberg then gave the LOIs to Aspiration which used them to book revenue.

What Aspiration, and its investors, did not know is that the LOIs were fraudulent.  Sanberg and the LOI Customers had agreed that they would not need to pay for the millions in tree planting services described in the LOIs.  For some, Sanberg went so far as to provide the money which they could then send to Aspiration.  The purpose of the LOIs was to create a phony paper trail to inflate Aspiration's revenue and profits, which was then

4

used to obtain hundreds of millions in new Aspiration investments.

As described in greater detail below, it appears that Kfir conspired with Sanberg to execute and obtain these fraudulent LOIs.  Specifically, Kfir executed at least one fraudulent LOI himself in the name of Gavrieli Brands (the "Company" which is the subject of this proceeding), and it appears that he solicited numerous other LOI Customers as well. The terms of the Gavrieli Brands fraudulent LOI obligated the Company to buy $350,000 worth of "sustainability services" *per month* from Aspiration Partners, an incredible sum for the Company which has no reason to purchase carbon credits.  Simultaneously, it appears Kfir also had his father's small business ("GPMS") execute its own fraudulent LOI, obligating GMPS to an additional $50,000 of "trees" per month.

The Gavrieli Brands LOI was not some random transaction. Kfir executed the LOI at exactly the same time that Joseph Sanberg was proposing to give Kfir the "Plan Backstop" upon which Kfir's entire Bankruptcy Plan was predicated, including his central goal to stay in control of the Company, other assets, and litigation.  And just a few days before executing the Gavrieli Brands and GPMS LOIs, Kfir, who was allegedly insolvent, sent $2.5 million directly to the business entity, Apogee Pacific, that Sanberg then used to fund his bogus circular LOI transactions.

In other words, in just the days immediately leading up to Kfir' bankruptcy filing it appears: (1) Kfir used Gavrieli Brands (the subject of this proceeding) to enter into a multimillion dollar fraudulent agreement with Sanberg; (2) sent millions of dollars to Apogee Pacific -- the entity Sanberg used to fund the fraudulent LOI transactions; and (3) obtained the Plan Backstop from Sanberg.

Dikla discovered the fraudulent Gavrieli Brands LOI long after her operative complaint was filed, but it falls squarely within the general allegations of the complaint: further indication that Kfir has breached his fiduciary duty and that he breached his duty as part of his larger goals of depriving Dikla of financial resources and maintaining unlawful control of the Company.  To the extent an amended complaint is necessary, Dikla asks for

5

leave of court to amend her complaint to include specific allegations relating to Kfir's Aspiration fraud. Dikla also requests a limited modification of the scheduling order to permit discovery and motion practice regarding these issues.

## II.    THE FRAUDULENT ASPIRATION PARTNERS LETTERS OF INTENT

Kfir filed for bankruptcy protection on February 1, 2021 – ten days after entry of the final judgment against him. Less than a week later, Kfir filed a lengthy and complex proposed disclosure statement and proposed chapter 11 plan, a plan built around the Plan Backstop. The Plan Backstop was supposed to be a $30 million revolving credit facility from RJB Partners, an entity controlled by Kfir's close friend Joseph Sanberg.

Ultimately, the Plan Backstop was expanded to $36.5 million, and it became the foundation for the chapter 11 trustee's proposed chapter 11 plan. As the chapter 11 Trustee's disclosure statement stated, "[t]he unconditional Plan Backstop is the single most important component of the Plan." [Disclosure Statement, Dkt. No. 622, p. 68 of 217.]

The Creditors' Committee's professionals interviewed Mr. Sanberg regarding the Plan Backstop and summarized the interview as follows:

> During the video conference interview of Joseph Sanberg conducted by KGI and UCC counsel on April 24, 2021, Mr. Sanberg affirmed RJB's capacity and commitment to perform under the Backstop Revolving Credit Agreement and the overall terms of the Backstop outlined above. **Mr. Sanberg indicated that RJB's investment in Aspiration Partners, Inc., currently valued at approximately $40 million per Mr. Sanberg, could be the primary asset that RJB monetizes to fund the Debtor's borrowings under the Backstop. Mr. Sanberg confirmed that the Backstop Revolving Credit Agreement, as written, represents the entirety of that arrangement between the Debtor and Mr. Sanberg (no other side deals or**

**side arrangements between the Debtor and Mr. Sanberg with respect to the Backstop).** Mr. Sanberg confirmed that the Backstop is an unsecured loan, cannot be used for Debtor-In-Possession financing during the pendency of the Debtor's bankruptcy case prior to final confirmation of the Plan, and that the Backstop is an exit financing facility that can only be used to fund payments required under a confirmed Plan.

[KGI Report (attached to Creditors' Committee Opposition to OSC), Dkt. No. 284, p. 65 of 162. (emphasis supplied)]

The Committee's professionals also interviewed Kfir regarding the Plan Backstop and summarized the interview as follows:

During the video conference interview of the Debtor conducted by KGI and UCC counsel on May 12, 2021, **the Debtor indicated that he was comfortable with the capacity and commitment of Mr. Sanberg and RJB to fund the Backstop loans.** The Debtor indicated that both he and Mr. Sanberg had agreed that repayment for the Debtor's outstanding balances under the Backstop will be due after all payments will have been made under the Plan. The Debtor indicated that he obtained the Backstop as added protection to ensure he could make consistent payments over the term of the Plan.

