CHRISTOPHER E. PRINCE (SBN 183553)
  cprince@lesnickprince.com
LISA R. PATEL (SBN 341574)
  lpatel@lesnickprince.com
LESNICK PRINCE PAPPAS & ALVERSON LLP
315 W. Ninth Street, Suite 705
Los Angeles, CA  90015
Telephone:  (213) 493-6496
Facsimile:   (213) 493-6596

Attorney for Plaintiff Dikla Gavrieli, individually
and derivatively on behalf of Gavrieli Brands,
LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>KFIR GAVRIELI,<br><br>                Debtor. | Case No.  2:21-bk-10826-BB<br><br>Chapter 11<br><br>Adv. No.  2:21-ap-01034-BB |
| DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, individually and derivatively on behalf of GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>                Plaintiff,<br><br>      v.<br><br>KFIR GAVIELI, an individual,<br><br>                Defendant.<br><br>-and-<br><br>GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>           Nominal Defendant. | **COMPENDIUM OF EXHIBITS FOR MOTIONS FOR LEAVE TO AMEND COMPLAINT RE WAYFAIR AND ASPIRATION**<br><br>―――――――――――――――――<br><br>Hearing Information:<br>Date:   May 12, 2026<br>Time:   2:00 p.m.<br>Place:  Courtroom 1539<br>          255 E. Temple Street<br>          Los Angeles, CA 90012<br>          Or Remotely Via ZoomGov |

1

| Exhibit | Description |
|---------|-------------|
| A | Redline of Proposed Fourth Amended Complaint |
| B | Excerpts of Bank Records |
| C | [Intentionally left blank] |
| D | Alhusseini Plea Agreement |
| E | Sanberg Plea Agreement |
| F | Bloomberg Article re Aspiration |
| G | SEC Complaint (Sanberg) |
| H | CTN Holdings, Inc. chapter 11 petition |
| I | Discovery Requests re Wayfair and Aspiration |

# Exhibit A

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Lesnick Prince Pappas & Alverson LLP, 315 W. 9th Street, Suite 705, Los Angeles, CA 90015

A true and correct copy of the foregoing document entitled **COMPENDIUM OF EXHIBITS FOR MOTIONS FOR LEAVE TO AMEND COMPLAINT RE WAYFAIR AND ASPIRATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)April 20, 2026I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Gregory K Jones**   gjones@stradlinglaw.com, smjohnson@sycr.com;smjohnson@stradlinglaw.com
- **Robert Allan Kors (TR)**   robertkorstrustee@gmail.com
- **Allison L Libeu**   alibeu@hueston.com, sjones@hueston.com
- **William N Lobel**   wlobel@tocounsel.com, mmason@tocounsel.com
- **Kerri A Lyman**   klyman@steptoe.com, #-FirmPSDocketing@Steptoe.com;nmorneault@Steptoe.com;mhernandez@steptoe.com;aodonnell@steptoe.com
- **Christopher E Prince**   cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com;porpe@lesnickprince.com
- **United States Trustee (LA)**   ustpregion16.la.ecf@usdoj.gov
- **Richard Lee Wynne**   richard.wynne@hoganlovells.com, tracy.southwell@hoganlovells.com;cindy.mitchell@hoganlovells.com;rick-wynne-7245@ecf.pacerpro.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 20, 2026  Christopher E. Prince | /s/  Christopher E. Prince |
|---|---|
| *Date*          *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                   **F 9013-3.1.PROOF.SERVICE**

LATHAM & WATKINS LLP
Daniel Scott Schecter (Bar No. 171472)
daniel.schecter@lw.com
Nima H. Mohebbi (Bar No. 275453)
nima.mohebbi@lw.com
Tara A. McCortney (Bar No. 334942)
tara.mccortney@lw.com
Alexandra N. Ibrahim (Bar No. 340972)
alexandra.ibrahim@lw.com
10250 Constellation Blvd.CHRISTOPHER E.
PRINCE (SBN 183553)
cprince@lesnickprince.com
LISA R. PATEL (SBN 341574)
lpatel@lesnickprince.com
LESNICK PRINCE PAPPAS & ALVERSON LLP
315 W. Ninth Street, Suite 1100705
Los Angeles, California 90067CA 90015
Telephone: +1.424.653.5500 (213) 493-6496
Facsimile: +1.424.653.5501 (213) 493-6596

AttorneysAttorney for Plaintiff Dikla Gavrieli
a/k/a Dikla, individually and derivatively on behalf
of Gavrieli UnatinBrands, LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re | Case No. 2:21-bk-10826-BB (Chapter 11) |
| KFIR GAVRIELI, | Adversary No. 2:21-ap-01034-BB |
| Debtor. | **THIRD AMENDED VERIFIED DERIVATIVE COMPLAINT FOR:** |
| DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, individually and derivatively on behalf of GAVRIELI BRANDS, LLC, a California limited liability company, | **(1) BREACH OF FIDUCIARY DUTY;** |
| | **(2) CONVERSION;** |
| | **(3) CORPORATE WASTE; AND** |
| Plaintiff, | **(4) VIOLATION OF CAL. PEN. CODE § 496** |
| v. | |
| KFIR GAVRIELI, an individual, | |
| Debtor, | |
| - and - | |
| GAVRIELI BRANDS, LLC, a | |

California limited liability company,

Nominal Defendant.

2

Plaintiff Dikla Gavrieli a/k/a Dikla Gavrieli Unatin ("Plaintiff"), derivatively on behalf of Nominal Defendant Gavrieli Brands, LLC, hereby complains and alleges against Debtor Kfir Gavrieli ("Defendant") as follows:

## JURISDICTION, VENUE, AND THE PARTIES

1. On February 1, 2021, Defendant filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code in this Court, styled *In re: Kfir Gavrieli*, No. 2:21-bk-10826-BB (Bankr. C.D. Cal.) (the "Bankruptcy Case").  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. § 1409.

2. Plaintiff is an individual residing in this District.

3. Defendant is an individual residing in this District.

4. Nominal Defendant Gavrieli Brands, LLC (the "Company") is a California limited liability company with its principal place of business in this District; both of its members (Plaintiff and Defendant) reside in this District.

## DEMAND FUTILITY ALLEGATIONS

5. The Company has two members and managers, Plaintiff and Defendant.  Plaintiff has been a member at all times during the conduct and time period complained of herein.

6. During the relevant period for all claims asserted in this action, the Company has manufactured, marketed, and sold a stylish foldable women's shoe that could fit into a purse, yet still be comfortable and durable enough to be worn all day.

7. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights.

8. Beginning in September 2017 and to the present day, Defendant has been and remains in sole control over all aspects of the Company's business.[1]  As explained below,

---

[1] References herein to Defendant's seizure of control of the Company in late-2017 and exclusion of Plaintiff from Company management, operations, and finances since that time to the present, are offered only by way of background to establish that during the relevant period at issue on the claims asserted in this Third Amended Complaint, Defendant bears sole and complete responsibility for the Company's affairs and its massive decline.  In light of the Court's prior

3

Defendant has steadfastly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff despite multiple requests. There are no other current managers or members of the Company on whom a demand could be made.

9. Plaintiff first filed an Adversary Complaint asserting derivative claims against Defendant on February 19, 2021 (Dkt. 001), filed a First Amended Complaint asserting derivative claims against Defendant on May 24, 2021 (Dkt. 029), and filed a Second Amended Adversary Complaint asserting derivative claims against Defendant on September 2, 2022 (Dkt. 114) based on a substantial decline in the Company's value and profits. Defendant has failed to address the allegations set forth in these complaints.

10. Given Defendant's intransigence and his sole control of the Company, no demand is necessary and, in any event, demand would be futile given that Defendant is plainly not independent and disinterested as the allegations of this action are asserted against him personally, and include allegations that he has intentionally impaired the Company's performance and value. In addition, as discussed below, Defendant has shown no willingness to address the Company's dire performance and has rejected Plaintiff's proposal that the Company engage a financial advisor to review the Company's options and situation. All of this renders any demand futile.

11. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

### **FIRST CLAIM FOR RELIEF**
**(Breach Of Fiduciary Duty)**
**(By Dikla Gavrieli Unatin Derivatively Against Defendant)**

12. This derivative claim for breach of fiduciary duty is based on and limited to acts and omissions by Defendant which either occurred on or after **July 22, 2019**, and/or were discovered by Plaintiff on or after **July 22, 2019** (the "Relevant Period"). July 22, 2019 (the

---

rulings (which Plaintiff intends to contest on appeal), Plaintiff does not intend to rely on Defendant's seizure of control of the Company or exclusion of Plaintiff from the Company as grounds for imposing liability on Defendant in this proceeding (although Plaintiff expressly reserves her position asserted in briefing on Defendant's prior Motions to Dismiss that she should not have to exclude such facts from the claims asserted in this action). Rather, the claims asserted herein are based on Defendant's acts and omissions in connection with his sole operation and management of the Company from July 22, 2019 to the present.

4

"Operative Date")[2] is the date of the statutory discovery cutoff (under California Code of Civil Procedure § 2024.020) in the matter of *Gavrieli v. Gavrieli*, Los Angeles Superior Court Case No. BC686856 (the "State Court Litigation").[3]

**A.    The Company's Massive Decline During The Relevant Period While Under Defendant's Sole Control.**

13.    Because Defendant barred Plaintiff from Company management and from access to the Company's operations, finances, and books and records beginning in late-2017 and continuing throughout the Relevant Period, due to Defendant's conduct, and despite Plaintiff's repeated efforts to obtain information which Defendant repeatedly has resisted (as discussed below), Plaintiff has minimal information about the Company's operations, finances, and books and records.

14.    During the Relevant Period, Defendant has been in sole control of the Company and has repeatedly and continuously denied Plaintiff access to the Company's accounts and information to which she is entitled as a member of the Company.

15.    During the Relevant Period, Defendant delayed providing financial data to the Company's accountant to intentionally hinder and delay Plaintiff's eventual receipt of the Company's summary, year-end financial information long into the following calendar year. During the Relevant Period, when Plaintiff finally did receive financial information for the prior year, it revealed declines in Company performance. However, the year-end financial information that was provided to Plaintiff (again, many months into the following calendar year) came in the

---

[2] As used herein, the term "Relevant Period" refers to the period from the Operative Date (July 22, 2019) to the date of filing of this Third Amended Adversary Complaint.

[3] Plaintiff's claims in this Third Amended Complaint are limited to acts and omissions occurring during the Relevant Period (after the July 22, 2019 discovery cutoff in the State Court Litigation, based on the Court's ruling on Defendant's Motion to Dismiss the Second Amended Complaint). However, Plaintiff avers that the limited discovery which she was able to obtain from Defendant in the State Court Litigation provided little to no information about the mismanagement of the Company under Defendant's sole control, and as noted in footnote 1 and in prior filings, Plaintiff reserves her position for appeal that the date limitations Plaintiff has been required to apply to her claims here are inconsistent with prevailing Ninth Circuit law (*see Howard v. City of Coos Bay*, 871 F.3d 1032, 1039–40 (9th Cir. 2017); *L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 750 F.2d 731, 739 (9th Cir. 1984); *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021–22 (9th Cir. 2019)).

5

form of annual financial reports and lists of bank and credit card transactions, all of which were submitted without analysis, key business metrics, reports, or data. Without this critical context, and almost entirely without substantiation, this information does not reveal or disclose the reasons for the Company's decline.

16. As just one example of Defendant's embargo on providing critical information to Plaintiff, the only information Plaintiff received during the Relevant Period about Defendant's management of the Company's customer acquisition strategies or advertising – which is critical in driving the Company's sales – is an alleged annual advertising expenditure and a list of credit card charges which total that amount. The total dollar volume of the prior year's multimillion dollar advertising spend omits virtually all necessary information about the nature, frequency, and performance of advertisements under Defendant's sole management, which is essential to assessing the extent of Defendant's willful, grossly negligent, and/or reckless handling of that key aspect of the Company.

17. During the Relevant Period, Defendant also has never provided any monthly or quarterly progress reporting to Plaintiff on the Company's financial or operational performance, nor any informal reporting, even after the judgment in the State Court Litigation (the "State Court Judgment") confirmed her 50% ownership and right of joint control and management.

18. Simply put, during the Relevant Period, beyond denying Plaintiff the information and access she always had, Defendant has not provided anything remotely akin to the information, reporting, or presentations that would be provided to a board of directors, lenders, private equity sponsors, venture capital investors, or an executive committee, let alone a partner with equal right of joint management and control. Instead, Defendant has frozen out Plaintiff since taking control of the Company.

19. Thus, it was not until September 12, 2019 when Plaintiff first learned of the Company's purportedly final 2018 financial results from financial statements and tax returns provided by the Company's forensic accountant. On September 12, 2019, Plaintiff learned that,

6

under Defendant's sole control, the Company had experienced a decline in net income (profit) of approximately 15% from 2017 to 2018.[4]

20.    Due to Defendant's delay and concealment of Company financial information, Plaintiff first learned of the Company's 2019 financial results in mid-2020, when she learned that Defendant's mismanagement had caused the Company to do far worse in 2019 than prior years – even though 2019 entirely predated any impacts of the COVID-19 pandemic.

21.    Under Defendant's sole management and control in 2019, the Company experienced a 58% decline in net income (profit) from 2017 to 2019, and a 27% decline in sales over that same period.    This drastic decline under Defendant's sole control, which was accompanied by his continued failure and refusal to take any steps to mitigate the massive (and deliberate) decline, occurred as Defendant continued to seek a buyout of Plaintiff's interest in the Company for pennies on the dollar.

22.    Due to Defendant's continued delay and concealment of Company financial information, Plaintiff learned of the Company's 2020 financial results in mid-2021, during the pendency of the Bankruptcy Case, when she learned that, under Defendant's sole management and control in 2020, the Company experienced an over 80% decline in net income (profit) from 2017 to 2020, and a nearly 40% decline in sales over that same period.

23.    Under Defendant's sole management and control in 2021, the Company's financial results declined even further.    According to draft financial reports received in June 2022, Defendant oversaw an 82% decline in net income (profit) from 2017 to 2021, and a 49% decline in sales over that same period.    Plaintiff has yet to receive the Company's final 2021 financial reports.

---

[4] In April 2019, Plaintiff received a preliminary estimate for the Company's expected 2018 net income on which estimated tax payments could be made.  However, those preliminary numbers only showed a decline in net income of about 7% compared to the prior year, less than half of the decline illustrated by the Company's year-end financials provided on September 12, 2019, which showed a decline in net income of about 15%.  The 7% decline in net income reflected in the Company's 2018 preliminary numbers in April 2019 was not enough to put Plaintiff on notice of the major harm being inflicted upon the Company by Defendant.

7

24.    Defendant has not yet provided financial statements or any interim reporting on 2022 results, and he continues to refuse to provide Plaintiff with the necessary information or access to substantiate the financial results he has reported.  Plaintiff is informed and believes and alleges thereon that the Company's performance under Defendant's control in 2022 to date has declined even further from its performance in 2021.  The information necessary to confirm this allegation is in Defendant's sole possession, custody, and control, and he has declined to provide that information to Plaintiff.

25.    The chart below indicates the Company's catastrophic downturn under Defendant's sole management and control based on information provided to Plaintiff during the Relevant Period:

**Comparison to 2017 Performance**

| Year | Sales Decline From 2017 | Net Income Decline From 2017 | Company Value Per Defendant's Experts |
|---|---|---|---|
| 2017 | | | $388 million (year-end) |
| 2018[5] | -10.1% | -18.9% | |
| 2019[6] | -26.9% | -58.2% | |
| 2020[7] | -39.8% | -80.4% | $40 million (Feb. 2021) |
| 2021[8] | -49.3% | -82.3% | |

26.    Based on tax returns and financial statements prepared for the Company by its forensic accountant Howard, Kittle & Company provided to Plaintiff since July 22, 2019, the Company has suffered lost profits totaling tens of millions of dollars and far more in value under Defendant's sole control and mismanagement.

---

[5] 2018 results were first reported on September 12, 2019 in Profit & Loss Statement prepared for the Company by Howard, Kittle & Company.  Howard, Kittle & Company provided updated results for 2018 in an August 5, 2021 Profit & Loss Statement.

[6] Per August 5, 2021 Profit & Loss Statement prepared for the Company by Howard, Kittle & Company.

[7] Per August 28, 2021 Profit & Loss Statement prepared for the Company by Howard, Kittle & Company.

[8] Per draft Profit & Loss Statement prepared for the Company by Howard, Kittle & Company and provided to Plaintiff in June 2022.

8

27.     Indeed, Defendant and his own financial experts confirmed an extraordinary loss of Company value under his sole control in sworn testimony in this bankruptcy case and in the State Court Litigation.  For example:

a.  Defendant's valuation expert, Dr. Bruce Strombom of Analysis Group, Inc., testified under oath in the State Court Litigation that the Company's valuation entering 2018 was **$388 million**.  That was almost precisely when Defendant seized sole control of the Company and became solely responsible for its performance. To arrive at this figure, Defendant's expert utilized the Market Approach and Income Approach methods of valuation, with each method indicating a value of $410.9 million and $366.2 million, respectively, at December 31, 2017. Defendant's expert then took the average of these two values to reach a Weight-Adjusted Fair Market Value of the Company at $388 million for the time at which Defendant's sole management began.

b.  In March 2021, early in his Bankruptcy Case, Defendant submitted a valuation of his ownership interest in the Company prepared by his financial advisor, Michael VanderLey of Force 10 Partners.  (Bk. Dkt.[9] 184-2 at 3.)   In the Liquidation Analysis prepared in connection with Defendant's First Amended Disclosure Statement, and also submitted in a Declaration in Support of the Debtor's Response to the Court's Order to Show Cause regarding Appointment of a Trustee, Mr. VanderLey valued Defendant's 50% ownership interest in the Company at $20 million, which implied a maximum valuation of the Company of just **$40 million** as of 2021.  (Bk. Dkt. 184 at 23; Bk. Dkt. 184-2 at 3; Bk. Dkt. 289 at 11.)

28.     These valuations prepared by Defendant's own financial experts establish that during the Relevant Period, Defendant presided over a decline in value of approximately $350 million – and the destruction of an astonishing *90%* of the Company's value.

---

[9] "Bk. Dkt." refers to Defendant's Chapter 11 Case: *In re: Kfir Gavrieli*, No. 2:21-bk-10826-BB (Bankr. C.D. Cal.).

9

29.     As discussed below, Plaintiff has not yet had an opportunity to obtain discovery into or information about the Company's operations and Defendant's management during the Relevant Period (indeed, she did not have the chance to obtain such discovery for the period before July 22, 2019, and the discovery Defendant provided in the State Court Litigation provided minimal information about the Company's management, operation, or finances).  As such, she remains unable to have a financial expert prepare a reliable and independent valuation of the Company or measurement of the damage inflicted by Defendant during the Relevant Period.  It is possible that the value destruction caused by Defendant's acts and omissions exceeds the 90% figure established by his own experts, but this will be the subject of fact and expert discovery in this action.

30.     Based on the minimal information available to Plaintiff, she is informed and believes and alleges thereon that the Company's value has decreased even further since Defendant's financial expert conducted his valuation in early 2021.  While the specific value of the Company and the value destruction caused by Defendant will be subject to proof at trial, the significant drop in sales and profits reported for the Company during the calendar year 2021 as compared to 2020, as well as expected results for 2022, suggests a lower overall value than Mr. VanderLey's March 2021 valuation, which presumably was based on the Company's 2020 performance.  Moreover, the Company's value may be further impacted by the fact that Defendant now has presided over four consecutive years of declining sales and profits.  Therefore, Plaintiff is informed and believes and alleges thereon that Defendant may have presided over a destruction of over 90% of the Company's value from 2018 to the present.

31.     This massive, consistent, and catastrophic decline in the Company's performance cannot be explained away by mere competition or market forces.  Indeed, no executive or manager would be retained after presiding over such a calamitous decline.  Rather, this decline is the product of Defendant's intentional, reckless, and grossly negligent misconduct, as is Defendant's complete and total failure to take any steps to arrest or reverse the decline.

10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

32.    In particular, Defendant is acting willfully and intentionally to depress the Company's value to try to increase Plaintiff's financial distress, with the ultimate goal of obtaining Plaintiff's ownership interest in the Company for pennies on the dollar.

33.    To achieve his personal goals to the detriment of the Company, and in contravention of the Company's historically innovative operations (which led to its renowned status), Defendant intentionally, knowingly, recklessly, and in a grossly negligent manner caused the Company's performance to decline and did nothing to try to prevent, arrest, or reverse the decline.

34.    Defendant has failed to implement strategies, or even bring in outside professionals or consultants to advise on possible strategies, which could have arrested or reversed the Company's decline, let alone produce some improvement in the Company's performance.  The Company has been flush with cash throughout the Relevant Period, and easily could have invested in growth strategies and/or hired or engaged experienced professionals and/or outside experts. Defendant nevertheless stood idle as the Company went into a tailspin, which his own experts confirm have resulted in destruction of almost the entire value of the Company.  Defendant cannot explain or justify why he failed to act as the Company imploded while it had massive cash reserves which Defendant failed to deploy, and his inaction constitutes willful, grossly negligent, and reckless conduct.

35.    Plaintiff is informed and believes, and alleges thereon, that Defendant's complete inaction in the face of the Company's decline and implosion was to serve his own personal interests in trying to force Plaintiff to sell her ownership interest at a minimal value.  In doing so, he breached his fiduciary duties to the Company by putting his personal interest in buying out his co-owner above the Company's.

**B.    Defendant Has Wrongfully Concealed And Withheld Company Information Which Would Provide The Reasons For The Company's Decline And Either Prove Or Disprove Defendant's Feeble Excuses.**

36.    As part of his effort to conceal the nature and extent of his misconduct, Defendant has refused to provide Plaintiff with relevant and crucial financial information about the Company, which Plaintiff repeatedly has sought, and to which she is entitled on multiple grounds, including:

11

(1) as a member and manager of the Company; (2) pursuant to the State Court Judgment and permanent injunction; and (3) through formal or informal discovery during the Bankruptcy Case. Plaintiff's efforts to obtain crucial information about the Company through formal and informal means during the pendency of Defendant's Bankruptcy Case include:

    a. **February 26, 2021 and March 4, 2021**: After filing the adversary complaint, the Unatins propounded discovery on the Defendant that included requests directed at Company operations and management. Defendant refused to provide responses to that discovery, other than some basic information unrelated to the Company.

    b. **August 4, 2021**: Counsel for Plaintiff submitted to the Chapter 11 Trustee a list of informal requests for information about the Company and Defendant's management. The Chapter 11 Trustee declined to provide information in response to this request due to Defendant's objections.

    c. **October 26, 2021**: At the request of counsel for the Chapter 11 Trustee, Plaintiff streamlined her informal request for information about the Company and Defendant's management. This request was also denied.

    d. **January 31, 2022**: Shortly after the Trustee filed his Plan of Reorganization ("the Plan") and Disclosure Statement, the Unatins made yet another modest, informal request for information about the Company and Defendant's management to assist in their preparation of a response to the Plan and Disclosure Statement. Counsel for the Unatins also asked for a deposition of the Defendant, which was rebuffed.

    e. **February 9 and 16, 2022**: Plaintiff served formal discovery requests on Defendant and the Trustee in Defendant's Bankruptcy Case seeking information about the Company and Defendant's management. Defendant refused to produce the documents and information requested regarding the Company.

    f. **March 15, 2022**: The Trustee sought and obtained a protective order on an expedited basis. Since then, the Trustee provided a handful of documents (183 in total) "pertaining to Force Ten LLC's work in connection with the Trustee's Plan

12

of Reorganization." In the cover letter transmitting these documents, the Trustee made clear that he would not be producing documents pertaining to the Company.

    g. **May 2, 2022**: The Trustee allowed counsel for Plaintiff to conduct a deposition on Mr. VanderLey of Force 10. In this deposition, Mr. VanderLey refused to provide information about the Company and counsel for the Chapter 11 Trustee instructed him not to answer questions regarding the Company.

37. On **September 1, 2022**, in another effort to obtain information to allow Plaintiff to ascertain the specific reasons for the Company's decline and the precise dimensions of Defendant's misconduct, Plaintiff issued an inspection demand pursuant to California Corporations Code Section 17704.10(a). The information requested in the demand has not been provided to Plaintiff by Defendant or the Company to this day; instead, counsel for the Company, selected and hired exclusively by Defendant, responded to the demand months late on January 17, 2023 and offered only to provide Mrs. Unatin with the same limited information that she already has.

**C.**     **Defendant's Willful, Reckless, And Grossly Negligent Conduct Regarding The Company's Business.**

38. Although Defendant's concealment and withholding of Company information precludes Plaintiff from fully detailing his ongoing misconduct at this stage of the litigation, she alleges on information and belief – based on the record of the Company's recent abysmal financial performance, and the limited information available to her – that from July 22, 2019 to the present, critical strategic and operational components such as the Company's sales and marketing, advertising, product line, administration, e-commerce storefront, creative, customer service, supply chain, and various other areas have been intentionally hindered and/or mismanaged by Defendant through grossly negligent and reckless conduct, all as part of Defendant's efforts to advance his own personal interests at the expense of the Company.

39. On information and belief, examples of Defendant's intentional, reckless, and grossly negligent misconduct since July 22, 2019 include the following (without limitation):

40. Defendant has manipulated and intentionally, recklessly, and in a grossly negligent manner mismanaged the Company's customer acquisition and advertising strategies, which he

13

personally oversees, thereby harming sales, profits, and brand strength, and increasing costs. Specifically, Defendant has manipulated advertising budgets and customer acquisition mechanisms to artificially limit or otherwise lower sales, for example by limiting the reach, spend, or budget of well-performing ads to slow and restrict sales.

41.     Defendant has allowed the Company to spend massive amounts on stale and poor producing ads, causing the Company to incur millions of dollars in annual spend on unproductive ads and declining sales.

42.     Defendant has failed to market the Company's product in other countries, despite having the resources and ability to do so, including in dozens of countries where the Company already invested significant resources to protect its intellectual property therein specifically in preparation for marketing and sales, and in which the Unatins were working to capitalize at the time Defendant locked them out.   This includes various English-speaking markets where advertising would be highly cost-effective and efficient, as the Company could largely run already available ads and creative to reach substantial new markets.

43.     Defendant has failed to leverage, maintain, or expand the brand through various available and potentially lucrative sales channels.  This includes any attempt to sell or distribute the Company's product with any retailer whatsoever, including various hugely popular online marketplaces (such as *Zappos*, an online retailer with a massive customer base that extended an offer to sell the Company's products), online retailers, or traditional brick and mortar retailers.

44.     Defendant has failed to cultivate and has mismanaged the Company's formerly vibrant online communities, squandering a longtime core strength of the brand.  Defendant has failed to implement meaningful marketing or advertising campaigns, failed to maintain or continue successful campaigns, and in other cases recycled stale campaigns from prior years (for example: in 2019-2022 repeatedly relaunching a "Neon" campaign including reusing certain creative elements created and advertised earlier; and in 2020 launching the "Rosé" shoe by copying the Company's previous and heavily used "Champagne" shoe campaign).

45.     Defendant has grossly mismanaged and neglected the Company's business development efforts, brand partnerships, and other direct and third-party campaigns that have

14

driven past Company success.  As a result of Defendant's intentional mismanagement of the Company's sales efforts, the Company's sales are currently limited entirely to just its own small website.

46.     Defendant has intentionally, recklessly, and in a grossly negligent manner mismanaged the Company's product, including the failure to expand or meaningfully refine the Company's existing product line.  As a result, the Company's sales are based entirely on a single shoe style, a women's ballet flat.  Although the Company's product is available in various colors, as Defendant ran out of those colors and materials which had been hand-picked by Plaintiff, Defendant has in large part eschewed the launch of new colors, and when he did, he made regrettable choices in many instances further damaging the Company's sales and brand.  Defendant also took an unlaunched children's product line with tremendous potential, and mismanaged its marketing, severely limiting its sales and potential to strengthen the brand.  Defendant's gross mismanagement including the relaunch of shoes that were originally marketed as limited releases, one-of-a-kind shoes, and seasonal styles, has undermined brand credibility and alienated customers who purchased "limited edition" or "seasonal" shoes under the impression that they would not be relaunched at a later date.  This included repeatedly making available the "Champagne" and "Love Potion" shoes which were marketed specifically as having limited and brief availability with enhanced exclusivity and value.

47.     Defendant has failed to adapt or capitalize on obvious consumer and industry trends.  Those include materials usage where, for example, Defendant has mismanaged the Company's pioneering Vegan line, for which there was significant demand and even more potential.  Defendant instead chose to develop shoes made from materials that are known in the industry to be poor quality for footwear -- such as velvet -- even though Defendant and Plaintiff previously had decided not to use such materials precisely because of these quality concerns and lack of demand.

48.     Defendant has failed to expand the Company's brand into other product categories discussed and planned by the parties, including various categories in which the Company has long since invested significant resources to protect its intellectual property in preparation for that

15

expansion. Those product lines, and the intellectual property therefore, sit unused at a time when the Company's performance is significantly suffering. Thus, Defendant's intentional mismanagement of the Company's product line has limited the Company's sales entirely to a single shoe style, with no attempt to broaden that product line, limiting the Company's sales and performance in the face of catastrophic decline.

49. Defendant has intentionally, recklessly, and in a grossly negligent manner mismanaged the Company's inventory and supply chain generating large wasteful and costly surpluses of some styles, and insufficient supply of others. This includes his failure to appropriately order certain colors, sizes, and components, resulting in shortages and lost sales.

