HUESTON HENNIGAN LLP
Marshall A. Camp (SBN 231389)
*mcamp@hueston.com*
Allison Libeu (SBN 244487)
*alibeu@hueston.com*
Justin M. Greer (SBN 318086)
*jgreer@hueston.com*
523 West 6th Street, Suite 400
Los Angeles, CA  90014
Telephone:     (213) 788-4340
Facsimile:     (888) 775-0898

ORSUS GATE LLP
Denis Shmidt (Bar No. 267987)
Nabil Bisharat (Bar No. 270305)
Zachary Murray (Bar No. 344762)
16 N. Marengo Ave., Suite 505
Pasadena, CA 91101
Telephone: (213) 373-4357
Email: DShmidt@OrsusGate.com
Email: NBisharat@OrsusGate.com
Email: ZMurray@OrsusGate.com

Richard L. Wynne (Bar No. 120349)
richard.wynne@hoganlovells.com
Edward J. McNeilly (Bar No. 314588)
edward.mcneilly@hoganlovells.com
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601

*Attorneys for J. Michael Issa, the Post-Effective
Date Trustee*

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>KFIR GAVRIELI,<br><br>　　　　Debtor.<br><br>DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, individually and derivatively on behalf of GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>KFIR GAVRIELI, an individual,<br><br>　　　　Defendant,<br>-and-<br><br>GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>　　　　Nominal Defendant. | Adversary Case No.: 2:21-ap-01034-BB<br><br>Chapter 11 Case<br><br>**POST-EFFECTIVE DATE TRUSTEE J. MICHAEL ISSA'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT TO ADD ALLEGATIONS REGARDING WAYFAIR LIABILITY AND MODIFICATION OF SCHEDULING ORDER**<br><br>Hearing Date:  May 12, 2026<br>Time:   2:00 p.m.<br>Place: Courtroom 1539<br>　　　255 E. Temple Street<br>　　　Los Angeles, CA 90012<br>　　　Or Remotely Via ZoomGov |

TRUSTEE'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND RE WAYFAIR
ADV. NO: 2:21-AP-01034-BB

7387121

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 4

II.  RELEVANT BACKGROUND ................................................................................ 6

III.  LEGAL STANDARD ............................................................................................. 9

IV.  ARGUMENT ............................................................................................................ 9

   A.  Mrs. Unatin Must First Establish Good Cause under Rule 16(b) to Modify the Scheduling Order and Amend Her Complaint .................................... 9

   B.  Mrs. Unatin Fails to Establish Good Cause Because She Did Not Diligently Pursue Her Wayfair Allegations ........................................................... 11

   C.  Even Under Rule 15(a), Mrs. Unatin's Proposed Fourth Amended Complaint Is Unduly Prejudicial, in Bad Faith, and Futile ................................. 14

V.  CONCLUSION ....................................................................................................... 16

1

7387121

## TABLE OF AUTHORITIES

**CASES**

*AmerisourceBergen Corp. v. Dialysist W., Inc.*,
    465 F.3d 946 (9th Cir. 2006) ................................................................................. 14

*Carvalho v. Equifax Information Servs., LLC*,
    629 F.3d 876 (9th Cir. 2010) .................................................................................. 9

*Chodos v. W. Publ'g Co.*,
    292 F.3d 992 (9th Cir. 2002) ................................................................................. 15

*Cornwell v. Electra Cent. Credit Union*,
    439 F.3d 1018 (9th Cir. 2006) ............................................................................... 13

*DCD Programs, Ltd. v. Leighton*,
    90 F.3d 1442 (9th Cir. 1996) ................................................................................... 5

*Fed. Trade Comm'n v. Kutzner*,
    2017 WL 5229182 (C.D. Cal. June 12, 2017) ...................................................... 15

*In re Art & Architecture Books of the 21st Century*,
    2021 WL 1821869 (Bankr. C.D. Cal. May 5, 2021) ............................... 4, 9, 10, 12

*In re Baroni*,
    2017 WL 1207413 (Bankr. C.D. Cal. Mar. 31, 2017) ...................................... 9, 12

*In re Kfir Gavrieli*,
    No. 2:21-bk-10826-BB (Bankr. C.D. Cal.) .............................................................. 7

*In re Western States Wholesale Nat. Gas Antitrust Litig.*,
    715 F.3d 716 (9th Cir. 2013) ..................................................................... 9, 10, 12

*Johnson v. Mammoth Recreations, Inc.*,
    975 F.2d 604 (9th Cir. 1992) ......................................................................... passim

*Johnson v. Maraj*,
    2024 WL 4800086 (C.D. Cal. Oct. 30, 2024) ....................................................... 13

*Jones v. County of Tulare*,
    2018 WL 6271577 (E.D. Cal. Nov. 30, 2018) ....................................................... 10

*Lockheed Martin Corp. v. Network Sols., Inc.*,
    194 F.3d 980 (9th Cir. 1999) ................................................................................. 15

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
    218 F.R.D. 667 (C.D. Cal. 2003) ............................................................. 10, 12, 13

*Rich v. Shrader*,

2

823 F.3d 1205 (9th Cir. 2016) ................................................................... 9, 16

*Salameh v. Tarsadia Hotel*,
726 F.3d 1124 (9th Cir. 2013) ...................................................................... 16

*Trans Video Electronics, Ltd. v. Sony Electronics, Inc.*,
278 F.R.D. 505 (N.D. Cal. 2011)................................................................... 15

*Zivkovic v. S. Cal. Edison Co.*,
302 F.3d 1080 (9th Cir. 2002) ................................................................. 5, 15

**STATUTES**

Federal Rule of Civil Procedure 15(a) ............................................................. passim

Federal Rule of Civil Procedure 16(b)............................................................. passim

3

7387121

## I.    INTRODUCTION

Post-Effective Date Trustee J. Michael Issa ("Trustee") opposes Plaintiff Dikla Gavrieli Unatin's Motion for Leave to Amend the Complaint to Add Allegations of Wayfair Liability and Modification of the Scheduling Order ("Motion"). This adversary proceeding is more than five years old. All discovery deadlines have passed, and the Trustee's summary judgment deadline is a mere eight days after this Motion is heard. Since filing her case more than five years ago, Mrs. Unatin has failed to diligently prosecute her claims, while the Trustee has expended significant resources disproving her allegations in discovery. Now, on the eve of summary judgment and final resolution of this case, Mrs. Unatin seeks a fourth bite at the apple to assert a new but equally meritless theory regarding "Wayfair" liability that she admits she has known about for two and a half years. She also seeks to reopen discovery nine months after the fact discovery cutoff, even though she barely conducted discovery on her operative claims during the discovery period. Put simply, this is a bad-faith litigation tactic intended solely to prolong this case to the prejudice of the Trustee and the creditors. The Motion should be denied for at least the following independently sufficient reasons.

*First*, Mrs. Unatin cannot establish the "good cause" required to modify the Scheduling Order under Federal Rule of Civil Procedure 16(b). In fact, Mrs. Unatin ignores this standard altogether, instead seeking to sneak a modification of the Scheduling Order through Rule 15(a)'s "liberal" standard. But Rule 16(b) governs here, both because her contemplated amendments would require reopening discovery and because her Motion expressly seeks to do so. *In re Art & Architecture Books of the 21st Century*, 2021 WL 1821869, at *3 (Bankr. C.D. Cal. May 5, 2021) (Rule 16(b), not Rule 15(a), applies to motion for leave to amend where proposed amendment "would require modifications to the scheduling order," including reopening discovery). Accordingly, Mrs. Unatin must establish good cause, a standard that "primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). Mrs. Unatin has been the opposite of diligent here. Despite knowing about the *Wayfair* allegations since at least January 2024, she waited until long after the close of discovery to seek leave to amend. Her lack of diligence requires that her

Motion be denied. *Id.* ("If [moving] party was not diligent, the inquiry should end.")

*Second*, though Mrs. Unatin must clear Rule 16(b)'s good cause standard first, she cannot satisfy even Rule 15(a)'s more liberal standard because her requested amendment is made in bad faith, will greatly prejudice the Trustee, and is a futile fourth bite at the apple. Although she knew about her *Wayfair* allegations before she filed this case (and no later than January 2024), Mrs. Unatin waited until after the close of discovery and on the eve of summary judgment to seek leave to amend. This bad-faith delay prejudices the Trustee, who would have to redo discovery if leave to amend were granted, which warrants denial of the Motion. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (affirming denial of leave to amend complaint five days before discovery deadline due to delay in proceedings). Moreover, Mrs. Unatin's new allegations are meritless because they amount to nothing but a claim that the Company has incurred tax liabilities, which cannot be recovered as damages as a matter of law. *See DCD Programs, Ltd. v. Leighton*, 90 F.3d 1442, 1449 (9th Cir. 1996) (tax liabilities result from statutory requirements and thus cannot be recovered as damages). Granting Mrs. Unatin leave to amend to assert these meritless claims would be futile. For these independent reasons, the Court should deny her Motion.

After five years of litigation, during which Mrs. Unatin filed numerous motions designed to delay resolution of this case, she now seeks to start over with new theories. Her operative complaint filed more than three years ago alleged serious breaches of fiduciary duty that she claimed caused nine figures in damages, and yet she has not prepared any of those allegations for trial. Although her Motion selectively relies on the 2024 financial statements that she received in October 2025, Mrs. Unatin admits elsewhere that she has known about "Wayfair" since *at least* January 2024. In fact, because she had access to the relevant Company records (including bank account access) since 2018, she has likely been aware of her "Wayfair" allegations since before this case was filed. She nevertheless waited until after all discovery closed, which revealed a complete lack of evidence for her asserted claims, and just weeks away from summary judgment, to ask for a do-over. Nothing justifies her tactics, and she cannot demonstrate good cause to modify the Scheduling Order. The estate has spent millions of dollars dispelling Mrs. Unatin's

5

endless stream of allegations, and it is now time for it to end. The Trustee respectfully asks that the Court deny Mrs. Unatin's Motion.

## II.   **<u>RELEVANT BACKGROUND</u>**

Mrs. Unatin filed this adversary proceeding derivatively on behalf of Gavrieli Brands, LLC ("Company") more than five years ago. *See* Dkt. No. 1. She alleges that Kfir Gavrieli—the Debtor in the underlying bankruptcy proceeding—breached his fiduciary duties to the Company and purportedly mismanaged it on or after July 22, 2019. *See generally* Dkt. No. 128. According to her, damages from these serious allegations could "exceed $300 million" and would require the expulsion of Mr. Gavrieli as member and manager of the Company. *Id.* at ¶¶ 79-82.

Despite the seriousness of her allegations, Mrs. Unatin has utterly failed to produce any proof supporting these claims or even actively prosecute her case in the last five years. Mrs. Unatin pursued very little discovery before the fact discovery cutoff on August 11, 2025. She sought limited written and document discovery from the Trustee. To illustrate her lack of diligence, Mrs. Unatin served discovery requests related to the "Wayfair" issues that are the subject of this Motion in *December 2024*. *See* Dkt. No. 377 at Ex. I. The Trustee objected to these requests because, among other things, the Wayfair issues are irrelevant and the Trustee had no responsive documents in his possession. Mrs. Unatin then waited more than seven months and long after the fact discovery deadline elapsed to move to compel further responses from the Trustee (which the Court denied). *See* Dkt. No. 308. Mrs. Unatin also issued subpoenas to the Company and Mr. Gavrieli that she subsequently abandoned. As a result, Mrs. Unatin never deposed Mr. Gavrieli or the Company, and she did not notice any other depositions.

Mrs. Unatin also completely failed to conduct expert discovery. The deadline for Mrs. Unatin to designate expert witnesses was December 13, 2025, and the expert discovery cutoff was March 23, 2026. *See* Dkt. No. 298 at 2. Yet, despite her allegation that damages could "exceed $300 million," Dkt. No. 128 at ¶ 79, she nevertheless failed to disclose any expert witnesses to support those damages. In fact, in both her ROG responses and in her deposition, she confirmed that she had made no effort to calculate the damages resulting from her allegations. *See* Ex. A at Interrogatory No. 17.  She also testified in her deposition that her only

6

7387121

witnesses are her and her husband Dean Unatin.

Instead of preparing her case for trial, Mrs. Unatin deployed every bad-faith discovery tactic in the book to delay resolution of her claims. Last summer, the Trustee noticed Mrs. Unatin's deposition for August 8, 2025, but she did not appear. Multiple court filings later, and Mrs. Unatin finally agreed to sit for her deposition on January 22, 2026. As the Court is aware, Mrs. Unatin and her counsel abruptly and improperly terminated that deposition, causing yet another three-month delay in the completion of her deposition. Mrs. Unatin also delayed her responses to the Trustee's written discovery. Though the Trustee extended professional courtesy in granting informal extensions throughout, the Trustee did so based in part on the assurance by Mrs. Unatin's counsel that she was not "attempting to go back in time and *re-visit deadlines that have already passed in the adversary proceedings*." Dkt. No. 321 at 129 (emphasis added).

In addition to her discovery tactics, Mrs. Unatin sought to delay this case through meritless motions. She moved for an indefinite stay in this case in August 2025 because she did not want to incur additional litigation expenses while she was uncertain about the assets remaining in the estate. *See* Dkt. No. 245. This stay request was denied. Dkt. No. 257. She then filed three motions in the underlying bankruptcy case seeking an order requiring the Trustee to: (1) fire Hueston Hennigan LLP and hire new counsel; (2) remove Mr. Gavrieli from managing this litigation; (3) immediately liquidate and distribute all the Trust's assets; and (4) seek disgorgement of certain funds from Mr. Gavrieli and the Trustee's counsel, arguing that the Trustee should be barred from paying counsel. *See In re Kfir Gavrieli*, No. 2:21-bk-10826-BB (C.D. Cal.), Dkt. Nos. 988-990. The Court denied all those requests too. *Id.* Mrs. Unatin's counsel has also confirmed that "her claim is not going to be paid at all, let alone in full." Ex. C at 60:19–20. After the Court thanked Mr. Prince for "thoroughly depressing me and making me feel like we're all completely wasting our time," Mr. Prince responded: "I think we are, to be honest." *Id.* at 61:5-8. Despite her counsel's admission, Mrs. Unatin still seeks to waste even more time and money with new and equally baseless claims.

Despite having time to file all her other motions and repeatedly obstruct and delay the Trustee's discovery efforts, Mrs. Unatin waited until now to seek leave to amend to introduce her

7

Wayfair allegations and modify the Scheduling Order. Mrs. Unatin's own papers admit that her counsel was aware of the Wayfair issues as early as January 2024. *See* Dkt. No. 375 at 18. Mrs. Unatin has also had regular and constant access to the Company's bank accounts, financial workpapers, accountant (Gary Howard), and tax returns since 2018 and could verify to which states the Company has been paying sales tax. She receives these financial and tax documents every year and can check the bank accounts daily. In fact, her operative complaint cites the Company's tax returns to support her claims, showing that she reviewed these documents and could have determined the extent of the Company's tax payments to other states. *See, e.g.,* Dkt. No. 128 at ¶¶ 19 & 26. Mrs. Unatin can also see the Company's public checkout page (and indeed has submitted screenshots of that page here) to verify whether sales tax has been charged to customers in various states. She also could have asked the Company or its accountants about these tax issues, but she never did. In short, Mrs. Unatin has likely been aware of her Wayfair allegations since long before January 2024.

These new allegations are also inconsistent with what she has previously alleged in this case. Through her Wayfair allegations, Mrs. Unatin contends that the Company either should have collected state taxes from consumers (and thereby effectively raise prices) or should have increased its costs. Of course, effectively raising prices would risk a negatively affecting demand for the Company's products, which is contrary to her operative allegations that Mr. Gavrieli breached his duties by not stopping the Company's decline in sales. (*See* Dkt No. 128 at ¶¶ 38-50). Indeed, Mrs. Unatin has even identified Mr. Gavrieli's decision to increase prices in the face of softening demand as a basis for her claims. *See* Ex. B at 15. Having failed to produce any evidence for her operative allegations, she now wants to flip her story and allege the opposite at the last minute.

More importantly, these allegations lack any merit. As an initial matter, Mrs. Unatin is alleging that the Company should be paying *more in taxes*, which does not constitute damages to the Company. The Company does not have any less money today as a result of Mr. Gavrieli's decisions regarding these tax issues—in fact, its potential tax burden has decreased because of Mr. Gavrieli's decisions. The Company has consulted with its lawyers and accountants about

8

these issues, and the end result is a *decreased potential tax burden for the Company.*

III.   **LEGAL STANDARD**

Rule 16(b) provides that a "schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b). "A court's evaluation of good cause is not coextensive with an inquiry into the propriety of the amendment under [] Rule 15." *Johnson*, 975 F.2d at 609. Indeed, while Rule 15(a) focuses on the bad faith of the movant or the prejudice to the non-movant, Rule 16(b) "primarily considers the diligence of the party seeking the amendment," *In re Western States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013), and in particular, whether the schedule's deadlines "cannot reasonably be met despite the diligence of the party seeking the extension," *Johnson*, 975 F.2d at 609. Even where parties seek leave to amend under Rule 15(a), they must first establish "good cause" under Rule 16(b) if their motion requires modifying the scheduling order. *See Johnson,* 975 F.2d at 609; *In re Baroni*, 2017 WL 1207413, at *3 (Bankr. C.D. Cal. Mar. 31, 2017); *In re Art*, 2021 WL 1821869, at *3 ("If the moving party shows good cause under Civil Rule 16(b), the court then applies Civil Rule 15(a)'s liberal standards in determining whether to grant leave to amend a pleading.").

Although Rule 15(a) provides for a "liberal" standard for granting leave to amend pleadings, courts may nevertheless deny leave due to "undue delay, bad faith or dilatory motive on part of the movant" or a "repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party …, [and] futility of amendment." *Carvalho v. Equifax Information Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The Court has wide discretion in refusing leave to amend "after the first amendment, and only upon gross abuse will its rulings be disturbed." *Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016).

IV.   **ARGUMENT**

Mrs. Unatin's Motion should be denied because she has not shown "good cause" to modify the Scheduling Order and because her bad-faith and last-minute effort to add futile allegations to her Complaint will unduly prejudice the Trustee.

A.   **Mrs. Unatin Must First Establish Good Cause under Rule 16(b) to Modify**

9

**the Scheduling Order and Amend Her Complaint**

Mrs. Unatin incorrectly cites Rule 15(a)'s "liberal" standard for granting leave to amend even though she expressly seeks to modify the Scheduling Order. To be clear, where a motion for leave to amend pleadings requires modifying the Scheduling Order, the Court must first determine whether "good cause" under Rule 16(b) exists before turning to Rule 15(a)'s more liberal standard. *In re Art*, 2021 WL 1821869, at *3; *see also In re Western States*, 715 F.3d at 737; *Johnson*, 975 F.2d at 609-10 (applying Rule 16(b), not Rule 15(a), for motion for leave to amend after pleadings deadline passed); *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 218 F.R.D. 667, 672 (C.D. Cal. 2003) (same). Courts require a good cause showing even where there is no specific deadline for amending pleadings in the scheduling order when the amended pleading would nevertheless require reopening discovery. *See In re Art*, 2021 WL 1821869, at *2-3; *see also Jones v. County of Tulare*, 2018 WL 6271577, at *3 (E.D. Cal. Nov. 30, 2018) ("Although the Court's Scheduling Order does not set a specific deadline for amending the complaint, Plaintiffs' motion to amend the complaint is governed by Rule 16(b)(4) because granting Plaintiffs leave to amend the complaint would require amending other dates in the Scheduling Order.").

Here, the Court set August 11, 2025 as the fact discovery cutoff. *See* Dkt. No. 241 at 2. Discovery has been closed for more than eight months. Mrs. Unatin nevertheless asks the Court to reopen discovery so that she can explore her "new" allegations without attempting to establish good cause for doing so. Moreover, the Court must require good cause to grant leave for Mrs. Unatin to add the Wayfair allegations, as doing so will necessarily require the Court to reopen fact discovery to allow the Trustee—who diligently pursued discovery ahead of the Court's deadline—to explore and disprove her new allegations. It would also require continuing the May 20 deadline for the Trustee to file a summary judgment motion, which the Trustee is already working on and will be filing a mere eight days after this Motion is heard. *See* Dkt. No. 366. Plaintiff's deadline to move for summary judgment has already passed. *See* Dkt. No. 298. Mrs. Unatin thus must show good cause not only because she expressly asks the Court to modify the Scheduling Order, but also because her amended complaint will inherently require reopening

10

discovery. *See In re Art*, 2021 WL 1821869, at *2–3.

*In re Art* is instructive. There, the Bankruptcy Court's Scheduling Order set a deadline for fact discovery. The plaintiff sought leave to amend his complaint to add new allegations two months after the close of fact discovery and just before the close of expert discovery, urging the Court to consider his motion under Rule 15(a)'s liberal standard, as Mrs. Unatin does here. *Id.* The Court, however, noted that the new allegations would require reopening nonexpert fact discovery and extending expert discovery, modifications of the Scheduling Order that required "good cause and [] the judge's consent." *Id.* at *3 (quoting *James v. J2 Cloud Services, Inc.*, 2019 WL 184330 (C.D. Cal. Jan. 14, 2019)). The Court then denied the Motion because the plaintiff failed to establish good cause for the amended allegations, including because he had at least imputed knowledge of the new allegations during the four years he had access to the debtor's tax returns and bank records. *Id.* at *16 ("This lengthy delay indicates inexcusable neglect in Plaintiff's investigation and prosecution of these new claims which is incompatible with the diligence required by Civil Rule 16(b)(4).").

Mrs. Unatin's Motion requires even greater modification to the Scheduling Order than the plaintiff's in *In re Art*. Her Motion seeks leave to add new allegations more than eight months after the close of fact discovery, and more than a month after the close of expert discovery (which she did not conduct anyway). Her Motion would also require the Court to reset the Trustee's summary judgment deadline so that the Trustee could conduct additional discovery into these allegations. Accordingly, because Mrs. Unatin's amended complaint would necessarily require modifying the Court's Scheduling Order, she must first establish "good cause" for doing so under Rule 16(b)(4), which she does not even attempt to do.

**B.    Mrs. Unatin Fails to Establish Good Cause Because She Did Not Diligently Pursue Her Wayfair Allegations**

In her Motion, Mrs. Unatin does not argue that good cause exists for granting leave to amend. Nor could she. The good cause inquiry focuses on Mrs. Unatin's diligence and reasons for seeking the modification—indeed, "'good cause' means scheduling deadlines cannot be met despite [the moving] party's diligence." *Johnson*, 975 F.2d at 609. Because Mrs. Unatin "was not

11

diligent, the inquiry should end." *Id.* (affirming denial of leave to amend complaint where party could have alleged facts sooner).

Mrs. Unatin's lack of diligence in asserting any claims based on Wayfair or California taxes is undeniable. Her own counsel concedes that Mrs. Unatin has known about the Wayfair allegations since at least January 2024, more than eighteen months *before the fact discovery cutoff*. Mrs. Unatin does not explain why she then waited for more than two years, and nine months *after the fact discovery cutoff*, to seek leave to amend. Courts routinely find such delay to be a lack of diligence sufficient to deny leave to amend under Rule 16(b)(4). *See In re Western States*, 715 F.3d at 737 (affirming district court's denial of leave to add allegations plaintiffs had known about for two years); *Johnson*, 975 F.2d at 610 (plaintiff's counsel did not read discovery responses served in the case which disclosed the underlying facts until four months after the cutoff); *In re Baroni*, 2017 WL 1207413, at *4 (leave to amend sought to add allegations known to plaintiff "long before she filed her leave to amend"); *Matrix Motor Co.*, 218 F.R.D. at 672 (no good cause where request came a month after expert cut off and 22 days before fact discovery cut off).

In addition to her counsel's admitted knowledge of the Wayfair allegations no later than January 2024, Mrs. Unatin has also had access to the Company's records for years, which she could have reviewed to identify her Wayfair allegations since before she filed this adversary proceeding in 2021. For example, Mrs. Unatin has had view-only access to the Company's bank accounts, allowing her to see what payments the Company makes in real time and thereby determine to which states the Company has paid sales taxes. She also has had yearly access to the Company's financial statements and tax returns since 2018 (the year *Wayfair* was decided), which also would have put her on notice about the Company's tax payments. The same is true regarding her allegations about California taxes. Mrs. Unatin has therefore been on notice of these issues since long before she filed this case. Her unexplained delay in seeking leave to amend is the opposite of good cause. *See In re Art*, 2021 WL 1821869, at *16 (finding no good cause for amendment where plaintiff possessed tax returns and other records, and therefore had imputed knowledge to discover relevant transfers for the previous four years); *see also In re*

12

*Western States*, 715 F. 3d at 737 (noting that case giving rise to new theory of liability was decided two years before plaintiff sought leave to amend); *see also* Dkt. No. 375 at p. 7 (admitting *Wayfair* decision garnered "considerable national media attention").

Even if the multi-year delay in asserting these allegations were not enough to deny leave to amend (it is), Mrs. Unatin has also failed to diligently prosecute her case and prepare for trial. For example, Mrs. Unatin served limited discovery in this case and never deposed anyone at the Company. She also used every tactic imaginable to try to delay resolution of this case, from not showing up to her deposition, to leaving her deposition early, to violating Court orders, and to seeking to stay this case and disqualify the Trustee's counsel. Courts deny Rule 16(b) motions where the moving party has shown this sort of lack of diligence in discovery. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006) (affirming finding of no good cause where "plaintiff's prior discovery efforts were not diligent."); *Johnson v. Maraj*, 2024 WL 4800086, at *4 (C.D. Cal. Oct. 30, 2024) (plaintiff did not satisfy "Rule 16(b)'s 'good cause' standard" given he waited until the "eleventh-hour" to pursue discovery); *In re Baroni*, 2017 WL 1207413, at *4 (failure to conduct discovery "is not compatible with a finding of diligence."); *Matrix Motor Co.*, 218 F.R.D. at 672 (similar).

Mrs. Unatin points to various health issues suffered by her counsel's family member and paralegal and the departure of one of her counsel's associates as a reason why she is seeking leave to amend now. *See* Dkt. No. 375 at 13-14. Although these circumstances are unfortunate, it is worth noting that these issues arose long after Mrs. Unatin and her former counsel were aware of the *Wayfair* allegations. In fact, these issues did not arise until after the fact discovery cutoff on August 11, 2025. *See id*. There is no explanation as to why Mrs. Unatin did not attempt to assert these allegations in this case *before the fact discovery cutoff*. These issues also did not prevent Mrs. Unatin from filing multiple motions in the bankruptcy proceeding to disqualify Hueston Hennigan and otherwise burden the Trustee. Nor did they prevent Mrs. Unatin from filing multiple motions in this proceeding, such as the stay motion and several discovery motions. In any event, courts have previously rejected similar arguments when determining whether a plaintiff diligently prosecuted her case. *See Matrix Motor Co.*, 218 F.R.D. at 672

13

(finding good cause not met under Rule 16(b)(4) even where lack of diligence explained by a "substituting … counsel … [who] is 68 years old, in poor health, and in a solo practice").

In short, Mrs. Unatin has not been diligent. Because her Motion seeks to modify the Scheduling Order, she must establish "good cause" under Rule 16(b) to amend her complaint. She failed to do so. The Court can deny the Motion on this basis alone without reaching the Rule 15(a) analysis.

**C.    Even Under Rule 15(a), Mrs. Unatin's Proposed Fourth Amended Complaint Is Unduly Prejudicial, in Bad Faith, and Futile**

Though Mrs. Unatin does not show the good cause required under Rule 16(b) to reach Rule 15(a)'s analysis, she is not entitled to amend her complaint under Rule 15(a) anyway. Each of the factors courts consider when denying leave to amend is present here, including a long and unexplained delay, undue prejudice to the Trustee, bad faith, and futility. The Court can and should deny Mrs. Unatin's request for leave under Rule 15(a) for the following reasons.

As an initial matter, Mrs. Unatin's more-than-two-year delay in asserting these allegations greatly prejudices the Trustee. The Trustee diligently conducted discovery into Mrs. Unatin's existing claims.[1] Among other things, the Trustee served written and document discovery and deposed Mrs. Unatin, all of which exposed that Mrs. Unatin has no evidence for any of her allegations. The Trustee is now preparing to file a summary judgment motion in just a few weeks to dispose of this case. Mrs. Unatin, by contrast, apparently kept these allegations in her back pocket and is now wielding them to mount a collateral attack on the Court's prior rulings denying her efforts to stay or obstruct these proceedings and to further delay her defeat at summary judgment. Permitting these new allegations now would require the Trustee to start over: conduct new written and document discovery and depose Mrs. Unatin again so that the Trustee can gather evidence proving anew that this case should be dismissed.

---

[1] The previous trustee and the Trustee here have spent millions of dollars investigating and litigating Mrs. Unatin's allegations. Robert Kors' multi-month investigation determined that these claims were frivolous. *See In re Kfir Gavrieli*, No. 2:21-bk-10826-BB, Dkt. No. 672 at 35. ("Having found no evidence to support the Unatins' claims of mismanagement, and the Unatins having failed to provide such evidence … the Trustee decided there was no basis to remove the Debtor from the management of the Company as the Unatins have advocated.").

14

Courts routinely deny leave to amend under Rule 15(a) where the plaintiff needlessly delays in bringing the new allegations and would force the defendant to pivot in discovery. *See AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) (delay of 15 months that required "parties to scramble" in discovery of new claims caused undue prejudice and warranted denial of leave to amend); *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (affirming refusal to amend where facts were available to moving party in part because amendment prejudiced defendant); *Zivkovic*, 302 F.3d at 1087 (court "may deny a motion for leave to amend if permitting an amendment would, among other things, cause an undue delay in the litigation or prejudice the opposing party"); *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th Cir. 1999) ("A need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend the complaint."); *Fed. Trade Comm'n v. Kutzner*, 2017 WL 5229182, at *5 (C.D. Cal. June 12, 2017), *aff'd sub nom. Fed. Trade Comm'n v. Marshall*, 781 F. App'x 599 (9th Cir. 2019) (denying leave to amend where new allegations "would require further depositions and discovery" on the eve of discovery deadline).