*Id.* at p. 66 of 162 (emphasis supplied).

It now appears that both Sanberg's and Kfir's representations to the Committee were false.

**A.    One Of Sanberg's Associates Is Indicted, Sanberg's Financial Empire Falls Apart And The Plan Backstop Proves Worthless.**

On January 21, 2025, the Department of Justice filed a sealed "information" as to Ibrahim Ameen Alhusseini, a member of Aspiration's board of directors. On February

7, 2025, Alhusseini pled guilty to conspiring with Joseph Sanberg to defraud investors in Aspiration. [USA v. Alhusseini, 2:25-cr-00042-SVW, Dkt. No. 26, p. 11, attached to the concurrently filed Compendium of Exhibits as Exhibit D.]

The financial mechanism of Alhusseini's confessed fraud was very similar to the Plan Backstop in Kfir's bankruptcy case. Sanberg solicited approximately $150 million in loans from two investment funds, pledging Aspiration stock as collateral and putting forth a backstop from Alhusseini: if Sanberg defaulted on the loans, Alhusseini agreed to purchase the Aspiration stock that Sanberg had pledged as collateral for a price sufficient to pay the loans. [*Id.* at p. 12.]

What the investors did not know is that Alhusseini's backstop was worthless. On February 28, 2025, the Department of Justice filed a criminal complaint against Sanberg for his conspiracy with Alhusseini. Three days later, Alhusseini's case – including his guilty plea – was unsealed, and 30 days after that, Aspiration filed for chapter 11 bankruptcy protection.[1] By August, Aspiration's assets were sold to one of its secured lenders, the case was converted to chapter 7, and Sanberg had pleaded guilty to the crimes described in Alhusseini guilty plea.

Sanberg's guilty plea, however, included significant additional criminal acts unrelated to his conspiracy with Alhusseini, most notably a revenue fraud scheme whereby Sanberg and others fraudulently inflated Aspiration's revenue to defraud investors out of hundreds of millions using contracts for phony tree planting services:

> Beginning no later than January 2021, Company A established a business line, known as "enterprise sustainability services," in which Company A sold tree planting services to individuals and companies interested in reducing their environmental impact.

> [D]efendant solicited small businesses and individuals, directly and through intermediaries, to sign "Letters of Intent" with Company A. The Letters of Intent stated that each small business or individual (collectively, the "LOI Customers")

---

[1] *In re CTN Holdings, Inc.*, U.S.B.C. DE, Case No. 1:25-bk-10603, Dkt. No. 1.

would pay for tens of thousands of trees to be planted on a recurring monthly or quarterly basis at a price of $1 per tree.

Certain LOI Customers paid Company A for the tree planting services described in the Letters of Intent with funds received from defendant. Defendant concealed from Company A investors that defendant was the source of funds for the payments under the Letters of Intent. These certain LOI Customers were not bona fide purchasers of the tree planting services from Company A.

[USA v Sanberg, Plea Agreement, p. 43, Compendium Exhibit E.]

**B.      A Bloomberg News Article And An SEC Complaint Include Further Details About The Fraudulent Letters Of Intent.**

On July 10, 2024, Bloomberg published an article entitled "DiCaprio-Backed Green Finance Startup Unraveled on Dubious Deals" and subtitled "Three years after pursuing a $2 billion IPO, Aspiration Partners faces probes by US Authorities." [See Bloomberg Article, Compendium Exhibit F.] The Bloomberg article provides more details about the LOI fraud described in Sanberg's Plea Agreement.

In addition, the SEC filed a civil complaint against Sanberg that further details the LOI fraud. [SEC Complaint, Compendium Ex. G.]   The SEC Complaint includes a chart listing 27 so-called LOI Customers, the effective dates of their LOIs and the monthly or quarterly amounts they purportedly agreed to pay Aspiration for tree planting/carbon credits. The 27 LOI Customers in the SEC Complaint are identified by initials.

One of the first LOI Customers is identified with the initials GB.  The GB LOI has an effective date of January 1, 2021 – one month before Kfir filed his chapter 11 bankruptcy petition (i.e., when Sanberg would have agreed to provide the Plan Backstop). **Kfir has now confirmed that he signed the GB LOI on the Company's behalf.**

Another of the first LOI Customers listed in the SEC Complaint is identified by the initials GPMS.  The Unatins believe that GPMS stands for Gavrieli Plastics Metal and Sign, a small business owned by Kfir's and Dikla's father.  Dikla believes that her father did not sign or even know about the fraudulent GPMS Aspiration LOI and that Kfir signed or had it signed without his knowledge.

Similarly, another January 1, 2021 LOI is closely connected to Kfir.  The LOI customer is identified by the initials "APM" in the SEC Complaint.  The Unatins believe this refers to AQP Property Management.  APM is a property management company owned and operated by Dan Murillo. Dan Murillo is a close friend of Kfir's (they went to business school together and Kfir was a groomsman in Mr. Murillo's wedding).  [Page 2240 of LASC Trial Transcript.]  Mr. Murillo facilitated the transfers of assets from Gavrieli Brands that were a major part of the state court case: Kfir transferred approximately $10 million from Gavrieli Brands to Murillo's entities as purported "investments" placed in Kfir's name alone.  [Page 2240-2241 of LASC Trial Transcript.]