50. Defendant's intentional, reckless, and/or grossly negligent mismanagement of inventory has also resulted in a massive surplus of total inventory totaling hundreds of thousands of pairs on hand and generated a multiyear prepaid supply of product. For example, the limited data available to Plaintiff indicates that despite plummeting sales, Defendant poured millions of dollars into inventory and purchasing, growing inventory by nearly 25% in 2019 alone, and by maintaining an increasingly massive stockpile of surplus inventory through 2020, 2021, and beyond. In addition to stockpiling inventory beyond any reasonable metric given the Company's declining sales under his control, Defendant has inexplicably made payments to suppliers that exceed what was purchased, effectively pre-paying hundreds of thousands of dollars to suppliers for no rational business purpose and thus improperly reducing the Company's cash on hand. These habits and Defendant's stockpiling are unheard of in the fashion industry for a Company of this size. By maintaining a huge surplus of shoe inventory, Defendant also risks negatively impacting the quality and condition of the Company's fine leather shoes as they sit for months or years before selling, as well as loss from theft and other damage (an audit and inspection of inventory will be required to determine the extent of any impairment from these large stockpiles). Despite these issues, Defendant continues to maintain and add to the Company's now multiyear supply of shoes on hand, and he has done so deliberately to manipulate and reduce the Company's cash on hand, while reducing the cash available for distribution, by converting that cash to inventory, in service of his own personal interests against Plaintiff.

16

51. Defendant has intentionally, recklessly, and in a grossly negligent manner mismanaged various aspects of Company operations, including his failure to hire professional management to properly or efficiently run the Company.  This includes Defendant's deliberate refusal to bring in any experienced managers, directors, or executives to improve the various areas of the Company contributing to its drastic financial decline.  Defendant refuses to bring in such professionals because of his deliberate efforts to suppress the Company's value, and conceal the occurrences and effects of his mismanagement.

52. Defendant has failed to implement any reliable accounting system for the Company, despite the significant tax and financial issues at the core of this dispute.  For example, companies of all sizes, let alone ones as successful as the Company, use at least basic accounting software to track financial data throughout the year.

53. Even the most basic accounting software allows companies to track sales and expenses, substantiate spending, generate financial reports, and maintain necessary oversight and visibility over a company's financial operations.  However, Defendant has refused to implement any accounting software, such as QuickBooks, or bookkeeping system whatsoever at the Company.

54. Rather than have any appropriate system, Defendant instead waits until after a calendar year ends, and typically months longer, and then sends a host of bank and credit card transactions to an outside forensic accountant who is then forced to try and reconstruct financial statements and a general ledger for the Company for the previous year.

55. Moreover, the bank account and credit card transactions sent to the accountant lack the necessary detail and itemization to properly classify business expenses.  As the accountant is not at the Company, and because there is no bookkeeper at the Company or any bookkeeping system or accounting software in place, the accountant is forced to rely on Defendant's representations regarding the thousands of financial transactions to be classified, or guess what each charge was for in his attempts to categorize the Company's expenses for the previous year.

56. Additionally, Defendant's baffling accounting practices in the face of the Company's substantial tax and financial issues suggest that he intentionally, recklessly, or with

17

gross negligence fails to implement any sort of accounting or bookkeeping system in order to obscure improper transactions or transfers of funds made entirely for his own benefit or for the benefit of his family members and others assisting him.

57.     Defendant has intentionally, recklessly, and in a grossly negligent manner mismanaged the Company's e-commerce website, which remains its sole storefront and source of revenue despite years of rapidly declining sales under his sole management and control. Defendant's mismanagement of the design and development of the Company's website includes his failure to implement industry standard applications and technologies that facilitate shopping online.  For example, Defendant uses an outdated, unsecure, and costly to develop e-commerce shopping cart platform (putting Company and customer information at risk), has failed to adopt or implement available productive and industry standard features, and has failed to improve the user interface or user experience of the Company's website design.

58.     Defendant has intentionally, recklessly, and in a grossly negligent manner mismanaged the Company's customer service operations, causing an increase in refunds, returns, expenses, and dissatisfaction with the brand.[10]

59.     Defendant has intentionally, recklessly, and in a grossly negligent manner mismanaged the Company's legal affairs, running up millions of dollars in legal fees in the process. However, as Defendant has refused to disclose key information regarding the Company's legal matters or operations to which Plaintiff is entitled and despite her explicit request, Plaintiff cannot allege more details regarding the full extent of Defendant's mismanagement of the Company's legal affairs.  Defendant continues to expend considerable sums initiating new litigation without consulting Plaintiff.  (*See, e.g., Gavrieli Brands LLC v. Xiamen Huaxi Tech. Co.*, No. 2:22-cv-5924 (C.D. Cal. filed Aug. 19, 2022); *Gavrieli Brands LLC v. Lovie Pearl GmbH*, No. 2:22-cv-6112 (C.D. Cal. filed Aug. 26, 2022)).

---

[10] Defendant also had the Company enter into off-brand business partnerships that intentionally, recklessly, or in a grossly negligent manner damaged the Company's brand.  For instance, in May 2020, Defendant entered the Company into a partnership with Aspiration Bank, a company affiliated with his friend and lender , whereby the Company's high-end designer shoe customers were asked to sign up for an Aspiration bank account in exchange for a Tieks discount.  This arrangement was understandably poorly received by the Company's customers.

18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

BK NO.: 2:21-bk-10826-BB
THIRD AMENDED COMPLAINT

**D.**      **Defendant's Failure To Take Steps To Arrest The Company's Decline Is The Product Of Independent Willful Misconduct, Recklessness, And Gross Negligence.**

60.      Defendant has no excuse for failing to take appropriate steps to create profit and revenue growth for the Company, such as pursuing other markets, online sales channels, traditional brick and mortar sales channels, improving its advertisements and customer acquisition, refreshing or expanding its product lines, modernizing and improving its e-commerce storefront and website, hiring talented and experienced employees and professionals, or expanding into international markets.

61.      Indeed, almost two years ago, Defendant stated under oath in his Bankruptcy Case that the Company may need to expend capital to "significantly expand its sales and marketing channels" (Bk. Dkt. 36 ¶ 10), yet throughout the Relevant Period the Company has maintained approximately $20 million in cash sitting idle, which Defendant never deployed to expand, alter, or modify sales and marketing channels used by the Company or add new product offerings, or take other steps to address the Company's decline.  Despite the Company being flush with enough cash that could have been utilized in multiple ways to address the downward trajectory of the Company, Defendant never brought in outside professionals or consultants to advise on possible strategies to arrest the Company's decline and even produce substantial improvement in the Company's performance.[11]

62.      Instead, Defendant spent millions of dollars of Company assets on unsubstantiated and questionable payments while Company profits dwindle under his sole control with no rational business purpose, and while he continues to conceal all Company information, particularly that which will confirm his present misconduct.  Furthermore, at no time during the Relevant Period has Defendant solicited input from the Unatins on how to address the Company's collapse or improve its performance such as to the levels it enjoyed under the Unatins' sole management in 2017 or the parties' joint management in prior years.

---

[11] To the extent Defendant claims that the State Court injunction barred him from doing so, Defendant never once asked Plaintiff to consent to any capital expenditures to improve the Company's performance.

19

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

BK NO.: 2:21-bk-10826-BB
THIRD AMENDED COMPLAINT

**E.**      **Defendant's Rejection Of Plaintiff's December 3, 2019 Proposal That The Company Retain A Financial Advisor To Help The Company Address Its Decline Under Defendant's Control.**

63.      Separate and apart from the foregoing wrongful acts, Defendant rejected a proposal by Plaintiff to bring in outside professionals to help address the Company's financial decline under his watch.  Plaintiff made this proposal in December 2019, after the trial in the State Court Litigation, based on 2018 year-end results provided to Plaintiff on September 12, 2019.  Plaintiff's proposal to Defendant was made in an effort address the Company's downturn as it was then known to her, before Defendant revealed the deep extent of the Company's continuing decline during 2019.

64.      On December 3, 2019, Plaintiff (through counsel) made an explicit proposal in writing to Defendant's counsel (the "Financial Advisor Proposal"):

> As we discussed this evening, given the deadlock between Mrs. Unatin and Mr. Gavrieli which you have commented on, and in light of the Company's performance over the past two years (as confirmed by Mr. Gavrieli's testimony during Phase II of the trial), Mrs. Unatin believes it is in the best interests of all involved for the Company to engage a financial advisor to review the Company's options and situation (and Mrs. Unatin's and Mr. Gavrieli's options as owners), including a potential sale of some or all of the Company to a strategic or financial buyer.
>
> Specifically, Mrs. Unatin proposes that the Company engage a financial advisor to be selected and overseen by mutual agreement of Mrs. Unatin and Mr. Gavrieli for this purpose.  Please advise if Mr. Gavrieli agrees to this proposal.

65.      The Financial Advisor Proposal was a straightforward, neutral proposal which plainly was in the best interests of the Company and its members, particularly given Defendant's awareness of the Company's 2019 decline which he had not yet disclosed to Plaintiff.  Given the Company's stunning decline in 2018 and 2019, any prudent manager (or officer or board member) would have sought out expert advice on how to address the Company's performance issues.

66.      Nevertheless, despite the Company's abysmal performance in 2019 – entirely prior to the onset of the COVID-19 pandemic – Defendant rejected the Financial Advisor Proposal. Defendant did so intentionally, recklessly, and with gross negligence in an effort to maximize his personal goal of driving down the price at which he could acquire Plaintiff's membership interest in the Company.

20

67.    There is no possible excuse for Defendant's rejection of the Financial Advisor Proposal and refusal to bring in outside advisors to provide guidance to the Company (and its members and managers) on how to address its poor performance, other than his intention to do financial harm to Plaintiff and to suppress the Company's value in anticipation of making a lowball buyout proposal to Plaintiff.

68.    Even apart from Defendant's intentional breach of his fiduciary duty to the Company in rejecting the Financial Advisor Proposal, his rejection of that proposal – which would have provided the Company, its managers, and members with information and expert advice on how to address the Company's declining fortunes – was grossly negligent and reckless.

69.    Defendant's rejection of the Financial Advisor Proposal caused the Company massive damage.  Based on the minimal information Defendant has provided about the Company's performance in calendar years 2020 and 2021, it is evident that Defendant caused further significant decline in the Company's sales and net income after he rejected the Financial Advisor Proposal at the end of 2019.  Defendant has no excuse or legitimate business reason for his rejection of Plaintiff's explicit, simple proposal to bring in a mutually acceptable, neutral expert to help the Company arrest its decline.  At the end of 2019, the Company had more than $17 million in cash in its bank account, making the cost of retaining a financial advisor virtually inconsequential and rendering Defendant's intransigent rejection of the Financial Advisor Proposal totally inexplicable.

70.    Defendant willfully refused Plaintiff's proposal that the Company bring in a neutral, outside financial advisor because he had intentionally, recklessly, and in a grossly negligent manner caused the Company's decline for his own personal reasons.  Defendant had no desire to arrest that decline because such a neutral advisor for the Company would have exposed details of Defendant's malfeasance and mismanagement.

**F.    Defendant's Wrongful Self-Dealing And Use Of Company Property To Financially Benefit Himself, Family And Friends.**

71.    Instead of maintaining the Company's success or fulfilling his fiduciary duties, on information and belief, Defendant has intentionally, recklessly, and in a grossly negligent manner

21

repeatedly put his own interests above the Company, and has improperly taken and used Company resources for his own benefit, in instances that cannot be attributed to any rational business purpose. As noted above, as part of his effort to conceal the nature and extent of his misconduct, Defendant has concealed information about these transactions from Plaintiff, which she has requested multiple times and to which she is entitled on multiple grounds, including (1) as a member and manager of the Company (including an inspection demand pursuant to California Corporations Code Section 17704.10(a)); (2) pursuant to the State Court Judgment and permanent injunction; and (3) through formal or informal discovery during the Bankruptcy Case which Defendant and the Chapter 11 Trustee refused to provide. Plaintiff reserves the right to amend this complaint to add additional information which Defendant has concealed and refused to disclose to Plaintiff despite repeated requests.

72. These suspect transactions since July 22, 2019 include (without limitation):

a. Stealing from the Company through payments to himself or on his behalf, or to individuals who have aided Defendant's misconduct, and concealing and otherwise failing to substantiate many others. For example:

i. Defendant has charged millions of dollars on credit cards which are issued in his personal name, and has made personal expenses and payments, all from Company funds without consent or authorization. For example, Company funds have been used to pay tens of thousands of dollars, if not more, to various retailers like Amazon, Nordstrom, and Target, personal assistants, public relations services, grocery stores, and other items to benefit Defendant personally at the Company's expense. Defendant has transferred or caused to be transferred millions of dollars in Company funds to various unknown individuals and entities, including various foreign entities. This includes hundreds of individual foreign transactions and thousands of domestic transactions, including various wires, electronic transfers, and handwritten paper checks, with no oversight or substantiation. Additionally, Defendant has allowed

22

others to charge millions of dollars on credit cards paid from Company funds. This includes purported Company credit cards he had issued in the name of family members and others for their and/or his benefit, as well as electronic payments and handwritten checks drawn directly from the Company's operating account. Despite demands, Defendant has failed to substantiate such charges, which include thousands of individual transactions during the Relevant Period on apparent personal expenses at various grocery stores (Bristol Farms, BevMo, Glatt Mart, Pavilions, Ralph's, Smart and Final, Trader Joe's, Vons, Whole Foods), personal credit services (Experian), luxury gym memberships (Equinox), high-end clothing retailers (Nordstrom), home goods (Amazon, Bath & Body Works, Bed Bath & Beyond, Home Depot, HomeGoods, Target, Walmart), bakeries (Hansen Cakes, Krispy Kreme, La Brea Bakery, La Provence Patisserie, Magnolia Bakery, Mrs. Field's, Porto's Bakery, Susie Cakes), drug and convenience stores (7-Eleven, CVS, Rite Aid), restaurant delivery (DoorDash, Instacart, Postmates, Uber Eats), transportation (Rapid Gas, Uber), countless restaurants, and many others. Just a few examples include: (1) handwritten checks by Defendant's sister for pool service at Defendant's mother's home in September 2019 and again in January 2021, with over $1,000 of Company funds used in 2021 alone for routine pool maintenance; (2) thousands of dollars for personal healthcare services including to Medicare, Blue Shield and other recipients outside of the Company's employee healthcare program, with approximately $9,000 of Company funds used is 2021 alone for medical expenses believed to be for Defendant's mother; (3) tens of thousands of dollars by Defendant to fund personal assistants and other unknown personal expenses through Upwork.com; (4) recurring membership

23

expenses for Defendant's mother's personal Care.com services, personal Google/cloud computing services, and credit card and membership fees; (5) tens of thousands of dollars spent by Defendant's sister Mrs. Betesh at restaurants and grocery stores often at locations near her home and on weekends or days when the Company's office was closed, such as purchases during the height of the COVID-19 lockdown when employees were all or largely out of the office, or an October 20, 2019 purchase by Mrs. Betesh at a Trader Joe's in Torrance, far from the Company's office and on a Sunday when it was closed, a January 1, 2020 purchase by Mrs. Betesh at the Whole Foods near her home on New Year's day, a July 5, 2020 purchase by Mrs. Betesh at the Bristol Farms near her home on Saturday of Fourth of July weekend, and a December 26, 2020 purchase by Mrs. Betesh at the Ralph's near her home on Saturday of the Christmas holiday weekend, and many more; (6) thousands of dollars spent by Defendant's personal assistant, Catherine Pickard, on various seemingly personal items for Defendant and/or herself; (7) thousands of dollars spent by Mrs. Betesh at retailers ranging from specialized cultural shops such as Abi's Judaica & Gifts and Glatt Kosher Market, to traditional and online retailers such as Target, Costco, Amazon and others; and (8) hundreds of handwritten paper checks written by Mrs. Betesh to various individuals with no oversight or substantiation. Even limited to the little information currently available to Plaintiff, these examples are in no way exhaustive, and are instead included for illustrative purposes regarding Defendant's massive unsubstantiated and unchecked spending of Company funds, including tens of thousands of transactions for which no substantiation has been offered.

24

ii. During the Relevant Period, Defendant has used Company funds to intentionally and substantially overpay his expected tax liabilities. From 2020 through 2022 alone, these payments have totaled over $3 million dollars, despite Defendant's knowledge, including repeated representations by Defendant to this Court in his Bankruptcy Case, that he expected little to no tax liability for those years. Defendant's actions to substantially overpay his tax liabilities were undertaken with the intent to benefit himself personally by generating large refunds and offsets, thereby funneling Company cash to himself under the guise of payments to the IRS and FTB.

iii. During the Relevant Period, Defendant has used Company funds to benefit and pay for the expenses of family members completely unrelated to the Company. These payments have included thousands of dollars to attorneys in Hawaii for Defendant's brother, such as a $5,000 payment on March 9, 2020; a $2,000 payment on May 12, 2020; a $5,000 payment on October 22, 2020; and a $3,000 payment on May 18, 2022.

iv. During the Relevant Period, Defendant shifted millions of dollars of Company spending away from the Company's American Express cards to specific credit card(s) in his name. Defendant did so to generate substantial credit card rewards and cash back benefits worth tens of thousands of dollars that he personally retained at the Company's expense. In addition to Defendant improperly benefitting himself, Defendant knowingly cost the Company at least tens of thousands of dollars by depriving it of the substantial discounts and benefits it would otherwise receive if the spending had not been shifted away from the Company's longtime use of its American Express charge cards that generate an immediate 1.5% discount on all spending.

25

BK NO.: 2:21-bk-10826-BB
THIRD AMENDED COMPLAINT

b. Refusing to remove family members from the Company payroll who were not employees and who provided no services to the Company, and instead rewarding them for their loyalty to him through improper benefits at the Company's expense. For example:

    i. During the Relevant Period, Defendant has paid his mother hundreds of thousands of dollars directly via the Company's payroll, even though she does not work for the Company. Confirming the impropriety of these substantial funds to Defendant's mother, the Company's forensic accountant is then forced to manually re-allocate the amount of those and related payments to remove them from the Company's Salaries & Wages Expense, including payroll taxes improperly paid on her behalf, and reclassify all such funds as distributions for the purposes of the Company's taxes and financial statements. However, Defendant's funneling of these funds to his mother has still not stopped, nor have any of these funds been repaid or returned to the Company. Defendant's improper payments to his mother, totaling hundreds of thousands of dollars, is of particular concern because Defendant's mother claims to be a substantial creditor in his Bankruptcy Case with a claim of $500,000, based on an alleged loan which she and Defendant admitted was not documented, had no stated interest rate or maturity, and which involved an alleged payment of $90,366 – not made by wire or check – but entirely in *cash*.

c. Mismanaging, running off and/or firing valuable Company employees, while retaining, elevating, and improperly compensating others, regardless of performance, based on perceived loyalty to him above the Company. For example, Defendant has used Company funds to give substantial "bonuses" and raises to certain Company employees and individuals who testified falsely on his behalf during the State Court Litigation to reward their support for him. These bonuses

26

and raises dramatically increased the total compensation to these individuals by 75-90% in a four-year period, making them the highest paid employees at the Company.  Further, Defendant rewarded these individuals with these massive increases in their compensation, despite the Company's unprecedented poor financial performance over the same period including the areas of which these employees are ostensibly responsible.

73.   Despite Defendant's half-hearted attempt to excuse the Company's precipitous decline under his watch as the result of an alleged sudden onset of competition (oddly concurrent with him seizing sole control of the Company) or the COVID-19 pandemic (which saw a marked increase in e-commerce sales across the industry as a whole), competition has always existed, and the decline was engineered by Defendant and, as noted in the above chart, was well underway before the onset of the pandemic (e.g., Defendant caused profits to decline by almost 50% by the end of 2019, totaling tens of millions of dollars).

## G.      The *Wayfair* Issue.

74.   Prior to 2018, longstanding Supreme Court precedent precluded states from collecting sales tax from sellers with no physical presence in their state. On June 21, 2018, the Court reversed its prior rulings in *South Dakota v. Wayfair, Inc.*, 585 U.S. 162 (2018). The *Wayfair* decision established an "economic nexus" test, thereby allowing states to impose sales tax obligations on out-of-state businesses based solely on their sales volume or transaction count, even without a physical presence.  Post-Wayfair, every state that imposes sales tax requires remote sellers to collect and remit sales tax once their sales exceed a specific economic threshold.

75.   In 2024, Kfir's counsel notified Plaintiff's counsel that the Company was ignoring its obligation to pay sales tax under *Wayfair*.  Kfir's counsel also indicated Kfir was acting deliberately, with the implication being that Kfir believed that not filing required tax returns and not paying taxes for years would ultimately reduce the Company's exposure that Kfir was knowingly creating.  Based on information and belief, Kfir: (1) understood the sales tax obligation

27

existed, but chose not to collect sales tax from customers; (2) chose not to make the appropriate filings and tax returns; and (3) chose not to remit required sales tax payments. By doing so he created a significant liability for the Company that was easily avoidable. Moreover, it is alleged that Kfir's sales tax misconduct was deliberate, and part of Kfir's misguided attempt to avoid what was owed by delaying compliance to a future period of lower sales.

76. Kfir's continuing intentional failure to pay sales tax across the United States is a breach of fiduciary duty. Kfir himself has estimated that the Company's *Wayfair* liability could be "in the range of" five to ten million dollars. Due to Kfir's ongoing misconduct, the Company's liability may also be increasing .

77. In addition, although the Company collects sales taxes in California, it appears Kfir has long caused the Company to report false sales numbers to California taxing authorities and is potentially underpaying California sales taxes. For example, since seizing sole control of the Company, the Company's sales tax filings show 15 quarters where Kfir reported the Company's California sales to be incredibly at exactly ten percent of total sales, even when rounded out to a thousandth of a percent. Statistically, this is so improbable that it can be considered impossible.

78. The flat ten percent figure Kfir reported for years is not only arbitrary and, therefore, inaccurate, but it may also substantially underreport the Company's California sales and tax. Before the period of Kfir's unlawful sole control, the Company had not observed or reported less than 12% of its sales from California, and often significantly higher. And the Company did not experience consecutive quarters with the exact same California sales percentage, let alone an inconceivable 15 consecutive quarters as reported by Kfir. If the Company's true California sales percentage did in fact remain above 10% as suggested by prior years, and Kfir underreported California sales at 10%, then Kfir has caused the Company to collect more in sales taxes than it remits to the taxing authorities – the cardinal sin of sales tax evasion. This constitutes another breach of fiduciary duty.

28

## H.      The Aspiration Fraud.

79.      In May 2020, Kfir had the Company enter into an off-brand business partnership that damaged the Company's brand.  Specifically, Kfir entered the Company into a partnership with Aspiration Bank, a company founded by his friend and Plan Backstop lender Joseph Sanberg, whereby the Company's high-end designer shoe customers were asked to sign up for Aspiration bank accounts in exchange for a Tieks discount.  Plaintiff has long alleged this arrangement to be an example of Kfir's self-interested misconduct and mismanagement.  Now, Kfir's motivation to allow the Company's reputation to be tarnished with Aspiration has been revealed.

80.      On January 21, 2025, the Department of Justice filed a sealed "information" as to Ibrahim Ameen Alhusseini, a member of Aspiration's board of directors. On February 7, 2025, Alhusseini pled guilty to conspiring with Joseph Sanberg to defraud investors in Aspiration. The financial mechanism of Alhusseini's confessed fraud was very similar to the Sanberg's Plan Backstop in Kfir's bankruptcy case. Sanberg solicited approximately $150 million in loans from two investment funds, pledging Aspiration stock as collateral and putting forth a backstop from Alhusseini: if Sanberg defaulted on the loans, Alhusseini agreed to purchase the Aspiration stock that Sanberg had pledged as collateral for a price sufficient to pay the loans.

81.      What the investors did not know is that Alhusseini's backstop was worthless.  On February 28, 2025, the Department of Justice filed a criminal complaint against Sanberg for his conspiracy with Alhusseini. Three days later, Alhusseini's case – including his guilty plea – was unsealed, and 30 days after that, Aspiration filed for chapter 11 bankruptcy protection. By August, Aspiration's assets were sold to one of its secured lenders, the case was converted to chapter 7, and Sanberg had pleaded guilty to the crimes described in Alhusseini guilty plea.

82.      Sanberg's guilty plea, however, included significant additional criminal acts unrelated to his conspiracy with Alhusseini, most notably a revenue fraud scheme whereby Aspiration's revenue was fraudulently inflated to defraud investors out of hundreds of millions using contracts for phony tree planting services.

29

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

83.    The fraud worked as follows:  Sanberg and certain "friends and associates" solicited letters of intent ("LOIs") from various companies and individuals ("LOI Customers") that purported to obligate the LOI Customers to pay huge sums of money for purported tree planting services.  The revenue from these LOIs was then booked by Aspiration and used to solicit investment.

84.    Plaintiff is informed and believes that Kfir conspired with Sanberg to execute and obtain these fraudulent LOIs.  Specifically, Plaintiff is informed and believes that Kfir executed at least one fraudulent LOI himself in the name of the Company and solicited numerous other LOI Customers as well. The terms of the Gavrieli Brands fraudulent LOI that Kfir signed obligated the Company to buy $350,000 worth of "sustainability services" *per month* from Aspiration, an incredible sum for the Company which has no reason to purchase carbon credits.

85.    Plaintiff is informed and believes that of the 27 LOI Customers listed on an SEC Complaint against Sanberg (and identified by initials), a substantial number were solicited by Kfir directly or with the assistance of his cousin, Guy Davidyan.

86.    Plaintiff is informed and believes that Kfir paid at least one of the LOI Customers from Company funds in connection with their participation in the LOI fraud.

87.    Kfir's use of Company funds, and his involvement of the Company in his conspiracy with Sanberg was a breach of his fiduciary duty.

**~~G.~~I.    Defendant's Conduct Constitutes A Breach Of Fiduciary Duty To The Company.**

~~74.~~88.  By virtue of Defendant's position as a manager and member of the Company, a California LLC, he owed unqualified fiduciary duties of good faith, care, and loyalty to the Company pursuant to, *inter alia*, California Corporations Code § 17704.09, as well as common law.

~~75.~~89.  During the Relevant Period, Defendant has exercised sole control over the Company and has precluded Plaintiff from exercising the rights and responsibilities of a manager of the Company (despite the permanent injunction included in the State Court Judgment).  As a

30

result, Defendant effectively made himself the sole manager of the Company and he owes the Company the fiduciary duties associated with his sole control of the Company.

90. Defendant has wholly disregarded these duties under California law. Defendant breached his fiduciary duties as set forth herein, deliberately and in bad faith to suppress Company profits and value in order to advance his personal position with respect to Plaintiff. In doing so, Defendant is significantly harming the Company.

91. As set forth herein, Defendant's wrongful conduct is adversely and materially affecting the Company's performance. Notably, according to Defendant's own experts, since Defendant took sole control over the Company's operations he has presided over a 90% decline in valuation equal to hundreds of millions of dollars, in addition to the loss of tens of millions of dollars in profits.

92. Defendant undertook this conduct to advance his personal interest at the Company's expense, in hopes of buying out Plaintiff's ownership share for pennies on the dollar by attempting to lower the Company's apparent valuation.

93. As a proximate result of these and other breaches of fiduciary duties by Defendant, the Company has suffered damages in an amount to be determined at trial, but which exceed the jurisdictional requirements of this Court. According to *Defendant's* financial experts, these damages to the Company may exceed $300 million.

94. The wrongful conduct particularized herein was not due to any honest error in judgment or an attempt to act in the best interests of the Company, but rather due to Defendant's willful misconduct, bad faith, and, at a minimum, his reckless and grossly negligent disregard for his fiduciary duties to the Company, without the reasonable and ordinary care he owed to it.

95. Defendant's oppressive and malicious misconduct in breaching his fiduciary duties to the Company also gives rise to exemplary and punitive damages pursuant to California Civil Code § 3294.

96. Plaintiff requests, derivatively and on behalf of the Company, pursuant to this Court's equitable powers, the expulsion or dissociation of Defendant as a member of the Company, an order barring Defendant from ever serving again as a manager or officer of the Company, and/or

31

the appointment of a provisional director and/or receiver to manage the Company's business and affairs pending the resolution of this dispute, as well as all other equitable remedies and rights under California Corporations Code § 17701.01 *et seq.*

## SECOND CLAIM FOR RELIEF
### (Conversion)
### (By Dikla Gavrieli Unatin Derivatively Against Defendant)

83.97.  This derivative claim for conversion is based on and limited to acts and omissions by Defendant which either occurred on or after **July 22, 2019**, and/or were discovered by Plaintiff on or after **July 22, 2019**.

84.98.  Plaintiff reasserts and re-alleges the allegations of paragraphs 13 through 8287 against Defendant as if fully set forth herein.

85.99.  During the Relevant Period, the Company maintained dominion and control (and had the right of control) over its funds.

86.100.During the Relevant Period, Defendant has converted substantial funds from the Company through various means including directly to himself and other parties for his benefit, without consent or authorization, and has done so intentionally and knowingly.

87.101.On information and belief, as set forth in paragraphs 13 through 8287, these acts of conversion include, but are not limited to: financially benefitting himself directly, and others aiding his misconduct, including family members; making unauthorized transfers and payments; and paying millions of dollars to credit cards in his name with Company funds with limited or no attempt to substantiate such expenditures.

88.102.Defendant's wrongful conversion of the Company's funds and assets was an intentional interference with the Company's dominion and control over such property.

89.103.As a proximate result of Defendant's wrongful conversion of the Company's interests and property, the Company has suffered damages in an amount to be proven at trial, but which exceed the jurisdictional requirements of this Court.

90.104.Between the time of Defendant's conversion of the Company's interests and property for his own use and the filing of this claim, Plaintiff, derivatively on behalf of the

32

Company, has expended substantial time and money in pursuit of the wrongfully converted property (including in attorneys' fees and related costs spent filing this suit and making the multiple demands described herein on Defendant) and has suffered further damages in an amount to be proven at trial.

91.105.Defendant's oppressive and malicious misconduct in converting the Company's funds also gives rise to exemplary and punitive damages pursuant to California Civil Code § 3294.