Mrs. Unatin's delay, combined with her discovery misconduct and her numerous frivolous motions, constitutes sufficient bad faith to warrant denial of leave to amend. *See Trans Video Electronics, Ltd. v. Sony Electronics, Inc.*, 278 F.R.D. 505, 510 (N.D. Cal. 2011) ("[U]ndue delay combined with bad faith is enough to justify a denial of a motion to amend."). Since the parties' voluntarily standstill expired in June 2025, Mrs. Unatin failed to pursue discovery by the August 11, 2025 deadline, delayed responding to the Trustee's written discovery for months, did not appear for her originally noticed deposition, and then walked out of her rescheduled deposition, all the while moving for an indefinite stay and seeking to disqualify the Trustee's counsel. Her counsel also previously agreed that Mrs. Unatin *would not seek to revisit the fact discovery deadline* after it had passed. *See* Dkt. No. 321 at 129. That she has gone back on that promise is further evidence that this Motion is yet another delay tactic intended to keep this case open despite no credible evidence. *See Trans Video Electronics, Ltd.*, 278 F.R.D. at 510 (tactical decision to withhold claims until summary judgment "smacks of

15

gaming the Court and opposing party"); *Bonin v. Calderon*, 59 F.3d 815, 846 (9th Cir. 1995) (affirming denial of leave to amend where "district court correctly found that [plaintiff] had acted in bad faith by not proposing the amendments earlier")

Finally, Mrs. Unatin's Motion should also be denied because the amendment is futile: there is no merit to these tax allegations. To begin, Mrs. Unatin seeks to amend her complaint for the *fourth* time, so the Court has wide discretion to deny leave to amend. *Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016); *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013). The Court should exercise that discretion here because Mrs. Unatin's allegations are meritless. As of the Supreme Court's 2018 *Wayfair* decision, all companies were not in compliance, and in the years since, the landscape, rules, and interpretations have been shifting dramatically. The Company has accountants and lawyers advising it on the complex issues surrounding *Wayfair* compliance, and the Company's actions have decreased its tax liability. And as for the California tax allegations, in the more than eight years since Mrs. Unatin left the Company, there have been no allegations or findings that the Company has underpaid any California taxes.

More importantly, Mrs. Unatin offers no reasonable explanation for what damages the Company has suffered because of the "Wayfair" or California tax issues she alleges exist. Incurring tax liability through the operation of the company (such as selling products in various states) does not constitute damages as a matter of law. *See Leighton*, 90 F.3d at 1449 (tax liability is the result of tax code and therefore not damages). Mrs. Unatin points to the payments the Company made to Wisconsin, but those tax payments pale in comparison to the tax savings the Company has derived from its response to the changing tax landscape, further undermining any possible allegations of damages. Granting Mrs. Unatin leave to amend her complaint would therefore be futile.

The Court should therefore deny leave to amend under Rule 15(a).

## V.     **CONCLUSION**

Despite Mrs. Unatin's effort to modify the Scheduling Order through the "liberal" standard for amending pleadings under Rule 15(a), she must first establish that she has good

16

cause for doing so under Rule 16(b). She cannot show good cause because she has been far from diligent in pursuing her claims and prosecuting this case. There is no justification for reopening discovery to allow Mrs. Unatin to pursue new but equally meritless claims. Mrs. Unatin should be denied leave to amend even under Rule 15(a), as her bad faith delay in asserting these futile allegations would cause great prejudice to the Trustee, who would have to restart discovery to disprove Mrs. Unatin's new allegations. The Trustee therefore respectfully requests that the Court deny Mrs. Unatin's Motion so that the Trustee can proceed with moving for summary judgment to resolve this long-pending adversary proceeding.

Dated: April 28, 2026                    HUESTON HENNIGAN LLP

                                         By: _____
                                             Allison L. Libeu
                                             Attorneys for J. Michael Issa,
                                             the Post-Effective Date Trustee

TRUSTEE'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND RE WAYFAIR
ADV. NO: 2:21-AP-01034-BB

7387121

# EXHIBIT A

CHRISTOPHER E. PRINCE (SBN 183553)
  cprince@lesnickprince.com
LESNICK PRINCE PAPPAS & ALVERSON LLP
315 W. Ninth Street, Suite 705
Los Angeles, CA  90015
T: (213) 493-6496 | F: (213) 493-6596

Attorney for Plaintiff Dikla Gavrieli, individually
and derivatively on behalf of Gavrieli Brands,
LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>KFIR GAVRIELI,<br><br>                    Debtor. | Case No.  2:21-bk-10826-BB<br><br>Chapter 11<br><br>Adv. No.  2:21-ap-01034-BB |
| DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, individually and derivatively on behalf of GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>                    Plaintiff,<br><br>        v.<br><br>KFIR GAVIELI, an individual,<br><br>                    Defendant.<br><br>-and-<br><br>GAVRIELI BRANDS, LLC, a California limited liability company,<br><br>               Nominal Defendant. | **PLAINTIFF DIKLA GAVRIELI A/K/A DIKLA GAVRIELI UNATIN'S FIRST SUPPLEMENTED AND AMENDED RESPONSES TO POST-EFFECTIVE DATE TRUSTEE'S SECOND SET OF INTERROGATORIES**<br><br>_____ |

PRPOUNDING PARTY:   J. MICHAEL ISSA, IN HIS CAPACITY AS THE POST-

                             EFFECTIVE DATE TRUSTEE

RESPONDING PARTY:   DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN

SET NUMBER:           Two (Nos. 17-18)

Pursuant to Federal Rule of Civil Procedure 33, made applicable by Federal Rule of Bankruptcy Procedure 7033, Plaintiff Dikla Gavrieli a/k/a Dikla Gavrieli Unatin ("Plaintiff" or "Responding Party") responds to J. Michael Issa, in his capacity as the Post-Effective Date Trustee for the Gavrieli Plan Trust's ("Propounding Party") Second Set of Interrogatories as follows:

### PRELIMINARY STATEMENT

The following responses and objections have been prepared prior to the completion of Responding Party's investigation, discovery, and preparation for trial in this action. The responses and objections are based only on information, facts, and documents currently available and known to Responding Party as of the date of such responses and objections and to the best of Responding Party's information and belief. Responding Party reserves its right to make changes to the responses and objections if it appears that omissions or errors have been made in them, or that further and more accurate information, facts, and/or documents are available. Responding Party also reserves its right to rely upon and/or introduce into evidence at trial or any pre-trial proceeding any additional information, facts, and/or documents.

Responding Party's responses and objections are for the purpose of discovery only and are not an admission or acceptance that any response, fact, or document is relevant and/or admissible into evidence. Responding Party reserves its right to object to the admissibility of any response, fact, or document at the time of trial or any pre-trial proceeding.

### RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 17:**

DESCRIBE all valuations of YOUR interest in the COMPANY conducted at any time during the RELEVANT PERIOD, including (a) who conducted each valuation, (b) the purpose for which each valuation was conducted, and (c) the value assigned to YOUR interest in the COMPANY during each valuation.

**RESPONSE TO INTERROGATORY NO. 17:**

Plaintiff objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and the attorney work product doctrines. Without waiving this objection, Plaintiff responds as follows:

Defendant, the Company and the PEDT have provided information relevant to their own valuations of the Company. Plaintiff has not, at this stage, performed her own valuation and has not obtained a valuation from any person retained for that purpose.

**INTERROGATORY NO. 18:**

IDENTIFY all DOCUMENTS supporting YOUR responses to the Post-Effective Date Trustee's Interrogatory No. 1.

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiff has previous produced documents within her possession, custody, or control that could be located after a reasonably diligent search to the Defendant and/or his agent(s) in connection with this adversary proceeding, during the course of Kfir Gavrieli's personal bankruptcy case in the United States District Court for the Central District of California, Case No. 2:21-bk-10826-BB, and during the course of the case styled *Gavrieli v. Gavrieli*, Case No. BC686856, in the Los Angeles Superior Court, which supports her responses to Interrogatory No. 1. Given the vast breadth and scope of Interrogatory No. 1 (which asked the Plaintiff to identify all facts supporting her contention that "Defendant intentionally, knowingly, recklessly, and in a grossly negligent manner caused the Company's performance to decline and did nothing to try to prevent, arrest, or reverse the decline"), the Plaintiff maintains that the entire production is relevant to her response to Interrogatory No. 1. Plaintiff reserves the right to supplement or amend this response as additional documents are produced.

2

DATED: December 30, 2025          LESNICK PRINCE PAPPAS & ALVERSON LLP


By: /s/ Christopher E. Prince
    Christopher E. Prince
    Counsel for Plaintiff Dikla Gavrieli a/k/a Dikla
    Gavrieli Unatin, individually and derivatively
    on behalf of Gavrieli Brands, LLC

3

### Verification

I have read the foregoing PLAINTIFF DIKLA GAVRIELI A/K/A DIKLA GAVRIELI UNATIN'S FIRST SUPPLEMENTED AND AMENDED RESPONSES TO POST-EFFECTIVE DATE TRUSTEE'S SECOND SET OF INTERROGATORIES and know its contents.

I am a party to this action. The matters stated in the foregoing documents are true of my own knowledge, except as to those matters which are stated on information and belief, to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 30, 2025 at Los Angeles, California.

_____
Dikla Gavrieli Unatin

4

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Lesnick Prince Pappas & Alverson LLP, 315 W. 9th Street, Suite 705, Los Angeles, CA 90015

A true and correct copy of the foregoing document entitled **PLAINTIFF DIKLA GAVRIELI A/K/A DIKLA GAVRIELI UNATIN'S FIRST SUPPLEMENTED AND AMENDED RESPONSES TO POST-EFFECTIVE DATE TRUSTEE'S SECOND SET OF INTERROGATORIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2**.  **SERVED BY UNITED STATES MAIL**:
On (*date*), I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3**.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 12/30/2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

   **VIA EMAIL:**
   Marshall A. Camp  -  mcamp@hueston.com  (counsel for J. Michael Issa, Post-Effective Date Trustee)
   Allison L. Libeu  -  alibeu@hueston.com  (counsel for J. Michael Issa, Post-Effective Date Trustee)

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/30/2025 | Christopher E. Prince | /s/ Christopher E. Prince |
|------------|----------------------|---------------------------|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

# EXHIBIT B

LATHAM & WATKINS LLP
  Daniel Scott Schecter (Bar No. 171472)
  *daniel.schecter@lw.com*
  Nima H. Mohebbi (Bar No. 275453)
  *nima.mohebbi@lw.com*
  Tara A. McCortney (Bar No. 334942)
  *tara.mccortney@lw.com*
  Alexandra N. Ibrahim (Bar No. 340972)
  *alexandra.ibrahim@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Telephone: +1.424.653.5500
Facsimile: +1.424.653.5501

Attorneys for Plaintiff Dikla Gavrieli
a/k/a Dikla Gavrieli Unatin

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 2:21-bk-10826-BB (Chapter 11) |
| KFIR GAVRIELI, | Adversary No. 2:21-ap-01034-BB |
| Debtor. | **PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES TO POST-EFFECTIVE DATE TRUSTEE'S FIRST SET OF INTERROGATORIES** |
| DIKLA GAVRIELI a/k/a DIKLA GAVRIELI UNATIN, on behalf of GAVRIELI BRANDS, LLC, a California limited liability company, | Judge:        Hon. Sheri Bluebond |
| Plaintiff, | |
| v. | |
| KFIR GAVRIELI, an individual, | |
| Debtor, | |
| - and - | |
| GAVRIELI BRANDS, LLC, a California limited liability company, | |
| Nominal Defendant. | |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Plaintiff Dikla Gavrieli a/k/a Dikla Gavrieli Unatin hereby submits the following objections and responses ("Responses") to the Post-Effective Date Trustee's[1] First Set of Interrogatories ("Interrogatories").

## PRELIMINARY STATEMENT

Without in any way waiving or limiting her objections, Plaintiff has attempted in good faith to provide responses to the Interrogatories to the extent reasonably practicable at this stage of the proceedings and based upon information known and reasonably knowable to Plaintiff.

Without undertaking any obligation to do so, except to the extent required under Rule 26(e)(1)(A) of the Federal Rules of Civil Procedure, as applied through Rule 7026 of the Federal Rules of Bankruptcy Procedure, Plaintiff reserves her right to change or supplement her Responses as additional facts or documents are discovered, revealed, recalled or otherwise ascertained, and as further analysis, research, investigation and discovery disclose additional facts, documents, contentions, or legal theories which may apply.  Plaintiff specifically reserves the right to utilize subsequently discovered facts, documents or evidence at trial or in later proceedings.

No incidental or implied admissions are intended by these Responses and none should be made.  Nothing stated in these Responses is an admission of a fact or document referred to or assumed in any Interrogatory, or an admission that anything stated in these Responses is admissible evidence, or a waiver of any objection.

The General and Specific Objections set forth below are intended to apply to all information produced or provided pursuant to the Interrogatories.  Furthermore, these Responses do not in any way waive any objections by Plaintiff, in this or in any subsequent proceeding, on

---

[1] J. Michael Issa was appointed as Post-Effective Date Trustee for the Post-Effective Date Trust established by the Order Confirming Chapter 11 Trustee's Second Amended Plan of Reorganization, dated May 31, 2022, in the Chapter 11 bankruptcy case, *In re Kfir Gavrieli*, No. 21-10826.  The Post-Effective Date Trustee is authorized by said Order to act as the representative of Kfir Gavrieli's bankruptcy estate for all purposes.  However, these Responses refer to Kfir Gavrieli as "Defendant."

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

any grounds, including objections as to competency, authenticity, relevancy, materiality, privilege or admissibility of the Responses, or the subject matter thereof.

## GENERAL RESPONSES AND OBJECTIONS

Plaintiff incorporates each of the following General Objections into her Responses and objections to each individual Interrogatory:

1. Plaintiff interposes the following General Objections to the Interrogatories. These objections are made to the Interrogatories in general, as well as each and every individual Interrogatory contained therein, and are incorporated by reference into each specific Response set forth below. Each Response therefore is made subject to, and without waiver of, these General Objections. Plaintiff's answers or objections to any Interrogatory are not an admission of any fact set forth or assumed by that Interrogatory. Furthermore, each answer to each Interrogatory is not an admission that such answer or objection constitutes admissible evidence.

2. Plaintiff's Responses herein are based upon the facts as they are known at this time. Plaintiff notes that her investigation into this matter is still continuing, and during the continuing course of discovery, Plaintiff may become aware of additional data, documentation and/or other and more specific facts which may be material to her Responses herein. Accordingly, except as required under the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure, Plaintiff reserves her right to supplement or modify these Responses, in her sole discretion.

3. Plaintiff objects to each Interrogatory to the extent that it calls for the disclosure or production of information and/or identification of documents that are protected by the attorney-client privilege, joint defense or common-interest doctrine, attorney work product doctrine, the spousal privilege, tax return privileges, or any other applicable privileges, immunities, or limitations on discovery. To the extent such information and/or documents are privileged or reflect attorney work product Plaintiff will not divulge such information and/or detail protected documents. Any inadvertent disclosure of information covered by such privileges, immunities, or discovery limitations does not waive any of Plaintiff's rights to assert such privileges, immunities, or discovery limitations.

3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

4.      Plaintiff objects to each Interrogatory to the extent that it is vague and ambiguous. Without waiver of her objections, Plaintiff has made reasonable interpretations of Defendant's intended meanings and will respond accordingly to such interpretations as set forth below.

5.      Plaintiff objects to each Interrogatory as overbroad, unduly burdensome, oppressive, vague, ambiguous and uncertain insofar as the instructions and definitions used in the Interrogatories purport to impose obligations on Plaintiff beyond the scope of the Federal Rules of Procedure and the Federal Rules of Bankruptcy Procedure.

6.      Plaintiff objects to each Interrogatory as overbroad, unduly burdensome and oppressive to the extent that the information requested is not clearly identified or not identified with sufficient particularity.

7.      Plaintiff objects to each Interrogatory as compound and unduly burdensome to the extent that it calls for multiple answers related to multiple topics.

8.      Plaintiff objects to each Interrogatory as overbroad, unduly burdensome and oppressive to the extent that it is more appropriately answered by other parties, or to the extent it seeks information that is already in the possession, custody or control of Defendant or available to Defendant from other readily accessible sources.

9.      Plaintiff objects to each Interrogatory to the extent it may be construed to require disclosure of information containing proprietary, confidential, private and/or competitively-sensitive information not otherwise protected by express court order or stipulation.

10.     Plaintiff objects to each Interrogatory as overbroad, unduly burdensome and oppressive to the extent that it seeks information that is not relevant to the subject matter of this action; is not reasonably calculated to lead to the discovery of admissible evidence; and/or is otherwise beyond the scope of permissible discovery.

11.     Plaintiff objects to each Interrogatory to the extent it seeks information that is publicly available.

12.     Plaintiff objects to each Interrogatory to the extent it seeks information in violation of Plaintiff's or third parties' rights of privacy, including any state or local laws,

4

LATHAM&WATKINSᴸᴸᶠ
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

ordinances, rules, or regulations protecting employee information.  Plaintiff's responses shall not be deemed to be a waiver of her or any third parties' rights with respect to such information.

13.     Plaintiff objects to each Interrogatory to the extent that it requires her to respond by stating or identifying "all," "each," or "every" potentially responsive fact or document because such a requirement is overbroad, vague, and unduly burdensome and, if read literally, full compliance may be impossible.

<strong><u>SPECIFIC RESPONSES AND OBJECTIONS</u></strong>

**<u>INTERROGATORY NO. 1:</u>**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 33 of the TAC that "Defendant intentionally, knowingly, recklessly, and in a grossly negligent manner caused the Company's performance to decline and did nothing to try to prevent, arrest, or reverse the decline."

**<u>RESPONSE TO INTERROGATORY NO. 1:</u>**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about Gavrieli Brands, LLC's (the "Company") operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the

5

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

judgment in the State Court Litigation[2] (the "State Court Judgment"[3]) and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of *In re Gavrieli*, Case No. 2:21-bk-10826-BB, filed in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Case").[4]  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019), and nothing since.  Simply put, Defendant has improperly denied Plaintiff access to critical Company information for approximately six years to conceal his mismanagement and self-dealing.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff responds as follows:

Under Defendant's sole control of the Company, the Company experienced steep declines in sales and net income both prior to and following the July 22, 2019 accrual date set by the Court for Plaintiff's claims (the "Court Ordered Accrual Date").  While the Company's massive decline under Defendant's sole control is irrefutable and documented by a forensic accountant hand-picked by Defendant, Defendant acknowledged the decline and the Company's "downward trajectory in sales and income" in his first-day declaration filed with this Court under penalty of perjury on February 5, 2021.  (Bk. Dkt. 36,[5] the "Defendant's FDD").  Thus, it is beyond dispute, as Defendant stated to the Court in the FDD – two and a half years ago and

---

[2] The "State Court Litigation" refers to the case styled *Gavrieli v. Gavrieli*, Case No. BC686856, filed in Los Angeles Superior Court.

[3] The "State Court Judgment" refers to the final judgment rendered in the State Court Litigation on January 22, 2021.

[4] In citations, the Bankruptcy Case will be referred to as "Bk. Dkt."

[5] As used herein, "Bk. Dkt." refers to the case styled *In re Gavrieli*, Case No. 2:21-bk-10826-BB, filed in the United States Bankruptcy Court for the Central District of California, Los Angeles Division.

6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

under penalty of perjury – that Defendant knew at least as of February 2021 that the Company faced "significant economic challenges," "supply chain [] disruption," "costs rising," "increased competition," and "demand dropping." (Defendant's FDD, ¶ 10).  During the Relevant Period, Defendant alone controlled the Company and was responsible for the Company's management and response to the challenges it faced as well as the pursuit of any opportunities to offset these challenges.

Defendant's intentional, knowing, reckless, and grossly negligent management of the Company is illustrated by his failure to take any steps to address these challenges, either in the period from the Court Ordered Accrual Date through February 5, 2021 (when he signed and filed the FDD), or in the nearly two and a half years since he signed and filed the FDD with this Court.  Indeed, as just one example, despite testifying under oath to this Court that "the Company may need to significantly expand its sales and marketing channels," (*id.*), and despite retaining an ample stockpile of cash on hand (at times in excess of $20 million), Defendant has:

- Caused and/or failed to prevent the massive decline in Company sales or to otherwise develop or implement strategies to address the Company's financial decline;

- Refused to diversify the Company's product line; refused to meaningfully expand the Company's sales and marketing channels by marketing and selling Company products on other ecommerce sites (e.g., Amazon), or via traditional retailers, wholesalers, or other distributors; and failed to market the Company's products outside the United States in jurisdictions where the Company invested in acquiring patent and/or trademark rights;

- Done nothing to adapt to claimed changing consumer demands and industry trends, such as offering new products or new product designs, even while the Company's competitors expanded their product offerings and sales channels;

- Allowed the Company's website to remain its sole sales channel while failing to update and maintain the website to industry standards, causing the website to

7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

appear virtually unchanged throughout the approximately six years of Defendant's sole control and during the Relevant Period;

- Failed to address the rise of "sophisticated and well-funded competitors" and "well-funded new entrants" Defendant acknowledged to the Court in his FDD (Defendant's FDD ¶¶ 8, 10);

- Spent millions of dollars on digital advertising campaigns Defendant knew were stale and declining in performance;

- Refused to adjust to a marketplace Defendant knew to be changing, and watched as the brand's previously stellar and valuable goodwill eroded despite his own public acknowledgement that brands must grow and change, switch gears, and change course when something is not working, when trends change, or when technologies improve;

- Done nothing to hire or utilize experienced employees to improve Company weaknesses or perceived limitations, instead relying entirely on the same handful of employees who were present for the Company's decline; and

- Done nothing to hire or utilize outside professionals, experts, or consultants to advise on possible strategies to address the Company's decline.

Defendant's intentional, knowing, reckless, and grossly negligent management of the Company must be viewed in light of the fact that the Company has had ample cash reserves during the Relevant Period[6] to address the headwinds and challenges that Defendant identified in his FDD over two years ago.  During the Relevant Period, Defendant has caused the Company to retain millions of dollars in cash, at times in excess of $20 million.  This is an unprecedented amount for the Company or for any ecommerce company with comparable sales and profits during the Relevant Period.  Plaintiff only has limited, view-only access to the Company's bank account at First Republic Bank (ending in -1076), where the Company's cash reserves are held, but based on this information, it appears that from January 2021 through July 2023, the average

---

[6] "Relevant Period" as used herein refers to July 22, 2019 through the present.

8

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

month-end balance for the Company's bank account ending in -1076 was approximately $17,153,073.  Before Defendant assumed sole control of the Company in 2017, the Company typically maintained far lower cash on hand; for example, the year-end account balance for 2015 was only $701,091.25.

Moreover, the cash on hand understates the Company's true position because Defendant has – without any business justification – pre-purchased and maintained vast amounts of inventory so as to artificially reduce the amount of cash on hand by converting it into excess inventory on hand, in transit, or in storage, and which appears to be wholly disconnected from the Company's needs over the Relevant Period.  In addition, Defendant has refused to return to the Company over $1.5 million dollars of Company funds on deposit at Kiva.org.  Due to Defendant's actions, those substantial funds remain out of the Company's immediate control, uninsured, and subject to risk, for no legitimate business purpose other than Defendant's own self-serving goals.

Examples of Defendant's intentional, reckless, and/or grossly negligent conduct also include the following:

1.      Defendant has failed to maintain, leverage, or expand the Company's brand and sales through various available and potentially lucrative channels.  This includes Defendant's refusal to make the Company's products available through:  any other online retail channels, including hugely popular online marketplaces such as Zappos and Amazon; any traditional brick and mortar retail channels, including retailers such as Nordstrom, Bloomingdales, or Macy's; any other third party wholesale or other distribution opportunities, such as boutiques; or any first-party retail opportunities, such as Company-operated or branded stores, pop-ups, or kiosks, like the Company's competitors.  Instead, Defendant has deliberately caused the Company's product to be available only on the Company's own limited website while sales and profits plummeted.  In doing so, Defendant has intentionally caused or exacerbated the effects of the alleged challenges he claims contributed to the Company's disastrous financial performance while under his control.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

2.      Defendant has failed to expand or meaningfully refine the Company's product line.  Defendant has refused to offer even the most basic additional products to broaden the Company's single-style shoe line, such as additional style women's flats, (i.e. pointed toe, loafer, etc.).  Nor has he expanded the Company's brand beyond women's flats as countless other companies in the sector have done, eschewing potential products such as women's sneakers, sandals, men's footwear, handbags and other accessories.  This includes various products which were not only previously discussed at the Company before Defendant assumed sole control, but many product types where the Company has already invested significant funds to protect its intellectual property.  Instead, Defendant has deliberately caused the Company to offer the same, single shoe design, which is the only design that the Company ever has offered, virtually unchanged for over a decade.

3.      Defendant has also failed to market the Company's products in numerous lucrative markets, such as international markets, despite having considerable resources to do so and extensive trademark and patent rights in foreign countries.  For example, Defendant has failed to market the Company's product in countries where the Company long ago invested significant resources to protect its intellectual property, including obtaining extensive foreign patents and registrations for its "TIEKS" and other trademarks.  A summary of the Company's international patent holdings as of 2017 (from before Defendant's seizure of control of the Company) is attached hereto as **Appendix 1**; a summary of the Company's international trademark holdings as of 2017 is attached hereto as **Appendix 2**.  Defendant has refused to market the Company's product in major markets throughout Europe, Asia, and around the globe, as well as in obvious and easy-to-launch English-speaking countries, such as Australia, New Zealand, Canada, and the United Kingdom.

4.      Relatedly, Defendant has failed to expand the Company's brand into other product categories previously discussed and planned by the parties prior to the Relevant Period, including various categories in which the Company has long since invested significant resources to protect its intellectual property in preparation for that expansion.  The Company maintains significant intellectual property holdings in product classes other than shoes (for example,

10

handbags, apparel, wallets, etc.).  For instance, the Company previously has registered, or applied to register, the "TIEKS" trademark product categories including, but not limited to the following classes of goods: shirts, blouses, sweaters, sweatshirts, coats, jackets, ponchos, raincoats, blazers, cardigans, vests, skirts, dresses, gowns, shorts, pants, jeans, leggings, sweatpants, suits, tuxedos, hats, scarves, shawls, underwear, bodysuits, sleepwear, bathrobes, socks, hosiery, belts, suspenders, gloves and mittens, earmuffs, neckties, and neckwear; bags made of leather or imitations of leather adapted for portable consumer electronic devices, namely mobile phones, tablets, laptops, and PDAs; mugs; drinking cups; shoe cream; apparel, namely, shirts; tote bags; shoe bags for travel; crossbody bags; jewelry; online retail store services featuring handbags and footwear; footwear; retail store and online retail store services; retail store and online retail store services featuring cosmetics and personal care products, fragrances, eyewear, smartphone and table cases, jewelry, luggage and handbags, housewares, bedding, tableware, textiles, towels, apparel and footwear; eyewear, sunglasses, spectacles, sunglasses and spectacles cases and frames, optical frames; pouches and bags adapted to carry sunglasses and spectacles; laptop cases, laptop bags; mobile phone cases; downloadable electronic publications in the nature of magazines in the field of fashion, travel, lifestyle and consumer products; beverage glassware; porcelain mugs and works of art; tableware being dishes and plates of glass, porcelain, and earthenware; plates, cups, saucers, mugs, bowls, servings dishes; drinking glasses; insulating sleeve holder made of leather for beverage cups; pots, pans, saucepans, vases, decanters, drinking flasks, stirrers for cocktails; ice buckets, glass boxes; money boxes; napkin holders and rings; bottle openers, candlesticks, perfume sprayers sold empty; perfume burners; perfume atomizers, sold empty; soap dishes, soap dispensers, lotion dispensers, cosmetic brushes, nail brushes, footwear brushes, shoe trees, shoe stretchers, flower pots; infant's and children's clothing, namely, shirts, blouses, sweaters, sweatshirts, coats, jackets, ponchos, raincoats, blazers, cardigans, vests, skirts, dresses, gowns, shorts, pants, jeans, leggings, sweatpants, suits, tuxedos, hats, scarves, shawls, underwear, bodysuits, sleepwear, bathrobes, socks, hosiery, belts, suspenders, gloves and mittens, earmuffs, neckties, and neckwear; kerchiefs and pocket squares; swimwear; footwear; headwear; jewelry; watches; jewelry and personal

11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

accessories, namely, broaches, cufflinks, and jewelry charms not included in other classes; jewelry made of precious and non-precious metals; clocks and timepieces; cosmetic bags sold empty; handbags; umbrellas; carrying cases; travel bags and articles for traveling not included in other classes, namely, garment bags, trunks, cases, grooming organizers, leather bags, overnight bags, weekend bags, backpacks, gym bags, diaper bags, beach bags, belt bags and hip bags, hobo bags, crossbody bags, all-purpose reusable carrying bags, baggage tags for travel baggage and shoe bags for travel; luggage; purses; wallets; clutches; messenger bags; utility bags in the nature of all-purpose carrying bags; sports bags; tote bags; shoe bags for travel; cologne; cosmetic preparations for body care; cosmetics; fragrances for personal use; perfumes; hair care preparations; bath products, namely, bath oil, bubble bath, bath powder, cosmetic bath salts, shower gels and skin lotions; shoe cream, shoe polish, shoe wax; cleaning and polishing preparations, namely, cleaning and polishing preparations for leather, footwear, handbags, sunglasses; retail store and online retail store services featuring fashion goods; retail store and online retail store services featuring cosmetics and personal care products, fragrances, eyewear, smartphone and table cases, jewelry, luggage and handbags, housewares, bedding, tableware, textiles, towels, apparel and footwear.  These product lines, and the intellectual property rights held in those product classes, have remain unused throughout the Relevant Period while the Company's performance suffered significantly.  This also is in stark contrast to the Company's competitors, which have expanded into new product lines.  Thus, Defendant's intentional mismanagement of the Company's product line has limited the Company's sales entirely to a single shoe style, with no attempt to broaden that product line, limiting the Company's sales and performance in the face of catastrophic decline.