The KGI report prepared for the Creditors' Committee includes 18 pages summarizing Kfir's financial transactions with Mr. Murillo. [KGI Report attached to Committee Opposition to OSC, Dkt. No. 284, pp. 37 - 54 of 162].  Many of these multimillion-dollar transactions were dated January 31, 2021, the day before Kfir filed for bankruptcy.  According to SEC Complaint, the APM LOI contemplated $500,000 *per month* in phony tree purchases, the second largest of any LOI Customer identified in the SEC Complaint.  As with the Gavrieli Brands and Gavrieli Plastics LOIs, the APM LOI is dated January 1, 2021, virtually simultaneous with Sanberg' promise to provide the Plan Backstop.

The Bloomberg article also contains information suggesting that Kfir's involvement in the LOI fraud is not limited to the Gavrieli Brands and Gavrieli Plastics LOIs.  For example, four LOI Customers are identified in the Bloomberg Article as being particularly baffling to Aspiration employees.  ("A flurry of other corporate deals, meanwhile, puzzled then-staffers at Aspiration, who said they struggled to understand who these customers were or why they would pay hundreds of thousands of dollars for reforestation.")  At least two of the four puzzling LOIs identified in the Bloomberg article were executed by entities with direct connections to Kfir: Young Israel of North Beverly Hills and ETZ Partners LLC.[2]

---

[2] The list of LOI Customers in the SEC Complaint includes LOI Customers identified by the initials "YINBH" and another with the initials "EP" suggesting that the information in the Bloomberg article is accurate.

Young Israel of North Beverly Hills is a synagogue where Kfir has personal ties to its leadership and is a longtime member and donor, and ETZ Partners is a company associated with Nathan Miller, a public relations specialist that Kfir has paid nearly $700,000 from 2020 to 2025 using funds from Gavrieli Brands. [Dikla Declaration, ¶3.]

The Bloomberg article noted another strange pattern: "An unusual number of [LOI] customers were Colombian celebrities, including an actor and several retired soccer players." The Colombian celebrities are most likely contacts of Kfir's cousin, Guy Davidyan. Mr. Davidyan is an Israeli citizen who has long lived in Colombia, pursuing an acting/modeling career. [Dikla Declaration, ¶4.] Mr. Davidyan is also the person who Kfir used to establish Hong Kong companies and opened the Hong Kong bank accounts on Kfir's behalf. If Mr. Davidyan was involved in recruiting LOI Customers for Aspiration Partners, he was likely acting on Kfir's behalf.[3]

As is obvious from the record in this case, Kfir's finances were deeply intertwined with Sanberg's (the section in KGI's report for the creditors committee describing their financial transactions is 20 pages long). While the $36 million Plan Backstop and Kfir's Aspiration stock[4] are the largest examples, the two had many other questionable transactions including multimillion dollar undocumented "loans" *from* Kfir to Sanberg which made no sense given Sanberg's supposed wealth and Kfir's supposed insolvency.

More relevant to Sanberg's Aspiration fraud, Kfir was also directly involved with one of Sanberg's other entities, Apogee Pacific. According to the Bloomberg Article, it was this Apogee Pacific entity that was used to facilitate the fraudulent "round-trip" LOI

---

[3] Kfir has a long and close relationship with Mr. Davidyan, including living and traveling with him. Dikla who is also technically a cousin, has no personal relationship with Mr. Davidyan, recalls almost no contact with him over the past 25 years, including no communication whatsoever over at least the past decade. [Dikla Declaration, ¶4.]

[4] Kfir valued his Aspiration stock at $5.2 million on his bankruptcy schedules but the valuation was revised upwards to $12.3 million by the time operative chapter 11 plan was proposed. [Amended Discl. Stmt for Second Amended Plan, Dkt. No. 690, p. 40 of 220.] This upward revision was justified by the then-pending SPAC transaction that Sanberg had arranged using the fraudulent LOIs that Kfir had procured for him.

transactions.  I.e., Sanberg would send money from Apogee Pacific to the LOI Customers, and they would then send the money to Aspiration.  As described below, Kfir transferred $7.5 million to Apogee Pacific prior to his bankruptcy filing, including $2.5 million that he transferred to Apogee Pacific just ten days before he signed the fraudulent Gavrieli Brands LOI (and only a few weeks before Sanberg's Plan Backstop was formalized and proposed to the Court).

The SEC Complaint describes additional details about the round-trip transactions.  [SEC Complaint, pp. 8-9.]  Of the two round-trip transactions specifically highlighted in the SEC Complaint, one involves "SB" which is described as the assignee of Kfir's Gavrieli Brands LOI.  The other involves "EP" which appears to be the ETZ Partners LOI described above and owned by Kfir's friend, Nathan Miller, who Kfir has paid hundreds of thousands of dollars for purported public relations services.

Not coincidentally, in the months leading up to the bankruptcy filing and Plan Backstop proposal, Kfir and Sanberg were involved in a series of multimillion dollar transactions where money passed back and forth between them – often using Apogee Pacific (i.e., the same entity that Sanberg was using to fund the "round trip" transactions).

- On June 7, 2019, Kfir wired $5 million to Sanberg's Apogee Pacific, purportedly as a loan (though the loan was not documented until years later on the day before Kfir filed for bankruptcy).

- Between February and July 2020, Sanberg paid $1.8 million to Kfir's professionals, largely to Hueston Hennigan.

- On December 16, 2020, Kfir wired $500,000 to Sanberg's RJB Partners (the entity they used for the Plan Backstop).