92.106.Plaintiff requests, derivatively and on behalf of the Company, pursuant to this Court's equitable powers, the expulsion or dissociation of Defendant as a member of the Company, an order barring Defendant from ever serving again as a manager or officer of the Company, and/or the appointment of a provisional director and/or receiver to manage the Company's business and affairs pending the resolution of this dispute, as well as all other equitable remedies and rights under California Corporations Code § 17701.01 *et seq.*

## THIRD CLAIM FOR RELIEF
### (Corporate Waste)
### (By Dikla Gavrieli Unatin Derivatively Against Defendant)

93.107.This derivative claim for corporate waste is based on and limited to acts and omissions by Defendant which either occurred on or after **July 22, 2019**, and/or were discovered by Plaintiff on or after **July 22, 2019**.

94.108.Plaintiff reasserts and re-alleges the allegations of paragraphs 13 through 8287 against Defendant as if fully set forth herein.

95.109.On information and belief, as set forth in paragraphs 13 through 8287, Defendant made numerous improper transfers, gifts, and other transactions using Company funds for his own personal benefit or for the personal benefit of friends or family members, and these transactions served no rational business purpose.

96.110.The exchanges laid out above were so one-sided that no business person of ordinary, sound judgment could conclude that the Company received adequate consideration. Thus, Defendant has irrationally squandered and given away Company assets.

97.111.As a result of Defendant's misconduct as set forth above, since Defendant assumed sole control over the Company's operations five years ago, Defendant has presided over a 90%

33

decline in valuation, and an over 80% decline in the Company's profits—if Defendant's own filings before this Court are to be believed.

98.112.As a proximate result of Defendant's misconduct, the Company has suffered damages in an amount to be determined at trial, but which exceed the jurisdictional requirements of this Court.  According to *Defendant's* financial experts, these damages to the Company may exceed $300 million.

99.113.Based on Defendant's intentional, reckless, and grossly negligent misconduct in wasting corporate assets, the Company is entitled to exemplary and punitive damages pursuant to California Civil Code § 3294.

100.114.	Plaintiff requests, derivatively and on behalf of the Company, pursuant to this Court's equitable powers, the expulsion or dissociation of Defendant as a member of the Company, an order barring Defendant from ever serving again as a manager or officer of the Company, and/or the appointment of a provisional director and/or receiver to manage the Company's business and affairs pending the resolution of this dispute, as well as all other equitable remedies and rights under California Corporations Code § 17701.01 *et seq.*

### FOURTH CLAIM FOR RELIEF
**(Violation Of Cal. Pen. Code § 496)**
**(By Dikla Gavrieli Unatin Derivatively Against Defendant)**

101.115.	This derivative claim for violation of California Penal Code § 496 is based on and limited to acts and omissions by Defendant which either occurred on or after **July 22, 2019**, and/or were discovered by Plaintiff on or after **July 22, 2019**.

102.116.	Plaintiff reasserts and re-alleges the allegations of paragraphs 13 through 8287 against Defendant as if fully set forth herein.

103.117.	On information and belief, Defendant stole, concealed, and withheld millions of dollars of Company's funds and assets since July 22, 2019 as set forth in paragraphs 13 through 8287.

104.118.	At all times mentioned herein, Defendant knew that using the Company's funds and assets in this manner was unauthorized and constituted theft of the Company's property.

34

Main Document      Page 39 of 202

105.119.      As a proximate result of Defendant's receipt of stolen property as set forth above, the Company suffered damages in an amount to be proven at trial, but which exceed the jurisdictional requirements of this Court.  The Company is thus entitled to three times the amount of actual damages, plus costs and attorneys' fees as provided under California Penal Code Section 496(c).

35

**PRAYER FOR RELIEF**[12]

WHEREFORE, Plaintiff prays for judgment as follows:

1.    For an award of compensatory damages against Defendant in favor of the Company, in an amount to be determined at trial, including interest;

2.    For an award of punitive damages against Defendant in favor of the Company;

3.    For an award of actual damages, treble damages, costs and attorneys' fees in favor of the Company as provided under California Penal Code Section 496(c);

4.    For an Order that Defendant make restitution to the Company for any unjust enrichment, in an amount to be determined at trial;

5.    For an accounting to determine the full extent of Defendant's unlawful acts toward the Company and the sums owed to the Company by Defendant;

6.    For an Order expelling Defendant as a member, manager and/or officer of the Company and barring Defendant from ever serving again as a manager or officer of the Company pursuant to California Corporations Code § 17706.02(e);

7.    For the appointment of a provisional director and/or receiver to manage the Company's business and affairs pursuant to California Code of Civil Procedure § 564;

8.    For costs of suit; and

9.    For such other and further relief as the Court deems just and proper.

---

[12] In the original Complaint and First Amended Complaint, Plaintiff included claims to establish that the derivative claims asserted in this pleading (and claims based on the money judgment issued in the State Court Litigation) are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6).  Under the terms of the Plan confirmed by the Court (Dkt. 829), Defendant does not receive a discharge until the Final Distribution Date (as defined in Dkt. 829 at 13 as "date that the final payment required pursuant to the terms of this Plan is made.").  Multiple provisions of the Plan establish that to the extent the claims set forth in this adversary proceeding are allowed, they are subject to payment and no discharge will be sought until such allowed claims are paid in full.

Accordingly, Plaintiff omits as moot a claim for nondischargeability, but reserves the right to assert such a claim in the (unlikely) event that a discharge is sought for Debtor on the claims set forth in this adversary proceeding before there is payment in full or a final, non-appealable judgment in Defendant's favor on all claims.

36

Dated:  March 30, 2026                          LATHAM & WATKINS LLP
                                                Daniel Scott Schecter
                                                Nima H. Mohebbi
                                                Tara A. McCortney
                                                Alexandra N. Ibrahim


                                                By   /s/ Daniel Scott Schecter
                                                Daniel Scott Schecter

Attorneys for Plaintiff Dikla Gavrieli a/k/a Dikla Gavrieli Unatin

DATED: April 20, 2026                    LESNICK PRINCE PAPPAS & ALVERSON LLP


                                                                        By:
                                                                        /s/



                                         Christopher E. Prince
                                         Counsel for Plaintiff Dikla Gavrieli a/k/a
                                         Dikla Gavrieli Unatin, individually and
                                         derivatively on behalf of Gavrieli Brands,
                                         LLC

37

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

**Exhibit B**

| Details | Posting Date | Description | Amount | Type |
|---------|-------------|-------------|--------|------|
| DEBIT | 5/5/2025 | COAL-05Apr25-508 | $ (233,670.83) | MISC_DEBIT |
| DEBIT | 7/14/2025 | COAL-13Jun25-464 | $ (3,289.87) | MISC_DEBIT |
| DEBIT | 7/18/2025 | ORIG CO NAME:WI DEPT REVENUE      ORIG ID:X000015200 DESC DATE:250717 CO ENTRY DESCR:TAXPAYMNT SEC:CCD TRACE#:042000012622606 EED:250718   IND ID:784890912            IND NAME:GAVRIELI BRANDS LLC TRN: 1982622606TC | $ (1,483.42) | ACH_DEBIT |

**Exhibit C**

# Exhibit D

JOSEPH T. MCNALLY
Acting United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
Chief, Corporate and Securities Fraud Strike Force
JENNA G. WILLIAMS (Cal. Bar No. 307975)
NISHA CHANDRAN (Cal. Bar No. 325345)
Assistant United States Attorney
Corporate and Securities Fraud Strike Force
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2429
     Facsimile: (213) 894-0141
     Email:     Nisha.Chandran@usdoj.gov

GLENN S. LEON
Chief, Fraud Section
Criminal Division, U.S. Department of Justice
THEODORE M. KNELLER (D.C. Bar No. 978680)
ADAM L.D. STEMPEL (D.C. Bar No. 1615015)
Trial Attorneys, Fraud Section
Criminal Division, U.S. Department of Justice
     1400 New York Avenue, NW
     Washington, DC 20530
     Telephone: (202) 514-5799
     Facsimile: (202) 514-3708
     Email:    Theodore.Kneller@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED
CLERK, U.S. DISTRICT COURT

2/10/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____asi_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 25-00042-SVW |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT IBRAHIM AMEEN ALHUSSEINI |
| v. | |
| IBRAHIM AMEEN ALHUSSEINI, | |
| Defendant. | |

     1.   This constitutes the plea agreement between IBRAHIM AMEEN ALHUSSEINI ("defendant") and the United States Attorney's Office for

the Central District of California (the "USAO") and the Fraud Section of the U.S. Department of Justice ("DOJ" and together with the USAO, the "United States") in the above-captioned case.  This agreement is limited to the USAO and DOJ and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2.     Defendant agrees to:

a.     Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the United States and provided by the Court, appear and plead guilty to the single-count superseding information in United States v. Ibrahim Ameen AlHusseini, CR No. 25-00052-SVW, in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with wire fraud, in violation of 18 U.S.C. § 1343.

b.     Not contest facts agreed to in this agreement.

c.     Abide by all agreements regarding sentencing contained in this agreement.

d.     Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.     Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.     Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

2

g. Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h. Defendant agrees that any and all criminal debt ordered by the Court will be due in full and immediately. The government is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

i. Complete the Financial Disclosure Statement on a form provided by the USAO and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all of the documents requested therein, to the USAO by either email at usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial Litigation Section at 300 North Los Angeles Street, Suite 7516, Los Angeles, CA 90012. Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

j. Authorize the USAO to obtain a credit report upon returning a signed copy of this plea agreement.

k. Consent to the USAO inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

3. Defendant further agrees to cooperate fully with the United States, the Federal Bureau of Investigation and United States Postal Inspection Service, and, as directed by the United States, any other federal, state, local, or foreign prosecuting, enforcement,

3

administrative, or regulatory authority.  This cooperation requires defendant to:

a.    Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

b.    Attend all meetings, grand jury sessions, trials or other proceedings at which defendant's presence is requested by the United States or compelled by subpoena or court order.

c.    Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the United States, or its designee, inquires.

d.    If requested to do so by the United States, act in an undercover capacity to the best of defendant's ability in connection with criminal investigations by federal, state, local, or foreign law enforcement authorities, in accordance with the express instructions of those law enforcement authorities.  Defendant agrees not to act in an undercover capacity, tape record any conversations, or gather any evidence except after a request by the United States and in accordance with express instructions of federal, state, local, or foreign law enforcement authorities.

4.    For purposes of this agreement: (1) "Cooperation Information" shall mean any statements made, or documents, records, tangible evidence, or other information provided, by defendant pursuant to defendant's cooperation under this agreement or pursuant to the letter agreement previously entered into by the parties dated December 17, 2024 (the "Letter Agreement"); and (2) "Plea Information" shall mean any statements made by defendant, under oath,

4

at the guilty plea hearing and the agreed to factual basis statement in this agreement.

### THE UNITED STATES' OBLIGATIONS

5.    The United States agrees to:

a.    Not contest facts agreed to in this agreement.

b.    Abide by all agreements regarding sentencing contained in this agreement.

c.    At the time of sentencing, move to dismiss the underlying information as against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

d.    At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

6.    The United States further agrees:

a.    Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the United States, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the United States, any Cooperation Information. Defendant agrees, however, that the United States may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any

5

purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

b.      Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed.  Defendant understands, however, that Cooperation Information will be disclosed to the United States Probation and Pretrial Services Office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c.      In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d.      If the United States determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 and 3 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to fix an offense level and corresponding guideline

range below that otherwise dictated by the sentencing guidelines, and to recommend a term of imprisonment within this reduced range.

### DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION

7.    Defendant understands the following:

a.    Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b.    Nothing in this agreement requires the United States or any other prosecuting, enforcement, administrative, or regulatory authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c.    Defendant cannot withdraw defendant's guilty plea if the United States does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the United States makes such a motion and the Court does not grant it or if the Court grants such a United States motion but elects to sentence above the reduced range.

d.    At this time the United States makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes or will constitute substantial assistance.  The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the United States.

e.    The United States' determination whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which defendant testifies or in which the government otherwise presents information resulting from defendant's cooperation.

7

## NATURE OF THE OFFENSE

8.    Defendant understands that for defendant to be guilty of the crime charged in the first superseding information, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, the following must be true: (1) defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) statements made as part of the scheme were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

## PENALTIES AND RESTITUTION

9.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1343, is: 20 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

10.    Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offense to which defendant is pleading guilty.  Defendant agrees that, in return for the United States' compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offense to which defendant is pleading guilty and in amounts greater than those alleged in the count to which defendant is

8

pleading guilty.  In particular, defendant agrees that the Court may order restitution to any victim of any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offense to which defendant is pleading guilty for any losses suffered by that victim as a result.  The parties currently believe that the applicable amount of restitution is approximately $145 million, and the defendant agrees that the Court may order restitution in the amount of $145 million based on this agreement, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

11.  Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

12.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or

supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

13.  Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his conviction on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is automatic removal from the United States.

FACTUAL BASIS

14.  Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the United States agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 15 below but is not meant to be a complete recitation of all facts

10

relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

Beginning no later than in or about March 2020, and continuing through in or about February 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant along with Joseph Sanberg ("Sanberg"), knowingly and with intent to defraud, participated in and executed a scheme to defraud INVESTOR FUND A and INVESTOR FUND B, as to material matters, and to obtain money and property from these victims by means of material false and fraudulent pretenses, representations, and promises, including untrue statements and omissions concerning defendant's financial assets and net worth.

Beginning no later than January 2020, Sanberg, who was an associate of defendant, began negotiating the terms of a $55 million loan from INVESTOR FUND A to Sanberg.  Under the terms of the loan, Sanberg pledged approximately 10.3 million shares of stock in Aspiration Partners as collateral.  On or around January 26, 2020, Sanberg introduced defendant to INVESTMENT ADVISER 1 to be the seller of a put option to INVESTOR FUND A.  Sanberg also guided defendant in his negotiations with INVESTMENT ADVISER 1 regarding the March 2020 put option.  As a condition of making the loan to Sanberg, INVESTMENT ADVISER 1 negotiated for INVESTOR FUND A to purchase a put option from defendant and two corporate entities that defendant controlled (the "March 2020 put option").  The March 2020 put option contractually required defendant to pay $55 million to INVESTOR FUND A if Sanberg defaulted on the $55 million loan and acted as a form of a financial guarantee on the $55 million loan from INVESTOR FUND A to Sanberg by mitigating the risk to INVESTOR FUND A if Sanberg defaulted on the loan.  Specifically, in the event of Sanberg's

11

default on the loan, defendant was obligated to purchase the approximately 10.3 million shares of Aspiration Partners stock that Sanberg pledged against the $55 million loan as collateral. Defendant knew that INVESTOR FUND A's $55 million loan to Sanberg was contingent on INVESTOR FUND A entering into the March 2020 put option agreement with defendant.

The terms of the March 2020 put option also required that defendant and the two co-signing entities he controlled maintain a collective total net worth of $137,500,000 and a liquid net worth of $68,750,000 to have sufficient assets to pay $55 million to INVESTOR FUND A if Sanberg defaulted.  At all relevant times, defendant did not have, and Sanberg knew that defendant did not have, a liquid net worth or sufficient assets to satisfy those requirements.  At Sanberg's direction, defendant made untrue statements of material fact to INVESTOR FUND A about defendant's personal wealth, and defendant provided INVESTOR FUND A with falsified account statements for defendant's brokerage accounts at BROKER 1 and defendant's personal bank accounts.  Defendant and Sanberg knew that the falsified statements inflated the value of the assets in defendant's accounts by tens of millions of dollars.

For example, on or about March 10, 2020, defendant sent a document by email to INVESTMENT ADVISER 1 that defendant falsely claimed was his true and accurate securities brokerage account statement with BROKER 1 as of December 31, 2019.  Defendant's falsified account statement stated that defendant held more than $86 million in securities in accounts at BROKER 1.  In reality, defendant's BROKER 1 accounts held a total of approximately $4,390.10.  Defendant also sent a document that he falsely claimed

12

was a true and accurate statement of his personal bank accounts as of February 20, 2020. Defendant's falsified bank account statement stated that defendant held more than $25 million in those bank accounts. In reality, as of February 20, 2020, defendant's bank accounts held a total of approximately $43,267.74.

On or about March 16, 2020, INVESTOR FUND A purchased the March 2020 put option from defendant. Under the terms of the March 2020 put option, defendant received approximately $6 million of the $55 million loan at the time of the loan's execution as consideration (also known as a "premium payment") for guaranteeing Sanberg's repayment of the loan.

On or about November 4, 2021, Sanberg refinanced the loan against his 10.3 million shares of Aspiration Partners stock. Under the refinanced loan, INVESTOR FUND B loaned $145 million to Sanberg, and Sanberg pledged approximately 10.3 million shares of Aspiration Partners stock as collateral. INVESTMENT ADVISER 1 negotiated for INVESTOR FUND B to purchase a new put option from defendant, in which defendant was obligated to pay $65 million to INVESTOR FUND B if Sanberg defaulted on the $145 million loan (the "November 2021 put option"). Defendant knew that INVESTOR FUND B's $145 million loan to Sanberg was contingent on INVESTOR FUND B entering into the November 2021 put option agreement with defendant.

On or about November 3, 2021, defendant caused his agent in California, to send an interstate wire communication, specifically an email, to INVESTMENT ADVISER 1, located in New York, and others, that contained documents that defendant falsely claimed were a true and accurate account statement as of September 30, 2021, of defendant's investment portfolio with BROKER 1, and a true and accurate

13

statement, as of September 22, 2021, of defendant's personal bank accounts. The falsified BROKER 1 account statement stated that defendant held more than $199 million in securities in accounts at BROKER 1. In reality, defendant's BROKER 1 account statements show that as of September 30, 2021, defendant's BROKER 1 accounts held a total of approximately $2,693.63. The falsified personal bank account statements stated that, as of September 22, 2021, defendant held more than $21 million in his accounts. In reality, defendant's personal bank account statements show that as of September 22, 2021, his personal bank accounts held a total of approximately $11,556.89. The next day, INVESTOR FUND B purchased the November 2021 put option from defendant. The terms of the November 2021 put option similarly required that defendant have sufficient assets to pay $65 million to INVESTOR FUND B in the event of Sanberg's default. Under the terms of the November 2021 put option, defendant received approximately $6.3 million at the time of execution as a premium payment in consideration for guaranteeing Sanberg's repayment of the loan.

To maintain and conceal defendant's deception of INVESTMENT ADVISER 1, INVESTOR FUND A, and INVESTOR FUND B, defendant submitted or caused to be submitted falsified brokerage and personal bank account statements to INVESTMENT ADVISER 1 on at least 24 occasions between in or around April 2020 and in or around February 2023. Defendant caused the falsified statements to be altered at Sanberg's direction and with Sanberg's assistance and then submitted or caused his agent to submit the statements to INVESTMENT ADVISER 1. Nearly all of these transmissions were accompanied by a certificate of compliance, in which defendant affirmed by electronic signature that the brokerage and personal bank account statements, among other

14

statements, were "in each case true, correct and complete copies." The falsified brokerage statements represented that defendant's brokerage account held highly liquid and publicly tradeable securities that were, depending on the month and year, worth between approximately $80 million to $200 million.  In fact, defendant's brokerage account during this period held between approximately $2,000 and $15,000.  The falsified personal bank statements represented that defendant's bank accounts were worth between approximately $21 million to $25 million.  In fact, defendant's personal bank accounts during this period held between approximately $11,000 and $500,000.

On or about November 2022, Sanberg defaulted on the loan to INVESTOR FUND B, and to secure a forbearance, defendant signed a December 5, 2022, amendment with INVESTOR FUND B that raised the put option price to $75 million.  On or about June 27, 2023, after Sanberg defaulted on the $145 million loan, INVESTOR FUND B exercised the November 2021 put option that contractually required defendant to pay INVESTOR FUND B $75 million in exchange for approximately 10.3 million shares of Aspiration Partners stock.  Defendant admits that INVESTOR FUND B had losses of approximately $145 million, and defendant personally received approximately $12.3 million in put premium payments.

### SENTENCING FACTORS

15.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the

15

Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

16.   Defendant and the United States agree to the following applicable Sentencing Guidelines factors:

Base Offense Level:            7     [U.S.S.G. § 2B1.1(a)(1)]

Loss more than $65,000,000    +24   [U.S.S.G. § 2B1.1(b)(1)(M)]

At the time of sentencing, the government will recommend that the Court apply a four-level downward departure/variance pursuant to 18 U.S.C. § 3553(a) because the Sentencing Guidelines calculation of loss in the amount of $145 million overstates the seriousness of the offense as it relates to defendant ALHUSSEINI.  Defendant and the United States reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

17.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

18.   Defendant and the United States reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

19.   Defendant understands that by pleading guilty, defendant gives up the following rights:

16

a.    The right to persist in a plea of not guilty.

b.    The right to a speedy and public trial by jury.

c.    The right to be represented by counsel – and if necessary have the Court appoint counsel - at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the Court appoint counsel – at every other stage of the proceeding.

d.    The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.    The right to confront and cross-examine witnesses against defendant.

f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

20.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant

17

is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

21.  Defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court, including, to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (c) the fine imposed by the court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any restitution order, provided it requires payment of no more than $145 million; (f) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (g) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

22.  The United States agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment within or above the range corresponding to an offense level of 22 and the criminal history category calculated by the Court, the United States gives up its right to appeal any portion of the sentence, with the exception

that the United States reserves the right to appeal the amount of restitution ordered if that amount is less than $145 million.

WAIVER OF COLLATERAL ATTACK

23.  Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction. Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

RESULT OF WITHDRAWAL OF GUILTY PLEA

24.  Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the United States will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation

19

Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible; and (c) should the United States choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

25.  Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the United States and defendant will be released from all their obligations under this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

26.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

27.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the United States may declare this agreement breached.  For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely

20

minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the United States to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the United States in writing.  If the United States declares this agreement breached, and the Court finds such a breach to have occurred, then:

a.   If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b.   The United States will be relieved of all its obligations under this agreement; in particular, the United States: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty; (ii) will no longer be bound by any agreements regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the United States would otherwise have been obligated to dismiss pursuant to this agreement; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

c.   The United States will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

21

d.  In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

28.  Following the Court's finding of a knowing breach of this agreement by defendant, should the United States choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.  Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.  Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

22

COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

OFFICE NOT PARTIES

29.  Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the United States' sentencing recommendations or the parties' agreements to facts or sentencing factors.

30.  Defendant understands that both defendant and the United States are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 18 are consistent with the facts of this case.  While this paragraph permits both the United States and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the United States' obligations not to contest the facts agreed to in this agreement.

31.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to

23

fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

NO ADDITIONAL AGREEMENTS

32.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the United States and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//

//

24

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

33.    The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

JOSEPH T. MCNALLY
Acting United States Attorney

_____          2/7/2025
BRETT A. SAGEL                              _____
JENNA G. WILLIAMS                           Date
NISHA CHANDRAN
Assistant United States Attorneys

FRAUD SECTION OF THE U.S.
DEPARTMENT OF JUSTICE

GLENN S. LEON
Chief, Fraud Section
Criminal Division

_____
THEODORE M. KNELLER
ADAM L.D. STEMPEL
Trial Attorneys, Fraud Section
Criminal Division

_____          02/07/2025
IBRAHIM AMEEN ALHUSSEINI                     _____
Defendant                                    Date

_____          02/07/25
RANDY S. GROSSMAN                            _____
NAEUN RIM                                    Date
ANDREW BESHAI
JESSICA NALL
Attorney for Defendant IBRAHIM
AMEEN ALHUSSEINI

25

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement.  I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____          02/07/2025
IBRAHIM AMEEN ALHUSSEINI                  Date
Defendant

26

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am one of IBRAHIM AMEEN ALHUSSEINI's attorneys. I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____        02/07/25
RANDY S. GROSSMAN                       _____
NAEUN RIM                               Date
ANDREW BESHAI
JESSICA NALL
Attorneys for Defendant IBRAHIM
AMEEN ALHUSSEINI

27

**Exhibit E**

BILAL A. ESSAYLI
Acting United States Attorney
CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division
NISHA CHANDRAN (Cal. Bar No. 325345)
Assistant United States Attorney
Major Frauds Section
JENNA G. WILLIAMS (Cal. Bar No. 307975)
Transnational Organized Crime Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2429
    Facsimile: (213) 894-0241
    E-mail:   Nisha.Chandran@usdoj.gov

LORINDA I. LARYEA
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
THEODORE M. KNELLER (D.C. Bar No. 978680)
ADAM L.D. STEMPEL (D.C. Bar No. 1615015)
Trial Attorneys, Fraud Section
Criminal Division, U.S. Department of Justice
    1400 New York Avenue, NW
    Washington, DC 20530
    Telephone: (202) 514-5799
    Facsimile: (202) 514-3708
    Email: Theodore.Kneller@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**FILED**
CLERK, U.S. DISTRICT COURT

**8/20/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_\_ MRV \_\_\_\_\_ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>         v.<br><br>JOSEPH NEAL SANBERG,<br><br>      Defendant. | No. 2:25-cr-00200(A)-SVW<br><br><br>PLEA AGREEMENT FOR DEFENDANT<br>JOSEPH NEAL SANBERG |

1.   This constitutes the plea agreement between JOSEPH NEAL SANBERG ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") and the Fraud Section of the Department of Justice's Criminal Division (the "DOJ") in the

above-captioned case.  This agreement is limited to the USAO and DOJ (collectively referred to herein as the "United States") and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

                          DEFENDANT'S OBLIGATIONS

    2.    Defendant agrees to:

         a.    Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the United States and provided by the Court, appear and plead guilty to counts one and two of the first superseding information in United States v. Joseph Neal Sanberg, CR No. 2:25-cr-00200(A)-SVW, in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with a wire fraud, in violation of 18 U.S.C. § 1343.

         b.    Not contest facts agreed to in this agreement.

         c.    Abide by all agreements regarding sentencing contained in this agreement.

         d.    Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

         e.    Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

         f.    Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

         g.    Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

                                    2

h.    Agree that any and all criminal debt ordered by the Court will be due in full and immediately.  The United States is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

i.    Complete the Financial Disclosure Statement on a form provided by the United States and, within 30 days of defendant's entry of a guilty plea, deliver the signed and dated statement, along with all of the documents requested therein, to the United States by either email at usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial Litigation Section at 312 North Spring Street, 11th Floor, Los Angeles, CA 90012.  Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

j.    Authorize the United States to obtain a credit report upon returning a signed copy of this plea agreement.

k.    Consent to the United States inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

3.    Defendant further agrees:

a.    To forfeit all right, title, and interest in and to any and all monies, properties, and/or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, or involved in the illegal activity to which defendant is pleading guilty, specifically including, but not limited to, the following:

3

Case 2:21-cr-00033-BB   Document 42   Filed 04/20/08   Entered 04/20/26 23:05:07   Page ID #:175

i.   $138.50 seized from Bank of America account 3251-5678-8058 (Consolidated Asset Tracking System ID ("CATS ID") 25-FBI-003506);

ii.   $605.91 seized from Bank of America account 3830-2602-6099 (CATS ID 25-FBI-003502);

iii. $2,187.68 seized from Bank of America account 3940-0164-7725 (CATS ID 25-FBI-003504);

iv.   $9,190.53 seized from Bank of America account 0094-5480-1102 (CATS ID 25-FBI-003505); and

v.   All funds, securities, or negotiable instruments, seized from Bank of America Account 41-01-100-0166771 (CATS ID 25-FBI-003501, collectively, the "Forfeitable Property").

b.   To the Court's entry of an order of forfeiture at or before sentencing with respect to the Forfeitable Property and to the forfeiture of the property.

c.   That the Preliminary Order of Forfeiture shall become final as to the defendant upon entry.

d.   To take whatever steps are necessary to pass to the United States clear title to the Forfeitable Property, including, without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States.

e.   Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced against the Forfeitable Property.  If defendant submitted a claim and/or petition for remission for all or part of the Forfeitable Property on behalf of himself or any other individual or entity, defendant shall and hereby does withdraw any such claims or petitions, and further agrees

4

Case 2:21-cr-00033-BB    Doc 377    Filed 04/20/26    Entered 04/25/26 23:05:07    Page ID #:176

to waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Property. Defendant further waives any and all notice requirements of 18 U.S.C. § 983(a)(1)(A).

f.    Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Property.

g.    Not to claim that reasonable cause to seize the Forfeitable Property was lacking.

h.    To prevent the transfer, sale, destruction, or loss of the Forfeitable Property to the extent defendant has the ability to do so.

i.    To fill out and deliver to the United States a completed financial statement listing defendant's assets on a form provided by the USAO.

j.    That forfeiture of Forfeitable Property shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

k.    To the entry as part of defendant's guilty plea of a personal money judgment of forfeiture against defendant in the amount of $6,650,000.00, which sum defendant admits was derived from proceeds traceable to the violations described in the factual basis of the plea agreement.  Defendant understands that the money judgment of forfeiture is part of defendant's sentence and is separate from any fines or restitution that may be imposed by the Court.

l.    That with respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture at sentencing, and incorporation of

5

the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Property and the money judgment of forfeiture in any proceeding on any grounds including, without limitation, that the forfeiture of the Forfeitable Property or the money judgment of forfeiture constitute an excessive fine or punishment.  Defendant acknowledges that the forfeiture of the Forfeitable Property and the money judgment of forfeiture are part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty pleas.

THE UNITED STATES' OBLIGATIONS

4.   The United States agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained in this agreement.

c.   At the time of sentencing, move to dismiss the underlying indictment as against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.  Defendant further agrees that he may be treated as if he had been convicted of the dismissed charges for purposes of U.S.S.G. § 1B1.2(c), regardless of whether the factual basis below would be sufficient to satisfy all elements of each

6

charge. Defendant waives the right to challenge the sufficiency of the factual basis as to any element of any dismissed charge.

d. At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, and the conditions set forth in paragraph 2 through 3 are met and defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

e. Not seek a sentence of imprisonment above the high end of the applicable Sentencing Guidelines range corresponding to an offense level of 36 and the criminal history category calculated by the Court. For purposes of this agreement, the high end of the Sentencing Guidelines range is that defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A. The parties also agree that the government may respond to a request by defendant for a sentence below the government's recommendation.