5.      Defendant has further mismanaged several of the Company's product lines, including:

   a.   Defendant mismanaged the Company's pioneering Vegan line, for which there was significant demand and rising consumer trends.  Instead, Defendant watched as competitors achieved tremendous success with non-leather footwear of similar design, while Defendant failed to properly market,

12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

expand, design, or otherwise capitalize on clear consumer demand, allowing the Company's own non-leather sales to languish. Rather than capitalize on these trends, Defendant chose to develop shoes made from materials that are of questionable suitability for the Company's style of footwear – such as velvet and suede – even though Defendant and Plaintiff previously had decided ***not*** to use such materials precisely because of these quality concerns and lack of demand.

b. Defendant took an unlaunched children's line with tremendous potential and mismanaged its marketing.

c. Defendant also relaunched shoes that were originally marketed as limited releases, undermining brand credibility and alienating customers who purchased "limited edition" or "seasonal" shoe colors, such as the "Champagne" and "Love Potion" shoes. The re-release and mass production of these so-called limited releases caused consumer confusion and the loss of trust.

d. Defendant launched other colors, including the "Mojave" and "Rouge Suede" shoes, which generated considerable negative feedback from customers. Other limited release colors, such as the "Poppy" or "Neon" colors were continually relaunched each year despite consumer fatigue and declining demand.

6. Based on the limited information available to Plaintiff, it appears that Defendant has mismanaged the Company's inventory and supply chain by generating costly surpluses of some styles, and insufficient supply of others. For example, the limited data available to Plaintiff indicates that despite plummeting sales, Defendant poured millions of dollars into inventory and purchasing. Defendant seemingly grew inventory by nearly 25% in 2019 alone and maintained an increasingly large stockpile of surplus inventory through 2020, 2021, and beyond. Defendant's stockpiling inventory goes beyond any reasonable metric given the Company's declining sales under his control, but served Defendant's purposes of creating the appearance

13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

that cash was unavailable for distribution to Plaintiff and Defendant via payments to tax authorities. Additionally, Defendant has made payments to suppliers that appear to have exceeded what was purchased, effectively pre-paying hundreds of thousands of dollars, or more, to suppliers to improperly reduce the Company's cash on hand. By maintaining a huge surplus of shoe inventory, Defendant also risks negatively impacting the quality and condition of the Company's fine leather shoes as they sit for months or years before selling. These long periods in storage can cause material degradation and also increase the potential for theft and other damage or loss. Despite these issues, Defendant added to the Company's multiyear supply of shoes on hand, and Plaintiff is informed and believes, based on the information available to her, that he has done so deliberately to manipulate and artificially reduce the Company's cash on hand available for distribution – all for his own personal purposes (i.e., his personal dispute with Plaintiff) – to the detriment of the Company.

7.     Defendant has mismanaged the Company's customer acquisition and advertising strategies. Based on limited information available to Plaintiff, including minimal information provided prior to the Relevant Period in discovery in the State Court Litigation, Plaintiff is informed and believes that Defendant has manipulated advertising budgets and customer acquisition mechanisms to artificially limit or otherwise lower sales, for example by limiting the reach, spend, or budget of well-performing ads to slow and restrict sales. In particular, Defendant implemented advertising mechanisms that terminated advertising campaigns after they reached a pre-set budget, even while the campaigns continued to generate profitable sales. The effect was to limit the reach of well-performing advertising campaigns, which would be automatically terminated the moment they exceeded Defendant's selected pre-set budget rather than when they stopped resulting in profitable sales (as had been the practice before Plaintiff's exclusion from the Company).

8.     Defendant has allowed the Company to spend massive amounts of money on stale and poor-producing ads. This includes incurring significant costs to run old ads to saturated audiences. At the same time, Defendant failed to invest in appropriate and emerging social media platforms and formats, such as short-form video. Defendant failed to establish an

14

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

appropriate presence on TikTok and similar platforms and has failed to appropriately utilize or otherwise advertise on those platforms, even as the industry observed the rise of video and short-form video in particular, and the accompanying shift in attention and advertising that trend created. Defendant also failed to properly utilize video content in other aspects of the Company's business, such as on the website and marketing campaigns, let alone make the appropriate investment in video as it became increasingly important. This includes causing the Company to not implement a Mother's Day campaign video in 2020 (or 2019) despite the Company having done so in 2017 and 2018.

9. Defendant has failed to implement meaningful marketing or advertising campaigns, failed to maintain or continue successful campaigns, and in other cases recycled stale campaigns from prior years. For example, in 2019-2022 the Company repeatedly relaunched a years-old "Neon" campaign, including reusing certain creative elements created and advertised earlier. Similarly, in 2020, Defendant launched the "Rosé" shoe by copying the Company's previous and heavily used "Champagne" shoe campaign.

10. Moreover, in the face of plummeting sales, Defendant also failed to implement promotions or other incentives to improve sales, instead making the confounding choice to *increase* prices in the face of what he claims was softening demand.

11. Defendant has mismanaged the Company's e-commerce website, which, due to Defendant's mismanagement described above, is its sole storefront and source of revenue. While maintaining massive cash reserves, which would have been more than adequate to fund any website functionality improvements, Defendant has failed to invest in or implement basic, industry standard applications and technologies that facilitate shopping online. For instance, the Company has not implemented Apple Pay, Amazon Pay, or Google Pay services on its website, nor has the Company implemented other basic features such as site search, product videos, SMS/text message communications for customer service and marketing, product reviews, push notifications, chatbots, multilingual support, referral programs, or product recommendations. Instead, Defendant uses an outdated, vulnerable, and costly e-commerce shopping cart platform that appears virtually unchanged throughout Defendant's control of the Company.

15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

12.     Plaintiff is further informed and believes that Defendant mismanaged the Company's customer experience/service operations, causing an increase in refunds, returns, expenses, and dissatisfaction with the brand.  The Company has pushed unsatisfied customers to accept poorly-executed repairs on products, leading to low customer satisfaction with repairs.  Defendant also has failed to improve upon the Company's limited customer service availability or implement various modern, industry-standard tools such as alternative communication channels or chatbots to supplement its live customer service personnel availability to maintain the high level of customer service that the Company was historically known for.

13.     Defendant has mismanaged and neglected the Company's business development efforts, brand partnerships, and other direct and third-party campaigns.  The Company traditionally receives numerous business inquiries and opportunities from a wide variety of businesses and potential partners, yet Plaintiff is informed and believes that Defendant has caused the Company to reject numerous potentially beneficial or lucrative offers.  Incredibly, while rejecting or ignoring promising inquiries from a variety of businesses, Defendant instead caused the Company to partner with his personal friend's company, Aspiration Bank, in which Defendant has a significant ownership interest.  As part of that partnership, Defendant asked the Company's high-end designer shoe clientele to sign up for an Aspiration Bank account and related financial services in exchange for a Tieks discount.  Defendant's self-serving, off-brand partnership was so unpopular and poorly executed that customers questioned whether the emails they received about it from the Company were spam.

14.     Defendant has failed to implement any reasonable or reliable bookkeeping system for the Company, even after purporting to reverse prior questionable tax and accounting practices.  Rather, Defendant still effectively runs the Company "out of a shoebox."  He waits until after a calendar year ends, and typically much longer, and then sends a host of bank and credit transactions to an outside forensic accountant who is then forced to try to reconstruct financial statements and a general ledger for the Company for the previous year.  Moreover, the bank account and credit card transactions sent to the accountant lack the necessary detail and itemization to properly classify business expenses.  Without a reliable bookkeeping system, the

16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Company is unable to contemporaneously track its finances in any reasonable way that reflects industry practice, let alone in a way that would allow it to react swiftly or appropriately to developing financial or operational trends.

15. Based on the limited information available to Plaintiff, Plaintiff is concerned that Defendant has caused the Company to spend millions of dollars in legal fees on litigation regarding the Company's intellectual property, with no apparent recovery. Defendant also caused the Company to expend substantial funds securing and maintaining intellectual property rights for a variety of products in various markets, all while failing to capitalize, market, or monetize this same intellectual property. Additionally, Defendant caused the Company to spend substantial funds to professionals that Defendant classified as legal fees or "other expenses" for matters which were unrelated to the Company or were otherwise improper. In addition, the Company's trademark counsel has advised the Company in writing that it should pursue international trademark protection for the Tiek blue color. Because Defendant has refused to provide Plaintiff with access to Company information, it is unknown to Plaintiff whether Defendant acted on this recommendation after he excluded Plaintiff from the Company. However, Plaintiff can find no indication that Defendant directed counsel or any other firm to pursue international trademark protection for the Tiek blue color per counsel's recommendation.

16. Defendant has also failed to address the supply chain disruptions, rising costs, increased competition, and reduced demand that he identified in his FDD. In the FDD, Defendant testified that the Company required significant cash reserves in order to address these headwinds. But based on the limited information available to Plaintiff, and as explained above, Defendant appears to have done nothing to use those cash reserves to address these business challenges. Instead, under Defendant's sole control, the Company's sales, profits, and value have plummeted.

17. Defendant failed to hire experienced employees or outside consultants. When confronted by the various business challenges Defendant identified in his FDD, as well the consistently declining financial results for the Company during the Relevant Period, Defendant

17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

consistently and deliberately failed to bring in any competent executives, directors, managers, employees, or experts to address the Company's catastrophic decline. Defendant has failed to hire any personnel (let alone individuals with meaningful prior experience working in such matters before working for/with the Company) to oversee the following functions for the Company on a regular basis: the Company's finances, bookkeeping, cash management, inventory management, operations, supply chain management, marketing, administration, sales, advertising, customer service, website design, website user interface and/or user experience, social media, technology, legal matters, and human resources. Defendant also has failed to hire any personnel (who had prior experience working in such matters before working for/with the Company) to act as the Company's chief executive officer on a regular basis, let alone any other executive leadership position.

18. Defendant compounded this by mismanaging the Company's personnel. For instance, Defendant rewarded perceived loyalty to him personally over those employees' performance and value to the Company. During the Relevant Period, Defendant used Company funds to give substantial "bonuses" and raises to certain Company employees and individuals who testified on his behalf during the State Court Litigation to reward their support for him. These bonuses and raises dramatically increased the total compensation to these individuals by 75-90% in a four-year period, making them the highest paid employees at the Company. Further, Defendant rewarded these individuals with these massive increases in their compensation, which he has continued to maintain, despite the Company's unprecedented poor financial performance over the same period.

19. In addition to Defendant's hoarding of Company cash noted above, Defendant continues to maintain between $15 and $20 million of Company funds in a simple checking account. Not only did this expose the Company to significant risk of a bank failure earlier this year as the funds were all on deposit with a single bank (First Republic Bank), but Defendant's cash management is depriving the Company of substantial interest that is available on safe investments, including U.S. Treasuries and money market funds. Based on the Company's

18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

recent bank balances, this is causing the Company damage in the form of lost interest of nearly $1,000,000 per year during the current high interest rate environment.

20.     Separate and distinct from the foregoing examples of Defendant's intentional, knowing, reckless, and grossly negligent management of the Company, Defendant rejected a straightforward proposal by Plaintiff (made on December 3, 2019), that the Company hire a mutually acceptable financial advisor to review the Company's options and situation given its quickening decline as of that time.  Defendant rejected that proposal even though, a year later, he openly acknowledged a number of financial and operational headwinds facing the Company in his FDD to this Court.  Defendant stated under oath in his Bankruptcy Case that the Company may need to expend capital to "significantly expand its sales and marketing channels." (Defendant's FDD, ¶ 10).  Yet throughout the Relevant Period, the Company has maintained large cash reserves, at times in excess of $20 million in cash sitting idle, which Defendant never deployed to expand, alter, or modify the Company's sales and marketing channels, add new product offerings, or take other steps to address the Company's decline.  Despite the Company having ample cash reserves that could have been utilized in multiple ways to address its downward trajectory, Defendant specifically rejected Plaintiff's proposal that the Company hire a mutually acceptable financial advisor to advise the Company in light of its plummeting financial performance.

Simply put, the Company's decline is not the result of some well-intentioned business strategy launched by Defendant which simply did not work.  It is not the result of a new product that fared poorly – the Company has not launched any new products during the Relevant Period. The decline is not the result of an unsuccessful entry into a new geographic market – the Company did not enter any new geographic markets during the Relevant Period.  The decline is not the result of an unsuccessful new sales channel – the Company has not expanded into new sales channels during the Relevant Period.  The decline is not the result of unsuccessful brick and mortar stores – the Company has not opened any stores during the Relevant Period.  The decline is not the result of burdensome debt service – the Company has carried no debt during the Relevant Period.  And the Company's decline is not the result of new executive leadership –

19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Defendant has caused himself to be the de facto Chief Executive Officer and only executive leadership at the Company during the Relevant Period.

The Company's decline under Defendant's sole control is the result of Defendant's self-serving and destructive decision to put his own personal interests ahead of the Company in his misguided attempt to inflict financial pain on Plaintiff and acquire her ownership interest for pennies on the dollar. Defendant's animus toward Plaintiff, and his intention to cause her and her family harm, is well-documented in Defendant's own words. By way of example, Defendant wrote (or stated in a voicemail) the following:

- "You and your husband will pay for any violations … And the cost will be severe … If you make a single wire without my permission I will never forgive you in my life and it will be all out nuclear war. I promise you on my life. Have no doubt about that. I dare you to cross me.";

- "HOW TO WHORE OUT YOUR FAMILY IN 20 EASY STEPS: The story of Dikla Unatin's life. Write it in your free time now. You will pay dearly for all this. Say goodbye to your supposed 40%. It is no more.";

- "When I make decisions you don't follow through on there will be consequences … I am done dealing with your bullshit. I will regulate as needed on you and Dean. There will be major changes. Don't fuck with me.";

- "Every time you and your bitch ass husband come at me, I'll come at you 5 times harder. Any pain or inconvenience you try to inflict on me, the business, mom, or the rest of the family, you and your family will feel multiples of that back. I promise you that. All day, every day, til the day I die. You will live to regret every misstep.";

- "[I]f you play like this I can promise you your life will be miserable.";

- "I want to be clear, in case the text wasn't clear enough. Not a single fucking wire goes out without my fucking permission. And every one that does, you and your bitch ass husband will pay a mother fucking price, I promise you. Not a single fucking wire. Trust me.";

20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- "You've forced me to come back to the office earlier than I should you dirty whore.  Challenge my authority today and see what happens."

These vile and explicit statements by Defendant lay bare his intention to suppress the Company's value and explain his otherwise shocking and inexplicable passivity as the Company's performance and valuation have nose-dived under his sole control, even while the Company maintained a massive cash stockpile that Defendant testified to this Court was necessary to address the Company's poor performance.

Individuals who may possess relevant information and documents include, but are not limited to, as-yet unidentified current and/or former employees of the Company, Defendant, Plaintiff, Dean Unatin, Yamit Betesh, as yet undetermined businesses with whom the Company and/or Defendant has contacted, engaged, and/or transacted business including, but not limited to, American Express Merchant Services, Bank of America, First Republic Bank, Braintree Payment Solutions LLC, Kiva, Meta, Alphabet, Pinterest, and Upwork.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 1.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the State Court Judgment and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of the Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019), and nothing since.  Simply put, Defendant has

21

improperly denied Plaintiff access to critical Company information for approximately six years to conceal his mismanagement and self-dealing. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff responds as follows:

Under Defendant's sole control of the Company, the Company experienced steep declines in sales and net income both prior to and following the Court Ordered Accrual Date. While the Company's massive decline under Defendant's sole control is irrefutable and documented by a forensic accountant hand-picked by Defendant, Defendant acknowledged the decline and the Company's "downward trajectory in sales and income" in his FDD filed with this Court under penalty of perjury on February 5, 2021. Thus, it is beyond dispute, as Defendant stated to the Court in the FDD – two and a half years ago and under penalty of perjury – that Defendant knew at least as of February 2021 that the Company faced "significant economic challenges," "supply chain [] disruption," "costs rising," "increased competition," and "demand dropping." (Defendant's FDD, ¶ 10). During the Relevant Period, Defendant alone controlled the Company and was responsible for the Company's management and response to the challenges it faced as well as the pursuit of any opportunities to offset these challenges.

Defendant's intentional, knowing, reckless, and grossly negligent management of the Company is illustrated by his failure to take any steps to address these challenges, either in the period from the Court Ordered Accrual Date through February 5, 2021 (when he signed and filed the FDD), or in the nearly two and a half years since he signed and filed the FDD with this Court. Indeed, as just one example, despite testifying under oath to this Court that "the Company may need to significantly expand its sales and marketing channels," (*id.*), and despite retaining an ample stockpile of cash on hand (at times in excess of $20 million), Defendant has:

- Caused and/or failed to prevent the massive decline in Company sales or to otherwise develop or implement strategies to address the Company's financial decline;

22

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- Refused to diversify the Company's product line; refused to meaningfully expand the Company's sales and marketing channels by marketing and selling Company products on other ecommerce sites (e.g., Amazon), or via traditional retailers, wholesalers, or other distributors; and failed to market the Company's products outside the United States in jurisdictions where the Company invested in acquiring patent and/or trademark rights;

- Done nothing to adapt to claimed changing consumer demands and industry trends, such as offering new products or new product designs, even while the Company's competitors expanded their product offerings and sales channels;

- Allowed the Company's website to remain its sole sales channel while failing to update and maintain the website to industry standards, causing the website to appear virtually unchanged throughout the approximately six years of Defendant's sole control and during the Relevant Period;

- Failed to address the rise of "sophisticated and well-funded competitors" and "well-funded new entrants" Defendant acknowledged to the Court in his FDD (Defendant's FDD ¶¶ 8, 10);

- Spent millions of dollars on digital advertising campaigns Defendant knew were stale and declining in performance;

- Refused to adjust to a marketplace Defendant knew to be changing, and watched as the brand's previously stellar and valuable goodwill eroded despite his own public acknowledgement that brands must grow and change, switch gears, and change course when something is not working, when trends change, or when technologies improve;

- Done nothing to hire or utilize experienced employees to improve Company weaknesses or perceived limitations, instead relying entirely on the same handful of employees who were present for the Company's decline; and

- Done nothing to hire or utilize outside professionals, experts, or consultants to advise on possible strategies to address the Company's decline.

23

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Defendant's intentional, knowing, reckless, and grossly negligent management of the Company must be viewed in light of the fact that the Company has had ample cash reserves during the Relevant Period to address the headwinds and challenges that Defendant identified in his FDD over two years ago.  During the Relevant Period, Defendant has caused the Company to retain millions of dollars in cash, at times in excess of $20 million.  This is an unprecedented amount for the Company or for any ecommerce company with comparable sales and profits during the Relevant Period.  Plaintiff only has limited, view-only access to the Company's bank account at First Republic Bank (ending in -1076), where the Company's cash reserves are held, but based on this information, it appears that from January 2021 through July 2023, the average month-end balance for the Company's bank account ending in -1076 was approximately $17,153,073.  Before Defendant assumed sole control of the Company in 2017, the Company typically maintained far lower cash on hand; for example, the year-end account balance for 2015 was only $701,091.25.

Moreover, the cash on hand understates the Company's true position because Defendant has – without any business justification – pre-purchased and maintained vast amounts of inventory so as to artificially reduce the amount of cash on hand by converting it into excess inventory on hand, in transit, or in storage, and which appears to be wholly disconnected from the Company's needs over the Relevant Period.  In addition, Defendant has refused to return to the Company over $1.5 million dollars of Company funds on deposit at Kiva.org.  Due to Defendant's actions, those substantial funds remain out of the Company's immediate control, uninsured, and subject to risk, for no legitimate business purpose other than Defendant's own self-serving goals.

Examples of Defendant's intentional, reckless, and/or grossly negligent conduct also include the following:

1.    Defendant has failed to maintain, leverage, or expand the Company's brand and sales through various available and potentially lucrative channels.  This includes Defendant's refusal to make the Company's products available through:  any other online retail channels, including hugely popular online marketplaces such as Zappos and Amazon; any traditional brick

24

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

and mortar retail channels, including retailers such as Nordstrom, Bloomingdales, or Macy's; any other third party wholesale or other distribution opportunities, such as boutiques; or any first-party retail opportunities, such as Company-operated or branded stores, pop-ups, or kiosks, like the Company's competitors.  Instead, Defendant has deliberately caused the Company's product to be available only on the Company's own limited website while sales and profits plummeted.  In doing so, Defendant has intentionally caused or exacerbated the effects of the alleged challenges he claims contributed to the Company's disastrous financial performance while under his control.

2.      Defendant has failed to expand or meaningfully refine the Company's product line.  Defendant has refused to offer even the most basic additional products to broaden the Company's single-style shoe line, such as additional style women's flats, (i.e. pointed toe, loafer, etc.).  Nor has he expanded the Company's brand beyond women's flats as countless other companies in the sector have done, eschewing potential products such as women's sneakers, sandals, men's footwear, handbags and other accessories.  This includes various products which were not only previously discussed at the Company before Defendant assumed sole control, but many product types where the Company has already invested significant funds to protect its intellectual property.  Instead, Defendant has deliberately caused the Company to offer the same, single shoe design, which is the only design that the Company ever has offered, virtually unchanged for over a decade.

3.      Defendant has also failed to market the Company's products in numerous lucrative markets, such as international markets, despite having considerable resources to do so and extensive trademark and patent rights in foreign countries.  For example, Defendant has failed to market the Company's product in countries where the Company long ago invested significant resources to protect its intellectual property, including obtaining extensive foreign patents and registrations for its "TIEKS" and other trademarks.  A summary of the Company's international patent holdings as of 2017 (from before Defendant's seizure of control of the Company) is attached hereto as **Appendix 1**; a summary of the Company's international trademark holdings as of 2017 is attached hereto as **Appendix 2**.  Defendant has refused to

25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

market the Company's product in major markets throughout Europe, Asia, and around the globe, as well as in obvious and easy-to-launch English-speaking countries, such as Australia, New Zealand, Canada, and the United Kingdom.

4.       Relatedly, Defendant has failed to expand the Company's brand into other product categories previously discussed and planned by the parties prior to the Relevant Period, including various categories in which the Company has long since invested significant resources to protect its intellectual property in preparation for that expansion.  The Company maintains significant intellectual property holdings in product classes other than shoes (for example, handbags, apparel, wallets, etc.).  For instance, the Company previously has registered, or applied to register, the "TIEKS" trademark product categories including, but not limited to the following classes of goods: shirts, blouses, sweaters, sweatshirts, coats, jackets, ponchos, raincoats, blazers, cardigans, vests, skirts, dresses, gowns, shorts, pants, jeans, leggings, sweatpants, suits, tuxedos, hats, scarves, shawls, underwear, bodysuits, sleepwear, bathrobes, socks, hosiery, belts, suspenders, gloves and mittens, earmuffs, neckties, and neckwear; bags made of leather or imitations of leather adapted for portable consumer electronic devices, namely mobile phones, tablets, laptops, and PDAs; mugs; drinking cups; shoe cream; apparel, namely, shirts; tote bags; shoe bags for travel; crossbody bags; jewelry; online retail store services featuring handbags and footwear; footwear; retail store and online retail store services; retail store and online retail store services featuring cosmetics and personal care products, fragrances, eyewear, smartphone and table cases, jewelry, luggage and handbags, housewares, bedding, tableware, textiles, towels, apparel and footwear; eyewear, sunglasses, spectacles, sunglasses and spectacles cases and frames, optical frames; pouches and bags adapted to carry sunglasses and spectacles; laptop cases, laptop bags; mobile phone cases; downloadable electronic publications in the nature of magazines in the field of fashion, travel, lifestyle and consumer products; beverage glassware; porcelain mugs and works of art; tableware being dishes and plates of glass, porcelain, and earthenware; plates, cups, saucers, mugs, bowls, servings dishes; drinking glasses; insulating sleeve holder made of leather for beverage cups; pots, pans, saucepans, vases, decanters, drinking flasks, stirrers for cocktails; ice buckets, glass boxes; money boxes; napkin

26

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

holders and rings; bottle openers, candlesticks, perfume sprayers sold empty; perfume burners; perfume atomizers, sold empty; soap dishes, soap dispensers, lotion dispensers, cosmetic brushes, nail brushes, footwear brushes, shoe trees, shoe stretchers, flower pots; infant's and children's clothing, namely, shirts, blouses, sweaters, sweatshirts, coats, jackets, ponchos, raincoats, blazers, cardigans, vests, skirts, dresses, gowns, shorts, pants, jeans, leggings, sweatpants, suits, tuxedos, hats, scarves, shawls, underwear, bodysuits, sleepwear, bathrobes, socks, hosiery, belts, suspenders, gloves and mittens, earmuffs, neckties, and neckwear; kerchiefs and pocket squares; swimwear; footwear; headwear; jewelry; watches; jewelry and personal accessories, namely, broaches, cufflinks, and jewelry charms not included in other classes; jewelry made of precious and non-precious metals; clocks and timepieces; cosmetic bags sold empty; handbags; umbrellas; carrying cases; travel bags and articles for traveling not included in other classes, namely, garment bags, trunks, cases, grooming organizers, leather bags, overnight bags, weekend bags, backpacks, gym bags, diaper bags, beach bags, belt bags and hip bags, hobo bags, crossbody bags, all-purpose reusable carrying bags, baggage tags for travel baggage and shoe bags for travel; luggage; purses; wallets; clutches; messenger bags; utility bags in the nature of all-purpose carrying bags; sports bags; tote bags; shoe bags for travel; cologne; cosmetic preparations for body care; cosmetics; fragrances for personal use; perfumes; hair care preparations; bath products, namely, bath oil, bubble bath, bath powder, cosmetic bath salts, shower gels and skin lotions; shoe cream, shoe polish, shoe wax; cleaning and polishing preparations, namely, cleaning and polishing preparations for leather, footwear, handbags, sunglasses; retail store and online retail store services featuring fashion goods; retail store and online retail store services featuring cosmetics and personal care products, fragrances, eyewear, smartphone and table cases, jewelry, luggage and handbags, housewares, bedding, tableware, textiles, towels, apparel and footwear.  These product lines, and the intellectual property rights held in those product classes, have remain unused throughout the Relevant Period while the Company's performance suffered significantly.  This also is in stark contrast to the Company's competitors, which have expanded into new product lines.  Thus, Defendant's intentional mismanagement of the Company's product line has limited the Company's sales entirely to a

27

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

single shoe style, with no attempt to broaden that product line, limiting the Company's sales and performance in the face of catastrophic decline.

5. Defendant has further mismanaged several of the Company's product lines, including:

a. Defendant mismanaged the Company's pioneering Vegan line, for which there was significant demand and rising consumer trends. Instead, Defendant watched as competitors achieved tremendous success with non-leather footwear of similar design, while Defendant failed to properly market, expand, design, or otherwise capitalize on clear consumer demand, allowing the Company's own non-leather sales to languish. For example, it appears that during the Relevant Period, Defendant has failed to expand the Company's Vegan line, which has consisted of the same five shoes for nearly a decade. Defendant chose not to expand the Company's non-leather product offerings even though Defendant acknowledged that the Company faced "greater competition during the relevant period" from competitors such as Rothy's and Allbirds, who have achieved notable success (for Rothy's, marked by $1 billion valuation in 2021) by offering shoes made from non-leather materials and sustainable fabrics. Defendant has had multiple opportunities to expand the Company's non-leather product offerings and capitalize on significant consumer demand for recycled and sustainable materials, but chose not to. The "Heritage Plaid", "Calouflage", and "Incognito" styles that the Company launched while under Defendant's sole control have non-leather "uppers" (the top part of the shoe), but leather insoles and mid/outsoles. The leather insoles and mid/outsoles prevent these styles from being marketed as Vegan. Thus, these styles do not appeal to customers who desire the Company's classic Italian leather shoes (because they feature fabric uppers), but they likewise do not appeal to customers who would prefer shoes made without animal products. Because the Company was already

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

making Vegan shoes before the Relevant Period, the Company was poised to capitalize on the skyrocketing demand for shoes made from non-leather materials or other sustainable materials. However, as demand for sustainably-sourced shoes rose, Defendant did not respond to that demand by, for instance, expanding the Company's Vegan line, offering desirable animal-free styles, or offering fabrics such as those knit from recycled materials, despite clear consumer demand for such products. Instead, Defendant apparently caused the Company to invest in shoes like the Heritage Plaid, Caloflauge, and Incognito styles, which are neither properly Vegan (and thus fail to appropriately capitalize on that demand) nor are they made from the quality Italian leather that has long appealed to the Company's customers at the Company's luxury price point. Rather than capitalize on these trends, Defendant chose to develop shoes made from materials that are of questionable suitability for the Company's style of footwear – such as velvet and suede – even though Defendant and Plaintiff previously had decided ***not*** to use such materials precisely because of these quality concerns and lack of demand.

b. Defendant took an unlaunched children's line with tremendous potential and mismanaged its marketing. It appears Defendant mismanaged the Company's children's line from the start by taking a product line that had long been in development and launching it in the late summer, a time of lesser demand for such a product. During the late summer, back to school shopping and related trends dominates children's spending and children tend to wear sneakers to school rather than high-priced Italian leather flats. Since then, and during the Relevant Period, Defendant has continued to mismanage the Company's children's line. For example, Defendant has consistently priced the children's line at an unappealing and unreasonably high price point, seemingly to limit sales. The children's line runs only from child size 7 (toddlers) to adult size

29

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

two (elementary school-aged children), yet are $130-140, and only a roughly $50 difference from most of the adult styles offered.  The limited size range is also perplexing given that demand for luxury Italian leather shoes for toddlers and elementary school-aged children is typically lower than for older children and teens.  Defendant has also failed to appropriately manage the inventory of the children's line.  For instance, as of the date of these Supplemental Responses, the children's style "Mini Cotton Candy" is only available in child sizes 7 and 8, which, again, would tend to mostly fit toddlers.  The rest of the sizes are out of stock.

c.  Defendant also relaunched shoes that were originally marketed as limited releases, undermining brand credibility and alienating customers who purchased "limited edition" or "seasonal" shoe colors, such as the "Champagne" and "Love Potion" shoes.  The re-release and mass production of these so-called limited releases caused consumer confusion and the loss of trust.

d.  Defendant launched other colors, including the "Mojave" and "Rouge Suede" shoes, which generated considerable negative feedback from customers. Other limited release colors, such as the "Poppy" or "Neon" colors were continually relaunched each year despite consumer fatigue and declining demand.