- On December 21, 2020, Kfir wired an additional $2.5 million to Sanberg's Apogee Pacific, also purportedly as a loan.

- On December 23, 2020, Kfir wired nearly $2 million to Sanberg's RJB Partners.

- On January 29, 2021, Sanberg's Apogee Pacific paid $250,000 directly to Hueston Hennigan.

[KGI Report (attached to Creditors' Committee Opposition to OSC), Dkt. No. 284, pp. 62-84 of 162.]

While these transactions between Kfir and Sanberg were taking place, and while Kfir was preparing to file his February 1, 2021 bankruptcy petition predicated on Sanberg's Plan Backstop, Kfir was arranging and executing the fraudulent LOIs:  the Gavrieli Brands and Gavrieli Plastics LOIs are dated January 1, 2021, and the ETZ Partners and the Young Israel of North Beverly Hills LOIs are dated February 1, 2021.

Thereafter, Sanberg used the fraudulent LOIs for staggering financial gain.  According to the SEC Complaint, Sanberg received more than $11.6 million in cash from Aspiration on account of the LOIs.  [SEC Complaint, p. 15 of 23.] The SEC Complaint also states that, Sanberg obtained more than $100 million in loans by pledging Aspiration stock as collateral. [*Id.*, p. 5 of 23.]  Aspiration also raised hundreds of millions at ever increasing valuations, causing Kfir to raise the stated value of his personal Aspiration stock from $5 million in early 2021 to $12 million at the height of the fraud.  Given the financial benefits Sanberg obtained from the fraudulent LOIs Kfir arranged, his motivation for supplying the Plan Backstop was to further their extensive fraud.

## C.    Kfir Has Close Connections With Many Of The Aspiration Partners Equity Holders.

When Aspiration filed for bankruptcy earlier this year, it filed a list of its equity holders.  [CTN Holdings, Inc. List of Equity Holders, attached to Petition, Dkt. No. 1, pp. 11-22 of 24, DE Bk. Ct. Case 25-10603. Compendium Exhibit H.]   In addition to Kfir himself, the list of Aspiration's equity holders includes many of Kfir's associates, including several of Kfir's close friends, creditors and three members of the Creditors' Committee.

- Yamit Gavrieli Betesh. Ms. Betesh is Kfir's sister, is a current employee at the Company and testified on Kfir's behalf in the state court case.

- Dan Nir.  Mr. Nir is a relative of Kfir by marriage.  Mr. Nir paid over $7.7 million to Hueston Hennigan on behalf of Kfir and had extensive other financial dealings with Kfir, particularly in the lead

up to BK. [KGI report, "Dan Nir Transactions", Dkt. No. 284, pp. 27-37 of 162.]

- Dan Murillo.  Mr. Murillo is a close friend and former business school classmate of Kfir's.  He had extensive financial dealings with Kfir.  [KGI report, "Dan Nir Transactions", Dkt. No. 284, pp. 37-54 of 162.]  Mr. Murillo owns AQP Property Management, Inc. which is believed to be one of the LOI Customers listed in the SEC Complaint (under the initials "APM").

- Ravi Sarin. Mr. Sarin is a creditor, a close friend of Kfir, and a plaintiff *Karr v. Sanberg* described below.

- Albert Liu. Mr. Liu is a creditor and a longtime close friend of Kfir.

- Nathan Miller.  Mr. Miller is a public relations specialist that Kfir has paid $700,000 or more using Company funds. He owns ETZ Partners, which is described in Bloomberg Article as one of the LOI Customers.

- Louis R. Miller.  An attorney who has represented Kfir personally in the course of the parties' dispute.  Mr. Miller represents the plaintiffs, and is a named plaintiff himself, in *Karr v. Sanberg* (LA Superior Court Case No: 25STCV20376), an action seeking damages from various defendants for the failure of Aspiration.

- "Reisner Millenium Investments LLC (Jeff Reisner)" appears on the list of equity holders.  Jeffrey Reisner represents Kfir in this bankruptcy case.

- Ronald Paz. Ronald Jose Paz Vargas is a former roommate, classmate, and longtime friend of Kfir.  Mr. Vargas was a member of the Creditors' Committee.  [Notice of Appointment, Dkt. No. 116, p.2 of 2.]

- Eyal Bilgrai.  Mr. Bilgrai is a business school classmate of Kfir and longtime friend.  Mr. Bilgrai was a member of the Creditors' committee.  [Notice of Appointment, Dkt. No. 116, p.2 of 2.]

- The "Miranda Brouwer Family Trust appears on the list of equity holders.  Melissa Miranda is the wife of Dick Brouwer a former business school classmate and longtime friend of Kfir.  Mr. Brouwer was member of the Creditors' Committee.  [Notice of Appointment, Dkt. No. 116, p.2 of 2.]

- Adel Davidyan, Guy Davidyan's mother (and Kfir's aunt).

- Moran Davidyan, Guy Davidyan's sister (and Kfir's cousin).