### NATURE OF THE OFFENSES

5. Defendant understands that for defendant to be guilty of the crime charged in counts one and two in the first superseding information, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, the following must be true for each count: (1) defendant knowingly devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts;

7

(2) the statements made, or facts omitted, as part of the scheme were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

PENALTIES AND RESTITUTION

6.    Defendant understands that the statutory maximum sentence that the Court can impose for each violation of Title 18, United States Code, Section 1343, is: 20 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

7.    Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 40 years imprisonment; a 3-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $200.

8.    Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offenses to which defendant is pleading guilty.  Defendant agrees that, in return for the United States' compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offenses to which defendant is pleading guilty and in amounts greater than those alleged in the counts to which defendant is pleading guilty.  In particular, defendant agrees that

8

the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offenses to which defendant is pleading guilty.  The parties currently believe that the applicable amount of restitution is approximately $248,703,886.00, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

9.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

10.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated

9

collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

11.  Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the convictions in this case make it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his convictions on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his pleas may entail, even if the consequence is automatic removal from the United States.

FACTUAL BASIS

Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty.  Defendant and the United States agree to the statement of facts provided in the factual basis included as Attachment A to this plea agreement and agree that this statement of facts is sufficient to support pleas of guilty to the charges described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 13 below, but is not meant to be a complete recitation of all facts relevant to

10

the underlying criminal conduct or all facts known to either party that relate to that conduct.

SENTENCING FACTORS

12.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other Section 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

13.  Defendant and the United States agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base offense level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss greater than $150 million: | +26 | U.S.S.G. § 2B1.1(b)(1)(N) |
| 10 or more victims: | +2 | U.S.S.G. § 2B1.1(b)(2)(A)(i) |
| Offense involved sophisticated means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Defendant derived more than $1 million in gross receipts from a financial institution as a result of the offense: | +2 | U.S.S.G. § 2B1.1(b)(17)(A) |

The United States will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an

11

additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 2 through 3 are met and if defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below.  The parties agree that defendant did not use violence or credible threats of violence in connection with the offense.  Subject to paragraph 28 below, defendant and the United States agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed, except that either party may seek or oppose, and argue for or against the applicability of a zero-point offender adjustment under U.S.S.G. § 4C1.1.  If, however, the U.S. Probation Office finds in preparing the Presentence Report that the zero-point offender adjustment does not apply for any reason including because (i) the defendant personally caused substantial financial hardship, or (ii) defendant should receive an adjustment for aggravating role under U.S.S.G. § 3B1.1, the United States may concur with Probation's findings if asked by the Court.  Defendant agrees, however, that if, after signing this agreement, but prior to sentencing, defendant were to commit an act, or the United States were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the United States, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the United States would be free to seek the enhancement set forth in that section and to argue that defendant is not entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.

14.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

15.  Subject to paragraph 4(e) above, defendant and the United States reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

WAIVER OF CONSTITUTIONAL RIGHTS

16.  Defendant understands that by pleading guilty, defendant gives up the following rights:

a.  The right to persist in a plea of not guilty.

b.  The right to a speedy and public trial by jury.

c.  The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

d.  The right to be presumed innocent and to have the burden of proof placed on the United States to prove defendant guilty beyond a reasonable doubt.

e.  The right to confront and cross-examine witnesses against defendant.

f.  The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.  The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

13

h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

WAIVER OF APPEAL OF CONVICTION

17.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

WAIVER OF APPEAL AND COLLATERAL ATTACK

18.  Defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court, including, to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (e) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

14

19.  Defendant also gives up any right to bring a post-conviction collateral attack on the convictions or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

20.  This agreement does not affect in any way the right of the United States to appeal the sentence imposed by the Court.

WAIVER OF RIGHTS CONCERNING PLEA COLLOQUY AND FACTUAL BASIS

21.  Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing; (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

22.  Defendant further agrees that this paragraph of the agreement is severable.  Thus, defendant's waivers are binding and effective even if, subsequent to defendant's signing this agreement,

15

defendant declines to plead guilty, the Court declines to accept his guilty plea, or, if this agreement is of the type described in Federal Rule of Criminal Procedure 11(c)(1)(A) or (c)(1)(C), the Court rejects this agreement.  Defendant also agrees that his waivers are binding and effective even if some other portion of this agreement is found to be invalid by this Court or the Ninth Circuit.

RESULT OF WITHDRAWAL OF GUILTY PLEAS

23.  Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this plea agreement was involuntary, then the United States will be relieved of all of its obligations under this agreement and should the United States choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

EFFECTIVE DATE OF AGREEMENT

24.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an attorney for the United States.

16

BREACH OF AGREEMENT

25. Defendant agrees that if defendant, at any time after the effective date of the agreement, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the United States may declare this agreement breached. All of defendant's obligations are material, a single breach of this agreement is sufficient for the United States to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the United States in writing. If the United States declares this agreement breached, and the Court finds such a breach to have occurred, then:

a. If defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas.

b. The United States will be relieved of all its obligations under this agreement; in particular, the United States: will no longer be bound by any agreements (i) concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crimes to which defendant has pleaded guilty; and (ii) regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the United States would otherwise have been obligated to dismiss pursuant to this agreement.

c. The United States will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

26. Following the Court's finding of a knowing breach of this agreement by defendant, should the United States choose to pursue any

17

charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of the defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

<u>OFFICE NOT PARTIES</u>

27.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the United States' sentencing recommendations or the parties' agreements to facts or sentencing factors.

28.   Defendant understands that both defendant and the United States are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 13 are consistent with the facts of this case.  While this paragraph permits both the United States and defendant to submit full and complete

factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the United States' obligations not to contest the facts agreed to in this agreement.

29.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

NO ADDITIONAL AGREEMENTS

30.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the United States and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//

//

//

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

31.  The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

BILAL A. ESSAYLI
Acting United States Attorney

DEPARTMENT OF JUSTICE
CRIMINAL DIVISION

LORINDA I. LARYEA
Acting Chief, Fraud Section

_____          August 20, 2025
_____
NISHA CHANDRAN                             Date
JENNA G. WILLIAMS
Assistant United States Attorneys

THEODORE M. KNELLER
ADAM L.D. STEMPEL
Trial Attorneys, Fraud Section
Department Of Justice
Criminal Division

_____          August 15, 2025
_____
JOSEPH NEAL SANBERG                        Date
Defendant

_____          August 18, 2025
_____
BRIAN R. MICHAEL                           Date
MARC L. MUKASEY
Attorneys for Defendant JOSEPH NEAL
SANBERG

20

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

Signed by:

_____
JOSEPH NEAL SANBERG
Defendant

_____August 15, 2025_____
Date

21

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am JOSEPH NEAL SANBERG's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.

_____        ___August 18, 2025_____
BRIAN R. MICHAEL                         Date
MARC L. MUKASEY
Attorneys for Defendant JOSEPH NEAL
SANBERG

22

**ATTACHMENT A – FACTUAL BASIS**

Defendant acknowledges that if this case proceeded to trial, the United States would prove the following facts, among others, which defendant acknowledges to be true, beyond a reasonable doubt.

At times relevant to this factual basis:

**I.   Background**

<u>Relevant Entities and Individuals</u>

1.   JOSEPH NEAL SANBERG ("defendant") was the co-founder of Company A, and, at various times, was Company A's largest shareholder and served on Company A's board of directors.

2.   Company A maintained its principal office in Los Angeles County, California.

3.   Investor Fund A was a private credit fund that made a loan to defendant.

4.   Investor Fund B was a private credit fund that made a loan to defendant.

5.   Co-Schemer Ibrahim Ameen AlHusseini was a resident of Los Angeles, California and served on the board of directors of Company A.

6.   Investment Adviser 1 was an investment adviser to Investor Fund A and Investor Fund B.

7.   Individual 1 solicited potential investors and lenders on behalf of defendant.

8.   Investment Manager 1 managed one or more investment funds that made a loan to defendant.

9.   Sanberg Entity 1 was a closely held legal entity, which had one or more bank accounts controlled by defendant.

10. Sanberg Entity 2 was a closely held legal entity, which had one or more bank accounts controlled by defendant.

11. LOI Customer 1 was an entity that defendant presented to Company A as a bona fide customer.

12. Employee 1 was an officer of Company A.

### Overview of Scheme to Defraud

13. Beginning no later than in or around January 2020, and continuing through in or about February 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant and others knowingly and with intent to defraud, devised, intended to devise, and participated in a scheme to defraud lenders and investors and to obtain money and property from those lenders and investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

## II.  **False and Fraudulent Representations to Lenders**

14. Beginning no later than in or around January 2020, defendant negotiated terms for a loan from Investor Fund A of approximately $55 million (the "Investor Fund A Loan") for the benefit of defendant and others.  Under the terms of the Investor Fund A Loan, defendant pledged approximately 10.3 million shares of Company A stock as collateral.

15. To secure the Investor Fund A Loan, defendant and co-schemer Ibrahim Ameen AlHusseini arranged a separate financial transaction (a put option agreement) between co-schemer AlHusseini and Investor Fund A.  The put option agreement purported to act as a type of financial guarantee by obligating co-schemer AlHusseini to purchase the Company A stock posted as collateral from Investor

2

Fund A for tens of millions of dollars if defendant defaulted on the loan.

16.   Defendant and co-schemer AlHusseini knowingly and intentionally made, and caused to be made, materially false and fraudulent representations to Investor Fund A and Investment Adviser 1 that co-schemer AlHusseini had sufficient liquid assets to pay tens of millions of dollars for the shares of Company A stock in the event of defendant's default.  In truth and in fact, co-schemer AlHusseini did not have sufficient liquid assets to cover the obligations in the put option agreement if defendant defaulted on the loan.  Defendant knew that the put option agreement was a material term of the Investor Fund A Loan.

17.   But at relevant times, defendant knew that co-schemer AlHusseini did not have sufficient assets to pay tens of millions of dollars to Investor Fund A in co-schemer AlHusseini's bank and brokerage accounts that were identified to Investor Fund A and Investment Adviser 1.

18.   Defendant and co-schemer AlHusseini prepared, or caused to be prepared, materially false and fraudulent bank and brokerage account statements that overstated the liquid assets in co-schemer AlHusseini's bank and brokerage accounts by tens of millions of dollars.

19.   Defendant and co-schemer AlHusseini sent, or caused to be sent, the false and fraudulent bank and brokerage account statements showing co-schemer AlHusseini's purported assets, by means of wire communications in interstate commerce, to Investment Adviser 1 and Investor Fund A to obtain the $55 million loan for defendant.

3

20. In or around November 2021, defendant negotiated with Investment Advisor 1 to refinance the terms of the Investor Fund A Loan by taking out a new loan from Investor Fund B for $145 million.

21. In or around November 2021, defendant and co-schemer AlHusseini sent, or caused to be sent, falsified bank and brokerage account statements, by means of interstate wires, containing materially false and fraudulent statements regarding co-schemer AlHusseini's purported assets to Investment Adviser 1 and Investor Fund B to obtain the $145 million loan for defendant.

22. From in or around February 2020 and continuing until at least in or around October 2024, defendant concealed the scheme to defraud from Investment Adviser 1, Investor Fund A, and Investor Fund B.

23. Additionally, beginning in or around October 2024, defendant negotiated the terms of a loan with Investment Manager 1, to be collateralized by defendant's shares in Company A. In furtherance of the scheme and artifice to defraud lenders, defendant made and caused to be made materially false and fraudulent representations to Investment Manager 1 regarding the financial condition of Company A, including by providing and causing to be provided a copy of a letter purportedly signed by Company A's Audit Committee that falsely overstated Company A's available cash by hundreds of millions of dollars.

24. Specifically, in furtherance of the scheme to defraud and to carry out an essential part of the scheme, on or about June 5, 2024, defendant sent an email via interstate wire from within the Central District of California to Individual 1 in Florida, attaching a letter purporting to be written and signed by members of

4

Company A's Audit Committee (the "Audit Committee Letter").  The Audit Committee Letter contained materially false representations that defendant knew to be false.  Among other things, the Audit Committee Letter stated that Company A had "a balance of cash and equivalents of at least $250,000,000."  In truth and in fact, Company A had a cash balance of less than $1,000,000 in June 2024.

25.  Defendant knowingly and intentionally sent the Audit Committee Letter to Individual 1 for the purpose of obtaining money or property by means of materially false or fraudulent pretenses and misrepresentations and with the intent to deceive and cheat. Defendant knew that the letter contained materially false representations and intended that the materially false representations would fraudulently influence others to part with money or property.

26.  The materially false and fraudulent statements in the Audit Committee Letter were capable of influencing, intended to influence, and did in fact influence Investment Manager 1's decision to loan defendant approximately $16,000,000 in or around January 2025.

III.  **False and Fraudulent Representations to Investors**

27.  Defendant also sent and caused to be sent false and fraudulent representations to investors seeking to invest in various assets related to Company A, including purchasing shares of Company A stock and making pooled investments to acquire debt securities issued by Company A through defendant.  In furtherance of the scheme, defendant caused Company A's revenue to be falsely inflated and misrepresented Company A's revenue and assets to induce those investments.

5

A. <u>Revenue Fraud</u>

28.  Beginning no later than January 2021, Company A established a business line, known as "enterprise sustainability services," in which Company A sold tree planting services to individuals and companies interested in reducing their environmental impact.

29.  Beginning no later than January 2021, defendant solicited small businesses and individuals, directly and through intermediaries, to sign "Letters of Intent" with Company A.  The Letters of Intent stated that each small business or individual (collectively, the "LOI Customers") would pay for tens of thousands of trees to be planted on a recurring monthly or quarterly basis at a price of $1 per tree.

30.  Certain LOI Customers paid Company A for the tree planting services described in the Letters of Intent with funds received from defendant.  Defendant concealed from Company A investors that defendant was the source of funds for the payments under the Letters of Intent.  These certain LOI Customers were not bona fide purchasers of the tree planting services from Company A.

31.  Between in or about March 2021 and November 2022, defendant paid millions of dollars to LOI Customers, who then paid Company A.  At times, defendant paid the LOI Customers using money he received from Company A.  For example, in or around January 2022, as a result of defendant's actions, Company A entered into a 12-month, $8 million advisory contract for business development services with one of defendant's closely held entities, Sanberg Entity 1.

32.  On or about January 31, 2022, Company A paid Sanberg Entity 1 $8 million.  The $8 million payment to Sanberg Entity 1 was made using funds of investors in Company A.

6

33. On or about March 14, 2022, defendant:

a. Made two transfers of approximately $350,000 each from the prepaid $8 million from the bank account of Sanberg Entity 1 to defendant's personal checking account;

b. Made two subsequent transfers of approximately $350,000 each from defendant's personal checking account to an account for another one of defendant's closely held entities, Sanberg Entity 2; and

c. Made two more subsequent transfers to Company A for $350,000 each from the Sanberg Entity 2 bank account and listed the name of LOI Customer 1 and an invoice number in each wire instruction.

34. Defendant also made or caused to be made additional payments to Company A directly from bank accounts held in the names of Sanberg Entity 2 and other closely held entities that defendant controlled. To conceal from Company A's investors that defendant was in fact was the source of these funds, defendant made these payments to Company A purportedly on behalf of LOI Customers through the Sanberg Entity 2 bank account, and through other accounts in the names of other entities that defendant controlled. Defendant concealed from Company A investors that he controlled Sanberg Entity 2 and the other closely held entities that defendant used to make payments to Company A on behalf of LOI Customers.

35. On or about March 21, 2022, defendant knowingly sent encrypted messages via interstate wires using a smartphone application called "Signal" from within the Central District of California to Employee 1 of Company A in Arizona to carry out an essential part of the scheme. Defendant informed Employee 1 via the

7

messages that the March 14, 2022 payments of $350,000 to Company A from Sanberg Entity 2 should be credited to LOI Customer 1.

36. To conceal the scheme to defraud from Company A's investors, defendant's March 21, 2022 text messages to Employee 1 contained deceitful statements of half-truths, and statements that omitted material facts. Defendant made such statements to Employee 1 with the intent to deceive and cheat Company A investors.

37. At relevant times and to further conceal the scheme to defraud, defendant also instructed Company A not to contact the LOI Customers to conceal from Company A's investors and creditors that certain payments for tree planting services pursuant to Letters of Intent were made by or indirectly funded by entities controlled by defendant and not from the LOI Customers.

38. From in or around March 2021 through in or around November 2022, Company A recognized as revenue the anticipated monthly and quarterly payments from each of the LOI Customers in the amounts specified in the Letters of Intent. Company A recognized that revenue from the LOI Customers as being from arms-length third parties and not as related-party revenue from Company A's co-founder, defendant.

39. The revenue booked from the LOI Customers materially misstated the recognized revenue of Company A such that Company A's financial statements were materially inaccurate.

40. At relevant times, defendant knew Company A's financial statements materially misstated revenue from LOI Customers. Knowing that Company A's financial statements materially misstated Company A's revenue, defendant knowingly and intentionally, through the use of interstate wires, solicited investors to purchase

8

securities to invest in Company A by means of materially false and fraudulent representations, and statements that omitted material facts.

B. Inflated Assets Fraud

41.  In furtherance of the scheme to defraud, defendant also made, and caused to be made, materially false and fraudulent representations that materially overstated Company A's value and assets, including Company A's available cash, to multiple investors for the purpose of influencing their decision to purchase Company A stock or to make pooled investments to acquire debt securities issued by Company A.

42.  From at least in or around June 2024 to in or around January 2025, defendant knowingly and intentionally made, and caused to be made, materially false and fraudulent representations that overstated Company A's available cash by hundreds of millions of dollars to investors for the purpose of influencing their decisions to invest in securities related to Company A.

**IV.  Conclusion**

43.  From in or around August 2024 to at least in or around February 2025, defendant accepted and received, directly or indirectly, criminal proceeds of the wire fraud scheme.  Defendant transferred at least approximately $6,650,000 to an account held in defendant's name at a financial institution, account number 41-01-100-0166771, knowing that the deposits were the proceeds of some form of unlawful activity, namely proceeds of the victim-lenders' and victim-investors' funds that defendant obtained from the wire fraud scheme.

9

44.  In accepting and receiving those victim-lenders' and victim-investors' funds, defendant deposited millions of dollars in unlawful proceeds from the scheme to defraud in an account with a financial institution.  The financial institution later loaned defendant more than $1 million because defendant posted the millions of dollars deposited to the account as collateral for the loan.  Accordingly, defendant derived more than $1 million in gross receipts from a financial institution as a result of the offense.

45.  Defendant's scheme to defraud lenders and investors involved sophisticated means as described above, including the use of sophisticated loan and investment structures, and multiple corporate entities, and defendant intentionally engaged in or caused the conduct constituting sophisticated means.

46.  In total, defendant's scheme to defraud lenders and investors involved 10 or more victims who sustained actual pecuniary harm, and victim losses are at least approximately $248,703,886.

# Exhibit F



Aspiration declared "Clean rich is the new filthy rich" in their billboards from Los Angeles to Brooklyn. *Source: Google Street View*

Green | ESG & Investing

# DiCaprio-Backed Green Finance Startup Unraveled on Dubious Deals

Three years after pursuing a $2 billion IPO, Aspiration Partners faces probes by US authorities.

By [Ben Elgin](#), [Kendall Taggart](#), and [Tom Schoenberg](#)
July 10, 2024 at 3:00 AM PDT

 

Three years ago, Aspiration Partners had turned a debit card designed for sustainable shopping and investment accounts that promised complete exclusion of fossil-fuel stocks into a high-flying climate startup. The Los Angeles-based company had set itself on the verge of a stock market debut with an expected valuation of more than $2 billion.

Most of the climate-oriented companies that have made the jump into public markets focus on renewable energy or other breakthrough clean technologies

Aspiration would be one of the first green unicorns to emerge from consumer finance.

Going public would have brought a big payday for a star-studded list of investors who had supported Aspiration over a decade, including Steve Ballmer, Leonardo DiCaprio, Orlando Bloom, Robert Downey Jr., and Cindy Crawford. Canadian rapper Drake promoted the company, and its catchy tagline, "Clean rich is the new filthy rich," was displayed on billboards and building walls from Los Angeles to Brooklyn. Things had gone so well that Aspiration appeared to have even become a viable launchpad into US Congress. Andrei Cherny, its co-founder and one-time chief executive officer, currently running as a pro-climate candidate in the hotly contested Democratic primary in Arizona's 1st District, with endorsements from former President Bill Clinton and Phoenix Mayor Kate Gallego. The election will be held at the end of the month.

But today Aspiration is struggling to stay afloat and faces an investigation by l authorities, including the Department of Justice and the Securities and Exchange Commission. The inside story of the unraveling of this once-promising climate company comes down to its hurried effort to start a new business line–and boost its revenues–by selling sustainability services, such a tree planting, to other companies.



Andrei Cherny, pictured in Los Angeles in 2014, co-founded Aspiration and was its CEO for nearly decade. *Photographer: J. Emilio Flores/The New York Times/Redux*

In late 2020, just as company executives began holding meetings about a potential public offering, Aspiration signed its first deals with corporate clients. Within a year, this new unit leapt to more than half of Aspiration's sal –accounting for $56 million of the $100 million in revenues it reported for 2021. But the explosive growth in Aspiration's new business was driven in par by dubious deals that inflated the company's revenue, according to a *Bloomberg Green* investigation that relied on interviews with 28 former employees and several of Aspiration's corporate customers, as well as a revie of numerous internal company documents.

In its pursuit of a public listing, Aspiration told investors it had signed deals with nearly three dozen business customers. While a few were household names–including the Los Angeles Clippers basketball team and consulting giant Deloitte–most were never disclosed. Many of these deals baffled the Aspiration insiders who had access to the information, and Cherny said in a statement that there were parts of some agreements he didn't know about.

Among the deals were a synagogue in Beverly Hills that was supposed to pay Aspiration $25,000 per month to participate in reforestation projects around

the world. A nonprofit was supposed to pay Aspiration an amount nearly 10 times greater than its annual revenue. Another client was an unknown LLC created anonymously within days of its deal with Aspiration.

An unusual number of customers were Colombian celebrities, including an actor and several retired soccer players. Two of them told *Bloomberg Green* that they had signed agreements simultaneously with Apogee Pacific LLC–an entity that was controlled by Joseph Sanberg, Aspiration's co-founder, board member and a major shareholder–which would cover the costs they were supposed to pay Aspiration.

"It sounded very weird," says Juan Pablo Llano, a Colombian actor who signe deals with both Aspiration and Apogee Pacific, but never exchanged funds with either company. "I smelled something I didn't like."



Joseph Sanberg, speaking at the California Democratic Party convention in 2019, co-founded Aspiration. *Photographer: Sheila Fitzgerald/Alamy*

Aspiration didn't respond to numerous questions about its specific customers including the Beverly Hills synagogue and Juan Pablo Llano, but a spokesmar said in a written statement that investors had conducted "thorough due

diligence" on Aspiration's financial reports, and that the company continues
cooperate with the government, "who have not made us aware of any alleged
wrongdoing" by Aspiration.

Cherny, the company's former CEO who is running for Congress, also didn't
comment about Aspiration's unusual array of corporate customers, but he sa
in a written statement that he had no knowledge of side agreements with
Apogee Pacific. "This information about side deals is news to me, does not
involve the actions of any of us who worked at the company, and it should no
at all detract from...the business we built," he said.

Sanberg didn't respond to numerous requests for comment, and his attorney
Robert Sacks, a partner at Sullivan & Cromwell, declined to comment. Officia
at the DOJ and SEC also declined to comment.

By early 2022, Aspiration accountants had uncovered a series of payments th
sent a wave of panic through the company's executive suite. In one case, moi
than $3 million arrived from two of Aspiration's customers through an entity
called Day 12 Partners LLC, according to company documents. Perplexed
staffers dug into state records and found the company, formed anonymously
Delaware, at one point had been registered to Aspiration co-founder Sanberg

Some Aspiration staffers worried that a company official might be
orchestrating fake transactions to inflate its numbers. "If that's the case, that
would be a clear violation of the law," says Jung Koo Kang, an assistant
professor of accounting and management at Harvard Business School and a
former auditor, who was briefed on the details by *Bloomberg Green*.

Sanberg told the company he wasn't involved in the payments and had long
ago cut ties with Day 12, according to internal company documents. KPMG, th
company's auditor, soon quit without signing off on Aspiration's financial
reports for 2021–a major blow to the company's hopes to reach public
markets.

Aspiration said that it is "wholly inaccurate" to suggest that any of its clients
were fictitious. After the Day 12 payments were discovered, it hired an outsid
law firm to conduct an investigation, which included a "forensic accounting
review." The months-long probe found "no evidence of wrongdoing," said the

company's spokesman. "We categorically reject these speculative and inaccurate claims," the spokesman said, adding that the company's financial statements followed "proper accounting methodologies."

KPMG declined to comment. Day 12 couldn't be reached for comment becaus it has no apparent public presence. Sanberg was the only name listed in two Day 12 records filed in California in 2013 and 2016; the company's records in Delaware don't include names or contact details for anyone at the company.

Aspiration recently relaunched its corporate business as Catona Climate to focus on selling carbon credits to companies like Meta Platforms Inc. and Microsoft Corp. But Aspiration, which halted its plans for an initial public offering last year, faces an arduous path ahead. Eden Reforestation Projects, i one-time tree planting partner, is pursuing Aspiration for millions of dollars i expenses that Eden says it incurred. After raising over $500 million from investors over the past decade, Aspiration is now "insolvent" and "has no reasonable means of becoming profitable," according to a court filing in June by Inherent Group, a lender to Aspiration which is requesting that Aspiration be put into receivership so the former climate high-flier can be wound down restructured "in an orderly fashion." In a legal rebuttal, Aspiration said that it continues to be operational and has found funding "with which it is working resuscitate itself."

WHEN ASPIRATION LAUNCHED MORE THAN A DECADE AGO, IT VIEWED ITSELF / a radical force upending the banking industry. It courted middle-class consumers, requiring a minimum of only $500 to invest in its first mutual fund. It also ditched fixed fees in favor of a tipping model, where customers could volunteer how much they would pay Aspiration.

"Meet Aspiration," one of its earliest ads declared, "Wall Street greed's worst nightmare."

"It was revolutionary," says Amr Mohamed, who ran Aspiration's engineering team from 2013 to 2016. The company's fundamental idea, he said, was "if yc want people to trust a bank, the bank has to trust people first."

Aspiration started adding climate-friendly features, like investment funds tha

excluded oil companies and a pledge to plant a tree each time a customer swiped a credit card. "You can fight climate change with each transaction you make," stated the company on its website.



Aspiration inspired some of its staff: "It was revolutionary," one worker said. *Photographer: Timon Schneider/Alamy*

Some ideas proved difficult to execute. Aspiration developed sustainability scores for thousands of retailers, which were intended to help customers sho more responsibly–"a Fitbit for sustainability," as then-CEO Cherny frequently put it. But the scores were overly simplistic, say two ex-staffers. Aspiration praised Delta Air Lines, for instance, on its "2018 Nice List" for "flying cleane than ever" by allowing travelers to purchase carbon offsets and replacing son of its fleet with more efficient planes. But those are common steps among air carriers and Delta's emissions climbed steadily until the Covid-19 shutdowns.

The company sparked the ire of some critics, including Scott Galloway, a marketing professor at the NYU Stern School of Business. In an online post written after Aspiration filed to go public in 2021, Galloway accused the company of exaggerating its number of users and "promoting the fiction that we can shop our way out of climate change."

But many investors ate it up. Allen & Company, Flourish Ventures, Alpha

Edison and Capricorn Investment Group poured in early funds. Its biggest slu
of capital came in December of 2021, when Oaktree Capital Management and
Steve Ballmer invested $315 million.

Aspiration began highlighting its growing corporate business, which quickly
surpassed revenues from its consumer banking products. At the end of 2020,
had two business clients; six months later there were 34. In an investor
presentation <u>filed with the SEC</u> in August 2021, it trumpeted its corporate
division's "explosive growth from a standing start," and projected it would
surpass 150 business clients by 2023.



Among its supporters, Aspiration counted Drake, clockwise from top left; Robert Downey Jr.; Cinc
Crawford; Leonardo DiCaprio; Steve Ballmer and Orlando Bloom. *Source: Getty Images (6)*

Most of these agreements involved reselling reforestation services performed
by others, at a very high markup. Two Aspiration customers told *Bloomberg
Green* that their agreements stipulated they would pay Aspiration $1 per tree.

Aspiration then worked with reforestation partners, with most of its funds directed to the nonprofit Eden Reforestation Projects. Eden charged Aspiration just 10 to 20 cents per tree, according to several people familiar with the arrangement.

These corporate agreements were far from ironclad. Most of Aspiration's early deals were letters of intent, slightly more than one page in length, rather than binding contracts, according to the list of deals reviewed by *Bloomberg Green*, as well as interviews with three customers and several former Aspiration insiders.

This is a red flag, according to accounting experts. If a company is going to count revenue from an agreement, it needs to be enforceable, according to Kecia Williams Smith, a former auditor and an associate professor of accounting and finance at North Carolina Agricultural and Technical State University. While a letter of intent might signal interest in pursuing a contract, she says, "a contract is more binding."

Many of the corporate agreements were brought in by Sanberg, the company co-founder and board member. Sanberg, who made his fortune on Wall Street and from early investments in companies like meal-delivery service Blue Apron, wasn't an Aspiration employee. Aspiration staffers, nevertheless, were told that Sanberg would manage these client relationships and were instructed to not contact them, even when the customers fell behind on payments, according to several former Aspiration employees, as well as internal records viewed by *Bloomberg Green*. Sanberg was paid hefty sums by Aspiration for his services, including $8 million in January of 2022, according to figures supplied to the SEC. (Aspiration's spokesman said the $8 million was to compensate Sanberg for taxes associated with a stock grant.)