6.  Based on the limited information available to Plaintiff, it appears that Defendant has mismanaged the Company's inventory and supply chain by generating costly surpluses of some styles, and insufficient supply of others.  For example, the limited data available to Plaintiff indicates that despite plummeting sales, Defendant poured millions of dollars into inventory and purchasing.  Defendant seemingly grew inventory by nearly 25% in 2019 alone and maintained an increasingly large stockpile of surplus inventory through 2020, 2021, and beyond. Defendant's stockpiling inventory goes beyond any reasonable metric given the Company's declining sales under his control, but served Defendant's purposes of creating the appearance

30

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

that cash was unavailable for distribution to Plaintiff and Defendant via payments to tax authorities. Additionally, Defendant has made payments to suppliers that appear to have exceeded what was purchased, effectively pre-paying hundreds of thousands of dollars, or more, to suppliers to improperly reduce the Company's cash on hand. By maintaining a huge surplus of shoe inventory, Defendant also risks negatively impacting the quality and condition of the Company's fine leather shoes as they sit for months or years before selling. These long periods in storage can cause material degradation and also increase the potential for theft and other damage or loss. Despite these issues, Defendant added to the Company's multiyear supply of shoes on hand, and Plaintiff is informed and believes, based on the information available to her, that he has done so deliberately to manipulate and artificially reduce the Company's cash on hand available for distribution – all for his own personal purposes (i.e., his personal dispute with Plaintiff) – to the detriment of the Company.

7.    Defendant has mismanaged the Company's customer acquisition and advertising strategies. Based on limited information available to Plaintiff, including minimal information provided prior to the Relevant Period in discovery in the State Court Litigation, Plaintiff is informed and believes that Defendant has manipulated advertising budgets and customer acquisition mechanisms to artificially limit or otherwise lower sales, for example by limiting the reach, spend, or budget of well-performing ads to slow and restrict sales. In particular, Defendant implemented advertising mechanisms that terminated advertising campaigns after they reached a pre-set budget, even while the campaigns continued to generate profitable sales. The effect was to limit the reach of well-performing advertising campaigns, which would be automatically terminated the moment they exceeded Defendant's selected pre-set budget rather than when they stopped resulting in profitable sales (as had been the practice before Plaintiff's exclusion from the Company). One of the Company's employees, Erin Turner, testified in prior litigation that, after Plaintiff and her husband were locked out of the Company, the Company moved Facebook advertisements to a system using daily budgets. The effect of implementing a daily budget was to effectively cap or limit the reach of well-performing ads, which coincided with the Company's sales decline. The Company has long had mechanisms for limiting poor-

31

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

performing ads, such as stop-losses, and there is little reason to limit ad spend on successful ads yielding positive returns. Ms. Turner also testified in prior litigation that the daily budgets depend on the day, and that Defendant was responsible for setting those budgets.  As a result of the use of daily budgets, the Company may have lost profitable sales; Plaintiff requires access to information she sought from Defendant in discovery (and multiple times previously) to determine the extent of lost sales/profits.

8.      Defendant has allowed the Company to spend massive amounts of money on stale and poor-producing ads.  This includes incurring significant costs to run old ads to saturated audiences.  For example, it appears the "Tieks Anatomy" advertisement and concept continues to appear in Facebook ads to this day, despite the fact that the basic format, design, and creative for that advertisement have now been used for over six years.  The same is true for the "What's Inside the Signature Tieks Blue Box" campaign.  The Company continues to run these years-old advertisements at significant cost, claiming approximately $6,880,469 in "Advertising and Marketing" expenditure in in 2019, $8,089,547 in 2020, and $6,940,552 in 2021.  At the same time, Defendant failed to invest in appropriate and emerging social media platforms and formats, such as short-form video.  Defendant failed to establish an appropriate presence on TikTok and similar platforms and has failed to appropriately utilize or otherwise advertise on those platforms, even as the industry observed the rise of video and short-form video in particular, and the accompanying shift in attention and advertising that trend created.  Defendant also failed to properly utilize video content in other aspects of the Company's business, such as on the website and marketing campaigns, let alone make the appropriate investment in video as it became increasingly important.  This includes causing the Company to not implement a Mother's Day campaign video in 2020 (or 2019) despite the Company having done so in 2017 and 2018.

9.      Defendant has failed to implement meaningful marketing or advertising campaigns, failed to maintain or continue successful campaigns, and in other cases recycled stale campaigns from prior years.  For example, in 2019-2022 the Company repeatedly relaunched a years-old "Neon" campaign, including reusing certain creative elements created and advertised earlier.  Similarly, in 2020, Defendant launched the "Rosé" shoe by copying the Company's

32

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

previous and heavily used "Champagne" shoe campaign. Additionally, Defendant's apparent implementation of daily budgets for its Facebook advertising systems effectively limits the performance of successful advertising campaigns after they reach a daily budget set by Defendant, a practice that appears to have coincided with the Company's plummeting sales. As a result of the use of daily budgets, the Company may have lost profitable sales; Plaintiff requires access to information she sought from Defendant in discovery (and multiple times previously) to determine the extent of lost sales/profits. Defendant appears to have also failed to continue successful campaigns including the Company's long history of successful business development campaigns and brand partnerships (such as were done with Disney, Pottery Barn, and Swarovski); loyalty boxes and other incentives for Company's top customers, influencer and blogger collaborations, and various brand building campaigns that built brand awareness, loyalty, and consumer engagement, such as the Company's April Fools campaigns and International Women's Day campaigns.

10.    Moreover, in the face of plummeting sales, Defendant also failed to appropriately implement promotions or other incentives to improve sales, instead making the confounding choice to *increase* prices in the face of what he claims was softening demand. For instance, it appears Defendant has generally failed to implement referral programs, first time customer discounts, discounts for niche/targeted groups, loyalty incentives, or other incentives, pricing or promotions that could have mitigated, or significantly improved, the Company's declining sales.

11.    Defendant has mismanaged the Company's e-commerce website, which, due to Defendant's mismanagement described above, is its sole storefront and source of revenue. While maintaining massive cash reserves, which would have been more than adequate to fund any website functionality improvements, Defendant has failed to invest in or implement basic, industry standard applications and technologies that facilitate shopping online. For instance, the Company has not implemented Apple Pay, Amazon Pay, or Google Pay services on its website, nor has the Company implemented other basic features such as site search, product videos, SMS/text message communications for customer service and marketing, product reviews, push notifications, chatbots, multilingual support, referral programs, or product recommendations.

33

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Instead, Defendant uses an outdated, vulnerable, and costly e-commerce shopping cart platform that appears virtually unchanged throughout Defendant's control of the Company.

12. Plaintiff is further informed and believes that Defendant mismanaged the Company's customer experience/service operations, causing an increase in refunds, returns, expenses, and dissatisfaction with the brand. The Company has pushed unsatisfied customers to accept poorly-executed repairs on products, leading to low customer satisfaction with repairs. For example, it appears that when presented with various customer complaints regarding materials or workmanship, Defendant has forced customers to mail their shoes to the Company for repairs to their shoes' stitching, leather finish, or outsole patches, many times at the hands of amateur and/or unskilled employees. This also forces customers, who are often already unsatisfied, to be apart from their shoes for days or weeks at a time while repairs are attempted on their sometimes relatively new pair of luxury shoes. Unsatisfactory resolution of customer complaints causes a decline in brand loyalty, desirability, and ultimately sales. Defendant also has failed to improve upon the Company's limited customer service availability or implement various modern, industry-standard tools such as alternative communication channels or chatbots to supplement its live customer service personnel availability to maintain the high level of customer service that the Company was historically known for.

13. Defendant has mismanaged and neglected the Company's business development efforts, brand partnerships, and other direct and third-party campaigns. The Company traditionally receives numerous business inquiries and opportunities from a wide variety of businesses and potential partners, yet Plaintiff is informed and believes that Defendant has caused the Company to reject numerous potentially beneficial or lucrative offers. Incredibly, while rejecting or ignoring promising inquiries from a variety of businesses, Defendant instead caused the Company to partner with his personal friend's company, Aspiration Bank, in which Defendant has a significant ownership interest. As part of that partnership, Defendant asked the Company's high-end designer shoe clientele to sign up for an Aspiration Bank account and related financial services in exchange for a Tieks discount. Defendant's self-serving, off-brand partnership was so unpopular and poorly executed that customers questioned whether the emails

34

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

they received about it from the Company were spam.  Meanwhile, it appears Defendant failed to pursue business development opportunities or brand partnerships, which had long been a successful aspect of the Company's business, including partnerships with businesses such as Disney, Pottery Barn and Swarovski, which the Company had previously partnered with.  Nor did Defendant appear to do business with Amazon or Zappos (which could have presented an opportunity for the Company to sell its products through lucrative sales channels other than its own small website), believed to be among the many companies that reached out to and looked to do business with the Company during the Relevant Period.

14.     Defendant has failed to implement any reasonable or reliable bookkeeping system for the Company, even after purporting to reverse prior questionable tax and accounting practices.  Rather, Defendant still effectively runs the Company "out of a shoebox."  He waits until after a calendar year ends, and typically much longer, and then sends a host of bank and credit transactions to an outside forensic accountant who is then forced to try to reconstruct financial statements and a general ledger for the Company for the previous year.  Moreover, the bank account and credit card transactions sent to the accountant lack the necessary detail and itemization to properly classify business expenses.  Without a reliable bookkeeping system, the Company is unable to contemporaneously track its finances in any reasonable way that reflects industry practice, let alone in a way that would allow it to react swiftly or appropriately to developing financial or operational trends.

15.     Based on the limited information available to Plaintiff, Plaintiff is concerned that Defendant has caused the Company to spend millions of dollars in legal fees on litigation regarding the Company's intellectual property, with no apparent recovery.  Defendant also caused the Company to expend substantial funds securing and maintaining intellectual property rights for a variety of products in various markets, all while failing to capitalize, market, or monetize this same intellectual property.  Additionally, Defendant caused the Company to spend substantial funds to professionals that Defendant classified as legal fees or "other expenses" for matters which were unrelated to the Company or were otherwise improper.  For example, the Company attributed roughly $4,043,226 to legal fees in 2019, roughly $1,289,721 in 2020, and

35

roughly $1,299,840 in 2021 for unspecified matters and/or litigation.  Meanwhile, the Company does not appear to have actually recovered any material funds via judgments or settlements, particularly in relation to the millions in fees it has incurred under Defendant's unlawful sole control.  In addition, the Company's trademark counsel has advised the Company in writing that it should pursue international trademark protection for the Tiek blue color.  Because Defendant has refused to provide Plaintiff with access to Company information, it is unknown to Plaintiff whether Defendant acted on this recommendation after he excluded Plaintiff from the Company.  However, Plaintiff can find no indication that Defendant directed counsel or any other firm to pursue international trademark protection for the Tiek blue color per counsel's recommendation.

16.     Defendant has also failed to address the supply chain disruptions, rising costs, increased competition, and reduced demand that he identified in his FDD.  In the FDD, Defendant testified that the Company required significant cash reserves in order to address these headwinds.  But based on the limited information available to Plaintiff, and as explained above, Defendant appears to have done nothing to use those cash reserves to address these business challenges.  Instead, under Defendant's sole control, the Company's sales, profits, and value have plummeted.

17.     Defendant failed to hire experienced employees or outside consultants.  When confronted by the various business challenges Defendant identified in his FDD, as well the consistently declining financial results for the Company during the Relevant Period, Defendant consistently and deliberately failed to bring in any competent executives, directors, managers, employees, or experts to address the Company's catastrophic decline.  Defendant has failed to hire any personnel (let alone individuals with meaningful prior experience working in such matters before working for/with the Company) to oversee the following functions for the Company on a regular basis:  the Company's finances, bookkeeping, cash management, inventory management, operations, supply chain management, marketing, administration, sales, advertising, customer service, website design, website user interface and/or user experience, social media, technology, legal matters, and human resources.  Defendant also has failed to hire

36

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

any personnel (who had prior experience working in such matters before working for/with the Company) to act as the Company's chief executive officer on a regular basis, let alone any other executive leadership position.

18.    Defendant compounded this by mismanaging the Company's personnel.  For instance, Defendant rewarded perceived loyalty to him personally over those employees' performance and value to the Company.  During the Relevant Period, Defendant used Company funds to give substantial "bonuses" and raises to certain Company employees and individuals who testified on his behalf during the State Court Litigation to reward their support for him.  These bonuses and raises dramatically increased the total compensation to these individuals by 75-90% in a four-year period, making them the highest paid employees at the Company.  Further, Defendant rewarded these individuals with these massive increases in their compensation, which he has continued to maintain, despite the Company's unprecedented poor financial performance over the same period.

19.    In addition to Defendant's hoarding of Company cash noted above, Defendant continues to maintain between $15 and $20 million of Company funds in a simple checking account.  Not only did this expose the Company to significant risk of a bank failure earlier this year as the funds were all on deposit with a single bank (First Republic Bank), but Defendant's cash management is depriving the Company of substantial interest that is available on safe investments, including U.S. Treasuries and money market funds.  Based on the Company's recent bank balances, this is causing the Company damage in the form of lost interest of nearly $1,000,000 per year during the current high interest rate environment.

20.    Separate and distinct from the foregoing examples of Defendant's intentional, knowing, reckless, and grossly negligent management of the Company, Defendant rejected a straightforward proposal by Plaintiff (made on December 3, 2019), that the Company hire a mutually acceptable financial advisor to review the Company's options and situation given its quickening decline as of that time.  Defendant rejected that proposal even though, a year later, he openly acknowledged a number of financial and operational headwinds facing the Company in his FDD to this Court.  Defendant stated under oath in his Bankruptcy Case that the Company

37

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

may need to expend capital to "significantly expand its sales and marketing channels." (Defendant's FDD, ¶ 10). Yet throughout the Relevant Period, the Company has maintained large cash reserves, at times in excess of $20 million in cash sitting idle, which Defendant never deployed to expand, alter, or modify the Company's sales and marketing channels, add new product offerings, or take other steps to address the Company's decline. Despite the Company having ample cash reserves that could have been utilized in multiple ways to address its downward trajectory, Defendant specifically rejected Plaintiff's proposal that the Company hire a mutually acceptable financial advisor to advise the Company in light of its plummeting financial performance.

Simply put, the Company's decline is not the result of some well-intentioned business strategy launched by Defendant which simply did not work. It is not the result of a new product that fared poorly – the Company has not launched any new products during the Relevant Period. The decline is not the result of an unsuccessful entry into a new geographic market – the Company did not enter any new geographic markets during the Relevant Period. The decline is not the result of an unsuccessful new sales channel – the Company has not expanded into new sales channels during the Relevant Period. The decline is not the result of unsuccessful brick and mortar stores – the Company has not opened any stores during the Relevant Period. The decline is not the result of burdensome debt service – the Company has carried no debt during the Relevant Period. And the Company's decline is not the result of new executive leadership – Defendant has caused himself to be the de facto Chief Executive Officer and only executive leadership at the Company during the Relevant Period.

The Company's decline under Defendant's sole control is the result of Defendant's self-serving and destructive decision to put his own personal interests ahead of the Company in his misguided attempt to inflict financial pain on Plaintiff and acquire her ownership interest for pennies on the dollar. Defendant's animus toward Plaintiff, and his intention to cause her and her family harm, is well-documented in Defendant's own words. By way of example, Defendant wrote (or stated in a voicemail) the following:

38

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- "You and your husband will pay for any violations … And the cost will be severe … If you make a single wire without my permission I will never forgive you in my life and it will be all out nuclear war. I promise you on my life. Have no doubt about that. I dare you to cross me.";

- "HOW TO WHORE OUT YOUR FAMILY IN 20 EASY STEPS: The story of Dikla Unatin's life. Write it in your free time now. You will pay dearly for all this. Say goodbye to your supposed 40%. It is no more.";

- "When I make decisions you don't follow through on there will be consequences … I am done dealing with your bullshit. I will regulate as needed on you and Dean. There will be major changes. Don't fuck with me.";

- "Every time you and your bitch ass husband come at me, I'll come at you 5 times harder. Any pain or inconvenience you try to inflict on me, the business, mom, or the rest of the family, you and your family will feel multiples of that back. I promise you that. All day, every day, til the day I die. You will live to regret every misstep.";

- "[I]f you play like this I can promise you your life will be miserable.";

- "I want to be clear, in case the text wasn't clear enough.  Not a single fucking wire goes out without my fucking permission.  And every one that does, you and your bitch ass husband will pay a mother fucking price, I promise you.  Not a single fucking wire.  Trust me.";

- "You've forced me to come back to the office earlier than I should you dirty whore.  Challenge my authority today and see what happens."

These vile and explicit statements by Defendant lay bare his intention to suppress the Company's value and explain his otherwise shocking and inexplicable passivity as the Company's performance and valuation have nose-dived under his sole control, even while the Company maintained a massive cash stockpile that Defendant testified to this Court was necessary to address the Company's poor performance.

39

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Individuals who may possess relevant information and documents include, but are not limited to, as-yet unidentified current and/or former employees of the Company, Defendant, Plaintiff, Dean Unatin, Yamit Betesh, as yet undetermined businesses with whom the Company and/or Defendant has contacted, engaged, and/or transacted business including, but not limited to, American Express Merchant Services, Bank of America, First Republic Bank, Braintree Payment Solutions LLC, Kiva, Meta, Alphabet, Pinterest, and Upwork.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**INTERROGATORY NO. 2:**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 32 of the TAC that "Defendant is acting willfully and intentionally to depress the Company's value to try to increase Plaintiff's financial distress, with the ultimate goal of obtaining Plaintiff's ownership interest in the Company for pennies on the dollar."

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in

40

the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Interrogatory No. 1 and additionally states as follows:

Defendant intentionally depressed the Company's value to inflict financial pain on Plaintiff in order to coerce her to sell her share of the Company at a dramatically reduced cost. Defendant's animus toward Plaintiff, and his intention to cause her and her family harm, is well-documented in Defendant's own words.  By way of example, Defendant wrote (or stated in a voicemail) the following:

- "You and your husband will pay for any violations … And the cost will be severe … If you make a single wire without my permission I will never forgive you in my life and it will be all out nuclear war. I promise you on my life. Have no doubt about that. I dare you to cross me.";

- "HOW TO WHORE OUT YOUR FAMILY IN 20 EASY STEPS: The story of Dikla Unatin's life. Write it in your free time now. You will pay dearly for all this. Say goodbye to your supposed 40%. It is no more.";

- "When I make decisions you don't follow through on there will be consequences … I am done dealing with your bullshit. I will regulate as needed on you and Dean. There will be major changes. Don't fuck with me.";

- "Every time you and your bitch ass husband come at me, I'll come at you 5 times harder. Any pain or inconvenience you try to inflict on me, the business, mom, or the rest of the family, you and your family will feel multiples of that back. I

41

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

promise you that. All day, every day, til the day I die. You will live to regret every misstep.";

- "[I]f you play like this I can promise you your life will be miserable.";

- "I want to be clear, in case the text wasn't clear enough.  Not a single fucking wire goes out without my fucking permission.  And every one that does, you and your bitch ass husband will pay a mother fucking price, I promise you.  Not a single fucking wire.  Trust me.";

- "You've forced me to come back to the office earlier than I should you dirty whore.  Challenge my authority today and see what happens."

These vile and explicit statements by Defendant lay bare his intention to suppress the Company's value and explain his otherwise shocking and inexplicable passivity as the Company's performance and valuation have nose-dived under his sole control, even while the Company maintained a massive cash stockpile that Defendant testified to this Court was necessary to address the Company's poor performance.

Individuals who may possess relevant information and documents include, but are not limited to, as-yet unidentified current and/or former employees of the Company, Defendant, Plaintiff, Dean Unatin, Yamit Betesh, as yet undetermined businesses with whom the Company and/or Defendant has contacted, engaged, and/or transacted business including, but not limited to, American Express Merchant Services, Bank of America, First Republic Bank, Braintree Payment Solutions LLC, Kiva, Meta, Alphabet, Pinterest, and Upwork.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 2.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of

42

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Supplemental Interrogatory No. 1 and additionally states as follows:

Defendant intentionally depressed the Company's value to inflict financial pain on Plaintiff in order to coerce her to sell her share of the Company at a dramatically reduced cost. Defendant's animus toward Plaintiff, and his intention to cause her and her family harm, is well-documented in Defendant's own words.  By way of example, Defendant wrote (or stated in a voicemail) the following:

- "You and your husband will pay for any violations … And the cost will be severe … If you make a single wire without my permission I will never forgive you in my life and it will be all out nuclear war. I promise you on my life. Have no doubt about that. I dare you to cross me.";

- "HOW TO WHORE OUT YOUR FAMILY IN 20 EASY STEPS: The story of Dikla Unatin's life. Write it in your free time now. You will pay dearly for all this. Say goodbye to your supposed 40%. It is no more.";

- "When I make decisions you don't follow through on there will be consequences … I am done dealing with your bullshit. I will regulate as needed on you and Dean. There will be major changes. Don't fuck with me.";

43

- "Every time you and your bitch ass husband come at me, I'll come at you 5 times harder. Any pain or inconvenience you try to inflict on me, the business, mom, or the rest of the family, you and your family will feel multiples of that back. I promise you that. All day, every day, til the day I die. You will live to regret every misstep.";

- "[I]f you play like this I can promise you your life will be miserable.";

- "I want to be clear, in case the text wasn't clear enough.  Not a single fucking wire goes out without my fucking permission.  And every one that does, you and your bitch ass husband will pay a mother fucking price, I promise you.  Not a single fucking wire.  Trust me.";

- "You've forced me to come back to the office earlier than I should you dirty whore.  Challenge my authority today and see what happens."

These vile and explicit statements by Defendant lay bare his intention to suppress the Company's value and explain his otherwise shocking and inexplicable passivity as the Company's performance and valuation have nose-dived under his sole control, even while the Company maintained a massive cash stockpile that Defendant testified to this Court was necessary to address the Company's poor performance.

Individuals who may possess relevant information and documents include, but are not limited to, as-yet unidentified current and/or former employees of the Company, Defendant, Plaintiff, Dean Unatin, Yamit Betesh, as yet undetermined businesses with whom the Company and/or Defendant has contacted, engaged, and/or transacted business including, but not limited to, American Express Merchant Services, Bank of America, First Republic Bank, Braintree Payment Solutions LLC, Kiva, Meta, Alphabet, Pinterest, and Upwork.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**INTERROGATORY NO. 3:**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 31 of the TAC that "[t]his massive, consistent, and

44

catastrophic decline in the Company's performance cannot be explained away by mere competition or market forces."

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Interrogatory No. 1 and additionally states as follows:

Once the Company came under Defendant's sole control, the Company's revenue and profit began to plummet and are now a fraction of what they were before Defendant seized

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

control and before the Relevant Period.  Defendant's own financial experts have confirmed that the Company has lost approximately 90% of its value under Defendant's control.

By the time Defendant took over in 2017, and certainly by the Court Ordered Accrual Date, various Company competitors already had been well-established in the competitive landscape, including other young ecommerce footwear brands such as Rothy's and Allbirds. Competition has long been fierce in the footwear industry.  However, the Company thrived and experienced tremendous success despite those forces until Defendant mismanaged it under his sole control.

Defendant has pointed to increased competition as one of the challenges facing the Company.  (Defendant's FDD ¶¶ 8, 10.)  But as noted, the Company always has had competitors, and Defendant has not identified any new competitors that have entered the market since the Court Ordered Accrual Date (let alone since Defendant assumed sole control of the Company). Defendant also has failed to explain how any of these as-yet unidentified competitors so drastically changed the footwear and broader fashion ecommerce marketplace that would explain away the 90% drop in Company value.  Additionally, the Company's precipitous decline began long before external forces such as the COVID-19 pandemic came into play.

Individuals who may possess relevant information and documents include, but are not limited to, as-yet unidentified current and/or former employees of the Company, Defendant, Plaintiff, Dean Unatin, Yamit Betesh, Mira Gavrieli, and every business or agent with whom the Company and/or the parties have contacted, engaged, and transacted business including, but not limited to, American Express Merchant Services, Bank of America, First Republic Bank, Braintree Payment Solutions LLC, Kiva, Meta, Alphabet, Pinterest, and Upwork.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 3.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and

46

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Supplemental Interrogatory No. 1 and additionally states as follows:

Once the Company came under Defendant's sole control, the Company's revenue and profit began to plummet and are now a fraction of what they were before Defendant seized control and before the Relevant Period. Defendant's own financial experts have confirmed that the Company has lost approximately 90% of its value under Defendant's control.

By the time Defendant took over in 2017, and certainly by the Court Ordered Accrual Date, various Company competitors already had been well-established in the competitive landscape, including other young ecommerce footwear brands such as Rothy's and Allbirds. Competition has long been fierce in the footwear industry. However, the Company thrived and experienced tremendous success despite those forces until Defendant mismanaged it under his sole control.

Defendant has pointed to increased competition as one of the challenges facing the Company. (Defendant's FDD ¶¶ 8, 10.) But as noted, the Company always has had competitors, and Defendant has not identified any new competitors that have entered the market since the

47

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Court Ordered Accrual Date (let alone since Defendant assumed sole control of the Company). Defendant also has failed to explain how any of these as-yet unidentified competitors so drastically changed the footwear and broader fashion ecommerce marketplace that would explain away the 90% drop in Company value.  Additionally, the Company's precipitous decline began long before external forces such as the COVID-19 pandemic came into play.

Individuals who may possess relevant information and documents include, but are not limited to, as-yet unidentified current and/or former employees of the Company, Defendant, Plaintiff, Dean Unatin, Yamit Betesh, Mira Gavrieli, and every business or agent with whom the Company and/or the parties have contacted, engaged, and transacted business including, but not limited to, American Express Merchant Services, Bank of America, First Republic Bank, Braintree Payment Solutions LLC, Kiva, Meta, Alphabet, Pinterest, and Upwork.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**INTERROGATORY NO. 4:**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 40 of the TAC that "Defendant has manipulated advertising budgets and customer acquisition mechanisms to artificially limit or otherwise lower sales, for example by limiting the reach, spend, or budget of well-performing ads to slow and restrict sales."

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite

48

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Interrogatory No. 1 and additionally states as follows:

Defendant has mismanaged the Company's customer acquisition and advertising strategies, which is reflected in the Company's financial statements and overall decline. Based on limited information available to Plaintiff, including minimal information provided prior to the Relevant Period in discovery in the State Court Litigation, Plaintiff is informed and believes that Defendant has manipulated advertising budgets and customer acquisition mechanisms to artificially limit or otherwise lower sales, for example by limiting the reach, spend, or budget of well-performing ads to slow and restrict sales. In particular, Defendant implemented advertising mechanisms that terminated advertising campaigns after they reached a pre-set budget, even while the campaigns continued to generate profitable sales. The effect was to limit the reach of well-performing advertising campaigns, which would be automatically terminated the moment they exceeded Defendant's selected pre-set budget rather than when they stopped resulting in profitable sales (as had been the practice before Plaintiff's exclusion from the Company).

49

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, Yamit Betesh, Meta, Pinterest, Alphabet, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 4.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her responses to Supplemental Interrogatory No. 1 and additionally states as follows:

Defendant has mismanaged the Company's customer acquisition and advertising strategies, which is reflected in the Company's financial statements and overall decline. Based on limited information available to Plaintiff, including minimal information provided prior to the Relevant Period in discovery in the State Court Litigation, Plaintiff is informed and believes that

50

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Defendant has manipulated advertising budgets and customer acquisition mechanisms to artificially limit or otherwise lower sales, for example by limiting the reach, spend, or budget of well-performing ads to slow and restrict sales.  In particular, Defendant implemented advertising mechanisms that terminated advertising campaigns after they reached a pre-set budget, even while the campaigns continued to generate profitable sales.  The effect was to limit the reach of well-performing advertising campaigns, which would be automatically terminated the moment they exceeded Defendant's selected pre-set budget rather than when they stopped resulting in profitable sales (as had been the practice before Plaintiff's exclusion from the Company).  One of the Company's employees, Erin Turner, testified in prior litigation that, after Plaintiff and her husband were locked out of the Company, the Company moved Facebook advertisements to a system using daily budgets.  The effect of implementing a daily budget was to effectively cap or limit the reach of well-performing ads, which coincided with the Company's sales decline.  The Company has long had mechanisms for limiting poor-performing ads, such as stop-losses, and there is little reason to limit ad spend on successful ads yielding positive returns. Ms. Turner also testified in prior litigation that the daily budgets depend on the day, and that Defendant was responsible for setting those budgets.  As a result of the use of daily budgets, the Company may have lost profitable sales; Plaintiff requires access to information she sought from Defendant in discovery (and multiple times previously) to determine the extent of lost sales/profits.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, Yamit Betesh, Meta, Pinterest, Alphabet, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**INTERROGATORY NO. 5:**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 41 of the TAC that "Defendant has allowed the Company to spend massive amounts on stale and poor producing ads, causing the Company to incur millions of dollars in annual spend on unproductive ads and declining sales."