[Dikla Declaration, ¶5]

Aspiration was a private company, i.e., its stock did not trade on public exchanges.  Accordingly, ownership of Aspiration stock is not a random or passive fact; it typically reflects purposeful, direct, high-level engagement between the investor and Aspiration, because private-company securities are issued through controlled transactions rather than purchased anonymously in an open market. In general, private issuers sell equity through exemptions from SEC registration under Regulation D, most commonly Rule 506(b) or Rule 506(c). Rule 506(b) generally requires that the issuer (and its placement agents) have a pre-existing, substantive relationship with any non-publicly-solicited offerees, and it is typically offered through a targeted financing process. Rule 506(c) permits "general solicitation," but only if the issuer takes reasonable steps to verify that each purchaser is accredited, which likewise requires an active onboarding and verification process (and, as a practical matter, the issuer still controls who is admitted to the investment round). For these reasons, unknown or unsolicited retail participation is, as a practical matter, highly unlikely— i.e., random investors do not acquire stock in private companies.

To be clear, the Unatins are not suggesting that mere ownership of Aspiration stock implies any wrongdoing on the part of the stockholder.  To the contrary, it may show that the stockholder was an innocent victim of Kfir's and Sanberg's fraudulent scheme.  On the other hand, the presence of multiple LOI Customers (Kfir via Gavrieli Brands and Gavrieli Plastics; Nathan Miller via ETZ; Dan Murillo via AQP Property Management and Pinni Dunner via Young Israel of North Beverly Hills) on the list of equity holders raises the possibility that Sanberg gave them Aspiration stock as an inducement for their participation in the scheme.

III.    **PROCEDURAL BACKGROUND**

The Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on February 1, 2021 (the "Petition Date"). The Debtor scheduled approximately $64 million in assets and $43 million in liabilities.  [Debtor's Summary of

Assets and Liabilities, Docket No. 16]. Of the $43 million in liabilities, approximately $31 million related to either tax claims (which have since been fully satisfied), or the judgment awarded to the Plaintiff in the Los Angeles County Superior Court (the "State Court"). [Schedule D: Creditors who have Claims Secured by Property, Docket No. 19].

The Unatins obtained a judgment in State Court against Kfir for monetary and punitive damages of approximately $17 million. The state court also issued extensive non-monetary relief, including a constructive trust, as well as injunctive relief that enjoins the Debtor from interfering with the Plaintiff's rights as a member and manager of Gavrieli Brands with "the full and uninhibited right of joint control" (the "Permanent Injunction"). The judgment is currently the subject of an appeal to the California Second Appellate District [Case No. B308136] (the "State Court Appeal").

On May 31, 2022, the Court entered an order confirming the Chapter 11 Trustee's Second Amended Plan of Reorganization [Docket Nos. 829, 834] (the "Plan"). The Plan was effective on June 17, 2022. In connection with the Plan, a "Post-Effective Date Trust" was created (the "Trust"), and Michael Issa was selected to serve as the Post-Effective Date Trustee (hereafter the "Trustee"). Under the Plan, the Debtor does not receive a discharge unless all Plan payments are made (i.e., all claims are paid in full). *See* Plan, §§ 6.8, 10.3.

**IV.    The Adversary Proceeding**

On February 19, 2021, shortly after the Debtor initiated his bankruptcy case, Plaintiff filed this adversary proceeding against the Debtor. Plaintiff's Third Amended Verified Complaint (hereafter, the "Complaint") alleges the Debtor engaged in misconduct on or after July 22, 2019, through the present, which has harmed Gavrieli Brands, LLC and the Plaintiff.

In the Complaint, Plaintiff, derivatively on behalf of Gavrieli Brands, brings four claims against the Debtor: (1) breach of fiduciary Duty; (2) conversion; (3) corporate waste; and (4) violations of the California Penal Code § 496.

## V.    ARGUMENT

Absent a specific right to amend not applicable here, to amend its complaint, a party must obtain leave of the court or consent of the adverse party. Fed. R. Civ. P. 15(a). "In general, a court should liberally allow a party to amend its pleading." *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (citing Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires")) (*Owens v. Kaiser Found. Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir.2001) ("A district court shall grant leave to amend freely when justice so requires," and "this policy is to be applied with extreme liberality")).

"Courts may decline to grant leave to amend only if there is strong evidence of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc.'" *Sonoma Cnty. Ass'n of Retired Emps.*, 708 F. 3d at 1117 (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

Here, none of the factors warranting denial is present. Dikla discovered the fraudulent Aspiration Partners LOI long after her operative complaint was filed.  Indeed, given the nature of the issue, Kfir was obviously concealing his fraudulent conduct from both Dikla and the PEDT.

For example, the PEDT stated that he originally intended to begin making payments to general unsecured creditors on June 17, 2024.  [Fifth Post-Confirmation Status Report; Declaration of J. Michael Issa in Support Thereof, Dkt. No. 949, ¶ 16, p. 4 of 17.] Instead, the PEDT asked (and the Court approved) a delay of the first semi-annual payment to general unsecured creditors to December 17, 2024.  [Moton to Modify Plan, Dkt. No. 943, pp. 7-8 of 30; Order Dkt. No. 946, ¶¶ 2-3 at p. 2 of 5.]  Then, when the December 2024 payment came due, the PEDT did not draw on the backstop, but instead he took out a "crypto" loan to fund the Plan payments.  [Sixth Post-Confirmation Status Report, Dkt. No. 954, ¶ 23, p. 6 of 21.]