This arrangement–where a large chunk of a company's sales is handled outside of its normal operating procedures–baffles experts. "I've never seen these kinds of practices," says Kang, the Harvard professor. "It's a clear indication of almost non-existent or weak internal control systems."

Two customers brought in by Sanberg described to *Bloomberg Green* a circula

flow of money, where they would be paid by a separate entity, so long as they continued funding tree planting with Aspiration.

Elizabeth Loaiza, a Colombian model who represented her country in the Miss World pageant in 2006, said she was approached by a mutual acquaintance of Sanberg's. The person asked if she would be interested in being paid to promote Aspiration. It seemed like a great cause, and she was impressed by the company's list of Hollywood backers.

She signed on in February of 2021. But when she looked more closely at the documents, she became concerned. Loaiza, who said her English is not good, had signed a letter of intent in English, which stated, in part, that her nonprofit foundation would pay Aspiration a monthly sum of $50,000, allowing her to say she had planted 50,000 trees, according to documents, which were reviewed by *Bloomberg Green*. A second document, which she had signed the same day, was an "advisory contract" with Apogee Pacific, the company run by Sanberg. That contract would pay Loaiza $55,000 per month for "marketing and branding services" and would "last for as long as" she worked with Aspiration.

When she expressed alarm about the obligation to pay Aspiration, she said Sanberg told her not to worry and that he would be paying her. In an email viewed by *Bloomberg Green*, Sanberg explained to Loaiza that Apogee would pay her "for your expertise and advice as long as your foundation is also working with Aspiration."

Juan Pablo Llano, the Colombian actor, said he was approached on Aspiration's behalf by the same middleman. "They said many actors in LA are working with this, it's good," he says.



Actor Juan Pablo Llano signed a deal with Aspiration. *Photographer: Adrián Monroy/Medios y Media/Getty Images*

Just as Loaiza had done, he signed deals to pay Aspiration for tree planting, while Apogee Pacific would compensate him for marketing the program. "They said, 'You don't have to pay for that, we'll give it to you,'" he says. But he said he started to feel uneasy about the arrangement, particularly the idea that they would cover his costs through a separate contract.

Both said they never made payments to Aspiration, nor did they receive fund from Apogee.

Accounting experts briefed on the situation say that the deals with Aspiration and Apogee Pacific should be treated as a single contract, because they are linked. Both documents should have been disclosed to Aspiration's finance team, as well as the company's outside auditors, according to Harvard's Kang "On a stand-alone basis, the customer would not enter into a contract with the company, so the company should disclose this," he says.

Several former Aspiration managers, however, said they had no knowledge of these side arrangements with Apogee Pacific, and they believed that this information wasn't disclosed to KPMG, the company's auditor at the time. Th

would amount to a "violation of accounting standards," according to Kang.

A flurry of other corporate deals, meanwhile, puzzled then-staffers at Aspiration, who said they struggled to understand who these customers were or why they would pay hundreds of thousands of dollars for reforestation. According to lists of deals viewed by *Bloomberg Green*, these included:

- Young Israel of North Beverly Hills, an orthodox synagogue, which signed a letter of intent to pay $25,000 per month in tree planting;

- An obscure company called 539 N. Alta Vista LLC, seemingly named for a house in Los Angeles, which agreed to pay $50,000 per month;

- The Hidden Light Institute, a nonprofit that produces documentaries about Israeli figures and events, which agreed to fund 300,000 trees per month at $ apiece–despite generating only $387,000 in revenue in 2021, according to its public tax filing;

- ETZ Partners LLC, which appears to have no public presence and was formed within days of its Aspiration deal by another LLC registered anonymously in Delaware, agreed to a multimillion-dollar reforestation arrangement.

Pini Dunner, the senior rabbi at the Beverly Hills synagogue, didn't respond t requests for comment. David Wizman, listed as the managing member of 539 N. Alta Vista, didn't respond to messages. Robert Schwartz, president of the Hidden Light Institute, declined to comment on its Aspiration deal. Nathan Miller, who runs a communications firm in Los Angeles and is listed in Aspiration records as the contact for ETZ Partners, didn't respond to messages.

It's not clear exactly how Aspiration counted revenue from each specific deal but it wasn't contingent on it receiving money from clients. In an accounting technique used by many companies, Aspiration claimed revenue when it fulfilled its portion of an agreement (such as paying for tree planting), rather than when it received payment from customers, according to filings with the SEC. Because Aspiration paid large sums for tree planting, this allowed it to claim substantial revenues even as customer payments fell far behind.



**Sign Up**

By continuing, I agree to the Privacy Policy and Terms of Service.

UNEASE OVER ASPIRATION'S DEALS FINALLY BOILED OVER ON MARCH 18, 2022. That's when two of Aspiration's accountants raised concerns about a series of suspicious incoming payments, calling them "a red flag for suspicious activity and possible fraud," according to a memo sent to the company's board by Aspiration's chief legal officer Mike Shuckerow.

One key concern: A couple of corporate clients had paid Aspiration through Day 12 Partners, the entity that had been registered to Sanberg. The company co-founder, who told Aspiration that he was no longer connected to Day 12, added that he was subject to a confidentiality agreement and couldn't disclose who currently owned Day 12, according to the memo. The two accountants quickly tendered their resignations, added the memo, while a third was considering leaving.



An Aspiration billboard in New York in 2021. *Source: Google Street View*

Aspiration's board hired an outside law firm, Baker Hostetler, to investigate.

The law firm eventually concluded that it found no evidence of wrongdoing.

Members of Aspiration's finance team continued to depart, and its relationsh
with KPMG soured. In a last-ditch effort to keep their accounting firm on
board, Aspiration officials told KPMG in the middle of 2022 that Sanberg was
prepared to resign from the board and would provide a sworn statement
under penalty of perjury about his lack of involvement in the Day 12 payment
But KPMG soon severed ties with Aspiration.

"Auditors are required to withdraw if they don't trust the numbers being
presented by the client," says Adam Pritchard, a professor who specializes in
securities law at the University of Michigan. "When you see the auditors quit,
that's a big red flag for investors." (Neither KPMG nor the company has
revealed the reason for the end of the engagement.)

Shuckerow, who is still a top executive at Aspiration, declined to be
interviewed. A spokesperson for Baker Hostetler didn't respond to messages.
Meanwhile, Aspiration's outside board members at the time, including ventu
capitalists Nate Redmond and Ibrahim AlHusseini, corporate advisor Helen
Melluish and civil rights leader Ben Jealous (who is now executive director of
the Sierra Club) didn't respond to numerous requests for comment.

Today, some two years later, Aspiration is a shell of its former self. The
company has laid off most of the 400-plus employees who were there at the
pinnacle of its growth. It faces more than a half-dozen lawsuits from vendors
over unpaid bills. And most of the three dozen corporate customers it once
trumpeted in its investor presentations are no longer active clients, according
to former company managers.

The company is trying to re-invent itself as a seller of high-quality carbon
credits. Its carbon spin-off, Catona Climate, announced a deal in February to
sell 350,000 credits to Microsoft over the next six years from a carbon projec
it funds and manages in Kenya.

It's unclear what has happened to the investment stakes of many of its
longtime financial backers. Representatives for numerous investors, including
Oaktree, Ballmer, Capricorn, Alpha Edison, Flourish, Allen & Company,

DiCaprio, Downey Jr., Crawford and Bloom all declined to comment or didn't respond to messages by deadline.

Cherny, the company's longtime CEO who once worked as a speechwriter for the Clinton White House and formerly ran the Arizona Democratic Party, frequently mentions Aspiration as he campaigns for Congress in a crowded Democratic primary. He touts the results of his time atop the company, including the creation of "thousands" of jobs and planting millions of trees. " am enormously proud of the work that our Aspiration team and I did to fight the climate crisis," he said in the written statement to *Bloomberg Green*.

After the Day 12 situation emerged, Cherny said he pushed for the internal investigation. He also tried to implement governance changes at the company such as blocking board members for negotiating and signing deals on Aspiration's behalf. When some of the proposed reforms got bogged down at the board, he offered his resignation, which the board accepted in October of 2022.

But Cherny bears some responsibility, according to experts, because he was the company's top official when it built the enterprise business. While some inside the company grew concerned about the unusual roster of customers, Cherny extolled the new business line's marvelous growth.

"The CEO," the board and other top company officials, according to Harvard' Kang, "are responsible for designing an effective internal control system."
– *With assistance from Allyson Versprille*

Contact us:
**Provide news feedback or report an error**

Confidential tip?
**Send a tip to our reporters**

Site feedback:
**Take our Survey** ⧉

Before it's here, it's on the Bloomberg Terminal

©2025 Bloomberg L.P. All Rights Reserved.

# Exhibit G

DANIEL S. LIM (Cal. Bar No. 292406)
Email: limda@sec.gov
DOHOANG T. DUONG (Cal. Bar No. 219127)
Email: duongdo@sec.gov
MATTHEW T. MONTGOMERY (Cal. Bar No. 260149)
Email: montgomerym@sec.gov

Attorney for Plaintiff
Securities and Exchange Commission
Brent W. Wilner, Associate Director
Douglas M. Miller, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| JOSEPH NEAL SANBERG, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendant Joseph Sanberg ("Defendant" or "Sanberg") has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant resides in this district.

## SUMMARY

4.     Between in or about January 2021 and December 2022, Sanberg, the co-founder, board member, and shareholder of an environmental sustainability services company, Aspiration Partners, Inc. ("Aspiration"), engaged in a scheme to artificially inflate the company's revenue in order to attract investors and increase the value of its stock.  To carry out the scheme, Sanberg made materially false and misleading statements to investors and engaged in other deceptive acts.

5.     To make it appear as though Aspiration's business was rapidly growing, Sanberg recruited friends, associates, small businesses, and religious organizations and presented them to Aspiration as bona fide customers who were fully committed to paying large sums of money for Aspiration's services.  These purported customers signed "letters of intent" or other one-to-two-page agreements ("LOIs") promising to pay $25,000 to $750,000 on a recurring basis in return for the company's reforestation services.

6.     In reality, however, these LOIs were a sham because the purported customers (the "LOI Customers") had no intention of paying for the sustainability services they received from Aspiration.  In fact, Sanberg made it clear to the LOI Customers that they did not actually have to pay for the services Aspiration provided.

2

7.    Sanberg just needed the LOI Customers to sign the sham LOIs so that Aspiration could recognize the amounts in them as revenue, creating the false appearance that Aspiration was experiencing "explosive growth" and allowing Sanberg to tout Aspiration's performance to investors looking to buy its stock.

8.    To add apparent legitimacy to these sham LOIs and ensure that Aspiration would continue recognizing the amounts on the LOIs as revenue, Sanberg paid the initial payment obligations of the LOI Customers by either sending funds to LOI Customers directly or sending funds to an entity that would then transfer those funds to Aspiration.  Sanberg made these payments in a way to avoid detection by Aspiration.

9.    Even as Sanberg stopped paying LOI Customer obligations, and Aspiration was left with a ballooning uncollected and aging receivable LOI balance, the company continued to recognize the amounts on the LOIs as revenue.

10.    Sanberg took several steps in furtherance of this fraudulent scheme. Using his influence as a co-founder, large shareholder, and board member of the company, he limited the access that Aspiration employees had to the LOI Customers to avoid detection and continue his secret payments on their behalf.  Sanberg also vouched for the LOI Customers and pushed for the amounts in the LOIs to be recognized as revenue, even though the LOI Customers had no intention of making payments and large portions of the purported revenue went uncollected.  In addition, Sanberg made false and misleading statements about Aspiration's revenue to investors, saying things like the LOI Customers were "recurring, sticky and value-add" when, in fact, the LOI Customers had no intention of paying for the sustainability services they received from Aspiration.  Sanberg also led certain investors to believe—falsely—that Aspiration's revenue projections for fiscal year 2022 were over $100 million higher than what the company had stated publicly.

11.    The purported LOI Customer revenue artificially increased Aspiration's revenue by approximately $44 million for fiscal year 2021, even though

3

approximately $33,875,000 of that amount remained uncollected by December 31, 2021, and the rest had been paid by Sanberg.

12.   In total, Sanberg's scheme resulted in his recruiting approximately 27 LOI Customers between 2021 and 2022, all of whom were ostensibly required to pay between $25,000 and $750,000 to Aspiration on a recurring basis.

13.   Through his fraud, Sanberg raised more than $300 million from investors who falsely believed Aspiration had a thriving environmental sustainability services business.

14.   By engaging in this conduct, Sanberg violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(3), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder.

15.   Accordingly, the SEC seeks an order against Defendant: permanently enjoining him from future violations of these provisions and from participating in the issuance, purchase, offer, or sale of any security other than for his own personal accounts; requiring him to pay disgorgement of ill-gotten gains and prejudgment interest; requiring him to pay civil monetary penalties; and imposing an officer-and-director bar against him.

## THE DEFENDANT

16.   **Joseph Neal Sanberg**, age 46, resides in Anaheim, California.  He is a co-founder and, until March 2025, was a member of the board of directors of Aspiration.  Sanberg also controls several other entities.  Sanberg and his entities held 29.82% of Aspiration's shares as of September 2021.

## RELATED ENTITIES

17.   **Aspiration Partners, Inc.** (n/k/a CTN Holdings, Inc.), a Delaware corporation based in Marina del Rey, California, was formed in 2013 to provide consumer banking services to consumers focused on environmental sustainability.  In early 2024, Aspiration sold its financial services business and rebranded its carbon business as Catona Climate Solutions LLC ("Catona").  In or about March 2025,

4

CTN Holdings, the parent company of Catona, filed for bankruptcy.  Neither Aspiration nor its securities have been registered with the Commission in any capacity.

18.    **InterPrivate Financial Partners III** ("InterPrivate"), a Delaware corporation based in New York, New York, was formed as a blank check company, or Special Purpose Acquisition Company ("SPAC"), to pursue a business combination.  InterPrivate's securities are registered under Section 12(b) of the Exchange Act and its common stock is quoted on the New York Stock Exchange (ticker symbol: IPVF).  Starting in around August 2021, InterPrivate sought to acquire Aspiration through a merger agreement that was ultimately terminated.

<u>THE ALLEGATIONS</u>

**A.    The Fraudulent Scheme**

**1.    Sanberg's Influence and Control Over Aspiration**

19.    In 2013, Sanberg co-founded Aspiration, a privately held financial services company focused on environmental sustainability.

20.    Sanberg was a large shareholder in and board member of Aspiration, and exercised decision-making authority over its business operations and fund-raising activities.

21.    Sanberg was also personally and financially tied to the success of Aspiration.

22.    From March 2020 through at least November 2021, Sanberg obtained more than $100 million in loans by pledging over ten million Aspiration shares as collateral.

23.    Sanberg made clear to others that maintaining and increasing the value of Aspiration's shares was important to him personally, and would also benefit Aspiration.

24.    For example, on November 29, 2020, Sanberg texted Aspiration's co-founder and Chief Executive Officer ("CEO"): "Figure out how to get me the money

tomorrow or I'll be in default.  It's your turn to do what needs to be done. . . .  But if you don't get me the money tomorrow we are all f…ed.  Get me the money.  Your turn to figure it out like I have for so long.  Wire it to the [Sanberg-entity] account.  If you don't then [the lender] will foreclose.  This will give you a good taste of what I have to experience every day.  I hate you and I hate this company and I don't want to work anymore with you [ ].  You are so oblivious to what you've forced me to have to do."

### 2. Sanberg Takes Advantage of a New Line of Business

25.    In late 2020, Aspiration began offering environmental sustainability services directly to individual and corporate customers under a wholly owned subsidiary called Aspiration Sustainable Impact Services, LLC ("ASIS").

26.    This new line of business offered carbon offsets and reforestation services, i.e., tree-planting, where customers would pay Aspiration, which in turn would pay a third party to plant trees.

27.    Starting in or around December 2020, Sanberg began to recruit the LOI Customers, including those friends and associates he directly communicated with and those who heard about the opportunity from those friends and associates.

28.    Sanberg made it clear to the LOI Customers he communicated with directly that they could receive reforestation and carbon footprint reduction services from Aspiration at no charge, through subsidies or "sponsorships."

29.    Specifically, Sanberg told them that he or his entities would pay Aspiration, or provide the LOI Customers funds to pay Aspiration, for these services.

30.    As a result of Sanberg's representations, the LOI Customers believed that they did not have to pay for Aspiration's reforestation services, and had no intention of paying for them.

### 3. Sanberg Has His Customers Sign Bogus "Letters of Intent"

31.    Despite his verbal assurances to the LOI Customers that they need not pay for the services they received from Aspiration, starting in or around January

2021, Sanberg prepared, or caused others to prepare, LOIs that made it appear like those customers were financially obligated to purchase a certain number of "trees per month" in return for a monthly/quarterly fee to Aspiration.

32. These LOIs were illusory because they did not indicate that customers were not actually obligated or expected to pay the monthly/quarterly fees.

33. The LOI Customers signed the LOIs, and Aspiration's CEO counter-signed them on behalf of Aspiration.

34. In 2021, Aspiration entered into approximately 27 LOIs and each of the LOI Customers purportedly agreed to pay amounts ranging from $25,000 to $750,000 to Aspiration on a monthly/quarterly basis.

35. The chart below contains the initials of the LOI Customers, the effective dates of the LOIs, and the purported monthly or quarterly payment obligations:

| INITIALS | DATES | AMOUNT |
| --- | --- | --- |
| A.P.M. | 1/1/2021 | $500,000 |
| D. | 1/1/2021 | $250,000 |
| G.P.M.S. | 1/1/2021 | $50,000 |
| G.B. (assigned to S.B.) | 1/1/2021 | $350,000 |
| 3.E. | 2/1/2021 | $250,000 |
| C.M. | 2/1/2021 | $50,000 |
| C.E. | 2/1/2021 | $100,000 |
| E.L.F. | 2/1/2021 | $50,000 |
| F.A.V.R. | 2/1/2021 | $50,000 |
| F.A. | 2/1/2021 | $50,000 |
| J.M. | 2/1/2021 | $50,000 |
| Y.I.N.B.H. | 2/1/2021 | $25,000 |
| E.P. | 3/1/2021 (amended from 2/1/2021 LOI) | $425,000 |
| M.E. | 3/1/2021 (amended from 2/1/2021 LOI) | $100,000 |
| 5.N.A.V. | 3/1/2021 | $50,000 |
| D.D.C. | 3/1/2021 | $150,000 |
| G.R. | 3/1/2021 | $50,000 |
| N.C. | 3/1/2021 | $25,000 |
| O.C. | 3/1/2021 | $50,000 |

7

| O. | 3/1/2021 | $50,000 |
| S.S.E. | 3/1/2021 | $75,000 |
| V. | 3/1/2021 | $50,000 |
| W. | 3/1/2021 | $50,000 |
| W.P. | 3/1/2021 | $50,000 |
| A.C.D. | 6/1/2021 | $750,000 |
| H.L.I. | 6/1/2021 | $300,000 |
| S.I. | 6/1/2021 | $50,000 |

### 4. Sanberg Limits Access to the LOI Customers

36. Sanberg tightly controlled Aspiration's communications with the LOI Customers, preventing Aspiration from conducting onboarding procedures designed to, *inter alia*, ensure that Aspiration's customers could meet their financial obligations.

37. Sanberg even had to approve the process by which invoices were sent to LOI Customers.

38. For example, on February 17, 2021, when Aspiration's CEO emailed Sanberg asking for an LOI Customer's address to send an invoice, Sanberg replied: "You should send it to me. And for all my relationships with [the LOI Customers] please email me the invoices to pass on."

39. Similarly, on March 26, 2021, when Aspiration's CEO asked Sanberg for his permission to send February and March 2021 invoices to an LOI Customer, Sanberg permitted the executive to send only one of the two invoices.

### 5. Sanberg Secretly Makes Payments for the LOI Customers

40. Despite the purportedly binding payment obligations imposed on LOI Customers, Sanberg made any and all payments on their behalf.

41. Sanberg did this by sending funds from bank accounts he controlled to either the LOI Customer or Aspiration.

42. As one example, Sanberg paid the LOI Customer obligations by sending funds to the LOI Customer, as follows:

8

a.    On June 4, 2021, Aspiration emailed the March invoice to E.P. for $425,000;

b.    On June 14, 2021, Aspiration emailed the April invoice to E.P. for $425,000;

c.    On June 14, 2021, Sanberg wired $450,000 from a bank account he controlled to E.P.;

d.    On June 15, 2021, E.P. wired $425,000 to Aspiration;

e.    On June 15, 2021, Sanberg wired $450,000 from a bank account he controlled to E.P.; and

f.    On June 15, 2021, E.P. wired $425,000 to Aspiration.

43.    As another example, Sanberg paid the LOI Customer obligations by sending funds first to a separate entity, which would then send those funds to Aspiration, as follows:

a.    On March 19, 2022, Aspiration emailed a September 2021 invoice to S.B.;

b.    On March 22, 2022, Sanberg wired $350,000 from a bank account he controlled to a separate entity affiliated with Sanberg;

c.    On March 22, 2022, that entity transferred the $350,000 to Aspiration, with a description indicating that the funds were for S.B.'s invoice.

44.    In these ways, Sanberg provided and sent the funds for every payment that was made by an LOI Customer to Aspiration from 2021 to 2022.  These payments totaled approximately $33,575,000.

### 6.    Aspiration's Artificially Inflated Revenues Are Recognized and Disseminated to the Public

45.    In or around March 2021, Aspiration sought to become a public company through a SPAC merger.  In pursuit of this goal, Aspiration hired KPMG to conduct an audit of Aspiration's finances.

9

46.     KPMG considered Aspiration's expected revenue stream from LOI Customers an important factor in its audit.

47.     With Sanberg's support, Aspiration recognized the revenue purportedly generated by the LOI Customers as actual revenue, despite the fact that Sanberg had agreed to cover their payments and despite concerns among Aspiration's finance department regarding the collectability of such payments.

48.     The revenue recognized from LOI Customers represented a significant portion of Aspiration's overall revenue for fiscal year 2021.

49.     Specifically, for fiscal year 2021, LOI Customer revenue accounted for approximately $44 million of Aspiration's $100.6 million in recognized revenue. Aspiration recognized this approximate $44 million in LOI Customer revenue, even though approximately $33,875,000 million remained uncollected as of December 31, 2021.

50.     On August 18, 2021, Aspiration announced the proposed SPAC merger with InterPrivate in a joint press release that was attached to a publicly filed Form 8-K.

51.     In an August 2021 investor presentation, which was attached to Aspiration's Form 8-K filed on August 18, 2021, Aspiration titled a slide "Explosive growth from a standing start" and noted its "Corporate ESG [or Environmental, Social, and Governance] Business has Scaled Rapidly . . ."

52.     The slide showed significant growth in Aspiration's annual recurring revenue in the first two quarters of 2021, referring to the number of "corporate clients" (i.e., primarily the LOI Customers) and revenue from the same.

53.     In a Form S-4 filed on February 15, 2022, InterPrivate included Aspiration's results of operations for the nine months ended September 30, 2021, which compared to the nine months ended September 30, 2020, showing that "[e]nterprise sustainability services revenue" went from $0 in 2020 to $33.7 million in 2021.

10

54.  The same Form S-4 showed that Aspiration's total revenue went from $9.2 million for the nine months ended September 30, 2020 to $62 million for the nine months ended September 30, 2021.

55.  In a press release a few days later, Aspiration's CEO stated: "Our results for the fourth quarter and full year 2021 demonstrate Aspiration's key role at the forefront of driving the sustainability revolution" and "Aspiration's strong, ongoing growth in revenues and gross profits reinforces the power of our differentiated business model . . . ."

56.  In the same press release, Aspiration announced that its total revenue in 2021 was $100.6 million, "up 584%" from 2020 due in part to "Enterprise Sustainability Services."

**7.  Sanberg Solicits Investors by Touting the Artificially Inflated Revenues**

57.  Between September and December 2021, Investor 1 purchased over $50 million in Aspiration stock.

58.  Before Investor 1 made this investment, Sanberg touted Aspiration's successes and profitability in the corporate ESG sector to Investor 1's Chief Investment Officer ("CIO") in person and over the phone, making materially false and misleading statements to Investor 1 in the process.

59.  As an example, Sanberg touted how Aspiration's ESG business "represented a large area of profitability" for the company.

60.  Further, on February 17, 2022, shortly after the investment and as a lulling tactic, Sanberg emailed Investor 1's CIO with a subject line "analysis of Aspiration 4Q results," noting that "Aspiration produced $100mm of revenue" in 2021, and touting how Aspiration was "growing as fast/faster" and "a lot more efficiently and profitably than projected."

61.  Investor 1's CIO considered these representations about Aspiration's successes in the corporate ESG sector and rapid growth to be "extremely important"

11

in Investor 1's decision to purchase Aspiration stock, as it made the company look "incredibly well" financially.

62. On December 15, 2021, Investor 2 purchased $250 million in Aspiration stock through a special purpose entity.

63. Prior to this investment, on September 2, 2021, Aspiration shared detailed financials with Investor 2, including the purported revenue from LOI Customers for the first half of 2021.

64. On September 8, 2021, after reviewing the financials, Investor 2's managing director asked, among other things, about the average term of the agreements that LOI Customers were signed up to and whether they were "one-off consulting agreements."

65. On the same day, Sanberg emailed a reply to Investor 2's question, saying that the agreements with LOI Customers were "definitely not one-off consulting agreements" and "we are engaging our corporate clients in long term relationship[s]."

66. In that same email, Sanberg said he "wanted to call out this point because I think it's such a big deal" and noted that Aspiration's relationship with the LOI Customers was "recurring, sticky and value-add" in nature.

67. In an October 12, 2021 email, Sanberg told Investor 2 about a specific LOI Customer, E.P., saying that it was "carbon neutral through Aspiration" and that he expected "more opportunities for deals like this."

68. Investor 2 considered these representations regarding the purported success, long-term relationship, and revenue generated from the LOI Customers to be important in its decision to invest.

**8.    Sanberg Further Inflates the Already Inflated Revenues**

69. At the start of 2022, Aspiration hoped to take advantage of its purportedly strong 2021 financial performance, based in large part on "revenue" generated by the LOI Customers, and use it to attract even more investors.

70.    InterPrivate included in its February 15, 2022 Form S-4 that Aspiration expected an estimated $254 million in total revenue for fiscal year 2022.  The Form S-4 also contained a "Letter from the Co-Founders" of Aspiration—identified as the CEO and Sanberg—to "Prospective Shareholders," stating that the enterprise sustainability services revenue for the nine months ended September 30, 2021 "represents a significant avenue for future growth."

71.    Despite these estimates in the Form S-4, Sanberg wanted to separately present much higher projections (i.e., $385-to-$386 million) to select, potential investors who had signed confidentiality agreements.

72.    Aspiration's Chief Financial Officer ("CFO") disagreed with Sanberg on this approach, due to issues with recognizing and collecting LOI Customer revenue, and expressed a preference for sharing the publicly disclosed, lower projection.

73.    Specifically, on March 14, 2022, the CFO informed Sanberg: "We do have some revenue recognition risk that I wanted to outline for you. . . .  As such, we may not be able to recognize all the revenues outlined [in Sanberg's higher projections]."

74.    In that same email, the CFO told Sanberg: "There is also risk with the existing Enterprise business.[]  Our collection has been poor and KPMG may push us to reverse or write off some revenue.  But our main challenge today is revenue recognition. . . .  Considering the revenue recognition risk, my recommendation is to go out with one set of projections ($255M)."

75.    On March 31, 2022, the Aspiration board, which included Sanberg, received the company's 2022 budget, which forecasted the lower $255 million in revenue for fiscal year 2022, largely driven by a forecast of $150 million in "[e]nterprise sustainability revenue."

76.    However, Sanberg still insisted on showing select investors the higher projections.

13

77.    After the March 31, 2022 email to Aspiration's board with the lower forecast, Sanberg went forward with circulating the higher projections to prospective investors who had signed confidentiality agreements.

78.    On April 6, 2022, Sanberg emailed a prospective investor this confidential "Investor Addendum," which projected that Aspiration would achieve "$386 million in total revenues in 2022" and discussed "strong demand generated by our Enterprise business."

79.    In the same April 6, 2022 email, Sanberg told the potential investor that the Investor Addendum contained "internal projections" that were "substantially ahead of the public projections that Aspiration disclosed to the marketplace."

80.    Sanberg was also copied on an April 25, 2022 email from an Aspiration executive to another prospective investor containing the higher 2022 revenue projections—i.e., more than $385 million in revenue for fiscal year 2022 based on expected revenue of over $280 million in "Enterprise Sustainability Services"—and purported actual revenue from LOI Customers in 2021.  In this email, the executive similarly told this prospective investor that the higher projections were "based on our internal targets rather than the more conservative numbers we've shared publicly."

81.    The prospective investors who received these inflated projections considered them important in deciding whether to invest in Aspiration.

### 9.    Sanberg Obtained Money and Shares from Aspiration as a Result of the Artificially Inflated Revenue

82.    Sanberg received significant compensation from Aspiration between 2021 and 2022 for his work recruiting LOI Customers.

83.    For example, on April 12, 2021, an Aspiration board resolution granted Sanberg an option to purchase 3,338,809 shares of Aspiration stock.

84.    Aspiration's CEO later memorialized this grant by signing an Aspiration services contract dated September 13, 2021, which stated that "in exchange for Joseph Sanberg's advisory services related to Aspiration Sustainable Impact Services

14

LLC . . . the Company has offered 3,338,809 common stock options of the Company to Joseph Sanberg [] in consideration for these services.”

85.     In September 2021, Aspiration internally valued 3,338,809 in its common stock at tens of millions of dollars.

86.     Aspiration's CEO signed another services contract dated July 29, 2021, which obligated Aspiration to pay one of Sanberg's entities $475,000 “in exchange for Joseph Sanberg's services related to Aspiration's Sustainable Impact Services LLC.”