51

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Interrogatory No. 1 and additionally states as follows:

Defendant has allowed the Company to spend massive amounts of money on stale and poor-producing ads, which is reflected in the Company's financial statements and overall decline.  This includes incurring significant costs to run old ads to saturated audiences.  At the same time, Defendant failed to invest in appropriate and emerging social media platforms and formats, such as short-form video.  Defendant failed to establish an appropriate presence on

52

TikTok and similar platforms and has failed to appropriately utilize or otherwise advertise on those platforms, even as the industry observed the rise of video and short-form video in particular, and the accompanying shift in attention and advertising that trend created. Defendant also failed to properly utilize video content in other aspects of the Company's business, such as on the website and marketing campaigns, let alone make the appropriate investment in video as it became increasingly important. This includes causing the Company to not implement a Mother's Day campaign video in 2020 (or 2019) despite the Company having done so in 2017 and 2018.

Defendant has also failed to implement meaningful marketing or advertising campaigns, failed to maintain or continue successful campaigns, and in other cases recycled stale campaigns from prior years. For example, in 2019-2022 the Company repeatedly relaunched a years-old "Neon" campaign, including reusing certain creative elements created and advertised earlier. Similarly, in 2020, Defendant launched the "Rosé" shoe by copying the Company's previous and heavily used "Champagne" shoe campaign.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 5.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery

53

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Supplemental Interrogatory No. 1 and additionally states as follows:

Defendant has allowed the Company to spend massive amounts of money on stale and poor-producing ads, which is reflected in the Company's financial statements and overall decline. This includes incurring significant costs to run old ads to saturated audiences. For example, it appears the "Tieks Anatomy" advertisement and concept continues to appear in Facebook ads to this day, despite the fact that the basic format, design, and creative for that advertisement have now been used for over six years. The same is true for the "What's Inside the Signature Tieks Blue Box" campaign. The Company continues to run these years-old advertisements at significant cost, claiming approximately $6,880,469 in "Advertising and Marketing" expenditure in in 2019, $8,089,547 in 2020, and $6,940,552 in 2021. At the same time, Defendant failed to invest in appropriate and emerging social media platforms and formats, such as short-form video. Defendant failed to establish an appropriate presence on TikTok and similar platforms and has failed to appropriately utilize or otherwise advertise on those platforms, even as the industry observed the rise of video and short-form video in particular, and the accompanying shift in attention and advertising that trend created. Defendant also failed to properly utilize video content in other aspects of the Company's business, such as on the website and marketing campaigns, let alone make the appropriate investment in video as it became increasingly important. This includes causing the Company to not implement a Mother's Day campaign video in 2020 (or 2019) despite the Company having done so in 2017 and 2018.

54

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Defendant has also failed to implement meaningful marketing or advertising campaigns, failed to maintain or continue successful campaigns, and in other cases recycled stale campaigns from prior years.  For example, in 2019-2022 the Company repeatedly relaunched a years-old "Neon" campaign, including reusing certain creative elements created and advertised earlier.  Similarly, in 2020, Defendant launched the "Rosé" shoe by copying the Company's previous and heavily used "Champagne" shoe campaign.  Additionally, Defendant's apparent implementation of daily budgets for its Facebook advertising systems effectively limits the performance of successful advertising campaigns after they reach a daily budget set by Defendant, a practice that appears to have coincided with the Company's plummeting sales.  As a result of the use of daily budgets, the Company may have lost profitable sales; Plaintiff requires access to information she sought from Defendant in discovery (and multiple times previously) to determine the extent of lost sales/profits.  Defendant appears to have also failed to continue successful campaigns including the Company's long history of successful business development campaigns and brand partnerships (such as were done with Disney, Pottery Barn, and Swarovski); loyalty boxes and other incentives for Company's top customers, influencer and blogger collaborations, and various brand building campaigns that built brand awareness, loyalty, and consumer engagement, such as the Company's April Fools campaigns and International Women's Day campaigns.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**INTERROGATORY NO. 6:**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 44 of the TAC that "Defendant has failed to cultivate and has mismanaged the Company's formerly vibrant online communities, squandering a longtime core strength of the brand."

55

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege. Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Interrogatory No. 1 and additionally states as follows:

Defendant has failed to invest in appropriate and emerging social media platforms and formats, such as short-form video. Defendant failed to establish an appropriate presence on TikTok and similar platforms and has failed to appropriately utilize or otherwise advertise on those platforms, even as the industry observed the rise of video and short-form video in particular, and the accompanying shift in attention and advertising that trend created. Defendant

56

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

also failed to properly utilize video content in other aspects of the Company's business, such as on the website and marketing campaigns, let alone make the appropriate investment in video as it became increasingly important. This includes causing the Company to not implement a Mother's Day campaign video in 2020 (or 2019) despite the Company having done so in 2017 and 2018.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 6.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

57

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Subject to the foregoing, Plaintiff incorporates her response to Supplemental Interrogatory No. 1 and additionally states as follows:

Defendant has failed to invest in appropriate and emerging social media platforms and formats, such as short-form video.  Defendant failed to establish an appropriate presence on TikTok and similar platforms and has failed to appropriately utilize or otherwise advertise on those platforms, even as the industry observed the rise of video and short-form video in particular, and the accompanying shift in attention and advertising that trend created.  Defendant also failed to properly utilize video content in other aspects of the Company's business, such as on the website and marketing campaigns, let alone make the appropriate investment in video as it became increasingly important.  This includes causing the Company to not implement a Mother's Day campaign video in 2020 (or 2019) despite the Company having done so in 2017 and 2018.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**INTERROGATORY NO. 7:**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 44 of the TAC that "Defendant has failed to implement meaningful marketing or advertising campaigns, failed to maintain or continue successful campaigns, and in other cases recycled stale campaigns from prior years."

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

58

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Interrogatory No. 1 and additionally states as follows:

Defendant has mismanaged the Company's customer acquisition and advertising strategies, which is reflected in the Company's financial statements and overall decline. Based on limited information available to Plaintiff, including minimal information provided prior to the Relevant Period in discovery in the State Court Litigation, Plaintiff is informed and believes that Defendant has manipulated advertising budgets and customer acquisition mechanisms to artificially limit or otherwise lower sales, for example by limiting the reach, spend, or budget of well-performing ads to slow and restrict sales. In particular, Defendant implemented advertising mechanisms that terminated advertising campaigns after they reached a pre-set budget, even while the campaigns continued to generate profitable sales. The effect was to limit the reach of well-performing advertising campaigns, which would be automatically terminated the moment

59

they exceeded Defendant's selected pre-set budget rather than when they stopped resulting in profitable sales (as had been the practice before Plaintiff's exclusion from the Company).

Defendant has allowed the Company to spend massive amounts of money on stale and poor-producing ads, which is also reflected in the Company's financial statements and overall decline.  This includes incurring significant costs to run old ads to saturated audiences.  At the same time, Defendant failed to invest in appropriate and emerging social media platforms and formats, such as short-form video.  Defendant failed to establish an appropriate presence on TikTok and similar platforms and has failed to appropriately utilize or otherwise advertise on those platforms, even as the industry observed the rise of video and short-form video in particular, and the accompanying shift in attention and advertising that trend created.  Defendant also failed to properly utilize video content in other aspects of the Company's business, such as on the website and marketing campaigns, let alone make the appropriate investment in video as it became increasingly important.  This includes causing the Company to not implement a Mother's Day campaign video in 2020 (or 2019) despite the Company having done so in 2017 and 2018.

Defendant has failed to implement meaningful marketing or advertising campaigns, failed to maintain or continue successful campaigns, and in other cases recycled stale campaigns from prior years.  For example, in 2019-2022 the Company repeatedly relaunched a years-old "Neon" campaign, including reusing certain creative elements created and advertised earlier.  Similarly, in 2020, Defendant launched the "Rosé" shoe by copying the Company's previous and heavily used "Champagne" shoe campaign.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 7.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Supplemental Interrogatory No. 1 and additionally states as follows:

Defendant has mismanaged the Company's customer acquisition and advertising strategies, which is reflected in the Company's financial statements and overall decline. Based on limited information available to Plaintiff, including minimal information provided prior to the Relevant Period in discovery in the State Court Litigation, Plaintiff is informed and believes that Defendant has manipulated advertising budgets and customer acquisition mechanisms to artificially limit or otherwise lower sales, for example by limiting the reach, spend, or budget of well-performing ads to slow and restrict sales. In particular, Defendant implemented advertising mechanisms that terminated advertising campaigns after they reached a pre-set budget, even while the campaigns continued to generate profitable sales. The effect was to limit the reach of well-performing advertising campaigns, which would be automatically terminated the moment they exceeded Defendant's selected pre-set budget rather than when they stopped resulting in

61

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

profitable sales (as had been the practice before Plaintiff's exclusion from the Company).  One of the Company's employees, Erin Turner, testified in prior litigation that, after Plaintiff and her husband were locked out of the Company, the Company moved Facebook advertisements to a system using daily budgets.  The effect of implementing a daily budget was to effectively cap or limit the reach of well-performing ads, which coincided with the Company's sales decline.  The Company has long had mechanisms for limiting poor-performing ads, such as stop-losses, and there is little reason to limit ad spend on successful ads yielding positive returns. Ms. Turner also testified in prior litigation that the daily budgets depend on the day, and that Defendant was responsible for setting those budgets.  As a result of the use of daily budgets, the Company may have lost profitable sales; Plaintiff requires access to information she sought from Defendant in discovery (and multiple times previously) to determine the extent of lost sales/profits.

Defendant has allowed the Company to spend massive amounts of money on stale and poor-producing ads, which is also reflected in the Company's financial statements and overall decline.  This includes incurring significant costs to run old ads to saturated audiences.  For example, it appears the "Tieks Anatomy" advertisement and concept continues to appear in Facebook ads to this day, despite the fact that the basic format, design, and creative for that advertisement have now been used for over six years.  The same is true for the "What's Inside the Signature Tieks Blue Box" campaign.  The Company continues to run these years-old advertisements at significant cost, claiming approximately $6,880,469 in "Advertising and Marketing" expenditure in in 2019, $8,089,547 in 2020, and $6,940,552 in 2021.  At the same time, Defendant failed to invest in appropriate and emerging social media platforms and formats, such as short-form video.  Defendant failed to establish an appropriate presence on TikTok and similar platforms and has failed to appropriately utilize or otherwise advertise on those platforms, even as the industry observed the rise of video and short-form video in particular, and the accompanying shift in attention and advertising that trend created.  Defendant also failed to properly utilize video content in other aspects of the Company's business, such as on the website and marketing campaigns, let alone make the appropriate investment in video as it became

62

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

increasingly important.  This includes causing the Company to not implement a Mother's Day campaign video in 2020 (or 2019) despite the Company having done so in 2017 and 2018.

Defendant has failed to implement meaningful marketing or advertising campaigns, failed to maintain or continue successful campaigns, and in other cases recycled stale campaigns from prior years.  For example, in 2019-2022 the Company repeatedly relaunched a years-old "Neon" campaign, including reusing certain creative elements created and advertised earlier.  Similarly, in 2020, Defendant launched the "Rosé" shoe by copying the Company's previous and heavily used "Champagne" shoe campaign.  Additionally, Defendant's apparent implementation of daily budgets for its Facebook advertising systems effectively limits the performance of successful advertising campaigns after they reach a daily budget set by Defendant, a practice that appears to have coincided with the Company's plummeting sales.  As a result of the use of daily budgets, the Company may have lost profitable sales; Plaintiff requires access to information she sought from Defendant in discovery (and multiple times previously) to determine the extent of lost sales/profits.  Defendant appears to have also failed to continue successful campaigns including the Company's long history of successful business development campaigns and brand partnerships (such as were done with Disney, Pottery Barn, and Swarovski); loyalty boxes and other incentives for Company's top customers, influencer and blogger collaborations, and various brand building campaigns that built brand awareness, loyalty, and consumer engagement, such as the Company's April Fools campaigns and International Women's Day campaigns.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**INTERROGATORY NO. 8:**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 45 of the TAC that "Defendant has grossly

63

mismanaged and neglected the Company's business development efforts, brand partnerships, and other direct and third-party campaigns that have driven past Company success."

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege. Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Interrogatory No. 1 and additionally states as follows:

Defendant has mismanaged and neglected the Company's business development efforts, brand partnerships, and other direct and third-party campaigns. The Company traditionally receives numerous business inquiries and opportunities from a wide variety of businesses and

64

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

potential partners, yet Plaintiff is informed and believes that Defendant has caused the Company to reject numerous potentially beneficial or lucrative offers.  Incredibly, while rejecting or ignoring promising inquiries from a variety of businesses, Defendant instead caused the Company to partner with his personal friend's company, Aspiration Bank, in which Defendant has a significant ownership interest.  As part of that partnership, Defendant asked the Company's high-end designer shoe clientele to sign up for an Aspiration Bank account and related financial services in exchange for a Tieks discount.  Defendant's self-serving, off-brand partnership was so unpopular and poorly executed that customers questioned whether the emails they received about it from the Company were spam.

Individuals who may possess relevant information and documents include, but are not limited to as yet undetermined current and/or former employees of the Company, Defendant, Plaintiff, and Dean Unatin.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 8.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus,

65

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Supplemental Interrogatory No. 1 and additionally states as follows:

Defendant has mismanaged and neglected the Company's business development efforts, brand partnerships, and other direct and third-party campaigns.  The Company traditionally receives numerous business inquiries and opportunities from a wide variety of businesses and potential partners, yet Plaintiff is informed and believes that Defendant has caused the Company to reject numerous potentially beneficial or lucrative offers.  Incredibly, while rejecting or ignoring promising inquiries from a variety of businesses, Defendant instead caused the Company to partner with his personal friend's company, Aspiration Bank, in which Defendant has a significant ownership interest.  As part of that partnership, Defendant asked the Company's high-end designer shoe clientele to sign up for an Aspiration Bank account and related financial services in exchange for a Tieks discount.  Defendant's self-serving, off-brand partnership was so unpopular and poorly executed that customers questioned whether the emails they received about it from the Company were spam.  Meanwhile, it appears Defendant failed to pursue business development opportunities or brand partnerships, which had long been a successful aspect of the Company's business, including partnerships with businesses such as Disney, Pottery Barn and Swarovski, which the Company had previously partnered with.  Nor did Defendant appear to do business with Amazon or Zappos (which could have presented an opportunity for the Company to sell its products through lucrative sales channels other than its own small website), believed to be among the many companies that reached out to and looked to do business with the Company during the Relevant Period.

Individuals who may possess relevant information and documents include, but are not limited to as yet undetermined current and/or former employees of the Company, Defendant, Plaintiff, and Dean Unatin.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**INTERROGATORY NO. 9:**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 47 of the TAC that "Defendant has failed to adapt or capitalize on obvious consumer and industry trends."

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege. Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Subject to the foregoing, Plaintiff incorporates her response to Interrogatory No. 1 and additionally states as follows:

Defendant has failed to maintain, leverage, or expand the Company's brand and sales through various available and potentially lucrative channels.  This includes Defendant's refusal to make the Company's products available through:  any other online retail channels, including hugely popular online marketplaces such as Zappos and Amazon; any traditional brick and mortar retail channels, including retailers such as Nordstrom, Bloomingdales, or Macy's; any other third party wholesale or other distribution opportunities, such as boutiques; or any first-party retail opportunities, such as Company-operated or branded stores, pop-ups, or kiosks, like the Company's competitors.  Instead, Defendant has deliberately caused the Company's product to be available only on the Company's own limited website while sales and profits plummeted.  In doing so, Defendant has intentionally caused or exacerbated the effects of the alleged challenges he claims contributed to the Company's disastrous financial performance while under his control.

Defendant has failed to expand or meaningfully refine the Company's product line. Defendant has refused to offer even the most basic additional products to broaden the Company's single-style shoe line, such as additional style women's flats, (i.e. pointed toe, loafer, etc.).  Nor has he expanded the Company's brand beyond women's flats as countless other companies in the sector have done, eschewing potential products such as women's sneakers, sandals, men's footwear, handbags and other accessories.  This includes various products which were not only previously discussed at the Company before Defendant assumed sole control, but many product types where the Company has already invested significant funds to protect its intellectual property.  Instead, Defendant has deliberately caused the Company to offer the same, single shoe design, which is the only design that the Company ever has offered, virtually unchanged for over a decade.

Defendant has also failed to market the Company's products in numerous lucrative markets, such as international markets, despite having considerable resources to do so and extensive trademark and patent rights in foreign countries.  For example, Defendant has failed to

68

market the Company's product in countries where the Company long ago invested significant resources to protect its intellectual property, including obtaining extensive foreign patents and registrations for its "TIEKS" and other trademarks.  A summary of the Company's international patent holdings as of 2017 (from before Defendant's seizure of control of the Company) is attached hereto as **Appendix 1**; a summary of the Company's international trademark holdings as of 2017 is attached hereto as **Appendix 2**.  Defendant has refused to market the Company's product in major markets throughout Europe, Asia, and around the globe, as well as in obvious and easy-to-launch English-speaking countries, such as Australia, New Zealand, Canada, and the United Kingdom.

Relatedly, Defendant has failed to expand the Company's brand into other product categories previously discussed and planned by the parties prior to the Relevant Period, including various categories in which the Company has long since invested significant resources to protect its intellectual property in preparation for that expansion.  The Company maintains significant intellectual property holdings in product classes other than shoes (for example, handbags, apparel, wallets, etc.).  For instance, the Company previously has registered, or applied to register, the "TIEKS" trademark product categories including, but not limited to the following classes of goods: shirts, blouses, sweaters, sweatshirts, coats, jackets, ponchos, raincoats, blazers, cardigans, vests, skirts, dresses, gowns, shorts, pants, jeans, leggings, sweatpants, suits, tuxedos, hats, scarves, shawls, underwear, bodysuits, sleepwear, bathrobes, socks, hosiery, belts, suspenders, gloves and mittens, earmuffs, neckties, and neckwear; bags made of leather or imitations of leather adapted for portable consumer electronic devices, namely mobile phones, tablets, laptops, and PDAs; mugs; drinking cups; shoe cream; apparel, namely, shirts; tote bags; shoe bags for travel; crossbody bags; jewelry; online retail store services featuring handbags and footwear; footwear; retail store and online retail store services; retail store and online retail store services featuring cosmetics and personal care products, fragrances, eyewear, smartphone and table cases, jewelry, luggage and handbags, housewares, bedding, tableware, textiles, towels, apparel and footwear; eyewear, sunglasses, spectacles, sunglasses and spectacles cases and frames, optical frames; pouches and bags adapted to carry sunglasses and spectacles; laptop

69

cases, laptop bags; mobile phone cases; downloadable electronic publications in the nature of magazines in the field of fashion, travel, lifestyle and consumer products; beverage glassware; porcelain mugs and works of art; tableware being dishes and plates of glass, porcelain, and earthenware; plates, cups, saucers, mugs, bowls, servings dishes; drinking glasses; insulating sleeve holder made of leather for beverage cups; pots, pans, saucepans, vases, decanters, drinking flasks, stirrers for cocktails; ice buckets, glass boxes; money boxes; napkin holders and rings; bottle openers, candlesticks, perfume sprayers sold empty; perfume burners; perfume atomizers, sold empty; soap dishes, soap dispensers, lotion dispensers, cosmetic brushes, nail brushes, footwear brushes, shoe trees, shoe stretchers, flower pots; infant's and children's clothing, namely, shirts, blouses, sweaters, sweatshirts, coats, jackets, ponchos, raincoats, blazers, cardigans, vests, skirts, dresses, gowns, shorts, pants, jeans, leggings, sweatpants, suits, tuxedos, hats, scarves, shawls, underwear, bodysuits, sleepwear, bathrobes, socks, hosiery, belts, suspenders, gloves and mittens, earmuffs, neckties, and neckwear; kerchiefs and pocket squares; swimwear; footwear; headwear; jewelry; watches; jewelry and personal accessories, namely, broaches, cufflinks, and jewelry charms not included in other classes; jewelry made of precious and non-precious metals; clocks and timepieces; cosmetic bags sold empty; handbags; umbrellas; carrying cases; travel bags and articles for traveling not included in other classes, namely, garment bags, trunks, cases, grooming organizers, leather bags, overnight bags, weekend bags, backpacks, gym bags, diaper bags, beach bags, belt bags and hip bags, hobo bags, crossbody bags, all-purpose reusable carrying bags, baggage tags for travel baggage and shoe bags for travel; luggage; purses; wallets; clutches; messenger bags; utility bags in the nature of all-purpose carrying bags; sports bags; tote bags; shoe bags for travel; cologne; cosmetic preparations for body care; cosmetics; fragrances for personal use; perfumes; hair care preparations; bath products, namely, bath oil, bubble bath, bath powder, cosmetic bath salts, shower gels and skin lotions; shoe cream, shoe polish, shoe wax; cleaning and polishing preparations, namely, cleaning and polishing preparations for leather, footwear, handbags, sunglasses; retail store and online retail store services featuring fashion goods; retail store and online retail store services featuring cosmetics and personal care products, fragrances, eyewear,

70

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

smartphone and table cases, jewelry, luggage and handbags, housewares, bedding, tableware, textiles, towels, apparel and footwear.

These product lines, and the intellectual property rights held in those product classes, have remain unused throughout the Relevant Period while the Company's performance suffered significantly. This also is in stark contrast to the Company's competitors, which have expanded into new product lines. Thus, Defendant's intentional mismanagement of the Company's product line has limited the Company's sales entirely to a single shoe style, with no attempt to broaden that product line, limiting the Company's sales and performance in the face of catastrophic decline.

Defendant has further mismanaged several of the Company's product lines, including:

a. Defendant mismanaged the Company's pioneering Vegan line, for which there was significant demand and rising consumer trends. Instead, Defendant watched as competitors achieved tremendous success with non-leather footwear of similar design, while Defendant failed to properly market, expand, design, or otherwise capitalize on clear consumer demand, allowing the Company's own non-leather sales to languish. Rather than capitalize on these trends, Defendant chose to develop shoes made from materials that are of questionable suitability for the Company's style of footwear – such as velvet and suede – even though Defendant and Plaintiff previously had decided ***not*** to use such materials precisely because of these quality concerns and lack of demand.

b. Defendant took an unlaunched children's line with tremendous potential and mismanaged its marketing.

c. Defendant also relaunched shoes that were originally marketed as limited releases, undermining brand credibility and alienating customers who purchased "limited edition" or "seasonal" shoe colors, such as the "Champagne" and "Love Potion" shoes. The re-release and mass production

71

of these so-called limited releases caused consumer confusion and the loss of trust.

    d. Defendant launched other colors, including the "Mojave" and "Rouge Suede" shoes, which generated considerable negative feedback from customers. Other limited release colors, such as the "Poppy" or "Neon" colors were continually relaunched each year despite consumer fatigue and declining demand.

Defendant has mismanaged the Company's e-commerce website, which, due to Defendant's mismanagement described above, is its sole storefront and source of revenue. While maintaining massive cash reserves, which would have been more than adequate to fund any website functionality improvements, Defendant has failed to invest in or implement basic, industry standard applications and technologies that facilitate shopping online. For instance, the Company has not implemented Apple Pay, Amazon Pay, or Google Pay services on its website, nor has the Company implemented other basic features such as site search, product videos, SMS/text message communications for customer service and marketing, product reviews, push notifications, chatbots, multilingual support, referral programs, or product recommendations. Instead, Defendant uses an outdated, vulnerable, and costly e-commerce shopping cart platform that appears virtually unchanged throughout Defendant's control of the Company.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**<u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9</u>:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 9.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite

72

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Supplemental Interrogatory No. 1 and additionally states as follows:

Defendant has failed to maintain, leverage, or expand the Company's brand and sales through various available and potentially lucrative channels. This includes Defendant's refusal to make the Company's products available through: any other online retail channels, including hugely popular online marketplaces such as Zappos and Amazon; any traditional brick and mortar retail channels, including retailers such as Nordstrom, Bloomingdales, or Macy's; any other third party wholesale or other distribution opportunities, such as boutiques; or any first-party retail opportunities, such as Company-operated or branded stores, pop-ups, or kiosks, like the Company's competitors. Instead, Defendant has deliberately caused the Company's product to be available only on the Company's own limited website while sales and profits plummeted. In doing so, Defendant has intentionally caused or exacerbated the effects of the alleged challenges he claims contributed to the Company's disastrous financial performance while under his control.

Defendant has failed to expand or meaningfully refine the Company's product line. Defendant has refused to offer even the most basic additional products to broaden the

73

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Company's single-style shoe line, such as additional style women's flats, (i.e. pointed toe, loafer, etc.).  Nor has he expanded the Company's brand beyond women's flats as countless other companies in the sector have done, eschewing potential products such as women's sneakers, sandals, men's footwear, handbags and other accessories.  This includes various products which were not only previously discussed at the Company before Defendant assumed sole control, but many product types where the Company has already invested significant funds to protect its intellectual property.  Instead, Defendant has deliberately caused the Company to offer the same, single shoe design, which is the only design that the Company ever has offered, virtually unchanged for over a decade.

Defendant has also failed to market the Company's products in numerous lucrative markets, such as international markets, despite having considerable resources to do so and extensive trademark and patent rights in foreign countries.  For example, Defendant has failed to market the Company's product in countries where the Company long ago invested significant resources to protect its intellectual property, including obtaining extensive foreign patents and registrations for its "TIEKS" and other trademarks.  A summary of the Company's international patent holdings as of 2017 (from before Defendant's seizure of control of the Company) is attached hereto as **Appendix 1**; a summary of the Company's international trademark holdings as of 2017 is attached hereto as **Appendix 2**.  Defendant has refused to market the Company's product in major markets throughout Europe, Asia, and around the globe, as well as in obvious and easy-to-launch English-speaking countries, such as Australia, New Zealand, Canada, and the United Kingdom.

Relatedly, Defendant has failed to expand the Company's brand into other product categories previously discussed and planned by the parties prior to the Relevant Period, including various categories in which the Company has long since invested significant resources to protect its intellectual property in preparation for that expansion.  The Company maintains significant intellectual property holdings in product classes other than shoes (for example, handbags, apparel, wallets, etc.).  For instance, the Company previously has registered, or applied to register, the "TIEKS" trademark product categories including, but not limited to the following

74

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

classes of goods: shirts, blouses, sweaters, sweatshirts, coats, jackets, ponchos, raincoats, blazers, cardigans, vests, skirts, dresses, gowns, shorts, pants, jeans, leggings, sweatpants, suits, tuxedos, hats, scarves, shawls, underwear, bodysuits, sleepwear, bathrobes, socks, hosiery, belts, suspenders, gloves and mittens, earmuffs, neckties, and neckwear; bags made of leather or imitations of leather adapted for portable consumer electronic devices, namely mobile phones, tablets, laptops, and PDAs; mugs; drinking cups; shoe cream; apparel, namely, shirts; tote bags; shoe bags for travel; crossbody bags; jewelry; online retail store services featuring handbags and footwear; footwear; retail store and online retail store services; retail store and online retail store services featuring cosmetics and personal care products, fragrances, eyewear, smartphone and table cases, jewelry, luggage and handbags, housewares, bedding, tableware, textiles, towels, apparel and footwear; eyewear, sunglasses, spectacles, sunglasses and spectacles cases and frames, optical frames; pouches and bags adapted to carry sunglasses and spectacles; laptop cases, laptop bags; mobile phone cases; downloadable electronic publications in the nature of magazines in the field of fashion, travel, lifestyle and consumer products; beverage glassware; porcelain mugs and works of art; tableware being dishes and plates of glass, porcelain, and earthenware; plates, cups, saucers, mugs, bowls, servings dishes; drinking glasses; insulating sleeve holder made of leather for beverage cups; pots, pans, saucepans, vases, decanters, drinking flasks, stirrers for cocktails; ice buckets, glass boxes; money boxes; napkin holders and rings; bottle openers, candlesticks, perfume sprayers sold empty; perfume burners; perfume atomizers, sold empty; soap dishes, soap dispensers, lotion dispensers, cosmetic brushes, nail brushes, footwear brushes, shoe trees, shoe stretchers, flower pots; infant's and children's clothing, namely, shirts, blouses, sweaters, sweatshirts, coats, jackets, ponchos, raincoats, blazers, cardigans, vests, skirts, dresses, gowns, shorts, pants, jeans, leggings, sweatpants, suits, tuxedos, hats, scarves, shawls, underwear, bodysuits, sleepwear, bathrobes, socks, hosiery, belts, suspenders, gloves and mittens, earmuffs, neckties, and neckwear; kerchiefs and pocket squares; swimwear; footwear; headwear; jewelry; watches; jewelry and personal accessories, namely, broaches, cufflinks, and jewelry charms not included in other classes; jewelry made of precious and non-precious metals; clocks and timepieces; cosmetic bags sold empty; handbags; umbrellas;

75

carrying cases; travel bags and articles for traveling not included in other classes, namely, garment bags, trunks, cases, grooming organizers, leather bags, overnight bags, weekend bags, backpacks, gym bags, diaper bags, beach bags, belt bags and hip bags, hobo bags, crossbody bags, all-purpose reusable carrying bags, baggage tags for travel baggage and shoe bags for travel; luggage; purses; wallets; clutches; messenger bags; utility bags in the nature of all-purpose carrying bags; sports bags; tote bags; shoe bags for travel; cologne; cosmetic preparations for body care; cosmetics; fragrances for personal use; perfumes; hair care preparations; bath products, namely, bath oil, bubble bath, bath powder, cosmetic bath salts, shower gels and skin lotions; shoe cream, shoe polish, shoe wax; cleaning and polishing preparations, namely, cleaning and polishing preparations for leather, footwear, handbags, sunglasses; retail store and online retail store services featuring fashion goods; retail store and online retail store services featuring cosmetics and personal care products, fragrances, eyewear, smartphone and table cases, jewelry, luggage and handbags, housewares, bedding, tableware, textiles, towels, apparel and footwear.

These product lines, and the intellectual property rights held in those product classes, have remain unused throughout the Relevant Period while the Company's performance suffered significantly.  This also is in stark contrast to the Company's competitors, which have expanded into new product lines.  Thus, Defendant's intentional mismanagement of the Company's product line has limited the Company's sales entirely to a single shoe style, with no attempt to broaden that product line, limiting the Company's sales and performance in the face of catastrophic decline.