In hindsight, it is obvious that these delays in drawing on the Plan Backstop were not the PEDT's ideas; they were Kfir's, likely with full knowledge of close friend Sanberg's unraveling fraud. By June 2024, Sanberg had resigned from Aspiration's board, Aspiration's CEO had stepped down, Aspiration's auditors (KPMG) had withdrawn, Aspiration's proposed SPAC (i.e., the transaction that would have taken Aspiration public) had been cancelled and one of Aspiration's investors was seeking to put Aspiration into receivership. [See Bloomberg Article.] Given Kfir's inside knowledge of Sanberg's fraudulent LOI scheme, Kfir would have known that these events reflected Sanberg's (and the Plan Backstop's) imminent downfall. It appears he did not reveal what he knew to the PEDT, and instead guided the PEDT towards first obtaining a six month delay of payments, and then to expensive crypto loans to avoid drawing on the Plan Backstop.

**A. Kfir And The PEDT Have Both Long Been Aware That Dikla Includes Kfir's Aspiration Mismanagement In The Derivative Action.**

There have long been concerns about Kfir's mismanagement of the Company in relation to his unusual relationship with Sanberg and Aspiration. For example, the Operative Complaint includes allegations regarding Kfir's mismanagement that included binding the Company to Aspiration through a bizarre off-brand partnership where the Company's high-end clientele was offered unusual discounts to sign up for Aspiration's services.

In December 2024, after the Bloomberg article was discovered, Dikla served requests for production on the PEDT as well as a document and testimony subpoena on Kfir and the Company. Both the requests for production and the subpoena request information relating to Kfir and the Company regarding Aspiration, Sanberg, law enforcement, and other related topics. These requests are attached to the concurrently-filed compendium of exhibits as exhibit I.[5]

---

[5] Dikla is concurrently filing applications for orders to show cause regarding earlier subpoenas issued to the Company and Kfir. To the extent that the discovery cutoff is relevant to those subpoenas, Dikla requests that the discovery cutoff date be re-set to allow enforcement or, if necessary, re-issuance of the subpoenas.

At that time, of course, no one aside from Kfir and Sanberg knew the full extent of their conspiracy to defraud Aspiration and its investors.  It was not until a few months ago, after the SEC Complaint was filed in late August 2025, that Dikla became aware of LOI Customers with the initials "G.B." and "G.P.M.S."  Thereafter, Dikla's counsel contacted Aspiration's chapter 7 trustee.  In November 2025, the Aspiration trustee's counsel told Dikla's counsel that he a number of LOIs in his possession, including the "G.B." LOI which he confirmed stood for Gavrieli Brands.

On Wednesday December 10, 2025, Dikla's counsel contacted the PEDT's counsel (Richard Wynee) and asked to have a phone call.  On Thursday, December 11, Dikla's counsel sent the PEDT's counsel a copy of the SEC Complaint to review in advance of the call.  On Friday, December 12, Dikla's counsel explained to the PEDT's counsel what she had discovered about Kfir's involvement with Sanberg.  Dikla's counsel said that he was calling as a professional courtesy to let the PEDT know that she would be including these matters in the derivative action and in filings with the Court.

The PEDT's counsel said that he would speak to Kfir and his counsel about the matter.  On Monday, December 14, 2025, the PEDT's counsel sent Dikla's counsel an email that, among other things, said: "I spoke to Jeff and Kfir with respect to the LOI and SEC complaint which I sent to Jeff as I told you I would to get their reaction. According to Kfir, there was never a contract, the company didn't pay or receive any money and no deal went into effect."

On December 15, 2025, Dikla filed a reply in support of her motion to require the PEDT to employ counsel without the appearance of an irreconcilable conflict.  [Reply, Dkt. No. 999.]  Pages eight through twelve of the Reply describe much of the same facts that are described in this Motion and in the proposed amended complaint:  the SEC Complaint, the Bloomberg article, the Gavrieli Brands LOI, the Gavrieli Plastics Metal and Sign Supplies LOI, and Kfir's involvement with Apogee (the same entity that Sanberg used to facilitate the fraudulent LOI transactions).

**B. Personal Circumstances Of Dikla's Counsel Constitute Cause To Allow The Amendment And For Modification Of The Scheduling Order.**

Lesnick Prince Pappas & Alverson, LLP ("LPPA") first appeared for Dikla at a chapter 11 status conference on March 11, 2025. [Prince Declaration, ¶2.] Counsel had just recently been retained at that time and was serving as co-counsel with Dikla's prior counsel (Latham & Watkins). [*Id*.] On March 3, 2025, just over a week before the March 11, 2025 status conference, Joseph Sanberg was arrested and his co-conspirator Alhusseini's indictment and plea agreement were unsealed, throwing the bankruptcy case into unforeseen territory.

At the March 11, 2025 status conference, the Court ordered the parties to mediation. As they had done multiple times before, the parties stipulated to continue the deadlines in the adversaries. [*Id*.]

In July 2025, LPPA filed a formal notice of appearance in this adversary and in the main chapter 11 case. [*Id*. at ¶3.] Shortly thereafter, in August 2025, one of LPPA's non-attorney employees (its only paralegal) went to the emergency room after experiencing unusual back pain. [*Id*.] After an initial diagnosis of a spinal fracture, additional tests were conducted, and this person was diagnosed with an underlying illness that is life-threatening. [*Id*.] This person has been on disability since that diagnosis and is not expected to return to work. [*Id*.] This person worked for LPPA for more than a decade and is an irreplaceable team member. [*Id*.]