87.     Aspiration's CEO signed another services contract dated August 30, 2021, which obligated Aspiration to pay one of Sanberg's entities $550,000 and specified that the payment was “related to Aspiration Sustainable Impact Services LLC.”

88.     Aspiration's CEO signed another Aspiration services contract dated September 30, 2021, which obligated Aspiration to pay one of Sanberg's entities $525,316 “in exchange for Joseph Sanberg's services related to [Aspiration's] sustainability impact business.”  An identical contract dated October 22, 2021, for $512,476, was also signed by the CEO.

89.     In all, in 2021, Aspiration paid Sanberg and his entities over $3.6 million in cash.

90.     In addition, during its January 2022 meeting, the Aspiration board granted Sanberg a one-time cash bonus of $8,000,000, deeming such a grant “advisable and in the in best interests of the Company.”

91.     In the same January 2022 meeting, the Aspiration board approved the grant of “9,000,000 shares of fully vested Restricted Stock to Joseph Sanberg . . . to reward Mr. Sanberg for his service to the Company and in order to incent Mr. Sanberg to continue his service to the Company.”

92.     In all, in 2022, Aspiration paid Sanberg and his entities approximately $8 million in cash.

93.     As of December 31, 2022, Sanberg and his entities owned more than 33 million shares of Aspiration stock, representing 24.8% of all outstanding shares of the company.

94.     Aspiration made these lucrative payouts to Sanberg despite having low cash reserves and employees expressing concerns over Aspiration's ballooning accounts receivable and accounts payable balances.

95.     Moreover, Sanberg used a portion of millions of dollars he obtained from Aspiration to pay the monthly/quarterly fees owed by the LOI Customers.

96.     For example, Sanberg used nearly $2.3 million of his aforementioned $8 million cash bonus from January 2022 to pay invoices for approximately five LOI Customers in early February 2022.

**10.     Sanberg's Inflated Revenue Scheme Falls Apart**

97.     In 2022, revenue from the LOI Customers accounted for over $40 million of Aspiration's $216,764,449 in recognized revenue.

98.     However, Aspiration's accounts receivable balance had increased to approximately $104 million by June 2022, higher than the entirety of the company's 2021 revenue.

99.     On March 18, 2022, an Aspiration accountant lodged an internal complaint to express concerns about "related party transactions" pertaining to Aspiration's reforestation services business, lack of supporting documentation for LOI Customer revenue, Aspiration's uncollected balances, and invoicing issues.

100.    As a result, the Aspiration board agreed to form a Special Committee to investigate these concerns.  By April 5, 2022, all board members, including Sanberg, signed the "Action by Written Consent of the Board" establishing the Special Committee.

101.    On or about July 5, 2022, after the creation of the Special Committee, KPMG resigned as Aspiration's outside auditor, citing, among other factors, "revenue transactions that had characteristics of fraud."

102.   In late 2022, Aspiration's new management launched a revenue remediation project that resulted in Aspiration restating its financial statements for fiscal years 2021 and 2022.

103.   In August 2023, InterPrivate announced that it was abandoning its SPAC merger with Aspiration.

**B.    Sanberg's False and Misleading Statements**

104.   In furtherance of and in connection with the fraudulent scheme to artificially inflate Aspiration's revenue, Sanberg made various false and misleading representations to investors.

105.   Sanberg was the maker of these false and misleading statements because he had ultimate authority over their content and/or approved their dissemination.

106.   Sanberg's false and misleading statements were material in that they would have been viewed by a reasonable investor as important in making an investment decision and as having significantly altered the total mix of information made available to the investor.

107.   First, Sanberg represented to investors that Aspiration's LOI Customer business—which was referred to as Aspiration's corporate ESG business, Enterprise Sustainability business, or ASIS business—was highly successful and profitable.

108.   Second, he represented to investors that LOI Customers were long-term customers.

109.   Third, he specifically identified a few specific LOI Customers for investors, to prove that they existed.

110.   Fourth, he circulated to investors inflated 2022 projections that were premised on revenue from the LOI Customers.

111.   All of these representations were materially false and misleading because Sanberg omitted the fact that he assured the LOI Customers they would not have to pay for Aspiration's services, that the LOI Customer revenue was predicated on Sanberg paying the monthly/quarterly fees on behalf of the LOI Customers, that

Sanberg was partially relying on money he obtained from Aspiration to cover those monthly/quarterly payments, and that a significant portion of the LOI Customer revenue remained uncollected.

112.   In addition, with respect to the 2022 projections, Sanberg omitted that Aspiration's CFO expressed concerns about the collectability of the projected revenue and its ability to be recognized as revenue.

**C.      Sanberg Acted with Scienter and Negligently**

113.   Sanberg acted with scienter in carrying out the scheme to defraud and in making the false and misleading statements to investors.  Sanberg also acted negligently in carrying out his scheme and in making the false and misleading statements, that is, Sanberg failed to exercise the level of care that a reasonable person would have exercised under the same circumstances.

114.   Sanberg's scienter and failure to act reasonably under the circumstances is demonstrated, in part, by the following:

(a)      Sanberg knew, or was reckless and negligent for not knowing, that the LOIs were artificially inflating Aspiration's revenue, both internally and to the public, because he assured LOI Customers they did not actually have to make the payments set forth in the LOIs.

(b)      Sanberg paid the invoices sent to the LOI Customers by either paying Aspiration or by wiring money to the LOI Customers for the customers to pay Aspiration.

(c)      Sanberg limited Aspiration's communication with the LOI Customers, controlling who could send invoices to them, and how many invoices could be sent at one time.

(d)      Sanberg ensured that little to no due diligence was done on the LOIs themselves, including on the identity and paying ability of the LOI Customers.

(e)      Despite knowing that he told LOI Customers they would not have to pay for Aspiration's services, and that most of the LOI Customer

monthly/quarterly payments were not actually being made, Sanberg touted the LOI Customers to Aspiration investors, calling them "a big deal" and claiming they were "recurring, sticky and value-add."

(f)    Despite knowing that his inflated 2022 projections were based on LOI Customer revenue that he financed and was largely uncollected, Sanberg created, advocated for, and disseminated to investors those inflated projections.

(g)    Sanberg knew, or was reckless and negligent for not knowing, that the inflated 2022 projections were riddled with revenue recognition issues, as specifically outlined for him by Aspiration's CFO, before he sent them out to investors.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

115.    The SEC realleges and incorporates by reference paragraphs 1 through 114 above.

116.    In connection with the purchase or sale of securities, Sanberg engaged in a scheme to defraud and made material misstatements, false statements, and omissions to investors.  Specifically, Sanberg (1) recruited LOI Customers to buy Aspiration's tree-planting services and maintained exclusive relationships with them; (2) had LOI Customers sign LOIs that purportedly obligated them to pay Aspiration over a long period of time but assured them that they would not actually have to do so; (3) made those payments himself through accounts he controlled and, in some cases, with money Aspiration paid him; (4) ensured that Aspiration recognized such payments and uncollected LOI Customer payments as revenue even though LOI Customers did not pay the amounts due and the LOIs themselves were not properly vetted; (5) made false statements to investors that such "revenue" was a sign of Aspiration's long-term success; and (6) lulled investors with financials showing such purported revenue.

19

117.   By engaging in the conduct described above, Sanberg, with scienter, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

118.   By engaging in the conduct described above, Sanberg violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**SECOND CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities**

**Violations of Sections 17(a) of the Securities Act**

119.   The SEC realleges and incorporates by reference paragraphs 1 through 114 above.

120.   In the offer or sale of securities, Sanberg engaged in a scheme to defraud and made material misstatements, false statements, and omissions to investors. Specifically, Sanberg (1) recruited LOI Customers to buy Aspiration's tree-planting services and maintained exclusive relationships with them; (2) had LOI Customers sign LOIs that purportedly obligated them to pay Aspiration over a long period of time but assured them that they would not actually have to do so; (3) made those payments himself through accounts he controlled and, in some cases, with money Aspiration paid him; (4) ensured that Aspiration recognized such payments and uncollected LOI Customer payments as revenue even though LOI Customers did not pay the amounts due and the LOIs themselves were not properly vetted; (5) made false statements to investors that such "revenue" was a sign of Aspiration's long-term

success; (6) lulled investors with financials showing the purported revenue; and (7) disseminated false, unsupported, and inflated projections to prospective investors.

121. By engaging in the conduct described above, Sanberg, with scienter, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

122. By engaging in the conduct described above, Sanberg violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

21

**III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant from directly or indirectly, including, but not limited to, through any entity he owns or controls, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts.

**IV.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and/or Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], prohibiting Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**V.**

Order Defendant to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3); 78u(d)(5) and 78u(d)(7)].

**VI.**

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for their violations of the federal securities laws.

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

22

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  August 21, 2025

/s/ *Daniel S. Lim*
Daniel S. Lim
Attorney for Plaintiff
Securities and Exchange Commission

## **Jury Demand**

The SEC demands trial by jury on liability.

Dated:  August 21, 2025

/s/ *Daniel S. Lim*
Daniel S. Lim
Attorney for Plaintiff
Securities and Exchange Commission

<span style="color: red">**Complaints and Other Initiating Documents**</span>

8:25-cv-01848 Securities and Exchange Commission v. Sanberg

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered by Lim, Daniel on 8/21/2025 at 7:33 AM PDT and filed on 8/21/2025

**Case Name:**        Securities and Exchange Commission v. Sanberg
**Case Number:**      8:25-cv-01848
**Filer:**            Securities and Exchange Commission
**Document Number:** 1

**Docket Text:**
<span style="color: blue">**COMPLAINT No Fee Required - US Government, filed by Plaintiff Securities and Exchange Commission. (Attorney Daniel S. Lim added to party Securities and Exchange Commission(pty:pla))(Lim, Daniel)**</span>

**8:25-cv-01848 Notice has been electronically mailed to:**

Daniel S. Lim     limda@sec.gov, haackk@sec.gov, irwinma@sec.gov, LAROfiling@sec.gov, LeungG@SEC.GOV

**8:25-cv-01848 Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\2025.08.21 Complaint (FINAL).pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=8/21/2025] [FileNumber=40772802-0
] [3bf7fc498f4ad7791b2f670617c6ff579e6f7875503d6be7675fd6cef11d02629ce
afdc44c63361749ba9953b267edc2971df9177e5d27185261150df8fc212b]]

# Exhibit H

| Fill in this information to identify the case: |
| --- |

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case number *(if known)* _____    Chapter **11**

☐ Check if this is an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy    **06/24**

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.**

| 1. | Debtor's name | **CTN Holdings, Inc.** |
| --- | --- | --- |

| 2. | All other names debtor used in the last 8 years | |
| --- | --- | --- |
| | Include any assumed names, trade names and *doing business as* names | **FKA  Aspiration Partners, Inc** |

| 3. | Debtor's federal Employer Identification Number (EIN) | **47-5059122** |
| --- | --- | --- |

**4.    Debtor's address**

| **Principal place of business** | **Mailing address, if different from principal place of business** |
| --- | --- |
| **548 Market Street, PMB 72015 San Francisco, CA 94101-5401** | |
| Number, Street, City, State & ZIP Code | P.O. Box, Number, Street, City, State & ZIP Code |
| **San Francisco** | **Location of principal assets, if different from principal place of business** |
| County | |
| | Number, Street, City, State & ZIP Code |

| 5. | Debtor's website (URL) | **www.catona.com** |
| --- | --- | --- |

**6.    Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

Debtor    **CTN Holdings, Inc.**                                        Case number (*if known*)
          Name

**7.**  **Describe debtor's business**    A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes.

__5239__

**8.**  **Under which chapter of the Bankruptcy Code is the debtor filing?**    *Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check **all** that apply*:

☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725 (amount subject to adjustment on 4/01/25 and every 3 years after that).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.**  **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

☑ No.
☐ Yes.

| | District | When | Case number |
|---|---|---|---|
| | District | When | Case number |

**10.**  **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☐ No
☑ Yes.

List all cases. If more than 1, attach a separate list

Debtor    **See Annex A attached**                    Relationship

Debtor **CTN Holdings, Inc.** _____  Case number (*if known*) _____

  Name

| District _____ | When _____ | Case number, if known _____ |

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes.  Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

  What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____

  Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes.  Insurance agency _____

  Contact name _____

  Phone _____

**Statistical and administrative information**

**13. Debtor's estimation of available funds**   .

*Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☑ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☑ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☑ $100,000,001 - $500 million | ☐ More than $50 billion |

| Debtor | **CTN Holdings, Inc.** | | Case number (*if known*) | |
|---|---|---|---|---|
| | Name | | | |

---

**Request for Relief, Declaration, and Signatures**

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   **March 30, 2025**
MM / DD / YYYY

*X* **/s/ Miles Staglik**                                **Miles Staglik**
Signature of authorized representative of debtor         Printed name

Title   **Chief Restructuring Officer**

---

**18. Signature of attorney**

*X* **/s/ William F. Taylor, Jr.**                      Date **March 30, 2025**
Signature of attorney for debtor                             MM / DD / YYYY

**William F. Taylor, Jr.**
Printed name

**Whiteford, Taylor & Preston LLC**
Firm name

**600 North King Street**
**Suite 300**
**Wilmington, DE 19801**
Number, Street, City, State & ZIP Code

Contact phone  **302-353-4144**       Email address  **wtaylor@whitefordlaw.com**

**2936 DE**
Bar number and State

---

Official Form 201         **Voluntary Petition for Non-Individuals Filing for Bankruptcy**         page 4

**ANNEX A**

**Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor**

On the date hereof, each of the entities below (collectively, the "Debtors") filed a Petition in the United States Bankruptcy Court for the District of Delaware for relief under chapter 11 of title 11 of the United States Code. The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of CTN Holdings, Inc.

- CTN SPV Holdings, LLC
- Catona Climate Solutions, LLC
- Make Earth Green Again, LLC
- Aspiration QFZ, LLC
- Zero Carbon Holdings, LLC
- Aspiration Fund Adviser, LLC

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **CTN Holdings, Inc.** |
| United States Bankruptcy Court for the: | **DISTRICT OF DELAWARE** |
| Case number (if known): | |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders

**12/15**

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | **LA Clippers LLC**<br>1212 Flower Street<br>Los Angeles, CA 90015 | ap@clippers.com<br>(213) 204-2800 | Unsecured trade payable and Contracted Carbon Credits | | | | **$30,047,222.00** |
| 2 | **Forum Entertainment, LLC**<br>3900 W. Manchester Avenue<br>Inglewood, CA 90305 | ron.bleiweiss@thelaforum.com<br>(310) 862-6200 | Contracted Carbon Credit Value | | | | **$10,999,414.00** |
| 3 | **Interprivate III Financial** Partners Inc.<br>1350 Avenue of the Americas<br>2nd Floor<br>New York, NY 10019 | info@interprivate.com<br>(212) 920-0125 | Unsecured trade payable | | | | **$7,000,000.00** |
| 4 | **KL2 Aspire LLC**<br>12220 Westerly Trail<br>Moreno Valley, CA 92557 | mitchfrankel.sports@gmail.com | Unsecured trade payable | | | | **$7,000,000.00** |
| 5 | **Boston Red Sox Baseball** Club Limited Partnership<br>Fenway Park<br>2 Jersey Street<br>Boston, MA 02215 | ar@redsox.com<br>(617) 226-6000 | Unsecured trade payable | | | | **$4,974,903.40** |
| 6 | **Socure, Inc.**<br>330 7th Ave<br>New York, NY 10001 | billing@socure.com<br>(866) 932-9013 | Unsecured trade payable | | | | **$4,140,120.39** |
| 7 | **Noble People**<br>96 Morton Street<br>New York, NY 10014 | accounting@noblepeople.com<br>(646) 234-8746 | Unsecured trade payable | | | | **$3,889,494.50** |

Debtor   **CTN Holdings, Inc.**
_____
Name

Case number *(if known)*
_____

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8 | **Slalom, LLC**  821 2nd Avenue  Suite 1900  Seattle, WA 98104 | billing@slalom.com  (206) 438-5700 | Unsecured trade payable | | | | **$2,617,224.85** |
| 9 | **Eden Reforestation Projects and Compassionate Carbons, LLC**  Spencer Hosie  Hosie Rice, LLP  149 New Montgomery Street  4th Floor  San Francisco, CA 94102 | shosie@hosielaw.com  (415) 247-6000 | Mediated Judgment Balance | | | | **$1,726,042.97** |
| 10 | **Clear Link Tehnologies, LLC d/b/a The Penny Hoarder (Taylor Media Corp)**  Kennedy D. Tate  36 South State Street  Suite 1400  Salt Lake City, UT 84111 | knate@rqn.com  (801) 323-3354 | Litigated Judgement | | | | **$1,049,598.26** |
| 11 | **Feedzai Inc**  1875 South Grant Street  Suite 950  San Mateo, CA 94402 | ana.lima@feedzai.com  (650) 260-8924 | Unsecured trade payable | | | | **$930,000.00** |
| 12 | **Sidley Austin LLP**  955 California Street  Chicago, IL 60603 | mdayton@sidley.com  (212) 839-5300 | Unsecured trade payable | | | | **$911,129.18** |
| 13 | **Impact Tech, Inc**  223 East De La Guerra Street  Santa Barbara, CA 93101 | breena.beckett@impact.com  (805) 324-6021 | Unsecured trade payable | | | | **$851,549.00** |
| 14 | **Mission Financial Partners**  1 Embarcadero Center Suite 800  San Fancisco, CA  94111 | tnewell@aspitation.com  (800) 683-8529 | Future Carbon Credits | | | | **$750,011.00** |
| 15 | **Facebook, Inc.**  15161 Collections Center Drive  Chicago, IL 60693 | ar@fb.com  (650) 308-7300 | Unsecured trade payable | | | | **$740,892.95** |
| 16 | **Donnelley Financial Solutions**  35 W Wacker Drive  Chicago, IL 60601 | Accounts-Receivable@dfinsolutions.com  (800) 823-5304 | Unsecured trade payable | | | | **$667,120.52** |

Debtor   **CTN Holdings, Inc.** _____    Case number *(if known)* _____
Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 17 | **Performcb LLC** 2389 E Venice Avenue #410 Venice, FL 34292 | accountsreceivable@performcb.com (866) 867-6333 | Unsecured trade payable | | | | $626,834.39 |
| 18 | **Clarity AI** 609 Greenwich Street 5th Floor New York, NY 10014 | billing@clarity.ai (929) 581-1230 | Unsecured trade payable | | | | $600,000.00 |
| 19 | **Trees for the Future** 10770 Columbia Pike #300 Silver Spring, MD 20901 | tim@trees.org (301)565-0630 | Contract Obligation | | | | $590,628.00 |
| 20 | **Gibson Dunn & Crutcher LLP** 333 South Grand Avenue Los Angeles, CA 90071 | RPerez@gibsondunn.com (212) 351-4000 | Unsecured trade payable | | | | $571,939.88 |
| 21 | **Deloitte Services, LP** 30 Rockefeller Plaza New York, NY 10122 | ekiaer@deloitte.com (212) 492-4000 | Prepaid Carbon Credits | | | | $500,000.00 |
| 22 | **Laurel Strategies, Inc** 4A Oxford Street Chevy Chase, MD 20815 | jvalic@laurelstrategies.com (202) 776-7776 | Unsecured trade payable | | | | $492,977.00 |
| 23 | **Davis Wright Tremaine LLP** 920 Fifth Avenue, Suite 330 Seattle, WA 98104 | ach@dwt.com (212) 489-8230 | Unsecured trade payable | | | | $451,933.73 |
| 24 | **Sandline Discovery LLC** 105 North Virginia Avenue, Suite 302 Falls Church, VA 22046 | ar@sandlineglobal.com (571) 888-3366 | Unsecured trade payable | | | | $433,767.59 |
| 25 | **Bank of America** Corprate Center 101 South Tyron Street Charlotte, NC  28255 | lisa.shpritz@bofa.com (800) 432-1002 | Prepaid Carbon Credits | | | | $360,000.00 |
| 26 | **Bartko Zankel Bunzel & Miller** One Embarcadero Center Suite 800 San Francisco, CA 94111 | carthur@bartkolaw.com (415) 956-1900 | Unsecured trade payable | | | | $328,868.43 |
| 27 | **Prodege, LLC** 100 N. Pacific Coast Highway, 8th Floor Pasadena, CA 91185-4252 | ar@prodege.com (310) 294-9599 | Unsecured trade payable | | | | $220,000.00 |

Debtor **CTN Holdings, Inc.** _____ Case number *(if known)* _____
    Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 28 | **APT 304, LLC** 5000 Birch Street, Suite 300 Newport Beach, CA 92660 | james@apt304.io (714) 386-9923 | Unsecured trade payable | | | | $195,033.44 |
| 29 | **Dechert LLP** 2929 Arch Street Philadelphia, PA 19104 | kathleen.fenton@dechert.com (212) 698-3500 | Unsecured trade payable | | | | $183,244.85 |
| 30 | **PricewaterhouseCoopers LLP** P.O. Box 952282 Dallas, TX 75395-2282 | geoffrey.b.husted@pwc.com (214) 999-1400 | Unsecured trade payable | | | | $167,000.00 |

**Fill in this information to identify the case:**

Debtor name     **CTN Holdings, Inc.**

United States Bankruptcy Court for the:    DISTRICT OF DELAWARE

Case number (if known) _____

☐ Check if this is an amended filing

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### ■ Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐  *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
☐  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
☐  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
☐  *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
☐  *Schedule H: Codebtors* (Official Form 206H)
☐  *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
☐  Amended *Schedule* _____
■  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
■  Other document that requires a declaration    **Corporate Ownership Statement and List of Equity Security Holders**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **March 30, 2025**          **/s/ Miles Staglik**
                                          Signature of individual signing on behalf of debtor

                                          **Miles Staglik**
                                          Printed name

                                          **Chief Restructuring Officer**
                                          Position or relationship to debtor

Official Form 202                 **Declaration Under Penalty of Perjury for Non-Individual Debtors**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CTN Holdings, Inc., *et al*.,[1] | Case No. 25- (_____) (__) |
| Debtors. | (Joint Administration Requested) |

**CONSOLIDATED CORPORATE OWNERSHIP
STATEMENT AND LIST OF EQUITY SECURITY HOLDERS
PURSUANT TO FED. R. BANKR. P. 1007(a)(1), 1007(a)(3), and 700.1**

Pursuant to rules 1007(a)(1), 1007(a)(3), and 7007.1 of the Federal Rules of Bankruptcy Procedure, the above-captioned debtors and debtors-in-possession (each a "Debtor" and, collectively, the "Debtors"), to the best of their knowledge, information, and belief, hereby state as follows:

1. The holders of equity in Debtor CTN Holdings, Inc. ("CTN"), are set forth below. Debtors CTN SPV Holdings, LLC; Catona Climate Solutions, LLC; Make Earth Green Again, LLC; Aspiration QFZ, LLC; Zero Carbon Holdings, LLC; and Aspiration Fund Adviser, LLC are owned 100% by CTN.

2. A list of Debtor CTN's equity holders appears below:

*[Remainder of page intentionally left blank.]*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are CTN Holdings, Inc. (9122), CTN SPV Holdings, LLC (8689), Make Earth Green Again, LLC (4441), Aspiration QFZ, LLC (1532), Aspiration Fund Adviser, LLC (4214), Catona Climate Solutions, LLC (3375) and Zero Carbon Holdings, LLC (1679). The mailing address for the Debtors is 548 Market Street, PMB 72015, San Francisco, CA 94101-5401.

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
|---|---|
| 1HMR, LLC | 0.009% |
| 205 Burr Oak Investment LLC | 0.005% |
| Adam Taub | 0.013% |
| Adel Davidyan | 0.006% |
| Adrem X LLC | 0.019% |
| AGO II GP, LLC | 0.004% |
| AGO II, LP | 0.742% |
| AGO III, LP | 0.227% |
| AGO Special Situations Credit LP | 1.555% |
| AGO Special Situations II LP | 0.418% |
| Ahya Kurdi | 0.001% |
| Albert S Liu | 0.004% |
| Albert Y. Kim Living Trust | 0.032% |
| Alejandro Francisco Cano Gutierrez | 0.005% |
| Alex Pomeroy | 0.054% |
| Alexandra Horigan | 0.179% |
| Alexis Maybank | 0.087% |
| Allan Hammock | 0.000% |
| Allen & Company, LLC | 0.064% |
| Alon Nelson | 0.002% |
| Alpha Edison A, L.P. | 0.429% |
| Alpha Edison Westwood II A LLC | 0.378% |
| Alpha Edison Westwood II LLC | 0.711% |
| Alpha Edison, L.P. | 2.965% |
| Alvaro Boulet Alonso | 0.195% |
| Andrei Cherny | 0.000% |
| Andrew L. Sandler Revocable Trust | 0.047% |
| Angelica Lomeli | 0.000% |
| Anna Dukor | 0.002% |
| AOG INSTITUTIONAL DIVERSIFIED FUND | 0.129% |
| APOGEE Pacific LLC | 0.001% |
| Ari Martirosyan | 0.001% |
| Arie Arik Betesh and Yamit Betesh | 0.008% |
| Arie Arik Betesh and Yamit Betesh | 0.062% |

---

[2]    Consistent with the Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Seal Certain Personally Identifiable Information for Individuals and (II) Granting Related Relief, filed contemporaneously herewith, contact information for each equity holder is on file with the Debtors and may be made available upon proper request.