Defendant has further mismanaged several of the Company's product lines, including:

    a.   Defendant mismanaged the Company's pioneering Vegan line, for which there was significant demand and rising consumer trends.  Instead, Defendant watched as competitors achieved tremendous success with non-leather footwear of similar design, while Defendant failed to properly market, expand, design, or otherwise capitalize on clear consumer demand, allowing the Company's own non-leather sales to languish.  For example, it appears

76

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

that during the Relevant Period, Defendant has failed to expand the Company's Vegan line, which has consisted of the same five shoes for nearly a decade. Defendant chose not to expand the Company's non-leather product offerings even though Defendant acknowledged that the Company faced "greater competition during the relevant period" from competitors such as Rothy's and Allbirds, who have achieved notable success (for Rothy's, marked by $1 billion valuation in 2021) by offering shoes made from non-leather materials and sustainable fabrics. Defendant has had multiple opportunities to expand the Company's non-leather product offerings and capitalize on significant consumer demand for recycled and sustainable materials, but chose not to. The "Heritage Plaid", "Calouflage", and "Incognito" styles that the Company launched while under Defendant's sole control have non-leather "uppers" (the top part of the shoe), but leather insoles and mid/outsoles. The leather insoles and mid/outsoles prevent these styles from being marketed as Vegan. Thus, these styles do not appeal to customers who desire the Company's classic Italian leather shoes (because they feature fabric uppers), but they likewise do not appeal to customers who would prefer shoes made without animal products. Because the Company was already making Vegan shoes before the Relevant Period, the Company was poised to capitalize on the skyrocketing demand for shoes made from non-leather materials or other sustainable materials. However, as demand for sustainably-sourced shoes rose, Defendant did not respond to that demand by, for instance, expanding the Company's Vegan line, offering desirable animal-free styles, or offering fabrics such as those knit from recycled materials, despite clear consumer demand for such products. Instead, Defendant apparently caused the Company to invest in shoes like the Heritage Plaid, Caloflauge, and Incognito styles, which are neither properly Vegan (and thus fail to appropriately capitalize on that demand) nor are they made from the quality

77

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Italian leather that has long appealed to the Company's customers at the Company's luxury price point. Rather than capitalize on these trends, Defendant chose to develop shoes made from materials that are of questionable suitability for the Company's style of footwear – such as velvet and suede – even though Defendant and Plaintiff previously had decided not to use such materials precisely because of these quality concerns and lack of demand.

    b. Defendant took an unlaunched children's line with tremendous potential and mismanaged its marketing. It appears Defendant mismanaged the Company's children's line from the start by taking a product line that had long been in development and launching it in the late summer, a time of lesser demand for such a product. During the late summer, back to school shopping and related trends dominates children's spending and children tend to wear sneakers to school rather than high-priced Italian leather flats. Since then, and during the Relevant Period, Defendant has continued to mismanage the Company's children's line. For example, Defendant has consistently priced the children's line at an unappealing and unreasonably high price point, seemingly to limit sales. The children's line runs only from child size 7 (toddlers) to adult size two (elementary school-aged children), yet are $130-140, and only a roughly $50 difference from most of the adult styles offered. The limited size range is also perplexing given that demand for luxury Italian leather shoes for toddlers and elementary school-aged children is typically lower than for older children and teens. Defendant has also failed to appropriately manage the inventory of the children's line. For instance, as of the date of these Supplemental Responses, the children's style "Mini Cotton Candy" is only available in child sizes 7 and 8, which, again, would tend to mostly fit toddlers. The rest of the sizes are out of stock

78

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

c. Defendant also relaunched shoes that were originally marketed as limited releases, undermining brand credibility and alienating customers who purchased "limited edition" or "seasonal" shoe colors, such as the "Champagne" and "Love Potion" shoes. The re-release and mass production of these so-called limited releases caused consumer confusion and the loss of trust.

d. Defendant launched other colors, including the "Mojave" and "Rouge Suede" shoes, which generated considerable negative feedback from customers. Other limited release colors, such as the "Poppy" or "Neon" colors were continually relaunched each year despite consumer fatigue and declining demand.

Defendant has mismanaged the Company's e-commerce website, which, due to Defendant's mismanagement described above, is its sole storefront and source of revenue. While maintaining massive cash reserves, which would have been more than adequate to fund any website functionality improvements, Defendant has failed to invest in or implement basic, industry standard applications and technologies that facilitate shopping online. For instance, the Company has not implemented Apple Pay, Amazon Pay, or Google Pay services on its website, nor has the Company implemented other basic features such as site search, product videos, SMS/text message communications for customer service and marketing, product reviews, push notifications, chatbots, multilingual support, referral programs, or product recommendations. Instead, Defendant uses an outdated, vulnerable, and costly e-commerce shopping cart platform that appears virtually unchanged throughout Defendant's control of the Company.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

79

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 10:**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 58 of the TAC that "Defendant has intentionally, recklessly, and in a grossly negligent manner mismanaged the Company's customer service operations, causing an increase in refunds, returns, expenses, and dissatisfaction with the brand."

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Interrogatory No. 1 and additionally states as follows:

80

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Plaintiff is informed and believes that Defendant mismanaged the Company's customer experience/service operations, causing an increase in refunds, returns, expenses, and dissatisfaction with the brand.  The Company has pushed unsatisfied customers to accept poorly-executed repairs on products, leading to low customer satisfaction with repairs.  Defendant also has failed to improve upon the Company's limited customer service availability or implement various modern, industry-standard tools such as alternative communication channels or chatbots to supplement its live customer service personnel availability to maintain the high level of customer service that the Company was historically known for.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Yamit Betesh, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 10.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been

81

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Supplemental Interrogatory No. 1 and additionally states as follows:

Plaintiff is informed and believes that Defendant mismanaged the Company's customer experience/service operations, causing an increase in refunds, returns, expenses, and dissatisfaction with the brand.  The Company has pushed unsatisfied customers to accept poorly-executed repairs on products, leading to low customer satisfaction with repairs. For example, it appears that when presented with various customer complaints regarding materials or workmanship, Defendant has forced customers to mail their shoes to the Company for repairs to their shoes' stitching, leather finish, or outsole patches, many times at the hands of amateur and/or unskilled employees.  This also forces customers, who are often already unsatisfied, to be apart from their shoes for days or weeks at a time while repairs are attempted on their sometimes relatively new pair of luxury shoes.  Unsatisfactory resolution of customer complaints causes a decline in brand loyalty, desirability, and ultimately sales.  Defendant also has failed to improve upon the Company's limited customer service availability or implement various modern, industry-standard tools such as alternative communication channels or chatbots to supplement its live customer service personnel availability to maintain the high level of customer service that the Company was historically known for.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Yamit Betesh, and as-yet undetermined current and/or former employees of the Company.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**INTERROGATORY NO. 11:**

IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 59 of the TAC that "Defendant has intentionally,

82

recklessly, and in a grossly negligent manner mismanaged the Company's legal affairs, running up millions of dollars in legal fees in the process."

**RESPONSE TO INTERROGATORY NO. 11:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff responds as follows:

Based on the limited information available to Plaintiff, Plaintiff is concerned that Defendant has caused the Company to spend millions of dollars in legal fees on litigation regarding the Company's intellectual property, with no apparent recovery.  Defendant also caused the Company to expend substantial funds securing and maintaining intellectual property

83

rights for a variety of products in various markets, all while failing to capitalize, market, or monetize this same intellectual property.  Additionally, Defendant caused the Company to spend substantial funds to professionals that Defendant classified as legal fees or "other expenses" for matters which were unrelated to the Company or were otherwise improper.

In addition, the Company's trademark counsel has advised the Company in writing that it should pursue international trademark protection for the Tiek blue color.  Because Defendant has refused to provide Plaintiff with access to Company information, it is unknown to Plaintiff whether Defendant acted on this recommendation after he excluded Plaintiff from the Company.  However, Plaintiff can find no indication that Defendant directed counsel or any other firm to pursue international trademark protection for the Tiek blue color per counsel's recommendation.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, and the Company's outside counsel.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 11.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus,

84

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff responds as follows:

Based on the limited information available to Plaintiff, Plaintiff is concerned that Defendant has caused the Company to spend millions of dollars in legal fees on litigation regarding the Company's intellectual property, with no apparent recovery. Defendant also caused the Company to expend substantial funds securing and maintaining intellectual property rights for a variety of products in various markets, all while failing to capitalize, market, or monetize this same intellectual property. Additionally, Defendant caused the Company to spend substantial funds to professionals that Defendant classified as legal fees or "other expenses" for matters which were unrelated to the Company or were otherwise improper. For example, the Company attributed roughly $4,043,226 to legal fees in 2019, roughly $1,289,721 in 2020, and roughly $1,299,840 in 2021 for unspecified matters and/or litigation. Meanwhile, the Company does not appear to have actually recovered any material funds via judgments or settlements, particularly in relation to the millions in fees it has incurred under Defendant's unlawful sole control.

In addition, the Company's trademark counsel has advised the Company in writing that it should pursue international trademark protection for the Tiek blue color. Because Defendant has refused to provide Plaintiff with access to Company information, it is unknown to Plaintiff whether Defendant acted on this recommendation after he excluded Plaintiff from the Company. However, Plaintiff can find no indication that Defendant directed counsel or any other firm to pursue international trademark protection for the Tiek blue color per counsel's recommendation.

Individuals who may possess relevant information and documents include, but are not limited to, Defendant, Plaintiff, Dean Unatin, and the Company's outside counsel.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

85

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 12:**

IDENTIFY all transactions that YOU contend constitute "improper transactions or transfers of funds made entirely for [Defendant's] own benefit or for the benefit of his family members and others assisting him," as alleged in paragraph 56 of the TAC.

**RESPONSE TO INTERROGATORY NO. 12:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff responds as follows:

Defendant engaged in wrongful self-dealing by using Company property to financially benefit himself, family, and friends.  Defendant has charged millions of dollars on credit cards in

86

his personal name, making personal expenses and payments, all from Company funds.  For example, Defendant used Company funds to pay tens of thousands of dollars, if not more, to various retailers like Amazon, Nordstrom, and Target, personal assistants, public relations services, grocery stores, and other items to benefit Defendant personally at the Company's expense.  Defendant has also transferred or caused to be transferred millions of dollars in Company funds to various unknown individuals and entities, including various foreign entities.  This includes various wires, electronic transfers, and handwritten paper checks, with no oversight or substantiation, including:

- Defendant has caused hundreds of thousands of dollars to be transferred to various unknown entities under the classification of "Inventory Purchases" including Pe Petrenko S.O., Zhao Guo Jie, Popular Planet Hong Kong Limited, Guangdong Xingyida Imp Ex, Zhang Min Zhen, Jiang Xiao Xia, Wo Kwun Trading Limited, Hong Kong Junbo Industrial Limited, Hk Yaohui Intl Trading Ltd, Dongguan Dongda Imp And Exp Co Ltd, Eternity Action Limited, United Century Group, Little Apple Hong Kong Limited, Gataila International Co, Wellinsyn Glory Company Limited, Yiwu Melody Trading Co, Zhicheng Yi, WenJing, and Tai Ya Internation Co Ltd, and Fu David.  These transactions can be found at pages GAVRIELI0035281 – GAVRIELI0035283, GAVRIELI0043563 – GAVRIELI0043565, and GAVRIELI0047269 – GAVRIELI0047271.

- Defendant shifted millions of dollars of Company spending away from the Company's American Express cards to specific credit card(s) in his name. Defendant did so to generate substantial credit card rewards and cash back benefits worth approximately $75,000, or more, that he personally retained at the Company's expense.  In addition to Defendant improperly benefitting himself, Defendant knowingly cost the Company this same amount by depriving it of the substantial discounts and benefits it would have otherwise received if this spending had not been shifted away from the Company's longtime use of its

87

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

American Express charge cards, which generate an immediate 1.5% discount on all spending.

- Defendant has used Company funds to intentionally and substantially overpay his expected tax liabilities. From 2020 through 2022 alone, these payments have totaled over $3 million dollars, despite Defendant's knowledge, including repeated representations by Defendant to this Court in his Bankruptcy Case, that he expected little to no tax liability for those years. Defendant's actions to substantially overpay his tax liabilities were undertaken with the intent to benefit himself personally by generating large refunds and offsets, thereby funneling Company cash to himself under the guise of payments to the IRS and FTB.

- During the Relevant Period, including in or around September 2022 or as late as 2023, Defendant personally and unilaterally caused the Company to file amended tax returns to improperly pocket an estimated $1-4 million in Company funds as refunds. Defendant did so by filing new Company returns, years after the applicable tax years and original filings, which substantially reduced Defendant's share of Company pass-through income. The lowered pass-through income resulted in substantially lower personal tax liability for Defendant, resulting in a windfall to Defendant who intentionally caused substantial overpayments from Company funds for those years to be made on his behalf. Defendant has failed to return those funds to the Company, and instead knowingly filed these recent amendments to improperly obtain millions of Company funds.

- Defendant has transferred hundreds of thousands of dollars to Eli Bechor for purported office catering, including thousands of dollars when the Company's office was closed and/or most employees were working remotely. For example, in 2020 alone, during the height of COVID-19 disruption, the Company purportedly spent approximately $125,000 with Mr. Bechor on catering alone.

- Additionally, Defendant caused the Company to partner with his personal friend's company, Aspiration Bank, in which Defendant has a significant ownership

88

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

interest, whereby he asked the Company's high end designer shoe clientele to sign up for an Aspiration Bank account and related financial services in exchange for a Tieks discount.

- All transactions involving Mira Gavrieli's receipt of Company funds and/or benefits also constitute self-dealing, including direct payments to her, Company credit cards issued in her name, and expenses paid for her benefit. For example, Defendant has improperly maintained his mother, Mira Gavrieli, on the Company's payroll throughout the Relevant Period (and before). However, she has provided no actual services to the Company, therefore there is no legitimate business purpose for providing any Company funds or resources to her. This has been repeatedly acknowledged by the Company's forensic accountant, who determined that over $200,000 in payments/transfers to Mira Gavrieli must be reclassified as distributions to Defendant in 2019-2021 alone. Additionally, Plaintiff believes that Defendant has continued this improper practice through 2022 and 2023, substantially increasing the amount of Company funds and benefits that Mira Gavrieli has received. Payments to Mira Gavrieli are shown on pages GAVRIELI0035297, GAVRIELI0035430, GAVRIELI0043579, GAVRIELI0043732, GAVRIELI0043759, GAVRIELI0047287, GAVRIELI0047344.

- Defendant and others with his authorization have charged millions of dollars on credit cards paid from Company funds. This includes purported Company credit cards he had issued in the name of family members and others for their and/or his benefit, as well as electronic payments and handwritten checks drawn directly from the Company's operating account. Despite demands, Defendant has failed to substantiate such charges, which include thousands of individual transactions during the Relevant Period on apparent personal expenses, including transactions at various grocery stores (Bristol Farms, BevMo, Glatt Mart, Pavilions, Ralph's, Smart and Final, Trader Joe's, Vons, Whole Foods), personal credit services

89

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

(Experian), luxury gym memberships (Equinox), high-end clothing retailers (Nordstrom), home goods (Amazon, Bath & Body Works, Bed Bath & Beyond, Home Depot, HomeGoods, Target, Walmart), bakeries (Hansen Cakes, Krispy Kreme, La Brea Bakery, La Provence Patisserie, Magnolia Bakery, Mrs. Field's, Porto's Bakery, Susie Cakes), drug and convenience stores (7- Eleven, CVS, Rite Aid), restaurant delivery (DoorDash, Instacart, Postmates, Uber Eats), transportation (Rapid Gas, Uber), countless restaurants, and many others.  Based on the limited information currently available to Plaintiff, these suspect transactions are identified as follows based on the accounting classifications designated and/or approved by Defendant:  Automobile Expense (GAVRIELI0035367), Draw (GAVRIELI0043732); Due From American Express (GAVRIELI0035419, GAVRIELI0043747); Dues and Subscriptions (GAVRIELI0035388, GAVRIELI0035562, GAVRIELI0043696, GAVRIELI0043747, GAVRIELI0043893, GAVRIELI0043940, GAVRIELI0047351, GAVRIELI0047506); Employee Meals and Events (GAVRIELI0035367 - GAVRIELI0035373, GAVRIELI0035562, GAVRIELI0043679 - GAVRIELI0043682, GAVRIELI0043747, GAVRIELI0043893 - GAVRIELI0043894, GAVRIELI0047331, GAVRIELI0047351, GAVRIELI0047506 - GAVRIELI0047509); Employee Recruitment Expense (GAVRIELI0035430, GAVRIELI0035562 - GAVRIELI0035563, GAVRIELI0043759, GAVRIELI0043894, GAVRIELI0047351); Gifts (GAVRIELI0043682, GAVRIELI0043687, GAVRIELI0047509); Medical Expense (GAVRIELI0043682, GAVRIELI0047299, GAVRIELI0047509 - GAVRIELI0047510); Misc Expense (GAVRIELI0035303, GAVRIELI0047351, GAVRIELI0047510); Office Expense (GAVRIELI0047299); Office Supplies and Expense (GAVRIELI0035373, GAVRIELI0043682, GAVRIELI0047331, GAVRIELI0047338, GAVRIELI0047510 - GAVRIELI0047511); Other Expense

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

(GAVRIELI0035404, GAVRIELI0035579, GAVRIELI0043682); Outside Services (GAVRIELI0035379 - GAVRIELI0035380, GAVRIELI0035563 - GAVRIELI0035565, GAVRIELI0043687 - GAVRIELI0043691, GAVRIELI0043894 - GAVRIELI0043896, GAVRIELI0047330, GAVRIELI0047351, GAVRIELI0047511 - GAVRIELI0045716); Photoshoot Expense (GAVRIELI0035373, GAVRIELI0047516 - GAVRIELI0047518); Repairs and Maintenance (GAVRIELI0043682 - GAVRIELI0043683, GAVRIELI0047331, GAVRIELI0047528); Software Subscriptions (GAVRIELI0043759, GAVRIELI0047338, GAVRIELI0047344); Supplies (GAVRIELI0035374 - GAVRIELI0035376, GAVRIELI0035585, GAVRIELI0043684 - GAVRIELI0043685, GAVRIELI0043755, GAVRIELI0043920, GAVRIELI0043940, GAVRIELI0047331, GAVRIELI0047537 - GAVRIELI0047539); and Travel Expense (GAVRIELI0035385 - GAVRIELI0035386, GAVRIELI0035585, GAVRIELI0043920, GAVRIELI0047540).

- Defendant has caused hundreds of thousands of dollars to be transferred to Blue Land Partners LLC, Magna Consulting, and Miller Ink for Defendant's personal public relations and related services at the Company's expense.

- Defendant transferred over one hundred thousand dollars to Byron Perez for purported "office disinfecting."

- Defendant has spent millions of dollars of Company funds on unknown digital advertising campaigns. This spending by Defendant is believed to include the use of Company funds on campaigns unrelated to the Company such as Defendant's personal endeavors that are not for Company purposes. In addition to Defendant's past practices, these concerns are also fueled by Defendant's apparent use of multiple accounts and credit cards and increasingly poor ad spend to sales ratio.

91

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- Defendant has spent thousands of dollars of Company funds to obtain and maintain various domain registrations for his own personal purposes unrelated to any legitimate Company purpose, and/or is attempting to obtain ownership and control of the valuable domain portfolio that was paid for and belongs to the Company.

- Handwritten checks were written on the Company's bank account by Defendant's sister to Juan Rivas for pool service at Defendant's mother's home in September 2019 and again in January 2021, with over $1,000 of Company funds used in 2021 alone for apparent pool maintenance at Defendant's mother's residence.

- The Company spent thousands of dollars for personal healthcare services including to Medicare, Blue Shield and other recipients outside of the Company's employee healthcare program, with approximately $9,000 of Company funds used in 2021 alone for medical expenses believed to be for Defendant's mother (GAVRIELI0043682, GAVRIELI0047299, GAVRIELI0047509 - GAVRIELI0047510).

- Defendant transferred approximately $500,000 to fund personal assistants and other unknown expenses through Upwork.com, including various charges Defendant attempted to hide by using multiple Upwork accounts and charges on multiple credit cards, including that of Catherine Pickard whose services are paid by the Company through Upwork. This includes approximately $100,000 in Upwork charges incurred by Ms. Pickard in 2020 alone.

- The Company paid recurring membership expenses for Defendant's mother's personal Care.com services, personal Google/cloud computing services, and credit card and membership fees.

- The Company paid tens of thousands of dollars to Defendant's sister Mrs. Betesh at restaurants and grocery stores, often at locations near her home and on weekends or on days when the Company's office was closed, such as purchases during the height of the COVID-19 lockdown when employees were all or largely

92

out of the office.  Examples include: an October 20, 2019 purchase by Mrs. Betesh at a Trader Joe's in Torrance, far from the Company's office and on a Sunday when it was closed; a January 1, 2020 purchase by Mrs. Betesh at the Whole Foods near her home on New Year's day; a July 5, 2020 purchase by Mrs. Betesh at the Bristol Farms near her home on Saturday of Fourth of July weekend and a December 26, 2020 purchase by Mrs. Betesh at the Ralph's near her home on Saturday of the Christmas holiday weekend.

- The Company spent thousands of dollars spent by Defendant's personal assistant, Catherine Pickard, on various seemingly personal expenses for Defendant and/or herself, which Defendant classified as gifts and travel expenses that do not appear to be related to the Company.

- Mrs. Betesh spent thousands of dollars of Company funds at retailers ranging from specialized cultural shops such as Abi's Judaica & Gifts and Glatt Kosher Market, to traditional and online retailers such as Target, Costco, Amazon and others.

- Mrs. Betesh wrote hundreds of handwritten paper checks from the Company's bank account to various individuals with no oversight or substantiation.

- Defendant has used Company funds to benefit and pay for the expenses of family members unrelated to the Company.  These payments have included thousands of dollars to attorneys in Hawaii for Defendant's brother, such as a $5,000 payment on March 9, 2020; a $2,000 payment on May 12, 2020; a $5,000 payment on October 22, 2020; and a $3,000 payment on May 18, 2022.

- In addition, Defendant mismanaged, ran off and/or fired valuable Company employees, while retaining, elevating, and improperly compensating others, regardless of performance, based on perceived loyalty to him above the Company. For example, Defendant has used Company funds to give substantial "bonuses" and raises to certain Company employees and individuals who testified falsely on his behalf during the State Court Litigation to reward their support for him.  These

93

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
CENTURY CITY

bonuses and raises dramatically increased the total compensation to these individuals by 75-90% in a four-year period, making them the highest paid employees at the Company.  Further, Defendant rewarded these individuals with these massive increases in their compensation, despite the Company's unprecedented poor financial performance over the same period including the areas of which these employees are ostensibly responsible.

- The Company's unreliable accounting practices under Defendant's control further suggest that Defendant is self-dealing at the Company's expense.  Instead of implementing industry standard accounting practices to contemporaneously track the Company's finances, Defendant waits until after a calendar year ends, and typically much longer, and then sends a host of bank and credit transactions to an outside forensic accountant who is then forced to try to reconstruct financial statements and a general ledger for the Company for the previous year.  The bank account and credit card transactions sent to the accountant lack the necessary detail and itemization to properly classify business expenses.  The effect is that many transactions that had no legitimate business purpose have been improperly categorized as business expenses.

Individuals who may possess relevant information and documents include, but are not limited to, as-yet undetermined current and/or former employees of the Company, Defendant, Plaintiff, Dean Unatin, Mira Gavrieli, Yamit Betesh, Cathrine Pickard, First Republic Bank, and those businesses and beneficiaries identified in this Response, including, but not limited to, First Republic Bank and Upwork.

Even limited to the little information currently available to Plaintiff, these examples are in no way exhaustive, and are instead included for illustrative purposes regarding Defendant's massive unsubstantiated and unchecked spending of Company funds, including tens of thousands of transactions for which no substantiation has been offered.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

94

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 12.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff responds as follows:

Defendant engaged in wrongful self-dealing by using Company property to financially benefit himself, family, and friends. Defendant has charged millions of dollars on credit cards in his personal name, making personal expenses and payments, all from Company funds. For example, Defendant used Company funds to pay tens of thousands of dollars, if not more, to various retailers like Amazon, Nordstrom, and Target, personal assistants, public relations services, grocery stores, and other items to benefit Defendant personally at the Company's expense. Defendant has also transferred or caused to be transferred millions of dollars in Company funds to various unknown individuals and entities, including various foreign entities. This includes various wires, electronic transfers, and handwritten paper checks, with no oversight or substantiation, including:

95

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- Defendant has caused hundreds of thousands of dollars to be transferred to various unknown entities under the classification of "Inventory Purchases" including Pe Petrenko S.O., Zhao Guo Jie, Popular Planet Hong Kong Limited, Guangdong Xingyida Imp Ex, Zhang Min Zhen, Jiang Xiao Xia, Wo Kwun Trading Limited, Hong Kong Junbo Industrial Limited, Hk Yaohui Intl Trading Ltd, Dongguan Dongda Imp And Exp Co Ltd, Eternity Action Limited, United Century Group, Little Apple Hong Kong Limited, Gataila International Co, Wellinsyn Glory Company Limited, Yiwu Melody Trading Co, Zhicheng Yi, WenJing, and Tai Ya Internation Co Ltd, and Fu David.  These transactions can be found at pages GAVRIELI0035281 – GAVRIELI0035283, GAVRIELI0043563 – GAVRIELI0043565, and GAVRIELI0047269 – GAVRIELI0047271.

- Defendant shifted millions of dollars of Company spending away from the Company's American Express cards to specific credit card(s) in his name. Defendant did so to generate substantial credit card rewards and cash back benefits worth approximately $75,000, or more, that he personally retained at the Company's expense.  In addition to Defendant improperly benefitting himself, Defendant knowingly cost the Company this same amount by depriving it of the substantial discounts and benefits it would have otherwise received if this spending had not been shifted away from the Company's longtime use of its American Express charge cards, which generate an immediate 1.5% discount on all spending.

- Defendant has used Company funds to intentionally and substantially overpay his expected tax liabilities.  From 2020 through 2022 alone, these payments have totaled over $3 million dollars, despite Defendant's knowledge, including repeated representations by Defendant to this Court in his Bankruptcy Case, that he expected little to no tax liability for those years.  Defendant's actions to substantially overpay his tax liabilities were undertaken with the intent to benefit

96

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

himself personally by generating large refunds and offsets, thereby funneling Company cash to himself under the guise of payments to the IRS and FTB.

- During the Relevant Period, including in or around September 2022 or as late as 2023, Defendant personally and unilaterally caused the Company to file amended tax returns to improperly pocket an estimated $1-4 million in Company funds as refunds.  Defendant did so by filing new Company returns, years after the applicable tax years and original filings, which substantially reduced Defendant's share of Company pass-through income.  The lowered pass-through income resulted in substantially lower personal tax liability for Defendant, resulting in a windfall to Defendant who intentionally caused substantial overpayments from Company funds for those years to be made on his behalf.  Defendant has failed to return those funds to the Company, and instead knowingly filed these recent amendments to improperly obtain millions of Company funds.

- Defendant has transferred hundreds of thousands of dollars to Eli Bechor for purported office catering, including thousands of dollars when the Company's office was closed and/or most employees were working remotely.  For example, in 2020 alone, during the height of COVID-19 disruption, the Company purportedly spent approximately $125,000 with Mr. Bechor on catering alone.

- Additionally, Defendant caused the Company to partner with his personal friend's company, Aspiration Bank, in which Defendant has a significant ownership interest, whereby he asked the Company's high end designer shoe clientele to sign up for an Aspiration Bank account and related financial services in exchange for a Tieks discount.

- All transactions involving Mira Gavrieli's receipt of Company funds and/or benefits also constitute self-dealing, including direct payments to her, Company credit cards issued in her name, and expenses paid for her benefit.  For example, Defendant has improperly maintained his mother, Mira Gavrieli, on the Company's payroll throughout the Relevant Period (and before).  However, she

97

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

has provided no actual services to the Company, therefore there is no legitimate business purpose for providing any Company funds or resources to her.  This has been repeatedly acknowledged by the Company's forensic accountant, who determined that over $200,000 in payments/transfers to Mira Gavrieli must be reclassified as distributions to Defendant in 2019-2021 alone.  Additionally, Plaintiff believes that Defendant has continued this improper practice through 2022 and 2023, substantially increasing the amount of Company funds and benefits that Mira Gavrieli has received.  Payments to Mira Gavrieli are shown on pages GAVRIELI0035297, GAVRIELI0035430, GAVRIELI0043579, GAVRIELI0043732, GAVRIELI0043759, GAVRIELI0047287, GAVRIELI0047344.