Latham & Watkins formally withdrew as counsel on September 18, 2025. [*Id*. at ¶4.] Approximately 10 days prior, on or about September 9, a close family member of the Unatins' lead counsel at LPPA (Mr. Prince) was diagnosed with a serious illness. [*Id*.] To treat this illness, this family member had multiple rounds of invasive testing, two surgeries, radiation and other treatments that continue to the present. [*Id*.]

In December 2025, Kaitlyn Husar, the associate at LPPA who was assigned to this matter, gave notice that she would be leaving the firm to accept a position as a law clerk for Judge Victoria Kaufman. [*Id*. at ¶5.] Her last day was in January 2026. [*Id*.]

Given the size and complexity of LPPA's engagement to represent the Unatins and the personal and professional circumstances described above, allowing the amendment and a limited modification of the scheduling order is appropriate.

**C. The PEDT Suffers No Prejudice From Allowing An Amended Complaint And Modifying The Scheduling Order.**

No trial date has been set in this adversary proceedings, the pretrial conference has not occurred, the deposition of Dikla is not completed, and the deposition of Dean has not taken place. As described above, the PEDT has been aware of these allegations since December, and Kfir, the PEDT's agent, has obviously been aware of the underlying facts for over six years. The PEDT will suffer no prejudice from allowing an amended complaint and a limited modification of the scheduling order.

Indeed, both the PEDT and the Court have a particular interest in obtaining testimony from Kfir about these issues. Collectively, professionals for the Debtor, the creditors' committee, the chapter 11 trustee and the PEDT have likely received more than $20 million. Kfir himself has received a $30,000 per month stipend and has remained in control of the Company for over five years while the case has been pending. All of this is because of the Sanberg's Plan Backstop. General unsecured creditors, however, may now receive nothing despite having been promised payment in full. To the extent that this outcome is not a random tragedy but rather the product of the Debtor's intentional fraud, a full and complete airing of the facts is the bare minimum that justice requires.

In particular, the PEDT and the Court should permit Dikla to subpoena the LOIs themselves from the Aspiration chapter 7 trustee. The trustee has confirmed the existence of the LOIs and some of the names of the companies and individuals on the LOIs, including specifically Gavrieli Brands and Kfir Gavrieli. The trustee has communicated that she will produce those LOIs in response to a subpoena.

21

## VI.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order: (1) granting Plaintiff leave to file the proposed amended complaint, attached to this Motion as Exhibit A, (2) for modification of the Scheduling Order to permit limited discovery and motion practice regarding the issues in the amended complaint; and (3) for such further relief as the Court deems just and proper.

DATED: April 20, 2026                    LESNICK PRINCE PAPPAS & ALVERSON LLP


By: /s/ Christopher E. Prince
    Christopher E. Prince
    Counsel for Plaintiff Dikla Gavrieli a/k/a Dikla
    Gavrieli Unatin, individually and derivatively on
    behalf of Gavrieli Brands, LLC

**DECLARATION OF DIKLA GAVRIELI UNATIN**

1.      I, Dikla Gavrieli Unatin, declare that I am over the age of 18 and, unless indicated otherwise, I have personal knowledge of the facts set forth in this declaration. If called upon to testify, I could and would testify competently to these facts under oath.

2.      The Bloomberg article about Aspiration identifies four LOI Customers as being particularly baffling to Aspiration employees.  At least two of the four puzzling LOIs identified in the Bloomberg article were executed by entities with direct connections to Kfir: Young Israel of North Beverly Hills and ETZ Partners LLC.

3.      I understand Young Israel of North Beverly Hills to be a synagogue where Kfir has personal ties to its leadership, the Dunner family, and I believe he has donated to it and/or its events, and attended various functions going back a decade or more, , and ETZ Partners that I understand to be a company associated with Nathan Miller, a longtime friend of Kfir and public relations specialist that Kfir has paid nearly $700,000 from 2020 to 2025 using funds from Gavrieli Brands.

4.      The Bloomberg article noted another strange pattern: "An unusual number of [LOI] customers were Colombian celebrities, including an actor and several retired soccer players."  The Colombian celebrities are most likely contacts of Kfir's cousin, Guy Davidyan.  I understand Mr. Davidyan to be an Israeli citizen who has long lived in Colombia, pursuing an acting/modeling career.  Kfir has a long and close relationship with Mr. Davidyan, including living and traveling with him.  I am technically his cousin, but I have no personal relationship with him, recall almost no contact with him over the past 25 years and have not communicated with him at all for at least the past decade.

5.      When Aspiration filed for bankruptcy earlier this year, it filed a list of its equity holders.  In addition to Kfir himself, the list of Aspiration's equity holders includes many of Kfir's associates, including several of Kfir's close friends, creditors and three members of the Creditors' Committee.  This includes:

- Yamit Gavrieli Betesh. Ms. Betesh is Kfir's sister, who testified on Kfir's behalf in the state court case and who Kfir has paid hundreds of thousands of dollars in Company funds as an "employee".

- Dan Nir.  Mr. Nir is a relative of Kfir by marriage.

- Dan Murillo.  Mr. Murillo is a close friend and former business school classmate of Kfir's.  Mr. Murillo owns AQP Property Management, Inc. which is believed to be one of the LOI Customers listed in the SEC Complaint (under the initials "APM").

- Ravi Sarin. Mr. Sarin is a creditor and close friend of Kfir's.

- Albert Liu. Mr. Liu is a creditor and a close friend of Kfir.