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
|---|---|
| Arioan ScoopSA - Aspiration | 0.040% |
| Arjuna Rajasingham | 0.018% |
| Arlene Waclawek | 0.004% |
| Arthur and Peta Klitofsky | 0.002% |
| Aspiration Holdings II SPE, LLC | 0.786% |
| Aspiration Holdings SPE, LLC | 0.000% |
| BANSBACH CAPITAL GROUP, LLC | 0.235% |
| Barry Donner | 0.001% |
| Ben Jealous | 0.000% |
| Benjamin Rafii | 0.005% |
| Benjamin S Heldfond Family Trust | 0.006% |
| Benjamin Sherman | 0.003% |
| Bingaman Family Irrevocable Trust | 0.032% |
| BPCCInc., LLC | 7.754% |
| BPCCInc., LLC | 0.124% |
| Brandee Busch | 0.000% |
| Brian Weinstein | 0.003% |
| Brittany Johnson | 0.001% |
| Budoff Billit Living Trust | 0.015% |
| Carmen Gutierrez Smith | 0.011% |
| Casa Teresa | 0.005% |
| Casey Weinstein 2018 Family Trust | 0.008% |
| Cecilia Martinez del Solar | 0.031% |
| Cecilia Saez | 0.000% |
| Charles A. Tharnstrom | 0.025% |
| Charles W McElfresh | 0.000% |
| Chicago Carbon Holdings LLC | 4.193% |
| Christina Margot Ross | 0.000% |
| Christopher Calvert | 0.000% |
| Christopher Coleman | 0.004% |
| Clayton Bourne | 0.025% |
| Clear Link Technologies, LLC | 0.000% |
| Clover Private Credit Opportunities Origination (Levered) II LP | 11.883% |
| Commerce Investment Group LLC | 0.012% |
| Craig Randall Johnson | 0.020% |
| Crawford/Gerber Living Trust dtd 10/7/2009 | 0.009% |

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
|---|---|
| Crestone Capital Partners LLC | 0.072% |
| DAM Birdie LLC (Daniel Murillo) | 0.012% |
| Damavandi 2021 Ins Trust | 0.068% |
| Damien Varron | 0.000% |
| Danette Eilenberg | 0.017% |
| Daniel Duran | 0.000% |
| Daniel Nir | 0.185% |
| Daniel Shurey | 0.000% |
| Daniel Zakowski | 0.006% |
| Danielle Gopen | 0.002% |
| Danielle Wolf | 0.006% |
| Darwin Capital Advisors II LLC | 0.097% |
| Darwin Capital Advisors II LLC | 0.051% |
| Darwin Capital Advisors LLC | 0.105% |
| Darwin Capital Advisors LLC | 0.058% |
| David Flusberg | 0.015% |
| David Goldsmith | 0.000% |
| David Jacobs | 0.002% |
| David Keyes | 0.001% |
| David Wolpe | 0.022% |
| DBD Family Trust | 0.012% |
| DCM Labs | 0.034% |
| DEA 88 INVESTMENTS LP | 0.072% |
| Deep Field Opportunities Fund, L.P. | 0.369% |
| Deepak Kumar | 0.000% |
| Delph Enterprises, Inc. | 0.002% |
| Derris & Company LLC | 0.045% |
| DMC (PED) Limited | 0.024% |
| DNS-Aspire, LLC | 1.629% |
| Doha Venture Capital LLC | 0.285% |
| Don Karr | 0.006% |
| Double Chase Investments LP | 0.006% |
| Double Chase Management LLC | 0.008% |
| Double Chase Management, LLC | 0.032% |
| Double Diamond Investment Holdings, LP | 0.040% |
| Dylan Blaty | 0.002% |
| E3 Asset Management, LLC | 0.064% |

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
|---|---|
| Edwin (Tate) Mill | 0.000% |
| Ellen Wilson | 0.000% |
| Elliot Brandt | 0.012% |
| Emerald Asset Management, Inc. | 0.023% |
| EQUITYZEN GROWTH TECHNOLOGY FUND LLC - SERIES 1145 | 0.005% |
| Eric Johnson | 0.005% |
| Eugene Sperling | 0.060% |
| Evelina Pivavarava | 0.004% |
| Eyal Bilgrai | 0.003% |
| Eyal Gutentag | 0.000% |
| FABFOUR SCSp | 0.040% |
| Fabian Andres Vargas Rivera | 0.006% |
| Fabio Montauti | 0.009% |
| Faisal AlHusseini | 0.369% |
| Flourish Ventures Fund LLC | 0.159% |
| FootPrint Coalition Ventures Late Stage Fund, LP - A1 | 0.051% |
| FP Ventures ASP LP Inc. | 0.967% |
| Frank A. Cuenca Living Trust Dated May 19, 2005 | 0.058% |
| Frank Berrin | 0.003% |
| Frank Yeary | 0.000% |
| FWPE Fund 1, LLC | 0.160% |
| GAM Investments LLC | 0.006% |
| George abou Joudi | 0.003% |
| GL Family Trust | 0.004% |
| Glenn Anton Rivers | 0.000% |
| Global Media Fund LLC | 0.003% |
| GLUCK/GLADDEN FAMILY TRUST Dtd DECEMBER 15, 2003 | 0.020% |
| Goodbank Irrevocable Trust | 0.006% |
| Gordon Crawford | 0.013% |
| Gregory Shadwick | 0.000% |
| GSV Capital Corp. | 0.453% |
| Hamid and Nahid Rafii | 0.001% |
| Hammerman Children Irrevocable Trust | 0.009% |
| Hannah Vanguilder | 0.000% |
| Helen Mullish | 0.000% |

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
|---|---|
| Ian Wentzell | 0.000% |
| Ibrahim AlHusseini | 0.000% |
| Ibrahim AlHusseini | 0.162% |
| IGSB Internal Venture Fund III, LLC | 0.573% |
| Ilya Holdings Limited | 0.088% |
| Inherent Aspiration, LLC | 1.749% |
| Inspira Financial, FBO Lev Moltyaner | 0.011% |
| IRA Club FBO Ruben Gallego Roth IRA 2001404 | 0.003% |
| Irfan Kamal | 0.000% |
| Jabez Dewey | 0.001% |
| Jack Oliver | 0.025% |
| Jaguar Acquisition Limited | 0.313% |
| Jaguarundi Partners, LLC | 0.573% |
| James Katz | 0.004% |
| James M. Cannon | 0.002% |
| James R. Gates Separate Porperty Revocable Trust | 0.049% |
| Jason Gupta | 0.018% |
| Jedi Capital | 0.241% |
| JeeAnn Whitney Petrina | 0.000% |
| Jeffrey Denight | 0.000% |
| Jeffrey Harris | 0.001% |
| Jeffrey Susskind | 0.012% |
| Jess Brown | 0.036% |
| Jessica Berrin | 0.008% |
| Jessica McMillin | 0.002% |
| Jim Meeks | 0.038% |
| Joe Carney | 0.006% |
| John B. Emerson and Kimberly K. Marteau, Trustees of the Emerson-Marteau Trust dated 10/9/2003 | 0.008% |
| Johnson Revocable Trust | 0.021% |
| Jon Barnwell | 0.091% |
| Jon Feigelson | 0.030% |
| Jonathan Alter | 0.003% |
| Joseph A Jolson 1991 Trust | 0.016% |
| Joseph Besecker | 0.082% |

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
|---|---|
| Joseph Chen | 0.861% |
| Joseph Chen Irrevocable Family Trust | 1.096% |
| Joseph Mulkey | 0.012% |
| Juan David Borrero | 0.008% |
| Junius Holding GmbH | 0.098% |
| Justin Kuok | 0.006% |
| Justin Meltzer Investment | 0.001% |
| Kaia Gerber | 0.009% |
| Katherine Lay | 0.001% |
| Kathleen Emmett | 0.000% |
| Kathleen Schier | 0.013% |
| KC Partners LLC | 0.013% |
| Kenneth Choi | 0.002% |
| Kfir Gavrieli | 0.322% |
| Koh Boon Hwee | 0.010% |
| Lauren Rocheleau | 0.009% |
| Lawrence Berrin | 0.004% |
| Leah Grace Hunt-Hendrix Trust | 0.003% |
| Leslie Morton | 0.013% |
| Long Live Bruce, LLC | 2.867% |
| Lorraine D. Berrin | 0.028% |
| Luke Clauson | 0.007% |
| Majid El Solh | 0.167% |
| MALI H. KINBERG REVOCABLE LIVING TRUST | 0.006% |
| Manzanita Ventures LLC | 0.062% |
| Marc Stad | 0.006% |
| Marilyn J Goens Rev Liv Trust U/A DTD 11/16/06 | 0.010% |
| Mark Corentin Cot-Magnas | 0.013% |
| Mark J. Silverman Living Trust U/A 7/27/95 | 0.009% |
| Mark Villanueva | 0.002% |
| Martin Alejandro Bedoya Benavides | 0.006% |
| Martin Gedalin | 0.003% |
| Mary Dent | 0.000% |
| Matthew Giles | 0.009% |
| Matthew Lee | 0.681% |

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
|---|---|
| Matthew Russo | 0.003% |
| Megan Holmes | 0.005% |
| Mendonca Family Trust | 0.015% |
| Metropolitan Levered Partners Fund VII, LP | 0.002% |
| Metropolitan Partners Fund VI (3C1), LP | 0.000% |
| Metropolitan Partners Fund VI, LP | 0.003% |
| Metropolitan Partners Fund VII, LP | 0.003% |
| MF Partners, LLC | 0.033% |
| MF Partners, LLC | 0.009% |
| Michael Christenson | 0.032% |
| Michael O'Mary | 0.201% |
| Michael Shuckerow | 0.000% |
| Michael Smith | 0.012% |
| Micharn Pollock | 0.002% |
| Michel Bayoud | 0.003% |
| Milena Davidson | 0.001% |
| Miller Family Legacy, LLC | 0.062% |
| Miranda Brouwer Living Trust | 0.009% |
| Mission and Market Fund I, LLC | 0.035% |
| Mohammad Khaja | 0.004% |
| Moran Davidyan | 0.003% |
| MUURAMASA LLC | 0.012% |
| MX of Kuok Family | 0.010% |
| Nano Financial Holdings, Inc | 0.000% |
| Nascent Line LLC | 0.062% |
| Nate Redmond | 0.000% |
| Nathan and Emily Kane Miller | 0.009% |
| Nathaniel Malka | 0.006% |
| NEV Alternatives LLC | 0.046% |
| Nikki Murphy | 0.001% |
| Nikolaos Nomikos | 0.003% |
| No. 4 LP | 0.101% |
| Oberndorf Enterprises/OEL Venture Investments LLC | 0.012% |
| OCM Aspiration Holdings, LLC | 23.290% |
| OREN ABRAHAM LAZAR | 0.003% |
| OS PETEIROS INVESTMENTS, S.L. | 0.040% |

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
| --- | --- |
| Pacific Sequoia Holdings LLC | 0.993% |
| Palmer Murray Living Trust | 0.006% |
| Paradox Capital | 0.058% |
| Paul Eisenstein | 0.027% |
| Paul Soros 2010 Family Trust A | 0.031% |
| Peter Early | 0.000% |
| Petr Averianov | 0.030% |
| Philip Remmele | 0.003% |
| Philippe von Stauffenberg | 0.120% |
| Pilpel Ltd. | 0.043% |
| Plummer Schnabel Family Trust UAD 8/6/07 | 0.015% |
| Pohlad Investments, LLC | 0.123% |
| Pohlad Investments, LLC | 0.200% |
| Polpat LLC | 1.981% |
| Praesumo Holdings, LLC | 0.985% |
| PWM Alternatives LLC | 0.046% |
| Quail Hill Holdings LLC | 0.025% |
| RA Perdue Family Trust | 0.009% |
| Rachel Sheinbein | 0.009% |
| Rachelle Higgins | 0.000% |
| Ravi Sarin | 0.015% |
| Raycrown AG | 0.040% |
| Reisner Millenium Investments LLC (Jeff Reisner) | 0.072% |
| Remember Bruce, LLC | 0.056% |
| Renren Lianhe Holdings | 3.171% |
| REYL & CIE S.A. | 0.031% |
| RG Family Investments LLC | 0.009% |
| Richard Shu | 0.001% |
| Rick Hess | 0.014% |
| Ricki Seidman | 0.011% |
| RJB Partners LLC | 4.921% |
| Rob Cherun | 0.009% |
| Robert Choi | 0.001% |
| Robert Downey Jr. | 0.000% |
| Robert J Abernethy | 0.006% |
| Robert Lee | 0.000% |

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
|---|---|
| Robert M. Pomeroy | 0.189% |
| Roman Micevic | 0.000% |
| Ron and Liraz Harari Living Trust | 0.008% |
| Ron and Liraz Harari Living Trust | 0.011% |
| Ron Ben Yosef | 0.005% |
| Ronald Paz | 0.003% |
| Rosensweig Family Revocable Trust | 0.023% |
| Roslyn K Berrin | 0.003% |
| RPR Gravitas LTD Kfir | 0.043% |
| Russell Acar | 0.001% |
| RxR Rocksolid LP | 0.038% |
| Ryan Graves | 0.039% |
| Sam Yebri | 0.005% |
| Samuel Murray | 0.000% |
| Satya Yenigalla | 0.002% |
| Selena C. Bryce Trust | 0.000% |
| Shahak Maimon | 0.006% |
| Shoham Nicolet | 0.003% |
| Silas Holdings III LLC | 0.068% |
| Silversea Chartering SA | 0.053% |
| SIPI VENTURES PTE LTD | 0.015% |
| SMR Capital Holdings LP | 0.006% |
| Social Impact Finance II LLC | 0.623% |
| Social Impact Finance III LLC | 0.415% |
| Social Impact Finance IV LLC | 0.720% |
| Social Impact Finance LLC | 2.286% |
| Social Impact Finance LLC | 0.233% |
| Spencer Rascoff | 0.000% |
| Stephan Klee | 0.000% |
| Stephan Lobmeyr | 0.016% |
| Stephen Pomeroy | 0.038% |
| Steve Bush | 0.034% |
| Steven Glickman | 2.202% |
| Strategic Business Management Co (Vivek Singhal) | 0.002% |
| SuRo Capital Corp. | 0.021% |
| Susskind Family Trust | 0.030% |
| SVB Financial Group | 0.000% |

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
|---|---|
| SVV GmbH | 0.080% |
| Synergy Wealth Management Sa | 0.346% |
| Tara Watumull | 0.001% |
| Taylor Media Corp | 0.000% |
| Taylor Vigil | 0.000% |
| Technology Stock Holding Master Trust / Series Sinay 2021 Trust | 0.029% |
| Technology Stock Holding Master Trust/Series Brown 2021 Trust | 0.222% |
| TECHNOLOGY STOCK HOLDING MASTER TRUST/SERIES COSTIGAN 2021  TRUST | 0.024% |
| Technology Stock Holding Master Trust/Series Morison 2021 Trust | 0.029% |
| Technology Stock Holding Master Trust/Series Ransom 2021 | 0.042% |
| The Dunner Family Trust | 0.002% |
| The Emerson Marteau Trust | 0.009% |
| The Glenn A. Rivers Revocable Trust UA September 28, 2000 | 0.033% |
| The Gordon and Dona Crawford Trust UTD 8/23/77 | 0.177% |
| The Hugely Successful Company, LLC | 0.002% |
| The Husseini Group | 0.032% |
| The Joseph Todd Lonsdale Trust dated March 4, 2015 | 0.023% |
| The Kit Stone Trust | 0.006% |
| The Kristin Rivers Revocable Trust UA September 28, 2000 | 0.033% |
| The Mark Murrel Revocable Trust Established 1/16/2009 | 0.000% |
| The Mark Murrel Revocable Trust, Established January 16, 2009 | 0.002% |
| The R L Gopen Trust | 0.006% |
| The Thomas and Janet Unterman Living Trust | 0.019% |
| Three Cats Consulting LLC | 0.001% |
| Timothy Broas | 0.002% |
| To Ventures LLC | 0.056% |
| Todd Baker | 0.000% |
| Todd Koren | 0.050% |

| EQUITY HOLDER[2] | PERCENTAGE OF EQUITY HELD |
|---|---|
| Todd Tappin | 0.000% |
| Tom Unterman | 0.000% |
| Tracy Bain | 0.000% |
| TriGen Investments, LP | 0.037% |
| True North Group LLC | 4.402% |
| Victoria Velasquez | 0.003% |
| Victoria Velazquez | 0.050% |
| Vikas Singhal | 0.003% |
| Voras Navigation SA | 0.004% |
| Walid Gardezi | 0.038% |
| Wayne Klitofsky | 0.006% |
| Weinstein Family Trust | 0.013% |
| Wesley Jew | 0.000% |
| West investments IV, LLC | 0.006% |
| William E. Oberndorf | 0.007% |
| Yuval Grill | 0.031% |
| Zack Exley | 0.004% |
| Zion Consulting and Advisory LLC | 0.006% |

## RESOLUTIONS OF ACTION
## OF CTN HOLDINGS, INC.

**WHEREAS,** the Directors of CTN Holdings, Inc. (the "Company") have determined that it is desirable and in the best interest of the Company, its creditors, stockholders, and/or members and other interested parties, that the Company file a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

**NOW, THEREFORE, BE IT RESOLVED**, that the filing by the Company of a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, or such other appropriate venue (the "Bankruptcy Court"), be, and it hereby is, authorized and approved; and it is further

**RESOLVED**, that Miles Staglik (the "Designated Representative") be, and hereby is, authorized and empowered, in the name of the Company, to execute and verify a petition for relief under chapter 11 of the Bankruptcy Code and to cause the same to be filed with the Bankruptcy Court at such time as the Designated Representative shall determine; and it is further

**RESOLVED**, that the Designated Representative, and such other Agent(s) as the Designated Representative and/or the Directors of the Company shall from time to time designate (each a "Representative"), be, and each of them hereby is, authorized to execute and file on behalf of the Company all petitions, schedules, lists, documents, pleadings and other papers and to take any and all action that they may deem necessary or proper in connection with the bankruptcy case of the Company; and it is further

**RESOLVED**, that each Representative be, and each of them hereby is, authorized and directed to retain the law firm Whiteford, Taylor & Preston L.L.P. to render legal services to and to represent the Company in connection with such bankruptcy case and other related matters in connection therewith, upon such terms and conditions as such Agent shall approve; and it is further

**RESOLVED**, that each Representative be, and each of them hereby is, authorized to retain such other professionals as they deem necessary and appropriate to represent, assist, or consult with the Company during the bankruptcy case; and it is further

**RESOLVED**, that each Representative be, and each of them hereby is, authorized and directed to take any and all further actions and to execute and deliver any and all further instruments and documents and pay all expenses (subject to Bankruptcy Court approval, where required), in each case as in their judgment shall be necessary or desirable in order to fully carry out the intent and accomplish the purpose of the resolutions adopted herein; and it is further

**RESOLVED**, that all acts lawfully done or actions lawfully taken by any and each Representative, which are necessary to effectuate the intent of the resolutions adopted herein, are hereby in all respects ratified, confirmed, and approved.

This 30th day of March, 2025, the Directors of the Company have set their hand adopting the foregoing resolutions.

*/s/ Nate Redmond*

By:     Nate Redmond

Title:   Chairman of the Board of Directors, CTN Holdings, Inc.


*/s/ Tate Mill*

By:     Tate Mill

Title:   Director, CTN Holdings, Inc.


*/s/ Rob Lee*

By:     Rob Lee

Title:   Chief Executive Officer & Director, CTN Holdings, Inc.


*/s/ Jeffrey T. Varsalone*

By:     Jeffrey T. Varsalone

Title:   Director, CTN Holdings, Inc.

**Exhibit I**

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

_____ Central _____ District of _____ California _____

In re  Kfir Gavrieli
_____
Debtor

*(Complete if issued in an adversary proceeding)*

Dikla Gavrieli a/k/a Dikla Gavrieli Unatin
_____
Plaintiff
v.
Kfir Gavrieli and Gavrieli Brands, LLC
_____
Defendant

Case No.   2:21-bk-10826-BB

Chapter   11

Adv. Proc. No.   2:21-ap-01034

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  GAVRIELI BRANDS, LLC d/b/a TIEKS BY GAVRIELI
_____
*(Name of person to whom the subpoena is directed)*

☑ *Production*:  **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A.

| PLACE | DATE AND TIME |
|---|---|
| Latham & Watkins LLP, 10250 Constellation Blvd. Ste 1100, Los Angeles, CA | 12/05/23        5:00 pm |

☐ *Inspection of Premises*:  **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

        The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/17/23

CLERK OF COURT

                                                                    OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
 Dikla Gavrieli _____ ,  who issues or requests this subpoena, are:

Daniel Scott Schecter, Latham & Watkins LLP, 10250 Constellation Blvd. Ste 1100, daniel.schecter@lw.com, (424) 653-5500

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☑ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

## EXHIBIT A

## <u>INSTRUCTIONS</u>

1.      Comply with the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the United States Bankruptcy Court for the Central District of California.

2.      Produce all responsive DOCUMENTS in YOUR possession, custody, or control, and in the possession, custody, or control of any agents, representatives, or advisors to YOU.

3.      Produce the original of each responsive DOCUMENT, together with all non-identical copies and drafts of that DOCUMENT.

4.      If YOU object to the production of any DOCUMENT in response to the Requests, state with specificity the reasons for YOUR objection.

5.      If YOU object to any portion of a Request, produce DOCUMENTS responsive to any portion(s) of the Request to which YOU do not object.

6.      DOCUMENTS shall be produced in full and complete form.  If any responsive DOCUMENTS cannot be produced in full, produce such DOCUMENTS to the extent possible, and specify the reason for the inability to produce the remainder.

7.      DOCUMENTS shall be produced in the manner that they are kept in the ordinary course of business or organized and labeled to correspond to the Request to which they are responsive.

8.      If any responsive DOCUMENT is not produced because of a claim of privilege or work product, provide an appropriate privilege log.

## <u>DEFINITIONS</u>

1.      "YOU," "YOUR" and the "COMPANY" shall mean GAVRIELI BRANDS, LLC and any PERSON acting on its behalf, including, without limitation, any past or present parent, division, subsidiary, affiliate, joint venture, associated organization, partner, attorney, financial advisor, accountant, agent, representative, employee, consultant, independent contractor, or affiliated entity, as well as any other PERSON acting on GAVRIELI BRANDS, LLC's behalf.

1

2.      "PERSON(s)" shall mean all natural persons and all entities, including any organizations, sole proprietorships, associations, companies, partnerships, joint ventures, corporations, legal entities, governmental entities, legal representatives, trusts, or estates.

3.      "ISSA" shall mean J. Michael Issa, and any PERSON acting on his behalf, including, without limitation, any past or present parent, attorney, affiliated entity, representative, employee, consultant, or independent contractor, as well as any other PERSON acting on Mr. Issa's behalf.

4.      "KFIR GAVRIELI" shall mean Kfir Gavrieli, and any PERSON acting on his behalf, including, without limitation, any past or present parent, attorney, affiliated entity, representative, employee, consultant, or independent contractor, as well as any other PERSON acting on Mr. Gavrieli's behalf.

5.      "COMMUNICATION(s)" shall have the broadest meaning allowable under the Federal Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure, and includes the transmission, sending, and/or receipt of information of any kind, or the attempt to elicit information of any kind, by and/or through any means, including, but not limited to, speech, discussion, meeting, conversation, writing, language (machine, foreign, or otherwise), electronic mail, computer electronics of any kind, videotape, photograph, graph, symbol, sign, sound, radio, telephone, telecommunication, film, or media of any kind.

6.      "DOCUMENT(s)" shall have the broadest meaning allowable under the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, and includes, but is not limited to, the following items, whether printed or recorded or reproduced by any mechanical or electronic process, or written or produced by hand: agreements; contracts; communications, including intra-company communications; correspondence; telegrams; telexes; teletypes; memoranda; record books; notes; reports; opinions; electronic mail (including any primary or back-up file); real-time or instant messages; SMS, MMS, or other text messages; postings on the Internet or World Wide Web; computer disks; videotapes; audio tapes; summaries, notes, memoranda or other records of personal conversations or interviews; diaries; forecasts; statistical statements; cost summaries; accountants' or bookkeepers' work papers, graphs, charts or accounts;

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

EXHIBIT A

logs; analytical records; minutes, notes, summaries, memoranda, or other records of investigations; audit reports; internal audit reports; opinions or reports of consultants' appraisals; trade letters; notes; projections; drafts of any documents; working papers; or any other documents or writing of whatever description, including, but not limited to, any information contained in any computer although not yet in printed form in YOUR possession, custody or control.

7.    "EXPERT" refers to any PERSON who is not an employee of the COMPANY, who has expertise in a particular field and provides that expertise to assist companies (for example, a consultant, financial advisor, or investment banker).

8.    "RELEVANT PERIOD" means and refers to July 22, 2019 through the date of YOUR responses to these Requests.

9.    The term "any" shall be construed to include and encompass "all," and vice versa.

10.    The terms "any," "all," and "each" shall be construed as broadly as possible to bring within the scope of the Request any information that might be deemed outside its scope by any other construction.

11.    The terms "and" and "or" shall be construed either conjunctively or disjunctively, as required by the context, to bring within the scope of the Request any information that might be deemed outside its scope by any other construction.

12.    The term "including" shall mean including but not limited to.

13.    The past tense of a verb herein includes the present tense and vice versa. The use of the singular of any word herein includes the plural and vice versa.

## DOCUMENT REQUESTS

1.    All DOCUMENTS evidencing changes or improvements made to the COMPANY's product line (such as new styles or designs) during the RELEVANT PERIOD.

2.    All DOCUMENTS specifically discussing or summarizing any contemplated or implemented changes made to the COMPANY's website during the RELEVANT PERIOD which are meaningful or material in YOUR view (such as meaningful or material changes to the website's design, functionality, user interface/experience, and/or back-end/administrative features).

3

3. All DOCUMENTS that relate to or evidence any analysis the COMPANY performed as to whether or not to enter new geographic markets during the RELEVANT PERIOD.

4. All DOCUMENTS that relate to or evidence any analysis the COMPANY performed as to whether to sell or market its products through new channels or on new platforms.

5. All DOCUMENTS that relate to or evidence any analysis the COMPANY performed as to whether to modify its marketing or advertising strategy in an effort to enhance sales.

6. All DOCUMENTS which specifically discuss or describe the COMPANY's inventory management practices during the RELEVANT PERIOD.

7. All DOCUMENTS prepared during the RELEVANT PERIOD to reflect the total amount of inventory that the COMPANY had on hand (including finished products and product components) at the time the document was prepared.  (In other words, this Request seeks copies of inventories of inventory levels during the RELEVANT PERIOD).

8. All DOCUMENTS specifically discussing any decline in the COMPANY's sales and profits during the RELEVANT PERIOD.

9. All DOCUMENTS evidencing any payments, transfers, purchases or reimbursements made from COMPANY funds or on a COMPANY credit card to or for the benefit of KFIR GAVRIELI or any of KFIR GAVRIELI'S family members during the RELEVANT PERIOD that were not for operating expenses of the COMPANY or ordinary business expenses of the COMPANY.

10. All DOCUMENTS evidencing payments, transfers or reimbursements made by the COMPANY to KFIR GAVRIELI during the RELEVANT PERIOD.

11. All DOCUMENTS evidencing the business purpose of any payments, transfers or reimbursements made by the COMPANY to KFIR GAVRIELI during the RELEVANT PERIOD.

4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

EXHIBIT A

12.     All DOCUMENTS evidencing payments, transfers or reimbursements made by KFIR GAVRIELI to the COMPANY during the RELEVANT PERIOD.

13.     All DOCUMENTS evidencing the nature or purpose of any payments, transfers or reimbursements made by KFIR GAVRIELI to the COMPANY during the RELEVANT PERIOD.

14.     All DOCUMENTS evidencing efforts made by KFIR GAVRIELI or the COMPANY during the RELEVANT PERIOD to measure the performance of the COMPANY by examining such metrics as return on advertising spend, average order value, average time spent on website, page-views per visit on website, etc.

15.     All DOCUMENTS which specifically discuss or describe any actual or contemplated change in the pricing of any product the COMPANY offered for sale during the RELEVANT PERIOD, including without limitation any sales promotions, discounts, or other sales incentives contemplated or implemented by the COMPANY.

16.     All DOCUMENTS evidencing any consideration or analysis by KFIR GAVRIELI or the COMPANY during the RELEVANT PERIOD as to whether the COMPANY should begin marketing its products through channels, platforms or distributors other than the COMPANY's website.

17.     All DOCUMENTS evidencing any potential business development opportunities presented to the COMPANY during the RELEVANT PERIOD, including without limitation any potential business opportunities that were directed to the COMPANY at the email address inquiries@tieks.com.

18.     All DOCUMENTS evidencing how KFIR GAVRIELI or the COMPANY responded to any potential business development opportunities presented to the COMPANY during the RELEVANT PERIOD.

19.     All DOCUMENTS specifically discussing any actual or contemplated agreements, business dealings, or exchange of anything of value between the COMPANY and Aspiration Partners, Inc. (and/or any of Aspiration Partners, Inc.'s affiliates) during the RELEVANT PERIOD).

5

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

EXHIBIT A

20.     Copies of each complaint and docket sheet RELATED TO all litigation in which the COMPANY is a party, or for which the COMPANY has received a subpoena.

21.     All DOCUMENTS specifically discussing or involving David Fu during the RELEVANT PERIOD which refer or relate to any financial matters or transactions, including but not limited to KFIR GAVRIELI, manufacturing, or inventory.

22.     All DOCUMENTS specifically reflecting, documenting, or referencing any food, dining, beverage, or catering expenses totaling over $250 and paid for using COMPANY funds during the RELEVANT PERIOD.

23.     All DOCUMENTS evidencing actions taken, contemplated, and/or proposed by KFIR GAVRIELI or the COMPANY during the RELEVANT PERIOD to expand the COMPANY's sales and marketing channels.

24.     All DOCUMENTS sufficient to identify each EXPERT who has rendered services to the COMPANY during the RELEVANT PERIOD, including but not limited to attorneys, bankers, consultants, and financial advisors, as well as the services each such EXPERT provided to the COMPANY during the RELEVANT PERIOD.

25.     DOCUMENTS sufficient to identify and provide contact information for each PERSON who: (a) has been employed by the COMPANY at any time during the RELEVANT PERIOD; (b) has provided any services to the COMPANY in exchange for compensation (e.g., an independent contractor) during the RELEVANT PERIOD; and/or (c) has reported to KFIR GAVRIELI at any time during the RELEVANT PERIOD and received compensation of any kind.  [Note:  In lieu of producing documents, YOU may satisfy this Request by providing a declaration identifying each PERSON who falls within the scope of the Request, their contact information, title, the scope of any work or services they performed for the COMPANY, and the dates during which such PERSON performed the work or services.]

26.     DOCUMENTS sufficient to identify and provide contact information for each PERSON responsible for the following functions at the COMPANY at any time during the RELEVANT PERIOD:  (a) finance/accounting (e.g. chief financial officer or equivalent); (b) operations (e.g. chief operating officer or equivalent); (c) marketing (e.g., chief marketing officer

6

or equivalent); (d) sales (e.g. chief revenue officer or equivalent); (e) technology (e.g., chief technology officer/chief information officer or equivalent); (f) legal (e.g., general counsel/chief legal officer or equivalent); (g) customer privacy (e.g., chief privacy officer or equivalent); (h) customer service (e.g., chief customer service officer or equivalent); and (i) human resources (e.g., chief human resource officer or equivalent); and (j) chief executive officer or equivalent. [Note:  In lieu of producing documents, YOU may satisfy this Request by providing a declaration identifying each PERSON who falls within the scope of the Request, their contact information, title, the scope of any work or services they performed for the COMPANY, and the dates during which such PERSON performed the work or services.]

27.   All DOCUMENTS evidencing the existence of supply chain disruptions during the RELEVANT PERIOD.

28.   All DOCUMENTS evidencing steps taken by KFIR GAVRIELI or the COMPANY to address or remedy supply chain disruptions during the RELEVANT PERIOD.

29.   All DOCUMENTS related to or evidencing steps taken by KFIR GAVRIELI and/or the COMPANY to address rising costs during the RELEVANT PERIOD.

30.   All business plans, strategic plans, budgets, forecasts and projections relating to or prepared during the RELEVANT PERIOD.

31.   All DOCUMENTS evidencing increased competition during the RELEVANT PERIOD.

32.   All DOCUMENTS evidencing steps taken by KFIR GAVRIELI and/or the COMPANY to respond to or remedy the effects of increased competition during the RELEVANT PERIOD.

33.   All appraisals or other valuations prepared during the RELEVANT PERIOD to reflect how much the COMPANY was worth.

34.   All DOCUMENTS evidencing plans or efforts made by KFIR GAVRIELI or the COMPANY during the RELEVANT PERIOD to improve the customer experience.

7

35.    All DOCUMENTS evidencing plans or efforts made by KFIR GAVRIELI or the COMPANY during the RELEVANT PERIOD to enhance or improve the effectiveness of the COMPANY's advertising and/or marketing campaigns.

36.    All DOCUMENTS evidencing any consideration or analysis by KFIR GAVRIELI or the COMPANY during the RELEVANT PERIOD as to whether to expand the marketing and advertising of the COMPANY's products into international markets.

37.    All DOCUMENTS evidencing how KFIR GAVRIELI or the COMPANY used credit card rewards, including points, miles and discounts, during the RELEVANT PERIOD that accrued on credit card accounts for which credit card charges were paid by the COMPANY.

38.    All DOCUMENTS related to any payments, transfers, purchases, or reimbursements involving COMPANY funds made by or to Mira Gavrieli, including DOCUMENTS substantiating any purported business purpose of such payments or transfers.

39.    All COMMUNICATIONS between YOU and ISSA (including COMMUNICATIONS between YOUR and ISSA's attorneys) during the RELEVANT PERIOD which refer or relate to any of the following: (a) this Adversary Proceeding; (b) Plaintiff's claims and allegations set forth in this Adversary Proceeding; (c) any defenses asserted by KFIR GAVRIELI or ISSA in this Adversary Proceeding; (d) Dikla Gavrieli a/k/a Dikla Gavrieli Unatin; and/or (e) Dean Unatin.