- Defendant and others with his authorization have charged millions of dollars on credit cards paid from Company funds.  This includes purported Company credit cards he had issued in the name of family members and others for their and/or his benefit, as well as electronic payments and handwritten checks drawn directly from the Company's operating account.  Despite demands, Defendant has failed to substantiate such charges, which include thousands of individual transactions during the Relevant Period on apparent personal expenses, including transactions at various grocery stores (Bristol Farms, BevMo, Glatt Mart, Pavilions, Ralph's, Smart and Final, Trader Joe's, Vons, Whole Foods), personal credit services (Experian), luxury gym memberships (Equinox), high-end clothing retailers (Nordstrom), home goods (Amazon, Bath & Body Works, Bed Bath & Beyond, Home Depot, HomeGoods, Target, Walmart), bakeries (Hansen Cakes, Krispy Kreme, La Brea Bakery, La Provence Patisserie, Magnolia Bakery, Mrs. Field's, Porto's Bakery, Susie Cakes), drug and convenience stores (7- Eleven, CVS, Rite Aid), restaurant delivery (DoorDash, Instacart, Postmates, Uber Eats), transportation (Rapid Gas, Uber), countless restaurants, and many others.  Based on the limited information currently available to Plaintiff, these suspect

98

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

transactions are identified as follows based on the accounting classifications designated and/or approved by Defendant:  Automobile Expense (GAVRIELI0035367), Draw (GAVRIELI0043732); Due From American Express (GAVRIELI0035419, GAVRIELI0043747); Dues and Subscriptions (GAVRIELI0035388, GAVRIELI0035562, GAVRIELI0043696, GAVRIELI0043747, GAVRIELI0043893, GAVRIELI0043940, GAVRIELI0047351, GAVRIELI0047506); Employee Meals and Events (GAVRIELI0035367 - GAVRIELI0035373, GAVRIELI0035562, GAVRIELI0043679 - GAVRIELI0043682, GAVRIELI0043747, GAVRIELI0043893 - GAVRIELI0043894, GAVRIELI0047331, GAVRIELI0047351, GAVRIELI0047506 - GAVRIELI0047509); Employee Recruitment Expense (GAVRIELI0035430, GAVRIELI0035562 - GAVRIELI0035563, GAVRIELI0043759, GAVRIELI0043894, GAVRIELI0047351); Gifts (GAVRIELI0043682, GAVRIELI0043687, GAVRIELI0047509); Medical Expense (GAVRIELI0043682, GAVRIELI0047299, GAVRIELI0047509 - GAVRIELI0047510); Misc Expense (GAVRIELI0035303, GAVRIELI0047351, GAVRIELI0047510); Office Expense (GAVRIELI0047299); Office Supplies and Expense (GAVRIELI0035373, GAVRIELI0043682, GAVRIELI0047331, GAVRIELI0047338, GAVRIELI0047510 - GAVRIELI0047511); Other Expense (GAVRIELI0035404, GAVRIELI0035579, GAVRIELI0043682); Outside Services (GAVRIELI0035379 - GAVRIELI0035380, GAVRIELI0035563 - GAVRIELI0035565, GAVRIELI0043687 - GAVRIELI0043691, GAVRIELI0043894 - GAVRIELI0043896, GAVRIELI0047330, GAVRIELI0047351, GAVRIELI0047511 - GAVRIELI0045716); Photoshoot Expense (GAVRIELI0035373, GAVRIELI0047516 - GAVRIELI0047518); Repairs and Maintenance (GAVRIELI0043682 - GAVRIELI0043683, GAVRIELI0047331, GAVRIELI0047528); Software Subscriptions

99

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

(GAVRIELI0043759, GAVRIELI0047338, GAVRIELI0047344); Supplies (GAVRIELI0035374 - GAVRIELI0035376, GAVRIELI0035585, GAVRIELI0043684 - GAVRIELI0043685, GAVRIELI0043755, GAVRIELI0043920, GAVRIELI0043940, GAVRIELI0047331, GAVRIELI0047537 - GAVRIELI0047539); and Travel Expense (GAVRIELI0035385 - GAVRIELI0035386, GAVRIELI0035585, GAVRIELI0043920, GAVRIELI0047540).

- Defendant has caused hundreds of thousands of dollars to be transferred to Blue Land Partners LLC, Magna Consulting, and Miller Ink for Defendant's personal public relations and related services at the Company's expense.

- Defendant transferred over one hundred thousand dollars to Byron Perez for purported "office disinfecting."

- Defendant has spent millions of dollars of Company funds on unknown digital advertising campaigns. This spending by Defendant is believed to include the use of Company funds on campaigns unrelated to the Company such as Defendant's personal endeavors that are not for Company purposes. In addition to Defendant's past practices, these concerns are also fueled by Defendant's apparent use of multiple accounts and credit cards and increasingly poor ad spend to sales ratio.

- Defendant has spent thousands of dollars of Company funds to obtain and maintain various domain registrations for his own personal purposes unrelated to any legitimate Company purpose, and/or is attempting to obtain ownership and control of the valuable domain portfolio that was paid for and belongs to the Company.

- Handwritten checks were written on the Company's bank account by Defendant's sister to Juan Rivas for pool service at Defendant's mother's home in September 2019 and again in January 2021, with over $1,000 of Company funds used in 2021 alone for apparent pool maintenance at Defendant's mother's residence.

100

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

From the limited information currently available to Plaintiff, checks drawn on the

Company's bank account by Ms. Betesh can be found on the following pages:

GAVRIELI0042338 - GAVRIELI0042342; GAVRIELI0042931 -

GAVRIELI0042935; GAVRIELI0042944 - GAVRIELI0042949;

GAVRIELI0042959 - GAVRIELI0042964; GAVRIELI0042975 -

GAVRIELI0042979; GAVRIELI0042988 - GAVRIELI0042993;

GAVRIELI0043004 - GAVRIELI0043014; GAVRIELI0043028 -

GAVRIELI0043043; GAVRIELI0043053 - GAVRIELI0043063;

GAVRIELI0043073 - GAVRIELI0043080; GAVRIELI0043091 -

GAVRIELI0043097; GAVRIELI0043106 - GAVRIELI0043112;

GAVRIELI0043124 - GAVRIELI0043131; GAVRIELI0043141 -

GAVRIELI0043147; GAVRIELI0047876 - GAVRIELI0047882;

GAVRIELI0047895 - GAVRIELI0047900; GAVRIELI0047914 -

GAVRIELI0047921; GAVRIELI0047933 - GAVRIELI0047939;

GAVRIELI0047950 - GAVRIELI0047956; GAVRIELI0047970 -

GAVRIELI0047974; GAVRIELI0047988 - GAVRIELI0047995;

GAVRIELI0048008 - GAVRIELI0048014; GAVRIELI0048027 -

GAVRIELI0048033; GAVRIELI0048049 - GAVRIELI0048055;

GAVRIELI0048068 - GAVRIELI0048074; GAVRIELI0048095 -

GAVRIELI0048101; GAVRIELI0048113 - GAVRIELI0048119;

GAVRIELI0068588 - GAVRIELI0068592; GAVRIELI0068601-

GAVRIELI0068606; GAVRIELI0068616 - GAVRIELI0068621;

GAVRIELI0068632 - GAVRIELI0068636; GAVRIELI0068645 -

GAVRIELI0068650; GAVRIELI0068661 - GAVRIELI0068671;

GAVRIELI0068685 - GAVRIELI0068700; GAVRIELI0068710 -

GAVRIELI0068720; GAVRIELI0068730 - GAVRIELI0068737;

GAVRIELI0068748 - GAVRIELI0068754; GAVRIELI0068763 -

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

GAVRIELI0068769; GAVRIELI0068781 - GAVRIELI0068788; GAVRIELI0068798 - GAVRIELI0068804.

- The Company spent thousands of dollars for personal healthcare services including to Medicare, Blue Shield and other recipients outside of the Company's employee healthcare program, with approximately $9,000 of Company funds used in 2021 alone for medical expenses believed to be for Defendant's mother (GAVRIELI0043682, GAVRIELI0047299, GAVRIELI0047509 - GAVRIELI0047510).

- Defendant transferred approximately $500,000 to fund personal assistants and other unknown expenses through Upwork.com, including various charges Defendant attempted to hide by using multiple Upwork accounts and charges on multiple credit cards, including that of Catherine Pickard whose services are paid by the Company through Upwork.  This includes approximately $100,000 in Upwork charges incurred by Ms. Pickard in 2020 alone.

- The Company paid recurring membership expenses for Defendant's mother's personal Care.com services, personal Google/cloud computing services, and credit card and membership fees.

- The Company paid tens of thousands of dollars to Defendant's sister Mrs. Betesh at restaurants and grocery stores, often at locations near her home and on weekends or on days when the Company's office was closed, such as purchases during the height of the COVID-19 lockdown when employees were all or largely out of the office.  Examples include: an October 20, 2019 purchase by Mrs. Betesh at a Trader Joe's in Torrance, far from the Company's office and on a Sunday when it was closed; a January 1, 2020 purchase by Mrs. Betesh at the Whole Foods near her home on New Year's day; a July 5, 2020 purchase by Mrs. Betesh at the Bristol Farms near her home on Saturday of Fourth of July weekend and a December 26, 2020 purchase by Mrs. Betesh at the Ralph's near her home on Saturday of the Christmas holiday weekend.

102

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- The Company spent thousands of dollars spent by Defendant's personal assistant, Catherine Pickard, on various seemingly personal expenses for Defendant and/or herself, which Defendant classified as gifts and travel expenses that do not appear to be related to the Company.

- Mrs. Betesh spent thousands of dollars of Company funds at retailers ranging from specialized cultural shops such as Abi's Judaica & Gifts and Glatt Kosher Market, to traditional and online retailers such as Target, Costco, Amazon and others.

- Mrs. Betesh wrote hundreds of handwritten paper checks from the Company's bank account to various individuals with no oversight or substantiation.

- Defendant has used Company funds to benefit and pay for the expenses of family members unrelated to the Company. These payments have included thousands of dollars to attorneys in Hawaii for Defendant's brother, such as a $5,000 payment on March 9, 2020; a $2,000 payment on May 12, 2020; a $5,000 payment on October 22, 2020; and a $3,000 payment on May 18, 2022.

- In addition, Defendant mismanaged, ran off and/or fired valuable Company employees, while retaining, elevating, and improperly compensating others, regardless of performance, based on perceived loyalty to him above the Company. For example, Defendant has used Company funds to give substantial "bonuses" and raises to certain Company employees and individuals who testified falsely on his behalf during the State Court Litigation to reward their support for him. These bonuses and raises dramatically increased the total compensation to these individuals by 75-90% in a four-year period, making them the highest paid employees at the Company. Further, Defendant rewarded these individuals with these massive increases in their compensation, despite the Company's unprecedented poor financial performance over the same period including the areas of which these employees are ostensibly responsible.

103

LATHAM&WATKINSᴸᴸᶠ
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- The Company's unreliable accounting practices under Defendant's control further suggest that Defendant is self-dealing at the Company's expense. Instead of implementing industry standard accounting practices to contemporaneously track the Company's finances, Defendant waits until after a calendar year ends, and typically much longer, and then sends a host of bank and credit transactions to an outside forensic accountant who is then forced to try to reconstruct financial statements and a general ledger for the Company for the previous year. The bank account and credit card transactions sent to the accountant lack the necessary detail and itemization to properly classify business expenses. The effect is that many transactions that had no legitimate business purpose have been improperly categorized as business expenses.

Individuals who may possess relevant information and documents include, but are not limited to, as-yet undetermined current and/or former employees of the Company, Defendant, Plaintiff, Dean Unatin, Mira Gavrieli, Yamit Betesh, Cathrine Pickard, First Republic Bank, and those businesses and beneficiaries identified in this Response, including, but not limited to, First Republic Bank and Upwork.

Even limited to the little information currently available to Plaintiff, these examples are in no way exhaustive, and are instead included for illustrative purposes regarding Defendant's massive unsubstantiated and unchecked spending of Company funds, including tens of thousands of transactions for which no substantiation has been offered.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 12.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of

104

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff responds as follows:

Defendant engaged in wrongful self-dealing by using Company property to financially benefit himself, family, and friends.  Defendant has charged millions of dollars on credit cards in his personal name, making personal expenses and payments, all from Company funds.  For example, Defendant used Company funds to pay tens of thousands of dollars, if not more, to various retailers like Amazon, Nordstrom, and Target, personal assistants, public relations services, grocery stores, and other items to benefit Defendant personally at the Company's expense.  Defendant has also transferred or caused to be transferred millions of dollars in Company funds to various unknown individuals and entities, including various foreign entities. This includes various wires, electronic transfers, and handwritten paper checks, with no oversight or substantiation, including:

- Defendant has caused hundreds of thousands of dollars to be transferred to various unknown entities under the classification of "Inventory Purchases" including Pe Petrenko S.O., Zhao Guo Jie, Popular Planet Hong Kong Limited, Guangdong Xingyida Imp Ex, Zhang Min Zhen, Jiang Xiao Xia, Wo Kwun Trading Limited, Hong Kong Junbo Industrial Limited, Hk Yaohui Intl Trading Ltd, Dongguan Dongda Imp And Exp Co Ltd, Eternity Action Limited, United

105

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Century Group, Little Apple Hong Kong Limited, Gataila International Co, Wellinsyn Glory Company Limited, Yiwu Melody Trading Co, Zhicheng Yi, WenJing, and Tai Ya Internation Co Ltd, and Fu David.  These transactions can be found at pages GAVRIELI0035281 – GAVRIELI0035283, GAVRIELI0043563 – GAVRIELI0043565, and GAVRIELI0047269 – GAVRIELI0047271.

- Defendant shifted millions of dollars of Company spending away from the Company's American Express cards to specific credit card(s) in his name. Defendant did so to generate substantial credit card rewards and cash back benefits worth approximately $75,000, or more, that he personally retained at the Company's expense.  In addition to Defendant improperly benefitting himself, Defendant knowingly cost the Company this same amount by depriving it of the substantial discounts and benefits it would have otherwise received if this spending had not been shifted away from the Company's longtime use of its American Express charge cards, which generate an immediate 1.5% discount on all spending.

- Defendant has used Company funds to intentionally and substantially overpay his expected tax liabilities.  From 2020 through 2022 alone, these payments have totaled over $3 million dollars, despite Defendant's knowledge, including repeated representations by Defendant to this Court in his Bankruptcy Case, that he expected little to no tax liability for those years.  Defendant's actions to substantially overpay his tax liabilities were undertaken with the intent to benefit himself personally by generating large refunds and offsets, thereby funneling Company cash to himself under the guise of payments to the IRS and FTB.

- During the Relevant Period, including in or around September 2022 or as late as 2023, Defendant personally and unilaterally caused the Company to file amended tax returns to improperly pocket an estimated $1-4 million in Company funds as refunds.  Defendant did so by filing new Company returns, years after the

106

applicable tax years and original filings, which substantially reduced Defendant's share of Company pass-through income.  The lowered pass-through income resulted in substantially lower personal tax liability for Defendant, resulting in a windfall to Defendant who intentionally caused substantial overpayments from Company funds for those years to be made on his behalf.  Defendant has failed to return those funds to the Company, and instead knowingly filed these recent amendments to improperly obtain millions of Company funds.

- Defendant has transferred hundreds of thousands of dollars to Eli Bechor for purported office catering, including thousands of dollars when the Company's office was closed and/or most employees were working remotely.  For example, in 2020 alone, during the height of COVID-19 disruption, the Company purportedly spent approximately $125,000 with Mr. Bechor on catering alone.

- Additionally, Defendant caused the Company to partner with his personal friend's company, Aspiration Bank, in which Defendant has a significant ownership interest, whereby he asked the Company's high end designer shoe clientele to sign up for an Aspiration Bank account and related financial services in exchange for a Tieks discount.

- All transactions involving Mira Gavrieli's receipt of Company funds and/or benefits also constitute self-dealing, including direct payments to her, Company credit cards issued in her name, and expenses paid for her benefit.  For example, Defendant has improperly maintained his mother, Mira Gavrieli, on the Company's payroll throughout the Relevant Period (and before).  However, she has provided no actual services to the Company, therefore there is no legitimate business purpose for providing any Company funds or resources to her.  This has been repeatedly acknowledged by the Company's forensic accountant, who determined that over $200,000 in payments/transfers to Mira Gavrieli must be reclassified as distributions to Defendant in 2019-2021 alone.  Additionally, Plaintiff believes that Defendant has continued this improper practice through

107

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

2022 and 2023, substantially increasing the amount of Company funds and benefits that Mira Gavrieli has received.  Payments to Mira Gavrieli are shown on pages GAVRIELI0035297, GAVRIELI0035430, GAVRIELI0043579, GAVRIELI0043732, GAVRIELI0043759, GAVRIELI0047287, GAVRIELI0047344.

- Defendant and others with his authorization have charged millions of dollars on credit cards paid from Company funds.  This includes purported Company credit cards he had issued in the name of family members and others for their and/or his benefit, as well as electronic payments and handwritten checks drawn directly from the Company's operating account.  Despite demands, Defendant has failed to substantiate such charges, which include thousands of individual transactions during the Relevant Period on apparent personal expenses, including transactions at various grocery stores (Bristol Farms, BevMo, Glatt Mart, Pavilions, Ralph's, Smart and Final, Trader Joe's, Vons, Whole Foods), personal credit services (Experian), luxury gym memberships (Equinox), high-end clothing retailers (Nordstrom), home goods (Amazon, Bath & Body Works, Bed Bath & Beyond, Home Depot, HomeGoods, Target, Walmart), bakeries (Hansen Cakes, Krispy Kreme, La Brea Bakery, La Provence Patisserie, Magnolia Bakery, Mrs. Field's, Porto's Bakery, Susie Cakes), drug and convenience stores (7- Eleven, CVS, Rite Aid), restaurant delivery (DoorDash, Instacart, Postmates, Uber Eats), transportation (Rapid Gas, Uber), countless restaurants, and many others.  Based on the limited information currently available to Plaintiff, these suspect transactions are identified as follows based on the accounting classifications designated and/or approved by Defendant:  Automobile Expense (GAVRIELI0035367), Draw (GAVRIELI0043732); Due From American Express (GAVRIELI0035419, GAVRIELI0043747); Dues and Subscriptions (GAVRIELI0035388, GAVRIELI0035562, GAVRIELI0043696, GAVRIELI0043747, GAVRIELI0043893, GAVRIELI0043940,

108

GAVRIELI0047351, GAVRIELI0047506); Employee Meals and Events (GAVRIELI0035367 - GAVRIELI0035373, GAVRIELI0035562, GAVRIELI0043679 - GAVRIELI0043682, GAVRIELI0043747, GAVRIELI0043893 - GAVRIELI0043894, GAVRIELI0047331, GAVRIELI0047351, GAVRIELI0047506 - GAVRIELI0047509); Employee Recruitment Expense (GAVRIELI0035430, GAVRIELI0035562 - GAVRIELI0035563, GAVRIELI0043759, GAVRIELI0043894, GAVRIELI0047351); Gifts (GAVRIELI0043682, GAVRIELI0043687, GAVRIELI0047509); Medical Expense (GAVRIELI0043682, GAVRIELI0047299, GAVRIELI0047509 - GAVRIELI0047510); Misc Expense (GAVRIELI0035303, GAVRIELI0047351, GAVRIELI0047510); Office Expense (GAVRIELI0047299); Office Supplies and Expense (GAVRIELI0035373, GAVRIELI0043682, GAVRIELI0047331, GAVRIELI0047338, GAVRIELI0047510 - GAVRIELI0047511); Other Expense (GAVRIELI0035404, GAVRIELI0035579, GAVRIELI0043682); Outside Services (GAVRIELI0035379 - GAVRIELI0035380, GAVRIELI0035563 - GAVRIELI0035565, GAVRIELI0043687 - GAVRIELI0043691, GAVRIELI0043894 - GAVRIELI0043896, GAVRIELI0047330, GAVRIELI0047351, GAVRIELI0047511 - GAVRIELI0045716); Photoshoot Expense (GAVRIELI0035373, GAVRIELI0047516 - GAVRIELI0047518); Repairs and Maintenance (GAVRIELI0043682 - GAVRIELI0043683, GAVRIELI0047331, GAVRIELI0047528); Software Subscriptions (GAVRIELI0043759, GAVRIELI0047338, GAVRIELI0047344); Supplies (GAVRIELI0035374 - GAVRIELI0035376, GAVRIELI0035585, GAVRIELI0043684 - GAVRIELI0043685, GAVRIELI0043755, GAVRIELI0043920, GAVRIELI0043940, GAVRIELI0047331, GAVRIELI0047537 - GAVRIELI0047539); and Travel Expense

109

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

(GAVRIELI0035385 - GAVRIELI0035386, GAVRIELI0035585, GAVRIELI0043920, GAVRIELI0047540).

- Defendant has caused hundreds of thousands of dollars to be transferred to Blue Land Partners LLC, Magna Consulting, and Miller Ink for Defendant's personal public relations and related services at the Company's expense.

- Defendant transferred over one hundred thousand dollars to Byron Perez for purported "office disinfecting."

- Defendant has spent millions of dollars of Company funds on unknown digital advertising campaigns.  This spending by Defendant is believed to include the use of Company funds on campaigns unrelated to the Company such as Defendant's personal endeavors that are not for Company purposes.  In addition to Defendant's past practices, these concerns are also fueled by Defendant's apparent use of multiple accounts and credit cards and increasingly poor ad spend to sales ratio.  Examples of self-serving campaigns run to benefit Defendant personally include UNATDERIV00003-UNATDERIV00026.

- Defendant has spent thousands of dollars of Company funds to obtain and maintain various domain registrations for his own personal purposes unrelated to any legitimate Company purpose, and/or is attempting to obtain ownership and control of the valuable domain portfolio that was paid for and belongs to the Company.  This includes a large portfolio of website domains registered for various jurisdictions, including those contemplated to benefit Company's search engine optimization ("SEO"), as well as other domains and purposes.  However, since Defendant has been in sole control of the Company, he has refused to account for the website domains that the Company registered, controls, or has otherwise paid for, and despite indications of continued cost to the Company for related fees.  In addition, after Defendant's loss at trial in the State Court Litigation, and during the Relevant Period, it appears Defendant has used Company resources to attempt to elevate himself personally at the Company's

110

expense through SEO efforts and otherwise to manipulate internet search results and bury unfavorable content related to Defendant personally.  For instance, during the Relevant Period, search results for Defendant have increasingly appeared to elevate paid-for positive media pieces about Defendant personally while depressing search results related to any negative content.

- Handwritten checks were written on the Company's bank account by Defendant's sister to Juan Rivas for pool service at Defendant's mother's home in September 2019 and again in January 2021, with over $1,000 of Company funds used in 2021 alone for apparent pool maintenance at Defendant's mother's residence. From the limited information currently available to Plaintiff, checks drawn on the Company's bank account by Ms. Betesh can be found on the following pages: GAVRIELI0042338 - GAVRIELI0042342; GAVRIELI0042931 - GAVRIELI0042935; GAVRIELI0042944 - GAVRIELI0042949; GAVRIELI0042959 - GAVRIELI0042964; GAVRIELI0042975 - GAVRIELI0042979; GAVRIELI0042988 - GAVRIELI0042993; GAVRIELI0043004 - GAVRIELI0043014; GAVRIELI0043028 - GAVRIELI0043043; GAVRIELI0043053 - GAVRIELI0043063; GAVRIELI0043073 - GAVRIELI0043080; GAVRIELI0043091 - GAVRIELI0043097; GAVRIELI0043106 - GAVRIELI0043112; GAVRIELI0043124 - GAVRIELI0043131; GAVRIELI0043141 - GAVRIELI0043147; GAVRIELI0047876 - GAVRIELI0047882; GAVRIELI0047895 - GAVRIELI0047900; GAVRIELI0047914 - GAVRIELI0047921; GAVRIELI0047933 - GAVRIELI0047939; GAVRIELI0047950 - GAVRIELI0047956; GAVRIELI0047970 - GAVRIELI0047974; GAVRIELI0047988 - GAVRIELI0047995; GAVRIELI0048008 - GAVRIELI0048014; GAVRIELI0048027 - GAVRIELI0048033; GAVRIELI0048049 - GAVRIELI0048055; GAVRIELI0048068 - GAVRIELI0048074; GAVRIELI0048095 -

111

GAVRIELI0048101; GAVRIELI0048113 - GAVRIELI0048119;

GAVRIELI0068588 - GAVRIELI0068592; GAVRIELI0068601-

GAVRIELI0068606; GAVRIELI0068616 - GAVRIELI0068621;

GAVRIELI0068632 - GAVRIELI0068636; GAVRIELI0068645 -

GAVRIELI0068650; GAVRIELI0068661 - GAVRIELI0068671;

GAVRIELI0068685 - GAVRIELI0068700; GAVRIELI0068710 -

GAVRIELI0068720; GAVRIELI0068730 - GAVRIELI0068737;

GAVRIELI0068748 - GAVRIELI0068754; GAVRIELI0068763 -

GAVRIELI0068769; GAVRIELI0068781 - GAVRIELI0068788;

GAVRIELI0068798 - GAVRIELI0068804; GAVRIELI0042228 -

GAVRIELI0042231; GAVRIELI0042247 - GAVRIELI0042249;

GAVRIELI0042265 - GAVRIELI0042267; GAVRIELI0042282 -

GAVRIELI0042284; GAVRIELI0042300 - GAVRIELI0042303

GAVRIELI0042319 - GAVRIELI0042322.  Various of these handwritten checks drawn on the Company's bank accounts which, based on the limited information available to Plaintiff, appear to involve services outside the scope of ordinary business for the Company (*e.g.*, checks for Mira Gavrieli's pool servicer, Medicare premiums, yoga instructors, and others).  These checks include numbers:  1412, 1414, 1416, 1433, 1447, 1457, 1488, 1498, 1505, 1514, 1528, 1551, 1574, 1574, 1593, 1609, 1623, 1624, 1633, 1640, 1792, 1804, 1825, 1826, 1837, 1849, 1882, 1893, 1903, 1905, 1906, 1908, 1916, 1922, 1933, 1934, 1942, 1992, 1994, 1995, 2007, 2025, 2042, 2081, 2116, 2166, 2196, 2212, 2230, 2239, 2247, 2251, 2252, 2256, 2264, 2268, 2275, 2313, 2318, 2336, 2345, 2355, 2374, 2385, 2398, 2401, 2412, 2422, 2437, 2449, 2463, 2478, 2489, 2492, 2502, 2509, 2518.  Additionally, as referenced above, Defendant has transferred hundreds of thousands of dollars to Eli Bechor, a longtime Gavrieli family friend, for purported office catering. These payments appear to rise in amount even as the Company decreased in size, and include many payments made during the height

112

of the COVID-19 pandemic while the Company's offices were closed and/or its employees worked remotely. Various handwritten checks drawn on the Company's bank accounts to Mr. Bechor include numbers:  1415, 1435, 1459, 1479, 1494, 1512, 1537, 1554, 1569, 1582, 1596, 1612, 1620, 1646, 1796, 1805, 1812, 2178, 2184, 2201, 2231, 2238, 2250, 2267, 2283, 2297, 2314, 2325, 2349, 2353, 2372, 2382, 2386, 2404, 2417, 2434, 2464, 2476, 2487, 2500, 2506, 2521. In addition, there are various handwritten checks drawn on the Company's bank accounts which, based on the limited information available to Plaintiff, appear to be payments not to Company-related businesses or vendors, but to unknown individuals not on the Company's payroll.  These checks include numbers:  1403, 1404, 1405, 1406, 1407, 1408, 1409, 1410, 1413, 1419, 1420, 1421, 1422, 1423, 1424, 1425, 1426, 1427, 1429, 1434, 1437, 1438, 1439, 1440, 1441, 1443, 1445, 1450, 1451, 1452, 1453, 1454, 1455, 1456, 1458, 1463, 1477, 1478, 1481, 1482, 1483, 1484, 1485, 1486, 1487, 1496, 1497, 1499, 1500, 1501, 1502, 1503, 1504, 1509, 1510, 1511, 1513, 1515, 1516, 1517, 1518, 1519, 1520, 1524, 1526, 1527, 1529, 1530, 1531, 1532, 1533, 1534, 1535, 1536, 1538, 1541, 1543, 1544, 1545, 1546, 1547, 1548, 1549, 1550, 1553, 1555, 1559, 1560, 1561, 1562, 1563, 1564, 1565, 1566, 1571, 1573, 1575, 1576, 1577, 1578, 1579, 1580, 1581, 1586, 1587, 1588, 1589, 1590, 1591, 1592, 1594, 1595, 1602, 1603, 1604, 1605, 1606, 1607, 1608, 1610, 1611, 1613, 1614, 1615, 1617, 1621, 1625, 1626, 1627, 1628, 1629, 1630, 1631, 1632, 1635, 1636, 1637, 1638, 1639, 1642, 1643, 1644, 1645, 1647, 1652, 1654, 1803, 1807, 1818, 1823, 1831, 1833, 1834, 1838, 1840, 1845, 1854, 1855, 1856, 1861, 1862, 1863, 1864, 1865, 1866, 1868, 1869, 1874, 1877, 1880, 1884, 1885, 1886, 1891, 1894, 1896, 1900, 1901, 1904, 1907, 1910, 1912, 1913, 1915, 1917, 1918, 1919, 1924, 1925, 1926, 1927, 1930, 1937, 1938, 1939, 1943, 1944, 1945, 1946, 1948, 1949, 1950, 1951, 1952, 1958, 1959, 1961, 1962, 1963, 1966, 1969, 1970, 1971, 1972, 1982, 1984, 1985, 1987, 1988, 1997, 1998, 1999, 2000, 2001, 2013, 2014, 2015, 2016, 2017, 2026, 2027, 2028, 2029, 2031, 2032,

113

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

2036, 2037, 2038, 2043, 2045, 2046, 2047, 2048, 2049, 2050, 2051, 2052, 2053, 2054, 2055, 2057, 2058, 2059, 2060, 2061, 2062, 2063, 2064, 2065, 2066, 2067, 2068, 2069, 2071, 2072, 2073, 2074, 2075, 2084, 2085, 2086, 2087, 2088, 2089, 2090, 2091, 2092, 2093, 2095, 2096, 2097, 2098, 2099, 2100, 2101, 2102, 2103, 2104, 2105, 2106, 2107, 2109, 2110, 2111, 2112, 2114, 2119, 2120, 2121, 2122, 2124, 2126, 2127, 2128, 2129, 2130, 2131, 2132, 2134, 2135, 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146, 2150, 2151, 2152, 2153, 2156, 2157, 2158, 2159, 2160, 2161, 2162, 2164, 2167, 2168, 2169, 2170, 2171, 2172, 2173, 2174, 2175, 2176, 2177, 2179, 2181, 2183, 2186, 2187, 2188, 2189, 2190, 2191, 2192, 2193, 2194, 2195, 2198, 2203, 2204, 2205, 2206, 2207, 2208, 2209, 2210, 2211, 2214, 2219, 2221, 2222, 2223, 2224, 2225, 2226, 2227, 2228, 2229, 2241, 2242, 2243, 2244, 2245, 2246, 2248, 2249, 2258, 2259, 2260, 2261, 2262, 2263, 2265, 2266, 2269, 2270, 2271, 2273, 2274, 2276, 2277, 2278, 2280, 2281, 2282, 2284, 2286, 2287, 2288, 2290, 2292, 2293, 2294, 2295, 2296, 2303, 2304, 2306, 2307, 2308, 2309, 2310, 2311, 2312, 2327, 2330, 2331, 2332, 2333, 2334, 2335, 2337, 2339, 2340, 2342, 2343, 2344, 2346, 2347, 2348, 2354, 2357, 2358, 2359, 2360, 2361, 2362, 2363, 2366, 2370, 2371, 2375, 2376, 2377, 2378, 2379, 2380, 2381, 2383, 2387, 2390, 2391, 2392, 2393, 2394, 2395, 2396, 2400, 2402, 2405, 2406, 2407, 2408, 2409, 2410, 2418, 2420, 2421, 2423, 2424, 2425, 2426, 2427, 2431, 2433, 2435, 2438, 2439, 2440, 2441, 2442, 2443, 2444, 2452, 2462, 2468, 2470, 2471, 2473, 2474, 2475, 2477, 2479, 2480, 2481, 2484, 2485, 2486, 2488, 2490, 2493, 2494, 2495, 2496, 2497, 2498, 2507, 2508, 2510, 2511, 2512, 2513, 2514, 2517, 2519, 2522, 2523, 2525, 2526, 2528. Also, there are various handwritten checks drawn on the Company's bank accounts for which the documents produced do not include check images from which to confirm basic payment information and which are believed to fall into one of the above suspect categories. These checks include numbers: 1442, 1552, 1872, 1881, 1892, 1965, 1967, 1977, 1986, 1989, 1990, 2002, 2003, 2004, 2006, 2011, 2018, 2019, 2020,

114

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

2030, 2033, 2035, 2039, 2040, 2076, 2077, 2078, 2079, 2113, 2123, 2125, 2144, 2147, 2472, 2521.