- Nathan Miller.  Mr. Miller is a longtime friend of Kfir. I understand Kfir has paid Mr. Miller approximately $700,000 using funds from Gavrieli Brands.

- Louis R. Miller.  An attorney who has represented Kfir personally since at least 2020 in connection with Kfir's litigation.

- Ronald Paz. Ronald Jose Paz Vargas is a former roommate, classmate, and longtime friend of Kfir.

- Eyal Bilgrai.  Mr. Bilgrai is a business school classmate of Kfir and longtime friend.

- The "Miranda Brouwer Family Trust appears on the list of equity holders.  I understand Melissa Miranda is the wife of Dick Brouwer a former business school classmate and longtime friend of Kfir.

- Adel Davidyan, Guy Davidyan's mother (and Kfir's aunt).

- Moran Davidyan, Guy Davidyan's sister (and Kfir's cousin).

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on April 20, 2026 in Los Angeles County, California.

_Dikla Gavrieli Unatin_
Dikla Gavrieli Unatin

**DECLARATION OF CHRISTOPHER E. PRINCE**

I, Christopher E. Prince, hereby declare:

1.      I am over the age of 18 and, unless indicated otherwise, I have personal knowledge of the facts set forth in this declaration. If called upon to testify, I could and would testify competently to these facts under oath.

2.      Lesnick Prince Pappas & Alverson, LLP ("LPPA") first appeared for Dikla at a chapter 11 status conference on March 11, 2025.  LPPA had just recently been retained at that time and was serving as co-counsel with Dikla's prior counsel (Latham & Watkins).

3.      At the March 11, 2025 status conference, the Court ordered the parties to mediation.  As they had done multiple times before, the parties stipulated to continue the deadlines in the adversaries.

4.      In July 2025, LPPA filed a formal notice of appearance in this adversary and in the main chapter 11 case.  Shortly thereafter, in August 2025, one of LPPA's non-attorney employees (its only paralegal) went to the emergency room after experiencing unusual back pain.  After an initial diagnosis of a spinal fracture, additional tests were conducted, and this person was diagnosed with an underlying illness that is life-threatening.  This person has been on disability since that diagnosis and is not expected to return to work.  This person worked for LPPA for more than a decade and is an irreplaceable team member.

5.      Latham & Watkins formally withdrew as counsel on September 18, 2025. Approximately 10 days prior, on or about September 9, a close family member of the Unatins' lead counsel at LPPA (Mr. Prince) was diagnosed with a serious illness.  To treat this illness, this family member had multiple rounds of invasive testing, two surgeries, radiation and other treatments that continue to the present.

6.      In December 2025, Kaitlyn Husar, the associate at LPPA who was assigned to this matter, gave notice that she would be leaving the firm to accept a position as a law clerk for Judge Victoria Kaufman.  Her last day was in January 2026.

7.      In or about September 2025, I contacted Aspiration's chapter 7 trustee and her counsel regarding the Aspiration LOIs.  In November 2025, the trustee's counsel told me that he several of the LOIs in his possession, including the "G.B." LOI which he confirmed stood for Gavrieli Brands.

8.      On Wednesday December 10, 2025, I emailed the PEDT's counsel (Richard Wynee) and asked to have a phone call.  On Thursday, December 11, I sent Mr. Wynne a copy of the SEC Complaint to review in advance of the call.  On Friday, December 12, I explained to Mr. Wynne what had been discovered about Kfir's involvement with Sanberg and the LOI fraud.  I told him that it was not a settlement communication, but that I was calling as a professional courtesy to let the PEDT know that Dikla intended to include these matters in the derivative action and in filings with the Court.

9.      Mr. Wynne said that he would speak to Kfir and his counsel about the matter. On Monday, December 14, 2025, Mr. Wynne sent me an email that, among other things, said: "I spoke to Jeff and Kfir with respect to the LOI and SEC complaint which I sent to Jeff as I told you I would to get their reaction. According to Kfir, there was never a contract, the company didn't pay or receive any money and no deal went into effect."

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on April 20, 2026 at Los Angeles, California.

/s/ Christopher E. Prince
Christopher E. Prince

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Lesnick Prince Pappas & Alverson LLP, 315 W. 9th Street, Suite 705, Los Angeles, CA 90015

A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND COMPLAINT RE ASPIRATION PARTNERS AND MODIFICATION OF SCHEDULING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF DIKLA GAVRIELI UNATIN AND CHRISTOPHER E. PRINCE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) April 20, 2026 , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Gregory K Jones**    gjones@stradlinglaw.com, smjohnson@sycr.com;smjohnson@stradlinglaw.com
- **Robert Allan Kors (TR)**    robertkorstrustee@gmail.com
- **Allison L Libeu**    alibeu@hueston.com, sjones@hueston.com
- **William N Lobel**    wlobel@tocounsel.com, mmason@tocounsel.com
- **Kerri A Lyman**    klyman@steptoe.com, #-FirmPSDocketing@Steptoe.com;nmorneault@Steptoe.com;mhernandez@steptoe.com;aodonnell@steptoe.com
- **Christopher E Prince**    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com;porpe@lesnickprince.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Richard Lee Wynne**    richard.wynne@hoganlovells.com, tracy.southwell@hoganlovells.com;cindy.mitchell@hoganlovells.com;rick-wynne-7245@ecf.pacerpro.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____ , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 20, 2026 Christopher E. Prince | /s/ Christopher E. Prince |
|---|---|
| *Date*          *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**