40.    All COMMUNICATIONS between YOU and KFIR GAVRIELI (including COMMUNICATIONS between YOUR and KFIR GAVRIELI's attorneys) during the RELEVANT PERIOD which refer or relate to any of the following: (a) this Adversary Proceeding; (b) Plaintiff's claims and allegations set forth in this Adversary Proceeding; (c) any defenses asserted by KFIR GAVRIELI or ISSA in this Adversary Proceeding; (d) Dikla Gavrieli a/k/a Dikla Gavrieli Unatin; and/or (e) Dean Unatin.

41.    All DOCUMENTS provided by YOU (or any PERSON acting on YOUR behalf) to any of the following during the RELEVANT PERIOD (including any of their attorneys and/or financial advisors): (a) ISSA; (b) Robert Kors; (c) the Official Committee of Unsecured Creditors; and/or Joe Sanberg.

8

EXHIBIT A

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

_____ Central _____ District of _____ California _____

In re  Kfir Gavrieli
_____
Debtor

Case No.  2:21-bk-10826-BB

*(Complete if issued in an adversary proceeding)*

Chapter  11

Dikla Gavrieli a/k/a Dikla Gavrieli Unatin
_____
Plaintiff

v.

Adv. Proc. No.  2:21-ap-01034-BB

Kfir Gavrieli
_____
Defendant

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  KFIR GAVRIELI
_____
*(Name of person to whom the subpoena is directed)*

☒ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A.

| PLACE | DATE AND TIME |
|---|---|
| Latham & Watkins LLP, 10250 Constellation Blvd. Ste 1100, Los Angeles CA | 12/06/2023          5:00 pm |

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  11/17/23

CLERK OF COURT

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* Dikla Gavrieli _____ , who issues or requests this subpoena, are:

Daniel Scott Schecter, Latham & Watkins LLP, 10250 Constellation Blvd. Ste 1100, daniel.schecter@lw.com, (424) 653-5500

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☑ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

 My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

       I declare under penalty of perjury that this information is true and correct.

Date:  _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

# EXHIBIT A

## INSTRUCTIONS

1.     Comply with the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the United States Bankruptcy Court for the Central District of California.

2.     Produce all responsive DOCUMENTS in YOUR possession, custody, or control, and in the possession, custody, or control of any agents, representatives, or advisors to YOU.

3.     Produce the original of each responsive DOCUMENT, together with all non-identical copies and drafts of that DOCUMENT.

4.     If YOU object to the production of any DOCUMENT in response to the Requests, state with specificity the reasons for YOUR objection.

5.     If YOU object to any portion of a Request, produce DOCUMENTS responsive to any portion(s) of the Request to which YOU do not object.

6.     DOCUMENTS shall be produced in full and complete form.  If any responsive DOCUMENTS cannot be produced in full, produce such DOCUMENTS to the extent possible, and specify the reason for the inability to produce the remainder.

7.     DOCUMENTS shall be produced in the manner that they are kept in the ordinary course of business or organized and labeled to correspond to the Request to which they are responsive.

8.     If any responsive DOCUMENT is not produced because of a claim of privilege or work product, provide an appropriate privilege log.

## DEFINITIONS

1.     "YOU," and "YOUR" shall mean Kfir Gavrieli, and any PERSON acting on YOUR behalf, including, without limitation, any past or present parent, attorney, affiliated entity, representative, employee, consultant, or independent contractor, as well as any other PERSON acting on YOUR behalf.

2.     The "COMPANY" shall mean GAVRIELI BRANDS, LLC and any PERSON acting on its behalf, including, without limitation, any past or present parent, division, subsidiary,

1

affiliate, joint venture, associated organization, partner, attorney, financial advisor, accountant, agent, representative, employee, consultant, independent contractor, or affiliated entity, as well as any other PERSON acting on GAVRIELI BRANDS, LLC's behalf.

3.      "PERSON(s)" shall mean all natural persons and all entities, including any organizations, sole proprietorships, associations, companies, partnerships, joint ventures, corporations, legal entities, governmental entities, legal representatives, trusts, or estates.

4.      "ISSA" shall mean J. Michael Issa, and any PERSON acting on his behalf, including, without limitation, any past or present parent, attorney, affiliated entity, representative, employee, consultant, or independent contractor, as well as any other PERSON acting on Mr. Issa's behalf.

5.      "COMMUNICATION(s)" shall have the broadest meaning allowable under the Federal Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure, and includes the transmission, sending, and/or receipt of information of any kind, or the attempt to elicit information of any kind, by and/or through any means, including, but not limited to, speech, discussion, meeting, conversation, writing, language (machine, foreign, or otherwise), electronic mail, computer electronics of any kind, videotape, photograph, graph, symbol, sign, sound, radio, telephone, telecommunication, film, or media of any kind.

6.      "DOCUMENT(s)" shall have the broadest meaning allowable under the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, and includes, but is not limited to, the following items, whether printed or recorded or reproduced by any mechanical or electronic process, or written or produced by hand: agreements; contracts; communications, including intra-company communications; correspondence; telegrams; telexes; teletypes; memoranda; record books; notes; reports; opinions; electronic mail (including any primary or back-up file); real-time or instant messages; SMS, MMS, or other text messages; postings on the Internet or World Wide Web; computer disks; videotapes; audio tapes; summaries, notes, memoranda or other records of personal conversations or interviews; diaries; forecasts; statistical statements; cost summaries; accountants' or bookkeepers' work papers, graphs, charts or accounts; logs; analytical records; minutes, notes, summaries, memoranda, or other records of investigations;

2

audit reports; internal audit reports; opinions or reports of consultants' appraisals; trade letters; notes; projections; drafts of any documents; working papers; or any other documents or writing of whatever description, including, but not limited to, any information contained in any computer although not yet in printed form in YOUR possession, custody or control.

7.      "EXPERT" refers to any PERSON who is not an employee of the COMPANY, who has expertise in a particular field and provides that expertise to assist companies (for example, a consultant, financial advisor, or investment banker).

8.      "RELEVANT PERIOD" means and refers to July 22, 2019 through the date of YOUR responses to these Requests.

9.      The term "any" shall be construed to include and encompass "all," and vice versa.

10.     The terms "any," "all," and "each" shall be construed as broadly as possible to bring within the scope of the Request any information that might be deemed outside its scope by any other construction.

11.     The terms "and" and "or" shall be construed either conjunctively or disjunctively, as required by the context, to bring within the scope of the Request any information that might be deemed outside its scope by any other construction.

12.     The term "including" shall mean including but not limited to.

13.     The past tense of a verb herein includes the present tense and vice versa. The use of the singular of any word herein includes the plural and vice versa.

## DOCUMENT REQUESTS

1.      All DOCUMENTS evidencing changes or improvements made to the COMPANY's product line (such as new styles or designs) during the RELEVANT PERIOD.

2.      All DOCUMENTS specifically discussing or summarizing any contemplated or implemented changes made to the COMPANY's website during the RELEVANT PERIOD which are meaningful or material in YOUR view (such as meaningful or material changes to the website's design, functionality, user interface/experience, and/or back-end/administrative features).

3

3. All DOCUMENTS that relate to or evidence any analysis YOU performed as to whether or not to cause the COMPANY to enter new geographic markets during the RELEVANT PERIOD.

4. All DOCUMENTS that relate to or evidence any analysis YOU performed as to whether to sell or market the COMPANY's products through new channels or on new platforms.

5. All DOCUMENTS that relate to or evidence any analysis YOU performed as to whether to modify the COMPANY's marketing or advertising strategy in an effort to enhance sales.

6. All DOCUMENTS which specifically discuss or describe the COMPANY's inventory management practices during the RELEVANT PERIOD.

7. All DOCUMENTS prepared during the RELEVANT PERIOD to reflect the total amount of inventory that the COMPANY had on hand (including finished products and product components) at the time the document was prepared.  (In other words, this Request seeks copies of inventories of inventory levels during the RELEVANT PERIOD).

8. All DOCUMENTS specifically discussing any decline in the COMPANY's sales and profits during the RELEVANT PERIOD.

9. All DOCUMENTS evidencing any payments, transfers, purchases or reimbursements made from COMPANY funds or on a COMPANY credit card to or for YOUR benefit or any of YOUR family members during the RELEVANT PERIOD that were not for operating expenses of the COMPANY or ordinary business expenses of the COMPANY.

10. All DOCUMENTS evidencing payments, transfers or reimbursements made by the COMPANY to YOU during the RELEVANT PERIOD.

11. All DOCUMENTS evidencing the business purpose of any payments, transfers or reimbursements made by the COMPANY to YOU during the RELEVANT PERIOD.

12. All DOCUMENTS evidencing payments, transfers or reimbursements made by YOU to the COMPANY during the RELEVANT PERIOD.

13. All DOCUMENTS evidencing the nature or purpose of any payments, transfers or reimbursements made by YOU to the COMPANY during the RELEVANT PERIOD.

4

EXHIBIT A

14.　All DOCUMENTS evidencing efforts made by YOU during the RELEVANT PERIOD to measure the performance of the COMPANY by examining such metrics as return on advertising spend, average order value, average time spent on website, page-views per visit on website, etc.

15.　All DOCUMENTS which specifically discuss or describe any actual or contemplated change in the pricing of any product the COMPANY offered for sale during the RELEVANT PERIOD, including without limitation any sales promotions, discounts, or other sales incentives contemplated or implemented by the COMPANY.

16.　All DOCUMENTS evidencing any consideration or analysis by YOU during the RELEVANT PERIOD as to whether the COMPANY should begin marketing its products through channels, platforms or distributors other than the COMPANY's website.

17.　All DOCUMENTS evidencing any potential business development opportunities presented to the COMPANY during the RELEVANT PERIOD, including without limitation any potential business opportunities that were directed to the COMPANY at the email address inquiries@tieks.com.

18.　All DOCUMENTS evidencing how YOU responded to any potential business development opportunities presented to the COMPANY during the RELEVANT PERIOD.

19.　All DOCUMENTS specifically discussing any actual or contemplated agreements, business dealings, or exchange of anything of value between the COMPANY and Aspiration Partners, Inc. (and/or any of Aspiration Partners, Inc.'s affiliates) during the RELEVANT PERIOD).

20.　Copies of each complaint and docket sheet RELATED TO all litigation in which the COMPANY is a party, or for which the COMPANY has received a subpoena.

21.　ALL invoices/bills received from counsel for the COMPANY in any such litigation.

22.　All DOCUMENTS specifically discussing or involving David Fu during the RELEVANT PERIOD which refer or relate to any financial matters or transactions, including but not limited to YOU, manufacturing, or inventory.

5

EXHIBIT A

23.     All DOCUMENTS specifically reflecting, documenting, or referencing any food, dining, beverage, or catering expenses totaling over $250 and paid for using COMPANY funds during the RELEVANT PERIOD.

24.     All DOCUMENTS evidencing actions taken, contemplated, and/or proposed by YOU during the RELEVANT PERIOD to expand the COMPANY's sales and marketing channels.

25.     All DOCUMENTS sufficient to identify each EXPERT who has rendered services to the COMPANY during the RELEVANT PERIOD, including but not limited to attorneys, bankers, consultants, and financial advisors, as well as the services each such EXPERT provided to the COMPANY during the RELEVANT PERIOD.

26.     DOCUMENTS sufficient to identify and provide contact information for each PERSON who: (a) has been employed by the COMPANY at any time during the RELEVANT PERIOD; (b) has provided any services to the COMPANY in exchange for compensation (e.g., an independent contractor) during the RELEVANT PERIOD; and/or (c) has reported to YOU at any time during the RELEVANT PERIOD and received compensation of any kind.  [Note:  In lieu of producing documents, YOU may satisfy this Request by providing a declaration identifying each PERSON who falls within the scope of the Request, their contact information, title, the scope of any work or services they performed for the COMPANY, and the dates during which such PERSON performed the work or services.]

27.     DOCUMENTS sufficient to identify and provide contact information for each PERSON responsible for the following functions at the COMPANY at any time during the RELEVANT PERIOD:  (a) finance/accounting (e.g. chief financial officer or equivalent); (b) operations (e.g. chief operating officer or equivalent); (c) marketing (e.g., chief marketing officer or equivalent); (d) sales (e.g. chief revenue officer or equivalent); (e) technology (e.g., chief technology officer/chief information officer or equivalent); (f) legal (e.g., general counsel/chief legal officer or equivalent); (g) customer privacy (e.g., chief privacy officer or equivalent); (h) customer service (e.g., chief customer service officer or equivalent); (i) human resources (e.g., chief human resource officer or equivalent); and (j) chief executive officer or equivalent.  [Note:

6

In lieu of producing documents, YOU may satisfy this Request by providing a declaration identifying each PERSON who falls within the scope of the Request, their contact information, title, and the scope of any work or services they performed for the COMPANY, as well as the dates during which such PERSON performed the work or services.]

28.   All DOCUMENTS evidencing the existence of supply chain disruptions during the RELEVANT PERIOD.

29.   All DOCUMENTS evidencing steps taken by YOU to address or remedy supply chain disruptions during the RELEVANT PERIOD.

30.   All DOCUMENTS related to or evidencing steps taken by YOU to address rising costs during the RELEVANT PERIOD.

31.   All business plans, strategic plans, budgets, forecasts and projections relating to or prepared during the RELEVANT PERIOD.

32.   All DOCUMENTS evidencing increased competition during the RELEVANT PERIOD.

33.   All DOCUMENTS evidencing steps taken by YOU to respond to or remedy the effects of increased competition during the RELEVANT PERIOD.

34.   All appraisals or other valuations prepared during the RELEVANT PERIOD to reflect how much the COMPANY was worth.

35.   All DOCUMENTS evidencing plans or efforts made by YOU during the RELEVANT PERIOD to improve the COMPANY's customer experience.

36.   All DOCUMENTS evidencing plans or efforts made by YOU during the RELEVANT PERIOD to enhance or improve the effectiveness of the COMPANY's advertising and/or marketing campaigns.

37.   All DOCUMENTS evidencing any consideration or analysis by YOU during the RELEVANT PERIOD as to whether to expand the marketing and advertising of the COMPANY's products into international markets.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

EXHIBIT A

38.     All DOCUMENTS evidencing how YOU used credit card rewards, including points, miles and discounts, during the RELEVANT PERIOD that accrued on credit card accounts for which credit card charges were paid by the COMPANY.

39.     All DOCUMENTS related to any payments, transfers, purchases, or reimbursements involving COMPANY funds made by or to Mira Gavrieli, including DOCUMENTS substantiating any purported business purpose of such payments or transfers.

40.     All COMMUNICATIONS between YOU and ISSA (including COMMUNICATIONS between YOUR and ISSA's attorneys) during the RELEVANT PERIOD which refer or relate to any of the following: (a) this Adversary Proceeding; (b) Plaintiff's claims and allegations set forth in this Adversary Proceeding; (c) any defenses asserted by YOU or ISSA in this Adversary Proceeding; (d) Dikla Gavrieli a/k/a Dikla Gavrieli Unatin; and/or (e) Dean Unatin.

41.     All DOCUMENTS provided by YOU (or any PERSON acting on YOUR behalf) to any of the following during the RELEVANT PERIOD (including any of their attorneys and/or financial advisors): (a) ISSA; (b) Robert Kors; (c) Joe Sanberg; and/or (d) the Official Committee of Unsecured Creditors which refer or relate to any of the following: (a) this Adversary Proceeding; (b) Plaintiff's claims and allegations set forth in this Adversary Proceeding; (c) any defenses asserted by YOU or ISSA in this Adversary Proceeding; (d) Dikla Gavrieli a/k/a Dikla Gavrieli Unatin; (e) Dean Unatin; (f) the COMPANY (including its valuation and financial performance).

8

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

EXHIBIT A

LATHAM & WATKINS LLP
   Daniel Scott Schecter (Bar No. 171472)
    *daniel.schecter@lw.com*
   Tara A. McCortney (Bar No. 334942)
    *tara.mccortney@lw.com*
   Alexandra N. Ibrahim (Bar No. 340972)
    *alexandra.ibrahim@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Telephone: +1.424.653.5500
Facsimile: +1.424.653.5501

Attorneys for Plaintiff Dikla Gavrieli
a/k/a Dikla Gavrieli Unatin

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>KFIR GAVRIELI,<br><br>        Debtor.<br><br>DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, on behalf of GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>        Plaintiff,<br><br>   v.<br><br>KFIR GAVRIELI, an individual,<br><br>        Debtor,<br><br>  - and -<br><br>GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>        Nominal Defendant. | Case No. 2:21-bk-10826-BB (Chapter 11)<br><br>Adversary No. 2:21-ap-01034-BB<br><br>**PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION TO POST-EFFECTIVE DATE TRUSTEE J. MICHAEL ISSA**<br><br>Judge:      Hon. Sheri Bluebond |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SET OF REQUESTS FOR
PRODUCTION TO POST-EFFECTIVE DATE TRUSTEE

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, made applicable here under Rules 7026, 7033, and 7034 of the Federal Rules of Bankruptcy Procedure, Plaintiff Dikla Gavrieli a/k/a Dikla Gavrieli Unatin, by and through her undersigned counsel, hereby serves these Requests for Production of Documents (the "Requests") to Michael J. Issa.  Documents responsive to the Requests shall be produced on a rolling basis, but not later than thirty days after receipt of these Requests.

## DEFINITIONS

For purposes of these Requests, the following definitions shall apply.  These definitions are to be construed in the broadest sense with reference to the Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure.

1.      "YOU," "YOUR," and "DEFENDANT" shall mean J. Michael Issa and any PERSON acting on his behalf, including, without limitation, any of his partners, attorneys, financial advisors, accountants, agents, representatives, employees, consultants, independent contractors, or affiliated entities, as well as any other PERSON acting on any of their behalf.

2.      "PERSON(s)" shall mean all natural persons and all entities, including any organizations, sole proprietorships, associations, companies, partnerships, joint ventures, corporations, legal entities, governmental entities, legal representatives, trusts, or estates.

3.      "COMMUNICATION(s)" shall have the broadest meaning allowable under the Federal Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure, and includes the transmission, sending, and/or receipt of information of any kind, or the attempt to elicit information of any kind, by and/or through any means, including, but not limited to, speech, discussion, meeting, conversation, writing, language (machine, foreign, or otherwise), electronic mail, computer electronics of any kind, videotape, photograph, graph, symbol, sign, sound, radio, telephone, telecommunication, film, or media of any kind.

4.      "COMPANY" shall mean Gavrieli Brands, LLC and all of its current and former members, agents, representatives, attorneys, employees, consultants, independent contractors, affiliated entities, and any other PERSON acting on its behalf.

2

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SET OF REQUESTS FOR
PRODUCTION TO POST-EFFECTIVE DATE TRUSTEE

5.     "DOCUMENT(s)" shall have the broadest meaning allowable under the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, and includes, but is not limited to, the following items, whether printed or recorded or reproduced by any mechanical or electronic process, or written or produced by hand: agreements; contracts; communications, including intra-company communications; correspondence; telegrams; telexes; teletypes; memoranda; record books; notes; reports; opinions; electronic mail (including any primary or back-up file); real-time or instant messages; SMS, MMS, or other text messages; postings on the Internet or World Wide Web; computer disks; videotapes; audio tapes; summaries, notes, memoranda or other records of personal conversations or interviews; diaries; forecasts; statistical statements; cost summaries; accountants' or bookkeepers' work papers, graphs, charts or accounts; logs; analytical records; minutes, notes, summaries, memoranda, or other records of investigations; audit reports; internal audit reports; opinions or reports of consultants' appraisals; trade letters; notes; projections; drafts of any documents; working papers; or any other documents or writing of whatever description, including, but not limited to, any information contained in any computer although not yet in printed form in YOUR possession, custody or control.

6.     "RELATED TO" shall mean all information, facts, or documents that directly, indirectly, or in any other way support, concern, negate, bear upon, touch upon, incorporate, affect, include, pertain to, or are otherwise connected with the subject matter referenced.

7.     "LAW ENFORCEMENT" shall mean any federal, state, or other law enforcement individual, agency, or regulator, and includes, without limitation, any investigation or regulatory proceeding overseen or initiated by the U.S. Department of Justice, the Securities and Exchange Commission, and/or the Commodity Futures Trading Commission.

8.     "MEDIA" shall mean any reporter, journalist, publication, blog, news organization, or other news or fact gathering or investigative action by any PERSON of any type whether or not the results of that work was published.

9.     "ASPIRATION" shall mean Aspiration Partners, Inc., and any PERSON acting on its behalf, including, without limitation, any past or present parent, division, subsidiary, affiliate,

3

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SET OF REQUESTS FOR
PRODUCTION TO POST-EFFECTIVE DATE TRUSTEE

joint venture, associated organization, partner, attorney, financial advisor, accountant, agent, representative, employee, consultant, independent contractor, founder, or affiliated entity.

10.    "APOGEE" shall refer to Apogee Pacific, LLC, and any PERSON acting on its behalf, including, without limitation, any past or present parent, division, subsidiary, affiliate, joint venture, associated organization, partner, attorney, financial advisor, accountant, agent, representative, employee, consultant, independent contractor, founder, or affiliated entity.

11.    "SUSTAINABILITY SERVICES" shall mean any actual, planned, or purported services or financial transactions involving tree planting, carbon credits, reforestation, or any related type activities or transactions.

12.    "ECONOMIC NEXUS LAWS" shall mean laws adopted by any jurisdiction following the decision of the U.S. Supreme Court in *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) regarding the collection of sales tax and other taxes from the sale of good and services by parties located outside of the state, as summarized at https://www.salestaxinstitute.com/resources/economic-nexus-state-guide and https://www.thetaxadviser.com/issues/2023/jun/south-dakota-v-wayfair-five-years-later.html.

13.    "RELEVANT PERIOD" means and refers to July 22, 2019 through the date of YOUR responses to these Requests.

14.    The term "any" shall be construed to include and encompass "all," and vice versa.

15.    The terms "any," "all," and "each" shall be construed as broadly as possible to bring within the scope of the Request any information that might be deemed outside its scope by any other construction.

16.    The terms "and" and "or" shall be construed either conjunctively or disjunctively, as required by the context, to bring within the scope of the Request any information that might be deemed outside its scope by any other construction.

17.    The term "including" shall mean including but not limited to.

18.    The past tense of a verb herein includes the present tense and vice versa.

19.    The use of the singular of any word herein includes the plural and vice versa.

4

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SET OF REQUESTS FOR
PRODUCTION TO POST-EFFECTIVE DATE TRUSTEE

## INSTRUCTIONS

1.      Comply with the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the United States Bankruptcy Court for the Central District of California.

2.      Produce all responsive DOCUMENTS in YOUR possession, custody, or control, and in the possession, custody, or control of any agents, representatives, or advisors to YOU.

3.      Produce the original of each responsive DOCUMENT, together with all non-identical copies and drafts of that DOCUMENT.

4.      If YOU object to the production of any DOCUMENT in response to the Requests, state with specificity the reasons for YOUR objection.

5.      If YOU object to any portion of a Request, produce DOCUMENTS responsive to any portion(s) of the Request to which YOU do not object.

6.      DOCUMENTS shall be produced in full and complete form.  If any responsive DOCUMENTS cannot be produced in full, produce such DOCUMENTS to the extent possible, and specify the reason for the inability to produce the remainder.

7.      DOCUMENTS shall be produced in the manner that they are kept in the ordinary course of business or organized and labeled to correspond to the Request to which they are responsive.

8.      If any responsive DOCUMENT is not produced because of a claim of privilege or work product, provide an appropriate privilege log.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 22:**

All DOCUMENTS, including without limitation all COMMUNICATIONS, RELATED TO any litigation, investigation, or inquiry by LAW ENFORCEMENT or MEDIA, which is RELATED TO ASPIRATION or any SUSTAINABILITY SERVICES, including any subpoenas received by the COMPANY or any of its managers, members, or employees.  This request includes any sums paid by the COMPANY for legal or other expenses in connection with any such litigation or investigation.

5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SET OF REQUESTS FOR
PRODUCTION TO POST-EFFECTIVE DATE TRUSTEE

**REQUEST FOR PRODUCTION NO. 23:**

All DOCUMENTS, including without limitation all COMMUNICATIONS, RELATED TO any litigation, investigation, or inquiry by LAW ENFORCEMENT or MEDIA of the COMPANY, any of its members, employees, or family members, regarding any SUSTAINABILITY SERVICES, ASPIRATION, APOGEE, or any creditor or other party named in the Kfir Gavrieli bankruptcy action, Case No. 2:21-bk-10826-BB.

**REQUEST FOR PRODUCTION NO. 24:**

All DOCUMENTS, including without limitation all COMMUNICATIONS, RELATED TO Miller Ink, including with any of its principals or employees such as Nathan Miller, regarding: (1) any services provided to the COMPANY or to any of its employees (including Kfir Gavrieli or any of his family members); (2) any funds provided by the COMPANY to Miller Ink; or (3) ASPIRATION, any SUSTAINABILITY SERVICES, or any litigation, investigation, or inquiry by LAW ENFORCEMENT or MEDIA.

**REQUEST FOR PRODUCTION NO. 25:**

All DOCUMENTS, including without limitation all COMMUNICATIONS, between Kfir Gavrieli and Yamit Betesh, Guy Davidyan, Joseph Sanberg, Nathan Miller, any other COMPANY employee, or any of Kfir Gavrieli's family members, RELATED TO ASPIRATION, APOGEE, SUSTAINABILITY SERVICES, or LAW ENFORCEMENT.

**REQUEST FOR PRODUCTION NO. 26:**

All DOCUMENTS which reflect the earliest date the COMPANY became aware of the following: (a) the decision of the U.S. Supreme Court in *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018); (b) the adoption of ECONOMIC NEXUS LAWS in any jurisdiction.

**REQUEST FOR PRODUCTION NO. 27:**

All DOCUMENTS RELATED TO the COMPANY's collection, calculation, or remittance of any taxes from consumers (including sales or use taxes) from the sales of goods or services by the COMPANY for the RELEVANT PERIOD, including but not limited to any sales tax returns filed, prepared, or contemplated for any jurisdiction, and supporting documents thereto.

6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SET OF REQUESTS FOR
PRODUCTION TO POST-EFFECTIVE DATE TRUSTEE

**REQUEST FOR PRODUCTION NO. 28:**

All DOCUMENTS RELATED TO the COMPANY's adoption of policies, practices, and procedures in response to: (a) the decision of the U.S. Supreme Court in *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018); (b) the adoption of ECONOMIC NEXUS LAWS in any jurisdiction.

**REQUEST FOR PRODUCTION NO. 29:**

All DOCUMENTS RELATED TO any funds received, reserved, or remitted by the COMPANY for the collection, remittance, and/or payment of any taxes to any state other than California (including sales or use taxes).

**REQUEST FOR PRODUCTION NO. 30:**

All DOCUMENTS RELATED TO any advice or services the COMPANY sought or obtained from any lawyers, accountants, or other professionals RELATED TO any of the following:  (a) the decision of the U.S. Supreme Court in *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018); (b) the adoption of ECONOMIC NEXUS LAWS in any jurisdiction; (c) the COMPANY's adoption of policies, practices, and procedures in response to any ECONOMIC NEXUS LAWS; (d) the COMPANY's financial and accounting practices in response to any ECONOMIC NEXUS LAW; and (e) potential civil or criminal liability or exposure for Kfir Gavrieli or the COMPANY, its members, or its employees.

Dated:  December 10, 2024

LATHAM & WATKINS LLP
Daniel Scott Schecter
Tara A. McCortney
Alexandra N. Ibrahim

By _____
Daniel Scott Schecter
Attorneys for Plaintiff Dikla Gavrieli
a/k/a Dikla Gavrieli Unatin

7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SET OF REQUESTS FOR
PRODUCTION TO POST-EFFECTIVE DATE TRUSTEE

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to this action.  My business address is Latham & Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, CA 90071.  My email address is tara.mccortney@lw.com.

On December 10, 2024, I served the following document described as:

**PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION TO POST-EFFECTIVE DATE TRUSTEE J. MICHAEL ISSA**

by serving a true copy of the above-described document in the following manner:

### BY ELECTRONIC MAIL

The above-described document was transmitted via electronic mail to the following party on December 10, 2024:

HUESTON HENNIGAN LLP
Marshall A. Camp (SBN 231389)
mcamp@hueston.com
Allison L. Libeu (SBN 244487)
alibeu@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014

Attorneys for J. Michael Issa,
the Post-Effective Date Trustee

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 10, 2024, at Los Angeles, California.

_____
Tara McCortney

8

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Lesnick Prince Pappas & Alverson LLP, 315 W. 9th Street, Suite 705, Los Angeles, CA 90015

A true and correct copy of the foregoing document entitled **COMPENDIUM OF EXHIBITS FOR MOTIONS FOR LEAVE TO AMEND COMPLAINT RE WAYFAIR AND ASPIRATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)April 20, 2026I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Gregory K Jones**    gjones@stradlinglaw.com, smjohnson@sycr.com;smjohnson@stradlinglaw.com
- **Robert Allan Kors (TR)**    robertkorstrustee@gmail.com
- **Allison L Libeu**    alibeu@hueston.com, sjones@hueston.com
- **William N Lobel**    wlobel@tocounsel.com, mmason@tocounsel.com
- **Kerri A Lyman**    klyman@steptoe.com, #-FirmPSDocketing@Steptoe.com;nmorneault@Steptoe.com;mhernandez@steptoe.com;aodonnell@steptoe.com
- **Christopher E Prince**    cprince@lesnickprince.com, jmack@lesnickprince.com;cprince@ecf.courtdrive.com;porpe@lesnickprince.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Richard Lee Wynne**    richard.wynne@hoganlovells.com, tracy.southwell@hoganlovells.com;cindy.mitchell@hoganlovells.com;rick-wynne-7245@ecf.pacerpro.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 20, 2026  Christopher E. Prince | /s/  Christopher E. Prince |
|---|---|
| *Date*                *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9013-3.1.PROOF.SERVICE**