- The Company spent thousands of dollars for personal healthcare services including to Medicare, Blue Shield and other recipients outside of the Company's employee healthcare program, with approximately $9,000 of Company funds used in 2021 alone for medical expenses believed to be for Defendant's mother (GAVRIELI0043682, GAVRIELI0047299, GAVRIELI0047509 - GAVRIELI0047510).

- Defendant transferred approximately $500,000 to fund personal assistants and other unknown expenses through Upwork.com, including various charges Defendant attempted to hide by using multiple Upwork accounts and charges on multiple credit cards, including that of Catherine Pickard whose services are paid by the Company through Upwork.  This includes approximately $100,000 in Upwork charges incurred by Ms. Pickard in 2020 alone.

- The Company paid recurring membership expenses for Defendant's mother's personal Care.com services, personal Google/cloud computing services, and credit card and membership fees.

- The Company paid tens of thousands of dollars to Defendant's sister Mrs. Betesh at restaurants and grocery stores, often at locations near her home and on weekends or on days when the Company's office was closed, such as purchases during the height of the COVID-19 lockdown when employees were all or largely out of the office.  Examples include: an October 20, 2019 purchase by Mrs. Betesh at a Trader Joe's in Torrance, far from the Company's office and on a Sunday when it was closed; a January 1, 2020 purchase by Mrs. Betesh at the Whole Foods near her home on New Year's day; a July 5, 2020 purchase by Mrs. Betesh at the Bristol Farms near her home on Saturday of Fourth of July weekend and a December 26, 2020 purchase by Mrs. Betesh at the Ralph's near her home on Saturday of the Christmas holiday weekend.

115

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- The Company spent thousands of dollars spent by Defendant's personal assistant, Catherine Pickard, on various seemingly personal expenses for Defendant and/or herself, which Defendant classified as gifts and travel expenses that do not appear to be related to the Company.

- Mrs. Betesh spent thousands of dollars of Company funds at retailers ranging from specialized cultural shops such as Abi's Judaica & Gifts and Glatt Kosher Market, to traditional and online retailers such as Target, Costco, Amazon and others.

- Mrs. Betesh wrote hundreds of handwritten paper checks from the Company's bank account to various individuals with no oversight or substantiation.

- Defendant has used Company funds to benefit and pay for the expenses of family members unrelated to the Company. These payments have included thousands of dollars to attorneys in Hawaii for Defendant's brother, such as a $5,000 payment on March 9, 2020; a $2,000 payment on May 12, 2020; a $5,000 payment on October 22, 2020; and a $3,000 payment on May 18, 2022.

- In addition, Defendant mismanaged, ran off and/or fired valuable Company employees, while retaining, elevating, and improperly compensating others, regardless of performance, based on perceived loyalty to him above the Company. For example, Defendant has used Company funds to give substantial "bonuses" and raises to certain Company employees and individuals who testified falsely on his behalf during the State Court Litigation to reward their support for him. These bonuses and raises dramatically increased the total compensation to these individuals by 75-90% in a four-year period, making them the highest paid employees at the Company. Further, Defendant rewarded these individuals with these massive increases in their compensation, despite the Company's unprecedented poor financial performance over the same period including the areas of which these employees are ostensibly responsible.

116

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- The Company's unreliable accounting practices under Defendant's control further suggest that Defendant is self-dealing at the Company's expense. Instead of implementing industry standard accounting practices to contemporaneously track the Company's finances, Defendant waits until after a calendar year ends, and typically much longer, and then sends a host of bank and credit transactions to an outside forensic accountant who is then forced to try to reconstruct financial statements and a general ledger for the Company for the previous year. The bank account and credit card transactions sent to the accountant lack the necessary detail and itemization to properly classify business expenses. The effect is that many transactions that had no legitimate business purpose have been improperly categorized as business expenses.

Individuals who may possess relevant information and documents include, but are not limited to, as-yet undetermined current and/or former employees of the Company, Defendant, Plaintiff, Dean Unatin, Mira Gavrieli, Yamit Betesh, Cathrine Pickard, First Republic Bank, and those businesses and beneficiaries identified in this Response, including, but not limited to, First Republic Bank and Upwork.

Even limited to the little information currently available to Plaintiff, these examples are in no way exhaustive, and are instead included for illustrative purposes regarding Defendant's massive unsubstantiated and unchecked spending of Company funds, including tens of thousands of transactions for which no substantiation has been offered.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant and the Company produce documents. Further, Plaintiff reserves the right to supplement this Interrogatory upon the restoration of her access to the Company.

**INTERROGATORY NO. 13:**

For each transaction IDENTIFIED in response to Interrogatory No. 12, IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR

117

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

contention in paragraph 56 of the TAC that such transaction was "improper" or "made entirely for [Defendant's] own benefit or for the benefit of his family members and others assisting him."

**RESPONSE TO INTERROGATORY NO. 13:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Interrogatory No. 12 and additionally states that discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 13.

118

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her response to Supplemental Interrogatory No. 12 and additionally states that discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 13.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery

119

requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her responses (including her supplemental responses) to Interrogatory No. 12 and additionally states that discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant and the Company produce documents.  Further, Plaintiff reserves the right to supplement this Interrogatory upon the restoration of her access to the Company.

**INTERROGATORY NO. 14:**

IDENTIFY all acts or omissions by Mr. Gavrieli during the RELEVANT PERIOD that YOU contend caused harm to the COMPANY.

**RESPONSE TO INTERROGATORY NO. 14:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome.  Plaintiff further objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of

120

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her responses to Interrogatories Nos. 1 and 12 and additionally states that discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 14.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff

121

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her responses to Supplemental Interrogatories Nos. 1 and 12 and additionally states that discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 14.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her responses (including her supplemental responses) to Interrogatories No. 1 and No. 12 and additionally states that discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this

122

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

matter progresses and Defendant and the Company produce documents.  Further, Plaintiff reserves the right to supplement this Interrogatory upon the restoration of her access to the Company.

**INTERROGATORY NO. 15:**

For each act or omission IDENTIFIED in response to Interrogatory No. 14, IDENTIFY all facts, including but not limited to all DOCUMENTS and witnesses, supporting YOUR contention in paragraph 80 of the TAC that such act or omission "was not due to any honest error in judgment or an attempt to act in the best interests of the Company."

**RESPONSE TO INTERROGATORY NO. 15:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege.  Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been

123

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her responses to Interrogatories Nos. 1 and 12 and additionally states as follows:

The Company's decline, and the acts and omissions by Defendant documented in response to Interrogatory No. 1, do not reflect any well-intentioned business strategy launched by Defendant which simply did not work. The decline is not the result of a new product that fared poorly – the Company has not launched any new products during the Relevant Period. The decline is not the result of an unsuccessful entry into a new geographic market – the Company did not enter any new geographic markets during the Relevant Period. The decline is not the result of an unsuccessful new sales channel – the Company has not expanded into new sales channels during the Relevant Period. The decline is not the result of unsuccessful brick and mortar stores – the Company has not opened any stores during the Relevant Period. The decline is not the result of burdensome debt service – the Company has carried no debt during the Relevant Period. And the Company's decline is not the result of new executive leadership – Defendant has caused himself to be the de facto Chief Executive Officer and only executive leadership at the Company during the Relevant Period.

The Company's decline under Defendant's sole control is the result of Defendant's self-serving and destructive decision to put his own personal interests ahead of the Company in his misguided attempt to inflict financial pain on Plaintiff and acquire her ownership interest for pennies on the dollar. Defendant's animus toward Plaintiff, and his intention to cause her and her family harm, is well-documented in Defendant's own words. By way of example, Defendant wrote (or stated in a voicemail) the following:

- "You and your husband will pay for any violations … And the cost will be severe … If you make a single wire without my permission I will never forgive you in my life and it will be all out nuclear war. I promise you on my life. Have no doubt about that. I dare you to cross me.";

124

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- "HOW TO WHORE OUT YOUR FAMILY IN 20 EASY STEPS: The story of Dikla Unatin's life. Write it in your free time now. You will pay dearly for all this. Say goodbye to your supposed 40%. It is no more.";

- "When I make decisions you don't follow through on there will be consequences … I am done dealing with your bullshit. I will regulate as needed on you and Dean. There will be major changes. Don't fuck with me.";

- "Every time you and your bitch ass husband come at me, I'll come at you 5 times harder. Any pain or inconvenience you try to inflict on me, the business, mom, or the rest of the family, you and your family will feel multiples of that back. I promise you that. All day, every day, til the day I die. You will live to regret every misstep.";

- "[I]f you play like this I can promise you your life will be miserable.";

- "I want to be clear, in case the text wasn't clear enough.  Not a single fucking wire goes out without my fucking permission.  And every one that does, you and your bitch ass husband will pay a mother fucking price, I promise you.  Not a single fucking wire.  Trust me.";

- "You've forced me to come back to the office earlier than I should you dirty whore.  Challenge my authority today and see what happens."

These vile and explicit statements by Defendant lay bare his intention to suppress the Company's value and explain his otherwise shocking and inexplicable passivity as the Company's performance and valuation have nose-dived under his sole control, even while the Company maintained a massive cash stockpile that Defendant testified to this Court was necessary to address the Company's poor performance.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

125

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 15.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff incorporates her responses to Supplemental Interrogatories Nos. 1 and 12 and additionally states as follows:

The Company's decline, and the acts and omissions by Defendant documented in response to Interrogatory No. 1, do not reflect any well-intentioned business strategy launched by Defendant which simply did not work. The decline is not the result of a new product that fared poorly – the Company has not launched any new products during the Relevant Period. The decline is not the result of an unsuccessful entry into a new geographic market – the Company did not enter any new geographic markets during the Relevant Period. The decline is not the result of an unsuccessful new sales channel – the Company has not expanded into new sales channels during the Relevant Period. The decline is not the result of unsuccessful brick and mortar stores – the Company has not opened any stores during the Relevant Period. The decline

126

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

is not the result of burdensome debt service – the Company has carried no debt during the Relevant Period.  And the Company's decline is not the result of new executive leadership – Defendant has caused himself to be the de facto Chief Executive Officer and only executive leadership at the Company during the Relevant Period.

The Company's decline under Defendant's sole control is the result of Defendant's self-serving and destructive decision to put his own personal interests ahead of the Company in his misguided attempt to inflict financial pain on Plaintiff and acquire her ownership interest for pennies on the dollar.  Defendant's animus toward Plaintiff, and his intention to cause her and her family harm, is well-documented in Defendant's own words.  By way of example, Defendant wrote (or stated in a voicemail) the following:

- "You and your husband will pay for any violations … And the cost will be severe … If you make a single wire without my permission I will never forgive you in my life and it will be all out nuclear war. I promise you on my life. Have no doubt about that. I dare you to cross me.";

- "HOW TO WHORE OUT YOUR FAMILY IN 20 EASY STEPS: The story of Dikla Unatin's life. Write it in your free time now. You will pay dearly for all this. Say goodbye to your supposed 40%. It is no more.";

- "When I make decisions you don't follow through on there will be consequences … I am done dealing with your bullshit. I will regulate as needed on you and Dean. There will be major changes. Don't fuck with me.";

- "Every time you and your bitch ass husband come at me, I'll come at you 5 times harder. Any pain or inconvenience you try to inflict on me, the business, mom, or the rest of the family, you and your family will feel multiples of that back. I promise you that. All day, every day, til the day I die. You will live to regret every misstep.";

- "[I]f you play like this I can promise you your life will be miserable.";

- "I want to be clear, in case the text wasn't clear enough.  Not a single fucking wire goes out without my fucking permission.  And every one that does, you and

127

your bitch ass husband will pay a mother fucking price, I promise you.  Not a single fucking wire.  Trust me.";

- "You've forced me to come back to the office earlier than I should you dirty whore.  Challenge my authority today and see what happens."

These vile and explicit statements by Defendant lay bare his intention to suppress the Company's value and explain his otherwise shocking and inexplicable passivity as the Company's performance and valuation have nose-dived under his sole control, even while the Company maintained a massive cash stockpile that Defendant testified to this Court was necessary to address the Company's poor performance.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

Plaintiff incorporates the foregoing objections to Interrogatory No. 15.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including:  (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case.  Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019).  Simply put, Plaintiff has been denied access to critical Company information for approximately six years.  Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

128

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Subject to the foregoing, Plaintiff incorporates her responses (including her supplemental responses) to Interrogatories Nos. 1 and 12 and additionally states as follows:

The Company's decline, and the acts and omissions by Defendant documented in response to Interrogatory No. 1, do not reflect any well-intentioned business strategy launched by Defendant which simply did not work.  The decline is not the result of a new product that fared poorly – the Company has not launched any new products during the Relevant Period.  The decline is not the result of an unsuccessful entry into a new geographic market – the Company did not enter any new geographic markets during the Relevant Period.  The decline is not the result of an unsuccessful new sales channel – the Company has not expanded into new sales channels during the Relevant Period.  The decline is not the result of unsuccessful brick and mortar stores – the Company has not opened any stores during the Relevant Period.  The decline is not the result of burdensome debt service – the Company has carried no debt during the Relevant Period.  And the Company's decline is not the result of new executive leadership – Defendant has caused himself to be the de facto Chief Executive Officer and only executive leadership at the Company during the Relevant Period.

The Company's decline under Defendant's sole control is the result of Defendant's self-serving and destructive decision to put his own personal interests ahead of the Company in his misguided attempt to inflict financial pain on Plaintiff and acquire her ownership interest for pennies on the dollar.  Defendant's animus toward Plaintiff, and his intention to cause her and her family harm, is well-documented in Defendant's own words.  By way of example, Defendant wrote (or stated in a voicemail) the following:

- "You and your husband will pay for any violations … And the cost will be severe … If you make a single wire without my permission I will never forgive you in my life and it will be all out nuclear war. I promise you on my life. Have no doubt about that. I dare you to cross me.";

- "HOW TO WHORE OUT YOUR FAMILY IN 20 EASY STEPS: The story of Dikla Unatin's life. Write it in your free time now. You will pay dearly for all this. Say goodbye to your supposed 40%. It is no more.";

129

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

- "When I make decisions you don't follow through on there will be consequences … I am done dealing with your bullshit. I will regulate as needed on you and Dean. There will be major changes. Don't fuck with me.";
- "Every time you and your bitch ass husband come at me, I'll come at you 5 times harder. Any pain or inconvenience you try to inflict on me, the business, mom, or the rest of the family, you and your family will feel multiples of that back. I promise you that. All day, every day, til the day I die. You will live to regret every misstep.";
- "[I]f you play like this I can promise you your life will be miserable.";
- "I want to be clear, in case the text wasn't clear enough.  Not a single fucking wire goes out without my fucking permission.  And every one that does, you and your bitch ass husband will pay a mother fucking price, I promise you.  Not a single fucking wire.  Trust me.";
- "You've forced me to come back to the office earlier than I should you dirty whore.  Challenge my authority today and see what happens."

These vile and explicit statements by Defendant lay bare his intention to suppress the Company's value and explain his otherwise shocking and inexplicable passivity as the Company's performance and valuation have nose-dived under his sole control, even while the Company maintained a massive cash stockpile that Defendant testified to this Court was necessary to address the Company's poor performance.

Discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant and the Company produce documents.  Further, Plaintiff reserves the right to supplement this Interrogatory upon the restoration of her access to the Company.

**INTERROGATORY NO. 16:**

DESCRIBE all damages, including monetary amounts, that YOU contend that the COMPANY suffered as a proximate result of any act or omission by Mr. Gavrieli during the RELEVANT PERIOD.

130

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

**RESPONSE TO INTERROGATORY NO. 16:**

In addition to and without waiving the General Objections, Plaintiff objects to this Interrogatory to the extent it seeks information protected from disclosure by applicable privileges and protections, including the attorney-client privilege, work product protection, joint defense or common-interest doctrine, and the spousal privilege. Plaintiff objects to this Interrogatory on the grounds that it is not relevant to the parties' claims or defenses and/or is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome. Plaintiff further objects to this Interrogatory as seeking information that is within Defendant's possession, custody, or control.

Additionally, since late-2017, Defendant has withheld from Plaintiff and repeatedly refused to provide critical information about the Company's operations, finances, and performance to Plaintiff even though she plainly is entitled to the information and despite multiple requests by Plaintiff on multiple grounds, including: (1) as a member and manager of the Company (including an inspection demand made on September 1, 2022, pursuant to California Corporations Code Section 11704.10(a)); (2) pursuant to the judgment in the State Court Litigation and permanent injunction; and (3) through formal and informal discovery requests made during the pendency of Defendant's Bankruptcy Case. Moreover, discovery in the State Court Litigation provided minimal insight into Defendant's management of the Company from September 2017 through the close of discovery in July 2019 (or even through trial in the State Court Litigation which commenced in September 2019). Simply put, Plaintiff has been denied access to critical Company information for approximately six years. Thus, Plaintiff's response to this Interrogatory is based on the minimal information Plaintiff has been able to glean despite Defendant's furious efforts to prevent her from obtaining information about the Company and his management of it.

Subject to the foregoing, Plaintiff responds that discovery in this matter is ongoing, and Plaintiff reserves the right to supplement or amend this response as this matter progresses and Defendant produces documents.

131

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

Dated:  January 5, 2024

LATHAM & WATKINS LLP
Daniel Scott Schecter
Nima H. Mohebbi
Tara A. McCortney
Alexandra N. Ibrahim

By _____
Daniel Scott Schecter
Attorneys for Plaintiff Dikla Gavrieli
a/k/a Dikla Gavrieli Unatin

132

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

## VERIFICATION

I, Dikla Gavrieli Unatin, am a party to this action.  I am informed and believe, and on that ground hereby state and affirm, that the statements and representations made in the document entitled PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES TO POST-EFFECTIVE DATE TRUSTEE'S FIRST SET OF INTERROGATORIES are true, correct and accurate to the best of my knowledge.

I declare under the penalty of perjury that the foregoing is true and correct, and that this verification was executed on January __5__, 2024.

_____
Dikla Gavrieli Unatin

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

Adversary No. 2:21-ap-01034-BB
PLAINTIFF'S SECOND SUPP. RESP. TO
PEDT'S FIRST SET OF INTERROGATORIES

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to this action.  My business address is Latham & Watkins LLP, 10250 Constellation Blvd. Suite 1100, Los Angeles, CA  90067.  My email address is aimee.mandel@lw.com.

On January 5, 2024, I served the following document described as:

**PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES TO POST-EFFECTIVE DATE TRUSTEE'S FIRST SET OF INTERROGATORIES**

by serving a true copy of the above-described document in the following manner:

### BY ELECTRONIC MAIL

The above-described document was transmitted via electronic mail to the following party on January 5, 2024:

HUESTON HENNIGAN LLP
Marshall A. Camp (SBN 231389)
mcamp@hueston.com
Allison L. Libeu (SBN 244487)
alibeu@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014

Attorneys for J. Michael Issa,
the Post-Effective Date Trustee

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 5, 2024, at Los Angeles, California.

_____
Aimee Mandel

134

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

# EXHIBIT C

1

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

-oOo-

In Re:                        ) Case No. 2:21-Bk-10826-BB
                              ) Chapter 11
KFIR GAVRIELI                 )
                              ) Los Angeles, California
                Debtor.       ) Tuesday, March 17, 2026
_____) 2:00 PM

ADV#: 2:21-ap-01034-BB
GAVRIELI, ET AL. v. GAVRIELI,
ET AL.

#203.00 PLAINTIFF DIKLA
GAVRIELI UNATIN'S MOTION FOR
PROTECTIVE ORDER RE: DEBTOR
KFIR GAVRIELI'S ATTENDANCE AT
PLAINTIFF'S DEPOSITION

#204.00 PLAINTIFF DIKLA
GAVRIELI UNATIN'S MOTION FOR
PROTECTIVE ORDER RE DAMAGES
EVALUATIONS AND DISCUSSIONS
WITH EXPERTS

#205.00 MOTION PLAINTIFF
DIKLA GAVRIELI UNATIN'S
MOTION TO COMPEL POST-
EFFECTIVE DATE TRUSTEE'S
AMENDED RESPONSES AND
PRODUCTION OF DOCUMENTS IN
RESPONSE TO SECOND SET OF
REQUESTS FOR PRODUCTION OF
DOCUMENTS

#206.00 MOTION TO COMPEL
CONTINUED DEPOSITION AND FOR
SANCTIONS FOR MRS. UNATIN'S
UNILATERAL TERMINATION OF HER
DEPOSITION

#207.00 MOTION TO COMPEL
DISCOVERY RESPONSES,
PRIVILEGE LOG, AND DOCUMENT
PRODUCTIONS

2

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SHERI BLUEBOND
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | JEFFREY M. REISNER, ESQ. (VIA ZOOM) |
| | Steptoe LLP |
| | 633 West Fifth Street |
| | Suite 1900 |
| | Los Angeles, CA 90071 |
| | (213)439-9400 |
| For Post-Effective Date Trustee: | RICHARD L. WYNNE, ESQ. |
| | Hogan Lovells US LLP |
| | 1999 Avenue of the Stars |
| | Suite 1400 |
| | Los Angeles, CA 90067 |
| | (310)785-4602 |
| | JUSTIN GREER, ESQ. |
| | ALLISON L. LIBEU, ESQ. |
| | Hueston Hennigan LLP |
| | 523 West 6th Street |
| | Suite 400 |
| | Los Angeles, CA 90014 |
| | (213)788-454 |
| For Dikla Gavrieli Unatin: | CHRISTOPHER E. PRINCE, ESQ. |
| | Lesnick Prince Pappas & Alverson LLP |
| | 315 West Ninth Street |
| | Suite 705 |
| | Los Angeles, CA 90015 |
| | (213)291-8984 |
| Also Present: | J. Michael Issa (Via Zoom) |
| | Kfir Gavrieli (Via Zoom) |
| | Dikla Unatin (Via Zoom) |
| | Dean Unatin (Via Zoom) |

eScribers, LLC

3

Court Recorder:                    DAWNETTE FRANCIS
                                   United States Bankruptcy Court
                                    Edward R. Roybal Federal Building
                                   255 East Temple Street
                                    Room 940
                                   Los Angeles, CA 90012
                                    (855)460-9641


Transcriber:                       RIVER WOLFE
                                    eScribers, LLC
                                   7227 N. 16th Street
                                    Suite #207
                                   Phoenix, AZ 85020
                                    (800) 257-0885

Proceedings recorded by electronic sound recording;
transcript provided by transcription service.

**Kfir Gavrieli; Gavrieli, et al. v. Gavrieli, et al.**

59

of indemnity.

The second half of the requests relates to what we call the Aspiration issue, which is Aspiration Partners is Joseph Sanberg's company and formed the basis of the plan and the backstop.  And according to the disclosure statement, it was Aspiration Partners' intention to go public, which satisfied the committee and the trustee that this plan was feasible.

I have spoken to the trustee of Aspiration, the Chapter 7 entity, and confirmed that Mr. Gavrieli signed a letter of intent on behalf of Gavrieli Brands with Aspiration, which was the basis of Joseph Sanberg's financial fraud.  I raised this with the trustee.  He went to Mr. Reisner and Mr. Gavrieli, who confirmed that was in fact the case that that LOI had been signed.  That's one of the documents that we're seeking.

And the damage to the company is Mr. Gavrieli has potentially involved Gavrieli Brands in a criminal enterprise for which a person has already gone -- going to be sentenced to prison, and Gavrieli Brands may be under criminal investigation.  And we're trying to figure that out.  And so that's also directly relevant to our to our claims.

And these two facts, the Wayfair issue and the Aspiration Partners issue, make the entire theory of the trustee's proceeding with this litigation impossible.  They

**Kfir Gavrieli; Gavrieli, et al. v. Gavrieli, et al.**

60

will never be able to get indemnity for when Mr. Gavrieli has done these.

THE COURT:  What does that got to do with getting documents from the trustee when he's already said he doesn't have it?  Sounds like you know an awful lot about this.

MR. PRINCE:  It's --

THE COURT:  So --

MR. PRINCE:  I was responding to --

THE COURT:  To the --

MR. PRINCE:  -- Counsel's repeated statements that he was dying to do a summary judgment.  That we have nothing going on.  That this is all smoke and mirrors.  And I'm identifying two specific issues that we're seeking discovery about and the trustee is saying he knows nothing about.  And that's what's going on.

And because I have already conveyed to counsel that there's no point in us seeking a hundred million dollars in damages, twenty million dollars in damages in the derivative action.  The estate has no money.  Unatin's claim is not going to be paid at all, let alone in full.  And the entire purpose of this litigation right now, according to the trustee -- I mean, this was put into papers in response to my motion.  The trustee has said the entire purpose of their defending this litigation is to obtain a claim for indemnity against Gavrieli Brands, which, by the way, is running out of cash and has a

Case 2:21-ap-01034-BB   Doc 383   Filed 04/28/26   Entered 04/28/26 22:25:17   Desc
Main Document      Page 167 of 170
**Kfir Gavrieli; Gavrieli, et al. v. Gavrieli, et al.**

61

ten-million-dollar-plus sales tax liability.  And so I don't know what that indemnity claim is going to be worth by the time they've run through all the money in the estate.  So I just really -- if Mr. Wynne got up --

THE COURT:  Well, thank you for thoroughly depressing me and making me feel like we're all completely wasting our time.  I really appreciate that.

MR. PRINCE:  I think we are, to be honest.

MR. WYNNE:  Your Honor, yeah.

No.  No.  No.  Allison, I have to respond.  Sorry.

THE COURT:  Frankly, a lot of this sounds like -- a lot of this sounds like you're starting to get into confidential settlement negotiations you ought not to be telling me about anyway.  Sounds like Mr. Reisner wanted to say something but think --

MR. WYNNE:  No, I'm going to cut Mr. Reisner off too.

THE COURT:  Okay.

MR. WYNNE:  Your Honor, I was tempted to move to strike what Mr. Prince was saying.  But actually, I wanted to let him say whatever he wanted to say.

And what I'm going to say is that these are issues that, yes, we've discussed in various forums recently.  Doesn't impact what I think we want to do with respect to moving for summary judgment.  Mr. Prince will defend on whatever new theories or speculative allegations or conspiracy theories, as

62

I put them, that he wants to bring up.  And we'll deal with that.

All I want to do is get this either to a position where we're going to move for summary judgment, and we're going to prevail because this is -- the interesting thing is that Mr. Prince basically said there's no purpose for their pursuing this litigation.  I agree.  I've had that position for years because there's not going to be any money there at the end of the day if they prevail on any of these theories.  They don't have a damages expert.  They've come up with nothing.

And now, they've got a bunch of new theories about Wayfair liability or now, all of a sudden, now, Mr. Gavrieli was in on Mr. Sanberg's criminal conspiracy.  Well, I don't know.  If there's a grand jury going on, I don't know about it.  I wouldn't know about it.  I'll find out about it, just like I found out when Mr. Sanberg got indicted.

But we're going to proceed with trying to finish and administer this estate.  And if there's some defense that way, great.  We'll hear it at the time.  And if we can't get summary judgment, we'll go to trial because we have to finish.  We have to move on.  And all that we've seen so far has been a lot of delay and a lot of obstruction and a lot of smoke and mirrors.

THE COURT:  Okay.  All right.

MR. WYNNE:  So I'm sure Mr. Reisner would like to deal with this.  I'm sure Ms. Libeu would like to deal with this.  I

82

C E R T I F I C A T I O N

I, River Wolfe, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

/s/ RIVER WOLFE, CDLT-265

eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020

Date:  March 25, 2026

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

620 Newport Center Drive, Suite 1300, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*): <u>POST-EFFECTIVE DATE TRUSTEE J. MICHAEL ISSA'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT TO ADD ALLEGATIONS REGARDING WAYFAIR LIABLITY AND MODIFICATION OF SCHEDULING ORDER</u>
_____
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>4/28/26</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

> Christopher E. Prince
> LESNICK PRINCE PAPPAS & ALVERSON LLP
> 315 West Ninth Street, Suite 705
> Los Angeles, CA 90015
> cprince@lesnickprice.com

☐                                                Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.
☐                                                Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) __3/04/26_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Sheri Bluebond
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1534 / Courtroom 1539
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 4/26/28 | Kristin McCarthy | /s/ Kristin McCarthy |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                         **F 9013-3.1.PROOF.SERVICE**